# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IOWA PUBLIC EMPLOYEES' RETIREMENT
SYSTEM, ORANGE COUNTY EMPLOYEES
RETIREMENT SYSTEM, and SONOMA
COUNTY EMPLOYEES' RETIREMENT
ASSOCIATION, on behalf of themselves and all
others similarly situated,

        Plaintiffs,

        - against -

BANK OF AMERICA CORPORATION;
MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED; MERRILL LYNCH
L.P. HOLDINGS, INC.; CREDIT SUISSE AG;
CREDIT SUISSE GROUP AG; CREDIT
SUISSE SECURITIES (USA) LLC; CREDIT
SUISSE FIRST BOSTON NEXT FUND, INC.;
THE GOLDMAN SACHS GROUP, INC.;
GOLDMAN, SACHS & CO. LLC; GOLDMAN
SACHS EXECUTION & CLEARING, L.P.; J.P.
MORGAN CHASE & CO.; J.P. MORGAN
SECURITIES LLC; J.P. MORGAN PRIME,
INC.; J.P. MORGAN STRATEGIC
SECURITIES LENDING CORP.; J.P. MORGAN
CHASE BANK, N.A.; MORGAN STANLEY;
MORGAN STANLEY CAPITAL
MANAGEMENT, LLC; MORGAN STANLEY
& CO. LLC; PRIME DEALER SERVICES
CORP.; STRATEGIC INVESTMENTS I, INC.;
UBS GROUP AG; UBS AG; UBS AMERICAS
INC.; UBS SECURITIES LLC; UBS
FINANCIAL SERVICES INC.; EQUILEND
LLC; EQUILEND EUROPE LIMITED; and
EQUILEND HOLDINGS LLC,

        Defendants.

No. 17 Civ. 6221

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

OVERVIEW OF THE ACTION .................................................................................1

JURISDICTION AND VENUE ...............................................................................13

PARTIES .................................................................................................................14

     A.     Plaintiffs ..................................................................................14

     B.     Defendants ...............................................................................15

FACTUAL ALLEGATIONS ...................................................................................23

I.      OVERVIEW OF THE STOCK LOAN MARKET .......................................23

     A.     History of the Stock Loan Market ............................................23

     B.     Deficiencies of Today's OTC Stock Loan Market .................29

II.     DEFENDANTS CONSPIRE TO BLOCK COMPETITION IN THE STOCK LOAN MARKET...................................................................33

     A.     The Prime Broker Defendants Create EquiLend to Protect their Economic Interests in the Industry..................................34

     B.     Defendants Block the Development of AQS' Trading, Execution, and Clearing Platform...........................................37

     C.     Defendants Block the Development of SL-x's Trading, Execution, and Clearing Platform.......................................45

     D.     Defendants Block Data Explorers and Markit from Providing Additional Pricing Data ......................................50

     E.     Faced With The Threat of Basel III, Defendants Collectively Conspire to Take Control of AQS and Central Clearing.........................................................54

II.     ABSENT A CONSPIRACY, THE STOCK LOAN MARKET WOULD BE FAR MORE COMPETITIVE, EFFICIENT, AND TRANSPARENT FOR THE BUY SIDE..................................................................................63

III.    DEFENDANTS' HISTORY OF COLLUSION IN THE FINANCIAL MARKETS ...............................................................66

     A.     Municipal Bond Investments Market.......................................66

     B.     LIBOR Market ........................................................................68

C.      Foreign Currency Exchange Spot Market....................................................68

D.      Interest Rate Swaps (ISDAfix) ...................................................................72

E.      Credit Default Swaps ..................................................................................73

CLASS ACTION ALLEGATIONS ....................................................................74

IV.     EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS ...............................77

CAUSES OF ACTION ........................................................................................80

FIRST CAUSE OF ACTION (CONSPIRACY TO RESTRAIN TRADE IN
         VIOLATION OF SECTION 1 OF THE SHERMAN ACT)............................80

SECOND CAUSE OF ACTION (UNJUST ENRICHMENT UNDER NEW YORK
         LAW) .......................................................................................................81

PRAYER FOR RELIEF ......................................................................................82

JURY DEMAND ...............................................................................................84

Plaintiffs Iowa Public Employees' Retirement System ("IPERS"), Orange County Employees Retirement System ("OCERS"), and Sonoma County Employees' Retirement Association ("SCERA") (collectively, "Plaintiffs"), individually and on behalf of all persons and entities who from January 7, 2009, through the present (the "Class Period") entered into stock loan transactions with Bank of America, Goldman Sachs, Morgan Stanley, Credit Suisse, JP Morgan, or UBS (collectively, the "Prime Broker Defendants") in the United States, bring this antitrust class action for treble damages and injunctive relief and allege as follows:

## OVERVIEW OF THE ACTION

1.     To paraphrase Tolstoy, all efficient markets resemble one another, but each inefficient market is inefficient in its own way. This case concerns a market variously called the "stock loan," "stock lending," or "securities lending" market. It is one of the largest and most important financial markets that exists in the world today.

2.     Unlike many other financial markets, the stock loan market has not evolved to reflect the ways in which modern technology can facilitate efficient and transparent electronic trading. Instead, the stock loan market remains an inefficient, antiquated, and opaque over-the-counter ("OTC") trading market dominated by large dealer banks, principally the Prime Broker Defendants. These banks have structured the market in such a way that they take a large cut of nearly every stock loan trade that is made. This arrangement is good for the Prime Broker Defendants. But it is bad for virtually everyone else, including the class members in this case.

3.     The stock loan market has long been ready to evolve to a modern, efficient market in which stock borrowers and lenders[1] (typically hedge funds and pension funds) could execute

---

[1]  Where applicable, the term "lender" includes both the beneficial owner of a security and any agent or agents it may employ.

stock loan trades on electronic platforms at lower costs and with better returns. But the Prime Broker Defendants conspired to keep stock loan trading frozen in an inefficient and opaque OTC market in order to preserve their privileged position as intermediaries on every trade. As described in detail below, the Prime Broker Defendants preserved this antiquated system by taking collective action to boycott trading platforms which sought to enter the market and which threatened to increase transparency and competition. Defendants were highly motivated to conspire: their privileged position as an intermediary on every trade had long generated massive and virtually risk-free profits for their firms, which they enjoyed year after year.

4.     Stock lending is the temporary transfer of stock from one investor to another investor. It plays a vital role in maintaining the liquidity of financial markets and is the fundamental process underlying most short selling activity. Short selling without stock borrowing is referred to as "naked" short selling, which is illegal under U.S. Securities and Exchange Commission ("SEC") rules. By contrast, short selling coupled with stock borrowing is lawful because it strengthens markets and reduces systemic risk.

5.     Stock lending improves the performance of pension funds, mutual funds, university endowments, and other entities that buy and hold large quantities of shares of public companies. Lending shares allows these institutional investors to earn a cash return on their investments while holding a stable interest in publicly-traded companies. This, in turn, puts additional money in the pockets of American workers and retirees.

6.     The stock loan market has grown exponentially in size and importance over the last four decades. Prior to the 1960s, stock lending volumes were negligible; today, there are approximately $1.72 *trillion* worth of securities on loan. But the structural framework of the market has not maintained pace with this growth. Despite the dramatic increase in its size and

importance, stock lending has not evolved with the times.  It has yet to embrace modern electronic trading protocols, and little has changed in the way trades are executed.  As a consequence, the stock loan market is one of the most closed, inefficient, and opaque markets the world has ever known.  Market observers describe stock lending as a "$2 trillion 'dark pool'" or the "mother of all dark pools."[2]

7.     Unlike, for example, the market for stocks themselves, there is no central marketplace for stock loan transactions.  Borrowers and lenders have no way to transact with each other directly.  They must instead transact through intermediaries.  Hedge funds and investors that short stock are not allowed to borrow stock themselves, but rather must go through the prime brokerage departments of the major banks, while lenders of stock have no means to interact directly with borrowers.  The Prime Broker Defendants are the dominant players in this industry, and they take a cut of nearly every stock loan transaction conducted in the United States.

8.     The cut taken by the Prime Broker Defendants is massive.  In 2016, for example, the Prime Broker Defendants skimmed approximately ***60%*** off a pot of some $9.15 billion in total industry revenue.[3]  These profits far exceed any benefit or service provided by the Prime Broker Defendants, who take virtually no risk in brokering these transactions.  They are a drain

---

[2]   Terry Flanagan, *Securities Lending:  A $2 Trillion 'Dark Pool,'* MARKETS MEDIA (Apr.  17, 2015), http://marketsmedia.com/securities-lending-a-2-trillion-dark-pool/.  A "dark pool" is a private exchange or trading venue that, unlike public exchanges, does not publish price quotations and is therefore opaque or "dark," as customers have little visibility as to price or market conditions.

[3]   *See Sec Lending Experts Discuss Last Year's Top Trades,* Global Investor/ISF (Jan. 31, 2017), http://www.globalinvestormagazine.com/Article/3657556/Sec-lending-experts-discuss-last-years-top-trades.html.

on the American economy and result from market inefficiencies the Prime Broker Defendants have jointly cultivated and fought to maintain.

9.     The immediate victims are the class members in this case, who receive less favorable financial terms on every transaction they execute.  Borrowers typically have to depend on the Prime Broker Defendants to find the stock they need and have few means at their disposal to secure better financial terms.  Institutions with large portfolios of stock to lend (called "beneficial owners"), which are often pension funds and other institutional investors, similarly have no way to shop the universe of potential borrowers.  They, too, must rely on the Prime Broker Defendants to find counterparties (often hedge funds) willing to borrow their shares.

10.     Because of this inefficient OTC market structure, borrowers and lenders are unable to see real-time pricing and cannot drive price competition.  If market participants could meet in a central electronic marketplace, the liquidity and transparency that would result would drive down spreads.[4]  And the need for the Prime Broker Defendants to act as a middleman on every trade would be reduced and, in time, possibly eliminated altogether.

11.     The Prime Broker Defendants have long known that, left to evolve naturally, the stock loan market would become more efficient and transparent and eventually move to "all-to-all" electronic trading like most major financial markets have — including the markets for publicly-traded stocks.  "All-to-all" electronic trading provides greater price transparency, expands the number and type of potential counterparties, and does not involve a "middleman" between the buyer and seller that captures enormous, opaque fees that are vastly disproportionate

---

[4]   In the stock loan market, the "spread" refers to the difference between what a lender receives and a borrower pays for a given stock.  A pension fund, for example, might receive a lending fee of only 20 basis points on a stock for which a hedge fund paid a 50 basis points borrowing fee.  The spread in this example would be 30 basis points, virtually all of which is collected by the Prime Broker Defendants.

to simple sponsored access to the market.  As a consequence, it results in significantly better prices for both sides of a stock loan transaction.

12.     Recognizing the nascent threat posed by all-to-all electronic trading, the Prime Broker Defendants took steps to organize themselves into a working cartel.  Their first step was to form a "dealer consortium" to protect their mutual interests.

13.     Specifically, in 2001, Barclays Global Investors, Bear, Stearns & Co., Goldman Sachs Group Inc., J.P. Morgan Chase & Co., Lehman Brothers Holdings Inc., Merrill Lynch & Co., and Morgan Stanley, along with a handful of other market participants, formed a company called EquiLend.[5]  The stated purpose of EquiLend was to "optimize efficiency in the securities finance industry by developing a standardized and centralized global platform for trading and post-trade services."[6]  But the unstated purpose was to set up a vehicle through which the Prime Broker Defendants could protect their privileged role as a broker on every stock loan trade. *Global Custodian*, an industry publication, aptly described EquiLend as a "cartel-cum-service provider" formed to protect the "economics" of an industry which "doubled or tripled the price" of lent securities "before passing them on to hedge fund managers."[7]

14.     Having formed EquiLend, the Prime Broker Defendants made it clear to market participants that all new entrants into the market would need to go through EquiLend.  EquiLend members such as Goldman Sachs (through Head of Global Securities Lending at Goldman Sachs and EquiLend Board member William Conley) and Morgan Stanley (through Morgan Stanley

---

[5]   Credit Suisse became the 11th co-owner of EquiLend in May of 2005.

[6]   *See About Us,* EQUILEND, http://www.equilend.com/about/.

[7]   *Hybrid or horror:  Can custody and prime brokerage be mixed?*, GLOBAL CUSTODIAN (December 01, 2009), https://www.globalcustodian.com/Magazine/2009/Winter-/Hybrid-or-horror--Can-custody-and-prime-brokerage-be-mixed-.

managing director Thomas Wipf), repeatedly used the *same language* in private conversations with different start-ups seeking to sign up prime brokerage departments on their platforms between 2009 and 2016.  EquiLend provided a convenient place for the Prime Broker Defendants to meet, and the Prime Broker Defendants used membership in EquiLend as a pretext to meet and discuss how to protect their collective interests in the stock loan market.  The Prime Broker Defendants whose representatives served on EquiLend boards and committees discussed threats they saw to their privileged position in the market and how to combat them.

15.     A major threat the Prime Broker Defendants identified was Quadriserv, Inc. ("Quadriserv" or "Quadriserv/AQS"), a start-up platform for stock lending.  In the mid-2000s, Quadriserv built an electronic platform, AQS, that would allow borrowers and lenders to transact anonymously in the stock loan market.  On January 7, 2009, Quadriserv announced that it had reached an agreement with the Options Clearing Corporation ("OCC") — the world's largest derivatives clearing organization — whereby OCC would provide "clearinghouse services and act as the central counterparty for all securities lending transactions submitted through [Quadriserv's] AQS Platform."[8]

16.     Central clearing virtually eliminates counterparty risk by interposing a "clearinghouse" between the two counterparties to the loan.  The clearinghouse becomes the borrower to every lender and the lender to every borrower.  In the event one party fails to meet its obligations, the clearinghouse steps in and assumes the obligation.  The clearinghouse maintains sufficient capital to stand behind every trade it clears.  By doing so, the clearinghouse creates a more efficient market and mitigates systemic risk, allowing borrowers and lenders to

---

[8] *OCC Formalizes Agreement With Quadriserv To Launch Centralized Securities Lending Marketplace,* OCC, https://www.theocc.com/about/newsroom/releases/2009/01_07.jsp.

trade without concern of counterparty default.  Quadriserv/AQS, by working with OCC, was thus able to offer a platform that would "match lenders and borrowers using a hybrid auction and continuous price discovery mechanism" where "matched loans will be processed through the OCC, which will provide central counterparty guarantees."[9]

17.     But the Prime Broker Defendants viewed central clearing as a dangerous pathway through which others could challenge their grip on the stock loan market.  As one industry veteran summarized, the very "idea of a securities lending CCP [central counterparty] is anathema to the broker-dealers that continue to intermediate loans to hedge funds by beneficial owners and their custodians."[10]  The Prime Broker Defendants discussed Quadriserv/AQS and how to deal with the threat it posed numerous times in connection with multiple EquiLend board meetings and other venues.

18.     Quadriserv publicized that AQS could "enhance the profitability and performance of lenders and borrowers alike by reducing spreads, and increasing the overall efficiency of the securities lending marketplace."[11]  The Prime Broker Defendants, however, saw Quadriserv as a threat to their profits and to their privileged position.  As a result, they jointly resolved to take action to eliminate AQS as a threat.

19.     First, the Prime Broker Defendants each told Quadriserv/AQS that it should turn its platform into a dealer-only platform that barred lenders and borrowers of securities.  After

---

[9]  *Id.*

[10]  *The Legends:  Joe Weinhoffer,* GLOBAL CUSTODIAN, https://www.globalcustodian.com/GC-Legends/Weinhoffer,-Joe/.

[11]  *Quadriserv, Inc. Highlights Securities Lending Innovations At TradeTech 2007,* NASDAQ- GLOBENEWSWIRE (March 9, 2007), https://globenewswire.com/news-release/2007/03/09/356337/115225/en/Quadriserv-Inc-Highlights-Securities-Lending-Innovations-At-TradeTech-2007.html.

