**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM; LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION; ORANGE COUNTY EMPLOYEES RETIREMENT SYSTEM; SONOMA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION; and TORUS CAPITAL, LLC, on behalf of themselves and all others similarly situated, | No. 17 Civ. 6221 (KPF) **AMENDED CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |

Plaintiffs,

- against -

BANK OF AMERICA CORPORATION; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MERRILL LYNCH L.P. HOLDINGS, INC.; MERRILL LYNCH PROFESSIONAL CLEARING CORP.; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE FIRST BOSTON NEXT FUND, INC.; CREDIT SUISSE PRIME SECURITIES SERVICES (USA) LLC; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO. LLC; GOLDMAN SACHS EXECUTION & CLEARING, L.P.; J.P. MORGAN CHASE & CO.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN PRIME, INC.; J.P. MORGAN STRATEGIC SECURITIES LENDING CORP.; J.P. MORGAN CHASE BANK, N.A.; J.P. MORGAN INSTITUTIONAL INVESTMENTS INC.; MORGAN STANLEY; MORGAN STANLEY CAPITAL MANAGEMENT, LLC; MORGAN STANLEY & CO. LLC; MORGAN STANLEY DISTRIBUTION, INC.; PRIME DEALER SERVICES CORP.; STRATEGIC INVESTMENTS I, INC.; UBS GROUP AG; UBS AG; UBS AMERICAS INC.; UBS SECURITIES LLC; UBS FINANCIAL SERVICES INC.; UBS INVESTMENT BANK; UBS ASSET MANAGEMENT (US) INC.; UBS FUND SERVICES (USA) LLC; EQUILEND LLC; EQUILEND EUROPE LIMITED; and EQUILEND HOLDINGS LLC,

Defendants.

## TABLE OF CONTENTS

OVERVIEW OF THE ACTION ..................................................................................1

JURISDICTION AND VENUE ...............................................................................12

PARTIES ..................................................................................................................14

    A.    Plaintiffs ...............................................................................................14

    B.    Defendants ...........................................................................................16

FACTUAL ALLEGATIONS ...................................................................................28

I.      OVERVIEW OF THE STOCK LOAN MARKET ........................................28

    A.    The History and Function of the Stock Loan Market ...........................28

    B.    The Structure of the Stock Loan Market...............................................31

    C.    The Lack of Evolution in the Stock Loan Market ................................38

II.     DEFENDANTS CONSPIRE TO INHIBIT COMPETITION IN THE STOCK
      LOAN MARKET ............................................................................................41

    A.    Early 2000s:  New Entrants Introduce Price Transparency and Electronic
          Trading .................................................................................................43

          1.    Quadriserv introduces limited price transparency to the stock loan
                market .......................................................................................43

          2.    Data Explorers provides additional price transparency and
                analytics ....................................................................................44

          3.    Quadriserv creates Quadriserv Securities and matches more than
                $2 billion of open stock loan transactions...............................47

          4.    Quadriserv creates AQS to develop an anonymous, electronic
                platform with central clearing of stock loan transactions .........48

    B.    2009-2011:  The Market's Evolution Accelerates ................................52

          1.    AQS launches with a clearing agreement with OCC...............52

          2.    SL-x enters the market ..............................................................58

          3.    Data Explorers continues to expand, and the Prime Broker
                Defendants begin to organize against it ...................................62

C.     The Prime Broker Defendants Conspire to Boycott and Neutralize AQS and SL-x ...................................................................................65

    1.    Goldman Sachs and Morgan Stanley Lead the Prime Broker Defendants to Act as a Cartel ....................................................66

    2.    The Prime Broker Defendants agree to boycott AQS and starve it of liquidity ...............................................................70

    3.    Defendants collude to withhold support from and boycott SL-x ..............73

D.     The Prime Broker Defendants Use EquiLend to Neutralize Data Explorers .........85

E.     The Prime Broker Defendants Agree to "Project Gateway" ................................88

F.     The Prime Broker Defendants' Use of EquiLend as a Forum for Collusion Triggers Special Scrutiny Under the Antitrust Laws ...........................................101

III.    DEFENDANTS' CONSPIRACY CAUSED ANTICOMPETITIVE HARM IN THE STOCK LOAN MARKET ..................................................................................110

IV.    DEFENDANTS' HISTORY OF COLLUSION IN THE FINANCIAL MARKETS .........................................................................................................120

A.     Municipal Bond Investments Market ..................................................................120

B.     LIBOR Market ....................................................................................................122

C.     Foreign Currency Exchange Spot Market...........................................................123

D.     Interest Rate Swaps (ISDAfix) ...........................................................................126

E.     Credit Default Swaps ..........................................................................................127

CLASS ACTION ALLEGATIONS ..................................................................................128

EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS .........................................131

CAUSES OF ACTION ....................................................................................................136

FIRST CAUSE OF ACTION (CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT)...........................................136

SECOND CAUSE OF ACTION (UNJUST ENRICHMENT UNDER NEW YORK LAW) ................................................................................................................137

PRAYER FOR RELIEF ...................................................................................................138

JURY DEMAND ............................................................................................................140

Plaintiffs Iowa Public Employees' Retirement System ("IPERS"); Los Angeles County Employees Retirement Association ("LACERA"); Orange County Employees Retirement System ("OCERS"); Sonoma County Employees' Retirement Association ("SCERA"); and Torus Capital, LLC ("Torus") (collectively, "Plaintiffs"), individually and on behalf of all persons and entities who from January 7, 2009, through the present (the "Class Period") entered into stock loan transactions with Bank of America, Goldman Sachs, Morgan Stanley, Credit Suisse, JP Morgan, or UBS (collectively, the "Prime Broker Defendants") in the United States, bring this antitrust class action for treble damages and injunctive relief and allege as follows:

## OVERVIEW OF THE ACTION

1.      To paraphrase Tolstoy, all efficient markets resemble one another, but each inefficient market is inefficient in its own way.  This case concerns the "stock loan" or "stock lending" market, which is an inefficient, antiquated, and opaque over-the-counter ("OTC") trading market artificially dominated by a handful of large prime broker banks.  As set forth herein, these banks (the "Prime Broker Defendants") conspired to keep the stock loan market frozen in this inefficient state to preserve their collective market control and dominance.

2.      The stock loan market is one of the largest and most important financial markets in the world.  Stock lending is the temporary transfer of stock from one investor to another.  In exchange for cash or noncash collateral and subject to the payment of a "borrowing fee," the owner of shares lends (technically, temporarily sells) its stock to the borrower, which in turn holds the stock for a period of time and then returns the equivalent stock to the lender at the end of the "borrowing" period.

3.      Stock lending plays a vital role in maintaining the liquidity of financial markets. It improves the performance of institutional investors who buy and hold large quantities of shares of publicly traded companies by allowing them to earn a return on their investments while

1

holding a stable interest in the company.  Stock lending also facilitates a practice known as

"short selling."  Short selling is a trading strategy that involves the sale of a stock that the seller

does not own.  For most short sales, the seller must "borrow" the stock from an entity that owns

the stock (the "beneficial owner") in order to cover the short sale.  Selling short without

borrowing stock is like kiting checks—it trades on assets that the trader does not possess at the

time of the trade.  Stock lending goes hand in hand with most short selling that occurs in the

United States equities markets today.

4.      Despite the size and importance of the stock loan market, however, relatively little

is known about this market because transactions are usually only visible to the two parties

directly involved."[1]  The stock loan market remains one of the most closed, inefficient, and

opaque major financial markets in the world.  Market observers describe stock lending as a

trillion-dollar "mother of all dark pools."[2]

5.      There is no good reason why this market remains so opaque and inefficient.

Stocks themselves trade in a transparent fashion on exchanges like the New York Stock

Exchange that are open widely to market participants.  In the stock loan market, by contrast,

there is no central marketplace for stock loan transactions.  Borrowers and lenders have no way

to transact with each other or to see the prices paid on both sides of the market.  They must

instead transact through intermediaries, which are almost always the Prime Broker Defendants.

---

[1]   Adam C. Kolasinski, et al., *A Multiple Lender Approach to Understanding Supply and Search in the Equity Lending Market*, 68:2 J. OF FIN. 559, 559-60 (2013) (observing that "[t]he general dearth of empirical research on the equity lending market is inherently linked to its opacity").

[2]   Terry Flanagan, *Securities Lending:  A $2 Trillion 'Dark Pool*,*'* MARKETS MEDIA (Apr. 17, 2015), http://marketsmedia.com/securities-lending-a-2-trillion-dark-pool/.  A "dark pool" is a private exchange or trading venue that, unlike public exchanges, does not publish price quotations and is therefore opaque or "dark," as customers have little visibility as to price or market conditions.

These banks sit in the middle of nearly all stock loan transactions and take a massive cut of almost every single trade, while keeping the size of that cut largely hidden from other participants to the transaction.

6.      Essentially, the Prime Broker Defendants act as "exclusive matchmakers" for stock lenders and stock borrowers on every trade.  If an investor, for example, wants to borrow a stock to facilitate a short sale, it must contact its broker-dealer.  The broker will locate or acquire the stock from an entity that owns the stock, and the broker will then quote the investor a price for the trade.  For their matchmaking services, which involve very little risk, the Prime Broker Defendants take approximately *65%* of the gross revenues generated each year in the stock loan market, amounting to more than *$9 billion annually*—far more than the returns paid to any other market participant, including the beneficial owners of the stock being lent.

7.      Borrowers and lenders of stock, who are the members of the proposed Class in this case, would benefit greatly from greater transparency, efficiency, and competition in the stock loan market.  Since the early 2000s, there has been significant demand from borrowers and lenders for electronic platforms that would allow them to execute stock loan trades at lower costs and with better returns.

8.      Several financial technology companies developed and introduced solutions that respond to this demand.  These companies include Quadriserv/AQS, SL-x, and Data Explorers. Each of them drew from their founders' deep experience in financial markets and invested substantial money, time, and ingenuity to bring to market viable platforms that would greatly increase transparency and trading efficiency in the stock loan market, for the benefit of borrowers and lenders alike.  Each fell victim to a cartel organized by the Prime Broker

Defendants that conspired to boycott these companies, shut them down, and eliminate them as threats.

9.       Quadriserv/AQS and SL-x both developed electronic trading platforms on which stock loan trades could be executed and centrally cleared at transparent prices.[3]  These companies strongly believed that such platforms were a natural step in the evolution of the stock loan market, and many in the industry (including some within the Prime Broker Defendants' own banks) agreed.  It is well-established in the academic and empirical literature that trading and clearing on electronic platforms improves the efficiency of financial markets and improves price terms for investors.  In both cases, however, the Prime Broker Defendants met this threat by organizing a group boycott of the platforms to starve them of liquidity.  They also took parallel steps to pressure others in the market not to use the platforms and to penalize those who did.

10.       Through their coordinated actions, the Prime Broker Defendants decimated the platforms, leaving them struggling to stay afloat.  At that point, the Prime Broker Defendants swooped in, using their ownership and influence over Defendant EquiLend, a vehicle for their conspiracy, to acquire the crippled platforms.  Having bought the platforms, the Prime Broker Defendants then shut them down and shelved their innovative technology so no one would ever be able to use it to threaten their stranglehold on the market..  The Prime Broker Defendants used similar methods to prevent a third company—Data Explorers, which intended to increase market transparency by offering real-time pricing data to borrowers and lenders—from gaining a

---

[3]  Central clearing virtually eliminates counterparty risk by interposing a "clearinghouse" between the two counterparties to the loan.  The clearinghouse becomes the borrower to every lender and the lender to every borrower.  In the event one party fails to meet its obligations, the clearinghouse steps in and assumes the obligation.  The clearinghouse maintains sufficient capital to stand behind every trade it clears.  By doing so, the clearinghouse creates a more efficient market and mitigates systemic risk, allowing borrowers and lenders to trade without concern of counterparty default.

foothold in the market.  This coordinated interference, over seven years, allowed the Prime

Broker Defendants to maintain their role as intermediaries in a market that otherwise was rapidly

evolving toward an electronic exchange-based model.

11.     The Prime Broker Defendants' conduct was primarily driven by Defendants

Goldman Sachs and Morgan Stanley.  These are the two largest prime brokers in the market,

with the most to lose if the market becomes more open and transparent.  As detailed below, from

time to time, senior personnel from these two banks met in person, one-on-one, to reach

agreement on how to protect their dominant market position as the "gatekeepers" of all stock

loan trading.  This complaint details the dates and attendees of some of these meetings, along

with the subject matter of the agreements reached at these meetings.  To be clear, the fact of

these illicit meetings is not a matter of inference.  They are known to have *actually occurred*.

12.     To ensure their agreements to boycott and squash the new platforms would be

effective, Goldman Sachs and Morgan Stanley recruited the other Prime Broker Defendants to

join their scheme, including certain banks that were initially receptive to the new platforms.

Goldman Sachs and Morgan Stanley recruited the other Prime Broker Defendants primarily

through Defendant EquiLend, which is a "dealer consortium" that gave the Prime Broker

Defendants a convenient excuse for meeting and coordinating their conduct in the stock loan

market.  All of the Prime Broker Defendants were board members of EquiLend, and they agreed

that they would not act individually in the stock loan market, but would instead coordinate their

actions in the market to protect their collective market dominance.

13.     The masterminds and chief coordinators of the Defendants' conspiracy were high-

ranking principals at the Prime Broker Defendants.  These individuals used a variety of known

forums and channels to communicate with one another to plot and carry out the conspiracy,

including EquiLend, private dinners, and phone conversations.  Such communications, and the

forums and channels through which they took place, were entirely different—and increasingly

so—in their content and purpose from the communications that brokers routinely have with one

another in the ordinary course of the prime brokerage business on a trading desk, such as

discussions to locate shares for borrowing.  The communications and coordination among these

principals in furtherance of the conspiracy were not a necessary part of the Prime Broker

Defendants' everyday broker activities, and could not possibly be mistaken as a necessary part of

those activities.

14.     Remarkably, in numerous private conversations, multiple personnel from the

Prime Broker Defendants used the same phrasing to describe the stock loan operations of the

Prime Broker Defendants collectively.  Specifically, these personnel characterized the Prime

Broker Defendants as "the five families" of the stock loan market—a reference to the five major

New York City organized crimes families of the Italian American Mafia.[4]  For example, during a

February 26, 2013 meeting with SL-x executives, one Credit Suisse director who was also an

EquiLend board member explained that EquiLend was like "the mafia run by five crime

families," and proceeded to explain that, as a result, nothing would happen in the market with

regard to SL-x's platform unless the Prime Broker Defendants *jointly* allowed it to happen.

15.     On April 10, 2014, Credit Suisse managing director Shawn Sullivan

recommended "get[ting] all the members of the five families together" to discuss AQS and

related stock loan issues that had emerged in the wake of a recent regulatory development.  On

another occasion, the head of securities lending at Bank of America similarly expressed an intent

---

[4]  *See Five Families*, WIKIPEDIA, https://en.wikipedia.org/wiki/Five_Families (last
visited Nov. 16, 2017).

to convene a meeting of "the five families."  The fact that multiple Prime Broker Defendants used the same mafia reference to describe themselves collectively shows that they knew they had formed an illegal cartel.  Indeed, it indicates they were proud of it.

16.     Emails, records of Bloomberg chats, and other electronic messages exchanged among EquiLend members reflecting the collusive agreement among the Prime Broker Defendants *exist today* on the servers of EquiLend and the Prime Broker Defendants who were its owners.  These communications indicate that EquiLend representatives, including CEO Brian Lamb, had been instructed not to "break rank" and not to take independent actions in the marketplace until the "EquiLend banks" determined as a group whether they would support any of the new platforms.

17.     JP Morgan Managing Director John Shellard admitted during a private meeting with SL-x executives on August 7, 2013 the existence of a "general agreement among Directors" of EquiLend "that industry advances should be achieved from within EquiLend," and a senior Credit Suisse executive told SL-x executives that "we are only going to do this through EquiLend."  Brad Levy, Global Head of Goldman Sachs' Principal Strategic Investments Group, was even more direct, telling SL-x executives:  "You ain't going to get this done."

18.     Time and again, SL-x executives were told privately and in confidence by other market participants (including large stock lending agents BNY Mellon, State Street, and Northern Trust) that the Prime Broker Defendants stood between interested customers and the SL-x platform.  In one such meeting on October 12, 2012, Andrew Clayton, Global Head of Securities Lending at Northern Trust, explained that Northern Trust would like to support SL-x, but could not do so without the approval of Goldman Sachs.  In another instance, BNY Mellon (then Bank of New York) agreed to extend a $50 million line of credit and to participate actively

on AQS, but abruptly withdrew its support after it was threatened by Goldman Sachs with a complete loss of further stock loan business from Goldman Sachs.

19.     Similarly, Morgan Stanley's European Prime Brokerage Desk threatened its hedge fund clients with the loss of critical prime brokerage services if they were to "trade away" their stock lending business to venues such as SL-x.  Hedge funds including Renaissance Technologies, D.E. Shaw, Millennium Management, and SAC Capital were all threatened by Prime Broker Defendants with retaliation if they moved their stock lending business to AQS.

20.     The Prime Broker Defendants' parallel refusals to do business, and their issuance of common threats to others in the marketplace, had their intended effect.  SL-x ran out of funding by September 2014, forcing it to shut down its platform.  The Prime Broker Defendants then used EquiLend to swoop in and purchase the intellectual property of SL-x (including several valuable technology patents) when Palamon Capital Partners (the owner of SL-x) looked for buyers in 2015.  Rather than capitalize on this technology for revenue-generating purposes, they buried it—having acquired it solely for the anticompetitive purpose of keeping it off the market.

21.     Thus, by late 2015, the Prime Broker Defendants had neutralized the threat from SL-x.  But they began to fear that their collective boycott of Quadriserv/AQS had not been sufficient to eliminate the threat that platform posed to their control of the market.  Goldman Sachs' William Conley and Morgan Stanley's Global Head of Bank Resource Management, Thomas Wipf, met in person to discuss options.  Over a series of private meetings and dinners (paid for by Mr. Wipf) held in New York City, these two executives reached an explicit agreement (which, predictably, was later joined by the other Prime Broker Defendants) that the Prime Broker Defendants would use EquiLend to purchase AQS and bury it, just as they had done with SL-x.  By killing AQS (and the ability of any other market participants to access the

8

platform), the Prime Broker Defendants would remain the exclusive "gateway" through which all stock loan transactions must pass, subject as always to their extortionate fees.  Mr. Conley and Mr. Wipf gave their plan the apt name of "Project Gateway."

22.     With the agreement reached by January 2016, Mr. Wipf reported the details of this agreement to his Morgan Stanley colleagues internally on a "pipeline call."  On this call, Mr. Wipf stated that he and Mr. Conley had met and agreed that it was time for both institutions to "get a hold of this thing"—referring specifically to AQS.  Mr. Wipf informed the group that Goldman Sachs and Morgan Stanley had agreed to launch Project Gateway, whose main purpose was to use EquiLend to acquire the assets of AQS, to take control of its operations, and to shut it down.

23.     The plan succeeded.  On July 31, 2016, the Prime Broker Defendants, through EquiLend, acquired the assets of AQS.  As the Prime Broker Defendants planned and intended, by their joint action, they control all "gateways" to central clearing for stock lending.  The market remains frozen in time, and the Prime Broker Defendants continue to dominate an inefficient and opaque, OTC market.

24.     The Prime Broker Defendants similarly used EquiLend to force Data Explorers out of the market.  Data Explorers posed a competitive threat to the Prime Broker Defendants because it threatened to give borrowers and lenders the pricing transparency they lacked in the OTC market.  Data Explorers had signed up borrowers, lenders, and brokers to its data products, and the Prime Broker Defendants were terrified that Data Explorers was on the verge of allowing borrowers to access "wholesale" stock lending data—that is, data showing what beneficial owners were paid by prime brokers for lending their stock—and vice versa.  The Prime Broker Defendants feared that, if borrowers and lenders saw what their counterparties were paying, they

would use competition to reduce the Prime Broker Defendants' outsized intermediary profits.  In the words of Goldman Sachs' Conley, if wholesale data were revealed to retail customers, "it will kill our business."

25.     The Prime Broker Defendants collectively decided that they could not tolerate a fully independent entity with access to all market participants' data.  They coordinated a multi-pronged strategy.  First, they each set out to deter their customers from signing up for Data Explorers, arguing (falsely) that its data was inaccurate.  Second, they set up a new unit within EquiLend—DataLend—that would replicate Data Explorers' products.  Unlike Data Explorers, however, the Prime Broker Defendants would have complete control over DataLend's board, and therefore its product offerings.  DataLend's explicit goal, as EquiLend CEO Brian Lamb told a number of Data Explorers customers, was to "kill" Data Explorers.  The Prime Broker Defendants promptly signed contracts with DataLend, each specifying that the data it collected could be aggregated and reported to Prime Broker Defendants but never given to borrowers or lenders.

26.     The keystone of the Prime Broker Defendants' plan was to cut off Data Explorers' access to wholesale price data from agent lenders.  If the Prime Broker Defendants could monopolize access to price data for even one side of the stock loan market, they could ensure borrowers and lenders would never be able to put their data together and seriously compress dealer spreads.  So they targeted a handful of major agent lenders who aggregate supply for the vast majority of stock loan trades and sought to cut them off from Data Explorers.

27.     DataLend offered the agent lenders essentially the same information they were getting from Data Explorers, but for low or no cost.[5]  DataLend offered to provide the information agent lenders had previously been paying Data Explorers upwards of a million dollars a year, for almost nothing.  The only catch was that DataLend would never provide agent lenders—or anyone else—with the cross-market wholesale-to-retail transparency that would allow borrowers and lenders to negotiate dramatically lower spreads with the Prime Broker Defendants.  DataLend quickly signed up all the major agent lenders, undermining Data Explorers' agent lender revenues and thus sabotaging its ability to transform the stock loan market.

28.     If EquiLend were an independent, profit-seeking firm rather than a screen for the Prime Broker Defendants' conspiracy, it would not have offered its data to agent lenders for free or almost-free.  Indeed, the agent lenders should have been some of DataLend's best customers, as they were for Data Explorers.  But EquiLend did not care about maximizing the value of its customers; it only cared about protecting the Prime Broker Defendants' business.

29.     As a result of their collusion to boycott and squash market entrants, the Prime Broker Defendants secured their role as permanent toll collectors on every stock loan transaction—to the detriment of all other market participants and the United States economy as a whole.  The principal victims are the class members in this case, who receive less favorable financial terms on every transaction and whose trading volume and ability to negotiate prices is artificially restricted by the bottleneck and information opacity imposed by the Prime Broker

---

[5]  DataLend was provided to EquiLend members—including each of the major agent lenders except BNY Mellon—at no additional cost.

Defendants.  Put simply, the Prime Broker Defendants both raised prices on market participants and reduced output in the stock loan market—the hallmarks of anticompetitive activity.

30.     This lawsuit is brought under the federal antitrust laws to address the "supreme evil of antitrust":  collusion among companies that are supposed to compete.[6]  Free-market competition is, and has long been, the fundamental economic policy of the United States.  As the Supreme Court has explained, this policy is enshrined in the Sherman Act, which makes it *per se* illegal for competitors (like Defendants here) to conspire and coordinate with each other to limit competition in the marketplace.[7]  Absent legal action like this case, the Prime Broker Defendants' stranglehold over the stock loan market will persist—to the detriment of Plaintiffs, the class members, and the United States economy as a whole.

## JURISDICTION AND VENUE

31.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiffs and the Class, alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

32.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

---

[6]   *Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004).

[7]   *See N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 4 (1958) ("The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade.  It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.").

33.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

34.     The Court has jurisdiction over Defendants pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22.  Most Defendants are subject to personal jurisdiction in the United States because they were formed in or have their principal places of business in the United States.  The other Defendants are members of the conspiracy and are subject to personal jurisdiction in the United States because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs and class members residing in, located in, or doing business throughout the United States.  For example, Defendants directly conspired through and with EquiLend, whose principal place of business is in New York City.  By way of another example, the conspiracy involved boycotting AQS, a platform located in New York City.  They also met and conspired at EquiLend Board of Directors meetings in New York City and elsewhere, including at private dinners in New York City.

35.     Defendants are also subject to personal jurisdiction because each, either directly or through its respective agents or affiliates, transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action. Specifically, the stock loans at issue were regularly traded through the desks of the Prime Broker Defendants located in New York City.  The Prime Broker Defendants are also subject to personal jurisdiction here because their affiliates conducted stock lending in the United States as their agents, and if they did not, the Prime Broker Defendants would have to have made those trades themselves.

36.     Additionally, the Court has jurisdiction over most Defendants because they have their principal place of business in New York State.

37.     The Court also has jurisdiction over Defendants pursuant to N.Y. C.P.L.R. § 302, because Defendants transact business in New York State; Defendants had substantial contacts with New York State; Defendants committed overt acts in furtherance of Defendants' conspiracy in New York State; each Defendant is an agent of the other Defendants; Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in New York State; and Defendants own, use, or possess real property in New York State.

38.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, because all Defendants are found or transact business in this District.

39.     Venue is also proper pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

## PARTIES

### A.    Plaintiffs

40.     Plaintiff Iowa Public Employees' Retirement System ("IPERS") was founded by the Iowa Legislature in 1953.  Its primary purposes are "to provide a secure core retirement benefit to Iowa's current and former public employees, as well as attracting and retaining quality public service employees."[8]  IPERS has over $31 billion in assets, collects over $1 billion in contributions every year, and pays nearly $2 billion in retirement, death, and disability benefits

---

[8]  *IPERS' History*, IPERS, https://www.ipers.org/about-us/ipers-history (last visited Nov. 16, 2017).

every year.  It has 350,000 members and beneficiaries.  Between 2009 and the present, IPERS has lent significant volumes of stock to the Prime Broker Defendants and their stock borrower clients.

41.     Plaintiff Los Angeles County Employees Retirement Association ("LACERA") is a public pension fund organized under California's County Employee Retirement Law of 1937, Cal. Gov't Code §§ 31450 *et seq.*, with its principal place of business in Pasadena, California. LACERA has provided retirement, disability, and death benefits to eligible County employees, retirees, and their beneficiaries since 1938.  As of June 30, 2016, LACERA had over 165,000 members and held net assets in trust for pension benefits totaling $53.8 billion.  Between 2009 and the present, LACERA has lent significant volumes of stock to the Prime Broker Defendants and their stock borrower clients.

42.     Plaintiff Orange County Employees Retirement System ("OCERS") is organized under California's County Employee Retirement Law of 1937, Cal. Gov't Code §§ 31450 *et seq.*, and has been providing retirement, death, disability, and cost-of-living benefits to employees of Orange County and certain districts for over 70 years.  OCERS has over $14 billion in assets. Between 2009 and the present, OCERS has lent significant volumes of stock to the Prime Broker Defendants and their stock borrower clients.

43.     Plaintiff Sonoma County Employees' Retirement Association ("SCERA") is organized under California's County Employee Retirement Law of 1937, Cal. Gov't Code §§ 31450 *et seq.*, and provides benefits to thousands of employees of Sonoma County and has assets of approximately $2.4 billion.  Between 2009 and the present, SCERA has lent significant volumes of stock to the Prime Broker Defendants and their stock borrower clients.  SCERA has also borrowed significant volumes of stock from its prime broker, Defendant Credit Suisse.

44.     Plaintiff Torus Capital, LLC ("Torus") is a proprietary trading firm with its headquarters in Greenwich, Connecticut.  Between 2009 and the present, Torus has borrowed significant volumes of stock from Prime Broker Defendants Goldman Sachs and Bank of America.

