quinn emanuel trial lawyers | new york



December 20, 2017

The Honorable Katherine Polk Failla
Thurgood Marshall United States Courthouse
40 Foley Square, Room 2103
New York, NY 10007

Re:   *Iowa Pub. Emps.' Ret. Sys, et al. v. Bank of Am. Corp., et al.*, 17-cv-6221 (KPF)

Dear Judge Failla:

      Pursuant to the Court's Individual Rule 4(A) and the Order dated September 20, 2017, Plaintiffs write in response to Defendants' December 13, 2017 letter (ECF No. 79).

      The Amended Complaint ("Complaint") in this case details an unlawful antitrust conspiracy among six investment banks (the "Prime Broker Defendants") and a joint venture they controlled (EquiLend) to suppress competition in the stock lending market. Stock lending is the temporary transfer of publicly traded stock. (Compl. ¶¶2-3, 91-113.) The Prime Broker Defendants act as matchmakers between stock lenders and borrowers, collecting approximately 65% of the fees paid by borrowers, a percentage wildly out of proportion to the unnecessary "service" they provide. (¶¶4-6, 97-113, 323-45.) Defendants enjoy inflated profits because the stock loan market remains frozen in an antiquated state where borrowers and lenders must transact over-the-counter through a broker-dealer intermediary with little to no price visibility. (¶¶113-20, 323-45.)

      This stagnation persists only because of Defendants' unlawful conspiracy to boycott and otherwise neutralize competitors that promised to make the market more open, transparent, and efficient. Defendants, for example, jointly extinguished the threat from Quadriserv/AQS, which offered an electronic trading platform to match borrowers and lenders directly. (¶144.) Defendants also boycotted SL-x, which offered an electronic platform on which broker-dealers could communicate bids and offers more efficiently, driving price transparency and competition. (¶173.) And Defendants also prevented Data Explorers from providing pricing transparency by way of real-time pricing data. (¶186.) The Prime Broker Defendants snuffed out each of these threats through carefully coordinated anticompetitive behavior, thereby ensuring that they remain the exclusive gatekeepers for the trading and clearing of stock loan transactions.

      Defendants advance four meritless arguments in support of dismissal. *First*, they claim the Complaint consists of "conclusory assertions" about Defendants "as undifferentiated collectives" and thus fails to state a plausible conspiracy. (Letter at 2.) To the contrary, the Complaint details illicit meetings that *actually occurred* among Defendants, including a meeting among the Prime Broker Defendants in September 2009. (¶202.) The Complaint also alleges that senior personnel from Goldman Sachs and Morgan Stanley later met and agreed on how to protect their dominant position as the "gatekeepers" of stock loan trading through a scheme called "Project Gateway." (¶¶11, 21-22.) The Complaint also alleges exactly how Thomas Wipf

from Morgan Stanley and William Conley of Goldman Sachs reached this agreement over a series of dinners in New York City and how Mr. Wipf then reported that agreement to his colleagues at Morgan Stanley.  (¶¶294-97.)  And the Complaint further alleges that a JP Morgan director acknowledged the existence of a "*general agreement among Directors*" of EquiLend "that industry advances should be achieved from within EquiLend," and a similar acknowledgement by a Credit Suisse executive that none of the Prime Broker Defendants would support the new platforms because they were outside of Defendants' control.  (¶¶17, 239.)

      Defendants also claim that the Complaint fails to plead "meaningful parallel conduct." (Letter at 2.)  But the Complaint alleges a host of incriminating parallel conduct (including Defendants' "parallel" comparison of their conduct to that of mafia families (¶¶14-15)).  The Complaint alleges, for example, that Credit Suisse, JP Morgan, Morgan Stanley, and UBS each communicated an *identical position* to AQS in separate meetings around the same time—they *uniformly* stated they would not participate on the platform unless AQS barred lenders and borrowers from trading directly on the platform.  (¶210.)[1]  The Complaint also alleges that Renaissance Technologies and dozens of other large hedge funds asked the Prime Broker Defendants for direct access to AQS, but Defendants consistently refused.  (¶¶215-16.) Ultimately, in the case of both AQS and SL-x, the Prime Broker Defendants jointly used EquiLend to buy the weakened platforms and shut them down.  (¶¶270-72, 298-301.)[2]

      ***Second***, Defendants argue that their conduct was consistent with unilateral business behavior.  Not so.  The Complaint alleges that the conspiracy was primarily driven by the two dominant players (Goldman Sachs and Morgan Stanley) who recruited and pressured others to join, including smaller players who otherwise had unilateral incentives to work with the new platforms to "more effectively compete with Goldman Sachs and Morgan Stanley for a larger share of the stock loan market."  (¶198.)  The Prime Broker Defendants' parallel threats to hedge-fund clients worked only because they were in lockstep, so that no other Prime Broker Defendant would take those clients.  (¶¶18-19, 191, 213-18, 237, 243, 251-52.)  Moreover, even if all Defendants hypothetically could have acted unilaterally, the Complaint squarely alleges that they did not.  Rather, they acted in concert to make sure that nothing happened to disrupt their joint gatekeeping role.

