**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IOWA PUBLIC EMPLOYEES' RETIREMENT
SYSTEM, *et al.*,

       Plaintiffs,

                - against -

BANK OF AMERICA CORPORATION, *et al.*,

       Defendants.

No. 17 Civ. 6221 (KPF)

**MEMORANDUM OF PRIME BROKER DEFENDANTS BANK OF AMERICA,**
**CREDIT SUISSE, GOLDMAN SACHS, JPMORGAN, MORGAN STANLEY AND UBS**
**IN SUPPORT OF THEIR JOINT MOTION TO DISMISS ALL CLAIMS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 5

    A.     Stock Lending ........................................................................................... 6

    B.     The Defendants ........................................................................................ 6

    C.     Central Clearing ...................................................................................... 8

    D.     The Alleged Conspiracy ......................................................................... 9

          1.     AQS.......................................................................................... 10

          2.     SL-x ......................................................................................... 11

          3.     Data Explorers ........................................................................ 14

ARGUMENT ...................................................................................................................... 15

I.     PLAINTIFFS DO NOT ADEQUATELY ALLEGE A VIOLATION OF
      SECTION 1 OF THE SHERMAN ACT. ...................................................... 15

    A.     Plaintiffs Do Not Plead a Plausible Antitrust Conspiracy Among Defendants... 15

          1.     Plaintiffs' Conspiracy Theory Is Facially Implausible. ........................... 17

          2.     Plaintiffs Fail To Allege "Direct Evidence" of a Conspiracy. ................. 19

          3.     Plaintiffs Fail To Plead Parallel Conduct from Which a Conspiracy
               Can Be Inferred. ...................................................................................... 22

          4.     Any Alleged Parallel Conduct Was Fully Consistent with Independent
               Decision-Making by Each Defendant in Its Unilateral Self-Interest. ...... 28

          5.     Plaintiffs Fail To Allege "Plus Factors" That Create a Plausible
               Inference of Conspiracy Based on Supposed Parallel Conduct. .............. 31

          6.     BofAML's Support for AQS Renders the Conspiracy Claim Against It
               Implausible. ............................................................................................. 34

          7.     The Allegations Against JPMorgan, UBS and Credit Suisse Are
               Insufficient. ............................................................................................. 37

    B.     Plaintiffs' Allegations Directed at Joint Venture or Joint Investment Conduct
        Fail To Plead a Claim Under the Rule of Reason. ............................................... 37

i

|  | 1. | Plaintiffs' Effort To Escape the Rule of Reason Is Unavailing. | 38 |
|  | 2. | Plaintiffs' Allegations Do Not Satisfy the Rule of Reason | 39 |
| II. | | PLAINTIFFS LACK ANTITRUST STANDING. | 42 |
| III. | | PLAINTIFFS' CLAIMS ARE TIME-BARRED IN SIGNIFICANT PART. | 45 |
| | A. | Plaintiffs' Antitrust Claim Is Time-Barred Before August 16, 2013 | 45 |
| | B. | Plaintiffs' Unjust Enrichment Claim Is Time-Barred Before August 16, 2014. | 46 |
| | C. | Plaintiffs Fail To Plead Fraudulent Concealment with Particularity. | 47 |
| | 1. | Plaintiffs Do Not Adequately Allege Concealment by Defendants | 47 |
| | 2. | Plaintiffs Do Not Adequately Allege That They Remained Ignorant of Their Claims Until Some Point Within the Limitations Periods. | 49 |
| | 3. | Plaintiffs Do Not Adequately Allege Diligence on Their Part. | 50 |
| IV. | | PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT. | 50 |
| CONCLUSION | | | 50 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*131 Maine St. Assocs. v. Manko*, 179 F. Supp. 2d 339 (S.D.N.Y. 2002) ......................................49

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010)..................................................39

*Am. Sales Co. v. AstraZeneca AB*, 2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011) .................22, 24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................................................23, 25

*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519
    (1983)................................................................................................................................43, 45

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)............................................................. *passim*

*Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999).......................................................................41

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011) .........................................16, 20, 25

*Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537
    (2d Cir. 1993)..........................................................................................................................32

*Concord Assocs., L.P. v. Entm't Props. Tr.*, 2014 WL 1396524 (S.D.N.Y. Apr. 9,
    2014) ........................................................................................................................................22

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005)...........................................43

*Garber v. Legg Mason, Inc.*, 347 F. App'x 665 (2d Cir. 2009)........................................................5

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68 (2d Cir. 2013)...........................43, 45

*Grynberg v. Eni S.p.A.*, 2007 WL 2584727 (S.D.N.Y. Sept. 5, 2007) .........................................46

*Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009)............33, 45, 50

*Hinds Cty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348 (S.D.N.Y. 2010).......................22

*In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510 (S.D.N.Y.
    Aug. 29, 2014), *aff'd on other grounds*, 833 F.3d 151 (2d Cir. 2016) ...................................33

*In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425 (S.D.N.Y.
    Sept. 15, 2014)........................................................................................................................50

*In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1344429 (S.D.N.Y.
    Mar. 23, 2015)..........................................................................................................................24

*In re Citigroup Inc. S'holder Derivative Litig.*, 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) ..................................................................................................49

*In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016) ............................33

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)...................................16, 33

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010)....................... *passim*

*In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430 (S.D.N.Y. 2017)................ *passim*

*In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014)....................................................................32

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015)..16, 29, 31, 32

*In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011) .....................22

*In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 6645533 (E.D. Pa. Dec. 20, 2012) ..................................................................................................49

*In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016) ...........................22, 24

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ........................................31

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ........................................................46

*Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)..............................45

*LLM Bar Exam, LLC v. Barbri, Inc.*, 2017 WL 4280952 (S.D.N.Y. Sept. 25, 2017) .........................................................................15, 17, 27, 37

*Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655 (S.D.N.Y. 2007)................................47

*Matana v. Merkin*, 957 F. Supp. 2d 473 (S.D.N.Y. 2013)............................................46

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013) ........................................................................................... *passim*

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)...............................37

*Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012)......................................................................22

*Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10 (2d Cir. 1980).....................43, 45

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257 (E.D.N.Y. 2010)..................................................................................46

*Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217 (2d Cir. 2008) ................................................43

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000).......................................................................5, 45

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218 (E.D.N.Y. 2009) ...................27

*Shak v. JP Morgan Chase & Co.*, 156 F. Supp. 3d 462 (S.D.N.Y. 2016) .....................................47

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084 (9th Cir. 2015) .....................22

*Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006) ................................................................................38

*United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) .............................................20

*United States ex rel. Taylor v. Gabelli*, 2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005) ..........................................................................................................................................46

*United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016).................................................15

*Williams v. Citigroup, Inc.*, 2009 WL 3682536 (S.D.N.Y. Nov. 2, 2009), *aff'd in relevant part*, 433 F. App'x 36 (2d Cir. 2011).........................................................................30

## Statutes & Rules

15 U.S.C. § 1 .................................................................................................................... *passim*

15 U.S.C. § 15b ...............................................................................................................................45

Fed. R. Civ. P. 9(b) ............................................................................................................5, 47, 49, 50

## Other Authorities

II AREEDA & HOVENKAMP, *Antitrust Law* (4th ed. 2014) .............................................................29

VI AREEDA & HOVENKAMP, *Antitrust Law* (3d ed. 2010) ......................................................29, 30

The Prime Broker Defendants (affiliates of Bank of America ("BofAML"), Credit Suisse, Goldman Sachs, JPMorgan, Morgan Stanley and UBS) respectfully submit this memorandum in support of their joint motion to dismiss the Amended Complaint ("AC") with prejudice.

## PRELIMINARY STATEMENT

This is the latest in a series of antitrust cases, all filed by the same lawyers, asserting that various over-the-counter ("OTC") financial markets should naturally have evolved into anonymous exchanges and that the absence of such evolution can be explained only by a Wall Street conspiracy. Plaintiffs contend that the Prime Broker Defendants, as co-owners and board members of Defendant EquiLend, participated in a nine-year conspiracy "to keep the stock loan market . . . in the stone age." (AC ¶ 324.) But Plaintiffs ignore the distinctive nature of stock lending—including that loans are subject to recall and that large agent-lenders control lending inventory—while recycling "remarkably similar" allegations (*id.* ¶ 360) from other dissimilar OTC markets. *See In re Interest Rate Swaps Antitrust Litig.* ("*In re IRS*"), 16-MD-2704 (PAE) (S.D.N.Y.); *In re Credit Default Swaps Antitrust Litig.*, 13-MD-2476 (DLC) (S.D.N.Y.).

Plaintiffs do not suggest that competition among the Prime Broker Defendants for stock loans is anything but intense or that Defendants fixed the fees they charge their clients. They instead allege that the Prime Broker Defendants "conspired" simply by continuing to execute stock loans under existing standards and rules "to maintain their role as intermediaries." (AC ¶ 10.) The essence of Plaintiffs' theory is that "[t]here is no good reason" why an anonymous exchange for stock loans does not exist. (*Id.* ¶ 5.) But that is a flawed premise. There is nothing inherently suspicious about OTC trading—a host of financial products continue to trade OTC, including corporate bonds and certain derivatives. (*See Over-the-Counter Market*, U.S. SEC. & EXCHANGE COMMISSION (last updated May 9, 2013), https://www.sec.gov/divisions/marketreg/

mrotc.shtml.)  Plaintiffs' claims also suffer from several fatal pleading defects that require dismissal of the Amended Complaint.

*First*, in repurposing conspiracy allegations from previous lawsuits involving different products, market dynamics and regulations, Plaintiffs posit a conspiracy that is implausible on its face.  To start, stock loans are poorly suited for anonymous trading because lenders can recall loaned shares at any time.  Given lenders' ability to terminate loans on demand (AC ¶ 106), rational stock borrowers want to know and cultivate the source of their loans so they can minimize the risk that the loaned shares will be recalled, which could force them to close their position early or scramble to borrow shares of a stock "in short supply" (*id.* ¶ 112).  That fundamental dynamic distinguishes stock loans from the OTC products at issue in other cases.

Moreover, the clearing arrangements needed to support anonymous exchange trading in securities lending simply do not exist.  As Plaintiffs concede, exchange trading is not possible without "a clearinghouse and clearing brokers standing between the parties."  (*Id.* ¶ 116 n.25.)  In contrast to other markets in which central clearing is mandatory, however, there has been no similar clearing mandate for stock loans.  In the absence of a regulatory mandate or market demand for central clearing, *no* clearinghouse offers clearing services directly to borrowers and lenders, and *none* of the 60 broker-dealers that are members of the relevant clearinghouse—most of which are unaffiliated with Defendants—is alleged to have gone into the business of offering clearing services for stock loans.  (*Id.* ¶¶ 120 n.26, 154 n.36.)  Without the necessary clearing arrangements, the alternative trading environment that Plaintiffs imagine cannot exist.

Plaintiffs nonetheless insist that just six prime brokers conspired to block the emergence of an exchange by boycotting three market entrants—AQS, SL-x and Data Explorers.  Plaintiffs do not allege that the dozens of other prime brokers, including Citigroup, Barclays and Deutsche

Bank—a top-five prime broker with more reported clients than two of the Prime Broker Defendants—participated in the supposed conspiracy.  (*See Prime Broker Ranking*, HEDGE FUND ALERT (May 3, 2017), https://www.hfalert.com/rankings/rankings.pl?Q=149 (cited at AC ¶ 323 n.63).)  Instead, Plaintiffs have sued only the six prime brokers that happen to have representatives on the board of directors of EquiLend—a joint venture formed eight years before the start of the alleged conspiracy.  Plaintiffs never explain how only six prime brokers could block the emergence of a stock lending exchange if broad demand for it existed, nor do they allege that these prime brokers acted any differently than the many non-defendant prime brokers.

Plaintiffs also ignore the critical role of agent-lenders in securities lending.  Agent-lenders are large financial institutions that represent stock lenders (*see* AC ¶¶ 97(b), 100-01); they include "custodian banks (such as State Street and BNY Mellon/Bank of New York)" and "large asset managers (such as Blackrock and Vanguard)" (*id.* ¶ 97(b)).  As the intermediary agents for stock lenders, agent-lenders control the supply of shares available to be loaned and decide which borrowers to deal with and on what terms.  Plaintiffs have not alleged that these large agent-lenders were part of the purported conspiracy or that they were powerless against the Prime Broker Defendants.  (*See* Pre-Mot. Conf. Tr. at 26:2-19.)  And they acknowledge that several large agent-lenders—BlackRock, Northern Trust and State Street—sit on EquiLend's board and attended the same meetings at which Defendants supposedly effectuated their conspiracy.  Plaintiffs thus contend that Defendants orchestrated their scheme in plain view of agent-lenders that represent many of the conspiracy's purported victims.

*Second*, Plaintiffs do not plead facts sufficient "to suggest that an [illegal] agreement was made," a threshold pleading requirement under Section 1 of the Sherman Act.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  None of Plaintiffs' allegations identifies "direct evidence"

of conspiracy and, contrary to their suggestion that Defendants have acted in parallel since 2009, Plaintiffs' allegations reveal that several Prime Broker Defendants actually joined one of the supposedly boycotted platforms and that BofAML was a substantial investor in and staunch supporter of that platform.  Other Defendants, consistent with each acting unilaterally, rationally decided to "sit[] tight and wait[] to see if [these new entrants] attracted sufficient support to survive" before investing in startup ventures that supposedly threatened their profits.  *In re IRS*, 261 F. Supp. 3d 430, 475 n.23 (S.D.N.Y. 2017).

