UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IOWA PUBLIC EMPLOYEES'<br>RETIREMENT SYSTEM, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>BANK OF AMERICA CORPORATION,<br>*et al.*,<br><br>        Defendants. | No.  17-cv-6221 (KPF) |

**PLAINTIFFS' OPPOSITION TO THE PRIME BROKER
DEFENDANTS' JOINT MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..........................................................................................1

OVERVIEW OF FACTUAL ALLEGATIONS ....................................................................4

ARGUMENT ......................................................................................................................7

    A.    Group Boycotts ....................................................................................7

    B.    The Rule 8 Pleading Standard...............................................................9

I.    THE COMPLAINT PLAUSIBLY ALLEGES AN UNLAWFUL CONSPIRACY .........11

    A.    The Complaint Details Direct and Circumstantial Evidence of an Actual Agreement................................................................................11

    B.    The Complaint Alleges Numerous "Plus Factors" ................................17

II.    DEFENDANTS' ARGUMENTS FOR WHY THE CONSPIRACY IS IMPLAUSIBLE FAIL ................................................................................19

    A.    The Conspiracy's Length Is Plausible ................................................19

    B.    The Members of the Conspiracy Are Plausible ....................................20

    C.    The Goals of the Conspiracy Are Plausible.........................................23

    D.    The Conspiratorial Meetings Are Plausible.........................................26

    E.    Defendants' Other Miscellaneous Arguments Fail...............................28

III.    PLAINTIFFS DO NOT RELY ON IMPERMISSIBLE GROUP PLEADING ...............29

IV.    PLAINTIFFS' GROUP BOYCOTT CLAIM WARRANTS *PER SE* TREATMENT ................................................................................31

    A.    Defendants Focus on Isolated Allegations Rather than on the Claim as a Whole................................................................................31

    B.    Even Viewed in Isolation, the EquiLend-related Allegations Involve a Naked Effort to Restrain Trade in the Stock Loan Market...................33

        1.    The Complaint Alleges that Defendants Used EquiLend to Conspire to Restrain Trade *Outside* of EquiLend......................33

2.       The Isolated Actions Identified By Defendants Were
Anticompetitive................................................................................36

C.       Plaintiffs Satisfy Any Analytical Standard ......................................................38

V.    PLAINTIFFS HAVE ANTITRUST STANDING............................................................41

VI.   PLAINTIFFS' CLAIMS ARE TIMELY ........................................................................45

A.       Plaintiffs Can Recover for Antitrust Injuries Prior to August 16, 2013 ...............45

1.       Plaintiffs Adequately Plead Concealment ..................................................45

2.       Plaintiffs Adequately Plead Ignorance.......................................................47

3.       Plaintiffs Adequately Plead Diligence ........................................................48

B.       Defendants' Timeliness Arguments Are Ill-Suited to Resolution .........................49

C.       Plaintiffs' Antitrust Claim Can Properly Rely on Pre-August 2013
Conduct ..........................................................................................................49

CONCLUSION.......................................................................................................................50

# TABLE OF AUTHORITIES

**Page**

**Cases**

*131 Maine St. Associates v. Manko*,
179 F. Supp. 2d 339 (S.D.N.Y. 2002)................................................................47

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016)...........................................................46, 48

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010).................................................................................34, 39

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946).........................................................................................31

*Anderson News, LLC. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)................................................................... passim

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)............................................................................13

*Ariz. v. Maricopa Cty. Med. Soc.*,
457 U.S. 332 (1982).........................................................................................35

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983).........................................................................................41

*Associated Press v. United States*,
326 U.S. 1 (1945)...............................................................................1, 7, 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................9, 15, 25

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)......................................................................49, 50

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946).........................................................................................42

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982)....................................................................................41, 42

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999)............................................................................37

*BPP Ill., LLC v. Royal Bank of Scotland Grp., PLC*,
603 F. App'x. 57 (2d Cir. 2015) ....................................................................49

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)............................................................................10

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)............................................................................47

*Concord Assocs., L.P. v. Entm't Properties Tr.*,
817 F.3d 46 (2d Cir. 2016)................................................................................9

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)................................................................................3, 9, 31

iii

*DNAML Pty, Ltd. v. Apple Inc.*,
   25 F. Supp. 3d 422 (S.D.N.Y. 2014).....................................................................42

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013)...................................................................................16

*Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*,
   312 U.S. 457 (1941)...........................................................................................7, 20

*FTC v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986)...........................................................................................8, 39

*Full Draw Productions v. Easton Sports, Inc.*,
   182 F.3d 745 (10th Cir. 1999) ...................................................................8, 9, 32, 37

*Global Network Commc'ns, Inc. v. City of N.Y.*,
   458 F.3d 150 (2d Cir. 2006)..................................................................................10

*Graphic Prods. Distribs., Inc., v. Itek Corp.*,
   717 F.2d 1560 (11th Cir. 1983) .............................................................................40

*Higgins v. New York Stock Exch., Inc.*,
   942 F.2d 829 (2d Cir. 1991)..................................................................................50

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)..............................................................................................41

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) ................................................................30

*In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*,
   213 F. Supp. 3d 631 (S.D.N.Y. 2016)...................................................................49

*In re Credit Default Swap Antitrust Litig.*,
   2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)................................................. passim

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009).............................................................................42, 43

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012)..............................................................10, 14

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015)..............................................12, 17, 19, 20

*In re Fresh and Process Potatoes Antitrust Litig.*,
   2012 WL 3067580 (D. Idaho July 27, 2012) ........................................................35

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)..............................................................................12, 36

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017)............................................................. passim

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016) .........................................................49

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...............................................................................17

*In re Namenda Direct Purchaser Antitrust Litig.*,
   2017 WL 4358244 (S.D.N.Y. May 23, 2017) ......................................................40

*In re OSB Antitrust Litig.*,
  2007 WL 2253419 (E.D. Pa. 2007) ....................................................................30

*In re Processed Egg Prods. Antitrust Litig.*,
  821 F. Supp. 2d 709 (E.D. Pa 2011) .................................................................16

*In re Publ'n Paper Antitrust Litig.*,
  2005 WL 2175139 (D. Conn. Sept. 7, 2005) ....................................................47

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ............................................................................12

*Int'l Star Class Yacht Racing Ass'n. v. Tommy Hilfiger U.S.A., Inc.*,
  146 F.3d 66 (2d Cir. 1998) ...............................................................................10

*Intellective, Inc. v. Mass. Mut. Life Ins. Co.*,
  190 F. Supp. 2d 600 (S.D.N.Y. 2002) .................................................................8

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ...........................................................................................42

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959) .......................................................................................7, 32

*Laydon v. Mizuho Bank, Ltd.*,
  2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ..................................................44

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ...............................................................................33, 34, 40

*LLM Bar Exam, LLC v. Barbri, Inc.*,
  271 F. Supp. 3d 547 (S.D.N.Y. 2017) ...............................................................17

*Merced Irrigation Dist. v. Barclays Bank PLC*,
  165 F. Supp. 3d 122 (S.D.N.Y. 2016) ...................................................45, 48, 49

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
  806 F.3d 835 (5th Cir. 2015) .........................................................................8, 32

*N. Pac. Ry. Co. v. U.S.*,
  356 U.S. 1 (1958) ...............................................................................................41

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ......................................................................................34, 39

*Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) .........................................................................................8-9

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) .............................................................................................8

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
  2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ......................................................48

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indemnity*,
  870 F.3d 1262 (11th Cir. 2017) .........................................................................36

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
  364 U.S. 656 (1961) .............................................................................................7

*Reading Indus. Inc. v. Kennecott Copper Corp.*,
  631 F.2d 10 (2d Cir. 1980) ...............................................................................43

*Schenker AG v. Societe Air France*,
    102 F. Supp. 3d 418 (E.D.N.Y. 2015) ...................................................................45

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) .............................................................................20

*Silver v. N.Y. Stock Exch.*,
    373 U.S. 341 (1963) ....................................................................................34, 35

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015) ...............................................................................17

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ........................................................................ passim

*State of N.Y. v. Hendrickson Bros., Inc.*,
    840 F.2d 1065 (2d Cir. 1988) ...........................................................45, 46, 47, 48

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ...............................................................................................33

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .................................................................................39

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ...................................................................9, 32, 42

*United States v. Columbia Pictures Indus., Inc.*,
    507 F. Supp. 412 (S.D.N.Y. 1980) ........................................................................37

*United States v. General Motors*,
    384 U.S. 127 (1966) .............................................................................................7

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967) ...........................................................................................32

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ...........................................................................................32

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004) .............................................................................................1

*Williams v. Citigroup, Inc.*,
    2009 WL 3682536 (S.D.N.Y. Nov. 2, 2009) .........................................................17

## Statutes and Rules

Fed. R. Civ. P. 8(a)............................................................................................9

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles
    and Their Application (4th ed. 2017)............................................8, 9, 34, 35, 38, 41

*Antitrust Guidelines for Collaborations Among Competitors*, Federal Trade Commission
    and U.S. Department of Justice (2000) ...................................................................40

## PRELIMINARY STATEMENT

Plaintiffs' Complaint provides extraordinary detail about collusion among direct competitors in the stock loan market—the "supreme evil of antitrust," *Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004).  The Prime Broker Defendants agreed to impede any new entrants that threatened their privileged position in the inefficient and opaque stock loan market.  In their own words, they reached a "general agreement" that "industry advances" would not be permitted to occur outside of their collective control.  ¶¶17, 239.[1]  As part of that agreement, acting together as an enterprise that Defendants proudly bragged to be akin to the "five families" of the mafia, they boycotted three market entrants (Quadriserv/AQS, SL-x, and Data Explorers), each of which would have made the stock loan market more competitive, efficient, and transparent to the benefit of stock lenders and borrowers alike.

In short, the Prime Broker Defendants engaged in a group boycott among horizontal competitors—a conspiracy that is *per se* unlawful under Supreme Court and Second Circuit precedent.  *Anderson News, LLC. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("[T]he Supreme Court has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act") (quotation omitted).  "Trade restraints of this character, aimed at the destruction of competition, tend to block the initiative which brings newcomers into a field of business and to frustrate the free enterprise system which it was the purpose of the Sherman Act to protect." *Associated Press v. United* States, 326 U.S. 1, 13-14 (1945) (finding boycott among members of association of new entrants *per se* illegal).

---

[1]  Paragraph citations ("¶") are to Plaintiffs' Amended Class Action Complaint (Dkt. No. 73, the "Complaint").

In moving to dismiss, Defendants highlight that they face similar boycott allegations in other financial markets.  MTD 1.[2]  Indeed, Defendants have paid billions of dollars in penalties and settlements for antitrust violations occurring during the period covered by the Complaint—a period during which they prioritized short-term profits over compliance with the nation's antitrust laws.  This case is another example of this pattern of misconduct.

But Defendants are dead wrong when they assert that the Complaint here contains allegations "recycled" from other cases.  The Complaint's allegations stand entirely on their own and specifically detail Defendants' conduct in this—the stock loan—market.  The Complaint reflects the fruits of an extensive investigation that has included meeting with dozens of industry participants, experts, and first-hand witnesses of events described.  Often the Complaint is able to allege exactly what Defendants did, when they did it, where they met, and the words they used.  The Complaint even identifies where incriminating evidence exists today.  *E.g.*, ¶16 (alleging specific communications exist on EquiLend servers); ¶295 (identifying Morgan Stanley teleconference system on which incriminating conversation occurred and was likely recorded).

In the face of these robust allegations, Defendants make specious and often legally impermissible arguments.  They first argue that what the Complaint alleges *did happen* could not have happened.  But such arguments are improper at the pleading stage, where well-pled allegations must be credited, and also wither under scrutiny.  For example, Defendants assert that Plaintiffs' claims are implausible because the stock loan market was never suited for the type of anonymous trading that AQS offered.  They then pivot to argue that Plaintiffs' claims are implausible because one of them, Bank of America, supported the AQS platform for a time.

---

[2]  "MTD" refers to the Prime Broker Defendants' memorandum in support of their joint motion to dismiss (Dkt. No. 110).

