UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>September 27, 20</u>18

IOWA PUBLIC EMPLOYEES' RETIREMENT
SYSTEM; LOS ANGELES COUNTY
EMPLOYEES RETIREMENT ASSOCIATION;
ORANGE COUNTY EMPLOYEES RETIREMENT
SYSTEM; SONOMA COUNTY EMPLOYEES'
RETIREMENT ASSOCIATION; and TORUS
CAPITAL, LLC, *on behalf of themselves and all
others similarly situated,*

                Plaintiffs,

                -v.-

MERRILL LYNCH, PIERCE, FENNER & SMITH
INC.; MERRILL LYNCH L.P. HOLDINGS, INC.;
MERRILL LYNCH PROFESSIONAL CLEARING
CORP.; CREDIT SUISSE AG; CREDIT SUISSE
SECURITIES (USA) LLC; CREDIT SUISSE
FIRST BOSTON NEXT FUND, INC.; CREDIT
SUISSE PRIME SECURITIES SERVICES (USA)
LLC; GOLDMAN SACHS & CO. LLC;
GOLDMAN SACHS EXECUTION & CLEARING,
L.P.; J.P. MORGAN SECURITIES LLC; J.P.
MORGAN PRIME, INC.; J.P. MORGAN
STRATEGIC SECURITIES LENDING CORP.;
J.P. MORGAN CHASE BANK, N.A.; MORGAN
STANLEY & CO. LLC; PRIME DEALER
SERVICES CORP.; STRATEGIC INVESTMENTS
I, INC.; UBS AG; UBS AMERICAS INC., UBS
SECURITIES LLC; UBS FINANCIAL SERVICES
INC.; EQUILEND LLC; EQUILEND EUROPE
LIMITED; and EQUILEND HOLDINGS LLC,

                Defendants.

17 Civ. 6221 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

In a 398-paragraph complaint, Plaintiffs detail a wide-ranging conspiracy to prevent the antiquated stock loan market from evolving into a transparent, direct, all-to-all electronic exchange. This market is critical to the short selling of stocks, a not-uncommon investment tool. The thrust of Plaintiffs' allegations is that Defendants conspired to boycott new market entrants — specifically, AQS, SL-x, and Data Explorers — in order to maintain their monopoly grip as prime broker intermediaries, and, by extension, to charge excessive fees under the cover of price opacity.

Defendants have jointly moved to dismiss the Amended Class Action Complaint (the "Amended Complaint" or "AC") under Federal Rule of Civil Procedure 12(b)(6) on five primary bases: the allegations are implausible; the alleged conduct as to SL-x and Data Explorers neither qualifies as *per se* unlawful nor violates the rule of reason; Plaintiffs lack antitrust standing; Plaintiffs' claims are untimely; and Plaintiffs' claim of unjust enrichment fails for the same reasons as their antitrust claim. Defendant EquiLend adds, in a supplemental motion to dismiss, that its alleged conduct was consistent with rational business strategy, and that the Court lacks specific personal jurisdiction over EquiLend Europe.

As set forth in the remainder of this Opinion, the Court rejects these arguments and denies Defendants' motions to dismiss. While it remains to be seen whether Plaintiffs' factual allegations will be borne out in discovery, the Court is not permitted to dismiss them at this early stage of the litigation.

# BACKGROUND[1]

## A.     Factual Background

Construed in the light most favorable to Plaintiffs, the Amended

Complaint alleges the following:

### 1.     The Parties

During the class period, Defendants Bank of America,[2] Credit Suisse,[3]

---

[1]     This Opinion draws its facts from Plaintiffs' Amended Complaint (Dkt. #73) ("AC"), the well-pleaded allegations of which are taken as true for purposes of the instant motions. *See, e.g.*, *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). For ease of reference, the Court will refer to the memorandum in support of the joint motion to dismiss submitted by the various Bank of America, Credit Suisse, Goldman Sachs, J.P. Morgan, Morgan Stanley, and UBS defendants (collectively, the "Prime Broker Defendants") as "Def. Br." (Dkt. #110); to Defendant EquiLend's memorandum in support of its motion to dismiss as "EquiLend Br." (Dkt. #107); to Plaintiffs' memorandum in opposition to the joint motion to dismiss as "Pl. Opp." (Dkt. #112); to Plaintiffs' memorandum in opposition to EquiLend's motion to dismiss as "Pl. EquiLend Opp." (Dkt. #113); to the Prime Broker Defendants' joint reply as "Def. Reply" (Dkt. #115); and to EquiLend's reply as "EquiLend Reply" (Dkt. #114).

The Court pauses to observe that the briefing on all sides was excellent, for which the Court extends its gratitude.

[2]     The claims against Bank of America Corporation were dismissed without prejudice by stipulation of the parties on January 26, 2018. (Dkt. #105). However, due to Bank of America Corporation's 2009 acquisition of Merrill Lynch & Co., and to Bank of America Securities LLC's 2010 merger with Defendant Merrill Lynch, Pierce, Fenner & Smith Inc., the Amended Complaint uses the term "Bank of America" to refer to Defendants Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Professional Clearing Corp., Merrill Lynch L.P. Holdings, Inc., and their parents, subsidiaries, and affiliates. (AC ¶¶ 46, 50). This Opinion will do the same.

[3]     The term "Credit Suisse" refers collectively to Defendants Credit Suisse AG, Credit Suisse Securities (USA) LLC, Credit Suisse Prime Securities Services (USA) LLC, and Credit Suisse First Boston Next Fund, Inc. (AC ¶¶ 53-56). Credit Suisse Securities (USA) LLC and Credit Suisse Prime Securities Services (USA) LLC are registered as broker-dealers with the SEC. (*Id.* at ¶¶ 53-54). Credit Suisse Prime Securities Services (USA) LLC is also a member of OCC. (*Id.* at ¶ 53). Credit Suisse First Boston Next Fund, Inc. is a part owner of Defendant EquiLend. (*Id.* at ¶ 55).

Goldman Sachs,[4] J.P. Morgan,[5] Morgan Stanley,[6] and UBS[7] (collectively, the "Prime Broker Defendants" or "Defendants") engaged in securities lending and stock lending transactions with class members, either directly or through Defendants' affiliates. (AC ¶¶ 50, 56, 61, 69-70, 77-78, 86-87). The Prime Broker Defendants are each partial owners of Defendant EquiLend, and their employees served on EquiLend's Board of Directors during the Class Period. (*Id.*). Employees from Bank of America, Goldman Sachs, J.P. Morgan, and Morgan Stanley also served on the Boards of Directors for the Options Clearing Corporation ("OCC") and the Depository Trust Clearing Corporation ("DTCC"), which are central clearinghouses for stock loan transactions. (*Id.* at ¶¶ 50, 61, 69, 77). Defendant UBS's employees served on the Board of Directors for DTCC. (*Id.* at ¶ 86). Defendant EquiLend is a "dealer consortium," which, it is

---

[4]     The term "Goldman Sachs" refers collectively to Defendants Goldman Sachs & Co. LLC, and Goldman Sachs Execution & Clearing, L.P. (AC ¶¶ 58-61). Goldman Sachs & Co. LLC is registered as a broker-dealer with the SEC and is a member of OCC. (*Id.* at ¶ 59). Goldman Sachs Execution & Clearing, L.P. is registered as a broker-dealer with the SEC. (*Id.* at ¶ 60).

[5]     The term "J.P. Morgan" refers collectively to Defendants J.P. Morgan Securities LLC, J.P. Morgan Prime, Inc., J.P. Morgan Strategic Securities Lending Corp., and J.P. Morgan Chase Bank, N.A. (AC ¶¶ 63-69). J.P. Morgan Securities LLC and J.P. Morgan Prime, Inc. are registered as broker-dealers with the SEC. (*Id.* at ¶¶ 64-65). J.P. Morgan Securities LLC is a member of OCC. (*Id.* at ¶ 64).

[6]     The term "Morgan Stanley" refers collectively to Defendants Morgan Stanley & Co. LLC, Prime Dealer Services Corp., and Strategic Investments I, Inc. (AC ¶¶ 73-75, 77). Morgan Stanley & Co. LLC and Prime Dealer Services Corp. are registered as broker-dealers with the SEC, and Morgan Stanley & Co. LLC is also a member of OCC. (*Id.* at ¶¶ 73-74, 76).

[7]     The term "UBS" refers collectively to Defendants UBS Americas Inc., UBS Securities LLC, and UBS Financial Services Inc. (AC ¶¶ 80-82, 86). UBS Americas Inc. is a part owner of Defendant EquiLend. (*Id.* at ¶ 80). UBS Securities LLC and UBS Financial Services Inc. are registered broker-dealers with the SEC and members of OCC. (*Id.* at ¶¶ 81-82).

alleged, Defendants used as a front for their conspiracy. (*Id.* at ¶¶ 10, 12).[8]

Plaintiffs Iowa Public Employees' Retirement System ("IPERS"), Los Angeles County Employees Retirement Association ("LACERA"), Orange County Employees Retirement System ("OCERS"), and Sonoma County Employees' Retirement Association ("SCERA") provide retirement and other benefits to public employees. (AC ¶¶ 40-43). Each manages many billions of dollars in assets and each has lent significant volumes of stock to the Prime Broker Defendants and their clients. (*Id.*). SCERA has also borrowed significant volumes of stock from Defendant Credit Suisse. (*Id.* at ¶ 43). Plaintiff Torus Capital, LLC ("Torus") is a trading firm, headquartered in Connecticut, that has borrowed significant volumes of stock from Defendants Goldman Sachs and Bank of America. IPERS, LACERA, OCERS, SCERA, and Torus (collectively, "Plaintiffs") bring this suit as a class action on behalf of themselves and all other similarly situated persons and entities who entered into stock loan transactions with the Prime Broker Defendants from January 7, 2009, to the present (the "Class Period"). (*Id.* at 1). The proposed class in this action includes borrowers and lenders. (*Id.* at ¶ 7).

## 2. The Stock Loan Market

Stock lending transactions are used primarily to facilitate the short selling of stocks, in which short sellers predict that a stock price will decrease. (AC ¶ 94). Short sellers generally do not own the stocks they sell. (*Id.* at ¶ 95).

---

[8]     The term "EquiLend" refers to Defendants EquiLend Holdings LLC, EquiLend LLC, EquiLend Europe Limited, and their parents, subsidiaries, and affiliates. (AC ¶ 89).

Instead, they typically use the services of a broker-dealer to "borrow" the stock, in exchange for cash collateral and a lending fee. (*Id.* at ¶¶ 95, 97). In a stock "loan" transaction, the lender transfers title of the security to the borrower, and the borrower promises to return equivalent securities in the future, in exchange for return of the collateral. (*Id.* at ¶¶ 105-06). A short seller who accurately predicts that a stock price will decrease can profit by borrowing the stock, selling the "borrowed" stock at a high price to a third party, waiting for the stock price to fall, and then buying back the equivalent stock at the lower price to return to the "lender." (*Id.* at ¶¶ 95, 97, 105-06). This process is risky in part because stock loans typically have no set termination date; either the lender or borrower can terminate the loan at will. (*Id.* at ¶ 106).

A stock lending transaction generally involves a number of different parties. (AC ¶ 97). The owner of the stock is known as the "stock lender" or the "beneficial owner." (*Id.*). An intermediary agent, called an "agent lender," works for the lender in exchange for a portion of the lending fee. (*Id.*). Agent lenders are often banks that service many lenders, and thus have large aggregate collections of stocks to loan out. (*Id.* at ¶ 107). A "broker-dealer" acts as an intermediary matchmaker between the agent lenders and prospective borrowers. (*Id.* at ¶ 97). The broker-dealer collects a fee from the borrower, takes a cut, and pays the remainder to the lender. (*Id.*). At present, broker-dealers do not reveal to either lenders or borrowers what their counterparty has paid or received, or what percentage of the fee the broker-

dealer has pocketed. (*Id.*). "Stock borrowers" are generally investors who borrow stocks to facilitate short selling. (*Id.*).

The stock loan market is known as an "over-the-counter" (or "OTC") market because it has no central marketplace where participants can engage in direct exchanges, or obtain real-time data about trading prices and transaction volumes. (AC ¶ 98). These characteristics of the market leave prospective lenders and borrowers dependent on the broker-dealer intermediaries, who often set the price of a trade without negotiation, and who keep data about the prices and volume of trades hidden from the market as a whole. (*Id.* at ¶¶ 98-99).

"Prime brokers" are broker-dealers who offer an array of services that include stock lending. (AC ¶ 102). Between 2014 and 2017, the Prime Broker Defendants controlled between 76% and 80% of market share for prime brokerage services, and, accordingly, the vast majority of real-time price and volume data. (*Id.* at ¶¶ 102-03). In 2016, the Prime Broker Defendants' share of lending fees amounted to approximately 65% of total industry revenue. (*Id.* at ¶ 113). In presumed justification, Defendants represented to their clients that one aspect of their role as prime brokers was to "protect[] clients from credit and counterparty risk by standing between clients and lenders in every stock loan trade." (*Id.* at ¶ 147).

Plaintiffs allege that the stock loan market has failed to evolve alongside other, more efficient markets for financial services that take advantage of central electronic trading exchanges, where buyers and sellers can transact

more directly, and more transparently, such as the publicly-traded stock exchange. (AC ¶¶ 114-16). Financial markets with central electronic trading exchanges operate through a central counterparty, called a "clearinghouse," which acts as an intermediary between lenders and borrowers, and which guarantees the obligations of each to the other, thereby reducing risk from counterparty default. (*Id.* at ¶¶ 9 n.3, 116 n.25). "The clearinghouse becomes the borrower to every lender and the lender to every borrower ... [and] maintains sufficient capital to stand behind every trade it clears." (*Id.* at ¶ 145). Participants on these central electronic trading exchanges transact with the clearinghouse via "clearing brokers," who match buyers and sellers, and who sponsor the participants' access to the central clearing platform. (*Id.* at ¶¶ 115, 116 n.25).

Clearing brokers are generally members of the clearinghouse who have contributed to its capitalization. (AC ¶ 120 n.26). They "vouch for a counterparty's credit with the clearinghouse ... [and t]he clearinghouse then clears the trade, having marked the transaction against the sponsoring clearing member's credit." (*Id.*). In 2016, OCC was the only major clearinghouse that both was licensed by the SEC to clear securities lending transactions and offered clearing of stock loan trades. (*Id.* at ¶ 289). It is alleged that central clearing threatened Defendants' prime brokerage business in part because, with central clearing, the clearinghouse assumed the risk of counterparty default against which Defendants purported to protect their clients. (*Id.* at ¶ 147).

Plaintiffs allege that the lack of a central electronic trading exchange, and the opacity of price and volume data, in the stock loan market impede price consistency, obstruct performance benchmarking of service providers, and enable the Prime Broker Defendants to charge excessive fees as middlemen. (AC ¶¶ 103-04, 116, 118). Plaintiffs allege that a regulated, centralized exchange would lower borrowing costs and increase returns for stock loan transactions. (*Id.* at ¶ 119).

### 3. The New Market Entrants

#### a. Quadriserv/AQS:

During the period relevant to the Amended Complaint, several entities attempted to bring innovation to the stock loan market. In 2001, industry veterans founded Quadriserv to provide new financial services to that market. (AC ¶ 127). One early Quadriserv product offered a "give to get" data-sharing service for daily stock loan transactions. (*Id.* at ¶¶ 128-29). Quadriserv launched another early product that acted as a registered broker-dealer, raised capital to make it a creditworthy counterparty, and matched borrowers and lenders anonymously for a flat, transparent fee. (*Id.* at ¶¶ 140-42). By 2005, more than $2 billion in stock loan transactions were matched on the Quadriserv platform, which maxed out the platform's credit exposure limit. (*Id.* at ¶ 143).

Quadriserv then began developing a second platform through its subsidiary, Automated Equity Finance Markets, Inc. ("AQS"). (AC ¶ 144). In or about 2005 or 2006, AQS began negotiating a partnership whereby OCC would

provide central clearinghouse services for AQS transactions. (*Id.* at ¶ 148). As noted, the Prime Broker Defendants viewed central clearing as a threat to their control of the stock loan market. (*Id.* at ¶ 147). Accordingly, AQS undertook a series of moves to evade the influence of the Prime Broker Defendants' representatives on the OCC Board, following which the Board passed a proposed deal with AQS. (*Id.* at ¶¶ 149-52).

On January 7, 2009, Quadriserv launched AQS and announced its agreement with OCC. (AC ¶ 154). According to an OCC newsroom release dated January 7, 2009, AQS offered a platform to "match lenders and borrowers using a hybrid auction and continuous price discovery mechanism" where "matched loans [would] be processed through the OCC, which [would] provide central counterparty guarantees." (*Id.*). OCC began providing central clearing services for AQS transactions in early 2009. (*Id.* at ¶ 156). In late 2009, AQS announced that Eurex, a European clearinghouse, had agreed to provide central clearing services for AQS transactions involving European equities. (*Id.*).

By September 2009, AQS was "primed" to offer direct stock loan transactions via clearing brokers, in partnership with OCC and SunGard's Loanet platform, which is an "accounting and settlement processing system for securities lending[.]" (AC ¶¶ 161-62). In October 2010, SunGuard integrated its technology with AQS, and a SunGuard vice president and general manager stated that SunGuard's customers had "responded favorably" to the

integration.  (*Id.* at ¶¶ 162-63).[9]  AQS provided trade matching, access to central clearing via a broker, live pricing data, daily liquidity data, and the option to trade anonymously.  (*Id.* at ¶¶ 146, 159).