AQS/Quadriserv refused to acquiesce to this parallel "request," the Prime Broker Defendants used threats and intimidation to discourage their customers from using the platform. In one example, in 2012, Defendant Goldman Sachs threatened Bank of New York Mellon ("BNY Mellon") that, if it continued to support the AQS platform, Goldman would return BNY Mellon's collateral and stop doing business with it. Given Goldman's size and clout, BNY Mellon quickly abandoned its activity on AQS. The Prime Broker Defendants' collective boycott of AQS starved it of needed liquidity, and AQS spent years trying to stay afloat.

20.     Starting in late 2010, a new stock lending platform called SL-x emerged. This platform also threatened the Prime Broker Defendants' lucrative position as intermediaries of every stock lending trade. Like AQS, SL-x offered an electronic platform for stock loans, including real time pricing information and central clearing of stock loans. As with AQS, the Prime Broker Defendants again presented a united front to block it: each one refused to transact business on SL-x's platform, and they told SL-x executives that if SL-x wanted to do any business in stock loans, it could only happen through their controlled entity, EquiLend.

21.     As with AQS, Defendants threatened clients with retaliation if they moved any of their stock lending transactions to SL-x. They also used their influence with two separate clearinghouses to block SL-x's access to central clearing. These concerted actions had their intended effect, and SL-x ran out of funding, forcing it to shut down its platform in September 2014, after only six months in operation.

22.     Defendants also took concerted action to prevent similar threats from emerging in the future. They used EquiLend jointly to purchase SL-x's intellectual property rights, including patents that SL-x had secured to protect its core functionality. Defendants had no plan to use

these patents — instead, they put them on the shelf, secure in the knowledge that no future

entrant could offer the same functionality in the future to challenge their stock loan hegemony.

23.     The Prime Broker Defendants also took steps to block offerings that improved

price transparency, recognizing that increased transparency would itself present a threat to their

inflated profits.  As noted, in the OTC stock loan market, borrowers and lenders do not have

access to real-time pricing.  As in many OTC markets, trading volumes and prices could only be

estimated based upon discretionary self-reports and incomplete data from service providers.

Such reports were typically at least a day late and limited in scope.  The Prime Broker

Defendants benefitted from this opacity because it made it difficult, if not impossible, for

borrowers and lenders to engage in price discovery.  Put more bluntly, price opacity allowed the

Prime Broker Defendants to maintain their ability to take large cuts of every transaction (in the

form of spreads) without borrowers and lenders knowing the degree to which they were being

fleeced.

24.     Any platform or service that provided increased access to pricing data would have

been widely embraced by market participants.  One entity, called Data Explorers, tried to bring

increased access to pricing data to the market.  Formed in 2002 by, among others, the author of

the *Guide to Securities Lending Markets,* Data Explorers steadily gained access to wholesale

pricing data, which the Prime Broker Defendants provided to Data Explorers in return for

analyses of, among other things, their market shares.

25.     By 2011, Data Explorers was determined to meet the demand of borrowers and

lenders for price transparency, and began marketing pricing data directly to agent lenders, asset

managers, and pension funds in the United States.  Fearing that its access to data would be cut

off, Data Explorers did not immediately offer real, wholesale pricing data (that would, for

example, let a pension fund lender know how much the Prime Broker Defendants were charging hedge funds for borrowing the stock it had lent), but it did offer such things as performance data. Performance data would let a beneficial owner know, for example, whether the price it was receiving for lending, say, Vodafone shares, was in line with market prices. Even that type of data would have been a major step forward for the buy side. These offerings were in great demand, and Data Explorers began signing up many beneficial owners in the United States as customers.

26.     These actions by Data Explorers alarmed the Prime Broker Defendants. William Conley of Goldman Sachs, for example, reportedly stated that the Prime Broker Defendants would set up a competing data business "to ensure that beneficial owners never see wholesale data . . . if that ever happens, it will kill our business." True to Mr. Conley's words, and as detailed further below, the Prime Broker Defendants moved in concert to extinguish the threat posed by Data Explorers. Among other things, the Prime Broker Defendants agreed amongst themselves that none of them would allow their pricing data to be released to beneficial owners. They set up a competing data business called DataLend as a division within EquiLend, and each agreed in parallel to provide their pricing data to DataLend with the same restrictions on its use — most importantly, that it would not be released to beneficial owners.

27.     After having announced DataLend in June 2012, the Prime Broker Defendants then directed it to go out to the market, including to those customers that had signed up with Data Explorers, to inform them that no Prime Broker Defendant data would be released in wholesale form to beneficial owners. They also told the agent lenders who had signed up with Data Explorers that DataLend would begin providing comparable data to them at very little cost and, in some cases, virtually for free. Because of these actions, Data Explorers — which now

faced questions about Defendant-controlled DataLend at every sales meeting — incurred a huge financial blow.  Steadily losing numerous clients and revenue opportunities, it started cutting staff in 2013 and 2014.  The net result is that the market today is as opaque as ever.  Because of the agreed-upon restrictions on the release of pricing data imposed by the Prime Broker Defendants, a pension fund is unable to know how much hedge funds are charged for borrowing the securities they lend.

28.     By 2016, the Prime Broker Defendants came under tremendous pressure as a result of Basel III[12] to begin clearing all of their stock loan trades.  They recognized, however, that the advent of central clearing would increase the risk of a central electronic marketplace developing.  They therefore resolved to begin building their own paths to central clearing through the OCC and another clearing entity named Eurex.  They did so with the collective goal of controlling the clearing of stock loan trades so that new entrants could not clear trades executed on their platforms without the Prime Broker Defendants' approval.  The Prime Broker Defendants also recognized that AQS was the only non-dealer-controlled product that offered centrally cleared, all-to-all stock loan trading.  To ensure that all stock loan transactions must travel through a "gateway" under their joint control, Morgan Stanley and Goldman Sachs hatched a plan that Morgan Stanley gave the codename "Project Gateway."

29.     Project Gateway was created through one-on-one discussions at restaurants between senior executives at Morgan Stanley and Goldman Sachs, including those identified by name below.  Having agreed on the plan, Morgan Stanley and Goldman Sachs took it to their

---

[12]   "Basel III" is a set of measures, developed by the Basel Committee on Banking Supervision and adopted in large part by the United States Federal Reserve, that, *inter alia*, imposed new capital requirements on the Prime Broker Defendants for bilateral securities lending transactions.  Centrally cleared securities lending transactions, however, were treated much more favorably by the Basel III regulatory requirements.

counterparts at the other Prime Broker Defendants, who agreed to join the plan.  As a result of their joint pursuit of Project Gateway, the Prime Broker Defendants collectively (again, via the vehicle of EquiLend) took a controlling ownership stake in AQS in late 2016 in order to ensure that they would control all commercially viable paths to central clearing.

30.     Absent their joint action as part of Project Gateway, the stock loan market would be much more like the modern, electronic, U.S. stock market, instead of a "$2 trillion dark pool." Stock lenders and borrowers would be able to discover publicly-available prices.  Lenders and borrowers would be able to meet on the trading platform of their choice and, if they chose AQS, would enjoy having their trades centrally cleared through the OCC.  Spreads would be lower for lenders and borrowers alike.  But this could only have occurred if an option like AQS, connected to a major clearing house like the OCC, existed and was not effectively destroyed by the Prime Broker Defendants.

31.     The Prime Broker Defendants had no intent actually to use AQS.  As they had done with SL-x's patents, they took control of AQS only to neutralize it as a threat.  Following the acquisition of AQS, the Prime Broker Defendants effectively shut it down.  The Prime Broker Defendants generally do not use it for transactions, and they certainly do not use it for centrally-cleared trades.  They have made no effort to develop AQS's technology and assets, confirming the main purpose of the purchase was to prevent AQS from threatening the Prime Broker Defendants' control of the market.

32.     As a result of these various actions, and others detailed herein, one of the world's largest and most important markets remains antiquated, opaque, and inefficient.  This action is

brought under the federal antitrust laws to address the "supreme evil of antitrust"[13] — collusion among companies that are, in our free market economy, supposed to compete.  Here, as detailed below, Defendants conspired to eliminate competition to their exclusive control of the stock lending market.

## JURISDICTION AND VENUE

33.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the Class, alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

34.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

35.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22.  Venue is also proper pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

36.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

37.     Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, all Defendants are subject to personal jurisdiction in the United States because they were formed in

---

[13]   *Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004).

or have their principal places of business in the United States.  Additionally, all members of the

conspiracy are subject to personal jurisdiction in the United States because the conspiracy was

directed at, carried out in substantial part in, and had the intended effect of, causing injury to

Plaintiffs and class members residing in, located in, or doing business throughout the United

States.  For example, Defendants directly conspired through and with EquiLend, whose principal

place of business is in New York City.  They also met and conspired at EquiLend Board of

Directors meetings in New York City and elsewhere, including at private dinners in New York

City.

38.     Defendants are also subject to personal jurisdiction because each transacted

business throughout the United States, including in this District, that was directly related to the

claims at issue in this action.  Specifically, the stock loans at issue were regularly traded through

the desks of the Prime Broker Defendants located in New York City.  The Prime Broker

Defendants are also subject to personal jurisdiction here because their affiliates and subsidiaries

conducted stock lending in the United States as their agents, and if they did not, the Prime

Broker Defendants would have to have made those trades themselves.

**PARTIES**

A.     **Plaintiffs**

39.     Plaintiff Iowa Public Employees' Retirement System ("IPERS") was founded by

the Iowa Legislature in 1953 and its primary purposes are "to provide a secure core retirement

benefit to Iowa's current and former public employees, as well as attracting and retaining quality

public service employees."  IPERS has over $31 billion in assets, collects over $1 billion in

contributions every year, and pays nearly $2 billion in retirement, death, and disability benefits

every year.  It has 350,000 members and beneficiaries.  Between 2009 and the present, IPERS

has lent significant volumes of stock to the Prime Broker Defendants and their stock borrower clients.

40.     Plaintiff Orange County Employees Retirement System ("OCERS") is organized under California's County Employee Retirement Law of 1937, Cal. Gov't Code §§ 31450 *et seq.*, and has been providing retirement, death, disability, and cost-of-living benefits to employees of Orange County and certain districts for over 70 years.  OCERS has over $14 billion in assets. Between 2009 and the present, OCERS has lent significant volumes of stock to the Prime Broker Defendants and their stock borrower clients.

41.     Plaintiff Sonoma County Employees' Retirement Association ("SCERA") is organized under California's County Employee Retirement Law of 1937, Cal. Gov't Code §§ 31450 *et seq.*, and provides benefits to thousands of employees of Sonoma County and has assets of approximately $2.4 billion.  Between 2009 and the present, SCERA has lent significant volumes of stock to the Prime Broker Defendants and their stock borrower clients.  It has also borrowed significant volumes of stock from its prime broker, Defendant Credit Suisse.

**B.     Defendants**

42.     Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

43.     Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.  Until sometime after BAC's 2009 acquisition of Merrill Lynch & Co., BAC offered prime brokerage services through its subsidiary Banc of America Securities LLC, a

limited liability company organized under the laws of the State of Delaware with its principal

place of business in New York, New York.  Banc of America Securities LLC merged into

Defendant MLPFS effective November 1, 2010.

44.     On January 1, 2009, BAC acquired Merrill Lynch & Co., Inc. and its subsidiaries.

Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation

organized and existing under the laws of the State of Delaware with its principal place of

business in New York, New York.  It is a wholly-owned subsidiary of BAC.  MLPFS is

registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and is

a clearing Member of the OCC.  Defendant Merrill Lynch L.P. Holdings, Inc. (MLLPH) is a

corporation organized under the laws of the state of Delaware with its principal place of business

in Charlotte, North Carolina.  It is a subsidiary of BAC.  MLLPH is a part owner of EquiLend

through Defendant EquiLend Holdings LLC.

45.     As used herein, the term "**Bank of America**" includes Defendants BAC, MLPFS,

MLLPH and their parents, subsidiaries, and affiliates (including Banc of America Securities

LLC).  During the Class Period, Bank of America directly engaged in stock lending transactions

with class members.  Bank of America agreed with the other Defendants to boycott AQS and

SL-x (and then acquire them) and thwart Data Explorers.  During the Class Period, Bank of

America was a co-owner of EquiLend and Bank of America employees served on EquiLend's

Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[14]  Bank of America

employees served on the OCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014,

---

[14]   Information about EquiLend's Board of Directors prior to 2012 is not currently
publicly accessible.

2015, 2016, and 2017 and on the Depository Trust Clearing Corporation's ("DTCC") Board of

Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

46.     Defendant Credit Suisse Group AG ("CSG") is a corporation organized and

existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.

Defendant Credit Suisse AG ("CS") is a corporation organized and existing under the laws of

Switzerland with its principal place of business in Zurich, Switzerland.  It is a wholly-owned

subsidiary of CSG.  Defendant Credit Suisse Securities (USA) LLC ("CSSUS") is a limited

liability company organized and existing under the laws of the State of Delaware with its

principal place of business in New York, New York.  CSSUS is a wholly-owned subsidiary of

CS, and thus ultimately of CSG.  CSSUS is registered as a broker-dealer with the SEC, and is a

clearing Member of the OCC.  Defendant Credit Suisse First Boston Next Fund, Inc.

("CSFBNF") is a corporation organized and existing under the laws of the State of Delaware

with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of

CS, and thus ultimately of CSG.  CSFBNF is a part owner of EquiLend through Defendant

EquiLend Holdings LLC.

47.     As used herein, the term "**Credit Suisse**" includes Defendants CSG, CS, CSSUS,

CSFBNF, and their parents, subsidiaries, and affiliates.  Credit Suisse transacts business in New

York, New York.  During the Class Period, Credit Suisse, directly or through its affiliate agents,

engaged in securities lending with class members.  Credit Suisse agreed with the other

Defendants to boycott AQS and SL-x (and then acquire them) and thwart Data Explorers.

During the Class Period, Credit Suisse was a co-owner of EquiLend and Credit Suisse employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[15]

48.     Defendant The Goldman Sachs Group, Inc. ("GSG") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  GSG is a direct part owner of EquiLend through Defendant EquiLend Holdings LLC.  Defendant Goldman Sachs & Co. LLC ("GSC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  GSC is a wholly-owned subsidiary of GSG, is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.  Defendant Goldman Sachs Execution & Clearing, L.P. ("GSEC") is a Limited Partnership organized and existing under the laws of the State of Utah, with its principal place of business in New York, New York.  GSEC is or was until recently a wholly-owned subsidiary of GSG, is registered as a broker-dealer with the SEC, and engaged in prime brokerage services in the United States before transferring its brokerage services to GSC in 2016.

49.     As used herein, the term "**Goldman Sachs**" includes Defendants GSG, GSC, GSEC, and their parents, subsidiaries, and affiliates.  During the Class Period, Goldman Sachs, itself and through its affiliate agents, directly engaged in securities lending transactions with class members.  Goldman Sachs agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and thwart Data Explorers.  During the Class Period, Goldman Sachs was a co-owner of EquiLend and Goldman Sachs employees served on EquiLend's Board of Directors

---

[15]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[16] Goldman Sachs employees served on the OCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017 and on DTCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

50.    Defendant J.P. Morgan Chase & Co. ("JPMC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant J.P. Morgan Securities LLC ("JPMS") (formerly known as "J.P. Morgan Securities Inc.") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York.  JPMS is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.  JPMS is also the successor in interest to J.P. Morgan Clearing Corp., itself a successor to Bear Stearns Securities Corp.  Both J.P. Morgan Clearing Corp. and Bear Stearns Securities Corp. were engaged in prime brokerage services in the United States, and were part owners of EquiLend through Defendant EquiLend Holdings LLC.  J.P. Morgan Clearing Corp. merged with JPMS in 2016.  Defendant J.P. Morgan Prime, Inc. ("JPMP") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York.  JPMP is a wholly-owned subsidiary of JPMS, and thus ultimately of JPMC.  It is registered as a broker-dealer with the SEC, and provides primary brokerage services in the United States.  Defendant J.P. Morgan Strategic Securities Lending Corp. ("JPMSSL") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Wilmington, Delaware.  JPMSSL is a subsidiary of JPMC, and is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

---

[16]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

51.     Defendant J.P. Morgan Chase Bank, N.A. ("JPMCB"), a wholly-owned subsidiary of JPMC, is a federally chartered national banking association with its principal place of business in New York, New York.  JPMCB was formerly a part owner of EquiLend through Defendant EquiLend Holdings LLC.