### B.     Defendants

45.     Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

46.     ***Bank of America Defendants.***  Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.  Until sometime after BAC's 2009 acquisition of Merrill Lynch & Co., BAC offered prime brokerage services through its subsidiary Banc of America Securities LLC, a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York.  Banc of America Securities LLC merged into Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, effective November 1, 2010.

47.     On January 1, 2009, BAC acquired Merrill Lynch & Co., Inc. and its subsidiaries. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of BAC.  MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and is a clearing Member of the OCC.

48.     Defendant Merrill Lynch Professional Clearing Corp. ("MLPCC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  MLPCC is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.

49.     Defendant Merrill Lynch L.P. Holdings, Inc. ("MLLPH") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  It is a subsidiary of BAC.  MLLPH is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

50.     As used herein, the term "Bank of America" includes Defendants BAC, MLPFS, MLPCC, MLLPH, and their parents, subsidiaries, and affiliates (including Banc of America Securities LLC).  During the Class Period, Bank of America directly engaged in stock lending transactions with class members.  Bank of America agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and thwart Data Explorers.  During the Class Period, Bank of America was a co-owner of EquiLend and Bank of America employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[9]  Bank of America employees served on the OCC's Board of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017 and on the Depository Trust Clearing Corporation's ("DTCC") Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

51.     Bank of America regularly transacts business in and has substantial contacts with New York, New York.  For instance, one of Bank of America's largest branch offices is located at the "Bank of America Tower," in New York, New York.  According to BAC's website, it has

_____

[9]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

at least 50 financial centers or ATMs in New York, New York.  BAC also has many direct and indirect subsidiaries in New York, New York, and offered prime brokerage services through those subsidiaries in New York, New York, during the relevant period.  As discussed above, MLLPH, MLPCC, and MLPFS each have their principal place of business in New York, New York.  MLLPH, MLPCC, and MLPFS each engaged in stock lending transactions with class members in New York, New York during the relevant period.  In addition, BAC also engaged in stock lending transactions with class members in New York, New York (either directly or through affiliates and agents) during the relevant period.

52.    ***Credit Suisse Defendants.***  Defendant Credit Suisse Group AG ("CSG") is a corporation organized and existing under the laws of Switzerland, with its principal place of business in Zurich, Switzerland.  Defendant Credit Suisse AG ("CS") is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.  It is a wholly-owned subsidiary of CSG.

53.    Defendant Credit Suisse Securities (USA) LLC ("CSSUS") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  CSSUS is a wholly-owned subsidiary of CS, and thus ultimately of CSG.  CSSUS is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.

54.    Defendant Credit Suisse Prime Securities Services (USA) LLC ("CSPSS") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  CSPSS is registered as a broker-dealer with the SEC.

55.     Defendant Credit Suisse First Boston Next Fund, Inc. ("CSFBNF") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of CS, and thus ultimately of CSG.  CSFBNF is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

56.     As used herein, the term "Credit Suisse" includes Defendants CSG, CS, CSSUS, CSPSS, CSFBNF, and their parents, subsidiaries, and affiliates.  Credit Suisse transacts business in New York, New York.  During the Class Period, Credit Suisse, directly or through its affiliate agents, engaged in securities lending with class members.  Credit Suisse agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and thwart Data Explorers. During the Class Period, Credit Suisse was a co-owner of EquiLend and Credit Suisse employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[10] In addition, CS was engaged in discussions and signed a non-disclosure agreement with SL-x prior to Defendants' implementation of the boycott.

57.     Credit Suisse regularly transacts business in and has substantial contacts with New York, New York.  For instance, in their 2016 Annual Report, CS and CSG listed their main office in the Americas as being located in New York, New York.[11]  CS is registered to do business in New York, has direct and indirect subsidiaries in New York, New York, and in 2016, all 105 of CS's U.S.-based employees were located in New York, New York.  As discussed above, CSSUS, CSPSS, and CSFBNF each have their principal place of business in New York,

---

[10]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

[11]   *See* Credit Suisse Group AG & Credit Suisse AG, *Annual Report 2016*, at A-12 (2017).

New York.  CSSUS and CSPSS engaged in stock lending transactions with class members in New York, New York during the relevant period.  In addition, CSG, CS, and CSFBNF also engaged in stock lending transactions with class members in New York, New York (either directly or through affiliates and agents) during the relevant period.

58.    ***Goldman Sachs Defendants.***  Defendant The Goldman Sachs Group, Inc. ("GSG") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  GSG is a direct part owner of EquiLend through Defendant EquiLend Holdings LLC.

59.    Defendant Goldman Sachs & Co. LLC ("GSC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  GSC is a wholly-owned subsidiary of GSG, is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.

60.    Defendant Goldman Sachs Execution & Clearing, L.P. ("GSEC") is a Limited Partnership organized and existing under the laws of the State of Utah, with its principal place of business in New York, New York.  GSEC is or was until recently a wholly-owned subsidiary of GSG, is registered as a broker-dealer with the SEC, and engaged in prime brokerage services in the United States before transferring its brokerage services to GSC in 2016.

61.    As used herein, the term "Goldman Sachs" includes Defendants GSG, GSC, GSEC, and their parents, subsidiaries, and affiliates.  During the Class Period, Goldman Sachs, itself and through its affiliate agents, directly engaged in securities lending transactions with class members.  Goldman Sachs agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and thwart Data Explorers.  During the Class Period, Goldman Sachs was a co-owner of EquiLend and Goldman Sachs employees served on EquiLend's Board of Directors

20

in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[12]  Goldman Sachs employees served on the OCC's Board of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017 and on DTCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

62.     Goldman Sachs regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, GSG, GSC, and GSEC each have their principal place of business in New York, New York.  GSC and GSEC engaged in stock lending transactions with class members in New York, New York during the relevant period.  In addition, GSG also engaged in stock lending transactions with class members in New York, New York (either directly or through affiliates and agents) during the relevant period.

63.     ***JP Morgan Defendants.***  Defendant J.P. Morgan Chase & Co. ("JPMC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

64.     Defendant J.P. Morgan Securities LLC ("JPMS") (formerly known as "J.P. Morgan Securities Inc.") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  JPMS is registered as a broker-dealer with the SEC, and is a clearing Member of the OCC.  JPMS is also the successor in interest to J.P. Morgan Clearing Corp., itself a successor to Bear Stearns Securities Corp.  Both J.P. Morgan Clearing Corp. and Bear Stearns Securities Corp. were engaged in prime brokerage services in the United States, and were part owners of EquiLend

---

[12]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

through Defendant EquiLend Holdings LLC.  J.P. Morgan Clearing Corp. merged with JPMS in

2016.

65.     Defendant J.P. Morgan Prime, Inc. ("JPMP") is a corporation organized and

existing under the laws of the State of Delaware, with its principal place of business in New

York, New York.  JPMP is a wholly-owned subsidiary of JPMS, and thus ultimately of JPMC.  It

is registered as a broker-dealer with the SEC, and provides prime brokerage services in the

United States.

66.     Defendant J.P. Morgan Institutional Investments Inc. ("JPMII") is a corporation

organized and existing under the laws of the State of Delaware, with its principal place of

business in New York, New York.  JMPII is registered as a broker-dealer with the SEC.

67.     Defendant J.P. Morgan Strategic Securities Lending Corp. ("JPMSSL") is a

corporation organized and existing under the laws of Delaware, with its principal place of

business in Wilmington, Delaware.  JPMSSL is a subsidiary of JPMC, and is a part owner of

EquiLend through Defendant EquiLend Holdings LLC.

68.     Defendant J.P. Morgan Chase Bank, N.A. ("JPMCB"), a wholly-owned

subsidiary of JPMC, is a federally chartered national banking association with its principal place

of business in New York, New York.  JPMCB was formerly a part owner of EquiLend through

Defendant EquiLend Holdings LLC.

69.     As used herein, the term "JP Morgan" includes Defendants JPMC, JPMS, JPMP,

JPMII, JPMSSL, JPMCB, and their parents, subsidiaries, and affiliates (including J.P. Morgan

Clearing Corp. and Bear Stearns Securities Corp.).  During the Class Period, JP Morgan, itself

and through its affiliate agents, directly engaged in securities lending transactions with class

members.  JP Morgan agreed with the other Defendants to boycott AQS and SL-x (and then

acquire them) and thwart Data Explorers.  During the Class Period, JP Morgan was a co-owner of EquiLend and JP Morgan employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[13]  JP Morgan employees served on the OCC's Board of Directors in 2009 and on DTCC's Board of Directors in 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

70.     JP Morgan regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, JPMC, JPMS, JPMP, MPJII, and JPMCB each have their principal place of business in New York, New York.  JPMS, JPMP, and JPMII engaged in stock lending transactions with class members in New York, New York during the relevant period.  In addition, JPMC, JPMSSL, and JPMCB also engaged in stock lending transactions with class members in New York, New York (either directly or through affiliates and agents) during the relevant period.

71.     ***Morgan Stanley Defendants.***  Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

72.     Defendant Morgan Stanley Capital Management, LLC ("MSCM") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  MSCM is a wholly-owned subsidiary of MS.

73.     Defendant Morgan Stanley & Co. LLC ("MS&C") (formerly known as Morgan Stanley & Co., Inc.) is a limited liability company organized and existing under the laws of the

---

[13]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

State of Delaware, with its principal place of business in New York, New York.  MS&C is a registered broker-dealer with the SEC and a clearing Member of the OCC.

74.     Defendant Prime Dealer Services Corp. ("PDSC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  PDSC is a wholly-owned subsidiary of MS&C, and thus ultimately of MS.  It is also a registered broker-dealer with the SEC.  PDSC engages in securities borrowing and lending in support of MS&C's prime brokerage services.

75.     Defendant Strategic Investments I, Inc. ("SII"), a subsidiary of MS, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  SSI is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

76.     Defendant Morgan Stanley Distribution, Inc. ("MSDI") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in New York, New York.  MSDI is registered with as a broker-dealer with the SEC.

77.     As used herein, the term "Morgan Stanley" includes Defendants MS, MSCM, MS&C, PDSC, SII, MSDI, and their parents, subsidiaries, and affiliates.  During the Class Period, Morgan Stanley, itself and through its affiliate agents, directly engaged in securities lending with class members.  Morgan Stanley agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and to thwart Data Explorers.  During the Class Period, Morgan Stanley was a co-owner of EquiLend and Morgan Stanley employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[14]  Morgan

---

[14]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

Stanley employees served on the OCC's Board of Directors in 2010, 2011, 2012, 2013, and 2014 and on DTCC's Board of Directors in 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.

78.     Morgan Stanley regularly transacts business in and has substantial contacts with New York, New York.  As discussed above, MS, MSCM, MS&C, PDSC, SII, and MSDI each have their principal place of business in New York, New York.  MS, MS&C, PDSC, and MSDI engaged in stock lending transactions with class members in New York, New York during the relevant period.  In addition, MSCM and SII also engaged in stock lending transactions with class members in New York, New York (either directly or through affiliates and agents) during the relevant period.

79.     **UBS Defendants.**  Defendant UBS Group AG ("UBSG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland.  Defendant UBS AG is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland.  It is a wholly-owned subsidiary of UBSG.

80.     Defendant UBS Americas Inc. ("UBSA"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut.  UBSA is a part owner of EquiLend through Defendant EquiLend Holdings LLC.

81.     Defendant UBS Securities LLC ("UBSS") is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York.  It is a subsidiary of UBSA, and thus ultimately of UBSG.  UBSS is a registered broker-dealer with the SEC and a clearing Member of the OCC.

82.     Defendant UBS Financial Services Inc. ("UBSFS") is a corporation organized and existing under the laws of Delaware, with its principal place of business in Weehawken, New Jersey.  UBSFS is a registered broker-dealer with the SEC and a clearing Member of the OCC.

83.     Defendant UBS Investment Bank ("UBSIB") is a corporation organized and existing under the laws of England, with its principal place of business in London, England. UBSIB, a subsidiary of UBS AG, provides prime brokerage services.  It was formerly known as UBS Warburg until it changed its name in 2003.

84.     Defendant UBS Asset Management (US) Inc. ("UBSAM") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  UBSAM is a registered broker-dealer with the SEC.

85.     Defendant UBS Fund Services (USA) LLC ("UBSFSU") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Hartford, Connecticut.  UBSFSU is a registered broker-dealer with the SEC.

86.     As used herein, the term "UBS" includes Defendants UBSG, UBS AG, UBSA, UBSS, UBSFS, UBSIB, UBSAM, UBSFSU, and their parents, subsidiaries, and affiliates. During the Class Period, UBS, itself and through its affiliate agents, directly engaged in securities lending with class members.  UBS agreed with the other Defendants to boycott AQS and SL-x (and then acquire them) and thwart Data Explorers.  During the Class Period, UBS was a co-owner of EquiLend and UBS employees served on EquiLend's Board of Directors in, at least, 2012, 2013, 2014, 2015, 2016, and 2017.[15]  UBS employees served on DTCC's Board of

---

[15]   Information about EquiLend's Board of Directors prior to 2012 is not currently publicly accessible.

Directors in 2009.  Moreover, UBS AG and UBSIB were engaged in discussions and signed non-disclosure agreements with SL-x prior to Defendants' implementation of the boycott.

87.     UBS regularly transacts business in and has substantial contacts with New York, New York.  For instance, UBS AG has a major branch office, which serves as one of its U.S. headquarters, in New York, New York.  This "flagship" office employs over 150 employees, and derives substantial revenue for UBS, in New York, New York.  UBSA, UBSS, UBSFS, and UBSAM are each registered to do business in New York, and UBSIB maintains an office in New York, New York.  As discussed above, UBSS and UBSAM both have their principal place of business in New York, New York.  UBSS, UBSFS, UBSAM, and UBSFSU engaged in stock lending transactions with class members in New York, New York during the relevant period.  In addition, UBSG, UBS AG, UBSA, and UBSIB also engaged in stock lending transactions with class members in New York, New York (either directly or through affiliates and agents) during the relevant period.

88.     ***EquiLend Defendants.***  Defendant EquiLend Holdings LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant EquiLend LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  It is a subsidiary of EquiLend Holdings LLC.  Defendant EquiLend Europe Limited is a private limited company incorporated in England and Wales, with its principal place of business in London, United Kingdom.  It is a subsidiary of EquiLend Holdings LLC.

89.     As used herein, "EquiLend" includes Defendants EquiLend Holdings LLC, EquiLend LLC, EquiLend Europe Limited and their parents, subsidiaries, and affiliates. [16] EquiLend is owned in part by Defendants Bank of America, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS.  As explained below, EquiLend conspired with the Prime Broker Defendants to prevent the emergence of efficient electronic trading systems in stock lending markets.

90.     EquiLend regularly transacts business in and has substantial contacts with New York, New York.  For instance, EquiLend Europe Limited has multiple officers and directors based in New York.  As discussed above, EquiLend Holding LLC and EquiLend LLC both have their principal place of business in New York, New York and are registered to do business in New York.

## FACTUAL ALLEGATIONS

## I.     OVERVIEW OF THE STOCK LOAN MARKET

### A.     The History and Function of the Stock Loan Market

91.     Stock lending plays a vital role in capital markets and has been called the "oil in the efficient market machine."[17]  By July 2015, the market value of securities on loan globally was approximately $1.75 trillion.

92.     Although the stock loan market has existed for decades, it saw a massive increase in volume in the mid-1960s, as a flourishing U.S. economy attracted investors.  The increased sophistication of financial market participants and their use of increasingly complex financial

---

[16]   Allegations that an individual was a board member of EquiLend mean that the individual was on the board of at least one EquiLend entity.

[17]   Quadriserv Comment Letter on SEC Extension of Temporary Interim Final Rule 204T, File No. S7-30-08, (June 19, 2009), https://www.sec.gov/comments/s7-30-08/s73008-126.pdf.

instruments (such as convertible securities, futures, options, and other derivative instruments) and transactions (including corporate mergers, acquisitions, and restructurings) fueled the need for increased liquidity and market stability through the borrowing of stock.  The trading strategies underlying the growth in the derivatives and options markets relied on effective hedging and risk management, and the upsurge in mergers and restructuring transactions created opportunities for stock traders to speculate for profit on the success of these proposed transactions by buying one company long and selling another short.

93.     The dramatic rise in trading activity on Wall Street that took place in the 1960s and 1970s made it difficult for securities exchanges, their members, and the securities depositories to settle (or consummate) the increased volume of securities transactions that they were processing, which led to unprecedented massive settlement failures.  The automation of securities trading together with an increase in stock lending activity enabled securities firms to begin to reduce the number of settlement failures by borrowing the securities underlying the trades and providing these securities "on loan" to the traders to settle the transactions that were driving their investment strategies.  This booming growth in the stock loan market continued throughout the 1980s and 1990s with the advent of index products and increasingly more complex trading strategies.  All of these strategies required the ability to borrow and lend shares of stock.

94.     A primary use of stock lending is to facilitate short selling.  Short selling is used for many purposes, including to profit from an expected downward price movement, to provide liquidity in response to unanticipated buyer demand, or to hedge the risk of a long position in the same security or a related security.  For example, a seller may short sell a stock at a price certain with the belief that the stock price will decrease, at which point the seller can then buy the stock

at the lower price and makes a profit on the difference.  Or a seller may short sell a stock to hedge against potential price volatility in related securities that it already owns.

95.     In most instances, short sellers do not own the stock being sold.  In these cases, to ensure that it can deliver the stock on the settlement date, the seller must confirm it will be able to arrange to "borrow" the stock from an existing "beneficial owner" via a process known as a "locate."  Practically speaking, when traders wish to take a short position, they typically use the services of broker-dealers who provide the "locate," execute the short trade, and borrow the underlying stock necessary to settle that trade (assuming the broker-dealer does not have the stock in inventory itself).

96.     Stock lending is also commonly used to finance transactions, through the lending of stock against cash.  Recent data indicates that U.S. equities comprise nearly half of all securities available for lending (the pie chart on the left), and account for over 30% of the securities on loan (the pie chart on the right).  The below graphics are drawn from the first quarter of 2015.



*Figure 1*

B.      **The Structure of the Stock Loan Market**

97.     The stock lending market involves a number of participants:

        (a)     **Stock lenders**, who own the stock and make it available to loan, are referred to as the "**beneficial owners.**"  By lending out stock that would otherwise sit idle in their portfolios, these lenders are able to generate additional revenues on the securities.

        (b)     **Agent lenders** act as intermediary agents for the beneficial owners to facilitate the lending of the beneficial owner's stock.  Agent lenders are typically custodian banks (such as State Street and BNY Mellon/Bank of New York), large asset managers (such as Blackrock and Vanguard) who maintain the lenders' securities portfolios in custodial accounts,[18] or in some cases specialist third-party lending agents that are neither custodians nor asset managers (such as eSeclending).  These agent lenders interact with broker-dealers to facilitate the trade and the beneficial owners pay them a portion of the lending fee received by the beneficial owners.  The size of that portion is established by a contract between the beneficial owner and the lending agent.

        (c)     **Broker-dealers** include the **Prime Broker Defendants** Bank of America/Merrill Lynch, Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS. These broker-dealers act as intermediaries or "matchmakers" on every stock loan trade, bringing together a prospective borrower looking to borrow a certain stock with a lender (often through its agent lender) who has this stock available.  The broker-dealers do not reveal to the lender the amount of the fee that they are receiving from the borrower, nor do they tell the borrower the amount of the fee they are paying to the lender.  The broker-dealers typically take a huge cut of the proceeds on each trade, and act as the gatekeepers for which trades are made, between whom,

---

[18]   Custodial banks who act as agent lenders are sometimes called "custodial lenders."

and at what price.  Neither the borrowers nor lenders know how big of a cut the broker-dealer takes out of each transaction.

        (d)    **Stock borrowers** are typically investors engaged in investment strategies that require short selling or risk hedging activities.  In order to engage in these investment strategies, these funds need to borrow the stocks underlying their hedges or short sale trades.  In addition to putting up cash as collateral for the borrowing, stock borrowers also typically pay a fee, or accept a below-market interest rate on their cash collateral, which is allocated among the broker-dealer and the beneficial owner of the stock.[19]

98.    The stock loan market is an "over-the-counter" ("OTC") market, meaning that there is no central marketplace or exchange through which market participants can send their bids and offers to the entire market or obtain real-time trading data such as price and volume information.  Instead, stock loan transactions go through a broker-dealer intermediary that provides the prospective borrower with a single price for the transaction in an opaque market with very limited information.

99.    For example, when a fund wants to borrow stock, it must contact its prime broker directly, via the telephone or an electronic message.  The prime broker will give the borrower a yes or no to the trade and, if yes, a price.  The borrower must either agree or decline to trade, with very limited opportunities to "price shop" by calling competing broker-dealers and comparing their offers (as that is costly and causes delay).  Trades are executed without other

---

[19]   This "fee" sometimes comes in whole or in part in the form of a below-market interest rate on cash collateral. In other words, lenders will pay borrowers interest on the borrowers' cash collateral, but will pay a rate of return below the market rate for cash loans. The difference between the market interest rate and the "refund" rate paid by lenders on borrowers' collateral is commonly understood by all parties as a cost borrowers pay for a stock loan. Hard to borrow stocks often come with a "negative refund," meaning that the borrower gets no interest on its collateral and pays an additional rate to borrow the stock.

market participants being aware of the pricing terms on which the transaction was effected.  As a result, there is little to no price transparency for end users.  The stock borrower thus has very little visibility into the price at which other parties might be willing to transact.  This process is inefficient and opaque and severely limits price competition, which helps keep the fees collected by prime brokers very high.

100.    The stock loan market can be visualized, in simplified form, as follows:



*Figure 2*

101.    As Figure 2 illustrates, under the current market structure, the ultimate borrowers of securities have no viable way to transact directly with lenders.  Instead, they must negotiate with and borrow securities from the Prime Broker Defendants, who in turn source the requested securities from the lenders (through their agents).  Indeed, stock lending transactions are

conducted almost exclusively by both lenders and borrowers through intermediary agents—the agent lenders on the lender side and the broker-dealers on the borrower side.[20]

102.     The Prime Broker Defendants dominate the market for stock lending.  The market for prime brokerage services—which encompasses stock lending—is highly concentrated. Between 2014 and 2017, the top 10 prime brokers accounted for between 89% and 95% of the market, with the Prime Broker Defendants alone holding between 76% and 80% market share. One analyst estimated in 2013 that the Prime Broker Defendants realized approximately 80% of the total securities lending-related revenue generated by the top 10 prime brokers.

103.     In the OTC stock loan market, the Prime Broker Defendants' advantage is enhanced by their complete control over real-time price data, which is unavailable to both borrowers and lenders.  (As in many OTC markets, real-time trading volumes and prices can only be guessed at through discretionary self-reports and incomplete or delayed data from service providers.)  Because customers have little visibility into this market, they have little practical ability to compare or negotiate with the Prime Broker Defendants.  Consequently, there is no market mechanism that imposes consistency in pricing or any restraint on the Prime Broker Defendants from charging different customers whatever they like.

104.     The lack of real-time price information has been a limiting factor in establishing best-execution metrics, and has made performance benchmarking of service providers like the Prime Broker Defendants close to impossible.  These concepts are second nature to investors in other, more efficient markets and help generate better economic terms for investors.  But their

---

[20]   Viktoria Baklanova, et al., *Reference Guide to U.S. Repo and Securities Lending Markets*, *Federal Reserve Bank of New York Staff Reports*, No. 740, 27 (Sept. 2015, rev. Dec. 2015), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr740.pdf.

benefits are denied to participants in the stock loan market.  In essence, the inefficient OTC structure of the stock loan market *prevents* borrowers and lenders from using the natural forces of competition to drive pricing, as it should in any market.

105.    Despite its name, stock "loan" transactions do involve an exchange of legal title. The lender transfers title of the security to the borrower for the duration of the loan—with an irrevocable obligation to return equivalent securities at a later date—and the borrower in turn transfers legal title of collateral to the lender.  The collateral is usually cash or safe securities like U.S. Treasuries.  The loaned stock is marked-to-market daily, with the amount of collateral required to be posted by the borrower adjusted accordingly.

106.    Although the lender technically gives up legal ownership, the economic benefit of any corporate actions accruing to the benefit of the stock holder (such as a stock split or dividend payment) are typically retained by the lender—although any voting rights associated with the stock are not.  Stock loans are typically "open," meaning that the loan has no specific term or tenor.  Either party can terminate the loan at any time.  When the trade concludes, the borrower returns the "equivalent" securities to the lender, along with any outstanding fee.[21]  The lender is obligated to return the collateral.

107.    In a typical stock loan transaction, a lender that is sitting on a portfolio of securities acts through its custodial bank or other third-party lending agent.  The custodial bank

---

[21]  Because securities are generally fungible, it is understood that the borrower will return the "equivalent" securities to the lender at the end of the loan's term—*i.e.*, will return the same amount and kind of stock that was borrowed (*e.g.*, one hundred shares of Amazon stock), without the expectation that these are the same shares that were borrowed from the lender.

often has access to the stock portfolios of any number of institutional clients and can draw from the aggregate basket of securities in its custodial accounts to lend out.[22]

108.    The borrowers, in turn, are required to place orders for stock to be borrowed through one of several broker-dealers (including the Prime Broker Defendants) who interface with the agent lenders to secure the stock to be borrowed.  The agent lender transacts directly with the broker-dealer, who in turn interfaces with the borrowers.

109.    Stock loan documentation is highly standardized.  Each stock loan uses a Master Securities Lending Agreement ("MSLA"), which provides uniformity across transactions and establishes the legal rights and obligations of the parties to the transaction.  The Prime Broker Defendants have established MSLA agreements with each of their agent lender counterparts and borrower clients.

110.    The following figure illustrates the make-up of stock lenders in the market over the Class Period:[23]

---

[22]    While most agent lenders tend to be the custodial banks (such as BNY Mellon) who generally administer and maintain a pension fund or endowment's securities portfolio in their custodial accounts, there are also a select few institutions that have established a specialist practice as agent lenders as an alternative to custodial banks.  These specialist agent lenders are often large asset management or investment management firms who will also act as securities lending agents on behalf of their clients.

[23]    Viktoria Baklanova, et al., *Reference Guide to U.S. Repo and Securities Lending Markets*, *Federal Reserve Bank of New York Staff Reports*, No. 740, 55 (Sept. 2015, rev. Dec. 2015), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/ sr740.pdf.



*Figure 3*

111.     While stock lending was historically an ancillary business for large lenders, they increasingly use stock lending as an important income-enhancing strategy.  Essentially, through stock lending, lenders can collect "rental" fees on otherwise idle assets.  In return for lending the stock, the lender receives collateral from the borrower (consisting of cash or "safe" securities) that the lender holds (and can invest) for the duration of the loan.  Upon the termination of the loan, the stock-for-collateral transaction is unwound, and the lender receives any outstanding fees from the borrower in compensation for the loan.

112.     Stock borrowers pay a fee for the right to use the borrowed stock, often as part of executing a short sale trade.  That fee is ultimately allocated in part to the broker-dealer as intermediary and in part to the stock lender and its agent.  The borrowing rate depends in large part on whether the stock is listed as a "hard to borrow" or "general collateral."  "Hard to borrow" is a designation applied to securities in short supply or for volatility reasons.  "General

collateral" stocks are highly liquid securities that a broker-dealer has "reasonable assurance" to believe will be readily available in the market upon a borrower's request.  These designations change frequently, and are often updated every 24 hours.