      ***Third***, Defendants claim that "stock loans by their very nature [are] ill-suited for anonymous, exchange trading"—that is, the type of trading offered by AQS.  (Letter at 2.)  But the sophisticated founders and backers of AQS did not agree with this contested factual proposition.  Nor did the Federal Reserve Bank of New York (then under Timothy Geithner),

---

[1]  Defendants' claim that Bank of America's initial support for AQS renders "the alleged boycott conspiracy even less plausible" is baseless.  (Letter at 2.)  The Complaint explains that Bank of America changed course and joined the conspiracy.  (¶¶200-07.)  Just as participants in a conspiracy need not have uniform motives or involvement, *see In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012), "[c]onspiracies, particularly when alleged among a large group, are not always tidy and symmetric."  *In re Interest Rate Swaps Antitrust Litig.*, 16-MD-2704 (PAE), 2017 WL 3209233, at *33 (S.D.N.Y. July 28, 2017) ("*IRS*") ("That RBS initially made markets with [one of the boycotted platforms] does not undermine the claim of a group boycott.").

[2]  Defendants ignore the Complaint's allegations that they bought AQS and SL-x after having nearly crushed them and did so only for the anticompetitive purpose of removing the platforms from the market and had no intention to do anything productive with them.  (¶¶316-19.)  Indeed, the purchases were economically irrational except for their anticompetitive purpose.

which was supportive of AQS's offering. (¶155.) Nor did the OCC or Eurex, both of which took the trouble to link up to AQS to clear its stock loan transactions. (¶156.) Other supporters of AQS included one of the largest lenders of stock, one of the largest borrowers of stock, the country's oldest venture capital fund, and one of the largest exchanges in the world. (¶160.)

Defendants also claim that because a cleared stock loan market (like every other cleared market) would require brokers to execute and clear trades, that means it was impossible for exchange trading to occur. This, too, is squarely contradicted by the Complaint's allegations. Numerous transparent, anonymous, electronic markets—including the stock market itself— operate by means of customers trading through executing and clearing brokers at modest fees, *i.e.*, an agency execution model. (¶¶120 n.26, 154 n.36.) If Defendants had not squashed AQS, borrowers and lenders could have traded and cleared stock loan transactions with each other using any of dozens of such agent brokers at low cost. The Prime Broker Defendants prevented that from happening, so they could continue to play their immensely profitable matchmaking role in an opaque, OTC market.

Defendants also ignore that the Complaint alleges that they did more than block exchange trading offered by AQS. They also blocked SL-x, which offered a more efficient (and better) platform than exists in the market, without moving (at least immediately) to anonymous, exchange trading. And they also blocked the pricing transparency provided by Data Explorers. That Defendants squashed three separate threats, each of which would have increased market efficiency and transparency in somewhat different ways, highlights that Defendants were determined to close off *every* competitive threat to their privileged market position.

***Fourth***, Defendants characterize the allegations involving EquiLend as "'joint venture' conduct," claim that all "joint venture conduct" is analyzed under the rule of reason, and then assert Plaintiffs do not attempt to plead a rule of reason claim. (Letter at 3.) This argument fails at each step. Defendants' conspiracy to extinguish competitive threats was reached among direct, horizontal competitors. It is illegal *per se*, and it does not matter that Defendants used a joint venture as one forum to implement the conspiracy. "An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 197 (2010). *See also United States v. Sealy, Inc.*, 388 U.S. 350 (1967) (applying *per se* rule to price fixing and territorial restriction agreements among "joint venture" of mattress manufacturers). In any event, the Complaint *does* allege all elements of a rule of reason violation. (¶¶304-45.)[3] Defendants' standing argument fares no better: the Complaint details how Plaintiffs and class members were injured and how they would have directly benefited from the greater competition and transparency provided by the three blocked entrants. (¶¶323-45.) *See In re Credit Default Swaps Antitrust Litig.*, 13-MD-2476 (DLC), 2014 WL 4379112, at *9 (S.D.N.Y. Sept. 4, 2014) ("*CDS*") ("Plaintiffs' alleged injuries are not speculative..."). Finally, the Complaint adequately pleads fraudulent concealment and unjust enrichment. (¶¶373-87); *see also CDS*, 2014 WL 4379112, at *16 (tolling adequately pled based on similar allegations).

---

[3]  Defendants rely on *IRS*, but the Complaint here addresses the shortcomings perceived in that case. Notably, *IRS* found that the plaintiffs did plausibly allege that the defendants in that case conspired to boycott three specific market entrants (referred to as SEFs) to preserve their privileged position as OTC dealers, relying on allegations similar in character to those pled in this case.

Respectfully submitted,

| | |
|---|---|
| /s/ Michael B. Eisenkraft | /s/ Daniel L. Brockett |
| Michael B. Eisenkraft | Daniel L. Brockett |
| Cohen Milstein Sellers & Toll PLLC | Quinn Emanuel Urquhart & Sullivan, LLP |
| meisenkraft@cohenmilstein.com | danbrockett@quinnemanuel.com |
| Telephone: (212) 838-7797 | Telephone: (212) 849-7000 |