*Third*, Plaintiffs' conspiracy allegations center on actions taken by the EquiLend joint venture and by the Prime Broker Defendants as co-owners and board members of that venture. "[M]odern antitrust law evaluates such joint conduct . . . under the rule of reason, with the pleading requirements that standard imposes."  *Id.* at 467.  Plaintiffs try to wave off the rule of reason by asserting that EquiLend "is not the independent joint venture that it purports to be." (AC ¶ 319.)  But Plaintiffs do not come close to alleging that EquiLend "was an illegitimate shell that . . . served only to mask concerted conduct."  *In re IRS*, 261 F. Supp. 3d at 468.  To the contrary, Plaintiffs' own allegations acknowledge that the EquiLend joint venture was formed long before the alleged conspiracy began, was co-owned and at all times had board representation by large agent-lenders, and offers its own profitable services that increased market efficiency.  (AC ¶¶ 89, 305, 307-08, 310, 378; *see also* Complaint ("Compl.") ¶ 100.)

*Fourth*, Plaintiffs lack antitrust standing because their claimed injury from the lack of anonymous all-to-all trading is too speculative.  Market standards and clearinghouse rules require that brokers function as intermediaries on all stock loans.  (AC ¶ 214.)  No Plaintiff thus contends that it could or would have traded on AQS without a broker intermediary, and Plaintiffs do not allege that Defendants did anything to prevent non-defendant brokers from providing

clearinghouse access to borrowers and lenders.  Beyond AQS, Plaintiffs concede that SL-x never launched in the United States and had no plans to offer direct trading between borrowers and lenders, and that Data Explorers was merely a data vendor.  As a result, Plaintiffs' "alternative history of [stock lending] . . . requires too many leaps of imagination and guesswork" to plead antitrust standing.  *In re IRS*, 261 F. Supp. 3d at 494.

*Fifth*, to the extent that Plaintiffs' antitrust claim is based on alleged conduct before August 16, 2013, it is barred by the Clayton Act's four-year statute of limitations.  Plaintiffs' unjust enrichment claim also is barred to the extent that it is based on conduct before August 16, 2014.  Plaintiffs cannot rely on equitable tolling because their fraudulent concealment allegations fail to satisfy Rule 9(b)'s pleading requirements.

*Sixth*, Plaintiffs' unjust enrichment claim should be dismissed because it is predicated entirely on Plaintiffs' fatally flawed antitrust claim.

## BACKGROUND[1]

Plaintiffs complain that borrowers and lenders of stock "have no way to transact with each other" but rather must do so "through intermediaries, which are almost always the Prime Broker Defendants."  (AC ¶ 5.)  They allege that Defendants sought to protect their position by organizing a "group boycott" of "electronic trading platforms on which stock loan trades could be executed and centrally cleared at transparent prices."  (*Id.* ¶ 9.)

---

[1] This background statement is based on the Amended Complaint's allegations, the materials cited therein and matters of public record, all of which can be considered on a motion to dismiss. *See, e.g.*, *Twombly*, 550 U.S. at 568 n.13 (holding that "the District Court was entitled to take notice of the full contents of the published articles" quoted in complaint); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (courts "may consider matters of which judicial notice may be taken," including "press articles and SEC filings"); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (courts may consider "any statements or documents incorporated" into the complaint "and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit").

### A.    Stock Lending

In a stock loan transaction, "[t]he lender transfers title of the security to the borrower" in exchange for the borrower's collateral and a guarantee to return the security on demand.  (*Id.* ¶ 105.)  "The loaned stock is marked-to-market daily, with the amount of collateral required to be posted by the borrower adjusted accordingly."  (*Id.*)  The borrower also pays "a fee for the right to use the borrowed stock," which "depends in large part on whether the stock is listed as a 'hard to borrow' [*i.e.*, in short supply] or 'general collateral'" at the time.  (*Id.* ¶ 112.)

Unlike trades of common stock, "[s]tock loans are typically 'open,' meaning that the loan has no specific term or tenor," and "[e]ither party can terminate the loan at any time."  (*Id.* ¶ 106; *cf. id.* ¶ 115.)  If a lender abruptly terminates a stock loan, the borrower may be forced to close out its position or scramble to find a "hard to borrow" stock.  (*Id.* ¶ 112.)  One of the "critical prime brokerage services" (*id.* ¶ 215) is ensuring that clients can maintain their short positions by borrowing shares from lenders not likely to recall the loans early (*see id.* ¶¶ 105, 213).

### B.    The Defendants

The Prime Broker Defendants, like other prime brokers, facilitate stock loans by "bringing together a prospective borrower looking to borrow a certain stock with a lender (often through its agent lender) who has this stock available."  (*Id.* ¶ 97(c).)  Prime brokers locate shares available to be loaned, "execute the short trade, and borrow the underlying stock necessary to settle that trade," assuming the risk if a default occurs.  (*Id.* ¶ 95.)  There are dozens of prime brokers, yet Plaintiffs do not contend that all or even most of those prime brokers participated in the alleged conspiracy.  (*See Prime Broker Ranking*, Hedge Fund Alert (May 3, 2017) (cited at AC ¶ 323 n.63).)  In fact, Plaintiffs ignore many of the largest prime brokers, including Deutsche Bank, Citigroup, Barclays, Fidelity Investments, Wells Fargo and BNP Paribas, even though Deutsche Bank, for example, has more reported clients than Defendants

BofAML and UBS.  (*See id.*)  Plaintiffs instead name as defendants only the six prime brokers with representatives on EquiLend's board of directors.

EquiLend is a joint venture formed in 2001 by a group of prime brokers and agent-lenders.  (AC ¶¶ 122, 305, 378.)  EquiLend provides post-trade reconciliation of stock loans and other "post-trade services such as a settlement instructions repository, contract comparison, mark-to-market comparison, billing comparison, billing delivery, recalls, and returns."  (*Id.* ¶ 305.)  "EquiLend has also for many years offered a service called AutoBorrow," "a quasi-trading service that provides a daily automated, sequential execution for general collateral stock loans."  (*Id.* ¶ 306.)  Each trading day, AutoBorrow enables its broker-dealer subscribers to decide how much general collateral stock "they wish to borrow, and that quantity is then executed."  (*Id.*)

EquiLend's co-owners include affiliates of the Prime Broker Defendants and several large agent-lenders such as BlackRock, Northern Trust and State Street.  (*See About Us*, EQUILEND, http://www.equilend.com/about/ (last visited Jan. 24, 2018) (cited at AC ¶ 305 n.54).)  These agent-lenders are among the largest asset managers; for example, BlackRock describes itself as the world's largest with more than $6 trillion under management.  (*See Welcome to BlackRock*, BLACKROCK, https://www.blackrock.com/investing (last visited Jan. 24, 2018).)  These agent-lenders participate together with the Prime Broker Defendants on EquiLend's board of directors, where the alleged conspiracy was supposedly planned and implemented.  (*See* AC ¶ 261 & n.45.)  Plaintiffs thus contend that the Prime Broker Defendants operated the alleged conspiracy at EquiLend board meetings also attended by the representatives of many victims of the alleged conspiracy.

### C.    Central Clearing

The parties to a stock loan have continuing obligations during the loan's term (*see id.*

¶¶ 105-06), creating the risk of "counterparty default" (*id.* ¶ 9 n.3).  In bilateral transactions, that

risk can be mitigated because each party knows its counterparty and thus can assess its

creditworthiness and impose collateral requirements "depending on the credit quality of the

counterparty."  (*See id.* ¶¶ 9 n.3, 145, 326-27; Compl. ¶ 62.)  However, because of counterparty

risk, anonymous stock lending is not feasible without "interposing a 'clearinghouse' between the

two counterparties to the loan."  (AC ¶¶ 9 n.3, 145.)  "The clearinghouse becomes the borrower

to every lender and the lender to every borrower" and "maintains sufficient capital to stand

behind every trade."  (*Id.* ¶ 9 n.3.)  "In the event one party fails to meet its obligations, the

clearinghouse steps in and assumes the obligation."  (*Id.*)

The Options Clearing Corporation ("OCC") is the only clearinghouse that offers stock

lending clearing services in the United States, although it does not offer those services *directly* to

borrowers and lenders.  (*Id.* ¶¶ 214, 289.)  (The Depository Trust & Clearing Corporation also is

an authorized clearinghouse, but has never used its license to offer clearing services for stock

loans (*id.* ¶ 289), and Defendants never controlled the "majority of the voting board seats"

needed to make that decision (Compl. ¶ 169 n.44).)  OCC is 100% owned by five exchanges—

the Chicago Board Options Exchange, Inc.; International Securities Exchange, LLC; NASDAQ

OMX PHLX, LLC; NYSE MKT LLC; and NYSE Arca, Inc.—and each has an "absolute veto

right concerning OCC decisions."  (AC ¶ 148 & n.32.)  Although representatives of certain

Defendants at times held seats on OCC's board, the overwhelming majority of the OCC board

was unaffiliated with any Defendant during the relevant period.  (*Id.* ¶¶ 149, 293; *see OCC*

*Annual Report Archive*, OCC, https://www.theocc.com/about/corporate-information/annual-

reports (last visited Jan. 24, 2018).)  In fact, Credit Suisse, UBS and EquiLend never had an

8

OCC board representative during the alleged conspiracy (*see* AC ¶¶ 56, 86, 88-90, 149 n.33), and JPMorgan had a board representative only for four months of the alleged conspiracy (January-April 2009) (*id.* ¶ 69).

OCC's by-laws "provide[] that *only* broker-dealer members of OCC, such as the Prime Broker Defendants, [can] transact on [a stock loan platform], either as the lender or borrower." (*Id.* ¶ 214.)  Accordingly, "[a]t present, broker-dealers (including but not limited to the Prime Broker Defendants) still have a role" in all stock loans.  (*Id.* ¶ 120 n.26.)  A borrower, lender or agent-lender must "be 'sponsored' by, and granted access through, a broker-dealer, who would stand in to facilitate and clear their trades" and would make the clearinghouse whole in the event of a default.  (*Id.* ¶¶ 120 n.26, 214.)  Plaintiffs do not allege that it was in the Prime Broker Defendants' unilateral self-interest to provide such services to borrowers and lenders as so-called "clearing brokers"; indeed, they offer no reason why a Prime Broker Defendant, in the absence of the alleged conspiracy, would have abandoned the prime brokerage business and relegated itself to the far more limited (and less profitable) role of simply "clearing" stock loans.  (*Id.* ¶ 120 n.26.)  According to the Amended Complaint, "there are over sixty brokerage firms with stock lending clearing privileges at OCC today" (*id.* ¶ 154 n.36)—most of which are unaffiliated with Defendants—that could have offered "clearing broker" services to borrowers and lenders (*id.* ¶¶ 120 n.26, 154 n.36).  But Plaintiffs do not allege that any of them did so.

### D.    The Alleged Conspiracy

Plaintiffs allege that the Prime Broker Defendants, acting primarily through EquiLend, conspired to boycott three companies—AQS, SL-x and Data Explorers.  (*Id.* ¶¶ 8-10.)  According to Plaintiffs, the conspiracy began on January 7, 2009, the date on which AQS launched its platform, and continues through the present.  (*Id.* ¶¶ 154, 363.)

### 1.    AQS

Believing (incorrectly) that the SEC would mandate central clearing of stock loans after the financial crisis, AQS "developed an electronic platform that would match borrowers and lenders directly."  (*Id.* ¶ 144.)  In January 2009, AQS reached an agreement "whereby OCC would act as the central counterparty" for AQS transactions submitted by a clearinghouse member.  (*Id.* ¶ 154.)  "OCC's amended by-laws (which set forth the standards and rules applicable to clearing transactions on the AQS platform) explicitly provided that *only* broker-dealer members of OCC . . . could transact on AQS."  (*Id.* ¶ 214.)  AQS thus never was capable of offering direct trades between borrowers and lenders.

Undercutting Plaintiffs' conspiracy theory, several "Prime Broker Defendants joined the AQS platform."  (Compl. ¶ 119.)  BofAML was a "strong" supporter of AQS and made "equity investments in AQS in 2007, 2008, 2009 and early 2011."  (AC ¶ 205.)  BofAML continued to place up to "$1 billion of notional loans each day" on AQS in 2011, two years into the alleged conspiracy.  (*Id.* ¶¶ 206-07.)  Morgan Stanley also used AQS for certain stock loan transactions until at least 2015.  (*Id.* ¶ 296 n.51.)

Ultimately, AQS "was unable to develop sufficient liquidity to remain [] financially viable" (*id.* ¶ 269) and allegedly tried to sell itself to OCC in 2016 (*see id.* ¶¶ 292, 298).  But OCC—which the Prime Broker Defendants did not control (*id.* ¶¶ 149, 293)—"cancelled" the proposed deal (*id.* ¶ 298).  When that deal "collapsed" (*id.* ¶ 299), AQS's owners were "[d]esperate" (Compl. ¶ 179).  According to Plaintiffs, Thomas Wipf of Morgan Stanley and William Conley of Goldman Sachs met for dinners in January 2016 to discuss EquiLend's potential purchase of AQS—what Plaintiffs call "Project Gateway."  (AC ¶¶ 293-97.)  "[H]aving spent nearly $100 million in investor money with very little volume or profit to show for it, AQS's owners accepted EquiLend's offer" of nearly $5 million "to purchase the assets of AQS."