But if the AQS offering was really so flawed that it could not possibly have succeeded, then Bank of America and other prominent investors would not have given it the time of day, much less supported it to the tune of approximately $100 million. *See* ¶299. Nor would the AQS platform have been supported by the many other sophisticated entities identified in the Complaint, including one of the largest stock lenders, one of the largest stock borrowers, the oldest venture capital fund in the country, and still others. Bank of America eventually bowed to pressure from the other Defendants and joined the boycott, but common sense dictates that it (and many others) supported the AQS platform because they recognized that the stock loan market *was* suited for the anonymous trading AQS offered, demonstrating that one of Defendants' central implausibility arguments is itself implausible.

Defendants' other tactic is to dismember the Complaint's allegations into pieces and to subject certain individual pieces to scrutiny in isolation from the broader context. But this approach is legally flawed as well. It is black letter law that an alleged conspiracy must be looked at "as a whole," not by "dismembering it and viewing its separate parts" in isolation. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

To take just one example, the Complaint alleges that, in 2014, Susan O'Flynn at Morgan Stanley began to promote central clearing of stock loan transactions as a way to solve balance sheet problems. It further alleges that Thomas Wipf of Morgan Stanley saw that the creation of prime broker pipelines to central clearing could encourage borrowers and lenders to use AQS. But he learned of this initiative when it was too late to reverse course completely. Wipf reacted by making sure that Morgan Stanley (and its counterparts) imposed unnecessary conditions on their clearing connections that artificially protected their positions as intermediaries, such as by requiring that clearing keep the price opacity of the existing market. ¶¶281-285.

The Complaint further alleges that, having been alarmed by this threat, Wipf reached out to William Conley of Goldman Sachs.  Over a series of dinners, the two senior bankers agreed that the Prime Broker Defendants would jointly acquire AQS (through EquiLend) so they could shut down its many-to-many trading functionality once and for all.  The Complaint further alleges that Defendants did just that through "Project Gateway," so named because it was designed to ensure that they remained the *sole gateway* to central clearing (as other potential gateways, like AQS, would be gone).  The Complaint identifies how Wipf relayed this agreement to his team at Morgan Stanley, and quotes the language he used during the internal "pipeline" call (we need to "get a hold of this thing" (AQS)).  ¶¶21-22, 293-98.

Remarkably, Defendants reduce all of this to the claim that the Complaint merely alleges that "two individuals met for the lawful purpose of discussing a potential joint venture acquisition," MTD 21, and then argue that such an allegation, in isolation, is not *per se* unlawful.  But Defendants cannot succeed by stripping away all context to attack watered-down allegations in isolation.  When the Complaint's allegations are considered as a whole, with reasonable inferences given to them, the Complaint easily pleads a plausible conspiracy claim.

Defendants' arguments that Plaintiffs lack standing and that portions of Plaintiffs' claims are time barred are equally flawed.  Their motion should be denied in its entirety.

## OVERVIEW OF FACTUAL ALLEGATIONS

While modern technology and market demand have driven many other "over-the-counter" ("OTC") financial markets to adopt more efficient and competitive trading platforms, the stock loan market remains artificially inefficient, opaque, and dominated by the Prime Broker Defendants.  ¶¶2-4.  The six Prime Broker Defendants, with 70% to 80% of market share, collect outsized fees from borrowers and lenders amounting to more than 65% of the multi-billion-

dollars per year in total industry revenue (¶¶102, 113, 323 & n.63), having positioned themselves as the "exclusive matchmakers" for virtually every stock loan trade.  ¶¶6, 113, 323 & n.63.

Beginning in the mid-2000s, sophisticated industry veterans developed innovative electronic platforms and products designed to increase price transparency and trading efficiency. ¶¶7-8.  Market demand for these new products was strong, and they garnered support.  *E.g.*, ¶¶18, 155-57, 160-63, 185-87, 205.  Defendants' own personnel acknowledged that these innovations had the power to cause "change overnight," and one Defendant (Bank of America) even invested millions of dollars in one of them.  ¶¶157, 205-07, 240.

Quardiserv / AQS:  Quadriserv, an electronic trading platform that directly matches borrowers and lenders, was founded by industry veterans in 2001.  It was "immediately popular with borrowers and lenders," and by 2005 had "more than $2 billion of open stock loan transactions . . . matched on" its initial platform.  ¶143.  Quadriserv brought the AQS platform to the market in 2009 and announced an agreement whereby The Options Clearing Corporation ("OCC") would act as the central counterparty for stock lending transactions submitted through the platform.  ¶154.  AQS's ambition was to become a platform for the entire stock loan market and it quickly gained the support of large and sophisticated industry participants.  ¶¶144-60.

SL-x:  Founded in 2010, SL-x developed an electronic platform where broker-dealers could communicate bids and offers more efficiently, driving price transparency and competition. ¶173.  Industry participants praised the product, with one Prime Broker Defendant calling it "the most intelligent, thoughtful and usable approach to the [stock loan] market that we have ever seen."  ¶227; *see also* ¶¶230-32.  In Europe, the SL-x platform permitted central clearing and was poised to clear U.S. stock loan trades by 2013.  ¶¶178, 233.

Data Explorers:  Data Explorers was founded in 2002 by experienced securities market participants.  ¶130.  It began to offer much-needed pricing data missing from the opaque stock lending market and was immensely popular with numerous market participants.  ¶¶131-38.  Around 2010, Data Explorers expanded its offering to include "performance" data and began marketing its products to hedge funds such as Och-Ziff.  ¶¶188.  This would allow borrowers and lenders to compare the prices they received on comparable trades, thus making it harder for the Prime Broker Defendants to charge supracompetitive prices.  ¶¶188-90.

Alarmed by these market developments, the Prime Broker Defendants sprang into action.  Consistent with their self-described view of themselves as involved in a mutual criminal enterprise ("members of the five families"), they agreed to boycott the platforms and starve them of liquidity.  ¶¶8-12, 123, 208, 212-13, 219, 236, 251, 266-69.  They held numerous secret meetings and private gatherings attended by their executives—including one where they agreed to "get a hold" of the threats posed by the innovative platforms.  ¶296.  And they frequently used EquiLend—a "dealer consortium" that acted as a market utility and did their wishes—as a forum for their collusion and tool for their concerted activity.  ¶¶10, 12, 122-24, 310-13.

This is not speculation.  One of the Defendants' executives *admitted* that there was "general agreement" among the Prime Broker Defendants "that industry advances should be achieved from within EquiLend," notwithstanding that AQS, SL-x, and Data Explorers had developed innovative products craved by the market while EquiLend offered little if anything of value.  ¶17.  Numerous Prime Broker Defendants repeatedly expressed that they would not support the platforms unless *all* Prime Broker Defendants agreed to do so, and would act only jointly, through EquiLend.  *See, e.g.*, ¶¶15-17, 223, 243, 313.

The Prime Broker Defendants' boycott culminated with a scheme aptly named "Project Gateway," because it ensured they—and only they—would remain the exclusive gateway for clearing and trading in the stock loan market.  As a result, the stock loan market today remains stuck in the stone age with inefficient and opaque trading protocols and no ability for borrowers and lenders to secure competitive economic terms for their trades.

## ARGUMENT

Defendants' motion invites the Court to reject two well-settled tenets of antitrust pleading.  *First*, that horizontal boycotts are, almost without exception, *per se* violations of the antitrust laws.  *Second*, that an antitrust claim need only satisfy Federal Rule of Civil Procedure 8(a)'s requirement of a "short and plain statement" of facts supporting a plausible claim.

### A.    Group Boycotts

The antitrust claim in this case is an example of a classic group boycott of the type long recognized by courts as unlawful *per se*.  *Anderson News*, 680 F.3d at 183 (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)); *see also, e.g.*, *United States v. General Motors*, 384 U.S. 127, 145 (1966); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 659-60 (1961); *Associated Press*, 326 U.S. at 13-14; *Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*, 312 U.S. 457, 462 (1941).  Such boycotts are "from their nature or character . . . unduly restrictive, and hence forbidden."  *Klor's*, 359 U.S. at 211.

The Second Circuit's 2012 decision in *Anderson News* is instructive.  In *Anderson News*, the Second Circuit considered an alleged conspiracy among magazine publishers and distributors to boycott magazine wholesalers.  Anderson News and Source, the two largest magazine wholesalers, had each attempted to charge publishers a per-issue fee to cover the costs of collecting and disposing of unsold magazines.  680 F.3d at 170.  In response, five major publishers conspired with each other, four magazine distributors, and one other wholesaler to

refuse to sell magazines to Anderson and Source.  *Id.* at 170-72.  The Second Circuit treated the alleged boycott as a *per se* violation in reversing the dismissal of the complaint.  *Id.* at 186-89.

Defendants conspicuously ignore *Anderson News* in their briefs.  Perhaps their intent is to try to distinguish the case in their reply briefs or to argue that not all group boycotts are *per se* unlawful.  Such efforts should be rejected.  It is true that "not all group boycotts are so inherently anticompetitive as to be *per se* illegal."  *Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 616 (S.D.N.Y. 2002).  In particular, purely vertical refusals to deal are analyzed under the rule of reason.  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135-36 (1998).  So are exclusions based on cooperative rules that are unlikely to have an anticompetitive effect.  *See Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985).  And courts have been "slow to condemn rules adopted by professional associations as unreasonable *per se*," though they may get only a "quick look" to confirm a likely anticompetitive effect.  *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986).

Nonetheless, each of these cases is consistent with the well-recognized principle that boycotts involving "horizontal agreements among direct competitors," *NYNEX*, 525 U.S. at 135, of the type alleged here are squarely illegal *per se*.  *Accord MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015) (reviewing Supreme Court precedent and determining that "group boycotts involving a horizontal conspiracy to foreclose a market participant are considered *per se* violations of § 1"); *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999) ("Classic group boycotts involving conspirators whose market position are horizontal to each other and who 'cut off access to a supply, facility, or market necessary to

enable the boycotted firm to compete' are generally *per se* illegal under § 1.") (quoting *Nw. Stationers*, 472 U.S. at 294).[3]

Indeed, group boycotts are *per se* unlawful even where, as here, they use a joint venture to implement certain aspects of the conspiracy. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 326 (2d Cir. 2010) (conspiracy *per se* unlawful where joint ventures used "as a means to implement [defendants'] anticompetitive agreements"); *see also United States v. Apple, Inc.*, 791 F.3d 290, 325 (2d Cir. 2015) (rejecting "enterprise and productivity" defense to *per se* liability); *Full Draw*, 182 F.3d at 751 (holding joint boycott among trade group members against trade show *per se* illegal).

### B.    The Rule 8 Pleading Standard

At the pleading stage, the Court must "proceed on the assumption that all of the factual allegations in the complaint are true" and "draw[] all reasonable inferences" in favor of the plaintiff. *Anderson News*, 680 F.3d at 185. "[T]here is no heightened pleading standard in antitrust cases, and the facts alleged are subject to Federal Rule of Civil Procedure 8(a)'s general requirement of a 'short plain statement' of facts supporting a plausible claim." *Concord Assocs., L.P. v. Entm't Properties Tr.*, 817 F.3d 46, 52 (2d Cir. 2016).

An antitrust conspiracy must "plausibly" allege the existence of an unlawful agreement by setting forth "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). In evaluating plausibility, the

---

[3]    The Areeda antitrust treatise distinguishes between "naked" and "ancillary" boycotts or concerted refusals to deal. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2017) (hereinafter, "Areeda") ¶2200a. Naked refusals—those in which the "objectively measured purpose is to reduce market output or increase price"—are condemned *per se*. *Id.* This case alleges a purely naked restraint—an agreement to eliminate competition from innovative market entrants. "By contrast, an ancillary restraint is one whose objectively considered purpose is to reduce costs, increase output, or please consumers by providing a better product or distribution." *Id.*

complaint must be "read as a whole," *Anderson News*, 680 F.3d at 190, and should not "be judged by dismembering it and viewing its separate parts." *Cont'l Ore*, 370 U.S. at 699.

An antitrust plaintiff can state a plausible claim by alleging direct or circumstantial evidence. *Anderson News*, 680 F.3d at 183-84, 186-87. When the alleged conspiracy is premised *solely* on inferences of collusion arising from parallel behavior, the allegations should be bolstered by "plus factors" which can support an inference of conspiracy. *In re Credit Default Swaps Antitrust Litigation*, 2014 WL 4379112, at *9 (S.D.N.Y. Sept. 4, 2014) ("*CDS*"). The plaintiff "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages." *Anderson News*, 680 F.3d at 184; *see also id.* ("the choice between or among plausible inferences or scenarios is one for the factfinder"); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 687 (S.D.N.Y. 2012) ("*eBooks*") (rejecting defendants' "claim that there are legitimate alternative explanations for their parallel actions").