AQS received "strong encouragement" from the Federal Reserve Bank of New York, which thought AQS had potential to improve systemic risk controls in the stock loan market.  (AC ¶ 155).  AQS also received support from Barclays Global Investors, an asset manager and stock lender; Renaissance Technologies, a quantitative hedge fund and stock borrower; Bessemer Ventures, a venture capital fund; and Deutsche Bourse, an exchange that supported AQS through its subsidiaries, one of which was Eurex.  (*Id.* at ¶ 160).  AQS received approximately $100 million in investment funds.  (*Id.* at ¶ 299).  Citi was an early investor in AQS.  (*Id.* at ¶ 157 n.37).  Defendant Bank of America made equity investments in AQS in 2007, 2008, 2009, and 2011. (*Id.* at ¶ 205).  Some hedge fund clients switched their prime brokerage services to Bank of America, "*expressly referencing AQS* in their decisions to do so."  (*Id.* at ¶ 157 (emphasis in original)).  AQS also received support from "numerous agent lenders" because of its ability to reduce fees.  (*Id.* at ¶ 165).  AQS's own analysis of the market predicted that its services would "increase the market volume" and reduce broker-dealer fees by over 30%.  (*Id.* at ¶¶ 167-69).

---

[9]      The Amended Complaint also touts AQS's partnership with "DTC" (*see* AC ¶ 161), which is a subsidiary of DTCC that operates in conjunction with SunGuard (*see id.* at ¶ 162).

### b.  SL-x:

SL-x, which stands for "securities lending exchange," was founded in late 2010.  (AC ¶ 172).  SL-x was designed to enable "prime brokers, broker-dealers, and agent lenders" to communicate bids and offers simultaneously to all of their existing market contacts, and to engage in simultaneous negotiations, without requiring a phone call, Bloomberg message, instant message, fax, or other one-to-one means of communication.  (*Id.* at ¶¶ 173-75).  SL-x provided an automated matching service for "easy-to-borrow stock" transactions, and a preliminary screening service for potential counterparties.  (*Id.* at ¶¶ 175, 180). Broker-dealers and agent lenders could trade anonymously on the SL-x platform, which could "progressively reveal information about each party, and important criteria such as number and price of securities and the nature and amount of collateral."  (*Id.* at ¶¶ 179-80).  SL-x also permitted access to central clearing through Eurex for trades in certain European stocks, and "took steps to access central clearing in the U.S.," such as beginning negotiations with, and building a platform that could connect to, OCC.  (*Id.* at ¶¶ 178, 233). Centrally-cleared SL-x transactions "were estimated" to provide broker-dealers with "more than $8 billion in capital savings benefits through balance sheet risk weighting and the zeroing out of counterparty credit risk when facing a central counterparty[,]" in addition to "reduced operational and administrative costs."  (*Id.* at ¶ 181).

SL-x also planned to offer "a real-time display of the price and quantity of completed loans" (which would reveal the fees taken by the Prime Broker

Defendants). (AC ¶¶ 175, 183-84). SL-x intended to provide "real-time pricing information (including stock name, trade time, trade quantity, and trade price) on a live ticker viewable by all platform participants, providing an up-to-the-minute stream of available, actionable stock loan prices for all SL-x users." (*Id.* at ¶ 177). In addition, SL-x "worked to integrate data and analytics from other market sources." (*Id.*).

SL-x received initial positive reception. One Prime Broker Defendant called SL-x "the most intelligent, thoughtful and usable approach to the [stock loan] market that we have ever seen." (AC ¶¶ 227, 230-32). And on December 4, 2012, UBS executives told SL-x that transitioning to a centrally-cleared market would in principle help market participants, and recognized "the unmistakable momentum arising from regulatory considerations and other pressures" toward central clearing. (*Id.* at ¶ 231). In an October 16, 2012 meeting, Karl von Buren, HSBC's Global Head of Equity Finance, told SL-x executives that the stock loan market was moving towards central clearing, and that HSBC might embrace SL-x. (*Id.* at ¶ 232). J.P. Morgan Chase executives also acknowledged that central clearing would benefit the stock loan market overall. (*Id.*).

In meetings with SL-x executives on February 26, March 19, May 9, July 10, and September 6, 2013, executives from Credit Suisse, Deutsche Bank, J.P. Morgan, Citigroup, and UBS praised the SL-x platform. (AC ¶ 230). Specifically, on February 26, 2013, in a meeting in London, Karl Bishti, the European Prime Brokerage Desk Head at Credit Suisse and an Associate

Director of EquiLend, told SL-x executives that the stock lending market would "change overnight" to increase automation and efficiency if SL-x gained broad support. (*Id.* at ¶¶ 240-41). Bishti raved that SL-x had "all the bells and whistles" he expected, lacked nothing, and had "no shortcomings" that would impede its marketability. (*Id.* at ¶ 230). Kevin Soobadoo, Head of Supply Trading at Deutsche Bank, called the SL-x platform "brilliant," "impressive," and the "most state-of-the-art piece of kit to hit the securities lending space." (*Id.*). On February 28 and October 17, 2013, executives from Nomura and Société Générale called the platform "fantastic" and "really an awesome product." (*Id.*). And on September 6, 2013, UBS executives Casey Whymark and Laurent Issner called the platform "very cool" and noted that they were "impressed." (*Id.*).

### c. Data Explorers

In 2002, securities market participants founded Data Explorers, which initially offered a "give to get" data-aggregation service for stock loan transactions that enabled customers to compare the prices for their own transactions to those of comparable market participants. (AC ¶¶ 130-34). By 2007, every major agent lender and 20 borrower clients were participating in the service. (*Id.* at ¶ 137). By 2009, Data Explorers had acquired market data from both agent lenders and beneficial owners. (*Id.* at ¶ 185). Several Prime Broker Defendants also shared pricing data with Data Explorers in return for market analytics. (*Id.* at ¶ 138).

Data Explorers provided separate products for agent lenders and borrowers, and strictly segregated the data for each. (AC ¶ 136). Plaintiffs allege that Data Explorers maintained this segregation for the benefit of the Prime Broker Defendants, who remained the sole actors in the market who knew the "spread" between what borrowers were charged and what lenders received. (*Id.* at ¶¶ 136, 139). However, in or about 2010, Data Explorers began to offer "performance" data, and also started successfully marketing its product to other types of customers, including hedge funds. (*Id.* at ¶¶ 187-88). The performance data service enabled end-user borrowers and lenders to compare the financial terms of their own trades to those of comparable trades. (*Id.* at ¶ 188).

### 4. EquiLend

If AQS, SL-x, and Data Explorers were the *enfants terribles* of the stock loan world, EquiLend was the anachronism against which they rebelled. EquiLend was founded in 2001 and provides primarily post-trade "reconciliation" services for stock loan transactions, verifying that the shares, the margins, and the collateral were handled correctly, as well as other post-trade services such as billing delivery and recalls. (AC ¶ 305). EquiLend also offers a daily automated service to effect transactions for stock loans between agent lenders and broker-dealers at predetermined fixed rates. (*Id.* at ¶ 306). However, it "does not offer fully electronic, price-transparent trading capabilities or the ability to negotiate terms with multiple potential

counterparties simultaneously, nor does it offer central clearing to market end users." (*Id.* at ¶ 307).

Plaintiffs allege that the Prime Broker Defendants "used their positions on the EquiLend Board to co-opt EquiLend as a vehicle through which to promote and achieve their anticompetitive objectives." (AC ¶ 304). For most of the Class Period, EquiLend had ten owners, six of whom were the Prime Broker Defendants. (*Id.* at ¶¶ 122, 309). Numerous members of EquiLend's Board of Directors were employees of the Prime Broker Defendants. (*Id.* at ¶ 309). EquiLend's directors met regularly to discuss "industry challenges such as central clearing." (*Id.* at ¶¶ 249-50). Under the Prime Broker Defendants' control, EquiLend acted "in illegitimate, non-competitive ways ... that in many cases did not further its own economic interests." (*Id.* at ¶ 304). Specifically,

> [t]he Prime Broker Defendants used EquiLend to: (i) suppress price transparency by refusing to release pricing data to its customers, despite having access to this data and despite a clear market demand for such data; (ii) force competitors out of the market by coercing their customers to use EquiLend ... even though EquiLend ... offered lower quality or entirely different services than what their customers desired and what prospective competitors offered; and (iii) stymie pro-competitive market developments by purchasing valuable patents and trading platform technology from SL-x and AQS for valuable consideration, and then refusing to use or capitalize on those assets in any way[.]

(*Id.* at ¶ 311).

Defendants' conspiratorial communications in emails, Bloomberg chats, text messages, internal memoranda, and recorded phone calls are allegedly

housed on EquiLend's servers (as well as those of the individual Prime Broker Defendants). (AC ¶ 312). These communications show that Defendants told EquiLend's representatives, including its CEO, Brian Lamb, not to "break rank," and not to take action "until the 'EquiLend banks' determined as a group whether they would support any of the new platforms." (*Id.* at ¶ 16). Of note, when EquiLend Board member William Conley discussed ensuring that data transparency would not "kill our business," the businesses to which he was referring were those of the Prime Broker Defendants, not of EquiLend. (*Id.* at ¶ 313). During the Prime Broker Defendants' individual meetings with AQS and SL-x, they "made clear that they considered themselves bound by understandings reached in EquiLend board meetings." (*Id.*).

The Amended Complaint proffers several allegations to support an inference of counter-profit behavior. In or about August 2011, Palamon Capital Partners and SL-x jointly proposed to acquire EquiLend at a price that would have yielded a profit for all parties. (AC ¶ 314). The EquiLend Board refused to engage or negotiate the offer. (*Id.*). And in late 2014 or 2015, the tables were turned: "[T]he Prime Broker Defendants directed EquiLend to purchase [SL-x and AQS] to complete the elimination of them as competitors." (*Id.* at ¶ 270). Plaintiffs argue that, if "EquiLend had truly behaved as a profit-maximizing firm, it would naturally have … capitalized on the valuable assets and technology" purchased from AQS and SL-x. (*Id.* at ¶ 315). One EquiLend executive "complained that EquiLend needed to upgrade its services and build something like SL-x, and EquiLend never did so." (*Id.*). Based on these

actions, Plaintiffs conclude that EquiLend "is not the independent joint venture that it purports to be[.]" (*Id.* at ¶ 319).

### 5.    Defendants' Anticompetitive Conduct

### a.    Allegations Concerning AQS

To review, Plaintiffs allege that Morgan Stanley and Goldman Sachs led the other Prime Broker Defendants in a conspiracy to block new market entrants from offering electronic trading and clearing platforms and services to enhance price transparency. (AC ¶¶ 198-99, 212). As one facet of this conspiracy, the Prime Broker Defendants "agreed on a common stance vis-à-vis AQS." (*Id.* at ¶ 210). Following initial meetings with AQS executives in or about 2009, Goldman Sachs refused to support the AQS platform at all. (*Id.* at ¶¶ 196, 209). At a 2009 meeting between the head of the Stock Loan Desk at Bank of America and William Conley of Goldman Sachs, Conley said that he was "opposed to transparency in any form" because of the "spread" fees that Goldman Sachs made on stock loan transactions; indeed, Conley "got so angry at the mention of [AQS's] name that spit was coming out of his mouth." (*Id.* at ¶ 200). Conley pressured Bank of America to "reverse course and to join the opposition to Quadriserv/AQS[.]" (*Id.*).

At the same time, Credit Suisse, J.P. Morgan, Morgan Stanley, and UBS each communicated to AQS "that the only way they would support the platform was if AQS made it … a broker-only platform … [and] lenders and borrowers would be barred from trading on the platform." (AC ¶ 210). When AQS refused, the Prime Broker Defendants agreed to starve AQS "by collectively

18

refusing to participate on the platform, and thereby to keep their trade flow and trade data outside of the platform's electronic market." (*Id.* at ¶¶ 211-12). This collective boycott of AQS compromised its utility for other market participants. (*Id.* at ¶ 212).

In preparation for an SEC roundtable discussion on securities lending held on September 29 and 30, 2009, the Bank of America executive whom Conley had pressured "convened what he characterized as a meeting of 'the five families' ... so the Prime Broker Defendants could settle on their collective messaging[.]" (AC ¶ 202). Around the same time, Goldman Sachs's Conley, a Credit Suisse employee named Shawn Sullivan, and others held a private meeting in which they discussed electronic trading platforms, where "each agreed to oppose AQS and disparage AQS and central clearing during the roundtable discussion." (*Id.* at ¶ 203). One participant in that meeting later stated that she felt "sorry for what [they were] about to do" to AQS. (*Id.*). At the subsequent SEC meeting, Sullivan spoke out against AQS, arguing that central clearing would reduce liquidity and expose beneficial owners to greater credit risk from counterparties. (*Id.* at ¶ 204).

By 2011, under pressure from Goldman Sachs, Morgan Stanley, Credit Suisse, and unspecified "others," Bank of America withdrew its support for AQS. (AC ¶¶ 205-06). More pointedly, "Bank of America/Merrill Lynch personnel who had formerly supported AQS were purged." (*Id.* at ¶ 206). Specifically, Mike Stewart, Global Co-Head of Equities and an advocate for AQS, "was abruptly replaced with ... Stuart Hendel, the former head of prime

brokerage at Morgan Stanley and UBS." (*Id.*).  Hendel directed Bank of America personnel to disavow AQS, limited the volume of transactions that the Bank of America stock loan desk was permitted to place on AQS to a small fraction of prior volume, and made no further investments in AQS.  (*Id.* at ¶ 207).

The Prime Broker Defendants also undertook to stop other market participants, including their clients, from using AQS.  In 2012, Goldman Sachs threatened executives at agent lender BNY Mellon, including James Slater, its Head of Global Collateral Management and Securities Finance:  If BNY Mellon used AQS for stock loan transactions, "Goldman Sachs would return all of the open stock borrowing trades with BNY and stop trading with the BNY stock loan desk altogether." (AC ¶ 218).  Thereafter, BNY Mellon abruptly withdrew an offer to AQS of $50 million in credit and an agreement to participate actively on the AQS platform.  (*Id.* at ¶ 18).  And Defendants also threatened to cut off an array of services to their own hedge fund clients — including Renaissance Technologies, D.E. Shaw, Millennium Management, and SAC Capital — if those clients transacted on AQS.  (*Id.* at ¶¶ 213, 215-16).

Finally, Defendants blocked access to AQS by refusing to serve as clearing brokers.  OCC's by-laws required "that *only* broker-dealer members of OCC, such as the Prime Broker Defendants, could transact on AQS, either as the lender or borrower." (AC ¶ 214).  Accordingly, the Prime Broker Defendants refused to "sponsor" their hedge fund clients' access to AQS by "stand[ing] in to facilitate and clear their trades." (*Id.*).  Plaintiffs allege that the Prime Broker

Defendants would not have refused to provide their hedge fund clients with access to AQS if they were acting unilaterally, as each would have been concerned about losing customers to other prime brokers. (*Id.* at ¶ 217).

By the end of 2014, AQS was struggling to maintain sufficient liquidity to act as a financially viable stock lending platform, and was marginalized in the market. (AC ¶ 269). However, around the same time, a regulatory development sparked new interest in AQS. On January 1, 2014, the Basel Committee on Banking Supervision had issued a set of measures, known as "Basel III," that "required the Prime Broker Defendants to carry more capital on their balance sheet to cover the same risk" in stock loan transactions. (*Id.* at ¶ 274). One way banks could comply was to centrally clear stock loan transactions, "thereby offloading the risk to a central clearing counterparty." (*Id.* at ¶ 276). According to Plaintiffs, staff at each Prime Broker Defendant were siloed to such a degree that the "loan trading staff did not know, and were not told by senior management until later, that a move toward central clearing of stock loan transactions — while superficially beneficial under Basel III — would be disastrous to the bank's profitability on a much larger scale." (*Id.* at ¶ 278). Hence, the following drama.

In 2014, Susan O'Flynn, Global Head of CCP Strategy, Governance and Optimization at Morgan Stanley, began promoting central clearing of stock loan transactions as a way to comply with Basel III while reducing balance sheet costs and increasing returns on Morgan Stanley's stock lending business. (AC ¶ 281). O'Flynn publically supported central clearing through Eurex and OCC,

21

though she did not share her support with senior management or executives on Morgan Stanley's stock loan desk. (*Id.* at ¶¶ 282-83). In late 2015 or early 2016, executives from Morgan Stanley's stock loan business became aware of O'Flynn's activities and told O'Flynn and her direct supervisor, Thomas Wipf, Global Head of Bank Resource Management, that central clearing threatened Morgan Stanley's business as a prime broker intermediary for stock loan transactions. (*Id.* at ¶¶ 281, 284).