52.     As used herein, the term "**JP Morgan**" includes Defendants JPMC, JPMS, JPMP, JPMSSL, JPMCB, and their parents, subsidiaries, and affiliates (including J.P. Morgan Clearing Corp. and Bear Stearns Securities Corp.).  During the Class Period, JP Morgan, itself and through its affiliate agents, directly engaged in securities lending transactions with class members.  JP Morgan agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and thwart Data Explorers.  During the Class Period, JP Morgan was a co-owner of EquiLend and JP Morgan employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017. [17]  JP Morgan employees served on the OCC's Board of Directors in 2009 and on DTCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

53.     Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley Capital Management, LLC ("MSCM") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  MSCM is a wholly-owned subsidiary of MS.  Defendant Morgan Stanley & Co. LLC ("MS&C") (formerly known as Morgan Stanley & Co., Inc.) is a limited liability company organized and existing under the laws of the State of Delaware, with its

---

[17]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

principal place of business in New York, New York.  MS&C is a registered broker-dealer with the SEC and a clearing Member of the OCC.  Defendant Prime Dealer Services Corp. ("PDSC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  PDSC is a wholly-owned subsidiary of MS&C, and thus ultimately of MS.  It is also a registered broker-dealer with the SEC.  PDSC engages in securities borrowing and lending in support of MS&C's prime brokerage services.  Defendant Strategic Investments I, Inc. ("SSII") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  SSII is an indirect subsidiary of MS and a part owner of EquiLend through Defendant EquiLend Holdings LLC.

54.     As used herein, the term "**Morgan Stanley**" includes Defendants MS, MSCM, MS&C, PDSC, SSII, and their parents, subsidiaries, and affiliates.  During the Class Period, Morgan Stanley, itself and through its affiliate agents, directly engaged in securities lending with class members.  Morgan Stanley agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and to thwart Data Explorers.  During the Class Period, Morgan Stanley was a co-owner of EquiLend and Morgan Stanley employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[18]  Morgan Stanley employees served on the OCC's Board of Directors in 2010, 2011, 2012, 2013, and 2014 and on DTCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

55.     Defendant UBS Group AG ("UBSG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich,

---

[18]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

Switzerland.  Defendant UBS AG is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland.  It is a wholly-owned subsidiary of UBSG.  Defendant UBS Americas Inc. ("UBSA"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut.  UBSA is a part owner of EquiLend through Defendant EquiLend Holdings LLC.  Defendant UBS Securities LLC ("UBSS") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York.  It is a subsidiary of UBSA, and thus ultimately of UBSG.  UBSS is a registered broker-dealer with the SEC and a clearing Member of the OCC.  Defendant UBS Financial Services Inc. ("UBSFS") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Weehawken, New Jersey.  UBSFS is a registered broker-dealer with the SEC and a clearing Member of the OCC.

56.    As used herein, the term "**UBS**" includes Defendants UBSG, UBS AG, UBSA, UBSS, UBSFS, and their parents, subsidiaries, and affiliates.  UBS maintains a New York branch and transacts business in New York, New York.  During the Class Period, UBS, itself and through its affiliate agents, directly engaged in securities lending with class members.  UBS agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and thwart Data Explorers.  During the Class Period, UBS was a co-owner of EquiLend and UBS employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017. [19]  UBS employees served on DTCC's Board of Directors in 2009.

---

[19]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

57.     Defendant EquiLend Holdings LLC a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant EquiLend LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  It is a subsidiary of EquiLend Holdings LLC.  Defendant EquiLend Europe Limited is a private limited company incorporated in England and Wales, with its principal place of business in London, United Kingdom.  It is a subsidiary of EquiLend Holdings LLC.

58.     As used herein, "**EquiLend**" includes Defendants EquiLend Holdings LLC, EquiLend LLC, EquiLend Europe Limited and their parents, subsidiaries, and affiliates. EquiLend is owned in part by Defendants Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS.  As explained below, EquiLend conspired with the Prime Broker Defendants to prevent the emergence of efficient electronic trading systems in stock lending markets.

## FACTUAL ALLEGATIONS

## I.     OVERVIEW OF THE STOCK LOAN MARKET

### A.     History of the Stock Loan Market

59.     Stock lending plays a vital role in today's capital markets.  Among other things, stock lending provides liquidity that reduces the cost of trading and promotes price discovery. The resultant increase in efficiency benefits the economy as a whole.  Stock lending has been called the "oil in the efficient market machine" — it is one of the most liquid and global of all financial markets.

60.     Stock lending allows market participants to sell stock they do not own with confidence it can be borrowed prior to settlement.  Stock lending is the fundamental process that underlies most short selling activity.  Indeed, the ability to borrow stock freely underpins the

trading strategies of many hedge funds and asset managers.  Stock lending is also used for financing, through the lending of stock against cash.  These transactions form an important part of money markets.  On the lending side, stock lending generates significant revenue for pension funds, money market funds, and other institutional investors.

61.     Despite the name, stock "loan" or "lending" transactions actually involve an exchange of legal title.  The lender transfers title of the security to the borrower — with an irrevocable obligation to return equivalent securities at a later date — and the borrower in turn transfers legal title of collateral to the lender.  The collateral is usually cash or safe securities like U.S. Treasuries.

62.     For OTC trades brokered by the Prime Broker Defendants, the collateral is typically between 102% and 105% of the market value of the security loaned.  But it may be higher depending on the credit quality of the counterparty and the volatility of the security.  The amount of cash required is higher for securities issued in currencies other than the U.S. dollar. The security is marked-to-market daily, with the corresponding required collateral adjusted accordingly.[20]

63.     Stock loans are typically "open," meaning the loan has no specific term or tenor. Either party can terminate the loan at any time.  When the trade concludes, the borrower returns the securities plus a fee that is equivalent to the "interest" earned on the security.  The lender is obligated to return the collateral.

---

[20]   Because the lender does not legally own the security while the loan is open, the lender does not have the right to vote the security during this time.  If the lender wants to vote the security, the lender needs to terminate the loan.  Similarly, the borrower will receive all dividends or other distributions made on the security while the loan is open.  To account for this, borrowers "manufacture" payments to lenders, equivalent to any distributions received in right of the security.

64.     Stock lending can be traced as far back as the market for U.S. Government war debt in the late 1700s and the privately traded market for U.S. and British stocks and bonds throughout the 1800s.  But the market truly became a dedicated financial service in the mid-1960s, as a flourishing U.S. economy attracted investors in numbers unseen since before the Great Depression.

65.     Mid-century economic growth drove new money into equity markets, where companies became more sophisticated in how they raised capital and used their shares to make acquisitions or restructure.  Convertible securities created the prospect of share class arbitrage, while mergers and acquisitions created opportunities to profit on the chance that deals might close by buying one company and selling another short.

66.     The dramatic rise in trading activity on Wall Street made it difficult for both exchanges and securities processing firms to maintain their normal course of business, causing massive settlement failures.  These events gave rise in the 1970s to improved trade process automation and the emergence of a nascent stock loan industry.  The stock loan process enabled securities firms to reduce the number of settlement failures by borrowing securities and providing them to arbitrageurs and other short sellers who needed to borrow securities to conduct their investment strategies.

67.     Suppliers of these securities initially were insurance companies, corporations, college endowment funds, and asset managers.  Later, following passage of the Employee Retirement Income Security Act ("ERISA"), public pension funds became large lenders of securities.  Throughout the 1970s and 1980s, large custodian banks (such as BNY Mellon and State Street) designed lending services that allowed the majority of institutional owners of securities to participate in the stock loan market.

68.     The growth of the stock loan market was matched by a concurrent increase in the demand for securities.  This in turn was fueled by an upsurge in equity option and derivatives trading.  Efficient options and derivatives pricing led to an explosion in trading volume, while the trading strategies underlying this growth relied on effective hedging and risk management — both of which required an ability to borrow and lend shares of stock.  That growth continued throughout the 1980s and 1990s with the advent of index products and complex trading strategies, all of which increased the demand from dealers and investors for borrowed shares to hedge market risks.

69.     Today, most stock loan activity occurs in order to facilitate equities trading strategies such as hedging and short selling.  When a hedge fund or other short-seller wants to hedge their investments in the public markets, or to cover an open short position, it must have access to the underlying security at issue.  It secures this access by "borrowing" the security from another market participant that holds large and mostly stable portfolios of securities, particularly shares in publicly-traded companies.

70.     Stock loan documentation is highly standardized.  Each uses a Master Securities Lending Agreement ("MSLA"), which provides uniformity for stock loan transactions.  The Prime Broker Defendants have established MSLA agreements with each of their lender agent and borrower clients.

71.     Stock lenders are often pension funds or mutual funds that invest on behalf of persons saving for retirement, for college, or for a first home.  The following figure illustrates the make-up of stock lenders in the market over the Class Period:[21]

---

[21]   Viktoria Baklanova, et al., *Reference Guide to U.S. Repo and Securities Lending Markets, Federal Reserve Bank of New York Staff Reports,* Staff Report No. 740, (Sept. 2015,



*Figure 1*

72.     Although stock lending has made *other* financial markets more efficient, and has contributed to the growth of the U.S. economy overall, the stock loan market itself has not evolved in the way financial markets typically do.  Stock loan remains almost exclusively an OTC market; it has not been improved, or scarcely even touched, by more modern, efficient trading methods.  By contrast, equities are almost entirely traded on technology-driven exchanges and other electronic platforms, and trades are processed immediately and sent to clearinghouses.

73.     In a typical equity transaction, for example, a purchaser will place an order on an exchange that uses a central order book.  Immediately after the order has been posted, a

rev. Dec. 2015),
https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr740.pdf.

technology-enabled algorithm matches the bids and offers and clears the trade.  Everything is done electronically, and there is full price transparency to all market participants.

74.    In contrast, the stock loan market lacks a central marketplace where buyers and sellers can meet directly.  Instead, when a hedge fund wants to borrow stock, its trader must call its prime broker on the telephone; the prime broker will give the hedge fund a price, and then it must go out and secure the stock, usually from an agent lender who manages a portfolio of stocks on behalf of numerous institutional investors.  The hedge fund has little or no insight into the price at which other parties might be willing to transact.

75.    The stock loan market today can be visualized, in simplified form, as follows:



*Figure 2*

76.     As Figure 2 illustrates, the ultimate borrowers of securities, like hedge funds, have no viable way to borrow securities directly from pension funds and other lenders.  Instead, they must borrow securities from their prime brokers — the Prime Broker Defendants here — who in turn source the requested securities from the lenders that actually hold them in long-term portfolios.[22]  It is only by going to the Prime Broker Defendants that lenders and borrowers can discover prices and execute securities lending transactions.

77.     The Prime Broker Defendants dominate the market for securities lending.  The market for prime brokerage services — which encompasses securities lending — is highly concentrated, with the top 10 prime brokers accounting for approximately 89% of the market in 2017 (Prime Broker Defendants account for approximately 76%).  In 2014, the top 10 prime brokers accounted for 95% of the market (Prime Broker Defendants accounted for approximately 80%).  Focusing only on securities lending revenue, one 2013 analysis estimated that, of the top 10 prime brokers, the Prime Broker Defendants accounted for approximately 80% of securities lending-related revenue.

### B.     Deficiencies of Today's OTC Stock Loan Market

78.     The structural framework of the stock loan market has not maintained pace with the evolution of modern, efficient financial markets.  Although the stock loan market has dramatically increased in size and importance over the past four decades, little has changed in the way trades are executed.  The market remains stuck in an inefficient, antiquated, OTC market

---

[22]   The beneficial owners (*e.g.*, the pension or mutual funds) of the securities typically conduct their lending activity through lending agents who manage the beneficial owner's lending activity for a fee.  These are often the custodian banks that hold the security on behalf of the owner.  The complaint refers to the beneficial owner and its agent collectively as the lender.

where price transparency does not exists and the middlemen (the Prime Broker Defendants) charge supra-competitive prices to intermediate virtually every trade.

79.     In the stock loan market, institutions looking to borrow stock want to minimize borrowing costs, and institutions holding stock want to maximize returns by lending out stock that would otherwise sit idle.  The inefficient OTC structure of the stock loan market prevents borrowers and lenders from using the forces of competition to drive pricing.

80.     As a result, borrowers today complain that middleman pricing is volatile and opaque.  Lenders complain that they cannot lend out more than a small fraction of their available stock.  The inability of borrowers and lenders to find and transact with each other directly thus represents a massive waste of scarce economic resources, yielding artificially higher costs of investment and lower returns on investment.  All market participants would benefit from a more modern and efficient stock loan market.  The only entities who wants to keep things the same are the Prime Broker Defendants.

81.     One of the advantages of an exchange-based marketplace (such as exists in the U.S. stock market itself, as well as many other markets) is the availability of comprehensive real-time price data.  In the stock loan market, such data is unavailable to both borrowers and lenders. As in many OTC markets, trading statistics such as trading volumes and prices can only be guessed at based upon discretionary self-reports and incomplete data from service providers. Such reports are typically at least a day late and limited in scope.  Borrowers and lenders are left at a major disadvantage when trying to secure competitive financial terms from the Prime Broker Defendants.

82.     The lack of real-time price information has also been a limiting factor in establishing best-execution metrics.  It has also made performance benchmarking of service

providers (such as prime brokers) difficult. These concepts are second nature to investors in other, more efficient markets. But their benefits are denied to participants in the stock loan market.

83.     A direct effect of the stock loan's OTC market structure is that the Prime Broker Defendants are able to exploit the inefficiencies to reap inflated profits at the expense of borrowers and lenders. In simplified terms, for stock loan transactions, the borrower pays the lender interest on the value of the security (often characterized as a "fee") in exchange for the loan. The loan allows the lender to earn a higher return on its equity holdings. Trade publication *Securities Lending Times* estimates that, as of June 2015, approximately $851 billion of equities were out on loan worldwide.[23] The fees earned by lenders on these securities were approximately $19 million per trading day — or more than $4 billion per year.

84.     Bringing lenders and borrowers together in a regulated, centralized trading platform would lower the cost of borrowing and increase the returns on lending. In an exchange or all-to-all trading environment, investors can trade anonymously in real time on electronic platforms, with live, executable pricing and with *any* qualified trading partner. On the New York Stock Exchange or NASDAQ, for example, buyers and sellers make offers to "all" potential counterparties simultaneously — with the electronic system matching trades primarily based on price. The seller gets the highest price offered and the buyer gets the lowest price available.

85.     "All-to-all" electronic trading provides greater price transparency, expands the number and type of potential counterparties, and does not involve a fee-extracting "middleman"

---

[23]   Mark Dugdale, *DataLend Infographic Reveals Industry's Size,* SECURITIES LENDING TIMES (July 20, 2015), http://www.securitieslendingtimes.com/securitieslendingnews/article.php?article_id=220006.

or intermediary between the buyer and seller.[24]  Consequently, such electronic trading results in greater efficiency and significantly better prices for both sides.  This method of trading is the norm for the securities of most publicly traded companies.

86.     The efficiencies created by all-to-all trading would reduce the cost of portfolio management strategies for investors, stimulating more stock loan trading and investment.  It would further increase the returns that pension funds and mutual funds earn on their lending, raising returns for retirees and pensioners.  All of this would further lower the cost of companies raising capital in the equity markets.

87.     Today, the Prime Broker Defendants vacuum up **60%** or more of the revenue generated by stock loan transactions — revenue that would otherwise flow to the borrowers and lenders themselves.  Such remarkable profits are not justified by any "risk" the Prime Broker Defendants assume.  The Prime Broker Defendants experience virtually *no* risk as the loans are fully collateralized at 102% of value or more.  Nor do these profits reflect any value-added "services" of the Prime Broker Defendants.  These same services could easily be reproduced — and even improved upon — by an automated matching engine on an exchange or exchange-like platform for minimal fees.