113.    In the current OTC market structure, borrowers and lenders are required to use the services of and transact through the Prime Broker Defendants.  The Prime Broker Defendants set the price and terms of the trade, and in return take a hefty fee.  Indeed, their complete domination and intermediation of this market means that they take a large share of the economics of nearly every stock loan trade.  In 2016, for example, the Prime Broker Defendants skimmed more than *65%* off a pot of some $9.15 billion in total industry revenue.[24]  These profits far exceed the benefit of the service provided by the Prime Broker Defendants, who take virtually no risk in brokering these transactions and whose "matching" function could be done far more efficiently.

## C.    <u>The Lack of Evolution in the Stock Loan Market</u>

114.    Financial markets typically evolve over time.  Many financial markets have evolved from an inefficient and high-transaction-cost OTC market to an exchange where participants can meet and transact.  Although the stock loan market has made *other* markets more efficient, it has not itself grown more significantly efficient over time.  The stock loan market today remains almost exclusively an opaque, OTC market that has not been meaningfully improved, or scarcely even been touched, by more modern, transparent trading methods.

115.    There is no natural reason for the stock loan market to continue to operate this way.  There are no technological or structural reasons that this market could not be transformed into a modernized electronic marketplace, as has happened with a number of other financial

---

[24]    *See Sec Lending Experts Discuss Last Year's Top Trades*, Global Investor/ISF (Jan. 31, 2017), http://www.globalinvestormagazine.com/Article/3657556/Sec-lending-experts-discuss-last-years-top-trades.html.

services markets.  The quintessential example of a modern centrally-cleared electronic trading platform is the publicly-traded stock exchange.  Stocks (or equities) are almost entirely traded on technology-driven electronic exchange platforms, which afford participants instantaneous information on trading flow, pricing and volume.  These exchanges also provide a marketplace through which buyers and sellers can directly transact via clearing brokers (such as Charles Schwab, or any other broker with a membership on the relevant exchange) who provide access to and "sponsorship" on the exchange for a minimal and transparent fee.  This allows sellers of securities to offer shares to the entire market and take the highest price, and buyers of securities to make an offer to the entire market and take the lowest price, via a central limit order book.  But this is the Prime Broker Defendants' nightmare for the stock loan market.

116.    Electronic trading is unquestionably beneficial to market participants.  It provides greater price and volume transparency on market trades, expands the number and type of potential counterparties, and does not involve a fee-extracting "middleman" or intermediary between the buyer and seller.[25]  Consequently, such trading results in greater efficiency and significantly better prices for both sides.  This method of trading is the norm for the securities of most publicly traded companies.

117.    The efficiencies created by electronic trading would reduce the cost of portfolio management strategies for investors, increase the number of borrowers, reduce the cost of

---

[25]    As a technical matter, an electronic exchange has a clearinghouse and clearing brokers standing between the parties to match their trades and eliminate counterparty risk, but they do so on a transparent commission basis.  In other words, the profits from these services come from the increased transaction volume that is driven by transparency and low fees—like the $4.95 fee that Charles Schwab charges for an equity trade.  In contrast, in OTC markets the middleman stands in the center of an opaque market with the explicit objective of capturing the largest possible spread between transacting parties;  that is, profits are driven by exploiting the middleman's informational advantage as against both sides and these prices are consequently not transparent or low.

borrowing, and stimulate more stock loan trading and investment. It would also increase the returns that lenders earn on their portfolios. All of this would further lower the cost for companies to raise capital in the equity markets.

118. But the stock loan market has none of this. It is devoid of a central marketplace where buyers and sellers can transact or view pricing and volume information across the entire market. As a result, borrowers today complain that the Prime Broker Defendants' "middleman" pricing is volatile and opaque. Lenders suffer from this same price opacity, and further complain that they cannot lend out more than a small fraction of their available stock as transactions are bottlenecked with the Prime Broker Defendants. The inability of borrowers and lenders to find and transact with each other results in a massive waste of economic resources, yielding artificially higher costs of investment and lower returns on investment. All market participants would benefit from a more modern and efficient stock loan market. That is, all participants except the Prime Broker Defendants.

119. A direct effect of the outdated OTC market structure is that the Prime Broker Defendants are able to exploit the inefficiencies to reap inflated profits at the expense of borrowers and lenders. Bringing lenders and borrowers together in a regulated, centralized trading platform would lower the cost of borrowing and increase the returns on lending. In that trading environment, investors can trade anonymously in real time on electronic platforms, with live, executable pricing and with *any* qualified trading partner.

120. On the New York Stock Exchange or NASDAQ, for example, buyers and sellers (via the electronic platform) make offers to "all" potential counterparties simultaneously—with the platform system matching trades primarily based on price. The seller gets the highest price offered and the buyer gets the lowest price available. It is only a function of the Prime Broker

Defendants' illegal, collusive and monopolistic practices that the modern stock loan market does not operate in this manner.[26]

## II. DEFENDANTS CONSPIRE TO INHIBIT COMPETITION IN THE STOCK LOAN MARKET

121.    Led by Goldman Sachs and Morgan Stanley, the Prime Broker Defendants were motivated to conspire to prevent new entrants in the stock loan market from successfully offering electronic trading and clearing platforms and additional pricing transparency that would threaten the Prime Broker Defendants' collective dominance of this lucrative market.  The threats they faced were so credible that the Prime Broker Defendants did not dare act unilaterally, and so they agreed to act as a cartel.

122.    The Prime Broker Defendants organized and effectuated their conspiracy in large part through EquiLend, a "dealer consortium" formed in 2001 and effectively controlled by the Prime Broker Defendants.  For most if not all of the Class Period, the ten owners of EquiLend included all six of the Prime Broker Defendants:  Bank of America (formerly Merrill Lynch), Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, and UBS.  Since its inception, the Prime Broker Defendants have dominated and controlled EquiLend through its Board of Directors.  They have jointly held a majority of the Board seats from the outset and, through the Board, jointly control EquiLend itself.  Because of the Prime Broker Defendants' joint control

---

[26]    At present, broker-dealers (including but not limited to the Prime Broker Defendants) still have a role in a cleared market.  Only institutions that are *clearing members* of a clearinghouse can transact through a CCP.  Clearing members have contributed to the capitalization of the clearinghouse, and are usually broker-dealers.  However, clearing members can and do sponsor access to CCPs through "agency trading" businesses, in which they vouch for a counterparty's credit with the clearinghouse, for a modest fee.  The clearinghouse then clears the trade, having marked the transaction against the sponsoring clearing member's credit.  This fee is predictable, transparent, and low, in contrast to the grossly inflated bid/ask spreads that are the lifeblood of the Prime Broker Defendants' stock loan desks.

and their overall clout in the market, the other owners of EquiLend effectively acquiesce to the Prime Broker Defendants.

123.    Beyond serving as a vehicle for the Prime Broker Defendants to meet and coordinate their conduct, EquiLend does little if anything of real value in the stock loan market. EquiLend ostensibly offers a bilateral (*i.e.*, one-to-one) trading platform for stock loan transactions along with post-trading, administrative, and other services.  But its trading platform is widely considered to be "archaic" and "entrenched" with very poor functionality, and EquiLend has done very little to develop it in a meaningful way.  Rather than pursue EquiLend's business interests, the Prime Broker Defendants systematically used EquiLend for illicit purposes:  (i) as a forum to discuss and agree on their anticompetitive plans, (ii) to coordinate their boycott of AQS, SL-x, Data Explorers, and other market innovations, and (iii) to pressure other EquiLend member banks to make sure they "understood" what their direction was to be and not to "break ranks" with the Prime Broker Defendants.

124.    They did this in connection with EquiLend meetings and while attending numerous dinners and industry conferences and events ostensibly on behalf of EquiLend.[27]  They did this explicitly in Bloomberg chats, text messages, internal memoranda, recorded phone calls, and emails that still reside today on EquiLend's and the Prime Broker Defendants' servers.  They did this by, among other things, instructing EquiLend's then-CEO, Brian Lamb, to advance an

---

[27]    The former Vice President of Morgan Stanley's securities lending desk has previously testified that there was a high level of interaction and cooperation among supposedly horizontal competitors in the market:  "The securities lending industry is very close-knit industry. . . . Persons employed in the securities lending industry frequently interact, both professionally and socially.  For example, I would regularly have lunches, dinners and casual drinks with securities lending employees working at various prime brokers. . . . [including] the very firms with which [I was] competing fiercely for business."  Decl. of Michael A. Manzino in Supp. of Pls' Opp. to Summ. J. dated Nov. 7, 2011 at ¶4, *Overstock .com Inc. v. Morgan Stanley & Co.*, CGC-07-460147 (Cal. Super. Ct. San Francisco Cnty. Nov. 10, 2011).

agenda through EquiLend to halt the widespread dissemination of pricing data to the market at large.

125.    One industry publication was prescient in this regard:  *Global Custodian* once described EquiLend as a "cartel-cum-service provider" formed to protect the "economics" of an industry that "double[s] or triple[s] the price" of lent securities "before passing them on to hedge fund managers."[28]  As noted, a Credit Suisse director characterized EquiLend as "*the mafia run by five crime families.*"

### A.    Early 2000s:  New Entrants Introduce Price Transparency and Electronic Trading

126.    In the early 2000s, several firms entered the stock loan market with the goal of introducing price transparency and electronic trading.  Drawing on considerable experience in financial markets, these firms developed and launched offerings that were fully viable, technologically and commercially.  They would have succeeded but for Defendants' collusion.

#### 1.    *Quadriserv introduces limited price transparency to the stock loan market*

127.    Quadriserv Inc. ("Quadriserv") was formed in 2001 by a group of industry veterans with the goal of developing and supplying financial applications for the stock loan market.  Quadriserv's founders included Martin Hakker, Sr., who had built more than 30 global exchange trading and clearing systems over a 25-year career, Gregory DePetris, a former commodities floor broker and proprietary trader who had already founded a number of other innovative and successful market structure technology companies, and Joseph Weinhoffer, a

---

[28]    *Hybrid or horror: Can custody and prime brokerage be mixed?*, GLOBAL CUSTODIAN (Dec. 1, 2009), https://www.globalcustodian.com/Magazine/2009/Winter-/Hybrid-or-horror--Can-custody-and-prime-brokerage-be-mixed-/?p=3.

former agency securities lending executive.  It was apparent to these industry veterans that the market was ready to evolve.

128.    In the early 2000s, Quadriserv created Quadriserv Data Services Inc. ("QDS"), which developed a market data service to bring some transparency to pricing in the stock loan market.  Using a "give to get" model—by which a participant could gain access to the data only if it contributed data on its own stock loan transactions—QDS collected stock loan trading data each day from, initially, a group of fewer than a dozen pension funds, agent lenders, hedge funds, and small prime brokers.  QDS assembled this data and made the full dataset, containing data from all participants, available to each participant the following day.

129.    Although the dataset was limited and not real-time, it gave participating hedge funds and agent lenders valuable insight into how stock loan transactions were being priced across the broader market.  One large hedge fund, QDS's first paying customer, later shared with QDS that the data empowered it to save many millions of dollars by renegotiating prices with its prime broker.  This limited example shows just how valuable price transparency can be to investors.

       2.    _Data Explorers provides additional price transparency and analytics_

130.    Data Explorers was formed in 2002 by Charles Sackville and Mark Faulkner, an author of numerous publications regarding securities lending.[29]  Data Explorers' services initially

---

[29]    _See_ Mark C. Faulkner, _An Introduction to Securities Lending_, International Securities Lending Association, https://www.canseclend.com/wp-content/uploads/2016/02/Introduction _to_Securities_Lending_Canada.pdf (3d ed. 2006); http://www.bankofengland.co.uk/markets/ Documents/gilts/securitieslending.pdf (1st ed. 2004).  _An Introduction to Securities Lending_ was originally commissioned by the Securities Lending and Repo Committee, the International Securities Lending Association, the London Stock Exchange, the London Investment Banking Association, the British Bankers' Association and the Association of Corporate Treasurers, and was first published in 2004.

targeted agent lenders, whose pension fund clients were seeking to analyze the revenue streams they were earning and the risk they were assuming in connection by lending securities.

131.    Data Explorers believed that, given the tools of modern technology, there was no good reason for the stock loan market to be so opaque.  Data Explorers thus endeavored to modernize the stock loan market by gathering complete stock loan transaction data from market participants and providing lenders, borrowers, and broker-dealers with access to the aggregated dataset.  At first, Data Explorers gathered data from agent lenders, aggregating it and giving back very basic price information that would let agent lenders see how well their prices fared against other lenders.

132.    Data Explorers offered only data that showed how market participants were faring relative to similarly situated players, with agent lenders only able to access aggregated "wholesale" data relating to the lending side of stock loan transactions, and borrowers only able to view retail or bid-side data relating to the borrowing side of transactions.  For example, a borrower could see how its trades were priced relative to other borrowers, and lenders could see data comparing them to other lenders.  In the opaque world of stock lending, even this limited insight was very welcome and met with strong demand.

133.    Data Explorers launched a product called Performance Explorer, which allowed agent lenders to type in a ticker symbol to see the average lending rate for that security, based on the underlying data that was provided by participating agent lenders.  Performance Explorer was followed by Transaction Explorer, a more advanced technology that gave agent lenders access to a deep array of "wholesale" data—but not the "retail" data from the borrower side of stock loan transactions—that Data Explorers had compiled from banks and other agent lenders.

134.    Data Explorers also used a "give to get" model, by which a participant could gain access to the data only if it contributed data on its own stock loan transactions.  Agent lenders provided their data without hesitation, so that they could gain visibility into the rates at which securities were lent, and analytics such as utilization rates by security (*i.e.*, the number of shares that agent lenders were willing to lend divided by the number of shares that had actually been loaned out).

135.    Data Explorers provided a separate version of Transaction Explorer to borrower clients, with the underlying transaction data provided on the same "give to get" basis.  This version of Transaction Explorer enabled borrowers to access "bid rates" (what borrowers were paying to borrow securities), along with analytics showing how liquid or illiquid a given security was, how heavily borrowed or "short" a security was, and how many buy-side players were borrowing a security.

136.    Data Explorers kept wholesale data strictly segregated from retail or "bid-side" data within Transaction Explorer.  Data Explorers did this to avoid conflict with the Prime Broker Defendants, who were opposed to technology that would allow agent lenders to view bid-side data, or borrowers to view wholesale data.  With borrowing and lending data segregated in their separate silos, the Prime Broker Defendants remained the only market participants who knew the size of the spread between what hedge funds were charged to borrow and what agent lenders were paid to lend.

137.    By 2007, every major agent lender was participating in Transaction Explorer, along with approximately 20 borrower clients who participated in the bid-side version of the technology.  Lenders and borrowers showed strong interest because they could put their own transactions in context, gauging their price negotiations with broker-dealers and creating other

important performance markers for their own deals.  This added value was enough to convince many lenders and borrowers to open their books to Data Explorers.

138.    Data Explorers tried to convince the prime brokers that the value of market level data was worth sharing access to their own data.  For example, Data Explorers could provide market share analyses allowing prime brokers to gauge how they stood with their competitors.  Over time, Data Explorers secured access to several of the Prime Broker Defendants' pricing data in return for providing them with data analytics that, among other things, allowed the Prime Broker Defendants to see, for the first time, accurate data on their market share within the stock loan market.

139.    The Prime Broker Defendants, however, were uniformly insistent that the wall between wholesale and retail data be maintained.  They constantly demanded assurances from Data Explorers that borrowers' and lenders' data were being segregated in Transaction Explorer and repeatedly called Data Explorers with accusations that data was leaking from one side to the other.  Despite Data Explorers' assurances, the Prime Broker Defendants' desire to collectively enforce that wall never abated.

       *3.*    *Quadriserv creates Quadriserv Securities and matches more than $2 billion of open stock loan transactions*

140.    Although QDS's data services began to give agent lenders and hedge funds some insight into pricing in the stock loan market, those market participants had no way to act directly on this newfound knowledge.  In 2005, Quadriserv set out to solve this problem.

141.    Quadriserv created Quadriserv Securities, Inc. and registered it as a broker-dealer.  Quadriserv Securities' broker-dealer status enabled it to serve as an intermediary between borrowers and lenders in the stock loan market.  It also enabled Quadriserv Securities to raise capital, which gave market participants confidence that it was a creditworthy counterparty—

47

confidence that helped entice agent lenders and pension funds to make their stocks available through Quadriserv Securities for loan directly to hedge funds.

142.     Borrower and lender identities remained anonymous throughout the transaction. Quadriserv Securities matched trades for a flat, disclosed fee—unlike the large spreads in the traditional stock loan market, which were undisclosed and unknown to all market participants except the Prime Broker Defendant.

143.     The Quadriserv Securities product offering was immediately popular with borrowers and lenders, who were starved for this type of offering.  By late 2005, more than $2 billion of open stock loan transactions had been matched on the platform, effectively maxing out the credit exposure Quadriserv Securities was capable of assuming, given its limited capital base. In order to grow and accommodate the demand from market participants for electronic, transparent trading services, Quadriserv needed to expand its platform and find a large provider of capital that would stand behind, conceivably, all of the securities lending activity in the industry.

> 4.   *Quadriserv creates AQS to develop an anonymous, electronic platform with central clearing of stock loan transactions*

144.     Through subsidiary Automated Equity Finance Markets, Inc. ("AQS"), Quadriserv next developed an electronic platform that would match borrowers and lenders directly in the stock loan market.  AQS promised to "enhance the profitability and performance of lenders and borrowers alike by reducing spreads, and increasing the overall efficiency of the securities lending marketplace."[30]

---

[30]   *Quadriserv, Inc. Highlights Securities Lending Innovations At TradeTech 2007*, NASDAQ - GLOBENEWSWIRE (March 9, 2007), https://globenewswire.com/news-release/2007/03/09/356337/115225/en/Quadriserv-Inc-Highlights-Securities-Lending-Innovations-At-TradeTech-2007.html.

145.    AQS's ambition was to become a platform for the entire stock loan market.  To do that, AQS pursued access to central clearing.  As noted above, central clearing largely eliminates counterparty risk by interposing a "clearinghouse" between the two counterparties to the loan. The clearinghouse becomes the borrower to every lender and the lender to every borrower.  The clearinghouse maintains sufficient capital to stand behind every trade it clears.  By doing so, the clearinghouse creates a more efficient market and mitigates systemic risk, allowing borrowers and lenders to trade without concern of counterparty default.

146.    Quadriserv/AQS saw that combining loan matching with a direct route to clearing (via a broker) for stock loans would represent a significant advance for the stock loan market. The AQS platform provided a live view of prices, so borrowers and lenders could ask their brokers what the market looked like and get a real-time idea of what prices were.  Bringing lenders and borrowers together in a regulated, centralized trading platform would lower the cost to borrowers of borrowing and increase the returns to lenders on lending.  In such an environment, investors could trade anonymously in real time on electronic platforms, with live, executable pricing and with *any* qualified trading partner.

147.    The Prime Broker Defendants, however, viewed central clearing as a dangerous pathway through which others could challenge their grip on the stock loan market.  The Prime Broker Defendants had long represented their "intermediary" role to clients as a valuable service that protected clients from credit and counterparty risk by standing between clients and lenders in every stock loan trade.  Central clearing would largely usurp this function, leaving clients to question the value of the Prime Broker Defendants' intermediary services.  As one industry

veteran summarized, the very "idea of a securities lending CCP [central counterparty] is anathema to the broker-dealers that continue to intermediate loans."[31]

148.    In or around 2005 and 2006, AQS began quietly negotiating with the Options Clearing Corporation, a U.S.-based central counterparty clearinghouse and the world's largest derivatives clearing organization, to provide AQS with central clearinghouse services.  The OCC Board of Directors is comprised of the five exchanges that own 100% of its equity,[32] along with eight broker-dealers and three "independents."

149.    Several of the Prime Broker Defendants are regularly represented on the OCC Board, and they wield considerable influence there despite not having a formal majority.[33] Accordingly, when approaching OCC Board members regarding its product, AQS went one-by-one to those who it believed would be its advocates.  This campaign was designed to deploy supportive Board members to persuade other Board members expected to oppose any move toward central clearing, by explaining that opposition to clearing was both bad for the market and contrary to the Prime Broker Defendants' own customers' wishes.

150.    When AQS approached OCC in 2005 and 2006, the OCC Board of Directors included the following individuals from the Prime Broker Defendants:  Frank J. Bisignano, the

---

[31]   *The Legends:  Joe Weinhoffer*, GLOBAL CUSTODIAN, https://www.globalcustodian. com/GC-Legends/Weinhoffer,-Joe/.

[32]   These exchanges are the Chicago Board Options Exchange, Incorporated; International Securities Exchange, LLC; NASDAQ OMX PHLX, LLC; NYSE MKT LLC; and NYSE Arca, Inc.  *See 2016 Annual Report*, OCC, https://www.theocc.com/components/docs/ about/annual-reports/occ-2016-annual-report.  Each of these five board members has an absolute veto right concerning OCC decisions.

[33]   For instance, Bank of America (or Merrill Lynch, as predecessor) and Goldman Sachs each sat on OCC's board each year from 2008 to 2017.  A Morgan Stanley representative sat on OCC's board from 2010 to 2014.  JPMorgan employees held OCC board seats from 2008 to 2009. See OCC, Annual Reports (2008-16), https://www.theocc.com/about/corporate-information/annual-reports/.

Chief Administrative Officer of Prime Broker Defendant JP Morgan Chase; Daniel B. Coleman,

the Managing Director and Head of Equities for the Americas for Prime Broker Defendant UBS;

John P. Davidson III, Managing Director of Equity Infrastructure at Prime Broker Defendant

Morgan Stanley; Mitchell J. Lieberman, Managing Director, Global Securities Services for

Prime Broker Defendant Goldman Sachs; Richard R. Lindsey, President Bear, Stearns Securities

Corp.,[34] and Gary Yetman, Managing Director of Prime Broker Defendant Merrill Lynch.  This

made them an influential faction on the OCC Board.

151.    Wayne Luthringshausen, the Chief Executive Officer of OCC at the time, was

supportive of AQS's efforts and wanted to give AQS the ability to clear stock loans via OCC.

But he knew certain Prime Broker Defendants would be concerned about giving AQS access to

central clearing because it would pose a threat to their way of doing business in the stock loan

market.  From the Prime Broker Defendants' perspective, AQS—by centralizing and

standardizing the specific nature of counterparty credit in the stock loan industry—threatened to

eliminate or neutralize the leverage that the Prime Broker Defendants wielded over other broker-

dealers and bank trading counterparties.  In particular, Mr. Luthringshausen understood that

Mitchell J. Lieberman of Goldman Sachs, who was very influential on the OCC Board, would

likely oppose giving AQS any access to OCC clearing.

152.    As a result, Mr. Luthringshausen, in his role as CEO, took pains to have direct

discussions with AQS.  He conducted the majority of the negotiations with AQS without

unnecessarily involving the Board and planned specific Board votes concerning the proposed

deal at times when he knew its most vigorous opponent, Goldman Sachs' Mr. Lieberman, was

not likely to attend.  These efforts ultimately resulted in the successful passage of a proposed

---

[34]    Bear Stearns was acquired by JP Morgan in 2008.

deal with AQS by the OCC Board—a result that garnered Mr. Leiberman significant criticism from within Goldman Sachs for having been "asleep at the wheel" during OCC's AQS approval process.

153.   This event motivated Goldman Sachs determined to organize the other Prime Broker Defendants to ensure that similar events that threatened their tight hold on the market did not happen in the future.

**B.**   **2009-2011:  The Market's Evolution Accelerates**

*1.*   *AQS launches with a clearing agreement with OCC*

154.   On January 7, 2009, Quadriserv launched AQS and announced an agreement with OCC whereby OCC would act as the central counterparty for all securities lending transactions submitted through the AQS platform.  By working with OCC, AQS was able to offer a platform that would "match lenders and borrowers using a hybrid auction and continuous price discovery mechanism" where "matched loans will be processed through the OCC, which will provide central counterparty guarantees."[35]  AQS offered a "hybrid auction" which allowed borrowers and lenders to interact directly with each other (via a clearing broker which provided access to the OCC)[36] and in which every transaction had a unique traceable identifier.

155.   AQS immediately received strong encouragement from the Federal Reserve Bank of New York (under then-President Timothy Geithner) to launch its product swiftly, given the

---

[35]   *OCC Formalizes Agreement With Quadriserv To Launch Centralized Securities Lending Marketplace*, OCC, (Jan. 7, 2009), https://www.theocc.com/about/newsroom/releases/2009/01_07.jsp.

[36]   While there are only a handful of top prime brokers, there are over sixty brokerage firms with stock lending clearing privileges at OCC today.  *See Member Directory*, OCC, https://theocc.com/membership/member-information (last visited Nov. 16, 2017).  Access to OCC clearing, which can be provided by any of these firms, is a commodity service and, in a normal market, would be priced accordingly.

regulator's recognition that improved systemic risk controls in the stock loan market might help to stabilize the reeling financial markets in the wake of the 2008 credit crisis. The Federal Reserve's support gave AQS credibility in the market and considerable momentum.

156.   In early 2009, OCC began centrally clearing stock loan transactions for AQS. By late 2009, AQS announced it had also reached agreement with Eurex, a European clearinghouse, to provide clearing services for stock loan transactions conducted on AQS involving European equities. The combination of U.S. and European central clearing (through OCC and Eurex), together with the electronic, transparent marketplace offered by AQS, promised to move the stock lending market into the modern world of efficient trading.

157.   Illustrating its promise, certain prime brokers (or at least elements within them not beholden to the bank's stock lending desk) supported and even invested in AQS during this time. Bank of America, for example, followed up its initial investment with a larger one in 2009.[37] As noted, these investments in and active participation on AQS were good for Bank of America in light of the support and demand for AQS in the market. Hedge fund clients were contacting competing prime brokers that were uniformly opposed to AQS, and switching to Bank of America, *expressly referencing AQS* in their decisions to do so.

158.   AQS was designed to attract broad-based participation by lenders and borrowers in order to create alternative stable pools of supply and demand. By centralizing counterparties, AQS could reduce traditional lending risks such as counterparty default risk while providing guaranteed mark-to-market payments, mandatory corporate action settlements, and rebate rate payments through OCC.

---

[37]   Citi also invested in AQS early on, but did not participate when AQS looked to recapitalize in 2009. Many clients encouraged Goldman to invest, but Brad Levy and Darren Cohen from their Principal Strategic Investments ("PSI") Group declined to do so.

159.    AQS's goal was to provide equal access to all market participants to an automated centralized marketplace through a single point of contact for trading, clearing, settlement and post-transaction processing—much like the traditional stock market.  AQS enabled individual lenders and borrowers to trade in a common instrument in a common credit environment for the benefit of all market participants.  The AQS platform provided previously unrealized benefits to market participants, including price discovery, trade matching, and clearing.  The OCC, as central counterparty to all AQS transactions, provided anonymous trading by becoming the borrower to the lender and the lender to the borrower, guaranteed delivery of securities versus cash upon close-out of any stock loan transaction, guaranteed daily mark-to-market payments, and guaranteed rebate payments.

160.    Further demonstrating its feasibility and value, AQS won the support of entities such as one of the largest lenders of stock (asset manager Barclays Global Investors), one of the largest borrowers of stock (the quantitative hedge fund Renaissance Technologies), the oldest venture capital fund in the country (Bessemer Ventures), and one of the largest exchanges in the world (Deutsche Bourse, through its Eurex AG and International Securities Exchange subsidiaries).

161.    By September 2009, the AQS platform was primed to offer a marketplace where lenders and borrowers could directly execute stock loan transactions via clearing brokers and centrally clear them via straight-through processing, in conjunction with its partnerships with OCC, DTC, and SunGard's Loanet platform as a reconciliation system.  This was a direct and imminent threat to the Prime Broker Defendants' privileged position in the stock loan market.