(*Id.* ¶ 299.)  In the press release cited by Plaintiffs, AQS's CEO trumpeted the deal as positive for both AQS and the industry as a whole:  "[I]t was critical for AQS and the key stakeholders in the industry to arrive at the best model for long-term marketplace operation.  We believe this transaction reflects a clear measure of success in defining that relationship and are happy to be working with EquiLend to see so many years of hard work at AQS turn into a positive outcome for the industry."  (*EquiLend Acquires AQS*, EQUILEND, http://www.equilend.com/news/articles /2016/equilend_acquires_aqs.php (cited at AC ¶ 300 nn.52 & 53).)  EquiLend advertises that AQS's "technology served as the basis for [its] newly launched EquiLend Clearing Services," which "continue[d] to operate the existing [AQS] platform, including its trading and middle-office services."  (*Who We Are*, EQUILEND CLEARING SERVS., http://www.equilend.com /services/ecs.php/ (last visited Jan. 24, 2018).)

### 2. SL-x

"Founded in late 2010 and primarily developed over the course of the following two years, SL-x offered an electronic, front-end trading system for stock loans."  (AC ¶ 172.)  Unlike AQS, "SL-x did not plan to offer anonymous trading between end-borrowers and lenders."  (*Id.* ¶ 179.)  Instead, SL-x "offered an electronic platform on which broker-dealers could communicate bids and offers more efficiently."  (ECF No. 81 at 1.)  SL-x "market[ed] itself as the 'softer, friendlier' market innovation that would not pose a threat to the prime brokers' existing relationships or revenue stream."  (AC ¶ 182.)  But SL-x focused on Europe and never actually launched in the United States.  (*See id.* ¶¶ 178, 233, 235, 253, 268.)

In August 2011—long before it even launched in Europe—SL-x approached EquiLend about a potential merger.  (*See id.* ¶¶ 221-22; Compl. ¶ 144.)  SL-x proposed a combination "between SL-x and EquiLend" and also met with "many of its member banks directly to further explain its product and pitch."  (AC ¶¶ 221-22.)  SL-x emphasized EquiLend's "positive impact

11

on increasing market efficiency by standardizing, centralizing, and automating middle- and back-office processes" and proposed a merger "whereby EquiLend shareholders would own a substantial portion of the combined company . . . and SL-x shareholders . . . would own the remainder." (Ex. 1 at 1, 3, Letter from Peter Fenichel, CEO, SL-x Ventures UK Ltd., to Jeffrey Benner, Chairman, EquiLend LLC (Aug. 1, 2011) (cited at AC ¶ 221).)[2]

In September 2011, EquiLend's CEO Brian Lamb, "on behalf of the Chairman of the Board of EquiLend, EquiLend's directors, and EquiLend management, informed SL-x that all parties had uniformly decided to reject SL-x's offer." (AC ¶ 224.) As Mr. Lamb explained in his response, EquiLend was "confident in [its] abilit[y] to respond to . . . changes in the marketplace" without a merger. (Ex. 2 at 2, E-mail from Brian Lamb, CEO, EquiLend Holdings LLC, to Peter Fenichel, CEO, SL-x Ventures UK Ltd. (Sept. 21, 2011, 09:48 PM) (cited at AC ¶ 224).) "[A]s EquiLend has operated as a profitable enterprise for many years now," Mr. Lamb stated, "it retains sufficient capital to build out any infrastructure that might become necessary should the market embrace other financing models, including those offered by central counterparty clearing solutions." (*Id.*) Mr. Lamb reported that "the management of EquiLend and the Boards of Directors [including the agent-lender members] are *unanimous* in their decision to decline your offer for a transaction at this juncture." (*Id.* (emphasis added).)

"With EquiLend having rejected its overtures, SL-x went back to trying to court" a "group of brokers" for capital investment. (AC ¶¶ 225-27.) "From the outset" in 2011, Goldman Sachs informed SL-x that it did not view SL-x as "a good development" and "ain't supporting this." (*Id.* ¶¶ 219-20.) Morgan Stanley allegedly informed SL-x in 2011 that it "should deal

---

[2] All references to "Ex." are to the exhibits accompanying the Declaration of Lauren M. Rosenberg, dated January 26, 2018.

with EquiLend directly rather than through Morgan Stanley" and that it did "not want to participate in a separate consortium."  (*Id.* ¶¶ 226-27.)

Despite the alleged positions of Goldman Sachs and Morgan Stanley, the other four Prime Broker Defendants continued to meet with SL-x executives over the next three years, between 2012 and 2014.  (*Id.* ¶¶ 225, 229-31, 238-39, 241-42, 244.)  Ultimately, those Defendants decided to wait until SL-x had shown signs of success before supporting or investing in it.  Credit Suisse "would only join [SL-x's] platform if and when the 'Big Boys' (*i.e.*, other large market players) committed to the platform and there was evidence of substantial liquidity." (*Id.* ¶ 241.)  UBS decided not to "sign on . . . until and unless SL-x could secure commitments from other large market participants and demonstrate evidence of significant liquidity."  (*Id.* ¶ 242.)  BofAML continued to meet with SL-x through July 2014, but ultimately "never moved forward."  (*Id.* ¶ 244.)  JPMorgan held several meetings with SL-x in 2012 and 2013 but by August 2013, "following internal discussions within JP Morgan," decided "to take no further action with SL-x at [that] time."  (*Id.* ¶¶ 230, 238-39.)  In discussions with SL-x, JPMorgan's EquiLend board representative supposedly referenced "a 'general agreement among [the] directors' of EquiLend 'that industry advances should be achieved from within EquiLend' and not through third parties such as SL-x."  (*Id.* ¶ 239.)  Other EquiLend board representatives purportedly referenced their relationships with EquiLend.  (*See id.* ¶¶ 241-44, 309.)

Throughout that period, SL-x had no clearing relationship in the United States.  (*Id.* ¶ 233.)  It was not until 2013—two years after it first reached out to EquiLend and the Prime Broker Defendants for support—that SL-x so much as approached OCC for "a deal that would permit central clearing of U.S. stock loan transactions executed on the SL-x platform."  (*Id.*)  But

"[t]he partnership between SL-x and OCC . . . never materialized." (*Id.* ¶ 253.)  As a result, SL-x's platform never launched in the United States.  (*Id.* ¶¶ 178, 233, 235, 253, 268.)

"SL-x's lifespan was brief." (*Id.* ¶ 268.)  Having run "out of funding by September 2014" (*id.* ¶ 20), SL-x's owner "tried to recover some of its investment by putting [SL-x's] patents up for" a "fire [] sale" (Compl. ¶ 146).  EquiLend agreed to purchase SL-x's patents for £500,000 in early 2015.  (AC ¶ 272.)  As Plaintiffs admit, EquiLend purchased those patents only after SL-x already had failed.  (*See id.* ¶¶ 268, 272.)

### 3. Data Explorers

Formed in 2002—seven years before the alleged conspiracy—"Data Explorers did not offer an electronic trading platform like AQS and SL-x." (*Id.* ¶ 193.)  Rather, Data Explorers offered agent-lenders "very basic" aggregated stock loan data.  (*Id.* ¶¶ 27, 131-32.)  Over time, Data Explorers attempted to market its data to borrowers and prime brokers.  (*Id.* ¶¶ 135, 138.)

Plaintiffs do not allege that the Prime Broker Defendants refused to subscribe to Data Explorers' data service.  Instead, the focus of Plaintiffs' boycott claim is EquiLend's creation of a competing data service.  (*See id.* ¶¶ 254-65.)  In 2011, nearly a decade after Data Explorers' launch, EquiLend created its own data division, DataLend, to "provide [agent-lenders] directly with data similar to that being provided by Data Explorers, but at very little cost or, in some cases, virtually for free." (*Id.* ¶ 261.)  "Most major agent lenders—those who were members of EquiLend—were at least initially offered DataLend's products for no additional fee." (*Id.* (footnote omitted).)  The EquiLend board also "authorized DataLend to go out and directly engage with the customers who had already signed up with Data Explorers." (*Id.* ¶ 259.)  As a result of this new competition, Plaintiffs allege that Data Explorers' "revenues plummeted and its momentum came to a dead stop." (*Id.* ¶ 264.)

14

Data Explorers was acquired in 2012 by Markit, an "independent company" that "operates in a number of different financial markets" and offers "large market data and post-trade processing" services. (*Id.* ¶ 265.) Markit now advertises that its "dataset cover[s] more than $16 trillion of global securities from 20,000 institutional funds" and provides "trading transparency from a macro to an individual stock level." (*See Securities Finance*, IHS MARKIT, https://ihsmarkit.com/products/securities-finance.html (last visited Jan. 24, 2018).)

## ARGUMENT

## I.   PLAINTIFFS DO NOT ADEQUATELY ALLEGE A VIOLATION OF SECTION 1 OF THE SHERMAN ACT.

To state a claim under Section 1 of the Sherman Act, "a plaintiff must make two showings: '[i] a combination or some form of concerted action between at least two legally distinct economic entities that [ii] unreasonably restrains trade.'" *LLM Bar Exam, LLC v. Barbri, Inc.*, 2017 WL 4280952, at *20 (S.D.N.Y. Sept. 25, 2017) (quoting *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016)). The Amended Complaint makes neither showing. *First*, Plaintiffs fail to plead a plausible antitrust conspiracy—their theory of a nine-year conspiracy, among just six prime brokers, to preserve OTC trading in a market not suited for an anonymous exchange, and orchestrated at meetings also attended by agent-lenders, is implausible on its face. *Second*, the vast majority of the conduct challenged by Plaintiffs is subject to the rule of reason because it is related to the EquiLend joint venture. Plaintiffs do not adequately allege that this conduct unreasonably restrained trade under the rule of reason.

### A.   Plaintiffs Do Not Plead a Plausible Antitrust Conspiracy Among Defendants.

A plaintiff asserting a Section 1 claim must plead an antitrust conspiracy that is not just "conceivable," but "plausible." *Twombly*, 550 U.S. at 570. Under *Twombly*, a complaint must allege "enough factual matter (taken as true) to suggest that an [illegal] agreement was made."

*Id.* at 556.  A plaintiff thus must plead "evidentiary facts" that sustain a "plausible" inference of an unlawful agreement, including "who, did what, to whom (or with whom), where, and when." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015).

There are two ways to satisfy these requirements.  A plaintiff may allege "direct evidence" of conspiracy.  *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  "Direct evidence of a conspiracy is 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'"  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (citation omitted).  Such "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Citigroup*, 709 F.3d at 136.

Alternatively, a plaintiff may plead an antitrust conspiracy based on "circumstantial facts" that "support[] the *inference* that a conspiracy [actually] existed."  *Id.*  Such "circumstantial facts" ordinarily consist of allegations of parallel conduct "in a context that raises a suggestion of a preceding agreement."  *Twombly*, 550 U.S. at 557.  Parallel conduct alone, however, is "not enough" to suggest a preceding agreement because such conduct is merely "consistent" with an inference of conspiracy, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007), and often results from "coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," *Twombly*, 550 U.S. at 556 n.4 (citation omitted).  Accordingly, allegations of parallel conduct must be accompanied by additional facts, so-called "plus factors," that create a plausible inference that the alleged conduct "flowed from a preceding agreement rather than from [the defendants'] own business priorities."  *Citigroup*, 709 F.3d at 137-38.  Plus factors "may include:  a common motive to conspire, evidence that shows that the parallel acts were against the apparent

16

individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* at 136 (citation omitted). But even "[t]he presence of plus factors certainly does not compel or 'necessarily lead to an inference of conspiracy.'" *Barbri*, 2017 WL 4280952, at *20 (citation omitted).

Plaintiffs' allegations fall well short of the mark. Beyond the inherent implausibility of their theory, Plaintiffs fail to plead either "direct evidence" of an unlawful conspiracy or parallel conduct that raises a plausible inference of conspiracy. Plaintiffs also do not come close to alleging the necessary "plus factors." The Prime Broker Defendants' alleged conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554.

### 1.   Plaintiffs' Conspiracy Theory Is Facially Implausible.

Before analyzing Plaintiffs' specific allegations, their plausibility should be considered holistically. Plaintiffs posit that just six prime brokers effectuated a nine-year conspiracy that blocked the migration of stock loans to an anonymous exchange. But the Amended Complaint does not allege any facts explaining how this feat could be accomplished amidst the dozens of other prime brokers (*see Prime Broker Ranking*, HEDGE FUND ALERT (May 3, 2017) (cited at AC ¶ 323 n.63)) and the agent-lenders that control the supply of shares available to be loaned (*see* AC ¶ 97(b)). Nor do Plaintiffs plead any facts explaining how six firms alone could block a "natural evolution" in the market (*id.* ¶ 361); why the borrowers, lenders and agent-lenders could not choose to deal with other prime brokers; or why large agent-lenders such as BlackRock, Northern Trust and State Street would have stood by idly while the Prime Broker Defendants conspired to harm their lender clients right in front of them at EquiLend board meetings.