Only facts that "actually appear in the Complaint" should be taken as true. *eBooks*, 859 F. Supp. at 686. Courts may, under limited circumstances, take "judicial notice" of extrinsic materials, but may not consider materials that are subject to reasonable dispute or for "the truth of the matters asserted." *Int'l Star Class Yacht Racing Ass'n. v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998); *see also Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006) (error to rely on external materials "to make a finding of fact that *controverted* the plaintiff's own factual assertions"). Even then, extrinsic materials should not be consulted unless the complaint relies upon them heavily for "terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation omitted). Defendants submit a host of materials that do not satisfy these restrictions and should not be considered.

## I.   THE COMPLAINT PLAUSIBLY ALLEGES AN UNLAWFUL CONSPIRACY

### A.   The Complaint Details Direct and Circumstantial Evidence of an Actual Agreement

While antitrust conspiracies "are rarely evidenced by explicit agreements," *Anderson News*, 680 F.3d at 183, this is the rare case where Plaintiffs have uncovered direct evidence of an illegal agreement among the Prime Broker Defendants.  The Complaint alleges quoted statements made by Defendants' executives—identified by name—admitting that the Prime Broker Defendants had reached a "*general agreement*" that the "*industry advances*" reflected by AQS, SL-x and Data Explorers should only "*be achieved from within EquiLend.*"  ¶239.  This is no less than an admission of an anticompetitive agreement among horizontal competitors.  The antitrust laws do not permit any group of competitors—let alone banks as powerful as these Defendants—to anoint themselves arbiters of whether innovation can occur in a market.

The Complaint details similar statements from other of the Prime Broker Defendants. For example, the Complaint alleges meetings in 2013 between Karl Bishti—a Credit Suisse executive—and SL-x, during which Bishti acknowledged that SL-x's platform was impressive enough to cause the stock lending market to "'*change overnight*' into a more automated and operationally efficient business."  ¶240.  But, after likening EquiLend to "the mafia run by five crime families," Bishti expressly stated that no industry change would happen without the "*cooperation*" of EquiLend.  ¶241.  In other words, "nothing would happen in the market with regard to SL-x's platform unless the Prime Broker Defendants *jointly* allowed it to happen." ¶¶14, 240-41, 246.  The Complaint even cites documents on Defendants' servers reflecting this agreement, including emails in which EquiLend CEO Brian Lamb was "instructed" by the Prime Broker Defendants "not to '*break rank*' and not to take independent actions in the marketplace

until the '*EquiLend banks*' determined as a group whether they would support any of the new platforms."  ¶16 (emphasis added).

The Complaint alleges further direct evidence relating to how Morgan Stanley (Wipf) and Goldman Sachs (Conley) jointly decided to eliminate AQS as a threat once and for all.  Having reached an agreement among themselves, they secured the agreement of the other Prime Broker Defendants to "purchase AQS for the sole purpose of eliminating any alternate path to central clearing."  ¶294.  These allegations are also not based on speculation or inference.  Wipf *admitted* to his Morgan Stanley colleagues during a (recorded) January 2016 internal conference call that Morgan Stanley and Goldman Sachs had agreed to "act together to '*get a hold of this thing*'"—a comment everyone on the call understood to mean that "Goldman Sachs and Morgan Stanley needed to act together to acquire AQS and shut it down."  ¶296.

These concrete allegations plead direct evidence of an agreement to boycott market entrants.  *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (Posner, J.) (noting direct evidence "would usually take the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy").  When properly credited, they "remove[] any ambiguities that might otherwise exist" about whether Defendants' efforts to deprive AQS, SL-x and Data Explorers of liquidity was "the result of independent or concerted action."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591-92 (S.D.N.Y. 2015) ("*FX*") (finding allegations of "direct evidence akin to the 'recorded phone call in which two competitors agreed to fix prices at a certain level'" where plaintiffs alleged defendants discussed "nonpublic information" and agreed "'in chat rooms and instant messages' to use collusive trading strategies across banks").

Beyond this direct evidence, the Complaint also painstakingly explains how Defendants engaged in parallel and other highly probative circumstantial conduct as they lived up to their "general agreement."  For example, the Complaint alleges that Credit Suisse, JP Morgan, Morgan Stanley, and UBS each demanded in separate meetings that AQS become a "*broker-only platform*"—saying they would not participate on the platform unless AQS barred lenders and borrowers from trading directly.  ¶210.  *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d, 430, 475-76 (S.D.N.Y. July 28, 2017) ("*IRS*") (crediting allegation that defendants "made the identical demand of Tera (to audit its rulebook) as a condition for clearing trades is improbable enough to support an inference of collaboration").

Defendants contend this allegation is a "conclusion" the Court is free to disregard.  *See* MTD 25.  But the allegation is not conclusory; it alleges the specific content of communications to AQS by specific Defendants.  That Plaintiffs do not quote the exact words in these particular communications does not mean they can be disregarded.  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (rejecting "notion that *Twombly* imposed a heightened standard that requires a complaint to include specific evidence" of each allegation).

Defendants also misleadingly claim that AQS was never able to offer "direct trades" between borrowers and lenders (MTD 10) and thus that the uniform demands they made of AQS reflect their adherence to the OCC by-laws, which require OCC clearing members to handle transactions.  MTD 26.  But this is an exercise in misdirection.  The AQS founders obviously knew of this requirement and specifically designed the platform to enable "borrowers and lenders to interact directly with each other (***via a clearing broker*** which provided access to the OCC)."  ¶154 (emphasis added).  There are many more clearing brokers than prime brokers ("over sixty brokerage firms with stock lending clearing privileges at OCC today," ¶154 n.36),

and clearing brokers take a very modest fee.  ¶120 n.26.  Many markets, including stock markets

like the New York Stock Exchange, allow investors to transact directly while using clearing

brokers for what is largely an administrative function.  That is what AQS allowed and what

Defendants each demanded that it not permit.  Defendants instead tried to make AQS "an

exclusive space for the Prime Broker Defendants to trade."  ¶210.

      The Complaint also details how the Prime Broker Defendants each (i) boycotted the three

platforms, starving them of liquidity and business, ¶¶212-14, 223, 228-30, 254-64; (ii) threatened

to deny major hedge funds (such as Renaissance Technologies, D.E. Shaw, Millennium

Management, and SAC Capital) access to prime brokerage services if they traded on AQS,

¶¶215-17; (iii) pressured major market participants (such as BNY Mellon, State Street, and

Northern Trust) to stay off the SL-x platform, ¶¶18, 251-52; (iv) refused to support SL-x's

"softer" and "cooperative" approach, which would have given Defendants a "seat at the table" in

the development of SL-x, ¶¶219-227; and (v) entered into distribution agreements in 2011 with

EquiLend-owned DataLend containing identical restrictions that prohibited disclosure of any

prime broker data to lender or borrower customers.  ¶¶257-58.

      All of this constitutes powerful evidence that Defendants were acting in a concerted

fashion.  *See Anderson News*, 680 F.3d at 187-89 (finding similar evidence "may plausibly be

interpreted as evincing [defendants'] agreement to attempt to eliminate" competition); *eBooks*,

859 F. Supp. 2d at 682 (upholding complaint that "describe[d] specific conversations from which

it is fair to infer that the [defendants] had agreed among themselves to adopt a joint strategy").

      In *CDS*, Judge Cote assessed allegations that dealer defendants conspired to block a

specific trading platform (CMDX) "and other nascent ventures from entering the CDS market."

*CDS*, 2014 WL 4379112, at *10.  Denying the motion to dismiss, the Court referenced

allegations similar to those set forth in the Complaint here, including that dealer-defendants "secretly met and communicated during certain time periods at certain places," including "under the auspices of board or committee meetings," to agree to block the specific, nascent platform. *Id. See also, e.g.*, ¶¶203-04, 294-98. *CDS* also recognized that while "no single" defendant "could prevent exchanges from emerging," they would all "profit from such prevention." *See* 2014 WL 4379112, at *10; *see also, e.g.*, ¶¶9-10, 14, 216-17

Judge Cote did not view the allegations of dealer-defendants' parallel refusals to deal in a vacuum, but properly determined that "[w]hen viewed in the context of the other allegations in the Complaint," such allegations "plausibly support an inference of conspiracy." *Id.* at *13. Likewise, here, the detailed allegations of Defendants' actual meetings, under the auspices of EquiLend and otherwise, in conjunction with the allegations detailing their collective and parallel actions to impede AQS, SL-x, and Data Explorers more than satisfy Plaintiffs' burden to set forth "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.

*IRS* also determined that an alleged boycott in the IRS market from 2013-2016 was plausible based on allegations similar to those alleged here, including the defendants' (i) "parallel refusals to trade" on existing platforms (¶¶208-12), (ii) "similar" reasons for not trading on the platform (¶¶17, 223), (iii) threats to keep other market participants from trading on the new platforms (¶¶18-19, 213-14), and (iv) anticompetitive conduct through a jointly-controlled entity (¶¶122-24, 304-312). *IRS*, 261 F. Supp. 3d at 472-76. As in *IRS*, the Prime Broker Defendants here did not "just say no," *id.* at 476, to AQS, SL-x, and Data Explorers. Rather, the Complaint alleges that Defendants actively coordinated with each other and developed and implemented "similar stylized stratagems" to blunt the new platforms from

15

gaining traction in the marketplace.  *Id.*  These detailed and specific allegations of active efforts to block new entrants are a far cry from the very general allegations of parallel *inaction* that troubled the Supreme Court in *Twombly*.  550 U.S. at 566-69.

Defendants argue that not all of their actions were "parallel" (by which they mean "identical").  MTD 24-28.  But, in the real world, conspirators do not always behave identically. *See Anderson News*, 680 F.3d at 191 ("there is nothing implausible about coconspirators' starting out in disagreement as to how to deal conspiratorially with their common problem"); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D. Pa 2011) ("[E]ach conspirator may be performing different tasks to bring about the desired result.") (quoting *Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980)).

For example, the Complaint alleges that Bank of America, "in light of the support and demand for AQS in the market," initially invested in AQS.  ¶157.  Bank of America did this out of self-interest because "hedge fund clients were contacting competing prime brokers that were uniformly opposed to AQS, and switching to Bank of America, *expressly referencing AQS*." ¶160.  Far from "[u]ndercutting Plaintiffs' conspiracy theory" (MTD 10), this non-parallel behavior supports the plausibility of the alleged conspiracy.  It debunks Defendants' claim that the AQS offering was misguided from the start, and it shows that individual Prime Broker Defendants had the incentive to support this innovative platform if they had acted in their individual self-interest.  Absent the conspiracy, more would have done so.  *See Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 38, 48 (1st Cir. 2013) (finding conspiracy plausible, in part based on allegation that at least one defendant initially "demonstrated interest" in plaintiff's recycling method, but then withdrew its support); *CDS*, 2014 WL 4379112 at *11 (reversal of support by certain defendants for platform supported plausibility).

**B.      The Complaint Alleges Numerous "Plus Factors"**

Given the Complaint's detailed allegations of direct and circumstantial evidence of an actual unlawful agreement, the Court need not even consider "plus factors," which are required only when a conspiracy claim rests solely on inferences drawn from allegations of parallel behavior.  *CDS*, 2014 WL 4379112, at *9.  Nonetheless, the Complaint also sets forth a number of "plus factors" that further support the plausibility of the conspiracy.  Defendants' arguments against these allegations are particularly weak.  MTD 22-24, 31-34.[4]

*High-level of Interfirm Communications*:  The Complaint details a high-level of inter-Defendant communications at specifically-identified meetings, dinners, and EquiLend meetings.  *E.g.*, ¶¶124, 199, 202-03, 211-12, 219-23, 229, 294-97, 312.  Multiple Defendants even referred to themselves collectively as the "five crime families," a reference to the five major New York City organized crime families of the Italian America Mafia.  ¶14.  In other words, Defendants themselves chose a nickname that linked them together as part of a larger enterprise—and an enterprise, no less, that is well known for its strong-arm and even criminal tactics.  This is a powerful and revealing allegation.  *See FX*, 74 F. Supp. 3d at 587, 592 (plausibility of alleged conspiracy supported by allegations that competitor banks participated in chat rooms they referred to as "The Cartel," "The Bandits' Club," and "The Mafia").