Rather than retreat from the balance sheet cost savings that central clearing would provide, Wipf maintained the budget projections that O'Flynn had provided while imposing three conditions on centrally cleared trades. (AC ¶ 287). Specifically, Wipf required that (i) central clearing maintain price opacity, meaning that neither the borrower nor the lender would know the price at which their counterparty transacted; (ii) the clearinghouse not link to an independent trading platform; and (iii) the clearinghouse not publish market data from Morgan Stanley transactions. (*Id.*). Wipf also wanted the Prime Broker Defendants to gain complete control of access to the clearinghouses so that market participants would have no other choice but to use the Prime Broker Defendants' services to clear trades. (*Id.* at ¶ 288). That meant controlling OCC because, in 2016, OCC was the only clearinghouse licensed by the SEC that cleared stock loan trades. (*Id.* at ¶ 289).

At that time, OCC was negotiating a deal to acquire AQS, and AQS was developing a new service to assist lenders in investing the cash collateral from their loans through what are known as "repurchase agreements." (AC ¶¶ 291-

92).  Wipf devised a plan to stop the acquisition and gain exclusive control over all the pathways to central clearing, a plan that he and his colleagues at Morgan Stanley code-named "Project Gateway."  (*Id.* at ¶¶ 21, 293).  Between late 2015 and January 2016, Wipf and William Conley from Goldman Sachs met over a series of dinners in New York City that were paid for by Wipf.  (*Id.* at ¶¶ 21-22, 294).  Wipf and Conley agreed that Morgan Stanley and Goldman Sachs should acquire AQS in order to shut it down.  (*Id.*).  Specifically, Wipf and Conley planned to persuade the other Defendants to use EquiLend to purchase AQS in order to destroy it.  (*Id.*).

In a January 2016 internal call, Wipf communicated the plan to his team at Morgan Stanley, which included Susan O'Flynn; Matthew Collins; Tejash Patel, the Managing Director and Co-Head of U.S. Securities Lending; and Thomas Kinnally, the Global Head of Client Financing, Firm Financing and Collateral Risk Management.  (AC ¶¶ 22, 295).  During the call, Wipf stated that he and Conley had agreed to "get a hold of this thing."  (*Id.* at ¶¶ 22, 296).  By use of that phrase, Wipf meant that "Goldman Sachs and Morgan Stanley needed to act together to acquire AQS and shut it down."  (*Id.* at ¶ 296).

At a series of private dinners, meetings at industry conferences, and EquiLend board meetings, executives at Morgan Stanley and Goldman Sachs persuaded the other Defendants to join Project Gateway in order to maintain control over the "universal gateway" to central clearing.  (AC ¶ 297).  Defendants also agreed to clear all stock loan transactions through their own pipelines to OCC, which pipelines were not connected to an electronic trading

platform.  (*Id.*).  And Defendants agreed to exert influence, as Directors of OCC and EquiLend, to prevent OCC's acquisition of AQS.  (*Id.* at ¶ 298).

Late in the negotiations between OCC and AQS, OCC abruptly pulled out of the deal and stopped returning AQS's calls.  (AC ¶ 298).  Shortly thereafter, on August 1, 2016, EquiLend purchased AQS's assets — the fruits of nearly $100 million in investment — for less than $5 million.  (*Id.* at ¶¶ 299-300).  Following the purchase, "the Prime Broker Defendants did not increase their participation in the new electronic trading platform or take other action to make it prosper."  (*Id.* at ¶ 301).

### b.  Allegations Concerning SL-x

As with AQS, Goldman Sachs refused to support SL-x from the outset. (AC ¶ 196).  In a private meeting in 2011, William Conley told other Goldman Sachs employees that any central trading platform with counterparty clearing threatened Goldman Sachs's market position.  (*Id.* at ¶ 219).  Conley told SL-x executives: "I ain't supporting this," informing them that the Prime Broker Defendants would only support the evolution of central clearing through an entity that they controlled, specifically EquiLend.  (*Id.* at ¶ 220).  Brad Levy, Global Head of Goldman Sachs' Principal Strategic Investments Group, told SL-x executives: "You ain't going to get this done."  (*Id.* at ¶¶ 17, 220).

On August 1, 2011, SL-x sent a letter to EquiLend's Chairman, Jeffrey Benner, proposing a joint venture between SL-x and EquiLend that would afford EquiLend "strong governance rights and a meaningful 'seat at the table' in the development of the SL-x marketplace and shift to a CCP-model."  (AC

¶ 221).  The EquiLend Board members met in August and September 2011,

decided against SL-x's proposal, agreed that no EquiLend member bank would

support SL-x, and further agreed only to support such market innovations if

developed within EquiLend.  (*Id.* at ¶ 223).

On September 21, 2011, EquiLend's CEO, Brian Lamb, declined SL-x's

offer.  (AC ¶ 224).  The same day, a Morgan Stanley employee, Edward McAleer,

told SL-x that he had spoken (also on that day) with Anthony Schiavo, a

Managing Director at Morgan Stanley and a Director at EquiLend, who said

that SL-x should deal directly with EquiLend, not with Morgan Stanley, and

that "approaching a group of brokers outside the EquiLend arena is not an

approach he wants to take."  (*Id.* at ¶ 226).  On October 12, 2011, McAleer

reiterated to SL-x, copying Schiavo on the communication, that "all the relevant

people at MS" shared the "house view" that "we do not want to participate in a

separate consortium," and noted Morgan Stanley's view "that any solution …

needs to involve EquiLend."  (*Id.* at ¶ 227).

Thereafter, none of the Prime Broker Defendants supported SL-x

individually.  (AC ¶ 225).  Each "withheld capital and support from SL-x

through the fall of 2011 and throughout 2012[.]"  (*Id.* at ¶ 228).  From 2012 to

2014, SL-x executives met with and pitched its product to high-ranking stock

loan executives at each of the six Prime Broker Defendants (Bank of America,

Credit Suisse, Goldman Sachs, J.P. Morgan, Morgan Stanley, and UBS), all of

whom sat on the board of EquiLend USA or EquiLend Europe.  Each refused to

support SL-x, allegedly as a result of the EquiLend agreement.  (*Id.* at ¶ 229).

In an October 2012 meeting with SL-x executives, some unspecified prime brokers expressed concern that SL-x provided "too much transparency," or "too much immediate transparency." (*Id.* at ¶ 184). SL-x refused a request from J.P. Morgan for "the ability to turn off the real-time ticker, or block certain trades from being included[.]" (*Id.*).

The Prime Broker Defendants doubled down on this position in mid-to-late 2013, when they "agreed to boycott SL-x, collectively refused to use its platform, and took steps to ensure that other market participants turned their back on SL-x as well." (AC ¶ 236). Following initially enthusiastic meetings with SL-x executives, "each bank went cold and, without explanation, refused to engage or proceed further with SL-x." (*Id.* at ¶¶ 237-38). In July 2013, Credit Suisse declined to join the SL-x platform, explaining that it would only join if and when the "Big Boys" committed to doing so and SL-x had acquired substantial liquidity. (*Id.* at ¶ 241). Also in July 2013, UBS declined to join the SL-x platform, saying that it would not do so until SL-x had secured "commitments from other large market participants and demonstrate[d] evidence of significant liquidity." (*Id.* at ¶ 242). In meetings on July 26, 2013, and September 26, 2013, James Buckland, UBS's Global Head of Securities Lending, "frequently referenced EquiLend in the context of discussing SL-x's strategy to gain widespread market acceptance of its platform, noting the benefit of being '***inside the club***' of EquiLend member banks to effectuate market changes and suggesting that any market transition towards an SL-x

platform and central clearing of stock loan trades would need to come from inside EquiLend." (*Id.* (emphasis in original)).

As with AQS, the Prime Broker Defendants "in some instances threatened their clients with the loss of other prime brokerage services if they signed on to the SL-x platform[.]" (AC ¶¶ 237, 243). On October 12, 2012, Andrew Clayton, the Global Head of Securities Lending at stock lending agent Northern Trust, told SL-x executives that Northern Trust would not support SL-x without approval from Goldman Sachs. (*Id.* at ¶¶ 18, 252). In 2015, OCC's Chief Operating Officer told SL-x executives that "nothing was going to happen" between SL-x and OCC without approval from the Prime Broker Defendants and specifically from Goldman Sachs. (*Id.* at ¶ 253). DTCC's Managing Director also told SL-x that it could not offer central clearing services to SL-x without approval from the Prime Broker Defendants and, specifically, from Goldman Sachs. (*Id.*).

The Prime Broker Defendants were aware that EquiLend was an "archaic" and "entrenched although unexciting system," with poor functionality that could not compete with SL-x's capacity. (AC ¶¶ 247-49). Nonetheless, they communicated "similar statements" that they would only support innovations such as SL-x's from within EquiLend. (*Id.* at ¶ 245). On February 26, 2013, Credit Suisse representatives told SL-x executives that "a successful launch will require cooperation of EquiLend." (*Id.* at ¶ 246). On June 18, 2014, in a meeting in Berlin, Morgan Stanley executives, including EquiLend Board member Edward McAleer, told SL-x that Morgan Stanley

would only support central clearing through EquiLend.  (*Id.* at ¶ 243).  At a meeting on July 19, 2013, Bishti told SL-x that winning market support would mean "facing off against EquiLend" and that transitioning to central clearing would require "cooperation" and "collaboration" with EquiLend; described EquiLend's Directors as "key players" and "members of the club"; and compared EquiLend to "the mafia run by five crime families[.]"  (*Id.* at ¶¶ 241, 249).  On August 7, 2013, John Shellard, Managing Director of Trading Services at J.P. Morgan and EquiLend Board member, told SL-x executives that there was a "general agreement among Directors" of EquiLend "that industry advances should be achieved from within EquiLend," rather than through third parties like SL-x.  (*Id.* at ¶¶ 17, 239).  In July 2014, Bank of America told SL-x executives that there was internal controversy about how endorsing SL-x's product would affect Bank of America's relationship with EquiLend.  (*Id.* at ¶ 244).

By September 2014, SL-x had exhausted its financial resources, cancelled its U.K. trading license, and abandoned plans to enter the U.S. market.  (AC ¶ 268).  After SL-x "shut its doors," the Prime Broker Defendants began negotiating with SL-x's private equity owner to purchase SL-x's intellectual property.  (*Id.* at ¶ 271).  In 2015, EquiLend purchased SL-x's intellectual property, without undertaking full due diligence, and allegedly with no intent to actually use it.  (*Id.* at ¶ 272).  EquiLend has since shelved the patents.  (*Id.*).

### c. Allegations Concerning Data Explorers

With its 2010 offering of "performance" data, the Prime Broker Defendants became "increasingly wary that Data Explorers would eventually package data that would expose the breadth of the price gap between borrowers and lenders[.]" (AC ¶ 186). During ten meetings that spanned 2011-2012, two Goldman Sachs employees, Shawn Byron and William Conley, "grilled Data Explorers" about "siloing borrower and lender data, despite Data Explorers' constant assurances that there was no leakage." (*Id.* at ¶ 189). Defendants "gradually decided they could not entrust market data to a firm they did not control." (*Id.* at ¶ 190). Accordingly, Goldman Sachs began contacting hedge funds, including SAC Capital Advisors, to stop them from sharing data with Data Explorers, achieving mixed success. (*Id.* at ¶ 191). "In approximately the second or third quarter of 2010, a representative from Goldman Sachs contacted Peter Economou at State Street (a large, influential agent lender) and demanded that State Street not report any of the trading data concerning State Street's trades with Goldman Sachs to Data Explorers, threatening State Street's business if it did not comply." (*Id.*). State Street refused to comply. (*Id.*). "[W]hen borrower clients instructed Morgan Stanley to provide Data Explorers with their market data, Morgan Stanley would provide a file that contained stale, sparsely populated data scrubbed clean of any timely or actionable information." (*Id.* at ¶ 192).

At a meeting of the EquiLend Board of Directors, William Conley stated that transparency about the spread between the fees paid to beneficial owners

and those collected from borrowers would "kill our businesses." (AC ¶ 255). In response, the Prime Broker Defendants agreed to "neutralize" Data Explorers by "set[ting] up a competing business" called DataLend, which was formed as a division within EquiLend in 2011. (*Id.* at ¶¶ 255, 257).

The Prime Broker Defendants each agreed (first amongst one another and subsequently with DataLend) to distribution agreements with DataLend that ensured that their data would not be disclosed to lenders or borrowers, and specifically that data about what borrowers paid for stock loans would not be disclosed to beneficial owners. (AC ¶ 257). Plaintiffs allege that DataLend's purpose was to offer a bare minimum of data to compete with Data Explorers while still withholding transparency about the Prime Brokers' fees. (*Id.* at ¶ 258). Accordingly, the Prime Broker Defendants allegedly told Data Explorer's customers that it was "inaccurate and unreliable." (*Id.* at ¶ 259).

The Prime Broker Defendants also attempted to stop borrowers and lenders from accessing each other's data directly by seeking "to monopolize access to" agent lender data about aggregate stock loan supply. (AC ¶ 260). To accomplish this, DataLend sought to lure away Data Explorer's agent lender customers by offering "to provide the same data services to agent lenders effectively for nothing." (*Id.* at ¶¶ 261-62). All major agent lenders except BNY Mellon were members of EquiLend and were "offered DataLend's products for no additional fee." (*Id.* at ¶ 261). "Agent lenders used the new stream of low-cost information provided by DataLend to renegotiate prices with Data Explorers," causing Data Explorers' revenues to drop. (*Id.* at ¶ 264). The

hobbled Data Explorers was acquired by another company over which Defendants allegedly wielded influence, and which has not indicated an interest in "carrying out Data Explorers' original vision of bridging the data divide between wholesale and retail customers." (*Id.* at ¶ 265).

**B.    Procedural Background**

Plaintiffs filed an initial Complaint on August 16, 2017 (Dkt. #1), and an Amended Complaint on November 17, 2017 (Dkt. #73). On January 26, 2018, Plaintiffs voluntarily dismissed all claims against Defendants Bank of America Corporation; Credit Suisse Group AG; The Goldman Sachs Group, Inc.; J.P. Morgan Chase & Co.; Morgan Stanley; Morgan Stanley Capital Management, LLC; and UBS Group AG, without prejudice to their inclusion at a later time. (Dkt. #105). The parties stipulated that any statutes of limitations or repose concerning the claims against these dismissed Defendants would be tolled as if they were filed on August 16, 2017. (*Id.*).

On January 26, 2018, the Prime Broker Defendants filed a joint motion to dismiss the Amended Complaint (Dkt. #109), and Defendant EquiLend filed its own motion to dismiss the Amended Complaint (Dkt. #106). Plaintiffs filed oppositions to both of these motions, separately, on March 2, 2018. (Dkt. #112, 113). The Prime Broker Defendants and Defendant EquiLend filed separate replies on March 30, 2018. (Dkt. #114, 115).

**DISCUSSION**

**A.      Applicable Law**

      **1.      Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570). In determining a Rule 12(b)(6) motion to dismiss, "the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor." *Doe* v. *Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

      **2.      Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1**

To state a claim under Section 1 of the Sherman Act, a plaintiff must show "[i] a combination or some form of concerted action between at least two legally distinct economic entities that [ii] unreasonably restrains trade." *United*

*States* v. *Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016). The Court considers each of these elements in turn.

To plead the first element, a plaintiff must show whether "the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'" *Mayor & City Council of Baltimore, Md.* v. *Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Starr* v. *Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir. 2010)). "Agreements that fall within the scope of Section 1 are characterized as either 'horizontal' or 'vertical.'" *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016). "A horizontal agreement is an 'agreement between competitors at the same level of the market structure,' while a vertical agreement is a 'combination[ ] of persons at different levels of the market structure.'" *Id.* (quoting *United States* v. *Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)).

"Section 1 does not disallow any and all agreements; it disallows only those 'in restraint of trade or commerce among the several States.'" *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 682 (S.D.N.Y. 2012) (quoting 15 U.S.C. § 1). Moreover, Section 1 "outlaws only unreasonable restraints." *Leegin Creative Leather Prods., Inc.* v. *PSKS, Inc.*, 551 U.S. 877, 885 (2007). Therefore, to plead the second element, a Plaintiff must show that the concerted action was unreasonable. Courts generally evaluate reasonableness under the "rule of reason," which requires courts to weigh "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition," including

factors such as the relevant business and the history, nature, and effect of the restraint. *Id.*

## B. The Prime Broker Defendants' Motion to Dismiss Is Denied

### 1. The Amended Complaint Adequately Alleges That Defendants Conspired to Restrain Trade in Violation of 15 U.S.C. § 1

#### a. Applicable Law

Defendants focus their efforts on Plaintiffs' pleading of the first element of a Sherman Act claim: whether there has been "a combination or some form of concerted action between at least two legally distinct economic entities[.]" *Am. Express Co.*, 838 F.3d at 193 (internal quotation marks and citation omitted). Their opening sortie is to argue that Plaintiffs have failed to plead a plausible antitrust conspiracy. Such an argument presents a high hurdle in the context of a motion to dismiss, and a hurdle that is not crossed here.

"A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Citigroup*, 709 F.3d at 136; *accord Twombly*, 550 U.S. at 556 ("[S]tating [a Section 1] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."). "To survive dismissal, 'the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial.'" *Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (quoting *Anderson News, LLC* v. *Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012)), *cert. denied*, 137 S. Ct. 814

(2017). "Instead, a well-pleaded complaint may proceed even if … actual proof of those facts is improbable, and … a recovery is very remote and unlikely as long as the complaint presents *a* plausible interpretation of wrongdoing." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 558 (S.D.N.Y. 2016) (emphasis in original) (internal quotation marks and citations omitted).