88.     As discussed below, the only reason the Prime Broker Defendants are able to enjoy these inflated profits today is because they have conspired to keep the market from developing in an more efficient manner.

---

[24]   As a technical matter, an all-to-all platform does stand between the parties to match their trades, but it does so on a transparent commission basis; profits come from the volume driven by transparency and low fees.  In contrast, in OTC markets the middleman stands in an opaque market with the explicit objective of capturing the largest possible spread between transacting parties; profits are driven by exploiting the middleman's informational advantage.

## II.   DEFENDANTS CONSPIRE TO BLOCK COMPETITION IN THE STOCK LOAN MARKET

89.     The Prime Broker Defendants have preserved the inefficiency of stock loan markets and their resultant profits by carrying out an anticompetitive campaign on several fronts — affecting the trading, price dissemination, and clearing of stock loans.  At the center is EquiLend, which facilitates joint coordination among the Prime Broker Defendants under the guise of an industry consortium.  Acting both through private meetings and under the auspices of EquiLend committees and board meetings, the Prime Broker Defendants coordinated to boycott, seize, and neutralize two major platforms that offered centrally cleared, electronic stock loan trading:  Quadriserv/AQS and SL-x.  To further prevent price discovery, the Prime Broker Defendants collectively disabled a third company, Markit, from providing actionable, real-time pricing data to borrowers and lenders.

90.     Nothing in the Defendants' conduct was inevitable.  There was a window, in fact, in which the prospect of breaking with cartel practices emerged:  Basel III.  As numerous banks began to recognize and accept the central clearing incentives in Basel III, many, including some internal units within the Prime Broker Defendants' *own organizations*, began taking unilateral, non-collusive steps toward central clearing.  Had these steps been completed, they would have led to a more efficient and transparent stock loan market.

91.     But when senior personnel at the Prime Broker Defendants discovered that such steps were being taken, they seized the reins and put a stop to these initiatives.  Alarmed that these initiatives were paving the very path that would threaten their long-held role as intermediaries, the Prime Broker Defendants sat down with their counterparts at other Prime Broker Defendants to form and then carry out a plan that Morgan Stanley codenamed "Project Gateway."  As the name implied, using Project Gateway, the Prime Broker Defendants jointly

erected a "gate" through which all stock loan transactions must pass on their way to central clearing. It is a gate that they control.

92.     The Prime Broker Defendants' joint acquisition of Quadriserv/AQS in 2016 was the culmination of this effort. By securing the final piece needed in order to control all aspects of the trading, clearing, and price dissemination, the Prime Broker Defendants sealed their role as permanent toll collectors on every stock loan transaction. Absent legal action like this case, their stranglehold will prevail for the foreseeable future, to the detriment of Plaintiffs, class members, and the public alike.

**A.     The Prime Broker Defendants Create EquiLend to Protect their Economic Interests in the Industry**

93.     In or around 2000, the Prime Broker Defendants resolved to form a "dealer consortium" by which they could ensure their joint control over the stock loan market and combat nascent threats to their dominance.

94.     In 2000, the Prime Broker Defendants, their predecessor broker-dealers, and a handful of agent lending firms each committed $4 million dollars and substantial manpower to an investment called EquiLend. The original investing firms were Barclays Global Investors, Bear, Stearns & Co., The Goldman Sachs Group Inc., J.P. Morgan Chase & Co., Lehman Brothers Holdings Inc., Merrill Lynch & Co., Morgan Stanley, Northern Trust Corp., State Street Corp., and UBS Warburg. For most if not all of the Class Period, the ten owners of EquiLend included all six of the Prime Broker Defendants: Bank of America (formerly Merrill Lynch), Credit Suisse,[25] Goldman Sachs, JP Morgan, Morgan Stanley, and UBS.

---

[25]   Credit Suisse became a co-owner of EquiLend in 2005.

95.     EquiLend Holdings LLC was formed in 2001, and the platform went live in 2002. The stated purpose of EquiLend was to "optimize efficiency in the securities finance industry by developing a standardized and centralized global platform for trading and post-trade services."[26] What was not disclosed was that the Prime Broker Defendants created EquiLend principally to create a forum for collusion.

96.     The Prime Broker Defendants have always held a majority on EquiLend's board and have jointly controlled EquiLend's board since its inception.  William Conley, Head of Global Securities Lending at Goldman Sachs, was an especially influential director on the board of EquiLend.  Other EquiLend board members during the Class Period included:  Fred Nadd-Aubert, Director, Prime Services & Strategic Product Development at Credit Suisse; Michael Kelleher, Managing Director, Equity Finance at JP Morgan; Stefano Bellani; Managing Director at JP Morgan Chase; Robert Genkinger, Managing Director, Equity Finance Sales & Trading at Bank of America Merrill Lynch; Anthony Schiavo, Vice Chair, Managing Director, at Morgan Stanley; and Brendan Cusick, Managing Director at UBS.

97.     During the Class Period, the Prime Broker Defendants used EquiLend as a vehicle to prevent the stock loan market from evolving into a transparent, all-to-all, electronic platform. The Prime Broker Defendants used Equilend to destroy, acquire, and/or suppress AQS/Quadriserv, SL-x, and Data Explorers.  As noted, *Global Custodian*, an industry publication, aptly described EquiLend in 2009 as a "cartel-cum-service provider" formed to protect the "economics" of an industry which "doubled or tripled the price" of lent securities "before passing them on to hedge fund managers."[27]

---

[26]   *See supra* note 6.

[27]   *See supra* note 7.

98.     From at least 2009 to the present, key strategic personnel from the Defendants used the auspices of EquiLend and the OCC to coordinate their conduct to ensure the securities lending market does not develop in ways that threaten their collective dominance.  Defendants installed themselves on the board of the OCC and EquiLend, as well as a variety of "committees" at OCC that meet to discuss the securities lending market under the cover of a supposedly legitimate and independent enterprise.

99.     The Prime Broker Defendants used EquiLend as a venue to conspire and used their membership as a pretext for discussions about how to address the threats to their market dominance discussed below, including AQS/Quadriserv and SL-x.

100.    EquiLend was not only a forum for the Defendants' collusion, but also an active participant and co-conspirator.  If EquiLend had behaved as a profit-maximizing firm, it would have contributed to the competitive evolution of the securities lending market.  Instead, EquiLend remains a "Potemkin village" for the Defendants — EquiLend offers just enough operational efficiency to be relevant through trade affirmation and an opaque, once-daily auction service for general collateral shares and similar services.[28]  But it does nothing that would risk the dominance of the Defendants' position in the market.

101.    While EquiLend has been the principal forum through which the Prime Broker Defendants have colluded, they use other forums for this purpose as well.  One of these is the International Securities Lending Association ("ISLA").  ISLA is nominally an industry trade association but, in reality, it served the interests of the Defendants during the Class Period.

102.    The annual RMA Conference on Securities Lending also provided a forum for collusion and planning.  Conspirators who attend the conference together for this purpose

---

[28]  General collateral shares are securities so liquid they are effectively cash equivalents.

include:  William Conley, Head of Global Securities Lending at Goldman Sachs; Fred Nadd-

Aubert, Managing Director, Investment Banking Division at Credit Suisse; Robert Genkinger,

Managing Director, Equity Finance Sales & Trading at Bank of America Merrill Lynch;

Anthony Schiavo, Vice Chair, Managing Director at Morgan Stanley; and Brendan Cusick,

Managing Director at UBS.

103.    The Prime Broker Defendants also used the Depository Trust Clearing

corporation ("DTCC"), which they controlled, as a forum to collude.  Indeed, when SL-x

approached DTCC to offer centrally cleared stock loans, DTCC refused, indicating that the

major banks on its board — *i.e.*, the Prime Broker Defendants — were not in favor of it

**B.      Defendants Block the Development of AQS' Trading, Execution, and
Clearing Platform**

104.    Quadriserv Data Services Inc. ("Quadriserv") originally supplied market data for

stock loan transactions from broker-dealers to hedge funds.  In the mid-2000s, Quadriserv built

AQS, a vertically integrated stock loan trading and clearing electronic platform that would allow

borrowers and lenders to transact anonymously in the stock loan market.

105.    For AQS to succeed, it needed access to central clearing, so it began quietly

negotiating with OCC, the world's largest derivatives clearing organization.  Wayne

Luthringshausen, the Chief Executive Officer of OCC, was supportive of AQS's efforts and

wanted to give it the ability to clear stock loans via OCC.  But he knew that the Prime Broker

Defendants would oppose giving AQS access to central clearing because it would pose a threat

to their way of doing business.

106.    In 2005-6, when AQS approached OCC, the OCC Board of Directors included

Frank J. Bisingnano, the Chief Administrative Officer of Prime Broker Defendant JP Morgan

Chase; Daniel B. Coleman, the Managing Director and Head of Equities for the Americas for

Prime Broker Defendant UBS; John P. Davidson III, Managing Director – Equity Infrastructure at Prime Broker Defendant Morgan Stanley; Mitchell J. Lieberman, Managing Director, Global Securities Services for Prime Broker Defendant Goldman Sachs; Richard R. Lindsey, President Bear, Stearns Securities Corp.,[29] and Gary Yetman, Managing Director of Prime Broker Defendant Merrill Lynch. This made them an influential faction on the OCC board. In particular, Mr. Luthringshausen knew that Mitchell J. Lieberman of Goldman Sachs was both very influential on the OCC Board and would be strongly opposed to giving AQS access to OCC clearing.

107. Mr. Luthringshausen used a two part strategy to deal with the likely opposition from the Prime Broker Defendants. First, he negotiated quietly with AQS, not informing the board. Second, he scheduled the critical vote on granting AQS access to OCC clearing for stock loan for a board meeting where Mr. Lieberman of Goldman Sachs was unable to attend in person or via a phone. It was at that moment that Mr. Luthringshausen put forward the proposal to give AQS access to OCC stock loan clearing. The proposal passed the Board of OCC.

108. On January 7, 2009, Quadriserv launched AQS and announced an agreement with the OCC whereby the OCC would provide clearinghouse services and act as the central counterparty for all securities lending transactions submitted through Quadriserv's AQS Platform.

109. At this time, there was tremendous demand in the market for the AQS platform. AQS raised nearly $100 million in investments. Quadriserv's launch of AQS was actively supported and encouraged by the Federal Reserve Bank of New York, which believed central clearing of securities lending would decrease systemic risk in the U.S. economy.

---

[29] Bear Stearns was acquired by JP Morgan in 2008.

110.     AQS also garnered the support of, among others, one of the largest lenders of stock (Barclays Global Investors CGI), one of the largest borrowers of stock (the quantitative hedge fund Renaissance Technologies), the oldest venture capital fund in the country (Bessemer Ventures), one of the largest exchanges in the world (Deutsche Bourse, through its Eurex AG and International Securities Exchange subsidiaries), and two of the largest market-makers (Susquehanna and Interactive Brokers).  AQS also obtained a commitment from SunGard to connect its industry standard back end system (Loanet), which was used by over 250 broker-dealers.

111.     The AQS platform offered a marketplace where lenders and borrowers could meet and execute stock loan transactions and then centrally clear them via straight through processing. It permitted anonymous trading and served as a transaction facility where price discovery could occur through bi-lateral negotiations and automated loan execution through a traditional electronic order book.

112.     AQS began in 2009, clearing trades through OCC, and later that year announced it had reached an agreement with Eurex, a European clearinghouse, to clear European equities. This combination — central clearing of stock loan transactions combined with an anonymous all-to-all marketplace — promised to move the stock lending market into the modern world of efficient electronic trading.  For that very reason, however, it threatened the Prime Broker Defendants' privileged position in the stock loan market.

113.     Quadriserv was acutely aware that AQS would revolutionize the stock loan industry.  Quadriserv pointed out that AQS had the "ability to enhance the profitability and performance of lenders and borrowers alike by reducing spreads, and increasing the overall

efficiency of the securities lending marketplace."[30]  It did this by taking direct aim at the "existing inefficiencies and large spreads in the securities lending industry" by providing "confidential, un-conflicted daily price discovery and transparency by anonymously and directly connecting borrowers and lenders of securities."[31]  "As a result, pension funds better realize the full intrinsic value of the securities they are lending, while hedge funds and other asset managers reduce short-selling costs by borrowing securities directly from beneficial owners of assets."[32]

114.    In other words, Quadriserv/AQS could simultaneously make more money for stock lenders and save money for stock borrowers by eliminating the 60% cut skimmed off the top by the Prime Broker Defendants.  This posed a major threat to the multi-billion dollar stock lending business of the Prime Broker Defendants.  The Prime Broker Defendants' personnel who served on the board of EquiLend expressly discussed this threat and how to respond to it numerous times in connection with multiple EquiLend board meetings.

115.    Not surprisingly, AQS soon began to receive veiled threats originating with the Prime Broker Defendants.  As AQS's executives made the rounds of the securities lending industry telling people what they intended to do and gathering support, they were told in no uncertain terms that there would be severe repercussions for crossing the cartel.  During a meeting with the DTCC, for example, AQS was told "this sounds great, but who's going to start your car in the morning?"

116.    At first feigning interest, various Prime Broker Defendants met with AQS executive multiple times so that they could gather information about the product and inform their

---

[30]   *See supra* note 11.

[31]   *Id.*

[32]   *Id.*

strategy to destroy it.  In these meetings with AQS, the Prime Broker Defendants almost always echoed each other — even though the meetings were separate with each Prime Broker Defendant.

117.     Eventually, Prime Broker Defendants Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS each told AQS that the only way they would support its platform was if AQS made it an exclusive space for the Prime Broker Defendants to trade — in other words, a "broker only" platform.  These five Prime Broker Defendants also all made it a condition of their participation that lenders and borrowers would be barred from trading on the platform directly. Prime Broker Defendants Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS each communicated this *identical position* to AQS in separate meetings.

118.     AQS refused to submit to these parallel conditions and demands.  In the words of Joe Weinhoffer, one of the founders of AQS/Quadriserv, he was willing to "fight[] the prime brokers with Quadriserv."[33]  Unable to get AQS to back down, the Prime Broker Defendants met and discussed what their next move should be.  They did so in EquiLend Board meetings and in separate meetings among smaller groups.  They collectively decided that AQS/Quadriserv was a "gateway drug" that could lead to disintermediation, and that the only effective response was to starve AQS of its necessary lifeblood:  liquidity.

119.     First, while some Prime Broker Defendants joined the AQS platform,[34] they deliberately engaged in few stock lending transactions via the AQS platform.  Again, this decision not to make substantive use of the AQS platform was action taken in concert by all the Prime Broker Defendants.

---

[33]     *See supra* note 10.

[34]     Prime Broker Defendant Goldman Sachs never completed its subscriber documentation.

120.    Second, the Prime Broker Defendants took active steps to prevent other market participants from transacting on AQS.  The Prime Brokers knew that for AQS to survive, it needed the hedge fund borrowers on its platform.  So the Prime Broker Defendants began to exercise the leverage they had over the hedge funds.  While the Prime Broker Defendants might have been unnecessary middlemen in stock loan transactions, their prime brokerage units offered other services, like access to initial public offerings ("IPOs") underwritten by the Prime Broker Defendants, proprietary research, trade ideas, and the ability to leverage their assets via margin accounts that the hedge funds and other borrowers of stock could not obtain from other sources.

121.    Many hedge fund founders were also alumni of the Prime Broker Defendants and relied on them to raise capital and provide other services.  Using these relationships, the Prime Broker Defendants threatened their hedge fund clients with consequences if they participated on AQS.  Specifically, the Prime Broker Defendants flatly refused to give their hedge fund customers access to AQS and, in many cases, threatened to deny the hedge funds access to critical prime brokerage services if they traded on AQS.  Faced with this prospect, many of the hedge fund borrowers opted not to on-board to AQS.