162.    AQS also obtained both a financial investment and a commitment from SunGard to connect AQS to its industry-standard back-end system Loanet.  SunGard's Loanet is the

universal accounting and settlement processing system for securities lending, which settles

through the Depository Trust Company ("DTC," a subsidiary of the DTCC).  Since its

establishment in 1980, Loanet has aimed to provide the highest degree of automation possible by

integrating securities lending activity with its clients' trading, bookkeeping, stock record, risk,

capital, credit, regulatory, settlement, and funding systems.  It was designed to become the single

point of entry to control and automate the flow of information among all systems that are

involved in the securities lending process, and is used by over 250 broker-dealers.  SunGard

integrated its Loanet Smart Loan technology with AQS in or around October 2010.

163.    In October 2010, John Grimaldi, executive vice president and general manager of

SunGard's Loanet business unit, commented that "SunGard's Loanet customers have responded

favorably to the first phase of our integration with the AQS securities lending market, which

includes seamless access to AQS' liquidity and price discovery mechanisms.  We are confident

our customers will also respond favorably to our next set of initiatives with AQS, featuring

greater trading and inventory control."[38]

164.    As noted, Quadriserv was able to explain that AQS had the "ability to enhance the

profitability and performance of lenders and borrowers alike by reducing spreads, and increasing

the overall efficiency of the securities lending marketplace."[39]  It did this by taking direct aim at

the "existing inefficiencies and large spreads in the securities lending industry" by providing

"confidential, un-conflicted daily price discovery and transparency by anonymously and directly

---

[38] *SunGard Integrates Loanet Smart Loan with Quadriserv AQS*, FINEXTRA (Oct. 6, 2010), https://www.finextra.com/news/announcement.aspx?pressreleaseid=35958.

[39] *Quadriserv, Inc. Highlights Securities Lending Innovations At TradeTech 2007*, NASDAQ - GLOBENEWSWIRE (March 9, 2007), https://globenewswire.com/news-release/2007/03/09/356337/115225/en/Quadriserv-Inc-Highlights-Securities-Lending-Innovations-At-TradeTech-2007.html.

connecting borrowers and lenders of securities."[40]  "As a result, pension funds better realize the full intrinsic value of the securities they are lending, while hedge funds and other asset managers reduce short-selling costs by borrowing securities directly from beneficial owners of assets."[41]

165.    In other words, Quadriserv/AQS could simultaneously make more money for stock lenders and save money for stock borrowers by drastically reducing the more-than-65% cut skimmed off the top by the Prime Broker Defendants.  For this reason, numerous agent lenders supported AQS as well.

166.    Quadriserv had conducted extensive research to quantify AQS's potential to transform the market.  This analysis was based in part on historical trading data from and comparisons to three other recently modernized financial products markets (the equity options market, the cash equities market, and the futures market).  This analysis showed that repositioning an intermediary that was keeping the lion's share of the profits for itself—*i.e.*, the Prime Broker Defendants and other broker-dealers—would provide substantial financial benefits to both lenders and borrowers in the stock loan market.

167.    AQS looked carefully at three historical precedents of markets that moved to electronic trading from an OTC system:  equity options, cash equities, and futures.  AQS took data from all these examples, and extrapolated what the implications would be for volume growth in stock lending—that is, if stock lending were more fluid, more liquid, and easier to trade, all of which would increase the market volume.  After taking historical variables into consideration and analyzing data from the 1990s to the mid-2000s from multiple sources—ISE (International Securities Exchange) for options, Archipelago Equities (for equities), and ICE

---

[40]  *Id.*

[41]  *Id.*

(Intercontinental Exchange) for futures—AQS estimated that automation in the stock loan market would have the effect of compressing spreads by approximately 32%.

168.    AQS estimated that the overall revenue stream in the stock loan market would decrease due to spread compression, but volume growth would occur and revenues would be redistributed among the various market constituents.  By reducing the role of the Prime Broker Defendants as middlemen, stock borrowers would pay significantly less, and stock lenders would make significantly more.  AQS's modeling predicted that stock lenders' slice would grow because of the greater revenue they would receive, and stock borrowers' slice would grow by virtue of the significant reduction in fees they would pay.

169.    Specifically, Quadriserv's analysis found that the modernization promised by AQS was predicted to *reduce by more than 30%* the total fees paid by borrowers and to redistribute total revenues more fairly as between the lenders/beneficial owners, the agent lenders, and the broker-dealers.  In other words, the AQS platform could simultaneously make more money for stock lenders and save money for stock borrowers (while improving systemic financial system risks) by reducing and redistributing the 65% cut skimmed off the top by the Prime Broker Defendants.

170.    Quadriserv embarked on a marketing campaign to introduce its product to participants in the existing stock loan market.  When presented with the improvements AQS would make to the existing market structure, it became clear to AQS that the Prime Broker

Defendants perceived a threat.  But in the words of Joe Weinhoffer, one of the founders of AQS/Quadriserv, he was willing to "fight[] the prime brokers with Quadriserv."[42]

171.    Once the Prime Broker Defendants circled the wagons, as further discussed below, AQS began to receive veiled and not-so-veiled threats.  AQS executives canvassing the market to gain support for the AQS platform were repeatedly told, in no uncertain terms, that there would be severe repercussions for crossing the Prime Broker Defendants in the stock loan space.  During a meeting with the DTCC on April 8, 2008, for example, AQS executives were originally told by DTCC's Managing Director and General Manager Fixed Income Clearance and Settlement Group, Thomas Costa, that "this sounds great, but who's going to start your car in the morning?"

2.      *SL-x enters the market*

172.    Another innovative entity that emerged in the stock lending space around this time was SL-x (*i.e.*, securities lending exchange).  Like AQS, SL-x developed a platform offering an electronic marketplace for stock lending transactions.  Founded in late 2010 and primarily developed over the course of the following two years, SL-x offered an electronic, front-end trading system for stock loans, employing a patented electronic trading system designed to build upon the relationship-based facets of the OTC model.

173.    As noted, in the OTC stock loan market, borrowers and lenders had to contact the Prime Broker Defendants by telephone or instant messages in order to get a quote for a stock loan trade.  SL-x promised to replace this inefficient method with an electronic system where

---

[42]    *Legends of Securities Lending*, GLOBAL CUSTODIAN, https://www.globalcustodian.com/Magazine/2009/Securities-Lending-and-Financing-Black-Book-/Legends-of-Securities-Lending-/?fullstory=true&p=13.

broker-dealers could communicate bids and offers much more efficiently on an electronic platform.  This would drive price transparency and competition for the benefit of investors.

174.    Having observed the difficulties encountered by AQS's more ambitious market offering, however, SL-x executives took care to design a product intended to be less disruptive to the existing market structure, while still taking steps toward a more efficient system.  To do so, SL-x built an electronic platform where bids and offers were shared between prime brokers, broker-dealers, and agent lenders, enhanced with real-time pricing data.  In addition to all of the benefits of central clearing, SL-x aimed to replace one-on-one communications via phone call, Bloomberg message, or even fax with an on-screen platform that tied traders into their existing market contacts simultaneously.  Participants could check the price and quantity of recent completed loans in real time, negotiate with many people at once in addition to one-to-one, and get an unprecedented peek at which lenders had baskets of stock to loan out without picking up the phone.

175.    SL-x had a real-time display of the price and quantity of completed loans (through SL-x), which anyone with an account could view.  Using a screen rather than a telephone or other antiquated devices meant negotiations could happen with one or more parties simultaneously.  SL-x also performed preliminary matching/screening to make sure the agent lenders with whom the broker was negotiating were likely to have enough relevant stock to get to a deal, increasing matching rates.

176.    For lenders, more of their stocks would be visible to potential borrowers through their agent lender's network of broker-dealer counterparts, allowing for more loans and more investment returns on their stock portfolio.  Similarly, borrowers ultimately would find the stocks they wanted more readily, and with a new pricing benchmark.

177.    The trade data SL-x intended to provide was real-time pricing information (including stock name, trade time, trade quantity, and trade price) on a live ticker viewable by all platform participants, providing an up-to-the-minute stream of available, actionable stock loan prices for all SL-x users.  As SL-x CEO Peter Fenichel later explained:  "The addition of real time data fills an important gap in the information available for stock loan transactions, and our system's unique capabilities will streamline customers' workflow as well as reduce their capital requirements, and provide relief to their counterparty credit constraints on centrally cleared trades."[43]  In addition to the real time information from the SL-x system, SL-x worked to integrate data and analytics from other market sources.

178.    The SL-x platform also permitted central clearing (through Eurex Clearing, a central counterparty based in Germany) of all transactions in Belgian, Dutch, French, German, and Swiss stocks executed on the platform, and it took steps to access central clearing in the U.S. as well.  Central clearing through SL-x would reduce risk to banks, allowing them to keep less capital on hand in case of a default, making bank balance sheets stronger and freeing up capital for other investments.  Traders would have a better window into the marketplace, allowing loans to be made faster, and more loans to be made overall, all within existing networks of contacts.

179.    While SL-x did not plan to offer anonymous trading between end-borrowers and lenders immediately upon launch, the platform would immediately have increased competition in the stock lending market and compressed trading spreads—reducing costs for borrowers, increasing returns for lenders, and shrinking the outsized profits the Prime Broker Defendants were able to capture in the OTC system.  Broker-dealers and agent lenders using the system

---

[43]   Georgina Lavers, *Lending Given Path Between SL-x and Markit*, SECURITIES LENDING TIMES (Oct. 9, 2013), http://www.securitieslendingtimes.com/securitieslendingnews/article.php?article_id=218939.

could trade anonymously from the start, or request or reveal identification during negotiations. By providing access to live trading data and an electronic mechanism for the traders to request additional quotes, borrowers communicating with their broker-dealers would have access to more pricing and trade information, which they could use to negotiate lower trade pricing and better assess competing quotes between different broker-dealers.

180.    The SL-x trading platform was also designed to apply technological innovations drawn from social networking to the stock loan market.  Broker-dealers and agent lenders would benefit from automated matched transactions for easy-to-borrow stock.  For hard-to-borrow stocks, SL-x offered an innovative bilateral trading feature permitting simultaneous one-to-one and one-to-many negotiations.  The connections between negotiating parties were designed to retain existing market relationships using social networking techniques amongst known partners instead of a marketplace connecting all possible parties.  Broker-dealers could even view prices in an order book, pre-trade.  SL-x had developed a patented program to progressively reveal information about each party, and important criteria such as number and price of securities and the nature and amount of collateral.

181.    Broker-dealers participating in a centrally-cleared SL-x stock loans trading platform were estimated to receive more than $8 billion in capital savings benefits through balance sheet risk weighting and the zeroing out of counterparty credit risk when facing a central counterparty.  Additionally, broker-dealers could have benefited from reduced operational and administrative costs through the efficiencies of an electronic trading system compared to the OTC market.

182.    Beginning in the fall of 2011, SL-x began marketing itself as the "softer, friendlier" market innovation that would not pose a threat to the prime brokers' existing

relationships or revenue stream.  But this was no comfort to the Prime Broker Defendants.  To the Prime Broker Defendants, SL-x was still a "Trojan horse" that could come to threaten their hold on the market and disintermediate them.

183.    As detailed below, when meeting with representatives of SL-x, certain personnel of the Prime Broker Defendants indicated that they appreciated the value of the technology SL-x had developed.  But behind closed doors, they were alarmed by the way SL-x provided price disclosure on trades.  That SL-x would list prices (post-trade) on a real-time ticker threatened to draw back the curtain of opacity that the Prime Broker Defendants had collectively maintained, as no one (including SL-x) knew how much the prime brokers were charging on stock loans.

184.    It was this trade data transparency that, in the words of SL-x executives, the Prime Broker Defendants found "most controversial" and caused the "color to drain out of their face" when explained at in-person sales meetings.  As explained by Deutsche Bank's Head of Supply Trading, Kevin Soobadoo, in one such meeting that took place with SL-x executives in October 2012, among the prime brokers' concerns about SL-x was that it provided "too much transparency," or at least "too much immediate transparency," for comfort.  JP Morgan requested the ability to turn off the real-time ticker, or block certain trades from being included, a request that SL-x declined.

    3.    *Data Explorers continues to expand, and the Prime Broker Defendants begin to organize against it*

185.    By 2009, Data Explorers had spent years and invested considerable resources to amass market data from agent lenders and beneficial owners.  Beneficial owners had proved especially eager to enjoy the transparency that Data Explorers was working to provide, so that as lenders they could have an informed assessment of how well they were making use of their stock portfolio.  Up to this point, the Prime Broker Defendants had tolerated Data Explorers' growing

presence, in part because they were content to use Data Explorers' information for their own decision making, and because of Data Explorers' willingness to ensure that borrowers never saw lending-side data, and vice versa.

186.     As the Prime Broker Defendants knew, however, Data Explorers always intended that its product offerings would evolve along with the market, to provide the type of real-time, actionable pricing data that market participants wanted.  As new entrants like AQS and SL-x pushed the market forward toward fully electronic and transparent stock loan trading, and Data Explorers' product portfolio continued to expand among borrowers and lenders, the Prime Broker Defendants grew increasingly wary that Data Explorers would eventually package data that would expose the breadth of the price gap between borrowers and lenders—the gap from which dealer profits were drawn.

187.     The Prime Broker Defendants' fears were crystallized by Data Explorers' building success among major hedge funds.  Through 2009, Data Explorers had largely been focused on agent lenders, who were anxious to benchmark their stock loans.  Though Data Explorers had hedge fund clients, the Prime Broker Defendants did not view these clients as posing a real threat of market-wide price transparency.  In 2010, however, Data Explorers signed Och-Ziff, a major hedge fund whose Head of Portfolio Management, James O'Connor, was vocal about Data Explorers' usefulness.

188.     After the Och-Ziff deal, Data Explorers began to take off among hedge fund clients, and the Prime Broker Defendants took notice.  During this period Data Explorers also began offering "performance" data and other similar products, which would allow market end-users (*i.e.*, borrowers and lenders) to have some insight into whether the financial terms they

were receiving for, say, lending a particular stock were consistent with the terms of comparable market trades.

189.    The Prime Broker Defendants' mounting anxiety manifested in accusations that Data Explorers was leaking data between borrowers and lenders.  In a series of ten meetings over the course of 2011 and 2012, Goldman Sachs' Shawn Byron and William Conley repeatedly grilled Data Explorers, paranoid about the prospect that Data Explorers was not siloing borrower and lender data, despite Data Explorers' constant assurances that there was no leakage.

190.    The Prime Broker Defendants gradually decided they could not entrust market data to a firm they did not control.  They began to push back against the emerging threat they saw from Data Explorers, which was gaining momentum and attracting a larger and larger client base by allowing clients to begin to see through the stock loan market's unnecessary fog of opacity.  Eventually, this distrust would coalesce into a coordinated plan to destroy Data Explorers using EquiLend.

191.    In one early example of this resistance, State Street faced powerful opposition when its support for Data Explorers became known to the Prime Broker Defendants.  In approximately the second or third quarter of 2010, a representative from Goldman Sachs contacted Peter Economou at State Street (a large, influential agent lender) and demanded that State Street not report any of the trading data concerning State Street's trades with Goldman Sachs to Data Explorers, threatening State Street's business if it did not comply.  State Street, regarding the data as their own, refused to comply, further heightening the Prime Broker-dealers' anxiety about and desire to act against Data Explorers.  Goldman Sachs also contacted numerous hedge funds, including SAC Capital Advisors, in a campaign to try to keep them from sharing any trading data with Data Explorers, with inconsistent success.

192.    The Prime Broker Defendants also took surreptitious steps to undermine the quality of the market data that Data Explorers provided to its customers.  For example, when borrower clients instructed Morgan Stanley to provide Data Explorers with their market data, Morgan Stanley would provide a file that contained stale, sparsely populated data scrubbed clean of any timely or actionable information.

193.    While Data Explorers did not offer an electronic trading platform like AQS and SL-x, the Prime Broker Defendants understood the threat it posed.  In the OTC stock loan market, borrowers and lenders do not have access to real-time pricing.  The Prime Broker Defendants benefitted from this opacity which made it difficult, if not impossible, for borrowers and lenders to engage in price discovery.  Releasing this data would not only give borrowers and lenders ammunition to push back on the Prime Broker Defendants' opaque pricing and execution practices, it would constitute a fundamental step towards a more transparent electronic trading environment.

194.    Data Explorers' increasing momentum in the market thus gave the Prime Broker Defendants reason to fear that the price transparency promised by Data Explorers would threaten their profit center.  Soon, that fear coalesced into active and coordinated countermeasures.

C.    **The Prime Broker Defendants Conspire to Boycott and Neutralize AQS and SL-x**

195.    The market momentum that products such as AQS, SL-x and Data Explorers were gaining in the 2009 and 2010 time period posed a major threat to the multi-billion dollar stock lending business of the Prime Broker Defendants.  Each of these products separately, and certainly in combination, threatened the Prime Broker Defendants' privileged intermediary position and their ability to extract huge profits on opaque and inefficient stock loan transactions.

1.      *Goldman Sachs and Morgan Stanley Lead the Prime Broker Defendants to Act as a Cartel*

196.    Goldman Sachs—the market leader that had the most to lose from the success of these products and was a primary driver behind the conspiracy—recognized this threat from the outset.  As early as 2009, when AQS began marketing its services to the Prime Broker Defendants and other market participants, Goldman Sachs refused ever to consider supporting the platform.  It took the same initial hard line approach to SL-x when that product began marketing itself in 2011, and its stance never wavered.

197.    Meanwhile, other second- and third-tier broker-dealers—including some of the other Prime Broker Defendants—initially recognized the benefits to the market that were offered by these platforms, and even saw benefits to themselves from these products' ability to open up competition with Goldman Sachs and Morgan Stanley from the smaller players in the stock loan prime brokerage industry.

198.    Even among top ten prime broker banks, Goldman Sachs and Morgan Stanley held the large majority of the stock loan brokerage business, followed after 2008 by Credit Suisse as a close third.  The other broker-dealers who serviced this business—such as Interactive Brokers, Jeffries, and certain other Prime Broker Defendants—benefitted from their collective positions as market intermediaries, but not nearly to the degree that Goldman Sachs and Morgan Stanley (and to a lesser degree Credit Suisse) did.  They thus recognized a potential benefit to themselves from products that might enable them more effectively to compete with Goldman Sachs and Morgan Stanley for a larger share of the stock loan market.

199.    As these platforms and products began gaining momentum in and around 2009, however, Goldman Sachs and Morgan Stanley brought their enormous leverage to bear to corral the remaining Prime Broker Defendants (all EquiLend member banks who held seats on

EquiLend's Board) to join a conspiracy by which the Prime Broker Defendants (collectively and through EquiLend) acted as a cartel to neutralize and eliminate these platforms as competitive threats, for the collective economic benefit of the Prime Broker Defendants.

200.    In September 2009, Quadriserv/AQS executives learned that, during a conversation with the Head of the Stock Loan Desk at Defendant Bank of America/Merrill Lynch that took place weeks earlier, Goldman Sachs' Conley "got so angry at the mention of [Quadriserv/AQS's] name that spit was coming out of his mouth."  Conley told the Bank of America executive that he was "opposed to transparency in any form," and that his opposition was driven by the above-market spread Goldman Sachs secretly made on stock loan transactions. Conley pressured Bank of America to reverse course and to join the opposition to Quadriserv/AQS or risk being ostracized by the other Prime Broker Defendants.

201.    On September 29 and 30, 2009, the SEC held a roundtable discussion on securities lending that included panels on "Improving Securities Lending for the Benefit of Investors:  Transparency; Electronic Platforms; Central Counterparties; Accountability" and "Controls on 'Naked' Short Selling:  Examination of Pre-Borrow and Hard Locate Requirements."  Panel members included, among others, the Co-Founder and Chief Strategic Officer of Quadriserv/AQS, the Chief Executive Officer of Quadriserv, Goldman Sachs' William Conley, Credit Suisse's Shawn Sullivan, and representatives from SunGard's Astec Analytics, agent lender Brown Brothers Harriman, and custodial lender State Street.

202.    In advance of these roundtable discussions, the executive from Bank of America/Merrill Lynch that faced pressure from Goldman Sachs' Conley convened what he characterized as a meeting of "the five families"—a mafia-related term that the Prime Broker Defendants often used to describe themselves collectively—so the Prime Broker Defendants

could settle on their collective messaging about these new electronic platforms in advance of the roundtable.  The meeting occurred, and AQS began seeing a harsher tone from the Prime Broker Defendants afterwards

203.    Also during this same time period, Goldman Sachs' Conley, Credit Suisse's Shawn Sullivan and various others held a private meeting to discuss the emerging threats from electronic platforms like AQS.  During this private meeting, they each agreed to oppose AQS and disparage AQS and central clearing during the roundtable discussion.  One of the members present at this secret meeting later expressed personal remorse to another conference attendee regarding the planned attack, quietly telling the attendee that she felt "sorry for what we're about to do" to AQS.

204.    Following the meeting, Sullivan of Credit Suisse spoke out against the AQS offering at the roundtable discussions.  He told the group that there was no proposal for central clearing that "truly addresses the unique characteristics inherent in the securities lending market," and that a central counterparty would "most likely *reduce* liquidity in the marketplace"—a sentiment seemingly without basis and unsubstantiated by industry or academic opinion.  He also stated, contrary to the economic reality of central clearing, that "if you have more bidders in the process, you're most likely going to have a deterioration in the credit quality of the counterparts, and that's something that a beneficial owner does not want to be exposed to."

205.    As a result of the pressure of Goldman Sachs, Morgan Stanley, Credit Suisse, and others, the behavior of Prime Broker Defendant Bank of America also began to shift.  As noted above, Bank of America was a strong early supporter of AQS and its vision for the stock loan market, making equity investments in AQS in 2007, 2008, 2009 and early 2011.  This early support was driven by Rohit D'Souza, who had run Capital Markets for Merrill Lynch and

believed Merrill should take a leadership role in modernizing the whole industry.  Senior

management and business units followed through on D'Souza's mandate, under the direction and

leadership of Mike Stewart (Head of Equities), Syl Chackman (co-Head of Prime Brokerage),

and Artie DiRocco as (Head of Securities Lending).

206.     As a result of the pressure from Goldman Sachs, Morgan Stanley, and others,

however, this support began to wane.  By late 2011, Bank of America's attitude had markedly

changed.  Bank of America/Merrill Lynch personnel who had formerly supported AQS were

purged.  For example, Mike Stewart, Global Co-Head of Equities, had supported and actively

promoted the AQS investment, and encouraged sales and operations personnel to try to help

AQS succeed.  Stewart was abruptly replaced with someone who would bring Bank of America

into line with Goldman Sachs, Morgan Stanley, and the other Prime Broker Defendants:  Stuart

Hendel, the former head of prime brokerage at Morgan Stanley and UBS, was named the new

head of Global Prime Brokerage at Bank of America.

207.     Once appointed, Hendel immediately began shutting down internal resources

dedicated to AQS and directing personnel to discourage and disavow the investment.  He ordered

the stock loan desk to limit the volume of transactions that could be placed on the AQS platform:

Going forward, the desk could put on only $1 billion of notional loans each day, a tiny fraction

of Bank of America's normal daily volume.  The new policy choked off dealer volume on AQS.

Under Hendel's direction, Bank of America made no further investments in AQS and stopped

providing any meaningful support.

208.     The conspiracy among the Prime Broker Defendants to boycott and eliminate

AQS, and SL-x that strengthened by 2011 is evidenced by the identical actions by each of the

Prime Broker Defendants to act in concert to pull its support from the products (in many cases

after initially acknowledging the products' great value to the market), to starve the products of

the liquidity and data that they needed to survive, and to bully and coerce others to turn their

back on the products.  Although the specific facts surrounding Defendants' adverse actions

against each of AQS, SL-x, and Data Explorers were unknown to each of the respective targets at

the time, in hindsight and with full knowledge, the similarities in Defendants' approach vis-à-vis

each product are striking.

2.     *The Prime Broker Defendants agree to boycott AQS and starve it of liquidity*

209.    When AQS began marketing its platform to the broker-dealers in and around

2009, the Prime Broker Defendants conducted several meetings with AQS executives, initially

expressing (or feigning) interest in the product in order to gather intelligence on the product's

offerings.  Coming out of these meetings, Goldman Sachs refused to support the AQS platform

under any circumstances.

210.    The immediate response of the other Prime Broker Defendants was not as

strident, at least at first.  Yet it swiftly became clear to AQS executives that the Prime Broker

Defendants had agreed on a common stance vis-à-vis AQS.  Eventually, Prime Broker

Defendants Credit Suisse, JP Morgan, Morgan Stanley, and UBS each communicated, in

separate meetings with AQS executives, an *identical position* concerning AQS:  that the only

way they would support the platform was if AQS made it an exclusive space for the Prime

Broker Defendants to trade—*i.e.*, made it a broker-only platform.  They all uniformly made it a

condition of their participation that lenders and borrowers would be barred from trading on the

platform.

211.    AQS refused to submit to these parallel demands, which would effectively have

gutted the intent and benefits of the platform to the market as well as to stock borrowers and

70

lenders.  Unable to get AQS to back down, the Prime Broker Defendants met and discussed what their next move should be.  They held these discussions not only at regular EquiLend Board meetings, but also among smaller groups outside official EquiLend Board meetings.

212.    The Prime Broker Defendants decided that AQS was a "gateway drug" that could lead to a marginalization of the Prime Broker Defendants' dominant market position, and that the only effective response was to starve AQS of its necessary lifeblood:  liquidity.  They agreed to do this by collectively refusing to participate on the platform, and thereby to keep their trade flow and trade data outside of the platform's electronic market.  The collective decision by the Prime Broker Defendants not to use AQS meant that the efforts of other market participants—for example, hedge funds and other broker-dealers (*e.g.*, Charles Schwab)—to use the AQS platform, which they liked and wanted to succeed, was seriously compromised.

213.    Not only did the Prime Broker Defendants themselves boycott the AQS trading platform, they also took concerted steps to prevent other market participants from transacting on AQS.  The prime brokers knew that for AQS to survive it needed hedge fund borrowers at a minimum to participate on its platform.  So the Prime Broker Defendants began to exercise leverage over their hedge funds clients.  In addition to providing critical prime brokerage services across many asset classes, the Prime Broker Defendants also routinely assisted (officially or unofficially) their own alumni employees, now at hedge funds, in raising capital and accessing various financial markets, gave them access to scarce initial public offerings, shared proprietary research with them, and provided other valuable services outside of stock lending.  These were services that the Prime Broker Defendants could—and did—threaten to cut off if their hedge fund clients decided to trade on AQS.

71

214.     The Prime Broker Defendants also refused to give their hedge fund customers access to AQS.  Stock loan market standards require that a broker-dealer (acting as a "qualified borrower") be the legal borrowing entity in every stock loan transaction, and the OCC's amended by-laws (which set forth the standards and rules applicable to clearing transactions on the AQS platform) explicitly provided that *only* broker-dealer members of OCC, such as the Prime Broker Defendants, could transact on AQS, either as the lender or borrower.  Accordingly, for borrowers and agent lenders to have access to trade on the AQS platform, they needed to be "sponsored" by, and granted access through, a broker-dealer, who would stand in to facilitate and clear their trades.  The Prime Broker Defendants' point blank denial of access for their clients to AQS meant that those clients simply could not trade on the platform.