Plaintiffs also say remarkably little about the market's readiness for anonymous trading. Stock loans are by their nature ill-suited for anonymous trading because lenders can terminate

17

loans at any time.  (*Id.* ¶ 106.)  Borrowers thus desire to know the source of their loans to assess

the risk that the loaned shares will be recalled, forcing them to close their position or search for

other shares of a "hard to borrow" stock.  (*Id.* ¶ 112.)  In suggesting that there was demand for

anonymous securities lending, Plaintiffs argue that "the Federal Reserve Bank of New York

(then under Timothy Geithner) . . . was supportive of AQS's offering."  (ECF No. 81 at 2-3

(citing AC ¶ 155).)  The Amended Complaint provides no citation for that assertion.  Although

Mr. Geithner publicly supported central clearing for derivatives in 2009, Plaintiffs point to no

statements by the Federal Reserve Bank of New York or by Mr. Geithner supporting anonymous

exchange trading of stock loans or AQS's proposed platform, and Defendants are aware of none.

In addition, Plaintiffs' own allegations confirm that the clearing arrangements necessary

to sustain anonymous exchange trading do not exist.  Unlike other financial markets in which

central clearing has been mandated, no similar clearing mandate exists in the stock loan market

that would have "facilitate[d] the emergence . . . of electronic 'all to all' platforms."  *In re IRS*,

261 F. Supp. 3d at 442.  Although Plaintiffs characterize Basel III as a significant "regulatory

development" that compelled "individual business units within certain banks [to] tak[e] steps

toward central clearing" (AC ¶¶ 273-74, 277), Basel III did not *require* central clearing of stock

loans, and the Amended Complaint does not allege otherwise.

Throughout the relevant period, OCC was the only clearinghouse that "offer[ed] clearing

of stock loan trades."  (*Id.* ¶¶ 148, 289.)  But lenders and borrowers cannot access OCC directly,

as OCC's by-laws "explicitly provided that *only* broker-dealer members" could clear stock loans.

(*Id.* ¶ 214; *see also id.* ¶ 120 n.26.)  Plaintiffs thus are reduced to arguing that the brokers that

belonged to OCC could have offered sponsored access to the clearinghouse "for a modest fee" as

clearing brokers.  (*See id.* ¶¶ 120 n.26, 214.)  Yet Plaintiffs do not allege that it was in the Prime

Broker Defendants' economic self-interest to enter the low-margin business of acting as clearing brokers, thus forgoing their profits as prime brokers. Moreover, Plaintiffs recognize that "there are over sixty brokerage firms with stock lending clearing privileges at OCC" (*id.* ¶ 154 n.36)—the vast majority of which are not affiliated with any Defendant. None of those other brokers is alleged to have entered the business of clearing stock loans, and Plaintiffs never allege that Defendants did anything to discourage or prevent them from offering such services.

In *In re IRS*, the court dismissed as implausible the conspiracy claim for the period when there was no regulatory mandate requiring central clearing. *See* 261 F. Supp. 3d at 463-72. As the court explained, "the structure and nature of the IRS market changed materially in or around 2013, as a result of Dodd-Frank's [clearing] mandate[]." *Id.* at 463. Before that mandate, "platforms offering anonymous all-to-all IRS trading . . . had not yet developed" because "the infrastructure for such platforms" did not exist. *Id.* Similarly here, there is no allegation that any stock loan platforms ever have existed that enabled borrowers and lenders to transact directly with each other. As in *In re IRS* during the period before Dodd-Frank, "the alternative trading environment to which class plaintiffs claim to have aspired not only did not exist," but also the critical clearing arrangements needed for such a trading environment to emerge—clearing brokers willing to clear stock loans through OCC—were "not yet in place." *Id.* at 465. Under these circumstances, "there would have [been] no urgency for collective action to block all-to-all exchange trading from emerging." *Id.* It is even more implausible that only six prime brokers out of dozens would conspire to try to block such a fundamental shift in the market.

### 2. Plaintiffs Fail To Allege "Direct Evidence" of a Conspiracy.

Plaintiffs do not come anywhere close to alleging "direct evidence"—*i.e.*, "smoking gun" evidence—of an unlawful conspiracy. *See Citigroup*, 709 F.3d at 136. Most of their purported "direct evidence" allegations relate to conduct that is not *per se* unlawful, and all of their

19

allegations "are a far cry from the illustration of direct evidence of a § 1 conspiracy—a recorded phone call in which competitors agreed to fix a price—that the Second Circuit has given." *In re IRS*, 261 F. Supp. 3d at 466 ("Far from qualifying as direct evidence of a § 1 conspiracy, the SAC's lengthy allegations . . . largely consist of conclusory allegations and inferences.").

Plaintiffs first attempt to plead "direct evidence" by asserting that an undisclosed BofAML executive convened a 2009 "meeting of 'the five families' . . . so the Prime Broker Defendants could settle on their collective messaging" in advance of a roundtable discussion sponsored by the SEC. (AC ¶ 202.) To start, any meeting organized by BofAML in 2009 could not have been conspiratorial because BofAML is not alleged to have joined the supposed conspiracy until 2011. (*Id.* ¶ 206; ECF No. 81 at 2 n.1; Pre-Mot. Conf. Tr. at 19:21-20:10.) Moreover, Plaintiffs fail to allege who attended any such meeting, where and when it occurred, what was discussed, and what agreement allegedly was reached. *See Burch*, 662 F.3d at 225 (not direct evidence where plaintiffs did not "specify a time or place that any actual agreement to fix credit terms occurred, nor [did] they [allege] that any particular individuals . . . made such an agreement"). In any event, "[j]oint efforts to influence public officials do not violate the antitrust laws." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965).

Nor can Plaintiffs plead direct evidence through colorful references to the "five families" of stock lending. (AC ¶¶ 14-15.) Plaintiffs never identify the so-called five families, state whether they include the large agent-lenders that also are EquiLend co-owners and board members, or say whether they include other large prime brokers. Even assuming that this phrase referred to the six Prime Broker Defendants, Plaintiffs allege no facts that connect these supposed comments to the alleged conspiracy. Such phrases, devoid of any factual specificity, do not constitute "smoking gun" evidence of a conspiracy, especially in light of Plaintiffs'

allegation that BofAML used the phrase "five families" in 2009 when BofAML concededly was not yet part of the conspiracy.  (*Compare id.* ¶ 202, *with* ECF No. 81 at 2 n.1.)

Similarly, Plaintiffs' allegations concerning "Project Gateway" relate to perfectly legitimate joint venture discussions among EquiLend owners.  *See infra* Argument I.B.  Those allegations also fail to satisfy the demanding standards for direct evidence.  Plaintiffs allege that Thomas Wipf of Morgan Stanley and William Conley of Goldman Sachs met for dinners in January 2016—seven years after the conspiracy supposedly began—to discuss EquiLend's potential purchase of AQS.  (AC ¶¶ 11, 21-22, 294-97, 363.)  Plaintiffs then assert, without more, that "Morgan Stanley and Goldman Sachs coordinated and secured the participation of the other Prime Broker Defendants (each of whom was an EquiLend Board member) in their common pursuit of Project Gateway."  (*Id.* ¶ 297.)  Plaintiffs cannot transform allegations that two individuals met for the lawful purpose of discussing a potential joint venture acquisition into "smoking gun" evidence of an unlawful conspiracy among six prime brokers.

Plaintiffs likewise fail to allege unlawful conduct by asserting that after EquiLend rejected SL-x's merger proposal, John Shellard, an EquiLend director who works at JPMorgan, referred to "a 'general agreement among [the] directors' of EquiLend 'that industry advances should be achieved from within EquiLend.'"  (*Id.* ¶ 239.)  Plaintiffs selectively truncate Mr. Shellard's purported statement to obscure its context, but even the abbreviated quotation they provide shows that the alleged agreement was not among *prime brokers*, but rather among *EquiLend's directors*.  Indeed, Mr. Shellard does not even *work* as a prime broker; he instead works for JPMorgan's agent-lending business in London.  (*See* JPMORGAN, AGENT LENDING NEWSLETTER Q1 at 10 (2013), http://jpmorganchina.com.cn/jpmpdf/1320605426029.pdf; AC ¶ 309.)  Moreover, any alleged agreement among EquiLend's *directors* to achieve advances

through EquiLend as opposed to its competitors would be reviewable under the rule of reason. *See infra* Argument I.B.  Similarly, the allegation that Credit Suisse's EquiLend director told SL-x that "we are only going to do this through EquiLend" (AC ¶ 17) at most reflects a natural and unilaterally rational decision of a joint venture participant not to invest in a potential competitor.  *See Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1091 (9th Cir. 2015) ("[T]he fact that [a defendant] did not enter a new market just to compete with its own joint venture is perfectly justifiable.").

### 3. Plaintiffs Fail To Plead Parallel Conduct from Which a Conspiracy Can Be Inferred.

#### a. Plaintiffs Rely on Impermissible Group Pleading.

Allegations that generalize about "defendants" as a group are "insufficient to withstand review on a motion to dismiss." *Concord Assocs., L.P. v. Entm't Props. Tr.*, 2014 WL 1396524, at \*24 (S.D.N.Y. Apr. 9, 2014).  Instead, a complaint must allege "particular activities" by each "particular defendant," *Am. Sales Co. v. AstraZeneca AB*, 2011 WL 1465786, at \*5 (S.D.N.Y. Apr. 14, 2011), and notify each Defendant how it "is alleged to have conspired, with whom and for what purpose," *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016); *see also Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387, at \*6 (S.D.N.Y. Dec. 3, 2012) (requiring a complaint to "provide a plausible factual basis to distinguish the conduct of each of the defendants"); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011) ("[c]onclusory, collective language is too convenient, too undisciplined, and too unfocused" to state an antitrust claim); *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) (plaintiffs must allege "a factual connection between each Defendant and the alleged conspiracy").

In attempting to plead parallel conduct, Plaintiffs rely on generalized assertions about "the Prime Broker Defendants" as a group.  (*See, e.g.*, AC ¶¶ 139, 212-17, 228, 236-37, 251.)  They allege, for example, that "the Prime Broker Defendants" used their positions as EquiLend board members to "discuss[] what their next move should be."  (*Id.* ¶ 211.)  They also assert that "[t]he Prime Broker Defendants collectively decided that they could not tolerate a fully independent entity with access to all market participants' data" (*id.* ¶ 25) and "collectively refus[ed] to participate on the [AQS] platform" (*id.* ¶ 212.)  And Plaintiffs state that "the Prime Broker Defendants not only boycotted the platforms themselves, but pressured other market participants to do so."  (*Id.* ¶ 251.)  Such allegations do not provide the required "nonconclusory factual allegation of parallel behavior."  *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

Plaintiffs further contend that "the Prime Broker Defendants" threatened to deny certain "hedge funds access to critical prime brokerage services if they traded on AQS."  (AC ¶ 215.)  Although Plaintiffs mention four hedge funds by name, they plead no facts to support this group-pled allegation, such as when these threats supposedly occurred or whether they were made in parallel.  (*See id.* ¶¶ 215-16.)  Plaintiffs simply assert that each fund was told by an unidentified Defendant that "it could take its business elsewhere."  (*Id.* ¶ 216.)  While Plaintiffs state that this strategy worked only because "there was no viable 'elsewhere' for the hedge funds to go" (*id.* ¶ 217), they fail to plead any facts to support their conclusory assertion or explain why those funds could not have moved their accounts to one of the many large prime brokers that were not part of the supposed conspiracy.

Where Plaintiffs do attempt to plead particular activities by particular defendants, their allegations focus on only two Prime Broker Defendants (Goldman Sachs and Morgan Stanley), largely ignoring the other four.  (*E.g.*, *id.* ¶¶ 11, 21-22, 287, 294-97.)  Plaintiffs then blithely

assert, with no supporting factual allegations, that "Goldman Sachs and Morgan Stanley recruited the other Prime Broker Defendants to join their scheme . . . primarily through Defendant EquiLend."  (*Id.* ¶ 12.)  Such generalized allegations do nothing to support a plausible inference of a broad conspiracy stretching from January 2009 to the present.

Plaintiffs also make no effort to distinguish among Defendants within corporate families. The Amended Complaint fails to notify each Defendant how it supposedly conspired by alleging "particular activities" by each "particular defendant."  *Am. Sales*, 2011 WL 1465786, at *5 (citation omitted); *see In re Zinc*, 155 F. Supp. 3d at 384.  For example, the Amended Complaint alleges that five Defendants—Merrill Lynch L.P. Holdings, Inc.; Credit Suisse First Boston Next Fund, Inc.; J.P. Morgan Strategic Securities Lending Corp.; Strategic Investments I, Inc.; and UBS Americas, Inc.—simply held an indirect partial ownership interest in EquiLend.  (AC ¶¶ 49, 55, 67, 75, 80.)  But Plaintiffs do not explain why a mere ownership interest in EquiLend (particularly given large agent-lenders' identical interest) suggests participation in a conspiracy. More broadly, Plaintiffs fail to allege which of the other corporate entities acted as a prime broker for stock loans or how those corporate entities supposedly conspired.  *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015) ("As independent entities, claims against them are plausible only if there are factual allegations that specifically pertain to them—as distinct from those applicable to their corporate affiliates.").