---

[4]   The authorities Defendants rely upon with respect to "plus factors" have little import.  *See, e.g.*, *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 138 (2d Cir. 2013) (plaintiffs pled "only parallel conduct, with little more"); *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 579 (S.D.N.Y. 2017) (alleged "parallel" conduct occurred years apart).  *See also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 n.5 (9th Cir. 2015) (plaintiffs could not allege who "conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out"); *Williams v. Citigroup, Inc.*, 2009 WL 3682536, at *3 (S.D.N.Y. Nov. 2, 2009) (complaint "bereft of any detail plausibly suggesting an agreement" and Plaintiff failed even to name the conspirators); *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 803 F.3d 1084 (9th Cir. 2015) (summary judgment case).

*Common Motive to Conspire*:  Plaintiffs allege that Defendants agreed to starve AQS, SL-x, and Data Explorers of liquidity with the common motive to preserve their supracompetitive profits.  *E.g.*, ¶¶6, 24, 169, 179, 195, 256-60, 279, 321, 324.  *See, e.g.*, *CDS*, 2014 WL 4379112, at *10 (common motive to conspire where "all Dealer-Defendants would profit from such prevention" of exchanges "from emerging"); *IRS*, 261 F. Supp. 3d at 476 ("plus factor" where complaint alleged that defendants sought to "preserve" their "profit center," by "assur[ing] that the new platforms were starved of liquidity").

*Actions Against Individual Economic Self-Interest*:  Absent the conspiracy, it would have been in the self-interest of many of the Prime Broker Defendants to support the platforms to avoid the risk of being left behind.  Smaller Prime Broker Defendants could have competed for customers by demonstrating their willingness to move forward with innovation.  The Complaint alleges strong market demand for AQS, SL-x, and Data Explorers.  ¶¶7, 18, 132, 143, 151, 155, 157, 160, 165, 191.  Yet each Defendant turned its back on the platforms.  *E.g.*, ¶237.

The Prime Broker Defendants also acted against their economic self-interest when they refused to provide clients with access to AQS.  Without the assurance that their competitors would act similarly, this approach would have been very risky; in a competitive market, failing to heed client wishes would risk that clients might take their business to competitors.  *See* ¶¶213-18.  But in the context of Defendants' conspiracy, each knew they could rely on the others denying access to AQS as well.

Defendants' argument that it was in their individual interests to "sit tight and wait" (MTD 30) disregards these allegations.  The Complaint alleges that they did *not* sit tight and wait. They took a host of affirmative actions to block competition, including denying their clients access to AQS and even threatening clients with retaliation.  *E.g.*, ¶¶18-20.  Such conduct by an individual

Prime Broker Defendant would be virtually inexplicable absent knowledge that its competitors would behave similarly  *See Starr*, 592 F.3d at 327 (denying motion to dismiss where conduct would not be in any defendant's interest "unless the defendant's rivals were doing the same").

Similarly, Defendants' argument that, just because EquiLend rejected SL-x's merger offer, each individual Prime Broker Defendant would necessarily give the same exact "common response" to SL-x makes no sense.  MTD 27.  Given the market demand for SL-x's platform, the different position of the Prime Broker Defendants in the marketplace (with Morgan Stanley and Goldman Sachs on top and the others competing for market-share), and Defendants' recognition of SL-x's benefits, *e.g.*, ¶¶230-32, 240, it is far more likely that absent a conspiracy the Prime Broker Defendants would have taken different positions towards the new platform and at least one self-interested Prime Broker Defendant would have seized the opportunity to take part in SL-x's development and differentiate itself and take market share from its competitors.

## II.    DEFENDANTS' ARGUMENTS FOR WHY THE CONSPIRACY IS IMPLAUSIBLE FAIL

Defendants advance an array of arguments for why the group boycott alleged in this case was supposedly implausible.  The gist of their position is summed up on page 15 of their brief, where they assert:  "Plaintiffs fail to plead a plausible antitrust conspiracy" because "their theory of a nine-year conspiracy, among just six prime brokers, to preserve OTC trading in a market not suited for an anonymous exchange, and orchestrated at meetings also attended by agent-lenders, is implausible on its face."  MTD at 15.  As demonstrated below, however, Defendants fail to identify anything about the conspiracy that is implausible.

### A.    The Conspiracy's Length Is Plausible

Defendants repeatedly suggest it is implausible that the alleged conspiracy could last "nine years"—a number they calculate by characterizing the conspiracy as lasting from 2009 to

2018.  MTD 1, 15, 17, 45.  But they cite not a single case holding that a group boycott could not last this long, and courts have repeatedly held that conspiracies of even greater length are plausible.  The *FX* Court, for example, found it plausible that these same banks (and others) engaged in a "a long-running conspiracy" lasting over a decade.  *FX*, 74 F. Supp. 3d at 594; *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 442 (4th Cir. 2015) (reversing dismissal of group boycott claim alleging conspiracy over 12 years and noting that "to the extent the dissenting opinion suggests that a large, multi-firm conspiracy by definition cannot exist, it is simply uninformed.  Large antitrust conspiracies have not only existed but have been caught—a perfect example being the famous international vitamin scandal of the 1990s—which involved 21 firms engaged in a conspiracy that lasted over a decade[.]").

The Complaint alleges the conspiracy commenced in 2009.  Goldman Sachs and Morgan Stanley, who had the most to lose, recognized the threat and sounded the alarm.  They convinced and pressured the other Prime Broker Defendants to join the boycott.  ¶¶195-208.  By 2011, the boycott had taken hold (¶208), with Defendants reaching the "general agreement" that they would not individually support AQS or SL-x.  ¶239.  The Prime Broker Defendants maintained that stance until the boycott achieved its objectives.  Nothing about that timeline is implausible.

### B.     The Members of the Conspiracy Are Plausible

Defendants assert that the Complaint "does not allege any facts explaining" how the six of them alone "amidst the dozens of other prime brokers" could have effectuated their conspiracy.  MTD at 17.  But the Complaint specifically alleges that the six Prime Broker Defendants held between "76% and 80% market share," ¶102, and possessed "overall clout in the market," ¶122.  They dominated the market, with the two leaders of the conspiracy (Goldman Sachs and Morgan Stanley) together holding "the majority of the market share of stock lending revenue."  ¶294.  Credit Suisse is next in line.  ¶198.

Defendants cite no authority suggesting that competitors controlling 75% to 80% of a market cannot carry out an effective group boycott.  That level of market power is more than sufficient.  *See Fashion Originators' Guild of Am. v. Fed. Trade Comm'n*, 312 U.S. 457, 462 (1941) (*per* se unlawful group boycott among members of association with between 38% and 60% market share); *Starr*, 592 F.3d at 323-24 (reversing dismissal of Section 1 claim in part based on allegation that several defendants controlled 80% of market).  There is nothing implausible about the members of the alleged conspiracy here.

Defendants fault Plaintiffs for not explaining why Deutsche Bank, although supposedly having "more reported clients" than just two of the smallest Prime Broker Defendants, was not named as a Defendant.  MTD 6-7.  This is one of Defendants' flimsier attacks.  Plaintiffs are not obligated to explain, at the pleading stage, exactly what occurred with every second-tier prime broker.  As noted, the conspiracy was primarily driven by Goldman Sachs and Morgan Stanley, who, as the dominant players, had the most to lose.  They pressured others to join, and especially their fellow owners of EquiLend.  *E.g.*, ¶200.  That they may not have recruited every smaller prime broker to join their scheme does not mean the conspiracy did not occur.

Defendants also argue that "Plaintiffs do not allege that Defendants did anything to prevent non-defendant brokers from providing clearinghouse access to borrowers and lenders." MTD 4-5; *see also id.* at 9.  But the Prime Broker Defendants controlled a sufficient share of the industry that other brokers alone could not provide sufficient liquidity, *see* ¶¶102, 122, and the Complaint specifically alleges *how* the Prime Broker Defendants wielded clout and collective market power to enforce compliance among other market players.  *See* ¶¶18-20, 215-18, 252-53. The Complaint cites several instances where Defendants threatened retaliation against market participants that considered dealing with AQS and SL-x.  ¶¶18-20.  It alleges those market

participants reasonably "feared incurring the wrath of those Defendants on whose services and relationships they depended[.]"  ¶382.  Allegations of parallel threats in support of a boycott, contrary to the unilateral self-interest of each participant, more than plausibly suggests an actual agreement.  *See CDS*, 2014 WL 4379112 at *3 (to effectuate conspiracy, "[d]efendants threatened to boycott [brokers] that transacted with non-dealers, a threat that, if acted upon, would effectively force a[] [broker] to shut down").

Similarly, as noted above, there is nothing implausible about Bank of America's alleged membership in the conspiracy given its early support for AQS.  *See* MTD at 34-36.  Bank of America's reversal was a result of pressure by the other Prime Broker Defendants, after Stuart Hendel—the former head of prime brokerage at Morgan Stanley and UBS—was appointed as Bank of America's head of Global Prime Brokerage.  ¶¶200; 205-07; *see IRS*, 261 F. Supp. 3d at 476 (plausibility of conspiracy supported by allegations that "officials involved in IRS trading sometimes switched employment from one Dealer to another, tying the firms closer").

Defendants claim that there was an "entirely benign" reason for Bank of America's withdrawal of meaningful support for AQS in 2011—that "AQS was failing (¶269), which would deter any investor from pouring in more money."  MTD 35.  But this mischaracterizes the allegations and improperly draws inferences in favor of Defendants.  The Complaint makes clear that AQS was failing "toward the end of 2014" (¶269), *three years after* Bank of America—"[a]s a result of the pressure from Goldman Sachs, Morgan Stanley, and others"—stopped providing meaningful support to AQS in late 2011.  *See* ¶206; *see also* ¶266 ("[b]y 2014, the Prime Broker Defendants' collective boycott had largely succeeded").

The *IRS* defendants made a similar argument to no avail.  There, it was RBS that, "for a short time, agreed to trade or provide liquidity to" one of the allegedly boycotted platforms.  *IRS*,

261 F. Supp. 3d at 456.  Recognizing that "[c]onspiracies, particularly when alleged among a large group, are not always tidy and symmetric," the court rejected the assertion that RBS's early support for the platforms rendered the group boycott in that case implausible.  *Id*. at 479.  The reasoning of *IRS* on this point should apply with equal, if not greater, force here.

### C.      The Goals of the Conspiracy Are Plausible

Defendants assert that the conspiracy is implausible because the stock loan market was not suited for an anonymous exchange and that there was supposedly no "market demand for central clearing."  MTD 2, 17-18.  But these are fact-laden arguments that cannot be credited at this stage.  *Anderson News*, 680 F.3d at 184-85.  They are also wrong.  The Complaint details the demand for these new products, including the anonymous trading features that AQS and SL-x offered.  *E.g.*, ¶¶7-8, 143, 157, 311.  It also explains why anonymous trading and central clearing were feasible in this market.  ¶¶142-43, 146, 154-56, 159, 179, 233, 279-84, 300, 331-32.

Defendants argue that anonymous trading could not possibly work in the stock loan market because borrowers demand to know the identity of the lender in order to assess the risk that loaned share might be prematurely recalled.  MTD 17-18.  But this argument is based on a false premise.  In the current OTC market, most borrowers do not demand to know the identity of the lender who is providing the stock loan.  Even if they did know the identity of a lender, that would generally not give definitive information as to what that lender intended to do with that particular stock in the future.  Stock borrowers generally care little (if at all) about the source of their loans; others understand lenders' anonymity as the price of their own.  Moreover, to the extent any borrower did care, anonymity was *optional* on both AQS and SL-x, and both had features allowing assessment of counterparty characteristics, including historical recall rates.  *See* ¶¶179-80, 271.

Defendants argue that "[i]f a lender abruptly terminates a stock loan, the borrower may be forced to close out its position or scramble to find a 'hard to borrow' stock." MTD 6 (citing ¶112). But the paragraph they cite to support this assertion says no such thing. In any event, to the extent that there is counterparty risk associated with recall of "hard to borrow" stock loans between anonymous parties, this could easily be accounted for with a variance in the risk premium. Indeed, the SL-x platform also had built-in features to address the possible premature recall for "hard to borrow" stocks. ¶180.