### b.    Discussion

Defendants' arguments with respect to the first element of Section 1 touch on six main issues, which the Court will address in turn: (i) facial plausibility; (ii) group pleading; (iii) direct evidence of conspiracy; (iv) parallel conduct; (v) so-called "plus factors"; and (vi) the sufficiency of the pleadings with particular respect to Bank of America, J.P. Morgan, UBS, and Credit Suisse.

### i.    The Alleged Conspiracy Is Facially Plausible

Defendants first argue that Plaintiffs' conspiracy theory is facially implausible.  For the reasons that follow, the Court finds otherwise.

*Duration and Membership:* Defendants contend that it is facially implausible that "just six prime brokers effected a nine-year conspiracy that blocked the migration of stock loans to an anonymous exchange[,]" when borrowers, lenders, and agent lenders could have dealt with the "dozens of other prime brokers" in existence.  (Def. Br. 17).  Defendants cite no legal authorities to support this assertion, and the Court is aware of none.  (*Id.*).

As an initial matter, the Court agrees with Plaintiffs that there is nothing facially implausible about the timeline of the alleged conspiracy, which began

in 2009 with Goldman Sachs and Morgan Stanley, expanded by 2011 to include the other Defendants in a "general agreement," and continued "until the boycott achieved its objectives." (Pl. Opp. 20; AC ¶¶ 195-208, 239). *Cf. In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 585, 587 (S.D.N.Y. 2015) (finding that allegations of a "long-running conspiracy" that endured for "over a decade" were plausible).

Contrary to Defendants' contentions, it is also not facially implausible that a small subset of prime brokers could bring about an actionable conspiracy, because the six named Prime Broker Defendants allegedly controlled between "76% and 80% of the market share in the stock loan market," and used that "overall clout in the market" to discourage others from investing in, or patronizing, AQS, SL-x, and Data Explorers. (AC ¶¶ 102, 122; Pl. Opp. 20). Plaintiffs argue, not without force, that it is not facially implausible for market participants who control this percentage of market power to carry out an effective group boycott. (Pl. Opp. 21). *See, e.g.*, *Fashion Originators' Guild of Am.* v. *Fed. Trade Comm'n*, 312 U.S. 457, 462, 465 (1941) (finding that members of a garment manufacturing and distribution guild, who collectively sold between 38% and 60% of all women's garments within a particular price range, and thus "occup[ied] a commanding position in their line of business[,]" carried out a group boycott in violation of the Sherman Act); *Starr*, 592 F.3d at 323-24 (vacating the dismissal of an antitrust complaint that alleged price-fixing based on parallel conduct by defendants who controlled over 80% of the market). Of course, at later stages of litigation, Plaintiffs will

36

be required to show in more detail how Defendants effectuated the alleged conspiracy. *Cf. Fashion Originators' Guild of Am.*, 312 U.S. at 461, 463 (observing that the boycott was effectuated through signed cooperation agreements and audits of members' books). But at the pleading stage, allegations of a conspiracy undertaken by six defendants that controlled 76% to 80% of the market are not rendered facially implausible by virtue of the existence of other market participants who could have transacted with the boycotted businesses.

*EquiLend Board Meetings:* Defendants next argue, again without reference to legal authority, that it is implausible that the conspiracy was planned at EquiLend board meetings because those meetings included "large agent-lenders" who supported the victim businesses and whose clients would have been harmed by the conspiracy. (Def. Br. 17; Def. Reply 4). Plaintiffs respond that the agent lenders on EquiLend's Board were themselves "entrenched" actors who "may well have their own incentives to preserve the status quo" and align themselves with Defendants, including vulnerability to pressure from the Defendants. (Pl. Opp. 27-30).

The parties' dispute on this issue amounts to a battle of competing inferences about who had the agent lenders' greatest loyalty. On a motion to dismiss, the Court must draw "all reasonable inferences in the plaintiff's favor[.]" *Columbia Univ.*, 831 F.3d at 48. Here, the Amended Complaint alleges sufficient facts to support a reasonable inference in Plaintiffs' favor: namely, that the agent lenders were willing to align themselves with Defendants, even to

37

the detriment of their own clients.  For instance, the Amended Complaint alleges that "the other owners of EquiLend effectively acquiesce[d] to the Prime Broker Defendants" due to the latter's overall market clout (AC ¶ 122); that agent lenders BNY Mellon, State Street, and Northern Trust told SL-x that they "could not support it" because the Prime Broker Defendants "were aligned against the platform" and because their own conduct "was subject to the approval of" a Prime Broker Defendant (*id.* at ¶¶ 18, 218, 251-52); and that Defendants "lure[d]" agent lenders with services provided "at very little cost or, in some cases, virtually for free (*id.* at ¶¶ 261-62).  Moreover, as Plaintiffs point out, the Amended Complaint also alleges numerous meetings in furtherance of the conspiracy that took place outside of EquiLend, such as at Wipf's dinner meetings with Conley and internal Morgan Stanley "pipeline call," and other "private dinners and meetings that often occurred at industry conferences[.]" (Pl. Opp. 27; AC ¶¶ 21-22, 297).  Drawing all reasonable inferences in Plaintiffs' favor, the mere presence of the agent lenders in some of the meetings where the conspiracy was allegedly formed does not undercut the Amended Complaint's explication of that formation.

*Access to OCC:*  Defendants also argue that the conspiracy is implausible because the bylaws of the sole central clearinghouse, OCC, prevent lenders and borrowers from transacting directly and require instead that they clear stock loans through broker-dealer members of OCC.  (Def. Br. 18; AC ¶¶ 120 n.26, 214).  In essence, Defendants characterize the Amended Complaint as alleging that they unlawfully agreed not to provide clearing broker services that would

38

have afforded borrowers and lenders access to OCC — even though, according to Defendants, providing such services was not required by regulation and would not have been in their economic self-interest, as shown by the fact that the Amended Complaint does not allege that any of the roughly 60 other broker-dealer members of OCC chose to provide the service either.  (Def. Br. 19; Def. Reply 3; AC ¶¶ 120 n.26, 154 n.36; *see also id.* at ¶¶ 13-14, 214).

Defendants point out that the Amended Complaint does not allege that they "did anything to discourage or prevent" other brokerage firms from offering clearing broker services.  (Def. Br. 19).  From this, they seek to analogize this case to *In re Interest Rate Swaps Antitrust Litigation*, in which a sister court in this District dismissed as implausible an antitrust complaint that alleged a conspiracy to destroy central clearing platforms for all-to-all interest rate swaps ("IRS") trading, where there was no regulatory mandate that required central clearing of such transactions, and where the infrastructure for such platforms did not yet exist.  (*Id.* (citing *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 463-72 (S.D.N.Y. 2017) ("*In re IRS*")).  Defendants here posit that the lack of "clearing brokers willing to clear stock loans through OCC" in the present action is similar to the absence of infrastructure in *In re IRS*.  (*Id.*).

Defendants misconstrue the Amended Complaint.  It does *not* allege that the conspiracy aimed to prevent borrowers and lenders from transacting directly without a clearing broker intermediary, and thus whether such transactions were permitted by OCC is of no moment.  Nor does the Amended Complaint allege — or need to allege — that Defendants conspired to stop any

of the roughly 60 other broker-dealer members of OCC from offering clearing broker services. Rather, the Amended Complaint alleges that Defendants refused to provide their own clients with clearing broker services, and threatened their clients, as well as other market participants, to prevent them from taking advantage of any such opportunities that OCC's other broker-dealer members might have provided. In Plaintiffs' words, "the Prime Broker Defendants controlled a sufficient share of the industry that other brokers alone could not provide sufficient liquidity," and "Defendants threatened retaliation against other market participants that considered dealing with AQS and SL-x." (Pl. Opp. 21; AC ¶¶ 18-20, 102, 122, 215-18, 252-53). Those threats allegedly succeeded. (Pl. Opp. 22; AC ¶ 382).

Drawing all reasonable inferences in Plaintiffs' favor, the necessary infrastructure existed for services such as those promised by AQS and SL-x, and it was Defendants' conduct, not structural impediments, that caused these companies to fail. Accordingly, unlike *In re IRS*, 261 F. Supp. 3d at 463-72, there is in this case no absence of enabling infrastructure that makes the alleged conspiracy implausible.[10]

*Anonymous Exchange Trading:* Defendants further submit that the conspiracy is implausible because "the clearing arrangements necessary to

---

[10]    Of course, Defendants may well succeed at the summary judgment stage in arguing that their refusal to provide clearing-broker services was in their own economic self-interest and a "coincidence, independent responses to common stimuli[.]" *United States* v. *Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (internal citation and quotation marks omitted). But such a conclusion would require factual determinations that the Court will not indulge when considering a motion to dismiss. *See Iqbal*, 556 U.S. at 678.

sustain anonymous exchange trading do not exist [in the stock loan market]."
(Def. Br. 18). In support, they present an array of additional factual issues
that the Court may not resolve on a motion to dismiss. Defendants infer that
anonymous exchange trading was unsustainable from the fact that, although
the Amended Complaint alleges that the Basel III regulatory development
encouraged some entities to take steps toward central clearing, no regulation
*requires* central clearing in this market. (*Id.*). Defendants also contend that
stock loan transactions are "ill-suited" for anonymous exchange trading
because lenders can terminate loans at will — a risk which, Defendants assert,
causes borrowers to "desire to know the source of their loans to assess the risk
that the loan shares will be recalled[.]" (*Id.* at 17-18). While Plaintiffs point out
that AQS was allegedly "developed by industry insiders" with knowledge of
demand and feasibility, Defendants question any inference of demand for
AQS's product by submitting that even industry insiders could have erred, and
by challenging the credibility of the allegation that the Federal Reserve Bank of
New York supported AQS's offering. (Pl. Opp. 24; Def. Br. 18; Def. Reply 4-5).

Plaintiffs offer competing inferences concerning the stock loan market's
suitability for anonymous exchange. (Pl. Opp. 23-25). They submit that the
absence of a regulatory mandate is immaterial because, even without such a
mandate, AQS and SL-x attracted market support for their offerings of
anonymous, centrally-cleared stock lending. (*Id.* at 25). (*See also* AC ¶¶ 145-
46, 154-61 (detailing AQS offerings and support); *id.* at ¶¶ 172-83 (detailing
SL-x offerings and support)). Plaintiffs also submit that most borrowers do not

currently care about, or demand to know, the identity of the lenders from whom they borrow stock. (Pl. Opp. 23). And, according to the Amended Complaint, anonymity was optional on AQS and SL-x, both of which also provided competency assessments of trading partners, including lenders' historical recall rates. (*Id.* at 23-24; AC ¶¶ 179-80, 271). Plaintiffs point to allegations in the Amended Complaint that "detail[] the demand for these new products" and explain their feasibility. (Pl. Opp. 23; *see* AC ¶¶ 7-8, 142-43, 179, 233, 279-84, 300, 311, 332-32).

More fundamentally, Plaintiffs submit, and the Court agrees, that these are "fact-laden arguments that cannot be credited" on a motion to dismiss. (Pl. Opp. 23, 25). On a motion to dismiss, the Court must accept all well-pleaded factual allegations as true. *See Iqbal*, 556 U.S. at 678; *see also Anderson News*, 680 F.3d at 184 ("[T]o present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true[.]"). On a future motion for summary judgment, Defendants may challenge the strength of the Amended Complaint's factual allegations, including whether Plaintiffs present sufficient evidence from which a reasonable fact-finder could conclude that the Federal Reserve Bank of New York supported AQS's offering. But the Court may not properly address that argument at this stage of the litigation.

For all of these reasons, the Amended Complaint's factual allegations are not facially implausible.

### ii. Plaintiffs Do Not Rely on Impermissible Group Pleading

"[A]n antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). The factual allegations must be "sufficient to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Anderson News*, 680 F.3d at 182 (quoting *Twombly*, 550 U.S. at 555). "Plaintiffs must allege a factual connection between each Defendant and the alleged conspiracy[.]" *Hinds Cty., Miss.* v. *Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010). Therefore, "[g]roup pleading, by which allegations are made against families of affiliated entities is simply insufficient to withstand review on a motion to dismiss." *Concord Assocs., L.P.* v. *Entm't Prop. Tr.*, No. 12 Civ. 1667 (ER), 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016).

Defendants argue that Plaintiffs' allegations rely on impermissible generalizations about Defendants as a group. (Def. Br. 23). In this regard, they focus specifically on paragraphs of the Amended Complaint that describe "the Prime Broker Defendants," without further specification, as using their positions at EquiLend to discuss "their next move" (AC ¶ 211), "collectively decide[] that they could not tolerate" the victim platforms (*id.* at ¶ 25), "collectively refuse[]" to use AQS (*id.* at ¶ 212), "pressure[] other market

participants" (*id.* at ¶ 251), and threaten to withhold services from hedge funds (*id.* at ¶¶ 215-16). While the Amended Complaint does name four individual Defendants as the source of the threats, it fails to allege additional details "such as when these threats supposedly occurred or whether they were made in parallel," and why the hedge funds could not have worked with other prime brokers outside the conspiracy. (Def. Br. 23).

Defendants concede that the Amended Complaint pleads some particular allegations about Goldman Sachs and Morgan Stanley, but argue that it impermissibly extends those more particular allegations to the remaining Defendants with a conclusory assertion that "Goldman Sachs and Morgan Stanley recruited the other Prime Broker Defendants to join their scheme … primarily through Defendant EquiLend." (Def. Br. 23-24; AC ¶ 12). Defendants also argue that the Amended Complaint inadequately distinguishes between Defendants within corporate families. (Def. Br. 24). Finally, five of the Defendants are alleged to have held merely "an indirect partial ownership interest in EquiLend," which Defendants challenge as the basis for inferring participation in the conspiracy. (*Id.*).

Plaintiffs respond, and the Court agrees, that the Amended Complaint specifically alleges that each Defendant agreed to participate in the conspiracy. (Pl. Opp. 29).[11] In contrast, group pleading is "insufficient to withstand review

---

[11] *See* Pl. Opp. 29 n.6:

> *See, e.g.,* for Bank of America (¶¶ 46-51, 122-24, 149 n.33, 205-07 (joining the conspiracy), 225 (refusing to support SL-x), 229, 244); Credit Suisse (¶¶ 14-15, 17, 52-57, 89, 122-24, 203-05 (making false statements about AQS at the SEC panel), 210, 229, 240-41,

on a motion to dismiss … [where there are] no factual allegations in the complaint to connect each, or any, of the group defendants, directly to the conspiracy[.]" *Concord Assocs., L.P.*, 2014 WL 1396524, at *24. Because the Amended Complaint alleges each Defendant's participation separately, it is not impermissible group pleading to refer to their collective actions in furtherance of the conspiracy using a more general phrase such as "the Prime Broker Defendants." Further, the Amended Complaint identifies specific employees by name who held themselves out as representing the interests of their employers. Doing so provides each Defendant with sufficient notice of the claims against that Defendant and their grounds. As a result, it is proper to name a corporate sub-entity as a Defendant, such as "Credit Suisse Securities (USA) LLC," while pleading allegations using a more generic name, such as "Credit Suisse." The Amended Complaint accordingly does not rely impermissibly on group allegations.

### iii. Plaintiffs Adequately Allege "Direct Evidence" of Conspiracy

At the pleading stage, there are two ways that a plaintiff may "allege enough facts to support the inference that a conspiracy actually existed."

---

245-46, 249, 280); Goldman Sachs (¶¶ 11-12, 17-18, 21-23, 58-62, 89, 122-24, 149 n.33, 152-53, 189-91, 199-203 (organizing Prime Broker Defendants ahead of SEC Panel), 218 (threatening BNY Mellon), 219-20, 251-53, 257, 294-97 (formulating Project Gateway)); J.P. Morgan (¶¶ 17, 63-70, 89, 122-24, 149 n.33, 184, 210 (demanding that AQS serve as broker-only), 238-39, 245, 257 (negotiating parallel DataLend agreements)); Morgan Stanley (¶¶ 11-12, 19, 21-22, 71-78, 89, 121-24, 149 n.33, 192 (providing scrubbed data to Data Explorers), 199, 205-07, 210, 226-27, 243, 251, 279-98 (organizing Project Gateway)); UBS (¶¶ 79-87, 89, 122-24, 206-07, 210, 229, 242, 245, 249-50).

*Citigroup*, 709 F.3d at 136.  One way to do this is to "assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Id.*  An example of direct evidence is "a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Id.*; *see also Burtch* v. *Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) ("Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." (internal quotation marks and citations omitted)).  As an alternative to pleading direct evidence, a plaintiff may allege "circumstantial facts supporting the *inference* that a conspiracy existed."  *Citigroup*, 709 F.3d at 136.

Plaintiffs identify certain allegations that, they claim, suffice to plead direct evidence of a conspiracy.  (*See* Pl. Opp. 11-12).  They include the following:

- John Shellard, a Managing Director at J.P. Morgan and EquiLend Board member, stated in an August 7, 2013 meeting that there was a "general agreement among [the] directors [of EquiLend]" that "industry advances should be achieved from within EquiLend," rather than through third parties such as AQS, SL-x, and Data Explorers.  (AC ¶ 239).