122.    For instance, Renaissance Capital Technologies — one of the world's largest and most successful quantitative hedge funds — asked each of its multiple Prime Brokers for direct access to AQS.  Every one of them not only refused, but told Renaissance Capital that if they were not happy with that, they could move their business to another firm.  The same thing happened to dozens of large hedge funds, including D.E. Shaw and SAC Capital.  After inquiring about AQS, each of them got stonewalled by the Prime Broker Defendants and were told that, if they were not happy with their refusal to give them access to AQS, they could take their business elsewhere.

123.    This strategy would not have worked if each Prime Broker Defendant had acted unilaterally.  Without assurances that other Prime Broker Defendants would also refuse to let hedge fund customers use AQS, no Prime Broker Defendant would risk losing their best customers by inviting them to take their business elsewhere if they were unhappy with the approval.  This technique only worked because there was no viable "elsewhere" for the hedge funds to go because the Prime Broker Defendants coordinated their anticompetitive strategy.

124.    In another act of intimidation, the Prime Broker Defendants took action when they learned that BNY Mellon was beginning to actively use AQS for stock loan transactions. When it learned of this, Defendant Goldman Sachs told executives at BNY Mellon in 2012 that, if they signed onto the platform, Goldman Sachs would never do business with BNY Mellon again.  Faced with this massive threat, BNY Mellon quickly abandoned its plans to increase or continue its participation on AQS.

125.    Third, the Prime Broker Defendants used their influence with AQS's clearinghouse, OCC.  Affiliates of the Prime Broker Defendants are all members of OCC and many of their high-ranking employees serve on OCC's board of directors.  For instance, in 2009, the OCC Board of Directors including Frank J. Bisignano, the Chief Administrative Officer of Prime Broker Defendant JP Morgan Chase; Mitchell J. Lieberman, Managing Director, Global Securities Services for Prime Broker Defendant Goldman Sachs; and Gary Yetman, Managing Director of Prime Broker Defendant Merrill Lynch.

126.    From 2009 to approximately 2014, the Prime Broker Defendants jointly insisted on preserving various antiquated rules whose only purpose was to make clearing less attractive to borrowers and lenders.  For instance, "netting" of cleared transactions was not permitted, requiring collateral to be posted for each trade.  During this period of anti-clearing rules at OCC,

William Conley of Goldman Sachs, one of the chief architects of Defendants' conspiracy, was speaking with Michael McClain — OCC's Chief Operating Officer who oversaw OCC's Technology and Operations — on a weekly basis about clearing stock lending.

127. Fourth, the Prime Broker Defendants blocked or purged elements within their own organizations that wanted to support AQS. For instance, the proprietary trading desk at Credit Suisse wanted to use AQS, but Sean Sullivan, who ran the stock lending desk, blocked them from using it. At Defendant Morgan Stanley, Bruce West, an Executive Director in Bank Resource Management, was given the job of interfacing with AQS on behalf of Morgan Stanley's securities lending desk. As soon as his activity on the AQS system was beginning to increase (in early 2015), Mr. West suddenly departed from Morgan Stanley. Similarly, Goldman Sachs' agent lending business in Boston wanted to use AQS, but William Conley prevented them from doing so.

128. Fifth, the Prime Broker Defendants worked together to hurt AQS's reputation in the market and in the eyes of regulators. On September 29, 2009, the SEC, for example, held a Roundtable discussion on securities lending. Panel 3 of the Roundtable was devoted to a discussion of "Improving Securities Lending for the Benefit of Investors: Transparency; Electronic Platforms; Central Counterparties; Accountability." Members of the panel included the Co-Founder and Chief Strategic Officer of Quadriserv/AQS, representatives from Brown Brothers Harriman, SunGard's Astec Analytics, eSecLending, State Street, Federated Investors, and Shawn Sullivan, Managing Director at Credit Suisse. Panel 1 on the second day of the Roundtable was on "Controls on "Naked" Short Selling: Examination of Pre-Borrow and Hard Locate Requirements" included, *inter alia*, William Conley of Goldman Sachs and the CEO of Quadriserv.

129.    Prior to the actual discussion, Mr. Conley, Shawn Sullivan of Credit Suisse, and others appearing at the Roundtable met and agreed to disparage AQS and central clearing in front of Commissioner Shapiro and the SEC.  The coordinated attack was carried out by the Prime Broker Defendants.  For instance, referring to the AQS offering, Mr. Sullivan told the group that there was no proposal for central clearing that "truly addresses the unique characteristics inherent in the securities lending market," that a central counterparty would "most likely reduce liquidity in the marketplace," and that "if you have more bidders in the process, you're most likely going to have a deterioration in the credit quality of the counterparts, and that's something that a beneficial owner does not want to be exposed to."

130.    All of these Prime Broker Defendants' actions had their intended effect.  Hobbled by Defendants' group boycott, their threats against the hedge funds and other market participants, and antiquated clearing rules frozen in place as a result of the Prime Broker Defendants' influence, AQS was unable to develop sufficient liquidity to operate a viable stock lending platform.  It was relegated to the margins of the industry and forced to scramble for years merely to stay afloat.

## C.    Defendants Block the Development of SL-x's Trading, Execution, and Clearing Platform

131.    While Defendants were boycotting AQS, a similar threat began to emerge from another start-up called SL-x, which promised to offer an electronic marketplace for stock lending transactions.  Once they learned of SL-x, the Prime Broker Defendants took collective action to ensure that it would fail and that its technology could never present a viable challenge to their control of the stock lending market, following a very similar playbook to that they had executed to block AQS.

132.    Founded in late 2010 and developed over the course of the following two years, SL-x offered an electronic front-end trading system for stock loans.  In the OTC stock loan market controlled by Defendants, borrowers and lenders had to contact the Prime Broker Defendants by phone calls or instant computer messages in order to find out the prices of stock loan trades.  SL-x proposed to replace this inefficient method with an electronic system where prime brokers could communicate bids and offers with lenders and borrowers much more efficiently on an electronic platform.

133.    SL-x included live pricing data, providing an up-to-the-minute stream of available, actionable stock loan prices for all SL-x users, as well as securities finance data and analytics from the financial data provider Markit.  As SL-x CEO Peter Finchel explained in 2013:  "The addition of real time data fills an important gap in the information available for stock loan transactions, and our system's unique capabilities will streamline customers' workflow as well as reduce their capital requirements, and provide relief to their counterparty credit constraints on centrally cleared trades."[35]  The SL-x platform also permitted central clearing (through Eurex Clearing, a central counterparty based in Germany) of all transactions in Belgian, Dutch, French, German, and Swiss stocks executed on the platform.

134.    While SL-x did not plan to offer anonymous all-to-all trading between borrowers and lenders upon launch, the platform would have immediately increased competition in the stock lending market — reducing costs for borrowers and increasing returns for lenders.  Most importantly, it would have immediately promoted stock lending competition among the Prime Broker Defendants.  In the OTC model, a hedge fund manager had to contact each Prime Broker

---

[35]   Georgina Lavers, *Lending Given Path Between SL-x and Markit,* SECURITIES LENDING TIMES (October 9, 2013), http://www.securitieslendingtimes.com/securitieslendingnews/article.php?article_id=218939.

Defendant separately, by telephone or instant message, in order to obtain a stock lending quote. By providing live pricing data and an electronic mechanism for the borrowers to request additional quotes, borrowers would have access to more pricing information, which they could have in turn used to negotiate lower loan prices.

135.    Moreover, SL-x's platform would have been a significant move in the direction of anonymous all-to-all stock lending.  SL-x provided a single marketplace to which all participants in the transaction — borrowers, prime brokers, and lenders — would migrate in order to initiate, execute, and clear their stock loans.  Once all these entities were actively participating on SL-x's platform, it would have been much easier for lenders and borrowers to begin transacting directly with each other, without participation by the Prime Broker Defendants.  Additionally, active participation in the marketplace by many borrowers and lenders would have made it easier for SL-x to later offer all-to-all lending, as the necessary sources of supply and demand would already have been regular users of their product.

136.    As SL-x's platform was in development, SL-x personnel began meeting with representatives from the Prime Broker Defendants to sell the technology.  But Defendants quickly made clear that any changes to the stock loan market could only happen, if at all, through EquiLend, which the Prime Broker Defendants controlled.  As they did with AQS, the Prime Broker Defendants refused to participate meaningfully on SL-x's platform and threatened their clients with the loss of valuable banking services if they agreed to join SL-x's platform.

137.    For example, in 2011, SL-x personnel met with William Conley and others from Goldman Sachs.  At the meeting, Mr. Conley was frank:  if the Prime Broker Defendants were to allow a central trading platform with counterparty clearing, it would encourage smaller competitors, such as Jefferies, to enter the stock lending market.  He also said that, if the Prime

Broker Defendants were to permit this kind of evolution at all, they would do it exclusively through an entity that they already controlled — EquiLend.  "I ain't supporting this," Mr. Conley said, and showed the SL-x executives to the door.  Brad Levy, who was then Global Head of Goldman Sachs' Principal Strategic Investments Group, was similarly curt:  "You ain't going to get this done."

138.    SL-x's meetings with other Prime Broker Defendants followed a similar dialogue. Morgan Stanley and JP Morgan initially feigned interest — but it was not sincere as they just wanted to gather market intelligence about SL-x's progress, while at the same time telling their hedge fund clients not to engage with SL-x.  Morgan Stanley's European prime brokerage division, for example, told some hedge funds that they would lose other prime brokerage services if they were to "trade away" their securities lending business at venues such as SL-x.

139.    Other market participants, such as BNY Mellon, State Street, and Northern Trust, met with SL-x personnel and acknowledged the price transparency and other benefits the platform would bring to the market.  But they said that, since the Prime Broker Dealers were apparently aligned against the platform (and especially Goldman Sachs and Morgan Stanley), they could not support it.  Thus, despite their interest in SL-x, none of these other market participants would come onboard.

140.    Defendants also worked collectively to undermine SL-x's ability to clear transactions executed on its platform.  While SL-x managed to ink a deal with Eurex to centrally clear transactions for stocks traded in five European countries, Defendants used their influence and control at the two U.S. clearinghouses — OCC and DTCC — to prevent SL-x from establishing clearing for U.S. stocks.

141.    SL-x asked OCC to make modest rule changes so that the agent-lenders — large, capital-rich banking entities like BNY Mellon — could become clearing members of OCC.  The membership of such entities in the clearing house would help the platform to operate more efficiently.  But OCC refused this request without providing any colorable reason for doing so — at precisely the same time that Goldman Sachs' William Conley was speaking with the OCC's Chief Operating Officer, Michael McClain, on a weekly basis about central clearing for stock lending.

142.    At DTCC, Murray Pozmanter — the DTCC Managing Director who served as the gatekeeper for DTCC's clearing business — was more direct:  he informed SL-x repeatedly that the DTCC could not offer SL-x central stock loan clearing until Goldman Sachs and other key board members agreed to it.

143.    Defendants conspired to marginalize SL-x in other ways, such as preventing it from joining the securities lending industry bodies that the Prime Broker Defendants used to control the market.  SL-x attempted to join ISLA and RMA in the U.S.  But it was denied membership in both associations because Defendants claimed that these organizations were open only to broker-dealers.

144.    SL-x's platform became operational in March 2014, after the UK Financial Conduct Authority licensed SL-x to act as a trading facility and authorized it to offer its service across 17 European capital markets.[36]  As they had with AQS, Defendants refused to conduct significant transactions on the SL-x platform and prevented others from doing so.  Starved of liquidity, and now confronted with the reality of Defendants' group boycott, SL-x's tenure was

---

[36]  Mark Dugdale, *Exclusive:  SL-x to Shut Up Shop,* SECURITIES LENDING TIMES, (September 17, 2014), http://www.securitieslendingtimes.com/securitieslendingnews/article.php?article_id=219512.

brief.  By September 2014, almost four years after development began and a mere six months

into operation, SL-x had largely burned through its financial resources.  It applied to cancel its

UK Financial Conduct Authority license as a trading facility and was forced to close.[37]

145.    Once the boycott had achieved its purpose, Defendants collectively executed a

final maneuver to thwart stock lending platforms similar to SL-x from developing in the future.

As it was building the platform, SL-x obtained patents covering its core functionality, including

the electronic negotiation of securities transactions (permitting one party in the negotiation to

remain anonymous) and automatic matching of lenders and borrowers.  These patents protected

SL-x from competitors, and anyone trying to offer similar functionality would need to buy or

license SL-x patents to do so.

146.    After SL-x closed, its owner, Palamon Capital Partners, tried to recover some of

its investment by putting the patents up for sale.  Making good on William Conley's promise that

changes to stock lending would only come through EquiLend, EquiLend purchased SL-x's

patents and other intellectual property — including its pipeline to clearing at Eurex — for the

fire-sale price of approximately £500,000.  EquiLend has never used the patents or attempted to

commercialize the technology.  Rather it put the patents on the shelf, only to be used if needed in

the future to block the next would-be platform using similar technology.

### D.   Defendants Block Data Explorers and Markit from Providing Additional Pricing Data

147.    The Prime Broker Defendants knew their ability to make supracompetitive profits

from their middleman role in stock lending depended on keeping spreads wide.  One way they

did so was by keeping the market opaque and preventing lenders and borrowers from obtaining

---

[37]    *Id.*

access to current and useful pricing data.  For example, if a lender knew what other lenders were receiving for a given stock loan, they could use that information to shop around or to negotiate a better price.  The same logic applies to borrowers.  Even in an OTC market, increased access to pricing data would have increased the fees lenders receive and decreased the fees borrowers pay and cut into Prime Broker Defendants' profits, to the benefit of the class members in this case. Similarly, once lenders and borrowers could see what a world with near real-time prices could look like, the necessity of all-to-all trading would be immediately apparent.

148.     A threat to this market opacity emerged from a company first founded in 2002 called Data Explorers.  Data Explorers was founded by Charles Sackville and Mark Faulkner with the goal of providing data and analytics about securities lending transactions.  Over time, it secured access to the Prime Broker Defendants' pricing data in return for providing that data back to the Prime Broker Defendants in the form of, for example, market-share analyses.

149.     By 2011, Data Explorers was pursuing an opportunity to grow its business by filling the glaring void for pricing data accessible to the buy side, including beneficial owners (*i.e.*, stock lenders).  Under the leadership of Donal Smith, formerly of Thomson Reuters, Data Explorers stepped up its sales efforts to agent lenders, pension funds, and hedge funds in the United States.  While Data Explorers was reluctant to offer access to wholesale pricing data, at least initially, it began offering "performance" data and other similar products, which would allow the buy side to have some insight into whether the financial terms it was receiving for, say, lending a particular stock was consistent with other prices in the market.

150.     These actions by Data Explorers alarmed the Prime Broker Defendants who met in 2011 under the cover of their roles in Equilend to discuss this threat and how to respond to it. In those discussions, Goldman Sachs' William Conley reportedly stated that "we will set up

DataLend to ensure that beneficial owners never see real wholesale data. . . .  [I]f that ever happens, it will kill our business."

151.    The Prime Broker Defendants had begun setting up DataLend as a data division within Equilend in 2011.  They originally had not focused much attention on the division, but re-focused their efforts (and substantially increased its funding) in light of the emerging threat from Data Explorers.  They then agreed, in lockstep, to distribution agreements with DataLend that placed substantially identical restrictions on how their data could be used.  Among other things, the Prime Broker Defendants agreed amongst themselves and then with DataLend that they would not permit their data to be provided in wholesale form to any beneficial owners.  William Conley from Goldman Sachs, Mike Kelleher from JP Morgan, and other Prime Broker Defendants on the board of EquiLend were involved in the discussions that led to these agreements.

152.    The Prime Broker Defendants also took steps to bring Data Explorers within their sphere of influence.  Specifically, they encouraged Markit Group, a data company that they had originally formed and still largely controlled, to buy Data Explorers.  Markit bought Data Explorers in April 2012.  Donal Smith was replaced as CEO in May 2012.  Surprisingly, however, Data Explorer's new leadership continued to show an interest in selling data to beneficial owners, agent lenders, and hedge funds.  Markit at this time was pursuing an initial public offering, which made it less susceptible to pressure from the Prime Broker Defendants.