215.     In many cases, the Prime Broker Defendants also outright threatened to deny the hedge funds access to critical prime brokerage services if they traded on AQS.  In the face of these threats, many of the hedge fund borrowers opted not to participate in AQS.  For instance, Renaissance Technologies—one of the world's largest and most successful quantitative hedge funds—asked each of the Prime Broker Defendants that it used for prime brokerage services for direct access to AQS.  Each one not only refused, but told Renaissance Technologies that if it was not happy, it could take its business to another firm—an idle threat, as they each knew none of them would agree to give Renaissance Technologies access to AQS, because they had collectively agreed not to do so.

216.     The same thing happened to dozens of large hedge funds, including flagship funds like D.E. Shaw, Millennium Management, and SAC Capital.  After inquiring about AQS, each was stonewalled by the Prime Broker Defendants.  Each was told that, if it was not happy with the Primer Broker Defendants' decision, it could take its business elsewhere.

217.     This strategy to deny clients access to AQS would not have worked if each Prime

Broker Defendant had acted unilaterally.  Without assurances that other Prime Broker

Defendants would also refuse, no Prime Broker Defendant would risk losing its best customers

by inviting them to take their business to another Prime Broker Defendant.  This only made

sense because there was no viable "elsewhere" for the hedge funds to go.

218.     The Prime Broker Defendants' threats were not restricted to their clients.  For

instance, they took swift action when they learned that agent lender BNY Mellon, an important

source of stock lending supply, planned to use AQS for stock loan transactions.  Upon learning

of this in 2012, Goldman Sachs told executives at BNY Mellon, including James Slater (Head of

Global Collateral Management and Securities Finance), that if BNY Mellon continued to use the

AQS platform, Goldman Sachs would return all of the open stock borrowing trades with BNY

and stop trading with the BNY stock loan desk altogether.  Faced with this threat, BNY Mellon

withdrew its support for AQS.

### 3.     *Defendants collude to withhold support from and boycott SL-x*

219.     The Prime Broker Defendants' boycott of SL-x followed the same playbook they

used to neutralize AQS.  From the outset, Goldman Sachs was staunchly against the SL-x

product and refused to support it.  In 2011, SL-x personnel met privately with William Conley

and others from Goldman Sachs.  At the meeting, Mr. Conley was frank:  If the Prime Broker

Defendants were to allow a central trading platform with counterparty clearing, it would

encourage smaller competitors, such as Jefferies, to enter the stock lending market and begin to

compete with the Prime Broker Defendants for market share.  This would not be a good

development for the Prime Broker Defendants.

220.     Mr. Conley also said to the SL-x executives that, if the Prime Broker Defendants

were to permit this kind of evolution at all, they would do it exclusively through an entity that

they already controlled:  EquiLend.  "I ain't supporting this," Mr. Conley said, and showed the

SL-x executives to the door.  Brad Levy, who was then Global Head of Goldman Sachs'

Principal Strategic Investments Group, was more definitive:  "You ain't going to get this done."

221.    SL-x executives reached out to EquiLend in late 2011 to propose a cooperative

approach.  On August 1, 2011, SL-x sent a letter to EquiLend Chairman Jeffrey Benner to

introduce its product and propose a venture between SL-x and EquiLend that would afford

EquiLend "strong governance rights and a meaningful 'seat at the  table' in the development of

the SL-x marketplace and shift to a CCP-model," and also guarantee that EquiLend would use its

resources to foster and promote the SL-x platform.

222.    SL-x executives followed this letter by meeting with EquiLend and many of its

member banks directly to further explain its product and pitch its proposed joint venture.  But

this softer approach did not work, either.  The Prime Broker Defendants understood that SL-x's

platform would lay the foundation for a significant move in the direction of anonymous, price-

transparent, electronic stock loan trading of stock loan.  SL-x provided a single marketplace to

which all participants in the transaction—borrowers, brokers dealers, and lenders—would

migrate in order to initiate, execute, and clear their stock loan trades.  Once all these entities were

actively participating on SL-x's platform, it would have been much easier for lenders and

borrowers to begin transacting directly with each other via clearing brokers, without the

participation of the Prime Broker Defendants as "middlemen."  The active participation in the

marketplace by many borrowers and lenders would also have made it easier for SL-x to later

offer an electronic, price-transparent trading platform, as the necessary sources of supply and

demand would already have been regular users of their product.

223.    In August and September 2011, EquiLend and its board members met and discussed SL-x's offer and whether to cooperate with or otherwise support the SL-x platform. They decided against it.  EquiLend and its board members agreed that EquiLend would not join forces with or support SL-x, and neither would any EquiLend member banks.  Instead, they agreed that any such market innovations, if they were to occur at all, would need to be done through EquiLend.

224.    On September 21, 2011, EquiLend's CEO, Brian Lamb, responded to SL-x's August 1 letter by email.  Lamb, writing on behalf of the Chariman of the Board of EquiLend, EquiLend's directors, and EquiLend management, informed SL-x that all parties had uniformly decided to reject SL-x's offer.

225.    With EquiLend having rejected its overtures, SL-x went back to trying to court the Prime Broker Defendants individually.  The reaction of the Prime Broker Defendants (including Bank of America, which had earlier expressed an interest in helping to move the market forward) was uniform and unwavering.  Each held to the agreement reached among the other Prime Broker Defendants and refused to support SL-x.

226.    For instance, on September 21, 2011—the same day as Brian Lamb's rejection email to SL-x—Morgan Stanley's Edward McAleer responded to SL-x concerning its overtures. McAleer indicated that he had spoken that same day with Anthony Schiavo—Managing Director at Morgan Stanley and a Director of EquiLend—concerning SL-x's proposal.  Schiavo's view, as relayed by McAleer, was that SL-x should deal with EquiLend directly rather than through Morgan Stanley, and that "approaching a group of brokers outside the EquiLend arena is not an approach he wants to take."

227.     SL-x again followed up with McAleer.  But Morgan Stanley held fast to its

agreement with the Prime Broker Defendants that nothing would happen outside of EquiLend.

Copying Schiavo on his response on October 12, 2011, McAleer explained once again to SL-x

that "all the relevant people at MS" shared the "house view" that "we do not want to participate

in a separate consortium," noting Morgan Stanley's "buy in that any solution of plan needs to

involve EquiLend."  Morgan Stanley's opposition to SL-x was not about the merits of the

platform.  One Prime Broker Defendant employee around this time praised SL-x as "the most

intelligent, thoughtful, and usable approach to the [stock loan] market that we have ever seen."

228.     Taking the parallel approach that they had agreed on, each Prime Broker

Defendant and EquiLend withheld capital and support from SL-x through the fall of 2011 and

throughout 2012, intent on seeing whether this would cause SL-x to wither and die on the vine.

229.     Between 2012 and 2014, SL-x executives met with Robert Genkinger and Rajeev

Patel from Bank of America; Gene Gemelli, Ralph Lehnis, and Karl Bishti from Credit Suisse;

William Conley from Goldman Sachs; Judith Polzer, B.J. Marcoullier, John Shellard, and

Jonathan Cossey from JPMorgan; Anthony Schiavo and Edward McAleer from Morgan Stanley;

and Brendan Cusick and James Buckland from UBS. Each of these individuals sat on the board

of EquiLend USA or EquiLend Europe. Because EquiLend's directors were high-ranking stock

loan executives at their respective Prime Broker Defendants, SL-x was often forced to pitch its

product to the very individuals who were regularly meeting and conspiring to ensure its failure.

As a result of the conspiracy, each of these personnel refused to support SL-x.

230.     Again, this opposition was not about the merits of the SL-x offering.  In fact,

certain personnel from within the banks praised the strength of the platform.  In meetings with

SL-x executives that occurred on February 26, March 19, May 9, July 10, and September 6,

2013, executives from Credit Suisse, Deutsche Bank, JP Morgan, Citigroup, and UBS, respectively, praised the platform's design and functionality, with Credit Suisse's European Prime Brokerage Desk Head, Karl Bishti, telling SL-x executives on February 26, 2013 that the product's functionality included "all the bells and whistles" he would expect, that the platform lacked nothing that he could identify, and that he saw "no shortcomings" that would prevent the platform's imminent introduction into the marketplace.  Deutsche Bank's Head of Supply Trading, Kevin Soobadoo, similarly told SL-x executives in a March 19, 2013 meeting that the platform was "brilliant" and "impressive" and was the "most state-of-the-art piece of kit to hit the securities lending space."  Executives from Nomura and Societe General, on February 28 and October 17, 2013, respectively, also praised the SL-x platform as "fantastic" and "really an awesome product."  UBS executives Casey Whymark and Laurent Issner, during a September 6, 2013 meeting, said the platform was "very cool and we are impressed."

231.    The Prime Broker Defendants' executives also recognized that the stock loan market was primed for this type of innovation, which was spurred by recent regulatory developments, and acknowledged that the SL-x platform would be good for the market in general.  For example, in an December 4, 2012 meeting, executives in Prime Broker Defendant UBS's Zurich office (Casey Whymark, Managing Director and Co-Head of Securities Lending and Financing, and Philipp Haller, Executive Director, Trading Strategy and Development) acknowledged to SL-x executives that transitioning the OTC stock lending business to a centrally cleared market would in principle be a good development for market participants, and noted the "unmistakable momentum arising from regulatory considerations and other pressures" toward this transition.

232.    HSBC's Global Head of Equity Finance, Karl von Buren shared this same sentiment in an October 16, 2012 meeting, informing SL-x executives of his belief that the stock loan market was moving in the direction of a centrally-cleared market and that HSBC was inclined to embrace a product like SL-x.  JP Morgan Chase executives (Laura Allen, Executive Director, Equity Finance Prime Brokerage, and Rosie Allott, Equity Finance Prime Brokerage) in March 2013 also acknowledged that the features offered by SL-x would be a good development for the overall stock loan market.

233.    SL-x struggled to move forward.  In 2013, the SL-x platform permitted central clearing of certain European stock loan transactions (specifically those in Belgian, Dutch, French, German, and Swiss stocks) executed on the platform through Eurex Clearing, a central counterparty based in Germany.  Also in early 2013, SL-x began making meaningful progress with OCC towards a deal that would permit central clearing of U.S. stock loan transactions executed on the SL-x platform through OCC.  These discussions progressed rapidly, and by summer of 2013, SL-x was in the process of developing and building out the infrastructure necessary to connect its platform to OCC.  SL-x and OCC began beta testing on that connectivity platform by late 2013, suggesting that the completion of a deal between SL-x and OCC and the working infrastructure to enable central clearing on SL-x through OCC would be imminent.  The consummation of a partnership between SL-x and OCC that would permit for U.S.-based stock loan clearing was a game changer for SL-x.

234.    Throughout the summer and fall of 2013, SL-x was also working toward a partnership with global financial information services provider Markit that was publicly announced in October 2013.  This partnership would enable Markit customers who used the SL-x platform to access to real time trading data from SL-x (at the time limited to European cleared

trades) through Markit, along with other securities finance data and analytics provided by Markit.

235.    Although the SL-x trading data to be made available through Markit was limited at that point to European cleared trades (through SL-x's then-existing partnership with Eurex), the existence of a SL-x/Markit partnership, together with what appeared to be an imminent deal to clear U.S. stock loan trades through OCC, seemed primed to open the floodgates on transparent access to real-time trading data from SL-x trades to the market at large.

236.    In mid- to late-2013, the Prime Broker Defendants renewed their commitment to standing against SL-x.  They agreed to boycott SL-x, collectively refused to use its platform, and took steps to ensure that other market participants turned their back on SL-x as well.

237.    Notwithstanding the earlier praise and recognition provided by certain bank executives, after several meetings in which SL-x executives shared with the Prime Broker Defendants' representatives details about SL-x technology and product offerings, each bank went cold and, without explanation, refused to engage or proceed further with SL-x.  Many of the Prime Broker Defendants suddenly reported that they were no longer willing to be first movers on SL-x and indicated that they would not break ranks with the other Prime Broker Defendants. And as they had done with AQS, the Prime Broker Defendants in some instances threatened their clients with the loss of other prime brokerage services if they signed on to the SL-x platform against the Prime Broker Defendants' wishes.

238.    Prime Broker Defendant JP Morgan, for example, had several meetings with SL-x executives from November 2012 to May 2013 where bank representatives praised the SL-x product and showed interest in obtaining access to the platform as soon as possible.  This

momentum continued for some time, over the course of several meetings, until it abruptly ceased without explanation in or around August 2013, leaving the SL-x executives stunned.

239.   Echoing Goldman Sachs' initial views, in an August 7, 2013 meeting with SL-x, John Shellard (Managing Director of Trading Services at JP Morgan and an EquiLend Board member) revealed a "***general agreement among [the] directors***" of EquiLend "that industry advances should be achieved from within EquiLend" and not through third parties such as SL-x.[44]  Shellard informed SL-x executives, for the first time, that following internal discussions within JP Morgan a decision had been made to take no further action with SL-x at this time.

240.   In similar vein, although certain executives within Credit Suisse had recognized the obvious merit of SL-x's product from the outset, they candidly acknowledged to SL-x that the platform's success would depend not on its own merits, but on breaking through the organized broker-dealer cartel that was operating under the auspices of EquiLend.  For example, Credit Suisse's European Prime Brokerage Desk Head, Karl Bishti, acknowledged to SL-x executives in a February 26, 2013 meeting in London that the stock lending market would "*change overnight*" into a more automated and operationally efficient business if the SL-x platform could receive broad-based market support.

241.   In that same meeting and a subsequent July 19, 2013 meeting, however, Bishti (also an Associate Director of EquiLend) candidly confirmed to SL-x the reality that winning such support would mean "facing off against EquiLend," which he viewed as a major challenge to SL-x that should not be underestimated.  Comparing EquiLend to "*the mafia run by five crime families*," Bishti told SL-x executives that any transition to the SL-x trading platform and toward

---

[44]   Shellard also admitted that EquiLend was "simply the industry utility, owned and supported by the major banks," putting the lie to the notion that EquiLend is an independent, profit-maximizing joint venture.

central counterparty clearing would necessarily require the "cooperation" of, or a "collaboration" with, EquiLend.  Unsurprisingly, despite Bishti's recognition of the benefits of the SL-x platform, Credit Suisse stalled for months on signing on to SL-x, ultimately telling SL-x in July 2013 that it would only join the platform if and when the "Big Boys" (*i.e.*, other large market players) committed to the platform and there was evidence of substantial liquidity—an eventuality Credit Suisse executives knew would likely never happen given the conspiracy.

242.    Credit Suisse's sentiments were echoed almost verbatim by executives from Prime Broker Defendant UBS during a similar time frame.  In a meeting with SL-x executives that took place in May 2013, UBS was initially interested in and enthusiastic about the functionality offered by SL-x.  By July 2013, however, UBS's Global Head of Securities Lending James Buckland informed SL-x executives that UBS would not sign on to the SL-x platform until and unless SL-x could secure commitments from other large market participants and demonstrate evidence of significant liquidity.  In that same meeting on July 26, 2013, and a subsequent meeting that took place in London on September 26, 2013, Buckland frequently referenced EquiLend in the context of discussing SL-x's strategy to gain widespread market acceptance of its platform, noting the benefit of being "***inside the club***" of EquiLend member banks to effectuate market changes and suggesting that any market transition towards an SL-x platform and central clearing of stock loan trades would need to come from inside EquiLend.

243.    On June 18, 2014, in a meeting scheduled in Berlin to coincide with the International Securities Lending Association's annual conference, Morgan Stanley executives (including Edward McAleer, an EquiLend board member) similarly informed SL-x that it would only be pursuing cleared solutions through EquiLend.  Around the time that Morgan Stanley ceased contact with SL-x, Morgan Stanley's European prime brokerage division threatened

certain of its hedge fund clients that the hedge funds would lose other prime brokerage services provided by Morgan Stanley if they were to "trade away" their securities lending business to venues such as SL-x.

244.    Similarly, when SL-x executives met with Bank of America in July 2014.  Bank of America told SL-x that there was considerable controversy within Bank of America about how endorsing an outside platform would affect the bank's relationship with EquiLend.  After this meeting, Bank of America never moved forward.

245.    Many of the Prime Broker Defendants made strikingly similar statements to SL-x concerning EquiLend's role in their reluctance ultimately to engage with the SL-x platform. Several Prime Broker Defendants—including JP Morgan, UBS, and Credit Suisse—echoed Goldman Sachs by telling SL-x executives point blank that they would only support the types of innovations that SL-x offered if this were done through EquiLend (which the Prime Broker Defendants controlled), and that it was generally recognized that any market transition such as that offered by SL-x would need to come from within EquiLend.

246.    Echoing what JP Morgan's Shellard had revealed to SL-x executives regarding a "**_general agreement_** among [the] directors" of EquiLend "that industry advances should be achieved from within EquiLend," Credit Suisse representatives privately told SL-x executives on February 26, 2013 that "a successful launch will require the cooperation of EquiLend"—despite the fact that EquiLend did not then offer any similar capabilities.

247.    In fact, any suggestion that EquiLend could offer competing functionality to SL-x during this time frame was entirely false.  As many of the Prime Broker Defendants' representatives revealed in early meetings with SL-x, they viewed EquiLend as "archaic" and as "an entrenched although unexciting system" whose functionality was very poor.  Deutsche Bank

executives in particular noted that the "fill-rate" of prospective trades on EquiLend—*i.e.*, the ability of brokers to locate and fill stock borrowing orders from their clients—was below 8%. Or, in other words, that Deutsche Bank was "lucky if 4 out of 50 stocks are located on EquiLend."

248.   Credit Suisse was similarly critical of EquiLend, with EquiLend board member Frederick Nadd-Aubert admitting serious shortcomings with the platform.  One ex-board member of EquiLend from UBS (by 2012, working for BNY Mellon subsidiary Pershing) told SL-x executives in October 2012 that he had told EquiLend years ago that they should build something like SL-x, yet EquiLend had never done so.

249.   Executives at several Prime Broker Defendants (including Credit Suisse and UBS) effectively confirmed to SL-x executives that the Prime Broker Defendants used their positions as Directors of EquiLend to meet and discuss threats to their business and to coordinate a unified response.  Credit Suisse's Bishti, for example, informed SL-x in July 2013 that EquiLend Directors—who he described as the "key players" in the stock lending industry and as "***members of the club***"—regularly met and engaged in substantive discussions concerning significant developments and trends in the stock loan market and particularly to address "industry challenges such as central clearing."

250.   UBS's Buckland confirmed this fact in meetings with SL-x executives that took place on July 26, 2013 and September 26, 2013, stating that EquiLend's Directors meet "every six months to discuss market evolution," including particularly the transition to central clearing of stock loan transactions.  He, too, referenced the obvious benefit of being "inside the club" of EquiLend member banks in order to effect change in the stock loan market, and suggested that

any market transition to a trading platform like SL-x and central clearing would be addressed from within EquiLend.

251.    As they did with AQS, the Prime Broker Defendants not only boycotted the platform themselves, but pressured other market participants to do so.  Other market participants, such as BNY Mellon, State Street, and Northern Trust, met with SL-x personnel and acknowledged the price transparency and other benefits the platform would bring to the market. But they said that, since the Prime Broker-dealers—and particularly industry giants Goldman Sachs and Morgan Stanley—were aligned against the platform, they could not support it.

252.    In one such meeting that took place in London on October 12, 2012, Andrew Clayton (Global Head of Securities Lending at Northern Trust) expressed interest in SL-x, but explained that Northern Trust's support of SL-x was subject to the approval of Goldman Sachs. He indicated that Goldman Sachs' Mr. Conley had "strong views" on directing business to EquiLend instead of encouraging "outside industry initiatives" such as SL-x, and explained that Northern Trust would not be inclined to proceed with SL-x without Goldman Sachs' approval. Thus, despite their interest in SL-x, none of these other market participants would come onboard because they feared the consequences of crossing the Prime Broker Defendants' cartel.

253.    The Prime Broker Defendants also pressured clearinghouses to refuse to provide clearing services to SL-x.  In 2015, OCC's Chief Operating Officer disclosed to SL-x that he had been in constant contact with Goldman Sachs' Conley during the period of the boycott and that "nothing was going to happen" between SL-x and OCC without the Prime Broker Defendants' blessing—and particularly the blessing of Goldman Sachs.  The partnership between SL-x and OCC that appeared to be imminent in 2013 subsequently, and without explanation, never materialized.  Similarly, Murray Pozmanter—the DTCC Managing Director who served as the

gatekeeper for DTCC's clearing business—admitted to SL-x that the DTCC could not offer SL-x central stock loan clearing without the approval of Goldman Sachs and other Prime Broker Defendants.

### D.       The Prime Broker Defendants Use EquiLend to Neutralize Data Explorers

254.     In 2011, perceiving Data Explorers as a threat that could no longer be tolerated, the Prime Broker Defendants met, under the auspices of discussing EquiLend business, to discuss the threat posed by Data Explorers and how to neutralize that threat.

255.     The solution that emerged during those discussion was that the Prime Broker Defendants agreed that EquiLend would set up a competing business—DataLend—that, controlled by the Prime Broker Defendants, would work to suppress Data Explorers and edge them out of the market.  It would monopolize and lock up data from agent lenders and prime brokers.  As reportedly stated by Goldman Sachs' William Conley in those discussions, DataLend would be set up to ensure that beneficial owners could never see the spread between what they were paid to lend securities and what borrowers were charged to borrow them, a nightmare scenario that would "kill our business."  In the first quarter of 2011, representatives from Data Explorers were told by some clients that Brian Lamb, CEO of EquiLend, told them that EquiLend had plans to "kill" Data Explorers.

256.     This plan to kill Data Explorers represented a sharp reversal for the Prime Broker Defendants.  In the past, EquiLend had internally considered whether to launch a data product in-house. Those plans disintegrated because the Prime Broker Defendants resisted anything that smelled of transparency.  Conley, in particular, said that EquiLend would get Goldman Sachs' data only "over [his] dead body."  Morgan Stanley's opposition was nearly as virulent. Threatened with Data Explorers' success, however, Conley and the Prime Broker Defendants turned about-face in an effort to prevent Data Explorers from killing their profits.

257.    The Prime Broker Defendants formed DataLend as a data division within EquiLend in 2011.  They then agreed, in lockstep, to distribution agreements with DataLend that placed substantially identical restrictions on how each Prime Broker Defendant's trading data could be used.  These agreements included a prohibition on disclosing any prime broker data to lender or borrower customers.  Among other things, the Prime Broker Defendants agreed amongst themselves, and then with DataLend, that they would not permit bid-side data (that is, data showing what borrowers paid to borrow securities) to be provided to any beneficial owners. Conley from Goldman Sachs, Mike Kelleher from JP Morgan, and other Prime Broker Defendants on the board of EquiLend were involved in the discussions that led to these parallel agreements.

258.    The design of these restrictions—and the intent of the Prime Broker Defendants from the outset—was to offer, through DataLend, just enough trading data to undermine Data Explorers, but to withhold from the market the real-time retail and wholesale data that they knew would lead to pricing compression (and a reduction in their fees) if it ever got out.  The Prime Broker Defendants now also agreed in parallel, and with captive competitor DataLend, that DataLend would also withhold this data from the market.

259.    As part of their plan to "kill" Data Explorers, the Prime Broker Defendants also began using DataLend to undercut Data Explorers' customer base in the market.  The EquiLend Board authorized DataLend to go out and directly engage with the customers who had already signed up with Data Explorers.  The Prime Broker Defendants also disparaged the data provided by Data Explorers, falsely characterizing it to customers as inaccurate and unreliable.

260.    The key to the Defendants' plan was to cut off Data Explorers' access to agent lender data.  It was relatively easy for the Prime Broker Defendants to ensure their *own* data

never made it into borrowers' or lenders' hands.  It was more difficult to ensure that borrowers and lenders never got access to *each other's* data.  In order to prevent data leakage across the borrower/lender divide, the Prime Broker Defendants targeted agent lenders—the handful of firms who aggregated stock loan supply—and sought to monopolize access to their data.

261.    For the agent lenders only—and in order to lure them away from Data Explorers—the Prime Broker Defendants agreed to provide them directly with data similar to that being provided by Data Explorers, but at very little cost or, in some cases, virtually for free. For example, Data Explorers had multiple contracts with agent lenders in the range of $1-2 million for data provision services.  To undercut Data Explorers' pricing and poach their customer base, DataLend offered to provide the same data services to agent lenders effectively for nothing.  Most major agent lenders—those who were members of EquiLend[45]—were at least initially offered DataLend's products for no additional fee.

262.    DataLend's provision of this data to agent lenders only was safe for the Prime Broker Defendants, and did not pose as great a risk as the provision of that same data to end-user beneficial owners and borrowers.  Providing trading data to agent lenders did not implicate the ability of borrowers to see market data or to have any visibility into (or ability to negotiate) the price they were being charged for stock loans.  Nor did the provision of trading data to agent lenders improve the negotiating leverage of beneficial owners, who would never see this data themselves.  Yet at the same time, agent lenders formed a significant base of support for Data Explorers, and removing this support would go a long way toward excluding Data Explorers from having any material influence or effect on the overall market.  In other words, this strategy was a calculated risk by the Prime Broker Defendants to permit some limited data transparency

---

[45]    In other words, all major agent lenders except BNY Mellon.

only to agent lenders in exchange for "killing" the far greater risk to their business posed by Data Explorers.

263.    Before Data Explorers emerged, EquiLend had never taken steps to monetize its access to the banks' trading data, because *any* additional degree of price transparency provided market participants with leverage to challenge the Prime Broker Defendants' prices.  It was only when faced with the threat posed by Data Explorers that the Prime Broker Defendants decided to offer EquiLend's minimal product as a gambit to avoid further damage.

264.    The gambit worked.  Agent lenders used the new stream of low-cost information provided by DataLend to renegotiate prices with Data Explorers.  Data Explorers' revenues plummeted and its momentum came to a dead stop.

265.    Crippled by the assault from DataLend, Data Explorers was acquired by Markit, a large market data and post-trade processing firm.  Although Markit is an independent company, the Prime Broker Defendants have considerable influence over it.  Markit operates in a number of different financial markets and is closely interconnected with the major banks, including all of the Prime Broker Defendants.  As such, Markit has shown no interest in carrying out Data Explorers' original vision of bridging the data divide between wholesale and retail customers.

E.    **The Prime Broker Defendants Agree to "Project Gateway"**

266.    By 2014, the Prime Broker Defendants' collective boycott had largely succeeded in sidelining these products from the market and eliminating the competitive threat.

267.    Data Explorers, having been purchased by Markit and unable to withstand the Prime Broker Defendants' coordinated scheme to starve it of information and customers, was relegated to the fringes of the market.

268.    As described above, the Prime Broker Defendants collectively refused to conduct significant transactions on the SL-x platform and prevented others from doing so.  Starved of

liquidity, and now confronted with the reality of the Prime Broker Defendants' group boycott, SL-x's lifespan was brief.  By September 2014, almost four years after development began, SL-x had largely burned through its financial resources.  It applied to cancel its UK Financial Conduct Authority license as a trading facility and was forced to close and abandon its plan to enter the U.S. market.[46]

269.    AQS was facing a similar fate toward the end of 2014.  Hobbled by Defendants' group boycott and their threats against the hedge funds and other market participants, the AQS platform was unable to develop sufficient liquidity to remain a financially viable stock lending platform.  It was relegated to the margins of the industry and forced to scramble for years merely to stay afloat.

270.    Having significantly weakened and all-but-eliminated both SL-x and AQS from the marketplace, the Prime Broker Defendants agreed in late 2014 and 2015 to use EquiLend to deliver the knockout blows:  After boycotting these electronic trading platforms for years, the Prime Broker Defendants directed EquiLend to purchase these platforms to complete the elimination of them as competitors.