> **b.  Where Plaintiffs Do Offer Specific Allegations Regarding Individual Defendants, Those Allegations Describe Conduct That Was More Divergent Than Parallel.**

Once the conclusory assertions are stripped away, the Amended Complaint is devoid of allegations of parallel conduct suggesting a conspiracy.  To plead a plausible conspiracy, parallel conduct must extend beyond acts that are readily explainable as "independent responses to common stimuli."  *Citigroup*, 709 F.3d at 137.  The type of suggestive parallel conduct that

24

"might be sufficient under *Twombly*'s standard" includes "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Id.* (citation omitted).  Far from alleging unprecedented price changes or otherwise unexplainable conduct here, Plaintiffs attempt to manufacture a conspiracy from *inaction*, suggesting that Defendants' failure to support new market entrants raises an inference of conspiracy.  (*See* AC ¶ 208.)

AQS.  Plaintiffs' own allegations dispel the suggestion that the Prime Broker Defendants engaged in any meaningful parallel conduct with respect to AQS.  In fact, they concede that several Prime Broker Defendants joined the AQS platform.  (Compl. ¶ 119.)  At least one Defendant—BofAML—was admittedly a "strong" supporter of AQS, "making equity investments in AQS in 2007, 2008, 2009 and early 2011."  (AC ¶ 205.)  As recently as 2011— two years after the alleged conspiracy commenced—BofAML continued to put up to "$1 billion of notional loans each day" through the AQS platform.  (*Id.* ¶ 207.)  These allegations flatly refute Plaintiffs' claim of parallel conduct.  *See Burtch*, 662 F.3d at 228 (allegations that various competitors "were choosing to decline, decrease, and even increase credit" fell "far short of demonstrating parallel behavior").

In a strained attempt to plead parallel conduct, Plaintiffs allege that "[e]ventually, . . . Credit Suisse, JP Morgan, Morgan Stanley, and UBS each communicated, in separate meetings with AQS executives, an *identical position* concerning AQS," namely that they would support AQS only as a "broker-only platform."  (AC ¶ 210.)  But Plaintiffs plead this "identical position" solely as a conclusion, without any underlying factual details of what these Defendants purportedly said, when they said it, or who supposedly was involved.  This bald assertion fails to supply the necessary *factual* allegations of parallel behavior.  *See Iqbal*, 556 U.S. at 680;

*Twombly*, 550 U.S. at 565 n.10.  In any event, any alleged statement that AQS should operate as "a broker-only platform" was not a distinctive "position" but rather a simple recognition of market realities:  Plaintiffs admit that "market standards" required "a broker-dealer . . . [to] be the legal borrowing entity in every stock loan transaction" and that OCC by-laws "provided that *only* broker-dealer members of OCC . . . could transact on AQS."  (AC ¶ 214.)  Plaintiffs' vague allegations of an "identical position" thus "made perfect business sense," *Citigroup*, 709 F.3d at 138, and do not amount to the type of unusual parallel conduct suggestive of a conspiracy.

In sum, Plaintiffs allege that BofAML affirmatively supported and invested in AQS, that certain other Prime Broker Defendants also joined AQS, that the remaining Prime Broker Defendants chose not to join AQS, and that several Defendants "eventually" recognized the obvious market reality that AQS at most could hope to serve as a platform for brokers.  Such allegations of unremarkable and even *divergent* conduct fall far short of pleading parallel conduct suggestive of a conspiracy.

**SL-x.**  Plaintiffs' allegations of parallel conduct with respect to SL-x also fail.  Plaintiffs' own allegations demonstrate that SL-x had little or nothing to offer EquiLend (AC ¶¶ 178-79) and, as a result, EquiLend's 2011 decision not to merge with SL-x does not support an inference of conspiracy.  Likewise, the alleged consensus among EquiLend's board members "that industry advances should be achieved from within EquiLend" (*id.* ¶¶ 17, 239, 246) made perfect business sense for directors with fiduciary duties to EquiLend, which offers its own competing service.  Such consensus easily passes muster under the rule of reason.  *See infra* Argument I.B.

Similarly, the allegations that the Prime Broker Defendants "withheld capital" from SL-x—*i.e.*, declined to invest in SL-x—fail on multiple grounds.  (AC ¶ 228.)  *First*, SL-x's relevance to a purported conspiracy to prevent all-to-all trading in the United States is remote.

26

Consistent with its decision to "market[] itself as the 'softer, friendlier' market innovation," SL-x had no plans to "offer anonymous trading between end-borrowers and lenders," never had any relationship with a U.S. clearinghouse, and never launched a U.S. platform.  (*Id.* ¶¶ 178-79, 182, 233, 235, 253, 268.)  Plaintiffs' own allegations thus prove that the Prime Broker Defendants had no apparent reason to fear SL-x's introduction of all-to-all trading in the United States.

        *Second*, any alleged commonalities among the Prime Broker Defendants' responses to SL-x were a product of SL-x's decision to "approach[] a group of brokers" about forming a "consortium" to invest capital in SL-x.  (*Id.* ¶¶ 226-28; *see also* Ex. 1 at 2 (SL-x merger proposal stating that "a successful marketplace in securities lending needs to be backed by a consortium of industry participants").)  That common request—after a unanimous decision by EquiLend's management and directors (including the Prime Broker Defendants) to reject SL-x's proposal—would have prompted common responses regardless of whether the brokers were engaged in "concerted action" for purposes of the Sherman Act.  *See Barbri*, 2017 WL 4280952, at *20. Notably, Plaintiffs allege nothing about whether SL-x approached other prime brokers that were not part of the alleged conspiracy (Citigroup, Barclays, Deutsche Bank and others), or what responses SL-x received.  But obviously SL-x found no takers from other prime brokers either.

        *Third*, any alleged decision by a Defendant not to invest in SL-x would have constituted mere inaction.  As *Twombly* emphasized, it is particularly perilous to draw conclusions from business inaction because "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets."  550 U.S. at 569; *see also RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009) (rejecting an inference of conspiracy where "conduct claimed to be conspiratorial is nothing more than the continuation of preexisting [business] patterns").

*Fourth*, the Prime Broker Defendants' reactions to SL-x are not even alleged to have been parallel.  Goldman Sachs and Morgan Stanley supposedly declined to support SL-x when SL-x first approached them in 2011.  (AC ¶¶ 219, 226-27.)  The other Prime Broker Defendants nonetheless continued to meet with SL-x over the next several years, waiting to see whether it launched and attracted sufficient liquidity.  (*See id.* ¶¶ 56, 86, 229-31, 238-42, 244.)  Plaintiffs' own allegations thus belie the claim that Defendants acted in parallel, and they are inconsistent with the assertion that "[t]he Prime Broker Defendants' conduct was primarily driven by Defendants Goldman Sachs and Morgan Stanley" (*id.* ¶ 11)—if that were the case, the other four Prime Broker Defendants would not have continued to meet with SL-x for *three years* after Goldman Sachs and Morgan Stanley decided not to invest.  Indeed, the fact that SL-x failed in Europe—where no conspiracy is alleged to have occurred—suggests that its demise was due to a failed business model.  (*Id.* ¶ 268.)  Put simply, it is by no means suggestive of a conspiracy that certain Prime Broker Defendants allegedly engaged in discussions with a fledgling business but ultimately decided not to invest capital in or otherwise support the unproven enterprise.

**Data Explorers.**  Plaintiffs make *no* attempt to allege parallel conduct by each of the six Prime Broker Defendants with respect to Data Explorers.  Their allegations of joint venture conduct related to Data Explorers are addressed below.  *See infra* Argument I.B.

### 4. Any Alleged Parallel Conduct Was Fully Consistent with Independent Decision-Making by Each Defendant in Its Unilateral Self-Interest.

Even if Plaintiffs had alleged parallel conduct by Defendants, that "alone is insufficient" to plead a plausible conspiracy.  *Citigroup*, 709 F.3d at 136.  An inference of conspiracy does not arise if the parallel conduct "made perfect business sense," *id.* at 138, or "there are 'obvious alternative explanation[s]' for the facts alleged," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010) (citation omitted).

Plaintiffs here fail to identify any parallel conduct that was contrary to each Defendant's self-interest—*i.e.*, conduct that was "so irrational that no firm would have engaged in it except on the understanding that others were in agreement." VI AREEDA & HOVENKAMP, *Antitrust Law* ¶ 1414 (3d ed. 2010); *see also In re Musical Instruments*, 798 F.3d at 1195. Indeed, "the mere fact that firms are rational profit maximizers in the same market implies that they will do a fair number of things in parallel fashion." II AREEDA & HOVENKAMP, *Antitrust Law* ¶ 307d1 (4th ed. 2014). Plaintiffs' attempt to infer a conspiracy from inaction is particularly weak. No inference of conspiracy can be drawn from allegations that Defendants simply conducted business as usual, particularly when that mode of business is still profitable. *See In re Ins. Brokerage*, 618 F.3d at 349 (noting that where defendants are "[r]eaping 'enormous profits,'" it is natural to have "no desire to upset the apple cart" (citation omitted)).

According to the Amended Complaint, the AQS and SL-x platforms threatened to gut the Prime Broker Defendants' profits from stock loans if they ever developed into robust all-to-all exchanges. (*See, e.g.*, AC ¶¶ 24, 113, 119, 179, 186, 194-95.) If that were true, then the "natural, unilateral reaction" of the Prime Broker Defendants—especially Goldman Sachs and Morgan Stanley, "the two largest prime brokers in the market, with the most to lose" (*id.* ¶ 11)— would have been to "resist" these alleged competitive threats, not to support them, particularly before other market participants began trading on the platforms in high volume. *See Twombly*, 550 U.S. at 566. Plaintiffs' allegations thus are fully consistent with *unilateral* decision-making by each Prime Broker Defendant. As the Supreme Court observed in *Twombly*, "resisting competition is routine market conduct," particularly when that competition threatens a highly profitable mode of business. *Id.* There is "no reason to infer that the [Prime Broker Defendants] had agreed among themselves to do what was only natural anyway." *Id.*

*In re IRS* is instructive.  The court there held that "the pleadings . . . supply good reason, as a matter of 'rational and competitive business strategy,' for any [defendant] independently to have sought to maintain the status quo and to discourage, not facilitate . . . an existential threat to [its] profit margins."  261 F. Supp. 3d at 464 (citation omitted).  Each defendant "had good reason to *independently* discourage . . . and not encourage . . . development of a new trading paradigm that threatened, some day, to cannibalize [its] trading profits."  *Id.* (emphasis added); *see also Williams v. Citigroup, Inc.*, 2009 WL 3682536, at *4 (S.D.N.Y. Nov. 2, 2009) (holding parallel refusals to use new financing product that threatened profits "d[id] not suggest a wide-ranging conspiracy but rather unilateral action among the [defendants], each of whom wants to preserve its own market position"), *aff'd in relevant part*, 433 F. App'x 36 (2d Cir. 2011).

Moreover, the alleged refusals to shift billions of dollars in stock loans each day to unproven (and, in SL-x's case, non-operational) platforms do not describe conduct that was "so irrational that no firm would have engaged in it except on the understanding that others were in agreement."  VI AREEDA & HOVENKAMP, *Antitrust Law* ¶ 1414.  To the contrary, that is exactly what would be expected in responding independently to the "common stimul[us]" of a new market entrant.  *See Citigroup*, 709 F.3d at 137.  Plaintiffs do not allege that it was in the Prime Broker Defendants' self-interests to support the AQS and SL-x platforms before they achieved critical mass or generated sufficient client demand to justify a departure from the traditional (and still profitable) stock lending model.

Far from suggesting a conspiracy, it made perfect business sense for each Prime Broker Defendant—independently from one another—to "sit[] tight and wait[] to see if [these new entrants] attracted sufficient support to survive."  *In re IRS*, 261 F. Supp. 3d at 475 n.23.  That is exactly what several Prime Broker Defendants supposedly did.  (*See, e.g.*, AC ¶¶ 241-42 (Credit

Suisse waiting until "the 'Big Boys' . . . committed to the platform and there was evidence of substantial liquidity," and UBS waiting "until and unless SL-x could secure commitments from other large market participants and demonstrate evidence of significant liquidity").)  The fact that SL-x's platform was not even operational in the United States at that time only confirms the reasonableness of those individual decisions.  (*See id.* ¶¶ 20, 253, 268; Compl. ¶ 144.)

>     **5.** **Plaintiffs Fail To Allege "Plus Factors" That Create a Plausible Inference of Conspiracy Based on Supposed Parallel Conduct.**

Plaintiffs also attempt to plead "plus factors" by alleging (i) inter-firm communications, particularly at EquiLend board meetings; (ii) a "common motive" among the Prime Broker Defendants to preserve their profits from securities lending; and (iii) prior investigations and litigation involving the Prime Broker Defendants in completely different markets.  None of these other allegations comes close to supporting a plausible inference of conspiracy.