In the end, Defendants' various technical arguments for why AQS and anonymous trading in general was misguided defy some basic facts. Most notably, AQS was developed by industry insiders, who knew the market, and won the support of entities such as one of the largest lenders of stock (Barclays Global Investors), one of the largest borrowers of stock (hedge fund Renaissance Technologies), the oldest venture capital fund in the country (Bessemer Ventures), and one of the largest exchanges in the world (Deutsche Bourse). ¶160. Quadriserv's first anonymous trading offering was "immediately popular with borrowers and lenders," with "more than $2 billion of open stock loan transactions . . . matched on the platform." ¶143. The Complaint explains that the only reason there were no successful platforms offering anonymous, centrally-cleared stock lending beginning in 2009 is that Defendants conspired to prevent their success. ¶¶114-20, 323-31.

If, as Defendants assert, the stock loan market was so ill-suited for anonymous trading, then why were all of these sophisticated market participants clamoring to trade anonymously on AQS? Why would Bank of America itself have invested millions of dollars in the trading platform if, as Defendants now assert, stock loans by their nature are ill-suited for what AQS had to offer? The questions are rhetorical, but the point is that the Complaint's well-pled allegations

contradict Defendants' narrative that the conspiracy was facially implausible because the products and platforms at issue could not possibly have worked.

Defendants also argue that anonymous trading was doomed to failure because clearing in the stock lending market was not "mandated." MTD 18. But, whether clearing was mandated or not, both AQS and SL-x were ready, willing, and able to offer anonymous, centrally cleared stock lending in 2009 and 2012 respectively. ¶¶154, 172-184. And many in the market supported the platforms for that very reason. The Complaint goes on to explain just how that clearing would have worked with these platforms. *E.g.*, ¶¶145-46, 154-61, 174-78. Again, these allegations must be assumed to be true and cannot be ignored by a counterfactual narrative offered by the Defendants on a motion to dismiss. *See Twombly*, 550 U.S. at 555-56.

Indeed, in support of their lack-of-mandate argument, Defendants simply fabricate a claim that Quadriserv developed the AQS platform because it "[b]eliev[ed] (incorrectly) that the SEC would mandate central clearing of stock loans after the financial crisis" in 2008. MTD 10. *Quadriserv's development of AQS began in 2005*, before the financial crisis, and the Complaint alleges that the platform's ability to "match borrowers and lenders directly" was discussed at an industry conference *in March 2007*, months before the financial crisis took hold. *See* ¶¶144 & n.30, 145-53. AQS was developed to meet the market demand for more efficient trading options, not a potential SEC mandate to address a financial crisis that had not even happened.

In *CDS*, Judge Cote rejected defendants' arguments for dismissal despite the lack of any clearing mandate where the complaint alleged that at least one boycotted platform was "fully operational and ready" to offer electronic all-to-all trading for the duration of the class period. *CDS*, 2014 WL 4379112, at *4. The lack of a regulatory "mandate" is immaterial. Nothing in *IRS* says otherwise. There, the court dismissed pre-2013 boycott claims (sustaining the rest of

the complaint) because during that period "platforms offering anonymous all-to-all IRS trading accessible to the buy-side had *not yet developed*," and did not exist until after central clearing was mandated in 2013.  261 F. Supp. 3d at 463 (emphasis added).[5]  This stands in marked contrast to Plaintiffs' allegations here where in 2009, AQS had *actually launched* its platform and anonymous trades *were actually occurring*.  ¶¶156-61.

### D.     The Conspiratorial Meetings Are Plausible

Defendants' various attacks on specific conspiratorial meetings are also meritless. Defendants first argue that there was nothing nefarious about the "five families" meeting convened by Bank of America in 2009.  MTD 20.  But while Defendants are correct that Plaintiffs do not (yet) know exactly what occurred at this particular meeting, they miss several important points by focusing on this meeting in isolation.

First, Defendants ignore that the Bank of America executive that called the meeting in September of 2009 did so only *after* receiving overt pressure from William Conley at Goldman Sachs, who threatened that Bank of America should "reverse course and [] join the opposition to Quadriserv/AQS or risk being ostracized by the other Prime Broker Defendants."  ¶200.  That allegation directly supports the conspiracy allegation.  In light of this, one plausible explanation is that Bank of America called the meeting to try to avoid being ostracized.  Indeed, the fact that Bank of America referred to its meeting as one with the "five families" shows that it knew it was facing *concerted* pressure.  Defendants also ignore that, shortly after the Bank of America-convened meeting, Conley, Credit Suisse's Sullivan, and other Prime Broker Defendants

---

[5]   Although *IRS* held that plaintiffs stated a boycott claim from 2013 forward, its pre-2013 dismissal hinged at core on the Court's view that the complaint in that case did not plausibly allege a viable all-to-all buy side platform pre-2013.  While counsel respectfully disagree, here such platforms have—as in the post-2013 period in *IRS*—been plausibly alleged under the pleading principles recognized by *Anderson News*.

convened *a separate secret meeting* where they agreed to oppose and disparage AQS and central clearing at the upcoming roundtable discussion.  ¶203.  That, too, is highly probative of the alleged conspiracy.  Nothing about these events is implausible.

Defendants also contend that the EquiLend Board is an implausible setting for conspiratorial discussions because of the presence of large agent lenders on the Board.  MTD 17.  As an initial matter, this argument overlooks all of the specific, actual meetings and discussions that occurred *outside* of EquiLend.  *See* ¶¶11, 15, 21-22, 203, 211, 280, 297.  Beyond that, this argument demands far too much certainty about what these agent lenders were motivated to do.  These major agent lenders, after all, were also entrenched in the market and may well have their own incentives to preserve the status quo.  Nothing in the Complaint says otherwise.  To the contrary, the Complaint alleges that the major agent lenders may have been more aligned with the Prime Broker Defendants than Defendants now suggest.  Defendants, for example, knew that agent lenders "did not pose as great a risk as the provision of [data similar to that being provided by Data Explorers] to end-user beneficial owners and borrowers."  ¶262.  They also knew that major agent lender members of EquiLend were offered "DataLend's products for no additional fee."  ¶261.

In addition, the Prime Broker Defendants are some of the most powerful institutions in the world and some of the most important clients of the agent lenders.  Few stand up to them because of their power.  The Complaint specifically alleges that the agent lenders on the EquiLend Board were pressured to acquiesce to the Prime Broker Defendants' demands and that "[b]ecause of the Prime Broker Defendants' joint control and their overall clout in the market, the other owners of EquiLend effectively acquiesce[d] to the Prime Broker Defendants."  ¶122.  This is supported by other factual allegations which provide examples of Defendants wielding

their power over agent lenders that were EquiLend Board members.  *See* ¶251 ("BNY Mellon, State Street, and Northern Trust . . . said that, since the Prime Broker-dealers—and particularly industry giants Goldman Sachs and Morgan Stanley—were aligned against the platform, they could not support it"), ¶252 (Northern Trust told SL-x that it was interested in SL-x but could not proceed "without Goldman Sachs' approval" and that "Goldman Sachs "had 'strong views' on directing business to EquiLend instead of encouraging 'outside industry initiatives' such as SL-x").

Defendants also assert that the December 2015 meetings between Morgan Stanley (Wipf) and Goldman Sachs (Conley), *see* ¶¶21-22, 294-97, were simply for the "lawful purpose of discussing a potential joint venture acquisition."  MTD 21.  But Wipf, who was not even an EquiLend board member, *admitted* to his colleagues during a January 2016 conference call that "he and Conley agreed that Goldman Sachs and Morgan Stanley needed to act together to '*get a hold of this thing*'"—meaning that "Goldman Sachs and Morgan Stanley needed to act together to acquire AQS and shut it down."  Indeed, the Complaint expressly alleges that "Wipf said that getting rid of AQS was necessary because AQS provided a pathway to central clearing that was outside the control of the Prime Broker Defendants."  ¶296.  Defendants cannot explain how a discussion between competitors about how to "get a hold" of a threat to stop it from providing investors with a path to central clearing outside of the Prime Broker Defendants' control constitutes a lawful, procompetitive joint venture discussion.

### E.    Defendants' Other Miscellaneous Arguments Fail

Finally, Defendants' other arguments for why AQS and SL-x failed for wholly innocent reasons ignore wide swaths of the Complaint and fail on their own terms.  Contrary to Defendants' contention (MTD 10), that OCC did not follow through on its plans to acquire AQS does not mean that AQS failed for independent reasons.  The Complaint specifically alleges that

(i) as part of the Project Gateway plan to "get a hold" of the threat AQS posed, the Prime Broker Defendants pressured OCC directors to stymie the OCC deal; and (ii) the Prime Broker Defendants and EquiLend acquired AQS for the express purpose of removing its all-to-all platform from the market, and that is exactly what they did.  ¶¶290, 298, 300-03.

Defendants also assert that their conduct towards SL-x is irrelevant because SL-x only launched in Europe, and that " its demise was due to a failed business model."  MTD 11, 28. This is contrary to allegations that Defendants' own personnel praised the SL-x model for its many benefits, including the additional efficiency and transparency it would provide, and that SL-x was poised to clear U.S. stock loan trades, (¶¶233-35), but that the Prime Broker Defendants who boycotted the platform thwarted its ability to do so.  *See* ¶¶219-242 (collusion to boycott SL-x), ¶253 (OCC executive disclosed that "had been in constant contact with Goldman Sachs' Conley during the period of the boycott and that 'nothing was going to happen' between SL-x and OCC without the Prime Broker Defendants' blessing").

## III.   **PLAINTIFFS DO NOT RELY ON IMPERMISSIBLE GROUP PLEADING**

Defendants' "group pleading" argument ignores the considerable Defendant-specific detail in the Complaint.  The Complaint alleges that Goldman Sachs and Morgan Stanley took a leading role in the conspiracy, *e.g.*, ¶¶198-99, but it also alleges that *each Defendant* agreed to participate.[6]  *See CDS*, 2014 WL 4379112, at *10 (rejecting argument that "references to

---

[6]   *See, e.g.*, for Bank of America (¶¶46-51, 122-24, 149 n.33, 205-07 (joining the conspiracy), 225 (refusing to support SL-x), 229, 244); Credit Suisse (¶¶14-15, 17, 52-57, 89, 122-24, 203-05 (making false statements about AQS at the SEC panel), 210, 229, 240-41, 245-46, 249, 280); Goldman Sachs (¶¶11-12, 17-18, 21-23, 58-62, 89, 122-24, 149 n.33, 152-53, 189-91, 199-203 (organizing Prime Broker Defendants ahead of SEC Panel), 218 (threatening BNY Mellon), 219-20, 251-53, 257, 294-97 (formulating Project Gateway)); JP Morgan (¶¶17, 63-70, 89, 122-24, 149 n.33, 184, 210 (demanding that AQS serve as broker-only), 238-39, 245, 257 (negotiating parallel DataLend agreements)); Morgan Stanley (¶¶11-12, 19, 21-22, 71-78, 89, 121-24, 149 n.33, 192 (providing scrubbed data to Data Explorers), 199, 205-07, 210, 226-27, 243, 251, 279-98 (organizing Project Gateway)); UBS (¶¶79-87, 89, 122-24, 206-07, 210, 229,

'Dealer-Defendants' as a group are insufficiently particular" where the complaint alleged the conspiratorial participation of each defendant and listed representatives attending various meetings at which the attendees were alleged to have colluded); *see also IRS*, 261 F. Supp. 3d at 478.

Defendants argue that the Complaint insufficiently distinguishes among members of the Prime Broker Defendants' corporate families.  MTD 24.  But each Defendant has more than ample notice of its alleged role in the conspiracy.  The Complaint alleges many specific examples of employees identified by name taking specific actions to further the interests of the conspiracy.  These personnel held themselves out as representing the interests of corporate families—"Credit Suisse," for example.