- On a recorded Morgan Stanley conference call that occurred in January 2016, Thomas Wipf stated that he and William Conley agreed that Morgan Stanley and Goldman Sachs needed to "get a hold of this thing," by which he meant that they needed to act together to acquire and shut down AQS.  (*Id.* at ¶¶ 295-96).

- Carl Bishti, a Credit Suisse executive and EquiLend Associate Director, stated at meetings on February 6, 2013, and July 19, 2013, that SL-x could cause the stock lending market to "change overnight," but not without the "cooperation" of EquiLend, which he

described as, "the mafia run by five crime families." (*Id.* at ¶¶ 240-41).

- Emails and chats that are currently stored on Defendants' servers "indicate that EquiLend representatives, including CEO Brian Lamb, had been instructed not to 'break rank' and not to take independent actions in the marketplace until the 'EquiLend banks' determined as a group whether they would support any of the new platforms." (*Id.* at ¶ 16).

The alleged statements by Shellard and Wipf qualify as direct evidence of concerted action. It is true that, as Defendants point out, Shellard's statement describes an agreement among *EquiLend's directors*, not merely among the Prime Broker Defendants. (Def. Br. 21-22; Def. Reply 6). Yet the alleged conspiracy encompassed EquiLend as well as the Prime Broker Defendants. Defendants also observe that Shellard himself did not work as a prime broker for J.P. Morgan. (Def. Br. 21). The Court does not find this observation probative, as an employee need not work in a particular position to know of and describe his employer's collusive conduct. Both statements expressly describe agreements among the Defendants, and are thus direct evidence of concerted action (element one of a Sherman Act claim).

Bishti's statement, and the emails to Lamb and his colleagues, are different matters entirely. There are far too many layers of inference between Bishti's analogy to the mafia and any conclusions that might be drawn from it for the statement to qualify as direct evidence of anything much, except perhaps of Bishti's affinity for colorful speech. While the remainder of Bishti's statement might support an inference of EquiLend's strong hold on the market,

47

it is a far cry from *direct* evidence of conspiracy.  The allegation of emails and chats telling Lamb not to "break rank" is similarly too vague to qualify.[12]

Accordingly, Plaintiffs have adequately pleaded at least some "direct evidence" allegations of conspiracy.  Notably, while the qualifying allegations may be slim, even a failure to allege direct evidence of conspiracy would not necessarily be fatal to the pleading.

### iv.    Plaintiffs Adequately Allege Parallel Conduct

A plaintiff may also make a showing of concerted action by alleging "circumstantial facts supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136.  For instance, a plaintiff may state a Section 1 claim by alleging behavior "that would plausibly contravene each defendant's self-

---

[12] Defendants argue, and Plaintiffs do not contest, that other allegations fall short of qualifying as direct evidence of conspiracy.  These include, for example, an unnamed executive's statement that Credit Suisse would pursue an exchange through EquiLend rather than invest in SL-x, which Defendants argue is a natural unilateral decision not to invest in a competitor.  (AC ¶ 17; Def. Br. 22; Def. Reply 6).  In this regard, Defendants contend that the allegation of a 2009 "meeting of 'the five families' … [to] settle on their collective messaging" for an anticipated discussion with the SEC does not plead direct evidence of conspiracy.  (AC ¶ 202; Def. Br. 20).  Defendants argue that (i) this meeting "could not have been conspiratorial" because it was organized by Bank of America, which was not alleged to have joined the conspiracy until 2011; (ii) the Amended Complaint fails to specify either who attended the meeting or when and where it occurred; and (iii) a meeting to coordinate messaging to a public official is not an antitrust violation.  (Def. Br. 20).  Defendants also contest that the reference to "five families" fails adequately to allege direct evidence because Plaintiffs never identify to whom the phrase refers or connect the phrase to the alleged conspiracy.  (*Id.*).  And the allegation of use of the "Project Gateway" code word does not, in Defendants' view, plead direct evidence because the phrase was used to refer to lawful joint venture discussions by Thomas Wipf and William Conley about Morgan Stanley and Goldman Sachs potentially purchasing AQS.  (Def. Br. 21; Def. Reply 7; *see also* AC ¶¶ 11, 21-22, 294-97, 363).  Finally, Defendants claim that the allegation that Morgan Stanley and Goldman Sachs conspiratorially secured the participation of the other Defendants lacks the specifics necessary to count as direct evidence of conspiracy.  (Def. Br. 21).  However, the fact that these, and perhaps many more, allegations in the Amended Complaint do not satisfy the standard to plead direct evidence does not mean that the Amended Complaint does not contain other, well-pleaded allegations of direct evidence of conspiracy.

interest in the absence of similar behavior by rivals." *Starr*, 592 F.3d at 327 (internal citation and quotation marks omitted). Another way to plead circumstantial evidence of conspiracy is by alleging parallel conduct. "Examples of parallel conduct allegations that might be sufficient under *Twombly*'s standard include parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties[.]" *Citigroup*, 709 F.3d at 137 (internal citation and quotation marks omitted).

Because parallel conduct can result from many different factors, these allegations generally must be accompanied by "plus factors" that support an inference that the conduct resulted from a prior agreement. *See Citigroup*, 709 F.3d at 137-38. The Court will first address whether Plaintiffs have adequately pleaded parallel conduct and then assess Plaintiffs' pleading of plus factors.

Plaintiffs argue — and the Court agrees — that the Amended Complaint adequately pleads parallel conduct by Defendants. To start, concerning AQS, the Amended Complaint alleges that Credit Suisse, J.P. Morgan, Morgan Stanley, and UBS each, in separate meetings, communicated an identical position to AQS: that they would not support AQS unless it became a "broker-only platform." (Pl. Opp. 13; AC ¶ 210). Defendants contend that this pleading lacks sufficient factual details about who said what to whom and when, and that the Defendants' shared position was simply a recognition that "market standards" and OCC by-laws required "broker-dealers" to transact on AQS.

(Def. Br. 25-26).  Defendants' argument is fallacious; that OCC required end users to clear their trades through clearing brokers is not the same as a requirement that AQS be a "broker-only platform," the latter of which implies that no one but broker-dealers can use it.  Moreover, the claim that the allegations of Defendants' identical positions regarding AQS lacks specificity only works when reading paragraph 210 in total isolation.  Taken holistically, the allegations of Defendants' parallel conduct toward AQS, including withdrawals and denials of support and threats to other market participants, are sufficiently specific to survive a motion to dismiss.  (*See* AC ¶¶ 196-218).

Next, Defendants maintain that the Amended Complaint's allegations show divergent, rather than parallel, conduct.  (Def. Br. 25-28).  They point out that several Defendants allegedly joined ACS, while Bank of America was initially a strong supporter and continued to make substantial transactions on the platform through 2011.  (*See* AC ¶¶ 119, 205, 207).[13]  In Defendants' view, any commonalities in their behavior toward SL-x resulted not from conspiracy, but rather from the fact that they were all responding to the same prompt, *i.e.*, SL-x approaching the group of them with a proposal to form a "consortium" to invest in SL-x.  (*See id.* at ¶¶ 226-28).  Indeed, they posit, Defendants did not act alike toward SL-x because Goldman Sachs and Morgan Stanley declined support immediately, while the other Defendants waited for several years

---

[13]     Defendants suggest that the 2011 date is significant because it is "two years after the alleged conspiracy commenced." (Def. Br. 25).  This reasoning lacks merit because the Amended Complaint does not allege that Bank of America joined the conspiracy until 2011.

before making a decision. The Court disagrees. No doubt, the Amended Complaint contains allegations of divergent conduct, such as Susan O'Flynn's actions in support of central clearing as other Morgan Stanley decision makers schemed to prevent it. (*See* AC ¶¶ 281-87). But the presence of some divergent conduct does not negate the allegations of other, parallel conduct.

As to Data Explorers, Defendants argue that the Amended Complaint makes no allegations of parallel conduct. (Def. Br. 27). That is incorrect. The Amended Complaint alleges that Defendants entered into identical distribution agreements with DataLend in an attempt to undermine Data Explorers and push it from the market. (Pl. Opp. 14; AC ¶¶ 257-58).

In a variation on this theme, Defendants argue that, to the extent the Amended Complaint *does* plead parallel conduct, it fails to support an inference of conspiracy because the alleged parallel conduct was not contrary to Defendants' self-interest and made good business sense. (Def. Br. 26-31). After all, AQS and SL-x threatened Defendants' profits as stock loan middlemen, and the platforms they offered were new, untested, and bereft of critical mass and client demand. Precisely because of these deficiencies, it made business sense for Defendants to decline to run trades through the AQS and SL-x platforms. And the fact that SL-x allegedly failed in Europe suggests it had little to offer, and that Defendants were wise not to invest. (Def. Br. 27; AC ¶ 268). Finally, according to Defendants, the refusals to invest do not support an inference of conspiracy to block all-to-all trading in the United States because SL-x had no immediate plans to offer such trading in the

United States. (Def. Br. 27). Indeed, the SL-x platform was not even operational in the United States during the relevant Class Period. (*See* AC ¶¶ 20, 253, 268). More generally, Defendants caution against drawing inferences from their failure to invest in SL-x, which they deem to be nothing more than an allegation of inaction, a "particularly perilous" basis from which to draw conclusions. (Def. Br. 27).

The Court appreciates the challenges of drawing inferences from allegations of inaction. Nonetheless, on a motion to dismiss, all reasonable inferences must be drawn in Plaintiffs' favor, including those arising from allegations of inaction. On the broader contentions that the parallel conduct pleaded in the Amended Complaint fails to support an inference of conspiracy, the Court turns to a "plus factor" analysis.

## v. Plaintiffs Adequately Allege Plus Factors

Allegations that a defendant engaged in parallel conduct, without more, are often insufficient to plead circumstantial evidence of a conspiracy if "such behavior could be the result of coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *United States* v. *Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (internal citation and quotation marks omitted). Therefore, to survive a motion to dismiss, allegations of parallel conduct generally must be accompanied by "plus factors" that support an inference that the parallel conduct "flowed from a preceding agreement rather than from [the defendants'] own business priorities." *Citigroup*, 709 F.3d at 137-38. Examples of plus factors include "a

52

common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* at 136 (internal citation and quotation marks omitted).

"[T]hese plus factors are neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Citigroup*, 709 F.3d at 136 n.6. "The mere opportunity to conspire does not *by itself* support the inference that such an illegal combination actually occurred." *Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) (emphasis added). However, allegations of an opportunity to conspire may, when considered alongside allegations of parallel conduct and other plus factors, suffice to defeat a motion to dismiss.

"[T]he presence of plus factors certainly does not compel or 'necessarily lead to an inference of conspiracy.'" *Anderson News, LLC* v. *Am. Media, Inc.*, 123 F. Supp. 3d 478, 499 (S.D.N.Y. 2015) (quoting *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987)). Of course, at the summary judgment stage, "plus factors may not necessarily lead to an inference of conspiracy. For example, such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior[.]" *Apex Oil*, 822 F.2d at 254. And sometimes, a plaintiff's allegations of parallel conduct, combined with plus factors, will not support a Section 1 claim. "An inference of conspiracy will not arise when the conspirators' parallel conduct 'made perfect business

sense,' … 'there are obvious alternative explanations for the facts alleged,' … or the alleged facts 'suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy[.]'" *In re IRS*, 261 F. Supp. 3d at 462 (quoting *Citigroup*, 709 F.3d at 138; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010); *In re Elevator Antitrust Litig.*, 502 F.3d at 51). Nonetheless, "the requirement of '*plausible* grounds to infer an agreement *does not impose a probability requirement at the pleading stage*; it simply calls for enough facts to raise *a reasonable expectation* that *discovery* will reveal evidence of illegal agreement[.]'" *In re IRS,* 261 F. Supp. 3d at 462 (internal quotation marks omitted) (emphases in original) (quoting *Anderson News*, 680 F.3d at 184).

*Interfirm Communications:* As Plaintiffs point out, the Amended Complaint pleads multiple interfirm meetings at conferences, private dinners, and EquiLend board meetings, including the 2009 meeting convened by Bank of America (AC ¶ 202), meetings between Wipf and Conley (*id.* at ¶¶ 21, 294); a 2009 meeting between Bank of America and Goldman Sachs executives (*id.* at ¶ 200); meetings between Morgan Stanley, Goldman Sachs, and other Defendants at private dinners and conferences (*id.* at ¶¶ 297, 312); and meetings of EquiLend's Board (*id.* at ¶¶ 223, 297). At this stage of the litigation, these allegations are sufficient both to plead "a high level of interfirm communications" and to support an inference of an opportunity to conspire. *Gelboim*, 823 F.3d at 781.

Defendants counter that agent lenders were also present at the EquiLend board meetings, and that it is implausible that meetings in furtherance of the conspiracy took place with agent lender participation. (Def. Br. 31-32). The Court has already rejected Defendants' contention that the mere presence of agent lenders at the EquiLend board meetings renders the allegations about those meetings implausible. Moreover, the inquiry into plus factors considers "interfirm communications," which need not necessarily be conspiratorial communications. The EquiLend board meetings easily satisfy that standard. Defendants also claim that, other than the EquiLend board meetings, the Amended Complaint presents merely "vague references to isolated discussions." (*Id.* at 32). That is not accurate. As noted above, the Amended Complaint alleges multiple interfirm meetings at private dinners and conferences, as well as during EquiLend board meetings.

Defendants concede that the Amended Complaint may adequately plead an "opportunity to conspire," but argue that such opportunity alone is insufficient to support an inference that a conspiracy actually happened. (Def. Br. 32). The Court does not disagree, and considers the opportunity to conspire as but one of a series of plus factors supporting an inference that Defendants' parallel conduct flowed from conspiracy.

*Common Motive to Conspire:* Plaintiffs argue that the Prime Broker Defendants had a "common motive to preserve their supracompetitive profits" from charging excess fees under cover of price opacity. (Pl. Opp. 18). The Amended Complaint makes this allegation explicitly: "The Prime Broker

55

Defendants feared that, if borrowers and lenders saw what their counterparties were paying, they would use competition to reduce the Prime Broker Defendants' outsized intermediary profits." (AC ¶ 24). The Court has little difficulty finding a common motive to conspire from these allegations. Conversely, the Court rejects Defendants' argument that, while the Amended Complaint alleges that Defendants each had a unilateral interest in waiting to see how the purported victim entities evolved instead of "supporting ventures that supposedly threatened its profits," it falls short of alleging that Defendants had a common motive to conspire. (Def. Br. 32-33).

*Actions Against Individual Self-Interest:* Plaintiffs contend that the Amended Complaint alleges actions against self-interest because, "[a]bsent the conspiracy, it would have been in the self-interest of many of the Prime Broker Defendants to support the platforms to avoid the risk of being left behind[,]" and to offer their clients access to AQS to avoid their jumping ship to a competitor. (Pl. Opp. 18-19). At this stage of the litigation, the Court accepts this inference as reasonable. The Court thus concludes that Defendants' lack of support for the new market entrants serves as an additional plus factor, adding to other circumstantial evidence of conspiracy.

Defendants contend that the Amended Complaint effectively alleges that they "continued to conduct business as they always had," which — in Defendants' view — required no conspiracy to accomplish. (Def. Br. 33). That may well be the case, but it is not the appropriate inquiry for the moment. The law is clear that plus factors do not "necessarily lead to an inference of

conspiracy." *Apex Oil Co.*, 822 F.2d at 254.  And they do not need to; "plus factors" need not *require* conspiracy in order to support an inference that parallel conduct by the defendants flowed from one.

*Collusion in Other Markets:*  The Amended Complaint additionally alleges that Defendants' "stock loan conspiracy is but the latest in a string of anticompetitive conspiracies involving the financial markets in which the Prime Broker Defendants have participated[.]"  (AC ¶ 346; *see also id.* at ¶¶ 347-62 (detailing alleged conspiracies in other markets)).  "Allegations of anticompetitive wrongdoing in [other venues] — absent any evidence of linkage between such foreign conduct and conduct here — is merely to suggest … that if it happened there, it could have happened here."  *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (internal citation and quotation marks omitted).  The Court agrees squarely with Defendants that these allegations are irrelevant, and will not consider them for purposes of evaluating the sufficiency of the Amended Complaint.  (*See* Def. Br. 33).

In sum, the Amended Complaint adequately pleads plus factors in addition to parallel conduct, and thereby supports an inference of concerted action from circumstantial evidence.

### vi.    Plaintiffs' Allegations Are Adequate As Against Bank of America, J.P. Morgan, UBS, and Credit Suisse

*Bank of America:*  Defendants seek dismissal of the claim against Bank of America on the basis that its membership in the conspiracy is implausible because it was an early supporter of, and investor in, AQS before allegedly

joining the conspiracy in 2011, at which point it declined to invest additional funds in AQS, and limited its transactions with AQS. (Def. Br. 34-36; *see* AC ¶¶ 157, 205-07). Defendants observe that Bank of America never withdrew its *initial* investment in, or eliminated *all* transactions with, AQS. (Def. Br. 35; Def. Reply 13; *see* AC ¶¶ 205, 207). Defendants infer from these observations, respectively, that joining the conspiracy would have been contrary to Bank of America's interests, and that Bank of America would not have wanted to harm AQS. (Def. Br. 35). Plaintiffs respond that it is entirely plausible that Bank of America initially supported AQS but changed its mind and joined the conspiracy as a result of pressure from the other Defendants, especially given that the transfer of Morgan Stanley's and UBS's head of prime brokerage to be head of Global Prime Brokerage at Bank of America allegedly facilitated such pressure. (Pl. Opp. 22; AC ¶¶ 200, 205-07).