153.    As a result, the Prime Broker Defendants took still more aggressive steps.  The Equilend board authorized DataLend to go out and directly engage with the customers who had signed up with Data Explorers.  They told those customers that the Prime Broker Defendants could not and would not allow their data to be distributed in wholesale form.  With the agent

lenders, the Prime Broker Defendants agreed to provide similar data to that being provided by Data Explorers at very little cost and, in some cases, virtually for free.  For example, Data Explorers had multiple contracts with agent lenders in the range of $1-2 million.  In an effort to squash Data Explorers, DataLend offered to provide the same services effectively for nothing. As a result, Data Explorers quickly began losing customers and steadily saw its business disappear.

154.     The net result is that the market remains incredibly opaque for borrowers and lenders.  A pension fund, for example, might be receiving 20 basis points to lend a security for which the Prime Broker Defendant turns around and charges a hedge fund 55 basis points to borrow it.  The Prime Broker Defendants knew the only way they could maintain these very large spreads and their "intermediation" was to keep both sides in the dark about the financial terms being provided to the other.  Remarkably, as a result of the concerted actions described herein, they have succeeded in doing so.

155.     Defendants' control over price visibility works hand in hand with the suppression of all-to-all trading.  Market data is the lifeblood of trading.  Today, however, what pricing information is made available is stale, allowing lenders and borrowers to see prices only two to three days after the trade has been executed.  Such a long delay in a fast moving market means that the information is useless for determining *current* securities lending prices, and thus does little or nothing to increase price competition.

156.     The Prime Broker Defendants benefit from the rest of the market only having access to stale price data because in addition to harming the ability of any lender or borrower to negotiate the fees they are paying or receiving, it undermines the possibility of trading *at all* — trading without real-time prices is "blind" to the market and thus meaningless.  With no

negotiating power and no means to discover prices in the moment and trade on them, the buy side is at the mercy of the Prime Broker Defendants.

**E.** **Faced With The Threat of Basel III, Defendants Collectively Conspire to Take Control of AQS and Central Clearing**

157. On January 1, 2014, Defendants' control of the cozy, opaque world of stock loan faced a new regulatory threat from Basel III.[38] Basel III imposed new capital requirements on the Prime Broker Defendants for bilateral stock loan transactions. This meant that a bank had to carry additional capital on its balance sheet to cover the revised risk calculation, reducing the rate of return on capital for that business and the bank overall.[39]

158. In the banking world, rate of return on capital is the key measuring stick for determining profitability.[40] For investment banks in particular, return on capital is a critical

---

[38] *See supra* note 12. Previously, on January 1, 2013, Federal Reserve had added the market risk capital framework to Basel I — the combination of which was referred to as Basel 2.5, and banks began disclosing Market Risk Capital Reports under Basel 2.5. On January 1, 2014, banks began reporting Basel III Pillar 3 Disclosures with current capital calculations.

[39] Moreover, if the bank's assets were to increase, with no corresponding increase in capital, it would result in increased leverage for the bank. Since the collapse of several investment banks and government bailouts for each of the Prime Broker Defendants in 2008, each was keen to show their regulators and shareholders that they were deleveraging, i.e., that their reported assets were falling in relation to the amount of capital they hold. Unfortunately for the banks, the revised asset calculation methodologies implemented in Basel III would significantly increase their reported assets and resulting leverage ratios, redoubling the intense pressure the banks were already under to reduce leverage.

[40] As Defendant Credit Suisse wrote in an article, "[a] core test of success for a business is whether one dollar invested in the company generates value of more than one dollar in the marketplace. Logically, this occurs only when a business earns a return on investment in excess of the opportunity cost of capital." Michael J. Mauboussin, *Calculating Return on Invested Capital- How to Determine ROIC and Address Common Issues,* CREDIT SUISSE GLOBAL FINANCIAL STRATEGIES (June 4, 2014), https://research-doc.credit-suisse.com/docView?language=ENG&format=PDF&source_id=csplusresearchcp&document_id=806230540&serialid=C0owv4XbV7zL%2BTQLggWqjPthH7IUpSwUZpiIwdvDgtA%3D.

metric of success, and the cost of capital is at least 10%.[41]  Therefore, for an investment banking business to be considered profitable, its return on capital must exceed 10%.  A business unit within a bank with a high rate of return on capital is considered very valuable, and the employees who work in that business are compensated accordingly.  An investment banking business with a low rate of return on capital is considered unprofitable and subject to shrinkage or potential closure.

159.    Basel III's capital requirements promised significantly to reduce the return on capital from bilateral stock loans.  For at least one Prime Broker Defendant, it was estimated that Basel III's capital requirements could potentially reduce return on capital for stock loans to less than 10%.

160.    Faced with this prospect, individual business units within certain banks began taking steps toward central clearing of stock loan transactions, a solution that Basel III itself encouraged.  Under Basel III, banks could dramatically reduce the "risk weight," and hence balance sheet costs, of stock loans, by sending them to central clearing.  Moreover, banks could do this independently and without the agreement or collusion of other participating banks.

161.    At the same time, senior personnel from many of the Prime Broker Defendants became alarmed.  They realized that central clearing could potentially lead to the end of their privileged position as intermediaries.  Central clearing opens the door to all participants in stock loan, removing the last pretext for Prime Broker Defendants' position in the market — that they buffer counterparty risk.  Senior personnel from the Prime Broker Defendants realized what those unaware of the cartel's function did not — that the loss of profits from this

---

[41]  *See* Laura Noonan, *Investment banks' return on equity declines,* FINANCIAL TIMES (Feb. 21, 2016), https://www.ft.com/content/0c65e85a-d719-11e5-8887-98e7feb46f27.

disintermediation would far outweigh any balance sheet cost savings.  As a result, the Prime

Broker Defendants that had initially embraced central clearing began to reverse course.

162.    This reversal is illustrated by events that occurred at Defendant Morgan Stanley.

In the beginning of 2014, Susan O'Flynn (Managing Director and Global Head of CCP Strategy,

Governance and Optimization at Morgan Stanley) was given a Basel III-related project by her

boss, Thomas Wipf, who was Managing Director and Global Head of Bank Resource

Management.  Mr. Wipf ran a new division at Morgan Stanley created after the financial crisis to

centralize the firm's funding, securities lending, collateral management, and counterparty

hedging activities.  Ms. O'Flynn's assignment was to decrease the bank's balance sheet costs and

increase its return on capital.

163.    Ms. O'Flynn considered several options to achieve her objective, but eventually

settled on central clearing as the most effective way to reduce the balance sheet cost of Morgan

Stanley's equities securities lending business and increase its return on capital.  In early 2014,

Ms. O'Flynn publicly came out in favor of central clearing via Eurex and OCC, discussing it

favorably with Morgan Stanley's customers (lenders and borrowers).  She set up working groups

to develop "plumbing"[42] for the banks to connect to Eurex and OCC.

164.    Ms. O'Flynn also started lobbying to make the OCC's rules friendlier to Morgan

Stanley's specific needs under Basel III and persuaded OCC to modernize its rules, including

Chapter XXII, which was first drafted in 1993.[43]  Unbeknownst to Ms. O'Flynn, these were the

---

[42]    Plumbing refers to back office decisions regarding rules like posting initial margin / haircut; posting & receiving variation margin (*e.g.,* amounts needed to cover varying types / changing valuations of collateral); Extensible Markup Language messaging protocols, affirmation standards and timelines, and custodian, tri-party agents, and collateral schedules.

[43]    *OCC Rules*, OCC, https://www.theocc.com/components/docs/legal/rules_and_bylaws/occ_rules.pdf.

same rules the Prime Broker Defendants had previously conspired to maintain in order to prevent AQS and SL-x from accessing efficient central clearing.

165.    At Morgan Stanley, strategy and trading were two different silos that did not communicate regularly.  Ms. O' Flynn did not inform the people who actually worked in stock loan trading about the risks to the firm of embracing central clearing.  Instead, she only gave Mr. Wipf projections about how much she planned to reduce the balance sheet cost for stock loan — she did not inform him that bringing bilateral stock loan trades to a clearinghouse would create the risk of disintermediation for Morgan Stanley or the other Prime Broker Defendants.

166.    In late 2015 or early 2016, however, Mr. Wipf began to realize the threat that central clearing posed to the Prime Broker Defendants' dominance of the stock loan business if Morgan Stanley continued to take unilateral steps toward central clearing.  Specifically, the central counterparties, including the OCC, were taking steps that could be used to support all-to-all electronic trading.  Mr. Wipf discussed the danger of intermediation on multiple occasions with his colleagues within Morgan Stanley, including Matthew R. Collins, Head of Securities Lending and Bank Resource Management in Europe at Morgan Stanley.

167.    But it was not easy for Morgan Stanley to reverse course.  Ms. O'Flynn had publicly advocated central clearing to Morgan Stanley's customers, gotten the OCC to encourage central clearing in its rules, and started working groups with other major industry participants to move towards central clearing.  It would be awkward (not to mention suspicious) for Morgan Stanley suddenly to reverse course and oppose central clearing.  Moreover, the balance sheet benefits provided by central clearing thanks to the favorable risk-weight provided by Basel III were real — and Mr. Wipf had already told his superiors that he would be providing those savings.

168.     Faced with this problem, Mr. Wipf developed a two-part plan.  The first part involved Morgan Stanley and the other Prime Defendants structuring their own clearing mechanisms or "pipelines" to OCC in such a way as to ensure their position as an intermediary. Specifically, according to the Morgan Stanley plan, when the Prime Broker Defendants cleared their trades, they needed to make sure that:  (1) the clearing maintained the opacity of the traditional stock loan market — with neither the lender nor the borrower knowing each other's identity or the price the counterparty paid or received, (2) there was no independent trading platform linked to the clearing house (like an exchange or central order book), and (3) the clearinghouse did not publish market data.

169.     The second part of the plan was to ensure that the ***only*** way for borrowers and lenders to clear trades was to use pipelines controlled by the Prime Broker Defendants.  To do that, the Prime Broker Defendants needed to control access to the clearinghouses completely. There were only two major clearinghouses with the SEC licensed to clear securities lending transactions in the U.S. in 2016:  DTCC and OCC.  As discussed above, the DTCC did not offer clearing for securities lending and would not do so except at the behest of the Prime Broker Defendants — so that avenue was effectively barred.  The OCC, on the other hand, did offer securities lending clearing.  The Prime Broker Defendants had considerable influence over OCC, with seats on the Board of Directors, so they knew they could probably block new pipelines to OCC securities lending outside of their own.[44]

---

[44]   Though the Prime Broker Defendants had close and influential relationships with OCC and DTCC and often used them as for a for collusion, they did not have a majority of the voting board seats.  Thus it was important for the Prime Broker Defendants to shore up their control of central clearing of stock loans by eliminating every potential competitor with a pipeline to a clearinghouse.

170.     The one thing that stood in the way of the Prime Broker Defendants acquiring complete control of central clearing for securities lending was AQS.  That electronic trading platform, which the Prime Broker Defendants had been boycotting and starving of liquidity for years, was still out there.  As noted, AQS had a direct pipeline to OCC clearing that anyone who traded on AQS could use to clear the trade.  Mr. Wipf feared that, once central clearing commenced, lenders and borrowers could shift to AQS and use its connection to OCC to trade amongst themselves via AQS's exchange.

171.     In order to deliver the knock punch to AQS, Mr. Wipf and his colleagues developed a plan, named "Project Gateway."  The goal of Project Gateway was to purchase AQS from Quadriserv and shut it down.  But Morgan Stanley could not implement Project Gateway unilaterally; it needed help from the other prime brokers.  Accordingly, Mr. Wipf reached out to his co-conspirator William Conley — a partner at Goldman Sachs and head of Global Securities Lending.

172.     Over a series of private calls and dinners at restaurants in New York, paid for by Mr. Wipf, in the first quarter of 2016, Mr. Wipf and Mr. Conley reached agreement on the terms of Project Gateway.  They agreed, as noted, to neutralize AQS by purchasing it and shutting it down.  But they needed to mask their own involvement by operating through a third party.  Mr. Wipf informed his colleagues at Morgan Stanley, including Susan O'Flynn and Matthew Collins, of this agreement with Goldman Sachs — to prevent AQS from disintermediating Morgan Stanley, Goldman Sachs, and the other Prime Broker Defendants.  Mr. Wipf also disclosed the vehicle that he and Mr. Conley had decided upon to purchase AQS — EquiLend.

173.     Over their phone calls, personal meetings, and dinners together, Mr. Wipf and Mr. Conley mapped out the operational plans for Project Gateway.  The easiest part would be

recruiting their co-conspirators, the other Prime Broker Defendants who had already teamed up with Goldman and Morgan Stanley to boycott both AQS and SL-x.  After all, the Prime Broker Defendants had just used EquiLend to purchase and shelve SL-x's patents and its pipeline to central clearing via Eurex.  Buying AQS would essentially be the same thing.

174.    Moreover, all of the Prime Broker Defendants had board seats on EquiLend and collectively they could control its actions.  Throughout the meetings and dinners, and at conferences, the key strategy discussed was to control a "universal gateway" that they would own and through which every securities lending transaction would have to pass.

175.    The Prime Broker Defendants also pledged to each other that they would not increase their participation in AQS and would not support other trading platforms that would threaten their privileged position in the market.  Instead, they would clear through their own pipelines to OCC — pipelines not attached to an electronic trading platform.

176.    But there was one final obstacle to Defendants' plan.  Beginning in 2015, OCC and AQS had been in discussions regarding OCC purchasing AQS.  By early 2016, when the Prime Broker Defendants had activated Project Gateway, while the contracts between OCC and AQS had not been signed and OCC had not obtained board approval for the deal, all other terms had been set.  In exchange for millions of dollars and a substantial cut of future revenue for three years, the owners of AQS would sell their exchange to OCC.

177.    This was a nightmare scenario for the Prime Broker Defendants.  Not only would they not control all access to central clearing, but AQS would be part of an organization (OCC) that the Prime Brokers did not completely control.  Moreover, if OCC owned AQS, it would have every incentive to change the rules that made it difficult for AQS to succeed — rules that the Prime Broker Defendants had fought to preserve.  Specifically, if OCC owned AQS, it would

make money from increasing the volume at AQS in two ways:  (1) by making money off clearing, and (2) by making money through fees charged by AQS.  This double-incentive would ensure that, after the acquisition was complete, OCC would do everything it could to make AQS successful — and a successful AQS meant the potential disintermediation of the Prime Broker Defendants.

178.    Thus, to ensure their continued dominance of stock lending, the Prime Broker Defendants needed to stop OCC from acquiring AQS.  And they did exactly that.  After months of constant communication, agreement on all terms, and coordination on how to make everything transition smoothly, OCC suddenly stopped returning calls from AQS.  With no explanation whatsoever, the acquisition of AQS by OCC, which had been treated as a done deal by both sides for months, was cancelled.

179.    Tellingly, shortly after the deal with OCC mysteriously collapsed, EquiLend offered to buy AQS.  Desperate — after years of being blocked and bullied and having spent nearly $100 million in investor money with very little volume or profit to show for it — AQS's owners accepted the offer from EquiLend of less than $5 million for the assets of AQS.

180.    Project Gateway was thus successful.  On August 1, 2016, EquiLend purchased AQS.  In the accompanying press release, Brian Lamb, CEO of EquiLend, said:  "Momentum has been building in the past two years in support of CCPs [central clearing] in the securities finance marketplace.  Balance sheet costs, risk weighting and tougher capital-adequacy requirements have highlighted to the industry the potential benefits of using central clearing services."  He claimed that, by "providing seamless access to OCC's Market Loan Program, the securities finance market now will have unprecedented access to central clearing services."

181.    What Mr. Lamb did not say, however, is that the Prime Broker Defendants only wanted central clearing on their terms.  After buying AQS, the Prime Broker Defendants did not increase their participation in their new electronic trading platform or take other action to make it prosper.  Instead, they bought it to complete their control of central clearing for stock loan and to make sure that central clearing only happened on their terms.