271.    Around the end of 2014, the Prime Broker Defendants began negotiating with SL-x's private equity owner, Palamon Capital Partners, to purchase the intellectual property (including several technology patents) held by SL-x.  As it was building the platform, SL-x obtained patents covering its core functionality, including the electronic negotiation of securities transactions (permitting one party in the negotiation to remain anonymous) and automatic matching of lenders and borrowers.  Although SL-x had shut its doors, this patented technology

---

[46]  Mark Dugdale, *Exclusive:  SL-x to Shut Up Shop*, SECURITIES LENDING TIMES, (Sept. 17, 2014), http://www.securitieslendingtimes.com/securitieslendingnews/ article.php?article_id=219512.

remained available to be sold or licensed to a competitor who might still be able to bring the technology to market.

272.    In early 2015, EquiLend purchased SL-x's patents and other intellectual property for approximately £500,000.  EquiLend had no intention of actually using this intellectual property.  EquiLend's due diligence of the technology it was purchasing from SL-x was cursory and superficial, and entirely devoid of the rigor that would be expected from a purchaser who wanted to understand the technology or utilize it for a commercial purpose.  In a due diligence call on May 21, 2015 lasting only thirty minutes, Laurence Marshall, Chief Operating Officer of EquiLend, along with EquiLend's Arvin Kumar and Vik Gupta, asked cursory questions that were answered in the previously provided pitch documentation, and had no discernable strategy or timeline for using SL-x's intellectual property.  The acquisition occurred that same month. EquiLend has never used the patents or attempted to commercialize the technology.  Rather, it put the patents on the shelf.

273.    Unlike with SL-x, which was fatally crippled by Defendants' boycott by the end of 2014, AQS got a second wind in 2014 following the implementation of new accounting guidelines specifically designed to *encourage* central clearing of stock loan transactions.  AQS had developed a platform and a partnership with OCC that permitted central clearing.  This regulatory development, and the resulting renewed interest in AQS, rendered the Prime Broker Defendants' boycott of AQS suddenly insufficient to ensure their continued dominance of the stock loan market.

274.    On January 1, 2014, the Basel Committee on Banking Supervision issued a set of measures called "Basel III."  Basel III, which was adopted in large part by the United States Federal Reserve, imposed new capital requirements on the Prime Broker Defendants for bilateral

stock loan transactions.  Basel III revised the "risk weighting" applicable to stock loan transactions in which the Prime Broker Defendants acted as a direct counterparty.  The revised risk weighting required the Prime Broker Defendants to carry more capital on their balance sheet to cover the same risk, which in turn reduced the bank's reported rate of return on capital.

275.    The rate of return on capital is a critical financial metric to determine the profitability of a bank, or a particular business line within a bank, and bankers are compensated (or de-compensated) accordingly as this metric increases or decreases.  For investment banks, return on capital is a critical metric of success, and the cost of capital is at least 10%.[47] Therefore, for a business within an investment bank to be considered profitable, its return on capital must exceed 10%.  A business unit within a bank with a high rate of return on capital is considered profitable and worth a great deal—and the employees who run and work in that business are compensated accordingly.  A business within a bank with a low rate of return on capital is considered unprofitable and subject to shrinkage or potential closure.

276.    Basel III essentially reduced the bank's reported rate of return on capital for stock loan transactions, unless the bank began centrally clearing its stock loan transactions (and thereby offloading the risk to a central clearing counterparty).  For one Prime Broker Defendant, it was estimated that Basel III's capital requirements could potentially reduce its return on capital for stock loans to an "unprofitable" rate of less than 10% if it did not centrally clear its stock loans.

277.    Faced with Basel III, individual business units within certain banks began taking steps toward central clearing of stock loan transactions.  Under Basel III, banks could

---

[47]    Laura Noonan, *Investment Banks' Return on Equity Declines*, FINANCIAL TIMES (Feb. 21, 2016), https://www.ft.com/content/0c65e85a-d719-11e5-8887-98e7feb46f27?mhq5j=e3.

dramatically reduce the "risk weight," and hence balance sheet costs, of stock loans by sending them to central clearing. Centrally clearing their stock loans would therefore dramatically improve the reported return on capital for their stock loan businesses.

278.    Within these large prime broker banks, business units and reporting lines are often siloed and lack effective coordination and communication. As a result, staff responsible for balance sheet management within the banks tasked with improving the bank's balance sheet position were often kept separate from staff responsible for trading stock loan. The loan trading staff did not know, and were not told by senior management until later, that a move toward central clearing of stock loan transactions—while superficially beneficial under Basel III— would be disastrous to the bank's profitability on a much larger scale.

279.    Upon discovering the steps being taken by their various middle management in these working groups towards central clearing, senior management and stock loan executives at many of the Prime Broker Defendants became alarmed. They recognized that central clearing could significantly impair the outsized profits that they still managed to squeeze from every stock loan trade. In their view, the loss of profits from potential market disruption would *far* outweigh any potential balance sheet cost savings resulting from central clearing. The tension between senior management and stock loan executives at the Prime Broker Defendants and their midlevel business heads in charge of the bank's balance sheet optimization in the wake of Basel III is illustrated by events that took place at Defendant Morgan Stanley in 2014.

280.    Credit Suisse's Shawn Sullivan, in April 2014, recommended "get[ting] all the members of the five families together" to discuss AQS and related stock loan issues that had now emerged.

281.    In 2014, Thomas Wipf, as Global Head of Bank Resource Management at Morgan Stanley, was running a new division that Morgan Stanley had created after the financial crisis to centralize the firm's funding, securities lending, collateral management, and counterparty hedging activities.  In the beginning of 2014, Mr. Wipf tasked his direct report— Susan O'Flynn (Global Head of CCP Strategy, Governance and Optimization)—with a project to reduce the bank's balance sheet costs and increase its return on capital.  Ms. O'Flynn decided to do this through central clearing, which she viewed as the most effective way to reduce the balance sheet cost of Morgan Stanley's stock lending business and increase its return on capital.[48]

282.    In early 2014, Ms. O'Flynn publicly came out in favor of central clearing via Eurex and OCC, discussing it favorably with Morgan Stanley's customers (lenders and borrowers).  She set up working groups to develop "plumbing"[49] for the banks to connect to Eurex and OCC, and started lobbying to make the OCC's rules friendlier to Morgan Stanley's

---

[48]   Mr. Wipf did not direct Ms. O'Flynn—newly appointed in her role, with a background in patent law and not connected to Morgan Stanley's trading side—on how to go about achieving her mission.  In theory, there were a number of ways for Ms. O'Flynn to reduce the risk-weighted assets held on Morgan Stanley's balance sheet.  She could increase the netting, "back loading," and optimization of fixed income trades, for example, which she did.  Ms. O'Flynn also decided to go down a path with an even higher potential reward in that it could dramatically reduce the balance sheet cost of Morgan Stanley's equities securities lending business and thus dramatically increase its return on capital.  She focused on the fact that Basel III provided an escape hatch from the onerous balance sheet costs of bilateral trading imposed on the stock loan business:  central clearing.  The "risk weight" for a centrally cleared stock loan was 2% under Basel III while, under its tightened standards, the "risk weight" for a traditional bilateral stock loan was between 20% and 120%.  In other words, a centrally-cleared stock loan transaction was between ten and sixty times cheaper in capital terms than a traditional bilateral transaction.  Clearing its stock loans would allow stock lending to continue to be a profit center for the banks and maintain them as a highly profitable business with low balance sheet costs.

[49]   Plumbing refers to back office decisions regarding rules like posting initial margin / haircut; posting and receiving variation margin (*e.g.*, amounts needed to cover varying types / changing valuations of collateral); Extensible Markup Language messaging protocols, affirmation standards and timelines, and custodian, tri-party agents, and collateral schedules.

specific needs under Basel III.  While Ms. O'Flynn's direct objective was to facilitate central clearing of Morgan Stanley's own stock loan trades, her vocal support of central clearing in general with clients, and her efforts to improve the bank's infrastructure for central clearing, constituted a significant step down the path toward wider market adoption of central clearing on all stock loan trades—something that, unbeknownst to her at the time, was very dangerous to the Prime Broker Defendants' privileged intermediary positions and their scheme to maintain them.

283.    At Morgan Stanley, as in many banks, corporate strategy and trading were separate and did not communicate regularly.  Therefore, while Ms. O'Flynn provided Mr. Wipf with projections concerning how much she planned to reduce the balance sheet cost through central clearing, she did not raise her plan to embrace central clearing more widely with senior management or executives on the stock loan desk.

284.    In late 2015 or early 2016, however, executives from Morgan Stanley's stock loan business got wind of Ms. O'Flynn's efforts and made Mr. Wipf and others aware of the threat that a move toward central clearing posed to Morgan Stanley's outsized profits as stock lending intermediaries.  Specifically, they were concerned that central clearing would eliminate the credit quality justification for a middleman prime broker.  Mr. Wipf then discussed this issue with others at Morgan Stanley, including with the Head of Securities Lending and Bank Resource Management in Europe, Matthew R. Collins.

285.    At this point, it would have been difficult for Mr. Wipf simply to direct Morgan Stanley to reverse course and cease all movement toward central clearing.  Internally, the projected savings had been widely socialized as a justification for the new Bank Resource Management Division, as well as Ms. O'Flynn's role.  Externally, Ms. O'Flynn had publicly advocated central clearing to Morgan Stanley's customers, had encouraged the OCC to modify

its central clearing rules to permit this evolution, and had started working groups with other major industry participants to move towards central clearing.  It would have been impossible, not to mention highly suspicious, for Morgan Stanley to explain to customers a valid basis for suddenly reversing course on a cost-savings strategy it had publicly and widely espoused, particularly since it could never reveal its true reasons:  that its internal cost-benefit analysis had revealed any cost savings resulting from central clearing paled in comparison to the extortionate profits the bank was able to wrest from those very customers in the current market structure.

286.    On a more basic level, the balance sheet benefits that would result from central clearing in the wake of Basel III were real—and Mr. Wipf had already told his superiors that he would be providing those savings.  Indeed, Mr. Wipf incorporated the savings projections that Ms. O'Flynn had presented to him into the budgets he sent to his superior, Colm Kelleher, who, in turn, incorporated those savings into budgets he sent to Morgan Stanley's CEO, James Gorman.  To detrimentally revise those budgets now not only would have cost Ms. O'Flynn and Mr. Wipf their credibility with their superiors and clients, but also would have affected their compensation and their jobs.

287.    Faced with this problem, Mr. Wipf devised a strategy that had two main components.  The first required Morgan Stanley and the other Prime Broker Defendants to structure their own clearing mechanisms or "pipelines" to OCC in such a way as to ensure their position as an intermediary.  Specifically, when the Prime Broker Defendants cleared their trades, they needed to make sure that:  (1) the clearing would maintain the opacity of the traditional stock loan market—with neither the lender nor the borrower knowing the price the counterparty paid or received, (2) there would be no independent trading platform linked to the

clearing house (like an exchange or central order book), and (3) the clearinghouse would not publish market data.

288.    The second part of the plan was to ensure that the *only* way for market participants to clear trades was to use pipelines controlled by the Prime Broker Defendants.  To do that, the Prime Broker Defendants needed to completely control access to the clearinghouses.

289.    There were only two major clearinghouses with an SEC license to clear securities lending transactions in the U.S. in 2016:  DTCC and OCC.  DTCC did not offer clearing for stock lending.  OCC, on the other hand, did offer clearing of stock loan trades.

290.    The Prime Broker Defendants had considerable influence over OCC, with seats on the Board of Directors, and had direct access to central clearing for stock loan transactions through OCC themselves.[50]  Bank of America and Goldman Sachs alone contributed roughly 40-50% of the capital in OCC's clearing fund.  But they were not the only ones with access to OCC for central clearing.  AQS also had a deal with OCC that allowed anyone who traded on AQS to clear their trades through OCC.  Mr. Wipf and other senior executives within Morgan Stanley feared that lenders and borrowers would increasingly shift their trades to AQS to take advantage of its clearing function, and use its connection to OCC and its electronic platform to trade among themselves via AQS's exchange.

291.    This fear was exacerbated by the existence of a pending deal that had been initiated in early 2015 for OCC itself to purchase AQS and to offer open access to central

---

[50]    Affiliates of the Prime Broker Defendants are all members of the OCC and many of their high-ranking employees serve on the OCC's board of directors.  For instance, in 2009, the OCC Board of Directors included Frank J. Bisingnano, the Chief Administrative Officer of Prime Broker Defendant JP Morgan Chase; Mitchell J. Lieberman, Managing Director, Global Securities Services for Prime Broker Defendant Goldman Sachs; and Gary Yetman, Managing Director of Prime Broker Defendant Merrill Lynch.

clearing for AQS customers. Concurrent with the emergence of the deal between OCC and AQS was AQS's development of a new service relating to electronic trading and clearing of equity repurchase agreements, which represents one financial reinvestment strategy employed by lenders of securities who receive cash collateral from the borrower. So-called "equity repo" activity accounts for between $400 billion and $700 billion in investment activity in the U.S. alone, and is critical to successful and liquid US financial markets. The inclusion of equity repurchase transactions on the AQS platform would have greatly enhanced the platform's efficiencies and benefits, and its attractiveness to market participants, particularly in the wake of Basel III.

292.    By early 2016, the material terms of this acquisition had been agreed to between AQS and OCC management. OCC would pay AQS millions of dollars upfront and AQS would receive a variable share of future revenue for the next three years. In exchange, AQS would be sold to and become operated by OCC. But the OCC Board (on which several Prime Broker Defendants hold seats as directors) had not approved this acquisition and the deal documents had not been signed.

293.    The prospective acquisition of AQS by OCC—an organization over which the Prime Broker Defendants exerted substantial influence but did not entirely control—presented a significant threat to the Prime Broker Defendants. It created the possibility of a pathway to central clearing for market participants that the Prime Broker Defendants could not control. To keep this from happening, Mr. Wipf and his colleagues at Morgan Stanley developed a plan that they code-named "Project Gateway." The goal of Project Gateway was to erect an iron-clad "gate" through which all stock loan transactions *must* pass on their way to central clearing, which

was now recognized as the inevitable result of Basel III.  Project Gateway made certain that this would be a "gate" that the Prime Broker Defendants would collectively control.

294.    Mr. Wipf reached out to William Conley, who was the head of Global Securities Lending at Goldman Sachs.  Over a series of private calls and dinners paid for by Mr. Wipf at restaurants in New York City, Mr. Wipf and Mr. Conley reached an explicit agreement on the strategy and implementation of Project Gateway.  They agreed that the two banks (who together held the majority of the market share of stock lending revenue) should neutralize AQS by arranging to acquire it.  They agreed that they would do this by securing the agreement of the other Prime Broker Defendants (who shared Morgan Stanley and Goldman Sachs' interest in preventing market disruption) to use EquiLend to purchase AQS for the sole purpose of eliminating any alternate path to central clearing.

295.    Mr. Wipf informed his colleagues at Morgan Stanley—including Susan O'Flynn and Matthew Collins—of this agreement in January 2016, during a regularly occurring internal teleconference (held on an internal system at Morgan Stanley known as iConference) referred to as a "pipeline call" or a "global sales call."  (Recordings of this call likely exist.)  In addition to Mr. Wipf, Ms. O'Flynn and Mr. Collins, other participants included Tejash Patel (currently Managing Director & Co-Head of U.S. Securities Lending) and Thomas Kinnally (currently Global Head of Client Financing, Firm Financing and Collateral Risk Management).

296.    At the outset of the call, Mr. Wipf informed his colleagues that he had spoken to Mr. Conley at Goldman Sachs about AQS.  He said that he and Conley agreed that Goldman Sachs and Morgan Stanley needed to act together to "get a hold of this thing."  By the expression "get a hold of this thing," Mr. Wipf meant that Goldman Sachs and Morgan Stanley needed to act together to acquire AQS and shut it down.  Mr. Wipf said that getting rid of AQS was

necessary because AQS provided a pathway to central clearing that was outside the control of the Prime Broker Defendants.[51]

297.    Following the Wipf/Conley meetings, Morgan Stanley and Goldman Sachs coordinated and secured the participation of the other Prime Broker Defendants (each of whom was an EquiLend Board member) in their common pursuit of Project Gateway.  These discussions took place at private dinners and meetings that often occurred at industry conferences or under the auspices of EquiLend Board meetings.  At these meetings, there was common agreement among the Prime Broker Defendants that they needed to control a "universal gateway" to central clearing through which every stock loan transaction would have to pass.  To further this goal, the Prime Broker Defendants all agreed to support Project Gateway and to clear all stock loan transactions through their own direct pipelines to OCC—pipelines that were not attached to an electronic trading platform.

298.    As part of their support for Project Gateway, the Prime Broker Defendants agreed to exert their influence as Directors of OCC and Directors of EquiLend to prevent OCC from acquiring AQS.  After an almost year-long negotiation resulting in an agreement on all material terms, and at the stage at which final Board approval of the acquisition was required, OCC abruptly pulled out of the deal to acquire AQS.  It stopped returning calls from AQS and, in a sudden about face and with no explanation, cancelled the transaction.

299.    Tellingly, shortly after the deal between OCC and AQS collapsed, EquiLend itself offered to buy AQS.  After years of being boycotted and having spent nearly $100 million in

---

[51]   Morgan Stanley also seemingly took suppressive action concerning its then-Executive Director in Bank Resource Management, Bruce West, who was acting as the bank's liaison with AQS.  In early 2015, shortly after he began actively to use AQS as a trading platform and to tout within Morgan Stanley that AQS allowed him to "do the work of six traders in one," he suddenly departed from the bank.

investor money with very little volume or profit to show for it, AQS's owners accepted
EquiLend's offer of less than $5 million to purchase the assets of AQS.

300.    On August 1, 2016, EquiLend purchased AQS.  In the accompanying press
release, Brian Lamb, CEO of EquiLend, said:  "Momentum has been building in the past two
years in support of CCPs [central clearing] in the securities finance marketplace.  Balance sheet
costs, risk weighting and tougher capital-adequacy requirements have highlighted to the industry
the potential benefits of using central clearing services."[52]  He claimed that by "providing
seamless access to OCC's Market Loan Program, the securities finance market now will have
unprecedented access to central clearing services."[53]

301.    What Mr. Lamb did not say, however, is that the Prime Broker Defendants only
wanted central clearing on their terms.  After buying AQS, the Prime Broker Defendants did not
increase their participation in their new electronic trading platform or take other action to make it
prosper.  Instead, they bought it to complete their control of central clearing for stock loans and
to keep the AQS pathway to central clearing out of the hands of the market's end users.

302.    If the Prime Broker Defendants had acted unilaterally, each would have been
driven by the pressures of Basel III to pursue the procompetitive path to central clearing that Ms.
O'Flynn of Morgan Stanley had first pursued.  In that event, the stock loan market, instead of
being the largest "dark pool" the world has ever known, would look more like the modern,
electronic, U.S. stock market itself.  Borrowers would be able to choose any broker they wished
to price, trade, clear, and settle stock loans.  And they could do so without facing pressure to
steer all their stock loan trading through the same broker at inflated rates.  Lenders could post

---

[52] *EquiLend Acquires AQS to Facilitate OCC CCP Connectivity for Securities Finance Market*, EQUILEND, http://www.EquiLend.com/news/articles/2016/EquiLend_acquires_aqs.php.

[53] *Id.*

their inventory on the stock loan trading and clearing platform of their choice, enjoying not only genuine choice but far higher returns.  There would be, in a word, competition, and lower transaction costs for all.

303.     To this day, no lender or borrower can trade and centrally clear stock loans without the significant involvement and tacit approval of the Prime Broker Defendants.  With their successful capture of AQS, the Prime Broker Defendants stand Cerberus-like at the "gate" of securities lending to prevent lenders and borrowers from clearing and trading securities loans in a more efficient, and less costly, environment.

### F.     The Prime Broker Defendants' Use of EquiLend as a Forum for Collusion Triggers Special Scrutiny Under the Antitrust Laws

304.     As previously described, the Prime Broker Defendants routinely used their positions on the EquiLend Board to co-opt EquiLend as a vehicle through which to promote and achieve their anticompetitive objectives.  In doing so, EquiLend was not acting as a legitimate market participant according to its own economic best interests as an independent competitive venture.  Instead, it was being used in illegitimate, non-competitive ways and taking actions that in many cases did not further its own economic interests.

305.     EquiLend Holdings LLC was formed in 2001, for the ostensible purpose of "optimiz[ing] efficiency in the securities finance industry by developing a standardized and centralized global platform for trading and post-trade services."[54]  EquiLend mainly provides reconciliation of stock loan transactions.  Reconciliation is a process that, post-trade, determines whether the shares from each counterparty were actually matched, whether margin due matched margin received, whether collateral given matched collateral received, and so on.  EquiLend has

---

[54]     *See About Us*, EQUILEND, at http://www.EquiLend.com/about/ (last visited Nov. 16, 2017).

gone on to add additional post-trade services, such as a settlement instructions repository, contract comparison, mark-to-market comparison, billing comparison, billing delivery, recalls, and returns.

306.    EquiLend has also for many years offered a service called AutoBorrow. AutoBorrow is a quasi-trading service that provides a daily automated, sequential execution for general collateral stock loans.  As with EquiLend's effort to mimic other competitor's products, AutoBorrow is similar to SunGard's LCOR product.  All AutoBorrow transactions are priced at a predetermined, fixed rate.  Each trading day, AutoBorrow router visits broker-dealer subscribers in a one-by-one, sequential order, with a basket of every general collateral stock that agent lenders are currently offering.  Each broker-dealer in the queue, in turn, decides how much stock loan quantity they wish to borrow, and that quantity is then executed.  The predetermined, fixed rate for each stock loan does not reflect any particular market price for that stock loan security, but rather the fact that the transactions are tied to the overall ratio lending contracts between the agent lenders and the broker-dealers.  Thus no price discovery takes place, and the stock loan executions remain bilateral (*i.e.*, one-to-one).

307.    In contrast to AQS and SL-x, EquiLend does not offer fully electronic, price-transparent trading capabilities or the ability to negotiate terms with multiple potential counterparties simultaneously, nor does it offer central clearing to market end users.  As described above, its trading platform is presently considered to be "archaic" and "entrenched" with very poor functionality and a significant inability to effectively "match" or "fill" stock loan transactions.  EquiLend's acquisitions of AQS and SL-x bore no relation, or procompetitive complement, to the products that EquiLend's business model has traditionally offered.  This discontinuity can only be explained by the strategy of the Prime Broker Defendants brought to

light here, to capture and prevent the development of electronic stock loan trading with actionable, real-time price discovery available to all.

308.    The original investing firms in EquiLend were Barclays Global Investors, Bear, Stearns & Co., The Goldman Sachs Group Inc., J.P. Morgan Chase & Co., Lehman Brothers Holdings Inc., Merrill Lynch & Co., Morgan Stanley, Northern Trust Corp., State Street Corp., and UBS Warburg—each of whom committed $4 million to the newly formed enterprise.  For most if not all of the Class Period, the ten owners of EquiLend included all six of the Prime Broker Defendants:  Bank of America (formerly Merrill Lynch), Credit Suisse,[55] Goldman Sachs, JP Morgan, Morgan Stanley, and UBS.

309.    Since its inception, the Prime Broker Defendants have dominated and controlled EquiLend through its Boards of Directors.  Those Board members of EquiLend Holdings LLC (EquiLend's USA entity) during the Class Period who were also employees of the Prime Broker Defendants include:  **Fred Nadd-Aubert**, Director, Prime Services & Strategic Product Development at Credit Suisse; **Gene Gemelli**, Director, Prime Services, Strategic Product Development at Credit Suisse; **Shawn Byron**, Managing Director, Goldman Sachs; **William Conley**, Head of Global Securities Lending at Goldman Sachs; **William Marcoullier**, New York Desk Head at JP Morgan; **Michael Kelleher**, Managing Director, Equity Finance at JP Morgan; **Ben Challice**, Managing Director, Global Head of Collateral Management & Agency Lending at JP Morgan; **Stefano Bellani**; Managing Director, Global Head of Trading Services at JP Morgan Chase; **Judy Polzer**, Global Head of Securities Lending Product at JP Morgan; **Robert Genkinger**, Managing Director, Equity Finance Sales & Trading at Bank of America Merrill Lynch; **Anthony Schiavo**, Vice Chair, Managing Director, at Morgan Stanley; and **Brendan**

---

[55]  Credit Suisse became a co-owner of EquiLend in 2005.

*Cusick*, Managing Director at UBS—with Goldman Sachs' Conley taking a particularly influential role on stock lending matters within this group.  For EquiLend Europe Ltd., Board members who were also employees of the Prime Broker Defendants include: *Karl Bishti*, European Prime Brokerage Desk Head at Credit Suisse; *Ralph Lehnis*, Managing Director, Credit Suisse; *Martin Cosgrove*, Managing Director, Goldman Sachs; *Michael Slomienski*, Vice President, Goldman Sachs; *John Shellard*, Managing Director at JP Morgan; *Jonathan Cossey*, Managing Director, Head of Equity Finance at JP Morgan; *Edward McAleer*, Managing Director at Morgan Stanley; *Matt Collins*, Executive Director, Head of European Securities Lending, Morgan Stanley; *Rajeev Patel*, Global Head of Securities Lending and Head of EMEA Equity Finance at Bank of America; and *James Buckland*, Global Head of Stock Borrow & Lending at UBS.

310.    Though EquiLend is nominally organized as a joint venture, this fact does not shield it—or the Prime Broker Defendants—from the antitrust laws.  This is because EquiLend does not act in its own economic interests as an independent, rational market participant by improving its products and services so as to meet customer demand and generate increased revenue for the company.  Instead, as detailed above, EquiLend has been used by the Prime Broker Defendants as a centralized forum for collusion and the advancement of their particular anticompetitive interests in the stock loan market.

311.    The cover story that EquiLend is a legitimate, for-profit business enterprise is belied by the actions taken, and *not* taken, by EquiLend and its member banks during the Class Period.  The Prime Broker Defendants used EquiLend to:  (i) suppress price transparency by refusing to release pricing data to its customers, despite having access to this data and despite a clear market demand for such data; (ii) force competitors out of the market by coercing their

customers to use EquiLend and/or DataLend, even though EquiLend and DataLend offered lower quality or entirely different services than what their customers desired and what prospective competitors offered; and (iii) stymie procompetitive market developments by purchasing valuable patents and trading platform technology from SL-x and AQS for valuable consideration, and then refusing to use or capitalize on those assets in any way, despite the fact that such patents and platform technology were essential for market developments that were in high demand and could have been used to bring extra revenue into the company.

312.    The Prime Broker Defendants did this by, among other things, conspiring to boycott and then to acquire and neutralize emerging platforms and data services that would have given market participants the centralized marketplace and price transparency that the market sorely lacked.  They did this not only at EquiLend Board meetings, but also while attending numerous dinners and industry conferences and events ostensibly on behalf of EquiLend.  They did this explicitly in emails, Bloomberg chats, text messages, internal memoranda, and recorded phone calls that are housed on EquiLend's and the Prime Broker Defendants' servers.  And, from at least 2009 to the present, they used EquiLend to ensure that all EquiLend member banks—both the Prime Broker Defendants and others—"understood" what their direction was to be and not to "break ranks" with the Prime Broker Defendants.