>     **a.** **Plaintiffs' Allegations of Inter-Firm Communications Are Insufficient.**

Plaintiffs cannot plead a plausible conspiracy simply by asserting that the Prime Broker Defendants "participated in secret meetings and communications," including "meetings of the EquiLend board."  (AC ¶ 374; *see also id.* ¶¶ 12, 34, 124.)  "[A] 'mere opportunity to conspire' at legitimate meetings does not support an inference that 'an illegal combination actually occurred.'"  *In re IRS*, 261 F. Supp. 3d at 471 (citation omitted).  Courts routinely hold that participation in such meetings is insufficient to create a plausible inference of conspiracy.  *See In re Musical Instruments*, 798 F.3d at 1196 ("mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement"); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (participation in association's board of directors by itself does not establish an illegal agreement).

Plaintiffs' allegations are particularly inadequate here.  Plaintiffs contend that the Prime Broker Defendants conspired at EquiLend board meetings even though several large agent-lenders—the representatives of stock lenders—are co-owners of EquiLend and also sit on its board.  (*See* AC ¶¶ 97(b), 261, 308.)  It is implausible to suggest that a conspiracy targeting lenders was orchestrated and effectuated at board meetings also attended by their representatives.  Apart from those board meetings, Plaintiffs' "vague references to isolated discussions" are "not enough plausibly to allege a 'high level' of interfirm communications." *Citigroup*, 709 F.3d at 140.  At most, Plaintiffs allege that Defendants had an "opportunity to conspire," but as discussed above, a "mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Capital Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).

### b. Plaintiffs' Allegations of a Common Motive To Conspire Are Insufficient.

Plaintiffs also fail adequately to allege that Defendants had a "common motive" to conspire.  It is not enough to allege that each Prime Broker Defendant had an interest in maintaining its profits.  *See, e.g.*, *In re Musical Instruments*, 798 F.3d at 1195 n.8 ("common motive for increased profits always exists"); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) ("if 'a motive to achieve higher prices' were sufficient, every company in every industry could be accused of conspiracy because they all 'would have such a motive'" (citation omitted)), *aff'd*, 741 F.3d 1022 (9th Cir. 2014).  Instead, Plaintiffs must allege that Defendants had a strong interest in *conspiring* to engage in conduct that they were unlikely to undertake absent a conspiracy.  *See Twombly*, 550 U.S. at 566 ("no reason to infer that the companies had agreed among themselves to do what was only natural").

Accepting Plaintiffs' allegations as true, each Prime Broker Defendant had a strong *unilateral* interest in "sitting tight and waiting to see if the new [entrants] attracted sufficient support to survive" rather than supporting ventures that supposedly threatened its profits.  *In re IRS*, 261 F. Supp. 3d at 475 n.23.  Far from alleging that the Prime Broker Defendants agreed to a new and risky form of behavior, Plaintiffs allege that most of the Prime Broker Defendants continued to conduct business as they always had.  The Prime Broker Defendants thus lacked any motive to conspire "to do that which they were already doing" and was in their individual economic self-interest.  *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *30 (S.D.N.Y. Aug. 29, 2014), *aff'd on other grounds*, 833 F.3d 151 (2d Cir. 2016).

### c.  Plaintiffs' Allegations of Collusion in Other Markets Are Irrelevant.

In an attempt to bolster their conspiracy claim, Plaintiffs point to unrelated investigations and lawsuits involving different markets and products.  (AC ¶¶ 346-62.)  But Plaintiffs' reliance on the allegations in those other markets (none of which has been proven) amounts to nothing more than speculation that "if it happened there, it could have happened here."  *In re Elevator*, 502 F.3d at 52; *see also Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009).  The Amended Complaint's references to other investigations and lawsuits thus should be disregarded, just as they were in *In re IRS*.  *See* 261 F. Supp. 3d at 477 n.25; *see also In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016) ("[T]he mere fact that regulatory entities have investigated, and may still be investigating, the possibility of misconduct with respect to the Gold Fixing is not a 'plus factor.'").

Indeed, the "remarkably similar" allegations in those other cases (AC ¶ 360) are not a function of similar conduct, but rather the efforts of Plaintiffs' counsel to recycle the same conspiracy theory in different OTC financial markets, even where it makes no economic sense.

The same lawyers may soon allege yet another conspiracy to block the supposed "natural evolution" of some other OTC "market to a more efficient, exchange-traded market" (*id.* ¶ 361) and cite these very allegations in an attempt to bootstrap their claim.  This recycling of the same theory has now gone well beyond the realm of plausibility.

### 6.   BofAML's Support for AQS Renders the Conspiracy Claim Against It Implausible.

Plaintiffs not only have failed to allege a plausible conspiracy involving the Prime Broker Defendants, but in the case of BofAML their allegations are implausible for an additional reason.  The conspiracy's centerpiece is the alleged boycott of AQS.  But BofAML *championed* AQS, investing millions of dollars in AQS's operator, Quadriserv, directing substantial transaction volume to AQS and leveraging its relationship with AQS to compete against the other Prime Broker Defendants.  (*Id.* ¶¶ 157, 205, 207.)  BofAML's support for AQS was so ardent that Quadriserv's press release launching AQS prominently featured a quote from BofAML extolling AQS and the "transparency" it would bring to the market.  (*See Quadriserv, Inc. Welcomes 26 New Member Firms to the AQS(R) Securities Lending Platform*, GLOBENEWSWIRE (Sept. 28, 2009), https://globenewswire.com/news-release/2009/09/28/405458/174194/en/Quadriserv-Inc-Welcomes-26-New-Member-Firms-to-the-AQS-R-Securities-Lending-Platform.html.)  BofAML put its money, name and customers behind AQS.  The idea that it joined a conspiracy to boycott that same platform is not just implausible; it is preposterous.

Proving that "no good deed goes unpunished," Plaintiffs complain that BofAML, starting in late 2011, declined to invest *additional* money in Quadriserv and limited its transactions with AQS to $1 billion per day.  (AC ¶¶ 206-07.)  But Plaintiffs do not allege a single fact supporting an inference that this stemmed from collusion.  (*See, e.g.*, *id.* ¶¶ 200, 202 (alleging, in a wholly conclusory manner, that there must have been "pressure" from others while offering no

allegations whatsoever in support of that speculation).)  The mere fact that BofAML had a board

seat on EquiLend proves nothing.  As Plaintiffs concede, numerous parties not alleged to be

conspirators were on the EquiLend board.  (*Id.* ¶ 308.)  Indeed, a BofAML representative was on

the board throughout the class period (*id.* ¶¶ 50, 122), and yet there is no allegation that BofAML

was part of a conspiracy until late 2011.

Nor would such an inference of collusion be plausible.  First, as a matter of public record,

BofAML continued to hold—and never reduced—its multi-million dollar stake in Quadriserv

even after it supposedly joined the conspiracy.  (*Id.* ¶ 205; *see also* BANK OF AM. CORP., ANNUAL

REPORT OF HOLDING COMPANIES—FR Y-6 (FY 2014), https://www.richmondfed.org/-

/media/richmondfedorg/banking/supervision_and_regulation/fry6_annual_reports/2014/batch1/1

073757_20141231.pdf (denoting 14.34% voting share in Quadriserv).)  It would have been

contrary to BofAML's economic interest to boycott a platform in which it had a large

investment.  Second, if harming AQS truly were BofAML's objective, BofAML would have

refused to bring *any* transactions to AQS.  BofAML did not do that—as Plaintiffs concede.  (AC

¶ 207.)  Third, there is an obvious unilateral—and entirely benign—reason why BofAML would

not have increased its financial exposure to Quadriserv by investing additional funds:  Plaintiffs

themselves allege that AQS was failing (*id.* ¶ 269), which would deter any investor from pouring

in more money.  The same is true for order flow.  Plaintiffs claim (without support) that an

alleged conspiracy of other prime brokers had already starved AQS of liquidity.  (*Id.* ¶¶ 212-13.)

If so, BofAML naturally would become more circumspect about transacting on the platform for

customers seeking robust liquidity.  Plaintiffs contend that this supposed reduction in support

was triggered by personnel changes, but Plaintiffs' assertion that BofAML "purged" its

"personnel who had formerly supported AQS" is unsupported by any allegations of fact and

incorrect as a matter of public record.  (*Id.* ¶ 206.)  For example, Sylvan Chackman, co-head of

Global Markets Financing & Futures at BofAML and an early supporter of AQS (*id.* ¶ 205), held

his position at BofAML until 2016, long after the alleged "purge."  (*See Sylvan Barry*

*Chackman*, FINRA BROKERCHECK, https://brokercheck.finra.org/individual/summary/2064087

(last visited Jan. 24, 2018).)  Even assuming that the newly hired BofAML personnel had a more

negative outlook on AQS than did their predecessors, the Amended Complaint pleads facts

demonstrating common-sense, unilateral reasons for that outlook:  Plaintiffs allege that AQS had

been "relegated to the margins of the industry."  (AC ¶ 269.)  Finally, Plaintiffs allege that

BofAML convened a meeting of the "five families" in 2009 ahead of an SEC roundtable

discussion.  (*Id.* ¶ 202.)  But Plaintiffs concede that BofAML was not part of any conspiracy in

2009 and, in fact, "*strong[ly]*" supported AQS at that time.  (*Id.* ¶ 205 (emphasis added).)

Plaintiffs' allegations as to SL-x and Data Explorers further confirm that BofAML has no

place in this case.  Plaintiffs recognize that BofAML continued to meet with SL-x through July

2014—even after others had allegedly rejected SL-x.  (*Compare id.* ¶ 244, *with id.* ¶¶ 239-40,

243.)  Moreover, BofAML would have had an additional unilateral reason not to support SL-x:

BofAML still had a large equity interest in rival AQS.  With respect to Data Explorers, the

Amended Complaint pleads *nothing at all* about BofAML.

In the end, Plaintiffs are left with the mere fact that BofAML had a representative on

EquiLend's board—which proves nothing.  Because BofAML did not act in "parallel" with the

other Defendants (indeed, it invested in AQS)—and there are no "plus factors" linking it to any

conspiracy—BofAML should be dismissed.  *See In re IRS*, 261 F. Supp. 3d at 483 (dismissing

claim against a single bank defendant for failure to connect it to the alleged conspiracy).

### 7. The Allegations Against JPMorgan, UBS and Credit Suisse Are Insufficient.

Plaintiffs likewise fail to state a claim against JPMorgan, UBS and Credit Suisse.  There are no allegations that those Defendants ever threatened or discouraged AQS, SL-x, or their potential customers or participated in the informal meetings at which the conspiracy supposedly was forged, or that JPMorgan or UBS ever used "five families" rhetoric.  Plaintiffs instead rely primarily on allegations that these Defendants simply declined to invest in or do business with AQS and SL-x.  (*See* AC ¶¶ 210, 239, 242, 245.)  Those allegations are "not—at all—suggestive of conspiracy" because JPMorgan, UBS and Credit Suisse, like the other Defendants, had strong *unilateral* reasons to decline to support new market entrants that allegedly "threatened, some day, to cannibalize their trading profits." *In re IRS*, 261 F. Supp. 3d at 464, 475.

### B. Plaintiffs' Allegations Directed at Joint Venture or Joint Investment Conduct Fail To Plead a Claim Under the Rule of Reason.

"A plaintiff alleging a § 1 violation may allege either a *per se* unlawful agreement or one that is illegal under the 'rule of reason.'" *Id.* at 467.  "*Per se* liability is limited to 'agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality[.]'" *Id.* (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).  "But '[m]ost antitrust claims are evaluated under the rule of reason.'" *Barbri*, 2017 WL 4280952, at *20 (citation omitted).  "Under the rule of reason analysis, 'the plaintiff bears the burden of showing that the alleged [agreement] produced an adverse, anti-competitive effect within a relevant geographic market.'" *In re IRS*, 261 F. Supp. 3d at 467 (quoting *In re Ins. Brokerage*, 618 F.3d at 315).

Most of Plaintiffs' allegations center on actions taken by EquiLend, its directors and the Prime Broker Defendants as joint venture participants.  This conduct does "not fit into any category of agreement recognized as *per se* illegal." *Id.*  There is no "case in which a decision

by competitors . . . to direct the activities of [a] business, in the context of a legitimate joint venture, has been evaluated under the *per se* standard." *Id.* at 467-68.  Instead, "modern antitrust law evaluates such joint conduct—including the creation of the joint venture itself, its business focus, its product selection, and its pricing—under the rule of reason." *Id.* at 467; *see also Texaco, Inc. v. Dagher*, 547 U.S. 1, 3, 6-7, 6 n.1 (2006).

The challenged actions by EquiLend and the Prime Broker Defendants as its owners and directors—all of the conspiratorial conduct alleged by Plaintiffs except for the supposed boycott of AQS—constitute legitimate joint venture activities that do not state a claim under the rule of reason.  Plaintiffs fail "to plead facts sufficient to support the conclusion that, evaluated under rule-of-reason methodology, the [EquiLend] joint venture—the centerpiece of [P]laintiffs' . . . § 1 claim—represented an unreasonable restraint of trade." *In re IRS*, 261 F. Supp. 3d at 468.