As such, it is entirely fair for Plaintiffs to plead allegations regarding "Credit Suisse," while naming as a defendant, for example, "Credit Suisse Securities (USA) LLC," a sub-entity that operated in the conspiracy's sphere as a registered broker-dealer and a clearing member of the OCC.  ¶53.  Courts routinely allow this type of pleading at the corporate family level.  *See IRS*, 261 F. Supp. 3d at 478 (noting that the complaint often groups the eleven defendants "each a corporate family" together).  *See also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (courts "do not require plaintiffs in complex, multinational, antitrust cases to plead detailed, defendant-by-defendant allegations"); *In re OSB Antitrust Litig.*, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed 'defendant by defendant.'").

---

242, 245, 249-50).  Plaintiffs have agreed, after consultation with defense counsel, to voluntarily dismiss entities with no involvement in the conduct alleged.  *See* Dkt. Nos. 83, 105.  As a practical matter, this negates the need to specify, prior to any discovery, the precise actions of each remaining, related entity in an opaque corporate family.

## IV.     PLAINTIFFS' GROUP BOYCOTT CLAIM WARRANTS *PER SE* TREATMENT

Defendants argue that the Court should apply the "rule of reason" to certain allegations concerning EquiLend—and then argue that Plaintiffs have failed to allege enough under the rule of reason about those specific allegations.  MTD 38-41.  But the question of liability is determined at the level of the *claim* as a whole, rather than *individual allegations* taken in isolation.  And the claim here is a group boycott that is *per se* unlawful.  *See* pp. 7-9, *supra*.

More basically, even if the Court were to consider individual allegations about how the boycott was carried out in isolation, *per se* treatment would remain appropriate because Defendants used EquiLend to engage in a "naked restraint"—that is, one that was objectively intended to reduce competition in the stock loan market *outside* of the joint venture.  Finally, even if the Court were to determine that elements of the claim warranted some scrutiny beyond *per se*, such scrutiny would involve at most a "quick look" or a "truncated" rule of reason analysis, which Plaintiffs easily satisfy.  Defendants' agreement *to destroy competitive threats* cannot possibly be considered procompetitive.

### A.     Defendants Focus on Isolated Allegations Rather than on the Claim as a Whole

Defendants cannot overcome the binding authority recognizing that the antitrust claim—a horizontal group boycott of competing market entrants—is *per se* unlawful.  *Anderson News*, 680 F.3d at 183, 187-89.  So they ignore such authority in favor of arguing that certain individual allegations involving EquiLend, taken in isolation, should be analyzed under the rule of reason.

This approach is meritless.  The question of whether to apply *per se* or rule of reason turns on the type of *claim* at issue, not on isolated allegations that make up the claim.  As the Supreme Court has held:  "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  *Cont'l*

31

*Ore*, 370 U.S. at 699; *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946)

("Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if

they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the

statute forbids, they come within its prohibition."). "[R]ead as a whole, rather than piecemeal,"

*Anderson News*, 680 F.3d at 190, the Complaint pleads a classic *per se* violation.

As the Second Circuit and numerous other courts have recognized, a *per se* claim does

not lose that character simply because some individual allegations concern joint venture conduct.

In *Starr*, the Second Circuit rejected the defendant's "joint venture" defense because the plaintiff

alleged the ventures were used "as a means to implement their anticompetitive agreements and to

facilitat[e] anticompetitive . . . horizontal combinations." 592 F.3d at 326. The Tenth Circuit

reached a similar conclusion in *Full Draw*, where members of a trade association conspired

among themselves (and with the trade group) to boycott a trade show that refused to accede to

their joint demands. 182 F.3d at 748, 750-51. The case law is replete with horizontal

conspiracies that were illegal *per se* in spite of "joint venture" trappings. *See, e.g.*, *United States*

*v. Topco Assocs., Inc.*, 405 U.S. 596, 610-12 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350,

357 (1967); *Associated Press*, 326 U.S. at 13-15; *Apple, Inc.*, 791 F.3d at 326, 329.

Similarly, many of the boycott cases cited above, in which the Supreme Court and other

Circuit courts applied *per se* treatment, involved some aspects that were not purely horizontal.

*E.g.*, *Anderson News*, 680 F.3d at 182-83; *Klor's*, 359 U.S. at 211-13 (retailer *per se* liable for

organizing boycott among its distributors, despite being vertically related to distributors); *MM*

*Steel*, 806 F.3d at 849 ("Each court that has addressed the anticompetitive nature of these group

boycotts was aware of the vertical components of the conspiracy and still applied *per se* liability

to each member of the conspiracy."). The fact that the agreement considered as a whole was a

horizontal agreement to boycott a competitor was sufficient in each of these cases for the claim to be *per se* unlawful, even though individual aspects of the claim considered in isolation were not purely horizontal. *See Apple*, 791 F.3d at 313-14 (discussing vertical participants in horizontal conspiracies)

     **B.**     **Even Viewed in Isolation, the EquiLend-related Allegations Involve a Naked Effort to Restrain Trade in the Stock Loan Market**

          **1.**     **The Complaint Alleges that Defendants Used EquiLend to Conspire to Restrain Trade *Outside* of EquiLend**

Defendants brazenly misconstrue the Complaint when they say that "[m]ost of Plaintiffs' allegations center on actions taken by EquiLend, its directors and the Prime Broker Defendants as joint venture participants." MTD 37. That is not so. The Complaint primarily concerns an agreement among the Prime Broker Defendants about what they would do *outside* of their joint venture. Specifically, the Complaint alleges that the Prime Broker Defendants agreed they would not provide any support to AQS, SL-x, and Data Explorers in the form of liquidity or pricing data. ¶¶212, 236-50. Instead, they would deprive those offerings of the essential inputs they needed to succeed. That agreement is anticompetitive because it restrained Defendants' actions in *the stock loan market itself*, *outside of the joint venture*—that is, it restrained their conduct in the market in which they were supposed to be competing as independent economic actors.[7]

This case is thus fundamentally different from *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006). *See* MTD 38. In *Dagher*, the two joint venture partners—Texaco and Shell—combined their

---

[7] Indeed, such an explicit agreement to reduce output in the stock loan market is *per se* illegal even if not characterized as a group boycott. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) ("A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful.").

businesses in the relevant market into a single, fully-integrated joint venture. 547 U.S. at 4. They did not compete with each other in the relevant market and participated only through their joint-venture investment. *Id.* at 5-6. Under those circumstances, the Supreme Court said the joint venture would be governed by the rule of reason because they were effectively a single firm in the market. *Id.* at 7.

Here, the Prime Broker Defendants are not a "single firm" in the stock loan market; they are separate, horizontal competitors in the relevant market who were supposed to be pursuing separate economic interests, but instead used a joint venture as a vehicle to carry out concerted activity. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195-96 (2010) (*Dagher* single-firm analysis turns on "whether the agreement joins together independent centers of decisionmaking" or whether they are "separate economic actors pursuing separate economic interests") (quotation omitted).[8] Because the Prime Broker Defendants were separate economic actors in the stock loan market, their agreement to restrain competition is *per se* unlawful.

By ignoring this distinction, Defendants engage in the very "overread[ing]" of *Dagher* the Areeda treatise cautions against. Areeda ¶2132 ("one should not overread the opinion . . . [o]ther ventures integrate far less"). The point is also illustrated by *New York Stock Exchange*, where the Supreme Court treated the actions of joint venture participants as continuing conspiracies to the extent they made rules for the control of the members' nonventure business. *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 347 (1963) ("concerted action" of stock exchange

---

[8]   Although the Supreme Court ultimately held that a rule of reason analysis should apply in *American Needle*, that was only because in the unique context of professional sports leagues, cooperation is necessary for the product (the sporting event) to exist. *Id.* at 203. That unique feature is not present here. *See also NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100-01 (1984) ("[W]hat is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all.").

members "was, in simple terms, a group boycott" to the extent it deprived plaintiffs of services "which they needed in order to compete effectively").

Defendants seize on *IRS* to argue that "[t]o avoid the rule of reason, Plaintiffs must 'adequately plead that the [EquiLend] joint venture was an illegitimate shell that offered no efficiency enhancements and served only to mask concerted conduct." MTD 38 (quoting *IRS*, 261 F. Supp. 3d at 468). But the quoted language concerned only what the *IRS* court deemed were the internal decisions of a legitimate joint venture about what products to offer and on what terms. *IRS*, 261 F. Supp. 3d at 467-68. That is not the situation here, where the challenged conduct primarily concerns Defendants' agreement to restrain competition *outside* of the joint venture—in the stock loan market itself.[9]

In any event, Defendants' assertion that the Complaint "concede[s] that EquiLend produces legitimate market efficiencies," MTD 38, is simply false. In fact, the Complaint alleges that, "[b]eyond serving as a vehicle for the Prime Broker Defendants to meet and coordinate their conduct, EquiLend is simply a captive utility that does little if anything of real value in the stock loan market." ¶123. The Complaint further alleges that EquiLend's very limited trading platform is widely considered to be "archaic" and "entrenched" with very poor and undeveloped functionality. *Id.* It alleges that "[r]ather than pursue EquiLend's business interests, the Prime Broker Defendants systematically used EquiLend for illicit purposes." *Id. See also* ¶239 n.44. And Defendants themselves characterized their control over EquiLend as akin to "the mafia run

---

[9]  In light of Supreme Court precedent holding joint ventures liable *per se* for their participation in horizontal conspiracies, *IRS* cannot reasonably be read as holding that otherwise-legitimate joint ventures are effectively immunized from *per se* liability. *See, e.g., Ariz. v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 351-54 (1982) (holding price-fixing agreement *per se* unlawful without inquiring into whether professional associations were otherwise illegitimate); *see also* Areeda ¶2200a (a naked restraint is *per se* unlawful "even if it is part of an elaborate joint venture arrangement whose overall efficiency and legality are not in question").

by five crime families." ¶241. *See In re Fresh and Process Potatoes Antitrust Litig.*, 2012 WL 3067580, at *11 (D. Idaho July 27, 2012) (finding allegations sufficient to establish joint venture was "shell" for collusion).

2.      **The Isolated Actions Identified By Defendants Were Anticompetitive**

Defendants focus on three narrow sets of allegations that they claim should be judged, in isolation, under the rule of reason:  (i) allegations related to "DataLend"; (ii) some of the allegations related to SL-x; and (iii) the allegations that EquiLend purchased AQS and SL-x to ensure they stayed out of the market.  MTD 40-42.  When viewed in context, however, these actions were plainly anticompetitive.

*DataLend*:  Defendants claim that "EquiLend's creation of DataLend to compete with Data Explorers does not support a claim under the rule of reason," because it is "evidence of competition, not a restraint of trade." *Id.* at 40.  But this ignores the most salient allegations. The Complaint alleges that Defendants created DataLend *only* to "kill" Data Explorers in an effort to prevent real-time pricing data from being disseminated to borrowers and lenders in the market.  ¶257-59.  To accomplish this, *each* Prime Broker Defendant agreed, in lockstep, to distribution agreements with DataLend that included a "prohibition on disclosing any prime broker data to lender or borrower customers." ¶257.  The Prime Broker Defendants also agreed amongst themselves, and with DataLend, "that they would not permit bid-side data (that is, data showing what borrowers paid to borrow securities) to be provided to any beneficial owners." *Id.*

These parallel restrictions were designed to offer "just enough trading data to undermine Data Explorers, *but to withhold from the market* the real-time and wholesale data they knew would lead to pricing compression (and a reduction in their fees) if it ever got out." ¶258 (emphasis added).  This is a plainly unlawful, naked restraint designed and intended to limit output and price competition in the stock loan market. *In re Ins. Brokerage Antitrust Litig.*, 618

36

F.3d at 345.  And these restrictions were also accompanied by other collective efforts by the Prime Broker Defendants to destroy Data Explorers, including disparaging its offering and supplying their own far more limited product below cost.  ¶259; *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem.*, 870 F.3d 1262, 1276 (11th Cir. 2017) (boycott claim involving disparagement by defendants); *Full Draw*, 182 F.3d at 751-53 (boycott claim for creating 'competitor' to destroy, not compete); *Taxi Weekly, Inc. v. Metro. Taxicab Bd. of Trade, Inc.*, 539 F.2d 907, 913 (2d Cir. 1976) (same).  The alleged restrictions limited pricing data in the market and are not procompetitive.