Defendants also suggest an alternate explanation for Bank of America's decision not to invest more funds and to reduce its transactions with AQS in or about 2011: AQS was failing. (Def. Br. 35; *see* AC ¶¶ 212-13, 269). But, as Plaintiffs point out, AQS was not failing when Bank of America withdrew its support in 2011; it was not failing until the end of 2014, following the trade-flow hypoxia caused by Defendants. (Pl. Opp. 22; AC ¶¶ 206, 266, 269).

As to SL-x and Data Explorers, Bank of America allegedly continued meetings with SL-x longer than the other Defendants, and further had independent reasons not to support SL-x due to Bank of America's support of its rival AQS. (Def. Br. 36; AC ¶¶ 234, 239-40, 244). According to Defendants,

the sole plausible allegation against Bank of America in relation to Data Explorers is that it held a seat on EquiLend's board.  (Def. Br. 36). Unfortunately for Bank of America, presence on EquiLend's board, combined with allegations of parallel conduct supported by plus factors, is enough at this stage of the litigation.

To be sure, Defendants do hit on a weakness: the Amended Complaint arguably contradicts itself by alleging that Bank of America convened a meeting of the "five families" in furtherance of the conspiracy in 2009, a point in time when it was allegedly still a strong supporter of AQS.  (Def. Br. 36; Def. Reply 13-14).  Nonetheless, Defendants' counter-explanations for Bank of America's behavior improperly draw inferences against Plaintiffs.  (Pl. Opp. 22). While the Court may be skeptical about the strength of the claims against Bank of America, at least as concerns conduct toward AQS, Plaintiffs' arguments, when taken as a whole, are not entirely implausible and thus cannot be rejected at the pleading stage.

*J.P. Morgan, UBS, and Credit Suisse:*  Defendants argue that the allegations against J.P. Morgan, UBS, and Credit Suisse are insufficient because the Amended Complaint fails to allege that these Defendants threatened or discouraged AQS, SL-x, or their potential customers, or that they participated in any conspiratorial meetings.  (Def. Br. 37).  According to Defendants, the Amended Complaint also fails to allege that J.P. Morgan or UBS used the phrase "five families."  (*Id.*).  The primary allegations against these three Defendants are that they did not invest in or transact with AQS and

SL-x, which decisions are, in Defendants' view, consistent with the Defendants' unilateral interests. (*Id.*; *see* AC ¶¶ 210, 239, 242, 245).

These arguments are not meritorious. As explained above, the Amended Complaint does allege that these Defendants participated in conspiratorial meetings. And because, as also explained above, the Court is not relying on references to the "five families," the fact that not every Defendant used that term does not matter. Not every member of a conspiracy needs to issue the same threats for the conspiracy to exist. Plaintiffs have adequately pleaded that these Defendants' failures to invest in or support new market entrants was part of a conspiracy to reduce competition in the market. More broadly, Plaintiffs adequately plead the first element of a Sherman Act claim.

### 2. The Amended Complaint Adequately Alleges an Unreasonable Restraint on Trade Under Either a *Per Se* or a Rule of Reason Theory

#### a. Applicable Law

Defendants also attack the sufficiency of Plaintiffs' pleadings on the second element of a Sherman Act claim — whether the alleged concerted action was an unreasonable restraint on trade — albeit to a lesser degree. Courts undertaking this analysis "apply one of two rules designed to provide guidance in forming judgments about the competitive significance of challenged restraints." *Am. Express Co.*, 838 F.3d at 193. Plaintiffs may either plead that the alleged concerted action was *per se* illegal under Section 1 of the Sherman Act, or that the conduct violated what is known as the "rule of reason." *See, e.g.*, *Texaco Inc.* v. *Dagher*, 547 U.S. 1, 3-5 (2006).

The *per se* rule applies to "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. R. Co.* v. *United States*, 356 U.S. 1, 5 (1958); *see also Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985) (reiterating the *per se* rule). For instance, "[i]t has long been settled that an agreement to fix prices is unlawful *per se*. It is no excuse that the prices fixed are themselves reasonable." *Catalano, Inc.* v. *Target Sales, Inc.*, 446 U.S. 643, 647 (1980).

Courts have made clear, however, that "[o]nly 'manifestly anticompetitive' conduct … is appropriately designated *per se* illegal." *Bogan* v. *Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999) (internal citations and quotation marks omitted). Courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Dagher*, 547 U.S. at 5. The rule of reason "requires a court to weigh all of the circumstances surrounding the challenged conduct to determine whether the alleged restraint is unreasonable, taking into account the nature of the specific business, the industry, the restraint's history, and whether the defendant has market power." *LLM Bar Exam, LLC* v. *Barbri, Inc.*, 271 F. Supp. 3d 547, 578-79 (S.D.N.Y. 2017) (quoting *In re Aluminum Warehousing Antitrust Litig.*, No. 13 MDL 2481 (KBF), 2014 WL 4277510, at *25 (S.D.N.Y. Aug. 29, 2014)).

"Group boycotts, which generally consist of agreements by two or more persons not to do business with other individuals, or to do business with them only on specified terms, may in some limited circumstances constitute *per se* violations of the Sherman Act." *Balaklaw* v. *Lovell*, 14 F.3d 793, 800 (2d Cir. 1994) (citing *Volvo N. Am. Corp.* v. *Men's Int'l Pro. Tennis Council,* 857 F.2d 55, 73 (2d Cir. 1988)). "[T]he category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC* v. *Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986). In contrast, "modern antitrust law evaluates [joint venture] conduct — including the creation of the joint venture itself, its business focus, its product selection, and its pricing — under the rule of reason, with the pleading requirements that standard imposes." *In re IRS*, 261 F. Supp. 3d at 467 (citing *Dagher*, 547 U.S. at 1 n.1 & 6-7). The animating inquiry is "whether there is a contract, combination ... or conspiracy amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition[.]" *Am. Needle, Inc.* v. *Nat'l Football League*, 560 U.S. 183, 195 (2010) (internal citations and quotation marks omitted). Of course, even participants in joint ventures may be liable *per se* for conduct undertaken outside the venture. *Cf. Ariz.* v. *Maricopa Cty. Med. Soc.*, 457 U.S. 332, 355-57 (1982).

### b.     Discussion

Defendants' second line of attack is to argue that, to the extent Plaintiffs' allegations concern joint venture or joint investment conduct, those allegations should trigger a rule of reason analysis — which, in Defendants' view, would fail.  Plaintiffs respond that the conduct alleged should be deemed *per se* illegal, but that, in the alternative, the allegations also suffice to plead a claim even under the rule of reason.  The Court agrees with Plaintiffs on both issues.

### i.     The Alleged Conduct Is *Per Se* Unlawful

Defendants argue that, except for the alleged boycott of AQS, all of the Amended Complaint's allegations concern actions taken in the context of, and in furtherance of, a joint venture, and thus should be evaluated under the rule of reason rather than the *per se* standard.  (Def. Br. 38).  Even though the Amended Complaint pleads at one point that EquiLend "is not the independent joint venture that it purports to be," Defendants observe that it elsewhere characterizes EquiLend as "organized as a joint venture."  (Def. Br. 38; AC ¶¶ 310, 319).  In Defendants' words, "Plaintiffs' antitrust claim primarily rests on allegations regarding EquiLend that are entirely consistent with lawful joint-venture conduct."  (Def. Reply 14).  Further, Defendants reiterate that the fact that EquiLend's ownership and board included agent lenders "contradict[s] any suggestion that it is illegitimate."  (Def. Br. 38; *see* AC ¶¶ 308, 378).

Plaintiffs argue in contrast that "[t]he question of whether to apply *per se* or rule of reason turns on the type of *claim* at issue, not on isolated allegations that make up the claim."  (Pl. Opp. 31).  Plaintiffs argue that, taken as a whole,

the Amended Complaint alleges a group boycott, which Plaintiffs contend automatically falls within a category of *per se* illegal conduct.  (*Id.* at 7-8, 31).  Even taking elements of the Amended Complaint in isolation, and even if EquiLend may have been a joint venture in some respects, Plaintiffs argue that the alleged conduct should still be analyzed under the *per se* rule because it was undertaken "*outside of the joint venture.*"  (*Id.* at 33 (emphasis in original)).  In other words, Defendants' alleged concerted actions, aimed at starving AQS, SL-x, and Data Explorers of data and liquidity, took place in circumstances that exceeded Defendants' service on EquiLend's Board, even if the conduct was planned and agreed to at EquiLend meetings.  Plaintiffs rely on *Starr* v. *Sony BMG Music Entertainment*, in which the Second Circuit vacated and remanded a rule-of-reason-based dismissal of an antitrust complaint involving purported joint ventures, where the plaintiffs had challenged the joint ventures as a sham means to implement anticompetitive agreements and there were "many allegations of conduct that took place outside of the joint ventures[.]" *Starr*, 592 F.3d at 326-27.  (*See also* Pl. Opp. 32).

The Court agrees with Plaintiffs.  The Amended Complaint alleges that EquiLend's joint venture status was a smokescreen behind which the Prime Broker Defendants could operate.  The full relevant allegation in the Amended Complaint is that, "[t]hough EquiLend is nominally organized as a joint venture, this fact does not shield it — or the Prime Broker Dealers — from the antitrust laws.  This is because EquiLend does not act as an independent, rational market participant[.]"  (AC ¶ 310).  In other words, the Amended

64

Complaint is entirely consistent in its allegations regarding EquiLend's joint venture status. More importantly, the Amended Complaint alleges that the Prime Broker Defendants, acting as separate and individual economic decision-makers, conspired to boycott SL-x, Data Explorers, and also AQS, and that this conduct was undertaken on behalf of each Prime Broker Defendant, and not in furtherance of a legitimate joint venture.

Defendants rely on *Texaco Inc.* v. *Dagher*, in which the Supreme Court held that it was not *per se* illegal for "a lawful, economically integrated joint venture to set the prices at which the joint venture sells its products." 547 U.S. at 3. But Defendants' reliance is misplaced. In *Dagher*, Texaco and Shell had formed a joint venture, called Equilon Enterprises, that "was approved by consent decree, subject to certain divestments and other modifications, by the Federal Trade Commission," in order to refine and sell gasoline. *Id.* at 4. The consent decree imposed no restriction on prices, and Equilon sold the gasoline at a single price under both the Texaco and Shell brand names. *Id.* The Supreme Court reasoned that the *per se* rule against price-fixing did not apply because:

> Texaco and Shell Oil did not compete with one another in the relevant market — namely, the sale of gasoline to service stations in the western United States — but instead participated in that market jointly through their investments in Equilon. In other words, the pricing policy challenged here amounts to little more than price setting by a single entity — albeit within the context of a joint venture — and not a pricing agreement between competing entities with respect to their competing products.

*Id.* at 5-6.  Here, in contrast, the parties have not disputed that the Prime

Broker Defendants are direct competitors in the stock loan market.  To be sure,

some of the Prime Broker Defendants' alleged conduct toward SL-x and Data

Explorers may arguably have been "*consistent with* lawful joint-venture

conduct" (Def. Reply 14 (emphasis added)), rather than conduct undertaken by

"separate economic actors pursuing separate economic interests," *Am. Needle*,

560 U.S. at 195.  But mere consistency with an alternate inference supporting

the Defendants' position is not enough at this stage of the litigation, where the

Court must draw all reasonable inferences in favor of Plaintiffs.

      In any event, plenty of relevant allegations cannot be so characterized.

For instance, the Amended Complaint alleges that, at EquiLend board meetings

in August and September 2011, the Prime Broker Defendants each agreed not

to support SL-x.  (AC ¶ 223).  Thereafter, each Prime Broker Defendant

separately and individually "withheld capital and support from SL-x through

the fall of 2011 and throughout 2012[.]"  (*Id.* at ¶ 228).  A Morgan Stanley

employee told an SL-x representative to deal directly with EquiLend.  (*Id.* at

¶¶ 224-26).  In late 2013, the Prime Broker Defendants allegedly agreed to a

collective boycott of SL-x, and began threatening other market participants to

deter them from using SL-x.  (*Id.* at ¶¶ 236-37).  Similarly, the Amended

Complaint does not allege that EquiLend, acting as an "independent center[] of

decisionmaking," *Am. Needle*, 560 U.S. at 195, launched DataLend because it

wished to compete with Data Explorers.  Rather, the thrust of the allegations is

that the Prime Broker Defendants used EquiLend to launch a subpar product

in an attempt to undermine Data Explorers so as to maintain opacity in pricing data *and* their lucrative roles as prime broker intermediaries.  These allegations are a far cry from *Dagher*, and the alleged conduct is not immunized from the *per se* rule by virtue of EquiLend's presence in the fact pattern.

### ii.     The Alleged Conduct Violates the Rule of Reason

Despite the Court's conclusion that the allegations in the Amended Complaint qualify as *per se* unlawful restraints of trade under the Sherman Act, for completeness the Court also undertakes a rule of reason analysis.  The Second Circuit has defined anticompetitive conduct as "conduct without a legitimate business purpose that make[s] sense only because it eliminates competition."  *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014).  Plaintiffs argue that, even if a rule of reason applies, the Amended Complaint satisfies this standard.  (Pl. Opp. 33-41).  The Court also finds that it has.

With respect to AQS, Defendants argue that the Amended Complaint alleges nothing improper about EquiLend's purchase of AQS, which it acquired at a low price after the platform failed and OCC declined to buy it.  (Def. Br. 41-42; *see* AC ¶¶ 294, 299).  Indeed, according to Defendants, the Amended Complaint does "not allege any facts suggesting that the Prime Broker Defendants undermined AQS's discussions with OCC."  (Def. Br. 42; *see* AC ¶¶ 292, 298).  While acknowledging that the Amended Complaint alleges that the purchase was made to "bury" AQS (AC ¶ 21), Defendants contend that, in fact, after the acquisition, EquiLend continued to operate the AQS technology,

67

and the Amended Complaint has not alleged "facts suggesting otherwise" (Def. Br. 42). Plaintiffs respond that EquiLend's purchases of both SL-x and AQS were anticompetitive because "it would have been irrational for Defendants to buy platforms they had no intention of using in the absence of an anticompetitive motive," and, further, that when considered in the context of the Amended Complaint as a whole, both purchases confirm Defendants' alleged anticompetitive intent. (Pl. Opp. 38).

Drawing all inferences in favor of Plaintiffs, as required on a motion to dismiss, the Court concludes that the Amended Complaint adequately pleads that Defendants purchased both AQS's and SL-x's intellectual property for anticompetitive purposes, as evidenced by the underuse of the products after purchase. Defendants' contention that EquiLend *did* operate the AQS technology post-purchase, and that the Amended Complaint has not alleged "facts suggesting otherwise" (Def. Br. 42), improperly draws inferences in Defendants' favor. Further, the Amended Complaint does allege that, "the Prime Broker Defendants agreed to exert their influence as Directors of OCC and Directors of EquiLend to prevent OCC from acquiring AQS." (AC ¶ 298). That allegation supports an inference that "Defendants undermined AQS's discussions with OCC," even without specific factual allegations of precisely how Defendants went about doing so. (Def. Br. 42).

As to SL-x, Defendants contend that EquiLend's decision not to merge with SL-x cannot support an antitrust claim because there is no indication that a merger would have been in EquiLend's interest. (Def. Br. 41; *see* AC ¶¶ 224,

68

253, 268).  Separately, Defendants argue that the Amended Complaint fails adequately to allege specific action by Defendants impeding SL-x's access to central clearing, or collusion not to invest in SL-x, and that any such allegation would fail a rule of reason analysis because each Defendant had rational unilateral reasons not to pursue the investment.  (Def. Br. 41).  Similarly, Defendants maintain that EquiLend's purchase of SL-x's intellectual property, and subsequent non-use of it, was "legitimate joint venture conduct."  (*Id.*; AC ¶ 272).  Plaintiffs respond that the Amended Complaint alleges more than a declined merger.  For instance, Conley "told SL-x executives that the Prime Broker Defendants would not support SL-x" and would only permit this type of market evolution from within EquiLend, and the Prime Broker Defendants each declined to support SL-x *as a result of* their agreed boycott.  (Pl. Opp. 37). Taking Plaintiffs' allegations as true and drawing all inferences in their favor, these allegations are sufficient to support a reasonable inference that Defendants' conduct toward SL-x was a result of an agreement among the Defendants, rather than of unilateral decision-making, and that EquiLend's purchase and non-use of SL-x's intellectual property was anticompetitive conduct that lacked "a legitimate business purpose" and made sense "only because it eliminates competition."  *In re Adderall XR Antitrust Litig.*, 754 F.3d at 133.