182.    If they had been acting unilaterally, absent Project Gateway, the Prime Broker Defendants would have been driven by the pressures of Basel III to pursue the procompetitive path to central clearing that Ms. O'Flynn had first pursued, instead of collusively reversing it to maintain their control.  As a result, instead of being the largest "dark pool" the world has ever known, the stock loan market today would look more like the modern, electronic, U.S. stock market itself.  Borrowers and lenders would be able to choose any broker they wished to price, trade, clear, and settle stock loans.  Hedge funds could choose whatever prime broker they wished, including any of the Prime Broker Defendants, without fear that same relationship would require them to steer all their stock loan trading through the same broker at inflated rates. Lenders, whether through their custodians or agency brokers or not, could post their inventory on the stock loan trading and clearing platform of their choice, enjoying not only genuine choice but far higher premiums.  There would be, in a word, competition, and lower costs for all.

183.    Instead, because of the Defendants' continuing conspiracy, everyone must go through the Defendants' cartel.  To this day, no buy-side participant can trade and centrally clear stock loans without the involvement of the Prime Broker Defendants.  With their successful capture of AQS, the Prime Broker Defendants stand Cerberus-like at the "gate" of securities lending to prevent lenders and borrowers from clearing and trading securities lending all-to-all.

## II.     ABSENT A CONSPIRACY, THE STOCK LOAN MARKET WOULD BE FAR MORE COMPETITIVE, EFFICIENT, AND TRANSPARENT FOR THE BUY SIDE

184.     As a result of their conspiracy, the Defendants continue to dominate the securities lending market, collectively controlling over 70% of the market.[45]

185.     As detailed above, the Defendants colluded to keep the securities lending market opaque by making the Prime Broker Defendants masters of the exclusive "gateway" that forces the buy side to rely on them, and them exclusively, for stock loan trading.  Defendants have relegated both lenders and borrowers to an inefficient OTC market to protect their own supracompetitive profits.  This market structure is wholly artificial and has directly imposed significant financial harm on other market participants.

186.     The financial harm suffered by borrowers and lenders of securities is directly observable and can be readily measured and quantified.  One way to do so would be to compare the current world of stock loan lending — with the Prime Broker Defendants acting as middlemen and taking 60% of the fees paid by the borrowers — with the "but for" world where the Prime Broker Defendants are disintermediated and their 60% "cut" flows to both the borrowers and lenders minus whatever small fee an efficient, competitive platform would charge.  As AQS itself explained back in 2009, "As a result, pension funds better realize the full intrinsic

---

[45]   Collectively, the Prime Broker Defendants controlled the vast majority of the prime brokerage industry, with a market share (based on hedge fund clients) as of 2016 of 70.4% with Goldman Sachs at 19.1%, Morgan Stanley at 16.4%, J.P. Morgan at 13.7%, Credit Suisse at 8.3%, UBS at 6.6%, Bank of America at 6.3%.  *See Prime Broker Ranking*, HEDGE FUND ALERT, (May 3, 2017), https://www.hfalert.com/rankings/rankings.pl?Q=149.  These share estimates are based on *number* of clients, rather than trade volume or revenues.  Because the hedge fund industry is heavily weighted toward major players, the Prime Broker Defendants likely control a much larger share of the actual volume of stock loan trades.

value of the securities they are lending, while hedge funds and other asset managers reduce

short-selling costs by borrowing securities directly from beneficial owners of assets."[46]

187.    There is a great deal of academic research on the liquidity impact of electronic

trading, including a recent case study of the Kansas City Board of Trade.[47]  As one of the last

futures exchanges to offer side-by-side trading of the same instrument, via both open outcry and

electronic trading, it affords the ability to observe differences in liquidity from alternative

execution methods.  After studying millions of trades the researchers observed that the range of

bid/offer spreads in open outcry trading are 322% that of the identical instrument traded

electronically.[48]  In futures trading there is a single central venue where traders gather to

facilitate price discovery, but trading in the OTC market is far less efficient due to its

decentralized nature.  Accordingly, the gap in pricing between decentralized OTC and electronic

trading would be even larger than the gap observed between open outcry and electronic trading.

188.    The financial harm suffered by buy-side investors can also be measured and

quantified by comparing the securities lending market with the market for other financial

instruments.  Numerous financial instruments have migrated from less transparent or OTC

trading platforms to all-to-all trading over the last two decades including equities, corporate

bonds, and dividend swaps.  The natural migration of financial instruments — from new

bespoke, illiquid, instruments traded OTC to increasingly standardized and liquid instruments

---

[46]  *Id.*

[47]  Samarth Shah  & B. Wade Brorsen, *Electronic vs. Open Outcry:  Side-by-Side Trading of KCBT Wheat Futures,* JOURNAL OF AGRICULTURAL AND RESOURCE ECONOMICS (2011, 36[1]:48-62), http://www.waeaonline.org/jareonline/archives/36.1%20-%20April%202011/JARE,Apr2011,pp48,Shah.pdf.

[48]  *Id.*

traded electronically through more transparent and competitive platforms — is well-documented and the subject of numerous empirical studies and substantial academic research.

189.    Examples include the migration of equities trading on NYSE and Nasdaq to electronic communication networks starting in the mid-1990s,[49] the introduction of post-trade price transparency for corporate bonds in 2002,[50] the subsequent migration of corporate bond trading from OTC to electronic platforms,[51] the opening of electronic order book trading on the NYSE to off-the-exchange-floor market participants in 2002,[52] and the migration of dividend swaps from OTC to exchange-like trading in 2008.[53]

190.    In each of these cases, and many others, the empirical research and academic literature establish that the move towards price transparency and all-to-all trading increased efficiency and lowered costs.  By way of example, recent academic literature studying the migration of corporate bonds away from OTC trading concludes that transaction costs for the

---

[49]    James McAndrews & Chris Stefanadis, *The Emergence of Electronic Communications Networks in the U.S. Equity Markets*, 6 CURRENT ISSUES ECON. & FIN. 12 (Fed. Reserve Bank of N.Y.), Oct. 2000, at 2-3, https://pdfs.semanticscholar.org/1ea6/52dbbba884d116f55d28ae958e18465cc955.pdf.

[50]    Hendrik Bessembinder, William Maxwell & Kumar Venkataraman, *Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds*, J. FIN. ECON. 82, 2006, at 251-288; Amy K.  Edwards, Lawrence E.  Harris & Michael S.  Piwowar, *Corporate Bond Market Transaction Costs and Transparency*, J.  OF FIN., Vol.  LXII, No.  3, June 2007, at 1421, 1438, 1446, 1447, 1448; Michael A.  Goldstein, Edith S.  Hotchkiss & Erik R.  Sirri, *Transparency and Liquidity:  A Controlled Experiment on Corporate Bonds*, 10 REV.  FIN.  STUDIES 235 (Mar.  2007).

[51]    BMO Capital Markets, MARKETAXESS, October 4, 2012.

[52]    Ekkehart Boehmer, Gideon Saar & Lei Yu, *Lifting the Veil:  An Analysis of Pre-Trade Transparency at the NYSE*, J. OF FIN., Vol.  LX, No.  2, April 2005, at 783-815; Kee H.  Chung & Chairat Chuwonganant, *Transparency and Market Quality:  Evidence from SuperMontage*, J.  FIN.  INTERMEDIATION 18, 2009.

[53]    Kian Abouhossein, Delphine Lee & Cormac Leech, *Regulatory Proposal Analysis: Structural IB Profitability Decline*, J.P. MORGAN, Sept. 9, 2009, at 19.

buy side decline rapidly as the number of responding dealers in electronic auctions increases, thus proving the commonsense point that "[c]ompetition lowers costs."[54]  A 2012 academic study comparing bid/ask spreads of bonds that trade on the New York Stock Exchange with bonds that trade only OTC similarly concludes that "the test group [NYSE-traded bonds] has on average 25 basis points smaller effective bid-ask spreads than the control group [bonds traded OTC only]."[55]

## III.   DEFENDANTS' HISTORY OF COLLUSION IN THE FINANCIAL MARKETS

191.   The stock loan conspiracy is but the latest in a string of conspiracies involving the financial markets in which the Prime Broker Defendants have participated.  In several instances, certain Defendants have pled guilty to the anticompetitive conduct.  These admissions not only demonstrate a pattern of repeated conduct, they demonstrate more generally the existence of a corporate culture wherein the Prime Broker Defendants are ready and willing to violate the law and collude with one another whenever they deem it necessary to preserve profits.  This culture of collusion demonstrates that the stock loan conspiracy alleged herein is plausible.

### A.   Municipal Bond Investments Market

192.   In or around 2010, Defendant Bank of America approached the United States Department of Justice ("DOJ") and voluntarily reported its involvement in a conspiracy to rig bids in the municipal bond derivatives industry.[56]  Later, on December 7, 2010, the DOJ

---

[54]   Terrence Hendershott & Ananth Madhavan, *Click or Call? Auction Versus Search in the Over-the-Counter Markets*, 70 J. OF FIN. 1, Feb. 2015, at 441.

[55]   Fan Chen & Zhuo Zhong, *Pre-Trade Transparency in Over-the-Counter Markets*, Working Paper, Aug. 2012, at 3.

[56]   *See* Press Release, DOJ, *Bank of America Agrees to Pay $137.3 Million in Restitution to Federal and State Agencies as a Condition of the Justice Department's Antitrust Corporate Leniency Program* (December 7, 2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/12/07/264827.pdf.

announced that Bank of America agreed to pay $137.3 million in restitution to federal and state agencies in connection with its admitted participation in that conspiracy.[57]  The restitution payment, along with Bank of America's cooperation in the DOJ's parallel investigations of Bank of America's co-conspirators, was a condition for Bank of America's admission into the DOJ's Antitrust Corporate Leniency Program.[58]

193.     On May 4, 2011, the DOJ announced that Defendant UBS AG, as part of a non-prosecution agreement, agreed to pay $160 million in restitution, penalties, and disgorgement to federal and state agencies in connection with admitted anticompetitive conduct in the municipal bond investments market.[59]  As part of its non-prosecution agreement, UBS AG admitted that certain of its then-employees "entered into unlawful agreements to manipulate the bidding process and rig bids on certain relevant municipal contracts, and made payments and engaged in other activities in connection with those agreements, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and certain sections of Title 18 of the United States Code."[60]

194.     On July 7, 2011, the DOJ announced that Defendant J.P. Morgan Chase & Co., as part of a non-prosecution agreement, agreed to pay $228 million in restitution, penalties, and disgorgement to federal and state agencies in connection with anticompetitive conduct in the same market — *i.e.*, the municipal bond investments market.[61]  As part of its non-prosecution

---

[57]   *Id*.

[58]   *Id*.

[59]   *See* Press Release, DOJ, (May 4, 2011), https://www.justice.gov/opa/pr/ubs-ag-admits-anticompetitive-conduct-former-employees-municipal-bond-investments-market-and.

[60]   *See Non-Prosecution Agreement letter In re UBS AG,* DOJ, (May 4, 2011), https://www.justice.gov/atr/file/761041/download.

[61]   *See* Press Release, DOJ, (July 7, 2011), https://www.justice.gov/opa/pr/jpmorgan-chase-admits-anticompetitive-conduct-former-employees-municipal-bond-investments.

agreement, J.P. Morgan Chase & Co. admitted that certain of its then-employees "entered into unlawful agreements to manipulate the bidding process and rig bids on certain relevant municipal contracts, and made payments and engaged in other activities in connection with those agreements, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and certain sections of Title 18 of the United States Code.[62]

### B.      LIBOR Market

195.     On December 19, 2012, the DOJ announced that Defendant UBS AG, as part of a non-prosecution agreement, had agreed to pay $1.5 billion in fines for manipulating LIBOR rates. According to the DOJ's press release, "By causing UBS and other financial institutions to spread false and misleading information about LIBOR, the alleged conspirators we've charged — along with others at UBS — manipulated the benchmark interest rate upon which many transactions and consumer financial products are based."[63]  Other banks ensnared by this investigation included The Royal Bank of Scotland, Rabobank, Deutsche Bank, and Barclays, among others.[64]

### C.      Foreign Currency Exchange Spot Market

196.     Beginning in 2013, media reports surfaced that governmental regulators and enforcement authorities in the U.S. and Europe were investigating potential manipulation of the foreign exchange ("FX") market. Those investigations quickly grew in scope to include

---

[62]    *See* Letter from Christine A. Varney to Thomas Mueller, DOJ, (July 6, 2011), https://www.justice.gov/sites/default/files/atr/legacy/2011/07/07/272815a.pdf.

[63]    *See* Press Release, DOJ, December 19, 2012, available at https://www.justice.gov/opa/pr/ubs-securities-japan-co-ltd-plead-guilty-felony-wire-fraud-long-running-manipulation-libor.

[64]    *See* Financial Institution Fraud, Criminal Division, DOJ, available at https://www.justice.gov/criminal-fraud/financial-institution-fraud.

authorities from across the globe, and have already resulted in criminal guilty pleas, settlements, and fines totaling over $11 billion, as well as the release of orders, notices, and reports detailing exactly how the banks colluded to manipulate the FX market.

197.    On May 20, 2015, the DOJ announced that Defendants JP Morgan and UBS, along with Barclays, Citi, and RBS, were fined a total of $3 billion by the DOJ, and each pled guilty to criminal conspiracy charges for manipulating FX prices and benchmark rates.[65]  The DOJ has since brought criminal charges against individual employees and former employees of the banks for their role in manipulating the FX market, including a former Managing Director at JP Morgan.[66]  Also in May 2015, the Federal Reserve imposed more than $1.8 billion in fines on Defendants Bank of America, JP Morgan, UBS, plus Barclays, Citi, and RBS, for their "unsafe and unsound practices in the foreign exchange markets,"[67] and the New York Department of Financial Services fined Barclays over $400 million for conspiring with other banks, including JP Morgan, to manipulate FX prices.[68]

---

[65]    *See U.S. v. Barclays PLC*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. Citicorp*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. JPMorgan Chase & Co.*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. The Royal Bank of Scotland PLC*, Plea Agreement (D. Conn. May 20, 2015); *U.S. v. UBS AG*, Plea Agreement (D. Conn. May 20, 2015); *In the Matter of Barclays Bank PLC*, CFTC Docket No. 15-24, Order Instituting Proceedings (May 20, 2015).

[66]    *See Three Former Traders for Major Banks Indicted in Foreign Currency Exchange Antitrust Conspiracy* (January 10, 2017), https://www.justice.gov/opa/pr/three-former-traders-major-banks-indicted-foreign-currency-exchange-antitrust-conspiracy.

[67]    *See Federal Reserve announces fines totaling more than $1.8 billion against six major banking organizations for their unsafe and unsound practices in the foreign exchange (FX) markets* (May 20, 2015), https://www.federalreserve.gov/newsevents/press/enforcement/20150520a.htm.

[68]    *See In the Matter of Barclays Bank PLC*, Consent Order, ¶ 44 (Nov. 17, 2015), http://www.dfs.ny.gov/about/ea/ea151117.pdf.

198.    These settlements followed a wave of Orders from November 2014, where the U.S. Commodity Futures Trading Commission ("CFTC")[69] and U.K. Financial Conduct Authority[70] imposed over $1.9 billion in fines on JP Morgan, UBS, Citi, HSBC and RBS for manipulating the FX market, the Office of the Comptroller of the Currency fined Bank of America, JP Morgan, and Citi another $950 million,[71] and the Swiss Financial Market Supervisory Authority fined UBS $141 million for "manipulation, collusion, and other market abusive conduct."[72]

199.    Other global regulators that have investigated the banks' manipulation of the FX market include the Brazilian Council for Economic Defense, which imposed fines on JP Morgan and several other banks,[73] the South African Competition Commission, which found that Bank of America, Credit Suisse, JP Morgan, and several other banks had a "general agreement to collude,"[74] the Australia Securities and Investment Commission,[75] and the Korea Fair Trade

---

[69]    *See CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates* (Nov. 12, 2014), http://www.cftc.gov/PressRoom/PressReleases/pr7056-14.