313.    EquiLend's role as a vehicle of collusion is illustrated by the way its board members steadfastly ignored the distinction between their prime brokerage businesses and their supposedly independent "joint venture."  When making decisions on behalf of EquiLend, William Conley talked about starting DataLend to ensure wholesale prices would not "kill our business"—meaning the Prime Broker Defendants' stock lending business.  Similarly, as AQS and SL-x made the rounds of the Prime Broker Defendants in an effort to sell their platforms, at

every turn they were told that the EquiLend directors had decided that any evolution toward central clearing would happen through EquiLend—meaning, through a vehicle that the Prime Broker Defendants controlled.  Nonetheless, in meeting after meeting, the Prime Broker Defendants made clear that they considered themselves bound by understandings reached in EquiLend board meetings.

314.    EquiLend's counter-profit behavior is further illustrated by the Prime Broker Defendants' economically irrational refusal to permit EquiLend to be sold at any price—even when the price would have represented a substantial profit for all members.  In or around August 2011, private equity firm Palamon Capital Partners, together with emerging stock loan trading platform SL-x and/or its principal founders, made an attractive offer to acquire EquiLend at a price that presented a significant profit proposition for all parties and would have led to an improvement on EquiLend's existing infrastructure.  Rather than engage with the prospective buyers regarding this offer—either to accept it, try to improve on it, or in any other way—the EquiLend Board (controlled by the Prime Broker Defendants) simply refused even to respond.

315.    If EquiLend had truly behaved as a profit-maximizing firm, it would naturally have sought to contribute to the competitive evolution of the stock loan market by promoting true trading efficiency through a centrally-cleared electronic marketplace and offering its clients transparent access (for a fee) to the market data it already owns and collects.  It would also have capitalized on the valuable assets and technology that it purchased for material consideration from AQS and SL-x, by further developing these assets for its own use or licensing them for use to third parties, in either case in exchange for increased revenues.  In fact, as noted, at least one of EquiLend's executives complained that EquiLend needed to upgrade its services and build something like SL-x, and EquiLend never did so.

316.     Instead, EquiLend remains a "Potemkin village" for the Defendants' collusive and anticompetitive behaviors——it offers just enough operational efficiency to be relevant through its bilateral trading platform and the provision of certain administrative and back-office services. Yet it carefully avoids (and takes active steps to thwart others from engaging in) any activity that would threaten the Prime Broker Defendants' position as dominant market intermediaries.

317.     Even ignoring the actions EquiLend *failed* to take that would have modernized the market, it is hard to square the actions it *did* take with an independent enterprise.  If EquiLend was content to act as an industry utility, leaving innovation to other firms, it is unclear why it was moved to purchase the technology needed for an electronic, centrally cleared stock lending platform with real-time, transparent pricing, only to leave that technology on the shelf to collect dust.  If EquiLend was content with its position as a bilateral trading platform and trade processing service, it is unclear what moved it to introduce a subpar data product at unbelievably low prices, at just the right time to kill a product that threatened to expose the stock lending market to full price transparency.  That EquiLend was able to do so shows only that it was an effective tool of Defendants' conspiracy, because it was capable of quickly shifting the direction of the development of the stock lending market.

318.     The actions taken by the Prime Broker Defendants through EquiLend amounted to naked restrictions on competition and output.  They were intended to, and did, reduce the volume and quality of stock lending overall, and the amount and quality of pricing data distributed by EquiLend and available to market participants, to the detriment of all market participants except for the Prime Broker Defendants.[56]  The Prime Broker Defendants'

---

[56]  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1912f (3d ed. 2011) (defining output "to include changes in both quantity and quality" and explaining that "[a]

restrictions on EquiLend's development and offered services were not necessary for or related to

any procompetitive actions by EquiLend.  In fact, they ran directly contrary to EquiLend's stated

purpose of "optimiz[ing] efficiency in the securities finance industry."

319.    EquiLend's own actions that in many cases ran counter to its own economic

interests (and were only in the collective interests of the Prime Broker Defendants who

dominated its Board) demonstrate that it is not the independent joint venture that it purports to

be, but in reality is and has long been used by the Prime Broker Defendants as an empty shell for

collusion.  EquiLend's actions should thus be viewed as concerted actions by the Prime Broker

Defendants that are fully subject to Section 1 of the Sherman Act.[57]

320.    It is well recognized that such collaborations among horizontal competitors,

regardless of whether they are organized as a joint venture, pose a high risk of anticompetitive

harm.  As the Antitrust Guidelines for Collaborations Among Competitors issued by the Federal

Trade Commission and Department of Justice explain:

> Competitor collaborations may harm competition and consumers by increasing
> the ability or incentive profitably to raise price above or reduce output, quality,
> service, or innovation below what likely would prevail in the absence of the
> relevant agreement.  Such effects may arise through a variety of mechanisms.
> Among other things, *agreements may limit independent decision making or*
> *combine the control of or financial interests in production, key assets, or*

---

reduction of any of these is anticompetitive in the sense that it reduces consumer welfare by
producing either a higher price or a smaller package of goods and services at the same price").

[57]    *See, e.g.*, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 192 (2010)
(explaining that a joint venture that is nothing more than a "formalistic shell for ongoing
concerted action" is subject to Section 1 liability); *United States v. Topco Associates, Inc.*, 405
U.S. 596 (1972) (cooperative association made of up grocery stores liable for *per se* illegal
conduct under § 1); *United States v. Sealy, Inc*., 388 U.S. 350 (1967) (group of mattress
manufacturers could not escape *per se* § 1 liability by operating through a single corporation that
they jointly controlled); *see also* Fed. Trade Comm'n & U.S. Dep't of Justice, *Antitrust*
*Guidelines for Collaborations Among Competitors* 9 (2000) ("*Antitrust Guidelines*") ("In any
case, labeling an arrangement a 'joint venture; will not protect what is merely a device to raise
price or restrict output; the nature of the conduct, not its designation, is determinative.").

> *decisions regarding price, output, or other competitively sensitive variables, or*
> *may otherwise reduce the participants' ability or incentive to compete*
> *independently*.[58]

321.    That risk is particularly acute here, because the Prime Broker Defendants already

possess substantial market power (over 70% of the market) and new market developments thus

threaten only to "cannibalize their supracompetitive earnings."[59]  Because the Prime Broker

Defendants already control much of the stock lending market and profit greatly from its opaque,

OTC structure, they have no incentive to foster innovation in that market, launch new products

or services, or improve the quality of existing products or services.  Instead, the Prime Broker

Defendants have the exact opposite incentive—to preserve the antiquated OTC market at all

costs, including by working together to stifle procompetitive developments that risk their

disintermediation.  The adoption of consortium strategies in such markets carries no positive

benefits and only "increase[s] the likelihood of an exercise of market power by facilitating

explicit or tacit collusion," as occurred here.[60]

---

[58]    *Antitrust Guidelines* at 6 (emphasis added); *see also id.* at 12 ("Anticompetitive harm may be observed, for example, if a competitor collaboration successfully mandates new, anticompetitive conduct or successfully eliminates procompetitive pre-collaboration conduct, such as withholding services that were desired by consumers when offered in a competitive market.").

[59]    *Id.* at 15; *see also id.* ("An exercise of market power may injure consumers by reducing innovation below the level that otherwise would prevail, leading to fewer or no products for consumers to choose from, lower quality products, or products that reach consumers more slowly than they otherwise would.  An exercise of market power also may injure consumers by reducing the number of independent competitors in the market for the goods, services, or production processes derived from the R&D collaboration, leading to higher prices or reduced output, quality, or service.").

[60]    *Id.* at 12.  Lest there be any doubt, it is explicit collusion that is alleged here.  It is worth noting that the banks have pursued similar collusive strategies in other markets.  One recent study, for example, found "more than 400 instances of large banks involved in at least 63 separate illegal conspiracies."  *See* John M. Connor, *Big Bad Banks: Big Rigging and Multilateral Market Manipulation*, American Antitrust Institute Working Paper No. 14-04 (May

322.     By working together to destroy or "swallow" nascent competitors, the Prime

Broker Defendants have contributed to a prolonged period of sluggish growth, lagging

productivity, and stalled innovation that is partially attributable to the inability of new market

entrants to challenge incumbents like the Prime Broker Defendants.[61]  These negative effects are

borne out by recent research showing that the exercise of market power by incumbent firms in

concentrated markets, such as the stock lending market, harms customers by contributing to

pricing markups and preventing new entrepreneurs from entering the market.[62]

## III.     DEFENDANTS' CONSPIRACY CAUSED ANTICOMPETITIVE HARM IN THE STOCK LOAN MARKET

323.     As a result of their conspiracy, the Prime Broker Defendants continue to dominate

the stock loan market, collectively controlling over 70% of the stock loan brokerage market and

---

5, 2014), https://www.antitrustinstitute.org/sites/default/
files/WorkingPaper14-04.pdf.

[61]     *See* Ben Casselman, *A Start-Up Slump Is a Drag on the Economy.  Big Business May Be to Blame*, N.Y. TIMES (Sept. 20, 2017), https://www.nytimes.com/2017/09/20/business/ economy/startup-business.html (collecting literature supporting the proposition that "the rising power of the biggest corporations," including the banks, "is stifling entrepreneurship by making it easier for incumbent businesses to swat away challengers – or else to swallow them before they become a serious threat").

[62]     *See* Jan De Loecker and Jan Eeckhout, *The Rise of Market Power and the Macroeconomic Implications* (2017), http://www.janeeckhout.com/wp-content/uploads/RMP.pdf (finding that significant increases in market power since the 1980s have resulted in average markups of 67% on products overall); *Benefits of Competition and Indicators of Market Power*, Council of Economic Advisers Issue Brief 6 (Apr. 2016), https://obamawhitehouse.archives.gov/ sites/default/files/page/files/20160414_cea_competition_issue_brief.pdf (finding "evidence of 1) increasing concentration across a number of industries," including financial services, "2) increasing rents, in the form of higher returns on invested capital, across a number of firms, and 3) decreasing business and labor dynamism"); *see also generally* Delegation of the U.S. to the Competition Comm. of the OECD, *Competition and Financial Markets* 3 (2009) (explaining that competition in the financial industry "encourages businesses to minimize costs and to innovate" and that "[w]ithout these innovations, the real economy would have grown more slowly"), https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international- competition-fora/09financialcrisis.pdf.

taking for themselves more than 65% of the multi-billion-dollars per year in gross revenue generated by stock lending activity.[63]

324.     As detailed above, the Prime Broker Defendants have maintained their dominant market position and supracompetitive profits by collectively boycotting and suppressing any platforms or services that might lift the veil of opacity or lead to a fully electronic and transparent trading environment.  The result of the Prime Broker Defendants' anticompetitive actions has been to keep the stock loan market and each of its participants in the stone age.  Stock lending persists in an inefficient, antiquated OTC structure that depends on the central position of the Prime Broker Defendants.

325.     OTC market structures may make sense where there is customization of terms and no standard contract.  However, stock loans are standardized contracts that are well-suited for a transparent market structure such as a trading platform or an exchange.  By preventing the development of such platforms or exchanges, the Defendants have directly imposed significant financial harm on other market participants.

326.     In the current bilateral OTC market, trade negotiation remains one-on-one, placing both borrowers and lenders at a substantial bargaining disadvantage vis-à-vis the Prime Broker Defendants.  These market end-users lack the information that the Prime Broker-dealers possess about pricing (*i.e.*, what the other side of the transaction is willing to pay/accept) and

---

[63]   Collectively, the Prime Broker Defendants controlled the vast majority of the prime brokerage industry, with a market share (based on hedge fund clients) as of 2016 of 70.4%—with Goldman Sachs at 19.1%, Morgan Stanley at 16.4%, J.P. Morgan at 13.7%, Credit Suisse at 8.3%, UBS at 6.6%, Bank of America at 6.3%.  *See Prime Broker Ranking*, HEDGE FUND ALERT, (May 3, 2017), https://www.hfalert.com/rankings/rankings.pl?Q=149.  These share estimates are based on *number* of clients, rather than trade volume or revenues.  Because the hedge fund industry is heavily weighted toward major players, the Prime Broker Defendants likely control a much larger share of the actual volume of stock loan trades.

volume/availability (*i.e.*, which counterparties own the desired stock and how much is available to trade) for any specific loan in question.  Borrowers and lenders also lack any mechanism to effectively "price shop" or efficiently compare dealer pricing and terms over many dealers. When offered terms by a dealer, there is no way for the lender or borrower to be confident that the dealer's quote is at or near the best available quote in the market, nor to know which other dealer might be willing to supply more favorable terms and pricing.

327.    Because the Prime Broker Defendants have inserted and collusively maintained themselves as middlemen, lenders and borrowers cannot work to obtain better terms and pricing by trading directly with the corresponding party that has the actual motive to transact.  Nor can a lender or borrower realistically force multiple dealers to compete against each other for a transaction because of the bilateral nature of the bargaining process.

328.    The current stock loan market involves high search costs and inefficient pricing. It can take numerous phone calls over several hours to locate a hot stock and negotiate pricing. The lender has no indicative level of pricing other than the demand information provided by the brokers, which the lender has no way to verify.  In other words, the securities lending market requires considerable manual effort to complete transactions that in other markets take seconds or minutes at most.  Because of the fragmented nature of the market, identical loans can trade simultaneously through different channels at very different prices.  These high search costs preclude arbitrage across liquidity pools.

329.    While a lender or borrower can, in theory, reject the price terms quoted by the dealer with whom it is negotiating and search for better terms, these negotiations would be cumbersome and difficult to do.  The market participants cannot choose the best terms from among a large number of various dealers simultaneously.  And the fact that a lender or borrower

could eventually negotiate quotes from multiple dealers does not in itself cause dealers to compete aggressively with each other.[64]

330.    When facing a lender or borrower, each dealer holds a degree of monopoly power because the counterparty has no ability to pick the best of many simultaneously executable terms.  The Prime Broker Defendants' exploitation of this monopolistic market power both (i) reduces the volume of trades that would otherwise occur in the stock lending market, and (ii) raises the costs associated with searching for desirable transaction terms (*i.e.*, reduces what is known as "matching efficiency").

331.    It is well-established in recent academic literature that the introduction of a central clearinghouse for stock loans would reduce search frictions and borrowing costs.  AQS itself explained the benefits of a move to electronic, price-transparent trading in 2009:  "As a result [of market evolution], pension funds better realize the full intrinsic value of the securities they are lending, while hedge funds and other asset managers reduce short-selling costs by borrowing securities directly from beneficial owners of assets."[65]  The economic benefits may have been even greater for "hard to borrow" securities, for which additional (often opaque and exceedingly high) fees exist as a result of limited supply.  Yet this is what the Prime Broker Defendants prevented from happening.

332.    The financial harm suffered by borrowers and lenders in this system can be measured and quantified.  One way to do so is to compare the current world of stock lending—

---

[64]    *See* Haoxiang Zhu, *Finding a Good Price in Opaque Over-the-Counter Markets*, 25:4 REV. OF FIN. STUD. 1255, 1255-56 (2012).

[65]    *Quadriserv, Inc. Highlights Securities Lending Innovations At TradeTech 2007*, NASDSAQ - GLOBENEWSWIRE (Mar. 9, 2007), https://globenewswire.com/news-release/2007/03/09/356337/115225/en/Quadriserv-Inc-Highlights-Securities-Lending-Innovations-At-TradeTech-2007.html.

with the Prime Broker Defendants acting as middlemen and taking more than 65% of the market revenues—with the "but for" world where the role of the Prime Broker Defendants is significantly reduced and their cut in large part flows instead to the borrowers and lenders, minus the small fees charged by an efficient platform and the clearing broker who provides the borrower and lender access to the central clearinghouse.  This, of course, is essentially the same trading model used by the stock, options, and futures exchanges today—all of which provide price competition via central limit order books and price transparency to those trading on those exchanges—in exchange for a tiny, transparent fee to the clearing broker who provides access to the exchange.

333.    There is a great deal of academic research on the liquidity impact of electronic trading, including a recent case study of the Kansas City Board of Trade, an American commodity futures and options exchange.[66]  As one of the last futures exchanges to offer two side-by-side trading methods for the same instrument—traders can trade either through traditional "open outcry" trading[67] *and/or* electronic trading—it affords the ability to observe differences in liquidity from these alternative execution methods.  Of the Kansas City Board of Trade, researchers observed that the range of bid/offer spreads in open outcry trading are orders of magnitude greater that of the identical instrument traded electronically.[68]

---

[66]    Samarth Shah & B. Wade Brorsen, *Electronic vs. Open Outcry:  Side-by-Side Trading of KCBT Wheat Futures*, 36(1) J. OF AGRIC. & RESOURCE ECON. 48, 48-62 (2011), http://www.waeaonline.org/jareonline/archives/36.1%20-%20April%202011 /JARE,Apr2011,pp48,Shah.pdf.

[67]    "Open outcry" trading refers to a traditional method of trading on a physical trading floor of an exchange using verbal communications and/or hand signals to communicate bids and offers and execute trades.

[68]    Samarth Shah & B. Wade Brorsen, *Electronic vs. Open Outcry:  Side-by-Side Trading of KCBT Wheat Futures*, 36(1) J. OF AGRIC. & RESOURCE ECON. 48, 56 (2011),

334.    It could reasonably be expected that spreads in the stock loan market would compress to a similar or greater degree upon the introduction of electronic trading.  In futures trading, even in the non-electronic platform environment there is a single central venue where traders gather to facilitate price discovery.  By contrast, trading in the OTC stock loan market is far less efficient due to its decentralized nature.  Accordingly, the gap in pricing between decentralized OTC and electronic trading is likely to be even larger than the gap observed in the futures market between open outcry and electronic trading.

335.    The financial harm suffered by stock loan borrowers and lenders can also be measured and quantified by comparing the stock loan market with the markets for other financial instruments that have migrated from less transparent or OTC trading platforms to electronic, transparent exchange trading over the last two decades.  The migration of financial instruments—from bespoke, illiquid instruments traded OTC to increasingly standardized and liquid instruments traded electronically via more transparent and competitive platforms—is well-documented and has been the subject of numerous empirical studies and substantial academic research.

336.    Examples include the migration of equities trading on NYSE and Nasdaq to electronic communication networks starting in the mid-1990s,[69] the introduction of post-trade price transparency for corporate bonds in 2002,[70] the subsequent migration of corporate bond

http://www.waeaonline.org/jareonline/archives/36.1%20-%202011/JARE,Apr2011, pp48,Shah.pdf.

[69]   James McAndrews & Chris Stefanadis, *The Emergence of Electronic Communications Networks in the U.S. Equity Markets*, 6 CURRENT ISSUES ECON. & FIN. 12 (Fed. Reserve Bank of N.Y.), Oct. 2000, at 2-3, https://pdfs.semanticscholar.org/1ea6/52dbbba884d11 6f55d28ae958e18465cc955.pdf.

[70]   Hendrik Bessembinder, William Maxwell & Kumar Venkataraman, *Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds*, J.

trading from OTC to electronic platforms,[71] the opening of electronic order book trading on the NYSE to off-the-exchange-floor market participants in 2002,[72] and the migration of dividend swaps from OTC to exchange-like trading in 2008,[73] as well as municipal bonds in 2005,[74] certain mortgage-backed securities in 2012, and asset-backed securities in 2015.

337.    The 2002 imposition of post-transaction reporting in U.S. corporate and municipal bond markets through the Trade Reporting and Compliance Engine ("TRACE")—and the resulting decrease of execution costs for buy-side customers that this post-trade transparency brought about—is one especially well-documented instance of this phenomenon.[75] As a general

---

FIN. ECON. 82, 2006, at 251-288; Amy K. Edwards, Lawrence E. Harris & Michael S. Piwowar, *Corporate Bond Market Transaction Costs and Transparency*, 62:3 J. OF FIN. 1421, 1438, 1444-50 (June 2007); Michael A. Goldstein, Edith S. Hotchkiss & Erik R. Sirri, *Transparency and Liquidity: A Controlled Experiment on Corporate Bonds*, 20 REV. FIN. STUDIES 2, Mar. 2007, at 235.

[71]   Terrence Hendershott & Ananth Madhavan, *Click or Call? Auction Versus Search in the Over-the-Counter Markets*, 70:1 J. OF FIN. 445 (2015).

[72]   Ekkehart Boehmer, Gideon Saar & Lei Yu, *Lifting the Veil: An Analysis of Pre-Trade Transparency at the NYSE*, 60:2 J. OF FIN. 783, 783-815 (2005); Kee H. Chung & Chairat Chuwonganant, *Transparency and Market Quality: Evidence from SuperMontage*, 18 J. FIN. INTERMEDIATION, Jan. 2009, at 93-111.

[73]   Kian Abouhossein, Delphine Lee & Cormac Leech, *Global Investment Banks: Regulatory Proposal Analysis: Structural IB Profitability Decline*, J.P. MORGAN, Sept. 9, 2009, at 19.

[74]   *See* Paul Schultz, *The market for new issues of municipal bonds: The roles of transparency and limited access to retail investors*, 106:3 J. OF FIN. ECON. 492, 502-04 (2012) (examining requirement instituted in 2005 that municipal bond dealers to report price and quantity of all trades within 15 minutes of trade execution, and finding that the mean standard deviation of purchase prices falls sharply in response, resulting in a 40% reduction such that "investors are now less likely to pay wildly different prices for the same amount of the same bond on the same day [because p]ost-trade transparency allows investors to see what other investors pay for bonds, but it also allows bond dealers to see what their competitors charge.").

[75]   *See, e.g.*, Hendrick Bessembinder and William Maxwell, *Markets: Transparency and the Corporate Bond Market*, 22:2 J. OF ECON. PERSP. 217 (2008); Hendrick Bessembinder, William Maxwell, and Kumar Venkataraman, *Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds*, 82:2 J. OF FIN. ECON. 251 (2006).

matter, competition is improved by fast and comprehensive post-trade transaction reporting. TRACE meant that there was quick public dissemination of transactions prices, giving all market participants an indication of the prices at which trades were taking place.  This knowledge of the going price is a particularly important factor that mitigates the bargaining disadvantage of buy-side market participants, who generally have much less direct observation of trading than do dealers.[76]

338.    In each of these cases, and many others, the empirical research and academic literature establish that the move towards price transparency and electronic, exchange-based trading increased market efficiency and lowered costs.  For example, scholarship studying the migration of corporate bonds away from OTC trading concludes that transaction costs for the buy side decline rapidly as the number of responding dealers in electronic auctions increases, thus proving the commonsense point that "[c]ompetition lowers costs."[77]  A 2012 academic study comparing bid/ask spreads of bonds that trade on the New York Stock Exchange with bonds that trade only OTC similarly concludes that "the test group [NYSE-traded bonds] has on average 25 basis points smaller effective bid-ask spreads than the control group [bonds traded OTC only]."[78]  As one academic study put it, "[t]o date, the equity loan market remains relatively opaque despite the increasing accessibility of electronic networks, and search costs

---

[76]   The Dodd-Frank Wall Street Reform and Consumer Protection Act (commonly known as "Dodd-Frank") sought to create similar post-trade transparency in the swaps market by mandating (with some exceptions) the immediate, public transaction reporting of standardized swaps.

[77]   Terrence Hendershott & Ananth Madhavan, *Click or Call? Auction Versus Search in the Over-the-Counter Markets*, 70:1 J. OF FIN.  411 (2015).

[78]   Fan Chen & Zhuo Zhong, *Pre-Trade Transparency in Over-the-Counter Markets*, Working Paper, Aug. 2012, at 3.

could be reduced, or possibly eliminated, by the creation of a central reporting mechanism for share availability and loan pricing."[79]

339.    Quadriserv's own internal research conducted in advance of launching the AQS trading platform confirmed that this phenomenon would be equally applicable to the stock loan market.  This analysis found that an electronic trading platform like AQS would offer substantial savings to both lenders and borrowers and that the modernization promised by AQS would substantially reduce the total fees paid by borrowers and redistribute total revenues more fairly between beneficial owners, agent lenders, and broker-dealers.

340.    Specifically, Quadriserv's analysis predicted a 32% reduction in the total fees paid by stock borrowers as a result of credit and pricing efficiencies on AQS, effectively saving borrowers approximately $4.5 billion per year in fees paid on stock loan transactions.  This analysis also predicted that fees paid to stock lenders would also increase from an approximate 26% of gross annual stock loan revenue paid to beneficial owners in the current inefficient OTC market to an approximate 52% of gross annual revenue under the efficient, AQS model, netting beneficial owners approximately $1.44 billion more in gross revenues each year.

341.    The economic logic behind inflated bid-ask spreads and other costs in inefficient, opaque markets is straightforward.  Dealers charge wider spreads, which provide a massive profit center, when they perceive that market participants do not have a realistic option to search for other quotes nor sufficient market data to contextualize their own trades.  In a dealer-dominated, opaque OTC market, the stock lender and borrowers face the prospect of a costly delay to find another suitable dealer, followed by another negotiation with a new dealer who has

---

[79]   Adam C. Kolasinski, et al., *A Multiple Lender Approach to Understanding Supply and Search in the Equity Lending Market*, 68:2 J. OF FIN. 559, 593 (2013).

a bargaining position of similar strength to that of the first dealer contacted.  They lack any meaningful opportunity to have multiple dealers bid against each other, giving rise to artificially wider bid-ask spreads than would be available in a market that enjoys a price transparency or a multilateral trading platform on which dealers bid directly against each other.

342.    In the context of an electronic, exchange-based trading platform, by contrast, market participants compete for the opportunity to trade and execution costs narrow as a natural result.  That is, on an electronic, exchange-based platform, the best price quotes could be transparent to all market participants and simultaneously executable.  Thus, the lender or borrower—by virtue of pre-trade transparency—could choose the lowest of all of the simultaneously available quoted prices.

343.    The stock loan market, however, lacks a central marketplace where buyers and sellers can meet directly.  Instead, when a hedge fund wants to borrow stock, its trader must call its broker-dealer on the telephone, over Bloomberg chat, or otherwise; the broker-dealer will give the hedge fund a price, and then it must go out and secure the stock.  The hedge fund has little or no insight into the price at which other parties might be willing to transact.

344.    In the stock loan market, institutions looking to borrow stock want to minimize borrowing costs, and institutions holding stock want to maximize returns by lending out stock that would otherwise sit idle.  The inefficient OTC structure of the stock loan market prevents borrowers and lenders from using the forces of competition to drive pricing.  If a lender knew what other lenders were receiving for a given stock loan, they could use that information to shop around or to negotiate a better price.  The same logic applies to borrowers.

345.    Cost savings associated with market transparency are fully consistent with economic theories and empirical research supporting the notion that post-trade transaction

reporting allows market participants to monitor and discipline the execution quality of their trades by comparing the prices obtained from a dealer with the prices obtained for other trades conducted around the same time in the market. If a dealer is aware that it is (or even could be) monitored through post-trade price dissemination, it is at risk of losing business over poor execution prices, and will thus provide better pricing.

## IV.   DEFENDANTS' HISTORY OF COLLUSION IN THE FINANCIAL MARKETS

346.    The stock loan conspiracy is but the latest in a string of anticompetitive conspiracies involving the financial markets in which the Prime Broker Defendants have participated—all with the goal, as here, of preserving an existing anticompetitive advantage against the natural tide of progress. As detailed below, the Prime Broker Defendants' blatant disregard for the antitrust laws over the last decade has been exposed in numerous instances in relation to other financial markets. In several instances, certain of the Prime Broker Defendants have pled guilty to the anticompetitive conduct. In other instances, certain of the Prime Broker Defendants have been fined for, or settled claims relating to, alleged anticompetitive conduct. These admissions not only demonstrate a pattern of repeated conduct, but demonstrate more generally the existence of a corporate culture wherein the Prime Broker Defendants are ready and willing to violate the law and collude with one another whenever they deem it necessary to preserve profits. This history and culture of collusion demonstrates the inherent plausibility of the stock loan conspiracy alleged herein.