### 1.    Plaintiffs' Effort To Escape the Rule of Reason Is Unavailing.

To avoid the rule of reason, Plaintiffs must "adequately plead that the [EquiLend] joint venture was an illegitimate shell that offered no efficiency enhancements and served only to mask concerted conduct." *Id.*  They do not meet that pleading burden.  Their conclusory assertion that EquiLend "is not the independent joint venture that it purports to be" (AC ¶ 319) is belied by their own allegations that EquiLend is "organized as a joint venture," "was formed in 2001," offers its own AutoBorrow platform, and earned a profit (*id.* ¶¶ 305-06, 310; Ex. 2). Plaintiffs also concede that EquiLend produces legitimate market efficiencies.  (AC ¶¶ 305-06, 316; Compl. ¶ 100.)  Moreover, EquiLend's diverse ownership and board composition contradict any suggestion that it is illegitimate.  Since EquiLend's formation in 2001, large agent-lenders have had representatives on its board.  (AC ¶¶ 308, 378.)  It is wholly implausible to suggest that those agent-lenders participated in "an illegitimate shell" that "served only to mask concerted conduct" designed to injure their lender clients.  *In re IRS*, 261 F. Supp. 3d at 468.

In arguing against application of the rule of reason, Plaintiffs rely on *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010).  (*See* ECF No. 81 at 3; AC ¶ 319 n.57.)  But that case addressed an entirely different issue:  whether the licensing activities of NFL teams and the corporate entity they formed to license their trademarks constituted concerted conduct under Section 1.  560 U.S. at 186, 189.  After holding that these activities constituted concerted conduct, the Court stated that "[t]he legality of that concerted action must be judged under the Rule of Reason."  *Id.* at 186.  In fact, the Court devoted an entire section of its opinion to the rule of reason.  *See id.* at 202-04.  *American Needle* thus provides no support for Plaintiffs' suggestion that the *per se* rule applies to Defendants' joint venture conduct.

### 2.     Plaintiffs' Allegations Do Not Satisfy the Rule of Reason.

Plaintiffs fail to plead the elements of a rule of reason claim.  *In re IRS*, 261 F. Supp. 3d at 468-69 (discussing elements).  "[U]nder a rule-of-reason analysis, the plaintiff 'bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within'" a properly defined product and geographic market.  *In re Ins. Brokerage*, 618 F.3d at 315 (citation omitted).  "[S]uccessful attempts to meet this burden typically include a demonstration of defendants' market power."  *Id.*  "If the plaintiff carries this burden, the court will need to decide whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits."  *Id.* at 316.

Plaintiffs do not come close to pleading a rule of reason claim.  The *In re IRS* court's reasoning in rejecting a Section 1 claim based on the defendants' role in the so-called "Project Fusion" joint venture applies equally to Plaintiffs' claim here.  *See* 261 F. Supp. 3d at 468-69.  As in that case, "there are no allegations . . . defining [EquiLend's] product or geographic market, or, within that market, defining its market share or market power."  *Id.* at 469.  "There is, in fact, no allegation that [EquiLend] had any presence, let alone power, in *any* market."  *Id.*

"And, vitally important, there are no allegations as to the pro-competitive benefits and anti-competitive harms of [the EquiLend joint venture] . . . , whether in general or as to [EquiLend's] specific choices after" 2009 as to which ventures to pursue, which assets to acquire, what to do with the acquired assets, and whether to offer a data service and at what prices. *Id.* Plaintiffs cannot satisfy the rule of reason simply by asserting that Defendants' conduct generally caused anticompetitive harm (AC ¶¶ 323-35) and "lack[ed] any countervailing procompetitive rationale" (*id.* ¶ 389). This failure to plead a rule of reason claim is fatal to *all* of Plaintiffs' allegations regarding Data Explorers and SL-x and many of their allegations regarding AQS.

### a. Plaintiffs' Data Explorers Allegations Fail To State a Rule of Reason Claim.

EquiLend's creation of DataLend to compete with Data Explorers does not support a claim under the rule of reason:  it is evidence of competition, not a restraint of trade. *See Citigroup*, 709 F.3d at 138; *In re Ins. Brokerage*, 618 F.3d at 322-23. Plaintiffs' allegations about DataLend's lower prices show robust competition (AC ¶ 261), and the terms of DataLend's agreements with the Prime Broker Defendants regarding the use of their own trading data are not alleged to violate the rule of reason (*see id.* ¶ 257). Plaintiffs do not even allege that the Prime Broker Defendants declined to subscribe to Data Explorers' data service or that Data Explorers was forced to exit the market. Plaintiffs' Data Explorers allegations thus fail to state a claim. *See In re IRS*, 261 F. Supp. 3d at 468-69.

### b. Plaintiffs' SL-x Allegations Fail To State a Rule of Reason Claim.

Plaintiffs' allegations regarding SL-x focus on (i) the reaction of EquiLend to a proposed merger with SL-x in 2011; (ii) the Prime Broker Defendants' subsequent responses to SL-x's request that they make a separate capital investment; and (iii) EquiLend's purchase of SL-x's intellectual property after SL-x already had failed.

Plaintiffs cannot state an antitrust claim based on the unanimous decision of EquiLend's management and board of directors (including the board's agent-lender members) not to merge with SL-x in 2011.  (AC ¶ 224; Compl. ¶ 144; Ex. 2.)  Indeed, Plaintiffs cannot even allege that a merger would have been in EquiLend's interest, particularly given that SL-x lacked an operational platform at that time.  (AC ¶¶ 253, 268.)  Nor do Plaintiffs allege any specific actions by any Prime Broker Defendant that impeded SL-x's access to central clearing.

After EquiLend's directors and management had "decided to reject SL-x's offer" (*id.* ¶ 224), SL-x approached the Prime Broker Defendants again to try to recruit a "consortium" to make a capital investment in SL-x (*id.* ¶¶ 226-28; *see* Ex. 1 at 2).  Plaintiffs have not adequately alleged that the Prime Broker Defendants entered into a multilateral agreement not to make such an investment, but even if they had, any such agreement would be subject to the rule of reason, as would any alleged agreement among EquiLend's owners to support the EquiLend joint venture as opposed to its competitors.  *See Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999) (rejecting application of *per se* rule "[w]here cooperation is inherent in an enterprise").  Plaintiffs make no effort to assert the required elements of such a rule of reason claim.

EquiLend's decision to purchase SL-x's intellectual property in early 2015 after SL-x already had failed also is legitimate joint venture conduct that does not violate the rule of reason.  Plaintiffs cannot plead a rule of reason claim simply by asserting that "EquiLend has never used the patents or attempted to commercialize the technology."  (AC ¶ 272.)

### c. Plaintiffs' Allegations Regarding EquiLend's Purchase of AQS Fail To State a Rule of Reason Claim.

Stripped of their conclusory assertions, Plaintiffs' allegations regarding EquiLend's purchase of AQS amount to the following underwhelming narrative:  AQS failed to develop a successful trading platform; OCC considered purchasing AQS but ultimately did not; and

EquiLend saw an opportunity to purchase AQS at a discounted price after AQS already had failed.  Nothing about that innocuous series of events states a rule of reason claim.

Although Plaintiffs assert that a deal between AQS and OCC would have posed a "significant threat to the Prime Broker Defendants" (*id.* ¶ 293), they do not allege any facts suggesting that the Prime Broker Defendants undermined AQS's discussions with OCC (*id.* ¶ 298; *see also id.* ¶ 292).  Instead, Plaintiffs merely allege that "shortly after the deal between OCC and AQS collapsed, EquiLend itself offered to buy AQS" for nearly $5 million (*id.* ¶ 299), and that Morgan Stanley and Goldman Sachs discussed the potential acquisition "[o]ver a series of private calls and dinners" (*id.* ¶ 294).  There is nothing improper about EquiLend's purchase of AQS or the Prime Broker Defendants' alleged role in that acquisition, especially *after* AQS already had failed.  And contrary to the assertion that EquiLend purchased AQS to "bury it" (*id.* ¶ 21), EquiLend advertises that "[t]he acquired [AQS] business and technology served as the basis for the newly launched EquiLend Clearing Services," which "continue[d] to operate the existing [AQS] platform, including its trading and middle-office services."  (*Who We Are*, EQUILEND CLEARING SERVS., http://www.equilend.com/services/ecs.php/.)  Plaintiffs allege no facts suggesting otherwise.

## II.   PLAINTIFFS LACK ANTITRUST STANDING.

Plaintiffs' antitrust claim also is defective because their asserted injury is too speculative to confer antitrust standing.  Plaintiffs base their claim of injury on a hypothetical world of all-to-all trading in which the elimination of the Prime Broker Defendants as middlemen would have allowed borrowers and lenders "to execute stock loan trades at lower costs."  (AC ¶ 7.)  But Data Explorers and SL-x had *no* plans to offer all-to-all trading between borrowers and lenders, and AQS lacked the ability to facilitate such trading because market standards and clearinghouse rules required broker-dealers to function as intermediaries on all stock loans.  Plaintiffs also have

not alleged that Defendants did anything to prevent the dozens of other "brokerage firms with stock lending clearing privileges" from replacing them as intermediaries if demand for an all-to-all exchange existed.  (*Id.* ¶ 154 n.36.)  Plaintiffs thus rely on "conjectural theories of injury and attenuated economic causality" that fail to support antitrust standing.  *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980).

To plead antitrust standing, a plaintiff must allege, among other things, that it is an efficient enforcer of the antitrust laws.  *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 n.1 (2d Cir. 2008).  "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation," and the efficient enforcer requirement ensures that the "plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534, 535 n.31 (1983) (citations omitted).  Multiple factors are relevant to efficient enforcer standing, including "the speculativeness of the alleged injury."  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013).  "[T]he weight to be given the various factors will necessarily vary with the circumstances of [the] particular case[]," *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005), but the failure to satisfy any factor can be fatal, *see In re IRS*, 261 F. Supp. 3d at 491-95.  Here, the speculative nature of Plaintiffs' alleged injury alone defeats antitrust standing (though Defendants do not concede the other relevant factors).

Once again, *In re IRS* is instructive.  The plaintiffs there alleged a similar conspiracy to prevent anonymous trading on all-to-all exchanges.  *Id.* at 441-42.  Although the court concluded that three of the four efficient enforcer factors favored standing, *id.* at 491-95, it nevertheless ruled that the plaintiffs had "not satisf[ied] the requirements for antitrust standing" before Dodd-

43

Frank's clearing mandate took effect in 2013 because their theory of injury before that mandate was "extraordinarily conjectural," *id.* at 494.  As the court explained, "it is 'entirely uncertain' that, absent the scheme, the necessary infrastructural preconditions for anonymous all-to-all trading, such as central clearing of IRS trades, would have developed before Dodd-Frank willed them into being." *Id.* (citation omitted).  The court thus held that the "[p]laintiffs' alternative history of IRS trading for the first five years of the class period . . . requires too many leaps of imagination and guesswork for a claim of class injury to be viable." *Id.*

The same analysis applies here, except that it applies to the *entire* alleged class period.  Even if all three allegedly boycotted ventures had succeeded, the result would not have been anonymous, all-to-all trading.  Data Explorers had no intention of offering a trading platform of any kind (AC ¶ 193), and "SL-x did not plan to offer anonymous trading between end-borrowers and lenders immediately upon launch" (*id.* ¶ 179).  In addition, SL-x's lack of central clearing in the United States (*id.* ¶ 253) eliminated any possibility that its proposed platform, had it ever become operational here (*id.* ¶ 268 & n.46), would become an anonymous exchange.  Thus, as to two of the three allegedly boycotted firms—Data Explorers and SL-x—"it [was] 'entirely uncertain' that, absent the scheme, the necessary infrastructural preconditions for anonymous all-to-all trading . . . would have developed." *In re IRS*, 261 F. Supp. 3d at 494 (citation omitted).

Plaintiffs' allegations regarding AQS likewise "require[] too many leaps of imagination and guesswork for a claim of class injury to be viable." *Id.*  Although Plaintiffs insist that the clearing infrastructure existed for all-to-all trading on AQS's platform, they fail to plead a plausible explanation for why borrowers and lenders did not use any of the dozens of other "brokerage firms with stock lending clearing privileges at OCC" (AC ¶ 154 n.36) to access the AQS platform without the Prime Broker Defendants' involvement.  "Where the 'theory of

44

antitrust injury depends upon a complicated series of market interactions,' the [injury is too] speculative" to confer antitrust standing.  *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *10 (S.D.N.Y. Mar. 28, 2014) (quoting *Reading*, 631 F.2d at 13).

Of course, the more direct victims of the alleged conspiracy—AQS, SL-x and Data Explorers—could have sued if they believed that Plaintiffs' claim had merit.  That none of them did so does not make Plaintiffs efficient enforcers by default.  Instead, those firms' failure to sue casts doubt on the merits of Plaintiffs' claim.  As the Supreme Court observed, "if there is substance to [Plaintiffs'] claims, it is difficult to understand why [the] direct victims of the conspiracy have not asserted any claim."  *AGC*, 459 U.S. at 542 n.47; *see also Gatt*, 711 F.3d at 79 ("If the 'superior plaintiff' has not sued, one may doubt the existence of any violation at all." (citation omitted)).