*SL-x*:  Defendants claim that the allegations regarding SL-x are insufficient under the rule of reason because the Complaint merely alleges that EquiLend decided not to merge with SL-x in 2011.  MTD 40.  But the Complaint alleges far more than that.  It alleges, among other things, that SL-x only suggested a merger with EquiLend *after* Conley of Goldman Sachs bluntly told SL-x executives that the Prime Broker Defendants would not support SL-x and "that, if the Prime Broker Defendants were to permit this kind of evolution at all, they would do it exclusively through . . . EquiLend."  ¶220.  SL-x thus proposed a merger with EquiLend as a desperate effort to stay in business.  The Complaint also alleges that SL-x tried to secure the support of individual Prime Broker Defendants, after the merger was declined, and they each refused to provide support as a result of their boycott and not as a result of the merits of the SL-x offering.  ¶¶225-253.  Far from an isolated declined merger request, what the Complaint actually alleges, in great detail, is a *per se* unlawful group boycott of SL-x.

Defendants also claim "any alleged agreement among EquiLend's owners to support the EquiLend joint venture as opposed to its competitors" would be subject to the rule of reason.  But that too is wrong as a matter of law.  *See Full Draw*, 182 F.3d at 750 (*per se* illegal for

manufacturers to agree to only attend their own trade show and boycott a rival show); *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 428-29 (S.D.N.Y. 1980) (*per se* illegal for movie producers to agree their films would exclusively be shown on a TV station they owned, even for a limited time period). Defendants cite *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999), but that case concerned an "*intra* firm agreement" regarding whether a single insurance company's agents could sell insurance, not a joint venture or an agreement among horizontal competitors. *Id.* at 515. Again, the Prime Broker Defendants are separate economic actors in the stock loan market. They are not permitted to agree to anoint themselves as the sole arbiters of whether innovation could occur.

      ***Purchase of SL-x and AQS***: The Complaint alleges that Defendants used EquiLend to buy up what remained after their boycotts of AQS and SL-x had devastated those platforms, in an effort to ensure they would be forever removed from the market. Defendants argue that these allegations should be considered as isolated "purchases" by a joint venture under the rule of reason. MTD 41-42. But those "purchases" cannot be considered in isolation. Considered within the Complaint as a whole, they strongly confirm the intent and purpose of Defendants' boycott all along—to remove competitive threats from the market. ¶¶21, 272, 294-303. As the Complaint alleges, it would have been irrational for Defendants to buy platforms they had no intention of using in the absence of an anticompetitive motive. ¶¶272, 294. *Cf.* Areeda ¶2220 ("product exclusion is anticompetitive when its purpose or effect is to exclude from the market a product or process that consumers would prefer").

### C.    Plaintiffs Satisfy Any Analytical Standard

      Finally, Defendants suggest that, if they can just get any of their alleged conduct out of *per se* territory, they get off scot free. MTD 39. But the Complaint makes clear that, no matter how the antitrust claim is analyzed, the alleged conduct harmed competition in the stock loan

market overall.  While the Complaint pleads that Defendants engaged in a restraint of trade that is *per se* unlawful, the Complaint also alleges that the conduct was unlawful even if considered under the rule of reason.  *E.g.*, ¶¶304-21 (alleging why EquiLend conduct is anticompetitive); 322-45 (alleging how challenged conduct allowed Defendants to maintain their dominant position in the market and to charge supracompetitive prices); 389-394 (alleging that the conduct is "an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale" which restrained conduct in a properly defined product and geographic market).

Given the obviously anticompetitive nature of Defendants' conduct, a hypothetical "rule of reason" analysis would be truncated in this case.  *See Am. Needle*, 560 U.S. at 203 ("[T]he Rule of Reason . . .  can sometimes be applied in the twinkling of an eye."); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. at 458 (applying truncated rule of reason where "no elaborate industry analysis [was] required to demonstrate the anticompetitive character of [the] agreement ).  But even under a more fulsome rule of reason analysis, Defendants' arguments are unavailing.

Defendants assert that Plaintiffs have failed to plead a relevant market.  MTD 39-40.  But that is false.  ¶¶391-93 (relevant market is the stock lending market in the United States). Indeed, Defendants identify no allegations that are missing or any substantive reason why a "rule of reason" analysis would lead to any different result.  *NCAA*, 468 U.S. at 103-04 (analyzing restraints under the rule of reason "does not change the ultimate focus" of the inquiry; "whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition").

Equally false is Defendants' assertion that allegations of market power to support a rule of reason claim are lacking.  Market power can be proven by direct or circumstantial evidence. *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (Sotomayor, J.).  Both are present here.

The very fact that Defendants' boycott could succeed in driving out market entrants is powerful direct proof of their market power.  *Id.* at 206-07 ("If a plaintiff can show an adverse effect on competition, such as reduced output . . . we do not require a further showing of market power."). In any event, Defendants are the *dominant* prime brokers with more than a 70% market share. ¶321.  *See Antitrust Guidelines for Collaborations Among Competitors*, Federal Trade Commission and U.S. Department of Justice (2000) § 3.33 ("In assessing whether an agreement [involving a collaboration among competitors] may cause anticompetitive harm," courts look to "the market shares of the participants and of the collaboration," considering their "sum").

Moreover, Defendants' exclusionary conduct clearly did not make the market *more* competitive.  Defendants kept an inefficient and opaque market frozen in time, as a massive "dark pool."  ¶4.  The remote prospect that Defendants could fashion some explanation of how they improved competition cannot warrant dismissing this case now.  *See Graphic Prods. Distribs., Inc., v. Itek Corp.*, 717 F.2d 1560, 1576 (11th Cir. 1983) ("merely offering a rationale for a . . . restraint will not suffice; the record must support a finding that the restraint . . . does indeed have a pro-competitive effect.").

Even if the Court were to determine that the "rule of reason" applied such that anticompetitive harms and procompetitive justifications must be weighed, this is a fact-intensive inquiry that cannot be resolved on the pleadings.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition"); *In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 4358244, at *19 (S.D.N.Y. May 23, 2017) (determinations of competitive

effects under rule of reason were "complex factual questions that cannot be decided on summary judgment").

## V.    <u>PLAINTIFFS HAVE ANTITRUST STANDING</u>

Defendants argue that Plaintiffs lack standing because they fail just one of the four "efficient enforcer" standards—speculativeness.  MTD 42.  But there could hardly be a clearer case for antitrust standing.  In the parlance of antitrust law, class plaintiffs are both the "direct purchasers" and "consumers" of the financial product directly affected by the conspiracy.  As such, these plaintiffs have a "preferred position" to vindicate the antitrust laws.  *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977) ("elevating direct purchasers to a preferred position as private attorneys general"); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 474 (1982) (direct purchasers are the plaintiffs "most likely to press their claims with the vigor that the § 4 treble-damages remedy was intended to promote"); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983) ("Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices"); Areeda ¶339d ("protecting consumers . . . is the central goal of the antitrust laws").

There is nothing speculative about the injury suffered by borrowers and lenders in the stock loan market.  As the Complaint details, Plaintiffs were injured because they were deprived of more efficient, competitive, and transparent trading options as a direct result of the boycott.  ¶¶323-45.  The whole point of Defendants' conspiracy was to maintain the inflated spreads they secured from borrowers and lenders by preventing borrowers and lenders from trading in an efficient, competitive, and transparent market with attendant cost savings and greater returns.  ¶¶26, 164-65, 179, 321, 324-25, 376-77.  Plaintiffs' injuries are the logical, foreseeable, and intentional object of Defendants' conspiracy.

If Defendants had not conspired to boycott and eliminate AQS, SL-x, and Data Explorers, Plaintiffs would have been able to reap the economic benefits that flow from greater price transparency and competition.  ¶¶117-19, 146, 176, 302, 324-30, 334, 344-45.  *See N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 4 (1958) ("The Sherman Act . . . rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress.").  The injury inflicted by Defendants is "is not some far-flung consequence of" the conduct alleged.  *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 429 (S.D.N.Y. 2014).  It is "'precisely the type of loss that [defendants' conduct] would be likely to cause.'"  *Id.* (quoting *McCready*, 457 U.S. at 479).

Of course, *every* antitrust lawsuit demands some degree of speculation, since it requires the plaintiff to present an account of how the world would have unfolded "but for" the wrongful conduct.  In *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 689 (2d Cir. 2009), the Second Circuit rejected the defendants' argument that the plaintiffs' claimed damages rested on "tenuous assumptions" about what impact increased competition would have had on the prices paid by the plaintiffs class.  The Court expressed "little doubt that those effects can be sufficiently estimated and measured" and that this was "especially so when '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'"  *Id.* (quoting *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265 (1946)); *see also J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (the wrongdoer is in a poor position "to insist upon specific and certain proof of the injury which it has itself inflicted" especially when the "vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation").

Defendants argue that AQS would not have benefited stock borrowers and lenders because it could not technically allow borrowers and lenders to transact directly, without using clearing agents.  MTD 42.  But, as explained above, AQS had built its offering to account for this feature of the market—it allowed borrowers and lenders to come together on the same platform using clearing agents, a standard protocol used in many other all-to-all markets.  *See* Section I.A, *supra*.  The embrace of AQS by many on the buy side demonstrates their recognition that this would benefit investors.  ¶¶157-65, 214-16.  Indeed, the Complaint explains that AQS itself had conducted analyses that *quantified* the significant economic benefits borrowers and lenders would enjoy.  ¶¶168-69.  Defendants simply ignore these concrete allegations.

As for SL-x and Data Explorers, Defendants attack a straw man by arguing that those platforms did not offer all-to-all trading.  MTD 42.  As the Complaint explains, SL-x and Data Explorers would have increased efficiency and price competition and transparency in the market in different ways from AQS.  ¶¶173-81, 187-88, 193.  The Complaint reports Defendants' own recognition that SL-x had great merit for improving the market.  ¶¶230-32, 238, 240, 242.  That Defendants boycotted and effectively destroyed three platforms that each offered different ways forward in the stock loan market only confirms the thoroughness of their joint conduct.

In *CDS*, the court held that defendants' collective efforts to block market entrants "directly injured . . . investors by sustaining the inflated bid/ask spreads they had to pay.  No intermediaries stood between the plaintiffs, who paid supracompetitive profits, and" the defendants, "who pocketed them as a result of their efforts to keep . . . nascent ventures out of the market."  *CDS*, 2014 WL 4379112 at *8.  The same is true here.  *See also DDAVP*, 585 F.3d at 688 ("harming competitors was simply a means for the defendants to charge the plaintiffs higher prices").

The cases cited by Defendants are outliers that are not to the contrary. *Reading Industries Inc. v. Kennecott Copper Corp.*, 631 F.2d 10 (2d Cir. 1980), for example, involved an unusually convoluted theory of injury. The plaintiffs alleged the defendants conspired to suppress prices for refined copper, which had the alleged effect of *raising* prices for scrap copper in a manner the court deemed was unexplained. *Id.* at 14. In *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014), Judge Daniels held that the Court "cannot hypothesize" the counterfactual world that would dictate plaintiffs' damages. *Id.* at *10. The narrow aspect of the *IRS* decision that found standing lacking for certain instruments turned on the factual finding that certain preconditions for plaintiffs' asserted damages did not exist during the earlier time period. 261 F. Supp. 3d at 494.[10] As explained above, there were no such structural impediments to the development of the stock loan market.

Finally, Defendants claim that the fact that none of the boycotted platforms filed its own separate lawsuit must mean that Plaintiffs' claims do not have merit. MTD 45. This argument is meritless on its own terms, as there are many reasons why entities that were effectively destroyed by a boycott of some of the most dominant financial institutions in the world might not file a lawsuit. *See CDS*, 2014 WL 4379112, at *9 (upholding standing of class plaintiffs in case where boycotted platform did not file its own lawsuit). But, in any case, AQS has now sued, alleging it was subjected to an unlawful group boycott by the Prime Broker Defendants. *See QS Holdco Inc. v. Bank of Am. Corp. et al.*, 18-cv-824, Dkt. No. 1 (Complaint, dated Jan. 30, 2018) ("QS

---

[10]   Defendants fail to note that Judge Engelmayer later reconsidered his speculativeness holding in significant part. *See* 16-md-2704, Dkt. No. 251.

Compl.").  By Defendants' own logic, the AQS lawsuit now must *support* the plausibility of Plaintiffs' claims.[11]

## VI.    PLAINTIFFS' CLAIMS ARE TIMELY

Finally, Defendants' statute of limitations arguments are misguided and rely on numerous misunderstandings of the applicable law and of Plaintiffs' allegations.