Defendants next argue that EquiLend's creation of DataLend was pro-competitive, as shown by its lower prices, and that the Amended Complaint does not allege any anticompetitive use of trading data or other anticompetitive

conduct.  Indeed, Defendants observe, the Amended Complaint does not even allege that Defendants failed to subscribe to Data Explorer's data service or forced Data Explorers to shut down.  (Def. Br. 40; AC ¶¶ 261, 257).  Plaintiffs respond by identifying allegations that Defendants overlook, allegations that evince both insult and injury:  Defendants created DataLend not to compete with, but rather to "kill," Data Explorers by agreeing "in lockstep, to distribution agreements with DataLend" that limited price transparency but still provided a product that, while anemic and subpar, could nonetheless "undermine Data Explorers," and then aggressively underpriced that product.  (Pl. Opp. 36-37).  Plaintiffs argue as well that the restrictions limiting the distribution of pricing data were not pro-competitive.  (*Id.* at 37).  Plaintiffs are correct.  At this stage of the litigation, the possibility that Defendants' conduct could conceivably be characterized as improving competition does not warrant dismissal.

Finally, Defendants argue that the joint-venture allegations (which comprise everything except the AQS boycott) fail the rule of reason.  They form this conclusion because, in their view, the Amended Complaint (i) lacks allegations as to EquiLend's market power and the joint venture's competitive benefits and harms, and (ii) relies solely on assertions "that Defendants' conduct generally caused anticompetitive harm" and lacked a "pro-competitive rationale."  (Def. Br. 38-39; AC ¶¶ 323-35, 389).  Plaintiffs respond that they *have* alleged circumstantial evidence of Defendants' market power in the form of an allegedly successful boycott that drove out competitors.  (Pl. Opp. 40).

70

*See Todd* v. *Exxon Corp.*, 275 F.3d 191, 206-07 (2d Cir. 2001) ("If a plaintiff can show an actual adverse effect on competition, such as reduced output … we do not require a further showing of market power.").  Plaintiffs point as well to the uncontested allegation that the Prime Broker Defendants controlled approximately 70% of market share.  (Pl. Opp. 40; Def. Br. 39-40).

This dispute boils down to whether the allegations concern conduct by EquiLend alone, or conduct undertaken by the Prime Broker Defendants using EquiLend.  As explained above, the Amended Complaint alleges that the Prime Broker Defendants took concerted action outside the scope of their joint venture in regards to both SL-x and Data Explorers.  It is therefore the Prime Broker Defendants' market power, not Defendant EquiLend's market power, that matters.  The Amended Complaint has adequately alleged that the Prime Broker Defendants held substantial market power.

In sum, whether analyzed as *per se* unlawful conduct, or under the rule of reason, the Amended Complaint adequately pleads that Defendants' concerted actions amounted to an unreasonable restraint on trade.

### 3. Plaintiffs Have Antitrust Standing

#### a. Applicable Law

In addition to a comprehensive attack on Plaintiffs' allegations of an antitrust violation, Defendants also contest whether Plaintiffs have standing to challenge any such violation.  To confer antitrust standing, an alleged injury must be "of the type the antitrust laws were intended to prevent and [an injury] that flows from that which makes defendants' acts unlawful." *Brunswick Corp.*

71

v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). A plaintiff must also allege that it is an "efficient enforcer" of the antitrust laws. *Ross* v. *Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 n.1 (2d Cir. 2008). Courts determine "efficient enforcer" standing by primarily considering the following factors:

> [i] the directness or indirectness of the asserted injury; [ii] the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; [iii] the speculativeness of the alleged injury; and [iv] the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt Commc'ns, Inc.* v. *PMC Assocs., LLC*, 711 F.3d 68, 78 (2d Cir. 2013) (internal citation omitted). "The extent to which these factors apply when plaintiffs sue for injunctive relief depends on the circumstances of the case." *Daniel* v. *Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005). "Similarly, the weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Id.*

As to the third factor, speculativeness, a plaintiff need not "account precisely for the likely effects of" competition that would have occurred but for the defendant's wrongful conduct as long as there is a "fair assumption" that "those effects can be sufficiently estimated and measured[.]" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009); *see also J. Truett Payne Co., Inc.*, v. *Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (describing a "willingness to accept a degree of uncertainty in … ascertaining business damages").

### b. Discussion

Plaintiffs argue that Defendants' alleged boycott of AQS, SL-x, and Data Explorers deprived them "of more efficient, competitive, and transparent trading options" that would have increased price transparency and competition. (Pl. Opp. 41-42). Plaintiffs rely in particular on three allegations in the Amended Complaint, to the effect that the lack of a central marketplace for stock loan transactions (i) creates bottlenecks, (ii) wastes resources, and (iii) causes volatile, opaque, and artificially inflated prices. (AC ¶ 118). Defendants allegedly preserved this "inefficient, antiquated OTC structure," which conceals information about pricing and availability and leads to "high search costs and inefficient pricing," by blocking the development of "a fully electronic and transparent trading environment." (*Id.* at ¶¶ 324-26, 328). Defendants thereby maintained themselves as middlemen and stopped Plaintiffs from trading directly, making negotiations "cumbersome and difficult to do," and "reduc[ing] the volume of trades that would otherwise occur[.]" (*Id.* at ¶¶ 327, 329-30).

According to Plaintiffs, these harms could have been avoided through centralized "electronic trading" for stock loan transactions. (AC ¶¶ 117, 119). More specifically, AQS and Data Explorers would have provided price transparency to the stock loan market (*id.* at ¶¶ 146, 255), and SL-x would have made more lender stocks visible to potential borrowers (*id.* at ¶ 176). If "Defendants had acted unilaterally," they would have taken "the pro-competitive path to central clearing[,]" which in turn would have enhanced

borrower choice in selecting brokers, increased competition, and lowered transaction costs. (*Id.* at ¶¶ 302, 344-45). The likely effect of centralized electronic trading in the OTC stock loan market — and thus the injury Defendants caused by blocking its development — could reasonably be expected to surpass that of electronic trading in futures exchange markets, which has been researched and quantified. (*Id.* at ¶¶ 334-35).

Defendants do not challenge that the injury alleged is "of the type the antitrust laws were intended to prevent[.]" *Brunswick Corp.*, 429 U.S. at 489. Nor do they contest that Plaintiffs have satisfied three of the four factors to plead "efficient enforcer" standing. Instead, Defendants argue the remaining factor — the speculativeness of the alleged injury — disfavors standing for three reasons.

*First*, Defendants argue that the alleged injury is "base[d]" on the loss of an all-to-all trading platform, but Data Explorers and SL-x had no plans to offer such a trading platform in the United States. (Def. Br. 42-43; *see* AC ¶¶ 179, 193). Defendants describe Data Explorers as "a pricing service," and SL-x as "a non-operational platform that lacked central clearing in the United States and did not plan to offer anonymous trading." (Def. Reply 20).

Plaintiffs counter that Data Explorers and SL-x would have "increased efficiency and price competition and transparency in the market in different ways from AQS." (Pl. Opp. 43). Plaintiffs point to the Amended Complaint's allegations that Data Explorers offered "performance" data and other products to enhance borrowers' and lenders' insight into whether their terms were

consistent with comparable market trades (*id.* at ¶ 188), and that it would have reduced pricing opacity (*id.* at ¶ 193). As for SL-x, the Amended Complaint alleges that it would have alleviated the need "to contact the Prime Broker Defendants by telephone or instant messages in order to get a quote" (*id.* at ¶ 173); provided "real-time" data about pricing and quantity, potentially "integrat[ing] data and analytics from other market sources" (*id.* at ¶¶ 174-75, 177); increased the visibility of lenders' stocks to potential borrowers (*id.* at ¶ 176); permitted central clearing for certain European transactions (*id.* at ¶ 178); enabled anonymous trading by, and provided automated matching for, broker-dealers and agent lenders while also making possible "simultaneous one-to-one and one-to-many negotiations" (*id.* at ¶¶ 179-80); and was "poised to clear U.S. stock loan trades" and would have done so but for Defendants' wrongful conduct (Pl Opp. 29; *see* AC ¶¶ 233-35). According to the Amended Complaint, SL-x would have afforded broker-dealers $8 billion in capital savings benefits in addition to reduced operational and administrative costs. (AC ¶ 181).

*Second*, Defendants argue that AQS lacked the ability to enable all-to-all trading due to rules requiring broker-dealer intermediaries. (Def. Br. 42-43). Plaintiffs counter that AQS accounted for this limitation by enabling all-to-all trading using clearing agents. (Pl. Opp. 43; *see* AC ¶ 154 n.36). Further, Plaintiffs contend that the fact that many buy-side parties embraced AQS shows that AQS would have benefitted investors, and AQS's own quantitative analysis shows the same. (Pl. Opp. 43; *see* AC ¶¶ 160, 162-63, 168-69).

Specifically, AQS would have reduced lending risks (AC ¶ 158), provided useful centralization (*id.* at ¶ 159), promised direct execution of transactions via clearing brokers (*id.* at ¶ 161), and afforded "daily price discovery and transparency" (*id.* at ¶ 164). Defendants respond that the Amended Complaint fails to allege that Defendants blocked the more than 60 other brokerage firms from acting as enabling clearing-agent intermediaries. (Def. Br. 42-43; Def. Reply 20; *see* AC ¶ 154 n.36).

*Third*, Defendants theorize that AQS, SL-x, and Data Explorers were the direct victims of the alleged conspiracy and thus the proper plaintiffs to bring this claim. (Def. Br. 45). Plaintiffs counter that those entities' decisions not to sue have no bearing, and in any event, AQS has since filed a related action. (Pl. Opp. 44). Plaintiffs maintain that they have antitrust standing as both the "direct purchasers" and the "consumers" of the financial product at issue, and that their injuries were "logical, foreseeable, and [the] intentional object of Defendants' conspiracy." (*Id.* at 41).

Defendants' arguments are thought-provoking, but insufficient to merit dismissal. To start, Defendants challenge merely one of the four factors to plead "efficient enforcer" standing. The efficient enforcer inquiry is a general balancing test in which the importance assigned to each factor "will necessarily vary with the circumstances of particular cases." *Gatt*, 711 F.3d at 78. Thus, even if the injury alleged veers closer to speculative than prudence would advise, it would not eliminate Plaintiffs' standing. Again for the sake of completeness, the Court has also assessed the parties' arguments on

76

speculativeness and has concluded that Plaintiffs' position is the stronger. The circumstances of this case are distinct from those in *In re IRS*, where the court rejected antitrust standing because it was "'entirely uncertain' that, absent the scheme, the necessary infrastructural preconditions for [the alleged lost benefit] … would have developed." *In re IRS*, 261 F. Supp. 3d at 494 (quoting *Gatt*, 711 F.3d at 79). Here, Plaintiffs have plausibly alleged that the new market entrants were met with market demand, and would have provided benefits, including increased transparency and efficiency leading to lower prices, had the conspiracy not occurred.

### 4. Plaintiffs' Claims Are Not Time-Barred

#### a. Applicable Law

Defendants also mount a challenge to the timeliness of Plaintiffs' claims. Claims under Section 1 of the Sherman Act are subject to a four-year statute of limitations that begins to run "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see* 15 U.S.C. § 15b. "Thus, if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to [the plaintiff] to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Zenith Radio Corp.*, 401 U.S. at 339.[14] If the

---

[14] The parties dispute whether a claim accrues when "the defendant commits an act that injures the plaintiff" (Def. Br. 45), or "when *the injury occurs*" (Pl. Opp. 50). Despite Defendants' apparent attempt to capitalize on the ambiguity of the phrase "commits an act that injures the plaintiff" (Def. Br. 45), the law is clear that the claim accrues at the time of injury. *See Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 401 U.S. 321, 338-39

77

defendant engages in a continuing violation, each new overt act that is part of the violation restarts the period of limitations, but does not permit the plaintiff to recover for injuries caused by acts that occurred before that limitations period. *Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal citation omitted). Claims for unjust enrichment under New York law are subject to a six-year period of limitations where the plaintiff seeks an equitable remedy, and a three-year period of limitations where the plaintiff seeks monetary damages. *Matana* v. *Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013).

The statute of limitations may be tolled by a defendant's fraudulent concealment of its conduct. "[C]lassic § 1 conduct [is] subject to Rule 8(a) pleading standards." *Hinds Cty., Miss.* v. *Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 392 (S.D.N.Y. 2010). However, to plead fraudulent conduct, a plaintiff must allege each of the following elements with the particularity required by Rule 9(b): "[i] that the defendant concealed from him the existence of his cause of action, [ii] that he remained in ignorance of that cause of action until some point within [the limitations periods], and [iii] that his continuing ignorance was not attributable to a lack of diligence on his part." *State of N.Y.* v. *Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *see also Butala* v. *Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996) (collecting cases and confirming that to plead tolling by fraudulent concealment, each element —

---

(1971). (*See also* Def. Reply 22 (acknowledging that a claim accrues "[a]s soon as a plaintiff suffers *any* injury from an allegedly wrongful act")).

concealment, ignorance, and diligence — must satisfy Rule 9(b)'s heightened pleading standard).

### b. Discussion

Plaintiffs filed their claims against the defendants named in the initial Complaint on August 16, 2017 (Dkt. #1), and against the additional defendants named in the Amended Complaint on November 17, 2017, alleging a continuing antitrust violation (Dkt. #73; AC ¶ 387). Accordingly, as Defendants' fourth line of attack, they contend that Plaintiffs' antitrust claim is time-barred to the extent it seeks damages for conduct committed before August 16, 2013, which time period would include the aspects of Plaintiffs' claim that are based on the alleged boycott of Data Explorers and the bulk of Plaintiffs' antitrust claim related to SL-x. (Def. Br. 46 (citing AC ¶¶ 254-65, 219-32)). Defendants also argue that Plaintiffs' unjust enrichment claim is time-barred for conduct prior to August 16, 2014, because, as Plaintiffs seek monetary damages, the three-year limitations period applies. (Def. Br. 46; AC ¶ 397).

### i. Plaintiffs Adequately Allege Concealment

"[T]he plaintiff may prove the concealment element [of tolling] by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083. Examples of inherently self-concealing frauds include passing a fake vase off as a real

antique, and a conspiracy that "must remain concealed from the victim of the" collusion in order "to endure." *Id.* at 1084.

Plaintiffs argue both that the alleged conspiracy was inherently self-concealing and that Defendants took affirmative steps to conceal it. (Pl. Opp. 45-46). At a minimum, the Court agrees that the Amended Complaint adequately pleads inherent self-concealment because the alleged conspiracy required numerous participants, was designed to endure, and depended on concealment for its success. *Cf. Hendrickson Bros.*, 840 F.2d at 1083-84 (finding that a "bid-rigging conspiracy" was inherently self-concealing where it had at least six members and discovery "would have defeated the enterprise").

Defendants retort that a finding of inherent self-concealment would conflict with the Amended Complaint's allegation that they "openly threatened industry participants." (Def. Br. 47). Not so. That Defendants made "open[] threat[s]" does not necessarily mean they made *public* threats. The Amended Complaint alleges that Defendants communicated threats directly to individual executives at hedge funds, and that these were threats to withhold bespoke services, such as official and unofficial assistance to former employees of the Defendants, the sharing of "proprietary research," and special access to initial public offerings. (AC ¶¶ 191, 213, 218). If any inferences are to be drawn from the nature of these services, the Court infers that such services were likely provided quietly, in the context of personal relationships, and that threats to eliminate them would have been similarly personalized and discrete.

Accordingly, the threats do not undermine a finding that the conspiracy was inherently self-concealing.

Defendants next assert, incorrectly, that the conspiracy alleged here cannot be inherently self-concealing because it "is essentially the same as" that alleged in *In re IRS*. (Def. Reply 23). In point of fact, the court in *In re IRS* considered the issue of equitable tolling solely in relation to a set of allegations that "overwhelmingly" centered on a trading platform that the defendants stifled after taking over its majority ownership. *In re IRS*, 261 F. Supp. 3d at 447-49, 487-88. The court reasoned that those allegations did not qualify as inherently self-concealing because both the takeover and the platform's subsequent failure to evolve "occurred in plain sight and in contrast to the market's expectations." *Id.* at 488.[15] This case is distinguishable because, unlike a known majority owner acting in full public view to starve the evolution of an innovative platform under its direct governance and control, Defendants here allegedly used boycotts and threats to starve new market participants of data and liquidity without exercising governance ownership or wielding any publically visible control over those entities. The *In re IRS* court expressly distinguished circumstances like those in the present action from its own reasoning about concealment, recognizing that "a group boycott of exchange

---

[15]   The facts alleged in *In re IRS* as a whole were far broader, and included boycotts of third- party platforms over which the defendants did not exercise direct control. *In re IRS*, 261 F. Supp. 3d at 452-59. However, the majority of those other allegations occurred within the limitations period, and the court did not consider whether they qualified as an inherently self-concealing conspiracy to trigger equitable tolling. *Id.* at 487-90.

trading, like a cover price fixing scheme, could be of [a self-concealing] nature, where the perpetrators' collective venture must remain concealed to be successful." *Id.* at 488 (internal citation and quotation marks omitted).