[70]    *See FCA fines five banks 1.1 billion for FX failings and announces industry-wide remediation program* (Nov. 12, 2014), http://www.fca.org.uk/news/fca-fines-five-banks-for-fx-failings.

[71]    *See OCC Fines Three Banks $950 Million for FX Trading Improprieties* (Nov. 12, 2014), http://www.occ.gov/news-issuances/news-releases/2014/nr-occ-2014-157.html).

[72]    *See* Press Release, The Swiss Financial Market Supervisory Authority, *FINMA sanctions foreign exchange manipulation at UBS* (Nov. 12, 2014), https://www.finma.ch/en/news/2014/11/mm-ubs-devisenhandel-20141112.

[73]    *See* Noticias, Administrative Council for Economic Defense, Brazil, *CADE signs five agreements regarding a cartel investigation in the foreign exchange market and opens a new cart investigation in the Brazilian exchange market* (Dec. 9, 2016), http://en.cade.gov.br/cade-signs-five-agreements-regarding-a-cartel-investigation-in-the-foreign-exchange-market-and-opens-a-new-cartel-investigation-in-the-brazilian-exchange-market.

[74]    *See* Media Statement, Competition Commission, South Africa, *Competition Commission prosecutes banks (currency traders) for collusion* (Feb. 15, 2017),

Commission.[76]  Many of the governmental investigations of FX manipulation remain ongoing, including major inquiries by the European Commission.[77]

200.    The governmental settlements lay out the details of how the banks colluded to manipulate FX prices to their benefit.  For instance, the CFTC found that Defendants JP Morgan and UBS, along with Citi, HSBC, and RBS, "used private electronic chat rooms to communicate and plan their attempts to manipulate the Forex benchmark prices."[78]  Traders used those inter-bank chat rooms to "coordinate[] their trading with certain FX traders at other banks to attempt to manipulate certain FX benchmark rates," and to "disclose[] confidential customer order information and trading positions, alter[] trading positions to accommodate the interests of the collective group, and agree[] on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates."  Those exclusive chatrooms were often given colorful names like "The Cartel," "The Mafia," "The Club," "The Bandits' Club," "The Dream Team," "One Team, One Dream," and "The Sterling Lads."

---

http://www.compcom.co.za/wp-content/uploads/2017/01/Competition-Commission-prosecutes-banks-currency-traders-for-collusion-15-Feb-2016.pdf.

[75]    *See* Georgia Wilkins, The Sydney Morning Herald, *ASIC launches investigation into foreign exchange benchmarks* (Mar. 21, 2014), http://www.smh.com.au/business/asic-launches-investigation-into-foreign-exchange-benchmarks-20140320-355wo.html.

[76]    *See South Korea fines Deutsche Bank, BNP Paribas $157,000 over FX forwards rigging,* REUTERS, (May 16, 2017), http://www.reuters.com/article/us-southkorea-antitrust-idUSKCN18C06G.

[77]    *See* Gaspard Sebag and Stephanie Bodoni, *FX Probe Said to Emerge From Shadows as EU Seeks Bank Data*, Bloomberg (June 3, 2016), https://www.bloomberg.com/news/articles/2016-06-03/currency-probe-said-to-emerge-from-shadows-as-eu-seeks-bank-data.

[78]    *See, e.g.*, *In the Matter of JPMorgan Chase Bank, N.A.*, Order Instituting Proceedings, CFTC Dkt. No. 15-04 (Nov. 11, 2014).

### D.     Interest Rate Swaps (ISDAfix)

201.     Numerous Prime Broker Defendants have also paid substantial sums to government regulators, private plaintiffs, or both to settle claims that they exploited their position on a panel of banks to manipulated the widely-used financial benchmark known as ISDAfix in violation of antitrust and anti-manipulation laws.

202.     Prime Broker Defendants Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, and UBS have collectively paid over $222 million to settle private antitrust and common laws claims concerning these banks' collusive manipulation of the ISDAfix benchmark at the expense of their counterparties and clients.  Goldman Sachs has paid an additional $120 million to settle proceedings initiated by the CFTC for conduct the Commission described at times as "particularly brazen"[79] and always designed to move the benchmark "in the direction that was best for Goldman at the expense of its counterparties and clients."[80]

203.     Numerous of Goldman Sachs' horizontal competitors also paid hefty settlement sums to the CFTC for their manipulation of ISDAfix.[81]  Numerous investigations into ISDAfix manipulation by various governmental bodies remain ongoing.  Highlighting the seriousness of the misconduct of the ISDAfix panel banks, these investigations reportedly involve a criminal dimension.[82]

---

[79]   *See In re The Goldman Sachs Group, Inc., and Goldman, Sachs & Co.*, CFTC No. 17-03, 2016 WL 7429257, at *8 (Dec. 21, 2016).

[80]   *Id.* at *7.

[81]   *See In re Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*, CFTC No. 15-25, 2015 WL 2445060 (May 20, 2015); *In re Citibank, N.A.*, CFTC No. 16-16, 2016 WL 3035030 (May 25, 2016); *In re The Royal Bank of Scotland plc*, CFTC No. 17-08, 2017 WL 511925 (Feb. 3, 2017).

[82]   *See* Matthew Leising & Tom Schoenberg, *CFTC Said to Alert Justice Department of Criminal Rate Rigging,* BLOOMBERG (Sept. 9, 2014),

204.    The Prime Broker Defendants' misconduct related to ISDAfix was undertaken, like that described above, to line their own pockets at the expense of investors, providing another illustration of a lack of internal controls and a culture where the bottom line was used to justify serious misdeeds.

### E.    Credit Default Swaps

205.    In the Credit Default Swaps ("CDS") litigation,[83] Defendants Bank of America, Credit Suisse, Goldman Sachs, J.P. Morgan & Chase, Morgan Stanley, and UBS, together with several entities not named as defendants in this action, were accused of participating in a remarkably similar conspiracy to the one alleged here.

206.    In the CDS litigation, plaintiffs alleged that the defendants — who dominated the over-the-counter CDS market and took advantage of its inefficiencies to reap supracompetitive profits from bid/ask spreads — were threatened by the development of electronic exchanges and clearinghouses for CDS transactions.  These electronic trading platforms threatened to introduce price transparency and other efficiencies that would have eliminated the CDS defendants' ability to charge artificially inflated bid/ask spreads.  In response, the CDS defendants (most of which are named as Defendants here) allegedly conspired to squash this threat by agreeing in secret meetings to, among other things, boycott the use of these new trading platforms.  As a result, according to the CDS plaintiffs, the defendants were successful in blocking the natural evolution of the CDS market from an inefficient over-the-counter market to a more efficient exchange-

---

https://www.bloomberg.com/news/articles/2014-09-08/cftc-said-to-alert-justice-department-of-criminal-rate-rigging-i2z7ngfn.  Indeed, at his deposition in the private civil case, the head of Deutsche Bank's swaps desk from 2007 to 2012 invoked his Fifth Amendment right to avoid self-incrimination in response to questions about his desk's ISDAfix practices.

[83]    *In re Credit Default Swaps Antitrust Litigation*, No. 13-md-2476 (DLC) (S.D.N.Y.).

traded market, resulting in significant damages to those market participants who were forced to continue paying grossly inflated bid/ask spreads.

207.    The defendants in the CDS litigation ultimately agreed to pay over $1.86 billion to settle those claims.

## CLASS ACTION ALLEGATIONS

208.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as representatives of a Class defined as follows:

> All persons and entities who, directly or through an agent, entered into stock loan transactions with Bank of America, Goldman Sachs, Morgan Stanley, Credit Suisse, JP Morgan, or UBS in the United States from January 7, 2009 through the present (the "Class Period").  Excluded from the Class are Defendants, their employees, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint.

209.    ***Numerosity.***  Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class, but believe that there are at least thousands of class members geographically dispersed throughout the United States.

210.    ***Typicality.***  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.  Specifically, Defendants' wrongdoing caused Plaintiffs and members of the Class to pay inflated rates when they borrowed stock or receive unduly low rates when they lent stock.

211.    Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving its own claims, Plaintiffs will prove other class members' claims as well.

212.    ***Adequacy of Representation.***  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.  Plaintiffs and

their counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

213.    *Commonality.*  There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to prevent the emergence of efficient all-to-all electronic trading platforms in the stock loan market, to boycott emerging platforms and force customers to boycott them, to cut off emerging platforms' access to clearing organizations, to jointly purchase and mothball emerging platforms and their intellectual property, and to jointly prohibit real-time price disclosures;

b.    Whether Defendants' conduct violated the antitrust laws;

c.    Whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiffs and other members of the Class;

d.    The effect of Defendants' alleged conspiracy on the prices associated with the lending and borrowing of securities in the United States during the Class Period;

e.    The appropriate measure of damages sustained by Plaintiffs and other members of the Class;

      f.     Whether Plaintiffs and other class members are entitled to injunctive relief; and

      g.     The appropriate injunction needed to restore competition.

214.    ***Predominance.***  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

215.    ***Superiority.***  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

216.    ***Ascertainability***.  The members of the Class are ascertainable by applying objective criteria to business records maintained by the Prime Broker Defendants and class members.

217.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IV.   EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

218.   Defendants' conspiracy was conducted in secret, since that is the only way it could have prospered.  Defendants also affirmatively concealed their anticompetitive conduct from Plaintiffs and the proposed Class since the inception of Defendants' conspiracy.  As a result, Plaintiffs and the proposed Class did not previously discover, nor could they have discovered through the exercise of reasonable due diligence, that they were injured by the acts alleged in this Complaint.

219.   Defendants' wrongful conduct was carried out, at least in part, through means and methods specifically designed to avoid detection and which, until very recently, successfully eluded detection.  In particular, Defendants participated in secret meetings and communications whereby they agreed upon the course of anticompetitive conduct described in this Complaint.  Plaintiffs and the proposed Class were not invited to these secret meetings and had no way of accessing Defendants' communications.

220.   The very nature and structure of the securities lending market itself — which was traded OTC with Defendants serving as intermediaries — made it impossible for Plaintiffs and the proposed Class to compare quotes or otherwise scrutinize Defendants' bid/ask spreads.  In fact, preserving this lack of price transparency is part of the reason Defendants conspired in the first place.

221.   In addition, Defendants publicly misrepresented to customers, potential vendors, and the general public their support for a trading platform that could centrally clear securities lending transactions.  In making those false statements, Defendants actively misled Plaintiffs and the proposed Class as to the true, collusive, and coordinated nature of their actions with the purpose and effect of concealing their conspiracy to preserve the opaque OTC market which

enabled them to charge supracompetitive spreads for intermediating securities lending transactions.

222. For example, in relating its own history on its website, EquiLend states: "In 2000, a group of 10 global financial institutions joined together, looking for ways to optimize efficiency in the securities finance industry by developing a standardized and centralized global platform for trading and post-trade services. EquiLend Holdings LLC was formed in 2001, and the platform went live in 2002." But as discussed throughout this Complaint, the Prime Broker Defendants have used EquiLend to achieve the exact opposite ends — *i.e.*, preventing the opaque, over-the-counter securities lending market from evolving into a more efficient, centrally cleared electronic platform with improved price transparency.

223. Other examples of affirmative misstatements made by Defendants that concealed their conspiracy include, but are not limited to, the following:

a) An October 2014 press release announcing that Morgan Stanley was becoming a member of Eurex Clearing's Securities Lending CCP, where Susan O'Flynn stated: "Morgan Stanley is supportive of CCP [central clearing] solutions for securities lending such as the Eurex Clearing model as it allows us to preserve our client relationships and deliver best execution with risk, resource and operational efficiencies."

b) An October 2016 interview by the Securities Lending Times in which Thomas Wipf was asked how things were progressing with respect to Morgan Stanley's central clearing on Eurex, and where Mr. Wipf replied: "We have grown cleared balances meaningfully since the inaugural launch and look forward to broader volume increases as new members come online."

c) On August 1, 2016, upon announcing EquiLend's acquisition of AQS, EquiLend's CEO, Brian Lamb stated:  "Momentum has been building in the past two years in support of CCPs [central clearing] in the securities finance marketplace.  Balance sheet costs, risk weighting and tougher capital-adequacy requirements have highlighted to the industry the potential benefits of using central clearing services. […] By providing seamless access to OCC's Market Loan Program, the securities finance market now will have unprecedented access to central clearing services."

224.    In reality, Morgan Stanley and the other Prime Broker Defendants did not want to broaden participation in, and use of, Eurex's central clearing services for securities lending transactions, especially if it resulted in direct participation by buy-side firms.  Nor did EquiLend acquire AQS to provide greater access to central clearing; EquiLend acquired AQS so the Prime Broker Defendants could control the gateway through which those centrally cleared securities lending transactions would pass.

225.    As a result of Defendants' affirmative misstatements and acts of concealment, Plaintiffs and the proposed Class had no prior knowledge of the conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.  Thus, all applicable statutes of limitations affecting Plaintiffs' claims and those of the proposed Class have been tolled during the period of Defendants' concealment.

226.    Plaintiffs, either directly or through investment professionals and/or attorneys they hired, regularly monitored their investments — including their activities in the stock loan market — and conducted due diligence to try to avoid being harmed by financial misconduct throughout the Class Period.

227.     In addition, the Complaint alleges a continuing violation (including misconduct and recurring injuries within the limitations period), and Plaintiffs and the proposed Class can recover for damages suffered throughout the limitations period, even absent a finding of equitable tolling or fraudulent concealment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)

228.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

229.     As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to restrict competition in the stock loan market and to jointly boycott entities that would introduce competition on stock loan rates in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination, or conspiracy constitutes a naked, *per se* violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

230.     Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

231.     Stock loan transactions are, and are widely perceived by those in the industry to be, a unique financial product.  The market for stock loan in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

232.    Other products are not substitutable for stock loan.  Taking "short" positions on equity securities that an investor does not already own requires that the investor first borrow the security in the stock loan market.

233.    The relevant geographic market is the United States.  The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

234.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, competition in stock loan transactions between Defendants and their non-Defendant customers has been severely curtailed.  Plaintiffs and class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Plaintiffs' and each class member's damages are directly attributable to Defendants' conduct, which resulted in class members either paying artificially high rates to borrow stock or receiving artificially low rates to lend on every stock loan transaction they conducted during the Class Period.  Plaintiffs' injuries consist of artificially inflated costs or deflated proceeds associated with stock loan transactions in the United States caused by Defendants' misconduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment Under New York law)

235.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

236.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

237.    Plaintiffs and the Class seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

**PRAYER FOR RELIEF**

238.    WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

a.      Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

b.      Find Defendants jointly and severally liable for the damages incurred by Plaintiffs and the Class;

c.      Award the Class treble damages;

d.      Award reasonable attorneys' fees and costs;

e.      Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

f.      Decree that Defendants and their co-conspirators have unlawfully conspired to block the emergence of fully anonymous all-to-all trading of securities lending open to the buy side in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.      Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs and the Class;

h.    Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the stock loan market, a market valuable to not only Plaintiffs and class members but also to the nation's financial system and broader economy for the risk management and liquidity benefits it can provide; and

i.    Order such other, further, and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

DATED:   New York, New York
                August 16, 2017

**COHEN MILSTEIN SELLERS &**
   **TOLL PLLC**

By:    /s/ Michael B. Eisenkraft
Michael B. Eisenkraft
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Fax: (212) 838-7745
meisenkraft@cohenmilstein.com

Kit A. Pierson (*pro hac vice* forthcoming)
Julie G. Reiser (*pro hac vice* forthcoming)
Richard A. Koffman (*pro hac vice* forthcoming)
David A. Young (*pro hac vice* forthcoming)
Robert W. Cobbs
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408 4600
Fax: (202) 408 4699
kpierson@cohenmilstein.com
jreiser@cohenmilstein.com
rkoffman@cohenmilstein.com
dyoung@cohenmilstein.com
rcobbs@cohenmilstein.com

**QUINN EMANUEL URQUHART &**
   **SULLIVAN, LLP**

By:    /s/ Daniel L. Brockett
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Thomas J. Lepri
Thomas Popejoy
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
thomaslepri@quinnemanuel.com
thomaspopejoy@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice* forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com