### A.   Municipal Bond Investments Market

347.    In or around 2010, Defendant Bank of America approached the United States Department of Justice ("DOJ") and voluntarily reported its involvement in a conspiracy to rig

bids in the municipal bond derivatives industry.[80]  Later, on December 7, 2010, the DOJ announced that Bank of America agreed to pay $137.3 million in restitution to federal and state agencies in connection with its admitted participation in that conspiracy.[81]  The restitution payment, along with Bank of America's cooperation in the DOJ's parallel investigations of Bank of America's co-conspirators, was a condition for Bank of America's admission into the DOJ's Antitrust Corporate Leniency Program.[82]

348.    On May 4, 2011, the DOJ announced that Defendant UBS AG, as part of a non-prosecution agreement, agreed to pay $160 million in restitution, penalties, and disgorgement to federal and state agencies in connection with admitted anticompetitive conduct in the municipal bond investments market.[83]  As part of its non-prosecution agreement, UBS AG admitted that certain of its then-employees "entered into unlawful agreements to manipulate the bidding process and rig bids on certain relevant municipal contracts, and made payments and engaged in other activities in connection with those agreements, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and certain sections of Title 18 of the United States Code."[84]

---

[80]    *See* Press Release, DOJ, *Bank of America Agrees to Pay $137.3 Million in Restitution to Federal and State Agencies as a Condition of the Justice Department's Antitrust Corporate Leniency Program* (Dec. 7, 2010), https://www.justice.gov/opa/pr/bank-america-agrees-pay-1373-million-restitution-federal-and-state-agencies-condition-justice.

[81]    *Id.*

[82]    *Id.*

[83]    *See* Press Release, DOJ, *UBS AG Admits to Anticompetitive Conduct by Former Employees in the Municipal Bond Investments Market and Agrees to Pay $160 Million to Federal and State Agencies* (May 4, 2011), https://www.justice.gov/opa/pr/ubs-ag-admits-anticompetitive-conduct-former-employees-municipal-bond-investments-market-and.

[84]    *See Non-Prosecution Agreement letter In re UBS AG*, DOJ, (May 4, 2011), https://www.justice.gov/atr/file/761041/download.

349.    On July 7, 2011, the DOJ announced that Defendant J.P. Morgan Chase & Co., as part of a non-prosecution agreement, agreed to pay $228 million in restitution, penalties, and disgorgement to federal and state agencies in connection with anticompetitive conduct in the same market—*i.e.*, the municipal bond investments market.[85]   As part of its non-prosecution agreement, J.P. Morgan Chase & Co.  admitted that certain of its then-employees "entered into unlawful agreements to manipulate the bidding process and rig bids on certain relevant municipal contracts, and made payments and engaged in other activities in connection with those agreements, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and certain sections of Title 18 of the United States Code."[86]

### B.    LIBOR Market

350.    On December 19, 2012, the DOJ announced that Defendant UBS AG, as part of a non-prosecution agreement, had agreed to pay $1.5 billion in fines for manipulating LIBOR rates.  According to the DOJ's press release, "By causing UBS and other financial institutions to spread false and misleading information about LIBOR, the alleged conspirators we've charged— along with others at UBS—manipulated the benchmark interest rate upon which many transactions and consumer financial products are based."[87]   Other banks ensnared by this

---

[85]    *See* Press Release, DOJ (July 7, 2011), https://www.justice.gov/opa/pr/jpmorgan-chase-admits-anticompetitive-conduct-former-employees-municipal-bond-investments.

[86]    *See* Letter from Christine A. Varney, DOJ, to Thomas Mueller (July 6, 2011), https://www.justice.gov/sites/default/files/atr/legacy/2011/07/07/272815a.pdf.

[87]    *See* Press Release, DOJ (Dec. 19, 2012), https://www.justice.gov/opa/pr/ubs-securities-japan-co-ltd-plead-guilty-felony-wire-fraud-long-running-manipulation-libor.

investigation included The Royal Bank of Scotland, Rabobank, Deutsche Bank, and Barclays, among others.[88]

### C.    <u>Foreign Currency Exchange Spot Market</u>

351.    Beginning in 2013, media reports surfaced that governmental regulators and enforcement authorities in the U.S. and Europe were investigating potential manipulation of the foreign exchange ("FX") market.  Those investigations quickly grew in scope to include authorities from across the globe, and have already resulted in criminal guilty pleas, settlements, and fines totaling over $11 billion, as well as the release of orders, notices, and reports detailing exactly how the banks colluded to manipulate the FX market.

352.    On May 20, 2015, the DOJ announced that Defendants JP Morgan and UBS, along with Barclays, Citi, and RBS, were fined a total of $3 billion by the DOJ, and each pled guilty to criminal conspiracy charges for manipulating FX prices and benchmark rates.[89]  The DOJ has since brought criminal charges against individual employees and former employees of the banks for their role in manipulating the FX market, including a former Managing Director at JP Morgan.[90]  Also in May 2015, the Federal Reserve imposed more than $1.8 billion in fines on Defendants Bank of America, JP Morgan, UBS, plus Barclays, Citi, and RBS, for their "unsafe

---

[88]    *See* Financial Institution Fraud, Criminal Division, DOJ, https://www.justice.gov/criminal-fraud/financial-institution-fraud.

[89]    *See* Press Release, DOJ, *Five Major Banks Agree to Parent-Level Guilty Pleas* (May 20, 2015), https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas; *see also* 2015 Enforcement Actions, CFTC, http://www.cftc.gov/LawRegulation/Enforcement/EnforcementActions/ 2015EnforcementActions/index.htm.

[90]    *See* Press Release, DOJ, *Three Former Traders for Major Banks Indicted in Foreign Currency Exchange Antitrust Conspiracy* (Jan. 10, 2017), https://www.justice.gov/opa/pr/three-former-traders-major-banks-indicted-foreign-currency-exchange-antitrust-conspiracy.

and unsound practices in the foreign exchange markets,"[91] and the New York Department of Financial Services fined Barclays over $400 million for conspiring with other banks, including JP Morgan, to manipulate FX prices.[92]

353.   These settlements followed a wave of Orders from November 2014, where the U.S. Commodity Futures Trading Commission ("CFTC")[93] and U.K. Financial Conduct Authority[94] imposed over $1.9 billion in fines on JP Morgan, UBS, Citi, HSBC and RBS for manipulating the FX market, the Office of the Comptroller of the Currency fined Bank of America, JP Morgan, and Citi another $950 million,[95] and the Swiss Financial Market Supervisory Authority fined UBS $141 million for "manipulation, collusion, and other market abusive conduct."[96]

354.   Other global regulators that have investigated the banks' manipulation of the FX market include the Brazilian Council for Economic Defense, which imposed fines on JP Morgan

---

[91]   *See* Press Release, Federal Reserve, *Federal Reserve announces fines totaling more than $1.8 billion against six major banking organizations for their unsafe and unsound practices in the foreign exchange (FX) markets* (May 20, 2015), https://www.federalreserve.gov/newsevents/press/enforcement /20150520a.htm.

[92]   *See* Consent Order, ¶ 44, *In the Matter of Barclays Bank PLC* (Nov. 17, 2015), http://www.dfs.ny.gov/about/ea/ea151117.pdf.

[93]   *See* Press Release, CFTC, *CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates* (Nov. 12, 2014), http://www.cftc.gov/PressRoom/PressReleases/pr7056-14.

[94]   *See* Press Release, U.K. Financial Conduct Authority, *FCA fines five banks 1.1 billion for FX failings and announces industry-wide remediation program* (Nov. 12, 2014), http://www.fca.org.uk/news/fca-fines-five-banks-for-fx-failings.

[95]   *See* Press Release, OCC, *OCC Fines Three Banks $950 Million for FX Trading Improprieties* (Nov. 12, 2014), http://www.occ.gov/news-issuances/news-releases/2014/nr-occ-2014-157.html.

[96]   *See* Press Release, The Swiss Financial Market Supervisory Authority, *FINMA sanctions foreign exchange manipulation at UBS* (Nov. 12, 2014), https://www.finma.ch/ en/news/2014/11/mm-ubs-devisenhandel-20141112.

and several other banks,[97] the South African Competition Commission, which found that Bank of America, Credit Suisse, JP Morgan, and several other banks had a "general agreement to collude,"[98] the Australia Securities and Investment Commission,[99] and the Korea Fair Trade Commission.[100]  Many of the governmental investigations of FX manipulation remain ongoing, including major inquiries by the European Commission.[101]

355.    The governmental settlements lay out the details of how the banks colluded to manipulate FX prices to their benefit.  For instance, the CFTC found that Defendants JP Morgan and UBS, along with Citi, HSBC, and RBS, "used private electronic chat rooms to communicate and plan their attempts to manipulate the Forex benchmark prices."[102]  Traders used those inter-bank chat rooms to "coordinate[] their trading with certain FX traders at other banks to attempt to manipulate certain FX benchmark rates," and to "disclose[] confidential customer order

---

[97]    *See* Noticias, Administrative Council for Economic Defense, Brazil, *CADE signs five agreements regarding a cartel investigation in the foreign exchange market and opens a new cart investigation in the Brazilian exchange market* (Dec. 9, 2016), http://en.cade.gov.br/cade-signs-five-agreements-regarding-a-cartel-investigation-in-the-foreign-exchange-market-and-opens-a-new-cartel-investigation-in-the-brazilian-exchange-market.

[98]    *See* Media Statement*,* Competition Commission, South Africa, *Competition Commission prosecutes banks (currency traders) for collusion* (Feb. 15, 2017), http://www.compcom.co.za/wp-content/uploads/2017/01/Competition-Commission-prosecutes-banks-currency-traders-for-collusion-15-Feb-2016.pdf.

[99]    *See* Georgia Wilkins,  *ASIC launches investigation into foreign exchange benchmarks*, THE SYDNEY MORNING HERALD (Mar. 21, 2014), http://www.smh.com.au/business/asic-launches-investigation-into-foreign-exchange-benchmarks-20140320-355wo.html.

[100]    *See South Korea fines Deutsche Bank, BNP Paribas $157,000 over FX forwards rigging,* REUTERS, (May 16, 2017), http://www.reuters.com/article/us-southkorea-antitrust-idUSKCN18C06G.

[101]    *See* Gaspard Sebag and Stephanie Bodoni, *FX Probe Said to Emerge From Shadows as EU Seeks Bank Data*, Bloomberg (June 3, 2016), https://www.bloomberg.com/news/articles/2016-06-03/currency-probe-said-to-emerge-from-shadows-as-eu-seeks-bank-data.

[102]    *See, e.g.*, Order Instituting Proceedings, *In the Matter of JPMorgan Chase Bank, N.A.*, CFTC Dkt. No. 15-04 (Nov. 11, 2014).

information and trading positions, alter[] trading positions to accommodate the interests of the

collective group, and agree[] on trading strategies as part of an effort by the group to attempt to

manipulate certain FX benchmark rates."  Those exclusive chatrooms were often given colorful

names like "The Cartel," "The Mafia," "The Club," "The Bandits' Club," "The Dream Team,"

"One Team, One Dream," and "The Sterling Lads."

### D. <u>Interest Rate Swaps (ISDAfix)</u>

356.    Numerous Prime Broker Defendants have also paid substantial sums to

government regulators, private plaintiffs, or both to settle claims that they exploited their

position on a panel of banks to manipulated the widely-used financial benchmark known as

ISDAfix in violation of antitrust and anti-manipulation laws.

357.    Prime Broker Defendants Bank of America, Credit Suisse, Goldman Sachs, JP

Morgan, and UBS have collectively paid over $222 million to settle private antitrust and

common laws claims concerning these banks' collusive manipulation of the ISDAfix benchmark

at the expense of their counterparties and clients.  Goldman Sachs has paid an additional $120

million to settle proceedings initiated by the CFTC for conduct the Commission described at

times as "particularly brazen"[103] and always designed to move the benchmark "in the direction

that was best for Goldman at the expense of its counterparties and clients."[104]

358.    Numerous of Goldman Sachs' horizontal competitors also paid hefty settlement

sums to the CFTC for their manipulation of ISDAfix.[105]  Numerous investigations into ISDAfix

---

[103]    *See In re The Goldman Sachs Group, Inc., and Goldman, Sachs & Co.*, CFTC No.
17-03, 2016 WL 7429257, at *8 (Dec. 21, 2016).

[104]    *Id.* at *7.

[105]    *See In re Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*, CFTC No.
15-25, 2015 WL 2445060 (May 20, 2015); *In re Citibank, N.A.*, CFTC No. 16-16, 2016 WL

manipulation by various governmental bodies remain ongoing.  Highlighting the seriousness of the misconduct of the ISDAfix panel banks, these investigations reportedly involve a criminal dimension.[106]

359.    The Prime Broker Defendants' misconduct related to ISDAfix was undertaken, like that described above, to line their own pockets at the expense of investors, providing another illustration of a lack of internal controls and a culture where the bottom line was used to justify serious misdeeds.

### E.    Credit Default Swaps

360.    In the Credit Default Swaps ("CDS") litigation,[107] Defendants Bank of America, Credit Suisse, Goldman Sachs, J.P. Morgan & Chase, Morgan Stanley, and UBS, together with several entities not named as defendants in this action, were accused of participating in a remarkably similar conspiracy to the one alleged here.

361.    In the CDS litigation, plaintiffs alleged that the defendants—who dominated the over-the-counter CDS market and took advantage of its inefficiencies to reap supracompetitive profits from bid/ask spreads—were threatened by the development of electronic exchanges and clearinghouses for CDS transactions.  These electronic trading platforms threatened to introduce price transparency and other efficiencies that would have eliminated the CDS defendants' ability

---

3035030 (May 25, 2016); *In re The Royal Bank of Scotland plc*, CFTC No. 17-08, 2017 WL 511925 (Feb. 3, 2017).

[106]  *See* Matthew Leising & Tom Schoenberg, *CFTC Said to Alert Justice Department of Criminal Rate Rigging*, BLOOMBERG (Sept. 9, 2014), https://www.bloomberg.com/news/articles/2014-09-08/cftc-said-to-alert-justice-department-of-criminal-rate-rigging-i2z7ngfn.  Indeed, at his deposition in the private civil case, the head of Deutsche Bank's swaps desk from 2007 to 2012 invoked his Fifth Amendment right to avoid self-incrimination in response to questions about his desk's ISDAfix practices.

[107]  *In re Credit Default Swaps Antitrust Litigation*, No. 13-md-2476 (DLC) (S.D.N.Y.).

to charge artificially inflated bid/ask spreads.  In response, the CDS defendants (most of which are named as Defendants here) allegedly conspired to squash this threat by agreeing in secret meetings to, among other things, boycott the use of these new trading platforms.  As a result, according to the CDS plaintiffs, the defendants were successful in blocking the natural evolution of the CDS market from an inefficient, over-the-counter market to a more efficient, exchange-traded market, resulting in significant damages to those market participants who were forced to continue paying grossly inflated bid/ask spreads.

362.    The defendants in the CDS litigation ultimately agreed to pay over $1.86 billion to settle those claims.

## CLASS ACTION ALLEGATIONS

363.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as representatives of a Class defined as follows:

> All persons and entities who, directly or through an agent, entered into stock loan transactions with Bank of America, Goldman Sachs, Morgan Stanley, Credit Suisse, JP Morgan, or UBS in the United States from January 7, 2009 through the present (the "Class Period").  Excluded from the Class are Defendants, their employees, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint.

364.    ***Numerosity.***  Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class, but believe that there are at least thousands of class members geographically dispersed throughout the United States.

365.    ***Typicality.***  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.  Specifically, Defendants' wrongdoing caused Plaintiffs and members of the Class to pay inflated rates when they borrowed stock or receive unduly low rates when they lent stock.

366.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.  Accordingly, by proving its own claims, Plaintiffs will prove other class members' claims as well.

367.     **Adequacy of Representation.**  Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action.  Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

368.     **Commonality.**  There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to prevent the emergence of platforms that permitted efficient electronic trading and clearing of stock loan transactions with real-time, transparent pricing; to boycott emerging platforms and force customers to boycott them; to interfere with clearing organizations' agreements with emerging platforms; to jointly purchase and mothball emerging platforms and their intellectual property; and to jointly prohibit real-time price disclosures;

(b)      Whether Defendants' conduct violated the antitrust laws;

(c)      Whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiffs and other members of the Class;

(d)    The effect of Defendants' alleged conspiracy on the prices associated with the lending and borrowing of securities in the United States during the Class Period;

(e)    The appropriate measure of damages sustained by Plaintiffs and other members of the Class;

(f)    Whether Plaintiffs and other class members are entitled to injunctive relief; and

(g)    The appropriate injunction needed to restore competition.

369.    ***Predominance.***  Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

370.    ***Superiority.***  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

371.    *Ascertainability*.  The members of the Class are ascertainable by applying objective criteria to business records maintained by the Prime Broker Defendants and class members.

372.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

373.    Defendants' conspiracy was conducted in secret, since that is the only way it could have prospered.  Defendants also affirmatively concealed their anticompetitive conduct from Plaintiffs and the proposed Class since the inception of Defendants' conspiracy.  As a result, Plaintiffs and members of the proposed Class did not previously discover, nor could they have discovered through the exercise of reasonable due diligence facts comprising their claims, including facts concerning the nature of the injuries alleged above; facts concerning to whose conduct their injuries were attributable; facts concerning when such injuries occurred; and facts concerning the intent, formation, and execution of Defendants' conspiracy.

374.    Defendants' wrongful conduct was carried out, at least in part, through means and methods specifically designed to avoid detection and which, until very recently, successfully eluded detection.  In particular, Defendants participated in secret meetings and communications whereby they agreed upon the course of anticompetitive conduct described in this Complaint.  These included private meetings of the EquiLend board, which are not open to the public, as well as one-on-one meetings between Defendants' senior executives.  Plaintiffs and other members of the proposed Class were not present at and had no way to attend or access the proceedings of these secret meetings, and had no way of accessing Defendants' other relevant communications.  Defendants also concealed their actions through the use of secret names and code words like "Project Gateway" for their conspiratorial conduct.

375.     Plaintiffs had no reason contemporaneously to know or suspect that these meetings were being used to plan and execute a conspiracy to stifle and boycott innovation. Indeed, the significant and substantial efforts and investments of AQS, SL-x, and Data Explorers along with the financial and other backing of market participants, *see, e.g.*, ¶¶18, 157, 160, 162 185, 187, would not have been rational if Defendants' conspiracy had been known. That financial resources were prioritized for these initiatives by savvy market participants belies any suggestion that Defendants' actions were known to Plaintiffs or the class.

376.     The very nature and structure of the securities lending market itself—an OTC trading environment with Defendants serving as intermediaries—was designed and maintained by Defendants. This structure made it impossible for Plaintiffs and other members of the proposed Class to compare quotes or otherwise scrutinize Defendants' bid/ask spreads. Preserving this lack of price transparency is part of the reason Defendants conspired in the first place.

377.     In addition, Defendants publicly misrepresented to customers, potential vendors, and the general public their support for a trading platform that could centrally clear securities lending transactions. Through those false statements, Defendants actively misled Plaintiffs and the proposed Class as to the true, collusive, and coordinated nature of their actions. Defendants made these false statements with the purpose and effect of concealing their conspiracy to preserve the opaque OTC market that enabled them to charge supracompetitive spreads for intermediating securities lending transactions.

378.     For example, EquiLend states on its web site that: "In 2000, a group of 10 global financial institutions joined together, looking for ways to optimize efficiency in the securities finance industry by developing a standardized and centralized global platform for trading and

post-trade services.  EquiLend Holdings LLC was formed in 2001, and the platform went live in 2002."  But as discussed throughout this Complaint, the Prime Broker Defendants used EquiLend to achieve the exact opposite ends—*i.e.*, preventing the opaque, over-the-counter securities lending market from evolving into a more efficient, centrally cleared electronic platform with improved price transparency.

379.    As detailed above, Defendants also made repeated statements at marketing and sales meetings concerning about their enthusiasm and support for the boycotted platforms and entities.  *See* ¶¶171, 209, 230, 237, 238.  These statements were false and contrary to Defendants' coordinated, hidden plan to thwart each initiative.  But they had their intended effect of masking the conspiracy.

380.    Other examples of affirmative misstatements made by Defendants that concealed their conspiracy include, but are not limited to, the following:

(a)    An October 2014 press release announcing that Morgan Stanley was becoming a member of Eurex Clearing's Securities Lending CCP, in which Susan O'Flynn stated:  "Morgan Stanley is supportive of CCP [central clearing] solutions for securities lending such as the Eurex Clearing model as it allows us to preserve our client relationships and deliver best execution with risk, resource and operational efficiencies."

(b)    An October 2016 interview by the Securities Lending Times in which Thomas Wipf was asked how things were progressing with respect to Morgan Stanley's central clearing on Eurex, and where Mr. Wipf replied:  "We have grown cleared balances meaningfully since the inaugural launch and look forward to broader volume increases as new members come online."

(c)      An August 1, 2016 announcement by EquiLend regarding its acquisition of AQS, where EquiLend CEO, Brian Lamb stated:  "Momentum has been building in the past two years in support of CCPs [central clearing] in the securities finance marketplace.  Balance sheet costs, risk weighting and tougher capital-adequacy requirements have highlighted to the industry the potential benefits of using central clearing services. [. . .]  By providing seamless access to OCC's Market Loan Program, the securities finance market now will have unprecedented access to central clearing services."

381.    In reality, Morgan Stanley and the other Prime Broker Defendants did not want to broaden participation in, and use of central clearing services for securities lending transactions because they feared it would result in direct participation by buy-side firms.  Nor did EquiLend acquire AQS to provide greater access to central clearing; EquiLend acquired AQS so the Prime Broker Defendants could control the gateway through which any centrally cleared securities lending transactions would have to pass.

382.    Defendants' market power and willingness to abuse it to silence, punish, and exclude those who dared to cross them is one important reason why their conspiracy was able to operate under the radar until recently.  As noted above, Defendants wielded their considerable clout to bully and threaten even large, established entities in the stock loan market.  *See* ¶¶18, 19, 191, 213, 215, 237, 243.  This clout meant that even their more aggressive tactics could remained unspeakable by those who feared retaliation.  Defendants' threats—and the power behind them—kept those to whom they were directed quiet about the conspiracy they furthered.  Those who were targeted feared incurring the wrath of those Defendants on whose services and relationship they depended if they did anything that would inform the market (including Plaintiffs and the class) about the strategies to quash emerging market innovation.

383.     While certain statements made by Defendants at meetings with the boycotted entities may, in hindsight and with the full knowledge of the broader market context, have suggested the existence of the conspiracy, these statements, too, were unknown to Plaintiffs and the Class.  Moreover, they were at odds with the contrary representations Defendants made to the public concerning their position on central clearing and market efficiency.

384.     As a result of Defendants' affirmative misstatements and acts of concealment, Plaintiffs and the proposed Class had no prior knowledge of the conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.  Because Defendants planned and executed their conspiracy in private, in fora shielded from public view, Plaintiffs had no reason to suspect that the terms of their stock loan transactions reflected not market forces but anticompetitive collusion.  Thus, all applicable statutes of limitations affecting Plaintiffs' claims and those of the proposed Class have been tolled during the period of Defendants' concealment.

385.     Plaintiffs, either directly or through investment professionals and/or attorneys they hired, regularly monitored their investments—including their activities in the stock loan market—and conducted due diligence to try to avoid being harmed by financial misconduct throughout the Class Period.  Through these relationships, Plaintiffs endeavored to obtain the best prices and return on their stock loan transactions.

386.     Throughout the Class Period, Plaintiffs and their investment professionals and/or attorneys regularly monitored new reports concerning the financial industry and the stock lending market.  Such efforts were made in order to invest wisely and maximize returns, but practically speaking, there were substantial limitations to how much Plaintiffs and the class could monitor prices in the opaque stock loan market.

387.     The foregoing allegations constitute a continuing violation of the antitrust laws, including misconduct and recurring injuries within the limitations period.  Accordingly, Plaintiffs and the proposed Class can recover for damages suffered throughout the limitations period, even absent a finding of equitable tolling or fraudulent concealment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)

388.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

389.     As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to restrict competition in the stock loan market and to jointly boycott entities that would introduce competition on stock loan rates in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination, or conspiracy constitutes a naked, *per se* violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

390.     Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

391.     Stock loan transactions are, and are widely perceived by those in the industry to be, a unique financial product.  The market for stock loan in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

136

392.    Other products are not substitutable for stock loan.  Taking "short" positions on equity securities that an investor does not already own requires that the investor first borrow the security in the stock loan market.

393.    The relevant geographic market is the United States.  The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

394.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, competition in stock loan transactions between Defendants and their non-Defendant customers has been severely curtailed.  Plaintiffs and class members have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.  Plaintiffs' and each class member's damages are directly attributable to Defendants' conduct, which resulted in class members either paying artificially high rates to borrow stock or receiving artificially low rates to lend on every stock loan transaction they conducted during the Class Period.  Plaintiffs' injuries consist of artificially inflated costs or deflated proceeds associated with stock loan transactions in the United States caused by Defendants' misconduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment Under New York law)

395.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

396.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.

397.     Plaintiffs and the Class seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## **PRAYER FOR RELIEF**

398.     WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class of similarly situated entities, respectfully request that the Court:

(a)     Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

(b)     Find Defendants jointly and severally liable for the damages incurred by Plaintiffs and the Class;

(c)     Award the Class treble damages;

(d)     Award reasonable attorneys' fees and costs;

(e)     Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

(f)     Decree that Defendants and their co-conspirators have unlawfully conspired to block the emergence of platforms that offered electronic trading and clearing of stock loan transactions with real-time, transparent pricing in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(g)     Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs and the Class;

(h)     Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the stock loan market, a market valuable to not

only Plaintiffs and class members but also to the nation's financial system and broader economy for the risk management and liquidity benefits it can provide; and

        (i)     Order such other, further, and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and

the proposed Class, demand a trial by jury on all issues so triable.


DATED:   New York, New York
             November 17, 2017

**COHEN MILSTEIN SELLERS &
   TOLL PLLC**

By:   /s/ Michael B. Eisenkraft
Michael B. Eisenkraft
Christopher J. Bateman
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Fax: (212) 838-7745
meisenkraft@cohenmilstein.com
cbateman@cohenmilstein.com


Kit A. Pierson (*pro hac vice*)
Julie G. Reiser (*pro hac vice*)
Richard A. Koffman
David A. Young
Robert W. Cobbs
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408 4600
Fax: (202) 408 4699
kpierson@cohenmilstein.com
jreiser@cohenmilstein.com
rkoffman@cohenmilstein.com
dyoung@cohenmilstein.com
rcobbs@cohenmilstein.com

**QUINN EMANUEL URQUHART &
   SULLIVAN, LLP**

By:   /s/ Daniel L. Brockett
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Maaren A. Shah
Thomas J. Lepri
Justin Reinheimer
Thomas Popejoy
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
maarenshah@quinnemanuel.com
thomaslepri@quinnemanuel.com
justinreinheimer@quinnemanuel.com
thomaspopejoy@quinnemanuel.com


Jeremy D. Andersen (*pro hac vice*
forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

**SAFIRSTEIN METCALF LLP**

By: _____/s/ Peter Safirstein_____
Peter Safirstein
1250 Broadway, 27th Floor
New York, New York 10001
Telephone: (212) 201-2845
psafirstein@safirsteinmetcalf.com

*Counsel for Torus Capital, LLC*