## III.    PLAINTIFFS' CLAIMS ARE TIME-BARRED IN SIGNIFICANT PART.

Plaintiffs' claims also are barred in significant part by the statutes of limitations.  Although Plaintiffs filed their initial Complaint on August 16, 2017,[3] they seek to assert claims for damages stretching back nine years, to January 7, 2009.  (AC ¶ 363.)  The applicable statutes of limitations bar Plaintiffs' claims for much of that time, and Plaintiffs fail to plead fraudulent concealment with the requisite particularity to toll the limitations periods.

### A.    Plaintiffs' Antitrust Claim Is Time-Barred Before August 16, 2013.

Plaintiffs' claim under Section 1 is subject to a four-year statute of limitations that accrues when "the defendant commits an act that injures the plaintiff."  *Hinds Cty.*, 620 F. Supp. 2d at 519 (citation omitted); *see* 15 U.S.C. § 15b.  To the extent that Plaintiffs allege a continuing

---

[3] The date on which the Amended Complaint was filed (November 17, 2017) is the relevant date for statute of limitations purposes for the newly added parties.  *See Rothman*, 220 F.3d at 96.

violation (AC ¶ 387), "each overt act that is part of the violation . . . starts the statutory period

running again," but "does not permit the plaintiff to recover for the injury caused by old overt

acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)

(citation omitted).  Instead, "[t]he continuing violation exception only allows a plaintiff to

recover damages caused by overt acts committed inside the limitations period." *Rite Aid Corp. v.

Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 268 (E.D.N.Y. 2010).  Plaintiffs'

antitrust claim thus is time-barred insofar as it seeks damages from conduct before August 16,

2013.  This means that Plaintiffs' claim based on the alleged boycott of Data Explorers falls

entirely outside the limitations period (AC ¶¶ 254-65), as does the bulk of Plaintiffs' claim

related to SL-x (*id.* ¶¶ 219-32).

### B.      Plaintiffs' Unjust Enrichment Claim Is Time-Barred Before August 16, 2014.

Under New York law, the statute of limitations for unjust enrichment "depends on the

nature of the substantive remedy plaintiff seeks." *Matana v. Merkin*, 957 F. Supp. 2d 473, 494

(S.D.N.Y. 2013).  "The limitations period is six years where plaintiff seeks an equitable remedy,

but three years where plaintiff seeks monetary damages." *Id.*

Plaintiffs here seek "restitution of the monies of which they were unfairly and improperly

deprived."  (AC ¶ 397.)  Because Plaintiffs seek compensation for their alleged losses, their

request for restitution is a demand for "monetary damages." *See United States ex rel. Taylor v.

Gabelli*, 2005 WL 2978921, at *3-4 (S.D.N.Y. Nov. 4, 2005) ("Damages are measured by

plaintiff's losses," whereas "restitution 'focus[es] on defendant's gain'" (citations omitted)); *see

also Grynberg v. Eni S.p.A.*, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007) (three-year

limitations period where complaint sought "restitution for monetary damages sufficient to fully

compensate plaintiffs for their damages").  The three-year limitations period thus applies, and Plaintiffs' unjust enrichment claim is time-barred for conduct before August 16, 2014.[4]

### C.       Plaintiffs Fail To Plead Fraudulent Concealment with Particularity.

Plaintiffs argue that Defendants fraudulently concealed their conduct, thus tolling the limitations periods.  (AC ¶¶ 373-87.)  To plead fraudulent concealment, a plaintiff must allege "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within [the limitations periods], and (3) that his continuing ignorance was not attributable to a lack of diligence on his part."  *In re IRS*, 261 F. Supp. 3d at 487.  Each of these elements must be pled with the particularity required by Rule 9(b).  *Id.*  Here, none of these elements is adequately pled.

### 1.       Plaintiffs Do Not Adequately Allege Concealment by Defendants.

Plaintiffs do not allege acts of concealment by Defendants with the requisite particularity. Given their allegations that Defendants openly threatened industry participants, including numerous members of the proposed class, Plaintiffs' concealment allegations conflict with their theory of the case.  (*E.g.*, AC ¶¶ 191, 213, 215-16, 218.)  Plaintiffs allege that "Defendants' market power and willingness to abuse it to silence, punish, and exclude those who dared to cross them is one important reason why their conspiracy was able to operate under the radar until recently."  (*Id.* ¶ 382.)  But that allegation is both conclusory and inconsistent with other allegations that targets of Defendants' purported threats resisted them.  (*E.g.*, *id.* ¶ 191 (State

---

[4] When an unjust enrichment claim "is merely incidental to or duplicative of another claim with a shorter limitations period," the shorter period applies.  *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007).  Thus, even if Plaintiffs' restitution request were viewed as seeking equitable relief, the Clayton Act's four-year statute of limitations would apply.  *See Shak v. JP Morgan Chase & Co.*, 156 F. Supp. 3d 462, 479-80 (S.D.N.Y. 2016).

Street "refused to comply").)  The Amended Complaint also never identifies what happened "recently" that supposedly brought the conspiracy to light.

Plaintiffs further allege that "Defendants participated in secret meetings and communications whereby they agreed upon the course of anticompetitive conduct described in this Complaint."  (*Id.* ¶ 374.)  But such allegations are far too "general and conclusory" to "discharge [P]laintiffs' burden to show concealment."  *In re IRS*, 261 F. Supp. 3d at 489. Moreover, Plaintiffs' conspiracy claim focuses on the Prime Broker Defendants' participation in EquiLend (AC ¶¶ 304-22), but Plaintiffs do not allege that those Defendants' participation in and support of EquiLend or any of their other EquiLend-related conduct were concealed from the market.  *See In re IRS*, 261 F. Supp. 3d at 488 (Tradeweb's failure to "evolve into an all-to-all IRS trading exchange occurred in plain sight").

Lastly, Plaintiffs assert that "Defendants publicly misrepresented . . . their support for a trading platform that could centrally clear securities lending transactions" (AC ¶ 377), citing several statements (*id.* ¶¶ 378-80) that supposedly conflict with their allegation that Defendants did not support the "use of central clearing services for securities lending transactions" (*id.* ¶ 381).  But Plaintiffs fail to plead with particularity that any of Defendants' statements were intentionally false when made.  For example, Morgan Stanley allegedly announced in October 2014 that it "was supportive of [central clearing] solutions."  (*Id.* ¶ 380(a).)  According to Plaintiffs' own allegations, however, that statement was not false when made.  (*See id.* ¶¶ 281-82, 284-85.)  Morgan Stanley also supposedly commented in October 2016 that it had "grown cleared balances meaningfully since the inaugural launch [of clearing on Eurex] and look[ed] forward to broader volume increases as new members c[a]me online."  (*Id.* ¶ 380(b).)  Plaintiffs allege no facts establishing that this statement was false either.  In short, Plaintiffs cannot satisfy

Rule 9(b) simply by alleging that certain of Defendants' statements were in tension with the private intentions of certain employees. *See In re Citigroup Inc. S'holder Derivative Litig.*, 2009 WL 2610746, at *10 (S.D.N.Y. Aug. 25, 2009) (Rule 9(b) not satisfied where "complaint does not allege with specificity *why* any alleged misstatement is fraudulent").

> ### 2.    Plaintiffs Do Not Adequately Allege That They Remained Ignorant of Their Claims Until Some Point Within the Limitations Periods.

Plaintiffs fail adequately to plead that they remained ignorant of their claims, and were not even on inquiry notice, until some point within the limitations periods. *See In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 6645533, at *3 (E.D. Pa. Dec. 20, 2012) ("[P]laintiffs must 'plausibly suggest[] that they did not have knowledge or did not possess any information about the conspiracy that would have given rise to inquiry notice.'" (citation omitted)).  To the contrary, Plaintiffs cite an article from *2009* (eight years before they sued) calling EquiLend a "cartel" that they say "was prescient" (AC ¶ 125 & n.28), and yet they inexplicably contend that they "had no prior knowledge . . . of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed" (*id.* ¶ 384).  That kind of "bare allegation," contradicted by their own allegations, "is essentially conclusory and therefore insufficient."  *In re Processed Egg Prods.*, 2012 WL 6645533, at *3 (citation omitted).

Plaintiffs' theory of the case also belies their claim of ignorance.  They argue that "[t]here is no good reason why [the stock loan] market remains so opaque and inefficient" (AC ¶ 5)—other than conspiracy.  But that defeats their claim of fraudulent concealment.  As the *In re IRS* court stated, "accepting [Plaintiffs'] premise that only a plot can explain the missing platforms, [Plaintiffs] had every basis, in real time, to smell a rat.  At a minimum, they were on inquiry notice."  261 F. Supp. 3d at 489.  "[A]ll that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing."  *131 Maine St.*

*Assocs. v. Manko*, 179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002).  Plaintiffs' theory of the case and the 2009 article they themselves cite establish that reason.

### 3.    Plaintiffs Do Not Adequately Allege Diligence on Their Part.

In attempting to plead due diligence, Plaintiffs offer only a conclusory, boilerplate allegation that could be made in any case.  (*See* AC ¶¶ 385-86.)  That conclusory assertion is plainly inadequate under Rule 9(b).  *See Hinds Cty.*, 620 F. Supp. 2d at 521 ("[G]eneral assertions of ignorance and due diligence without more specific explanation . . . will not satisfy the[ ] pleading requirements." (citation omitted)).  Plaintiffs "make no allegation of any specific inquiries of [Defendants], [or] detail when such inquiries were made, to whom, regarding what, and with what response." *Id.* (citation omitted).  Without such details, Plaintiffs cannot plead that they engaged in due diligence with the particularity required by Rule 9(b).  *See In re IRS*, 261 F. Supp. 3d at 489-90 (rejecting fraudulent concealment allegations where plaintiffs "ma[d]e only generalized 'boilerplate recitals' about an 'investigation'").

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT.

Plaintiffs' unjust enrichment claim is entirely dependent on their fatally flawed antitrust claim.  "[W]ithout a viable underlying claim of illegality, an unjust enrichment claim 'must be dismissed.'" *In re IRS*, 261 F. Supp. 3d at 500 (citations omitted); *see also In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014).

### CONCLUSION

The Amended Complaint should be dismissed with prejudice.  Plaintiffs already have amended their complaint once and, having declined the Court's invitation to amend before this motion, should not be given another bite at the apple.

January 26, 2018                     Respectfully submitted,

                                    s/ Daniel Slifkin
                                    _____
                                    Daniel Slifkin
                                    Michael A. Paskin
                                    Damaris Hernández
                                    Lauren M. Rosenberg
                                    CRAVATH, SWAINE & MOORE LLP
                                    Worldwide Plaza
                                    825 Eighth Avenue
                                    New York, NY 10019
                                    Tel:  (212) 474-1000
                                    Fax:  (212) 474-3700
                                    dslifkin@cravath.com
                                    mpaskin@cravath.com
                                    dhernandez@cravath.com
                                    lrosenberg@cravath.com

                                    *Attorneys for Defendants Morgan Stanley & Co.
                                    LLC, Prime Dealer Services Corp., and Strategic
                                    Investments I, Inc.*


                                    s/ Adam S. Hakki (on consent)[5]
                                    _____
                                    Adam S. Hakki
                                    Richard F. Schwed
                                    SHEARMAN & STERLING LLP
                                    599 Lexington Avenue
                                    New York, NY 10022
                                    Tel:  (212) 848-4000
                                    ahakki@shearman.com
                                    richard.schwed@shearman.com

                                    Ryan A. Shores (*pro hac vice*)
                                    401 9th Street, N.W.
                                    Washington, D.C. 20004
                                    Tel:  (202) 508-8100
                                    ryan.shores@shearman.com

                                    *Attorneys for Defendants Merrill Lynch, Pierce,
                                    Fenner & Smith Incorporated, Merrill Lynch L.P.
                                    Holdings, Inc., and Merrill Lynch Professional
                                    Clearing Corp.*

---

[5] Defendants use electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

/s David G. Januszewski (on consent)

David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
Sheila C. Ramesh
Margaret A. Barone
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Tel:  (212) 701-3000
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com
sramesh@cahill.com
mbarone@cahill.com

*Attorneys for Defendants Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Next Fund, Inc., and Credit Suisse Prime Securities Services (USA) LLC*


/s Robert Y. Sperling (on consent)

Robert Y. Sperling (*pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel:  (312) 558-7941
Fax:  (312) 558-5700
rsperling@winston.com

Richard C. Pepperman, II
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-3493
Fax:  (212) 558-3588
peppermanr@sullcrom.com

*Attorneys for Defendants Goldman Sachs & Co. LLC and Goldman Sachs Execution & Clearing, L.P.*

/s Robert D. Wick (on consent)

Robert D. Wick (*pro hac vice*)
John S. Playforth (*pro hac vice*)
Kuntal Cholera (*pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
Tel:  (202) 662-5487
Fax:  (202) 778-5487
rwick@cov.com
jplayforth@cov.com
kcholera@cov.com

*Attorneys for Defendants JPMorgan Chase Bank,
N.A., J.P. Morgan Securities LLC, J.P. Morgan
Prime, Inc., and J.P. Morgan Strategic Securities
Lending Corp.*


/s David C. Bohan (on consent)

David C. Bohan
Peter G. Wilson
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
david.bohan@kattenlaw.com
peter.wilson1@kattenlaw.com

*Attorneys for Defendants UBS AG, UBS Americas
Inc., UBS Securities LLC, and UBS Financial
Services Inc.*