### A.    Plaintiffs Can Recover for Antitrust Injuries Prior to August 16, 2013

As set forth below, Plaintiffs readily satisfy the pleading standard for tolling of the Clayton Act's statute of limitations by alleging "(1) that [Defendants] concealed [] the existence of [the] cause of action, (2) that [Plaintiffs] remained in ignorance of that cause of action until some point within four years of the commencement of [the] action, and (3) that [Plaintiffs'] continuing ignorance was not attributable to lack of diligence on [their] part."  *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

#### 1.    Plaintiffs Adequately Plead Concealment

A plaintiff may plead concealment by alleging "the wrong itself was of such a nature as to be self-concealing."  *Hendrickson Bros.*, 840 F.2d at 1083.  Conspiracies among competitors—such as that alleged here, ¶¶373, 377-82—are regularly recognized to be inherently self-concealing.  The *CDS* court recognized that "[a] group boycott of exchange trading has the characteristics of other types of conspiracies that have been held to be self-concealing—it is the kind of enterprise that requires a number of participants, is designed to endure over a period of time, and must remain concealed to be successful."  *CDS*, 2014 WL 4379112, at *15; *see also*

---

[11]  Defendants express skepticism about the allegation that the Federal Reserve Bank of New York supported the AQS platform.  MTD 18.  The AQS complaint confirms that their skepticism is misplaced.  *See* QS Compl. ¶144 ("AQS immediately received strong encouragement from the Federal Reserve Bank of New York, which recognized that improved systemic risk controls in the stock loan market might help to stabilize financial markets in the wake of the 2008 credit crisis.").

*Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 135 (S.D.N.Y. 2016) ("Allegations of price-fixing conspiracies in violation of antitrust law constitute the type of unlawful activity that is inherently self-concealing."); *Schenker AG v. Société Air Fr.*, 102 F. Supp. 3d 418, 424-25 (E.D.N.Y. 2015) ("price-fixing conspiracies, such as the one here, are by their very nature self-concealing").

Even if the conspiracy was not self-concealing, a plaintiff may also plead concealment by alleging "the defendant took affirmative steps to prevent the plaintiff's discovery of his claim." *Hendrickson Bros.*, 840 F.2d at 1083. Here, Defendants took numerous steps to conceal their conduct, including holding numerous private meetings where the conspiracy was shaped (¶¶11-12, 14-15, 21, 34, 123-24, 202-03, 211, 249-50, 254, 297, 312, 373-74); using code words to mask their conduct (¶¶293-301); indicating their support for central clearing and greater market efficiency (¶¶377-81); making misleading and false statements about the purpose and actions of EquiLend (¶¶378, 381); and utilizing their market power to silence and threaten witnesses and victims (¶¶18-19, 191, 213, 215, 237, 243). *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 66 (S.D.N.Y. 2016) (finding similar allegations sufficient).

Defendants' argument that such allegations are too "general and conclusory," MTD 47-48, hardly warrants a response. There is nothing "conclusory" about identifying and providing details from specific, private meetings during which Defendants' executives plotted and even developed secret code phrases. Nor is there anything "general" about identifying specific industry participants that were actually threatened by Defendants during the Class Period.

Defendants' reliance on *IRS* is again misplaced. There, Judge Engelmayer perceived that there was "as yet, no all-to-all anonymous" trading pre-2012, meaning that the *IRS* plaintiffs were merely alleging "at heart, that the [defendants] agreed block Tradeweb from evolving."

261 F. Supp. 3d at 488.  With that framing, Judge Engelmayer concluded that there was no concealment because Defendants' ownership and direction of Trade was "visible." *Id*.  Here, in contrast, there are specific allegations that Defendants conspired in secret to starve three existing platforms of liquidity, while falsely holding out EquiLend as existing to "optimize efficiency" and "develop[] a standardized and centralized global platform for trading." *E.g.*, ¶378.

### 2. Plaintiffs Adequately Plead Ignorance

Plaintiffs also adequately allege that they "remained in ignorance" of the conspiracy until recently.  *Hendrickson Bros., Inc.*, 840 F.2d at 1083.  Defendants' collusion only came to light as a result of a thorough investigation by counsel, which uncovered critical, non-public facts concerning Defendants' secret meetings and misconduct directed at AQS, SL-x, and Data Explorers—information that was *never* publicly disclosed until Plaintiffs filed suit.  Plaintiffs had no prior knowledge of the conspiracy and could not "have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974).  A plaintiff's ignorance may be pled generally.  *See In re Publ'n Paper Antitrust Litig.*, 2005 WL 2175139, at *3 n.3 (D. Conn. Sept. 7, 2005) ("The complaint alleges that the plaintiffs were unaware . . .  Under Rule 9(b) such general averments of knowledge are sufficient.").[12]

Defendants claim that Plaintiffs should have smelled "a rat."  But, as discussed above, Defendants' collusive planning was undertaken in private meetings and actively disguised by hiding behind false public statements that Defendants were supportive of the central clearing and

---

[12]  *131 Maine Street Associates v. Manko*, 179 F. Supp. 2d 339 (S.D.N.Y. 2002), cited by Defendants, disregards the governing standard and is easily distinguished.  It is a summary judgment ruling that did not involve an antitrust claim, and plaintiffs' representative admitted that he became "aware" of the fraud outside the applicable limitations window.  *Id.* at 352.  Here, there was nothing remotely equivalent to such notice or admission of knowledge.

greater market efficiency.  Nor can Defendants' argument be squared with reality.  If it was known that Defendants were colluding, AQS and SL-x would not have spent years of effort and millions of dollars, or amassed the support of industry participants and market regulators.  ¶¶18, 155, 157, 160-63, 185-87.  The fact that they did so shows that no one had smelled a rat.

With nothing else to argue, Defendants can only point to a single 2009 article in an attempt to impute to Plaintiffs knowledge of the alleged conspiracy.  MTD 49.  But the article says nothing about a boycott by the Prime Broker Defendants and, in almost 9,000 words, it mentions EquiLend only once in passing.  This article cannot trigger the running of the statute of limitations because it provides no *specific facts* relating to the *misconduct alleged.  See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *53 (E.D.N.Y. Jan. 4, 2011) ("In the antitrust context, the requisite notice required to defeat a claim of fraudulent concealment is an 'awareness of sufficient facts to identify . . . the particular cause of action at issue, not [notice] of just any cause of action"); *see also Alaska Elec.*, 175 F. Supp. 3d at 67 ("a single article raising suspicions about the rate-setting process [at issue] is not enough to establish, on a motion to dismiss, that Plaintiffs failed to exercise reasonable diligence"); *Merced Irrigation Dist.*, 165 F. Supp. 3d at 136 (no duty to inquire based on a single article).

### 3.   **Plaintiffs Adequately Plead Diligence**

Plaintiffs also sufficiently allege that their "continuing ignorance was not attributable to lack of diligence on [their] part."  *Hendrickson Bros., Inc.*, 840 F.2d 1083.  Despite monitoring their investments and news about the stock loan market during the Class Period (to the best of their ability given the opaqueness on fees and prices that was maintained by Defendants' design), no Plaintiff believed or had reason to believe that Defendants were engaged in a secret, unlawful conspiracy.  ¶¶375-76, 382; 384-86; *see also* ¶¶98-99, 118, 338, 341.  Nothing more is required of Plaintiffs to satisfy the diligence prong.  *See CDS*, 2014 WL 4379112, at *16.

48

Moreover, a plaintiff's diligence is often satisfied by allegations of a defendant's concealment because there can be no duty to investigate that which has been so effectively hidden as to avoid suspicion.  *See, e.g.*, *Alaska Elec.*, 175 F. Supp. 3d at 67 ("requiring Plaintiffs, 'at the motion to dismiss stage, to make a showing of reasonable diligence' would be 'premature'") (quoting *BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*, 603 F. App'x. 57, 59 (2d Cir. 2015)); *Merced Irrigation*, 165 F. Supp. 3d at 136 (a plaintiff "must have been on inquiry notice of some illegality before having a responsibility to respond with reasonable diligence"). Such is the case here, and Defendants' cursory diligence argument must be rejected.

Finally, the hundred-plus page Complaint—which describes in detail a secret conspiracy that Plaintiffs' Counsel spent thousands of hours uncovering without the assistance of any government investigation—is itself evidence of adequate diligence.  *See In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.* 213 F. Supp. 3d 631, 676 (S.D.N.Y. 2016).

## B.      Defendants' Timeliness Arguments Are Ill-Suited to Resolution

Even if there was merit to Defendants' assertions about concealment, ignorance, or diligence, they would raise only fact-specific issues the Court should  defer consideration of until an appropriate factual record has been developed.  *See BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (requiring plaintiffs, "at the motion to dismiss stage, to make a showing of reasonable diligence was premature"); *see also In re London Silver Fixing, Ltd., Antitrust Litig.*, 2016 WL 5794777, at *24 (S.D.N.Y. Oct. 3, 2016) ("because resolution of a claim of fraudulent concealment is intimately bound up with the facts of the case, it often cannot be decided at the motion to dismiss stage") (quotation omitted).

## C.      Plaintiffs' Antitrust Claim Can Properly Rely on Pre-August 2013 Conduct

Finally, even in the absence of tolling, Plaintiffs may in all events rely on conduct prior to August 2013 to recover for all subsequent injuries.  It is well-established that conduct falling

outside the limitations period is relevant to and can be a partial basis for claims which seek to recover for injuries suffered inside the applicable antitrust limitations window. *Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263, 295-96 (2d Cir. 1979) (claims "for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period"); *CDS*, 2014 WL 4379112, at *14.

Defendants' argument to the contrary (MTD 45-46) is premised on the incorrect notion that an antitrust claim "accrues when the defendant *commits* an act that injures the plaintiff." MTD at 45 (emphasis added). In fact, accrual occurs—and the limitations period runs—not from when the defendant *acts*, but rather when *the injury occurs*. *See Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991) (a "cause of action for violation of the antitrust laws ordinarily accrues as soon as there is an injury"). It is common for an antitrust injury to occur subsequent to misconduct, such that a claim accrues at a later time. *See, e.g.*, *Berkey Photo*, 603 F.2d at 295. As such, there is no requirement that a plaintiff's injuries be *solely* attributable to within-limitations conduct. *See Berkey Photo*, 603 F.2d at 295-96; *Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1171-72 (3d Cir. 1993) (rejecting argument that plaintiff could only recover for "damages attributable to overt acts occurring within the limitations period" as foreclosed by Supreme Court precedent). Because Defendants' pre-August 2013 *conduct* was part of an ongoing conspiracy that caused continuing, recurring injuries, it is relevant to and can form a basis for liability, even without tolling.[13]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss the Complaint.

---

[13]   Because Defendants' arguments regarding Plaintiffs' antitrust claim have no merit, the effort to dismiss the unjust enrichment claim on the same grounds necessarily fails.

DATED:   New York, New York
         March 2, 2018

**COHEN MILSTEIN SELLERS &**
   **TOLL PLLC**

By:   /s/ Michael B. Eisenkraft
Michael B. Eisenkraft
Christopher J. Bateman
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com
cbateman@cohenmilstein.com

Kit A. Pierson (*pro hac vice*)
Julie G. Reiser (*pro hac vice*)
Richard A. Koffman
David A. Young
Robert W. Cobbs
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
jreiser@cohenmilstein.com
rkoffman@cohenmilstein.com
dyoung@cohenmilstein.com
rcobbs@cohenmilstein.com

**QUINN EMANUEL URQUHART &**
   **SULLIVAN, LLP**

By:   /s/ Daniel L. Brockett
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Maaren A. Shah
Thomas J. Lepri
Justin Reinheimer
Thomas Popejoy
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
maarenshah@quinnemanuel.com
thomaslepri@quinnemanuel.com
justinreinheimer@quinnemanuel.com
thomaspopejoy@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*
forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
jeremyandersen@quinnemanuel.com

**SAFIRSTEIN METCALF LLP**

By:      /s/ Peter Safirstein
Peter Safirstein
1250 Broadway, 27th Floor
New York, New York 10001
Telephone: (212) 201-2845
psafirstein@safirsteinmetcalf.com

*Counsel for Torus Capital, LLC*