The Court's finding that Plaintiffs have alleged an inherently self-concealing conspiracy discharges Plaintiffs' burden to plead concealment. Still again, for the sake of completeness, the Court also considers whether the Amended Complaint pleads affirmative acts of concealment. Plaintiffs maintain that Defendants took affirmative steps to conceal the conspiracy by (i) conducting secret meetings, (ii) using code words, (iii) misrepresenting their support for both EquiLend and central clearing, and (iv) using threats to silence victims and witnesses. (Pl. Opp. 45-46). Plaintiffs rely on the Amended Complaint's allegations that Defendants conducted the conspiracy through "private meetings of the EquiLend board," using the code name "Project Gateway," and that Defendants misrepresented EquiLend's purpose as "optimiz[ing] efficiency in the securities finance industry" when its true purpose was to prevent such efficiency. (AC ¶¶ 374, 378). The Amended Complaint also alleges that Defendants made encouraging statements to SL-x executives about the platform and about central clearing more broadly,[16] which

---

[16] Plaintiffs specifically rely on the following alleged statements: On April 8, 2008, the Managing Director and General Manager of DTCC's Fixed Income Clearance and Settlement Group, Thomas Costa, told AQS executives that "this sounds great, but who's going to start your car in the morning?" (AC ¶ 171); in and around 2009, "Defendants conducted several meetings with AQS executives, initially expressing (or feigning) interest in the product" (*id.* at ¶ 209); on February 26, 2013, Credit Suisse's European Prime Brokerage Desk Head, Karl Bishti, told SL-x executives that "the product's functionality included 'all the bells and whistles' he would expect, that the platform lacked nothing that he could identify, and that he saw 'no shortcomings'" (*id.* at ¶ 230); on March 19, 2013, Deutsche Bank's Head of Supply Trading, Kevin

statements misrepresented their true lack of enthusiasm as shown by the fact that, after several meetings with SL-x executives, Defendants allegedly "went cold," refused to engage further, and "reported that they were no longer willing to be first movers on SL-x." (AC ¶¶ 237-38). Finally, the Amended Complaint alleges that Defendants threatened to terminate certain services if their hedge fund clients decided to trade on AQS or on SL-x. (*Id.* at ¶¶ 213, 237, 243). For instance, the Amended Complaint alleges that a Goldman Sachs representative threatened influential agent lender State Street in an unsuccessful attempt to stop it from sharing data with Data Explorers (*id.* at ¶ 219), and that the quantitative hedge fund Renaissance Technologies "opted not to participate in AQS" after facing threats from each Defendant (*id.* at ¶ 215).

In Defendants' view, the Amended Complaint's pleadings of secret meetings and communications are too "general and conclusory," especially because Defendants' participation in and support of EquiLend was not concealed from the market. (Def. Br. 48). Defendants also argue that the Amended Complaint fails the Rule 9(b) requirement to plead with particularity

---

Soobadoo, told SL-x executives that "the platform was 'brilliant' and 'impressive' and was the 'most state-of-the-art piece of kit to hit the securities lending space" (AC ¶ 230); on February 28, 2013, executives from Nomura called the SL-x platform "fantastic" (*id.*); on October 17, 2013, executives from Société Générale called the SL-x platform "really an awesome product" (*id.*); on September 6, 2013, UBS executives Casey Whymark and Laurent Issner "said the platform was 'very cool and we are impressed'" (*id.*); between November 2012 and May 2013, representatives from Defendant J.P. Morgan had several meetings with SL-x executives and "praised the SL-x product" (*id.* at ¶ 238); in October, 2014, a Morgan Stanley press release announced that "Morgan Stanley is supportive of CCP [central clearing] solutions" (*id.* at ¶ 380)(a)); in an October, 2016 interview, Thomas Wipf described the growth of "Morgan Stanley's central clearing on Eurex" (*id.* at ¶ 380(b)); and on August 1, 2016, EquiLend CEO, Brian Lamb, stated that "[m]omentum has been building in the past two years in support of CCPs [central clearing]" (*id.* at ¶ 380(c)).

that any alleged misrepresentations by Defendants were "intentionally false when made." (*Id.* at 48-49). On this point, the Court agrees. While the Amended Complaint does allege that Wipf and Conley met over private dinners in New York City (AC ¶¶ 21, 294); that Wipf informed his team of the planned conspiracy over an internal (albeit routine) Morgan Stanley call (*id.* at ¶¶ 22, 295); and that Morgan Stanley and Goldman Sachs persuaded the remaining Defendants to join the conspiracy during meetings at industry conferences and of the EquiLend Board (*id.* at ¶ 297), alleging that Defendants conspired during private meetings, without more, is insufficient to plead affirmative acts of concealment. *Compare Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42 (JG) (VVP), 2011 WL 7053807, at *50 (E.D.N.Y. Jan. 4, 2011) (allegation that the defendants "formulated the conspiracy during secret meetings," without alleging efforts to avoid detection, such as "pretextual press announcements," did not adequately plead affirmative acts of concealment), *with Hendrickson Bros.*, 840 F.2d at 1084 (finding affirmative acts of concealment where defendants allegedly burned and shredded documents to avoid their discovery).

As to pleading intentional misrepresentations, the Amended Complaint alleges that Defendants described EquiLend's purpose as promoting the broad goal of efficiency, and made supportive statements about both central clearing in general and Plaintiffs' products in particular before turning cold. (*See* AC ¶¶ 237, 377-80). Even taken in the light most favorable to Plaintiffs, the allegation that Defendants' initial enthusiasm dissipated does not support a

reasonable inference that the enthusiastic statements were knowingly false when made. Nor do any facts alleged in the Amended Complaint support an inference that Defendants' threats against their hedge fund clients were made in furtherance of concealment, rather than merely to stop the clients from using Plaintiffs' products. The Amended Complaint also does not support Plaintiffs' arguments that Defendants used threats to silence victims and witnesses. The word "silence" appears once in the Amended Complaint, in a conclusory and unsupported assertion that Defendants abused their market power "to silence, punish, and exclude those who dared to cross them[.]" (*Id.* at ¶ 382). What the Amended Complaint does allege is that Defendants made threats "privately and in confidence" to stop market participants from using and sharing data with the victim platforms. (*Id.* at ¶¶ 18, 191, 213, 215, 237, 243). These allegations do not support an inference that threats were made to silence anyone.

However, drawing all reasonable inferences in favor of Plaintiffs at this stage of litigation leads the Court to conclude that the phrase "Project Gateway" may have been designed as a code name rather than as mere shorthand. For this reason, the Amended Complaint plausibly alleges at least one affirmative act of concealment. When combined with the inherently self-concealing nature of the alleged conspiracy, the Amended Complaint adequately pleads concealment for tolling purposes.

## ii. Plaintiffs Adequately Allege Ignorance

Plaintiffs argue that they had no prior knowledge of the collusion, which was brought to light only by counsel's recent investigation revealing "critical, non-public facts." (Pl. Opp. 47). That other industry participants and market regulators did not catch wind of the conspiracy shows, in Plaintiffs' view, that Plaintiffs could not have acquired knowledge of it through the exercise of reasonable diligence. (*Id.* at 47-48). The Court agrees.

Defendants argue that Plaintiffs were put on inquiry notice by a 2009 article in an industry magazine that called EquiLend a "cartel." (AC ¶ 125 & n.28; Def. Br. 49). But a single instance of unverified media speculation, mentioned in passing without any specifics, is not enough to put Plaintiffs on inquiry notice. *See Ala. Elec. Pension Fund* v. *Bank of America Corp.*, 175 F. Supp. 3d 44, 67 (S.D.N.Y. 2016) ("a single article raising suspicions about the rate-setting process [at issue] is not enough to establish, on a motion to dismiss, that Plaintiffs failed to exercise reasonable diligence"); *Merced Irrigation Dist.* v. *Barclays Bank PLC*, 165 F. Supp. 3d 122, 136 (S.D.N.Y. 2016) (concluding that a "single, speculative" article did not put plaintiffs on inquiry notice). Defendants also contend that Plaintiffs had notice based on the Amended Complaint's assertion that a conspiracy is the only good explanation for why the stock loan market remains opaque. (AC ¶ 5; Def. Br. 49). However, the Court agrees with Plaintiffs that the alleged substantial investment support for the victim platforms shows that, at the least, it was not obvious that a conspiracy was in the works to destroy them. (*See* Pl. Opp. 47-

48). Accordingly, the Amended Complaint adequately pleads ignorance for purposes of tolling.

### iii. Plaintiffs Adequately Allege Diligence

"With respect to the third element, a 'plaintiff will prove reasonable diligence either by showing that: [i] the circumstances were such that a reasonable person would not have thought to investigate, or [ii] the plaintiff's attempted investigation was thwarted.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 676 (quoting *In re Publ'n Paper Antitrust Litig.*, No. 3:04-MD-1631 (SRU), 2005 WL 2175139, at *5 (D. Conn. Sept. 7, 2005)). The Amended Complaint alleges that Plaintiffs exercised diligence by "regularly monitor[ing] their investments" and "regularly monitor[ing] new[s] reports concerning the financial industry and the stock lending market." (AC ¶¶ 385-86).

Defendants contend that these allegations are merely conclusory and therefore fail the Rule 9(b) pleading standard. (Def. Br. 50). *See also Butala*, 916 F. Supp. at 319 (applying the Rule 9(b) standard to pleadings of tolling by fraudulent concealment). Plaintiffs argue that the allegations are sufficient because, in monitoring their investments and market news, they received no indication of the concealed conspiracy, which was only revealed when Plaintiffs' counsel conducted a diligent investigation that formed the basis of the Amended Complaint. (Pl. Opp. 48-49).

Plaintiffs have shown reasonable diligence under the first prong for purposes of defeating a motion to dismiss because, drawing all inferences in their favor, "a reasonable person would not have thought to investigate" above

and beyond the standard activities of investment and news monitoring that Plaintiffs engaged in. At this stage of the litigation, requiring more from Plaintiffs would be "premature." *BPP Illinois, LLC* v. *Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (summary order). The statutes of limitations on Plaintiffs' claims are tolled, making the claims timely.

### 5. Plaintiffs' Unjust Enrichment Claim Stands

Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed because it is "entirely dependent on their fatally flawed antitrust claim." (Def. Br. 50). Since the Court has concluded Plaintiffs state a viable antitrust claim, their unjust enrichment claim stands as well.

### C. EquiLend's Supplemental Motion to Dismiss Is Denied

EquiLend's supplemental motion to dismiss advances four main arguments: (i) its conduct was consistent with rational business strategy; (ii) the alleged use of its board meetings to plan the conspiracy is insufficient to support a claim against it; (iii) the allegations against it do not pass muster under a rule of reason analysis; and (iv) this Court lacks personal jurisdiction over EquiLend Europe. The Court addresses, and rejects, each of these arguments in turn.

To start, EquiLend contends that its purchase of AQS, its refusal to merge with SL-x, its subsequent purchase and shelving of SL-x's intellectual property, and its creation of the DataLend product were all "consistent with rational business strategy," and therefore cannot serve as evidence of its joining a conspiracy. (EquiLend Br. 4-8). Of course, the fact that conduct may

be consistent with an innocuous explanation does not permit the Court, on a motion to dismiss, to ignore other inculpatory inferences that may reasonably be drawn from the same allegations when considered in light of the complaint as a whole. To be sure, pleading a Section 1 claim requires "allegations plausibly suggesting (not merely consistent with) agreement[.]" *Twombly*, 550 U.S. at 557. That is why pleading parallel conduct that is consistent with unilateral action, unaccompanied by other circumstantial evidence of a conspiracy in the form of "plus factors," is insufficient to state a Section 1 claim. *Id.* However, the Amended Complaint does not rest on bare allegations that EquiLend engaged in parallel conduct; Plaintiffs also allege circumstantial evidence of conspiracy, in that EquiLend acted against its own economic self-interest under direction from the Prime Broker Defendants. For example, the Amended Complaint alleges that: "EquiLend representatives, including CEO Brian Lamb, had been instructed not to 'break rank' and not to take independent actions" (AC ¶ 16); the Prime Broker Defendants "instruct[ed] EquiLend's then-CEO, Brian Lamb, to advance an agenda through EquiLend to halt the widespread dissemination of pricing data to the market at large" (*id.* at ¶ 124); EquiLend's refusal to allow itself "to be sold at any price," and its underuse of the assets purchased from AQS and SL-x, were counter-profit behaviors (*id.* at ¶¶ 314-15); and EquiLend's joint venture status was a sham (*id.* at ¶¶ 313, 319). That *some* of EquiLend's alleged conduct may be consistent with rational business strategy does not negate the presence of

other "allegations plausibly suggesting ... agreement." *Twombly*, 550 U.S. at 557.

In an apparent attempt to bolster its consistency arguments, EquiLend ignores the allegations that it acted against economic self-interest and at the direction of the Prime Broker Defendants, instead making a series of assertions about what is missing from the Amended Complaint. EquiLend asserts, for instance, that the Amended Complaint "alleges no facts" connecting EquiLend's purchase of AQS to a boycott conspiracy. (EquiLend Br. 5). It follows up by noting that the Amended Complaint fails to allege that, following the purchase of AQS, EquiLend stopped operating the AQS platform. (*Id.*). Instead, the Amended Complaint merely alleges that, following the purchase, EquiLend failed to develop AQS assets further or to license those assets to third parties. (*See* AC ¶ 315). EquiLend acknowledges here the allegation that it purchased AQS at a rock-bottom price of $5 million, which price was a direct result of the harm caused by the boycott. (*Id.* at ¶ 301). But, it reasons, the mere fact that EquiLend may have benefited from the boycott, without more, is insufficient to infer its participation. EquiLend argues as well that there is nothing suspicious about its refusal to merge with SL-x, its purchase of, and subsequent failure to use, SL-x's intellectual property, or its launch of the DataLend product. (EquiLend Br. 6-8). EquiLend advances the innocuous inference that it purchased and shelved SL-x intellectual property in order to protect itself from patent trolls. (*Id.* at 7). Finally, it asserts that the Amended Complaint fails to plead that the launch of DataLend to complete against Data

90

Explorers "is more consistent with conspiracy than it is with the 'wide swath of rational and competitive business strategy' that cannot support an inference of conspiracy." (*Id.* (quoting *Twombly*, 550 U.S. at 554)).

Unfortunately for EquiLend, the isolated facts it presents regarding its purchase of AQS's and SL-x's intellectual property and its launch of DataLend are not the only allegations connecting it to the boycott and the conspiracy more generally. As detailed above, the Amended Complaint alleges that EquiLend acted against self-interest, and at the direction of the Prime Broker Defendants. Those allegations support a reasonable inference that EquiLend acted on behalf of the conspiracy, not as an independent economic decisionmaker.

Next, EquiLend argues that the allegation that the conspiracy was planned at its board meetings is insufficient to implicate it in the conspiracy. (EquiLend Br. 3-4). It relies here on the reasoning of the court in *In re IRS*, which dismissed a complaint against an organization that EquiLend contends was analogous. (*Id.* at 4). The analogy is inapt. In *In re IRS*, the relevant allegations were threefold: the alleged conspirators had used the organization as a forum for conspiratorial discussions; the organization had failed to launch the product that the plaintiffs felt would have been attractive; and the organization had priced its existing products in a manner that the plaintiffs claimed was designed to be inaccessible to certain customers. *In re IRS*, 261 F. Supp. 3d at 486-87. Here, in contrast, the Amended Complaint alleges not merely that Defendants used EquiLend meetings as a forum to plot the

conspiracy, but also that EquiLend engaged in active conduct in furtherance of the conspiracy, namely purchasing SL-x's intellectual property to shelve its enabling technology and launching DataLend to underprice and block the development of Data Explorers. These allegations of active conduct in furtherance of the conspiracy distinguish this case from *In re IRS*.

For similar reasons, EquiLend's contention that the Amended Complaint fails to plead sufficient facts to support a rule of reason violation also fails. EquiLend argues that a rule of reason analysis would require "allegations of a geographic market, a product market, market power in that market, and anticompetitive effects." (EquiLend Br. 11). But because the Amended Complaint pleads sufficient facts to support an inference that EquiLend was a member of the conspiracy, the allegations concerning the Prime Broker Defendants' market power in the U.S. stock lending market, and anticompetitive conduct including boycotts, also implicate EquiLend.

Finally, EquiLend argues that there is no specific personal jurisdiction over EquiLend Europe, which is incorporated in the United Kingdom and Wales and headquartered in London. (EquiLend Br. 11). Plaintiffs respond that the Amended Complaint attributes the EquiLend Board members' alleged "general agreement" not to allow "industry advances" outside of EquiLend to EquiLend Europe, as well as to the other EquiLend entities. (Pl. EquiLend Opp. 12). Plaintiffs point out that some of the alleged statements evidencing involvement in the conspiracy were made by individuals who sat on EquiLend Europe's board, and not on the board of the U.S. EquiLend entity. (*Id.*; *see* AC ¶¶ 239-

46).  Plaintiffs argue that, drawing all inferences in their favor, EquiLend Europe was part of the conspiracy.  The Court agrees with Plaintiffs that it has jurisdiction over EquiLend Europe because its co-conspirators' "overt acts in furtherance of the conspiracy" may be imputed to it for purposes of exercising jurisdiction.  *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018).  Accordingly, EquiLend's supplemental motion to dismiss is denied in its entirety.

## CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are DENIED.  Defendants are hereby directed to file an Answer to the Amended Complaint by **October 26, 2018**.  The Parties are directed to file a proposed case management plan by **November 9, 2018**.

The Clerk of Court is directed to terminate the motions at Docket Entries 106 and 109.

SO ORDERED.

Dated:      September 27, 2018
            New York, New York

_____
          KATHERINE POLK FAILLA
          United States District Judge