**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA CORPORATION, *et al.*, <br><br> Defendants. | No.  17-cv-6221 (KPF) |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ON U.S. STOCK LOAN MARKET ......................................................9

ARGUMENT .........................................................................................................................11

I.     PLAINTIFFS SATISFY RULE 23(A)'S REQUIREMENTS.........................................11

     A.     Numerosity..............................................................................................12

     B.     Commonality...........................................................................................12

     C.     Typicality ................................................................................................12

     D.     Adequacy .................................................................................................14

II.     THE PROPOSED CLASS SATISFIES RULE 23(B)(3) .................................................16

     A.     Common Questions Of Law And Fact Predominate .............................................16

          1.     Common Evidence Of Defendants' Liability Will Predominate..............16

               (a)     Common Evidence Of The Conspiracy's Origins .........................17

               (b)     Common Evidence Of Defendants' Conspiracy To Block And Boycott Disintermediation Threats .........................................20

                    (i)     AQS............................................................................22

                    (ii)     SL-x...........................................................................25

                    (iii)     Data Explorers ...........................................................27

                (c)     Common Evidence Of Defendants' Continuing Efforts To Preserve A Bilateral Trading Model ................................................30

          2.     Plaintiffs Are Capable Of Proving Class-Wide Impact At Trial .............34

          3.     Common Evidence Provides A Reliable Model Of Damages ..................42

               (a)     The Model Provides A Robust Estimate Of Class Damages.........42

               (b)     The Model Excludes Trades That Are Not In The Class...............46

               (c)     Plaintiffs Are Capable Of Calculating Individual Class Members' Damages ..................................................................48

     B.     Resolving The Dispute As A Class Action Is Superior To Any Alternative.........49

III.     THE COURT SHOULD APPOINT QUINN EMANUEL AND COHEN MILSTEIN AS CO-LEAD COUNSEL...................................................................50

CONCLUSION......................................................................................................................50

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*,
 463 F. Supp. 3d 409 (S.D.N.Y. 2020) .................................................................. 48

*Amchem Products, Inc. v. Windsor*,
 521 U.S. 591 (1997) ....................................................................... 12, 16, 49

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013) .............................................................................. 1, 11

*Casale v. Kelly*,
 257 F.R.D. 396 (S.D.N.Y. 2009) ........................................................... 14, 15

*Chan Ah Wah v. HSBC N. Am. Holdings Inc.*,
 2017 WL 2417854 (S.D.N.Y. June 5, 2017) ................................................ 47

*Dial Corp. v. News Corp.*,
 314 F.R.D. 108 (S.D.N.Y. 2015) ...................................................... 35, 42, 49

*Hart v. Rick's Cabaret Int'l, Inc.*,
 60 F. Supp. 3d 447 (S.D.N.Y. 2014) .......................................................... 48

*Hawaii v. Standard Oil Co.*,
 405 U.S. 251 (1972) .................................................................................. 49

*Hickory Sec. Ltd. v. Repub. of Arg.*,
 493 F. App'x 156 (2d Cir. 2012) ................................................................ 44

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ................................... 17, 35, 50

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
 689 F.3d 229 (2d Cir. 2012) ...................................................................... 16

*In re Amla Litig.*,
 282 F. Supp. 3d 751 (S.D.N.Y. 2017) ........................................................ 16

*In re Auction Houses Antitrust Litig.*,
 193 F.R.D. 162 (S.D.N.Y. 2000) ............................................................... 15

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ............................................ 11

*In re Currency Conversion Fee Antitrust Litig.*,
 264 F.R.D. 100 (S.D.N.Y. 2010) ............................................................... 16

*In re Digital Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) .................................................................. 12

*In re Domestic Drywall Antitrust Litig.*,
   322 F.R.D. 188 (E.D. Pa. 2017) ................................................................ 49

*In re DRAM Antitrust Litig.*,
   2006 WL 1530166 at *7 (N.D. Cal. June 5, 2006) .................................. 34

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ......................................... 45

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................... 17

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) ..................................................................... 14

*In re Magnetic Audiotape Antitrust Litig.*,
   2001 WL 619305 (S.D.N.Y. June 6, 2001) ............................................. 35

*In re Namenda Direct Purchaser Antitrust Litig.*,
   331 F. Supp. 3d 152 (S.D.N.Y. 2018) ..................................................... 41

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ....................................................... 14, 15

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ............................................................... 15

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017) ..................................................................... 12

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   335 F.R.D. 1 (E.D.N.Y. 2020) ........................................................... 38, 44

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) ........................................ 48

*In re Vitamin C Antitrust Litig.*,
   904 F. Supp. 2d 310 (E.D.N.Y. 2012) ..................................................... 47

*In re: Credit Default Swaps Antitrust Litig.*,
   13-MD-2476 (April 15, 2016) .................................................................. 49

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   340 F. Supp. 3d 285 (S.D.N.Y. 2018) ..................................................... 21

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981) ........................................................................ 45

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) .......................................................... 11

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959) ................................................................. 4, 22

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) .......................................................... 12

*Meredith Corp. v. SESAC LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y. 2015) .............................................. 16

*New York v. Hendrickson Bros., Inc.*,
    840 F.2d 1065 (2d Cir. 1988) ........................................................ 42

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
    772 F.3d 111 (2d Cir. 2014) .......................................................... 12

*Ramirez v. Riverbay Corp.*,
    39 F. Supp. 3d 354 (S.D.N.Y. 2014) .............................................. 15

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) .......................................................... 16

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) .......................................................... 12

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*,
    262 F.3d 134 (2d Cir. 2001) .......................................................... 15

*Sykes v. Mel Harris & Assocs., LLC*,
    285 F.R.D. 279 (S.D.N.Y. 2012) ................................................... 12

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ............................................................ 14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................. 11, 12

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ........................................................................ 35

**Statutes**

15 U.S.C. § 6a .................................................................................... 47

iv

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................... *passim*

**Treatises**

6 *NEWBERG ON CLASS ACTIONS*, § 20 (5th ed. 2019) .......................................................... 16

**Additional Authorities**

*Fed Proposes New Capital Rules for Banks, New York Times*  (Dec. 20, 2011)........................ 30

## PRELIMINARY STATEMENT

Plaintiffs Iowa Public Employees' Retirement System, Los Angeles County Employees Retirement Association, Orange County Employees Retirement System, Sonoma County Employees' Retirement Association, and Torus Capital, LLC, allege that the dominant banks in the U.S. stock loan market conspired to block and boycott new offerings that would have increased competition and improved the efficiency and transparency of the market as a whole. Trial will focus on Defendants' conspiracy and its market-wide effects—and it will be dominated by issues and evidence common to all class members. Because a class action is the method "best suited to adjudication of the controversy fairly and efficiently," *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013), Plaintiffs respectfully move for class certification.

Stock lending is supposed to be the "oil in the efficient market machine."[1]  But the U.S. stock loan market "████████████████████████████████████ ████████████████████████."[2]  This opaque over-the-counter ("OTC") market is dominated by a handful of large dealer banks—the Prime Broker Defendants[3]—who have lodged themselves as permanent market intermediaries.  Borrowers and lenders of stock cannot meet for a transaction (either directly or through agents) in a central marketplace.  Rather, for stock lending to occur, the beneficial owner of the stock must lend it to a prime broker in one "bilateral" transaction, with the prime broker then lending it to the borrower in a separate "bilateral" transaction.  This "bilateral" market structure is inefficient for borrowers and lenders.

---

[1]  Ex. 1 (Quadriserv Comment Letter) at 6.  In this memorandum, "Ex. __" refers to the exhibits attached to the Declarations of Daniel L. Brockett and Michael P. Eisenkraft filed herewith.

[2]  Ex. 2 (████████████████████) at '962.

[3]  The Prime Broker Defendants are Bank of America Merrill Lynch, Goldman Sachs, Morgan Stanley, Credit Suisse, JPMorgan, and UBS, including affiliates named in the Amended Complaint (ECF No. 73) that have not been voluntarily dismissed (*see* ECF No. 105).

But the Prime Broker Defendants profit from this inefficiency, because prime brokers enjoy a privileged middle-man position that allows them to take a large cut of every stock loan trade.

There is no good reason why this inefficient market structure has persisted.  Technology has long existed that would allow stock borrowers and lenders to transact more efficiently.  Electronic platforms making it easy for users to find and execute the best available prices are widespread across the economy, including in many financial markets.  Numerous studies show that such platforms reduce search costs and lead to more competitive prices.  But all efforts to introduce such platforms to the U.S. stock loan market have failed.  And the evidence in this case explains why:  Defendants conspired to block them.

The Prime Broker Defendants are some of the world's largest banks, and they are direct competitors in the stock loan market.  Yet the evidence shows that these competitors met regularly to discuss new entrants into the market who posed threats to their privileged status as market intermediaries.  And the evidence further shows that they agreed to boycott those entrants to eliminate those threats.  The Prime Broker Defendants also conspired to prevent new trading platforms from being able to clear transactions through a central credit counterparty ("CCP"), a transaction structure that facilitates multilateral trading.  And they worked together to ensure that any changes to the market would be ones they controlled.

A central tool of the Prime Broker Defendants' conspiracy was EquiLend, an industry "utility" they created and jointly control.  Since forming EquiLend in 2001, the Prime Broker Defendants have used it to oppose any threat to their market dominance.  In the words of ███████ "███████████████████" and serves as one of the "███████████████"[4]

---

[4]  Ex. 3 (2008.1.28 ███████████████████) at '454 (Sheet 3).

More specifically, the Prime Broker Defendants formed EquiLend to combat the threat of "████████████"—a term they used to refer to new offerings that might eliminate their role as toll-collecting intermediaries in stock lending's antiquated and opaque bilateral market structure. Indeed, a slide-deck prepared for a meeting of the EquiLend board of directors answers the question, "████████████████████" with the following:  "████████████████████████ ████████████████████"[5]  This purpose was unlawful.  The antitrust laws do not allow entrenched competitors to conspire to protect themselves from competitive threats.

The 2008 financial crisis increased the "████████████" risk for the Prime Broker Defendants.  Regulators began to push for central clearing in a number of financial markets in order to remove systemic risk.  The Prime Broker Defendants feared that, if central clearing were adopted in the stock loan market, centralized or multilateral trading platforms would swiftly follow.  Such platforms would "████████████" the Prime Broker Defendants, because the platforms would allow beneficial owners to lend stock to borrowers in a single transaction rather than forcing each to transact separately with a toll-collecting prime broker.

The Prime Broker Defendants swiftly mobilized through EquiLend.  In early 2009, ████ ████████████████████████████████████████████ The Prime Broker Defendants then ████████████ which they controlled, to oppose central clearing.  At a June 17, 2009 meeting of the ████████████ for example, ████████████████████ ████████████████████████████ ████████████████████████████ On June 22, 2009, ████████████ ████████████████████████████████████

---

[5]  Ex. 4 (2015.12.2 ████████████████████) at '681.

3

 The board even agreed on how to police this boycott, expressly providing that "█████████████████████████████████ █████████████████████████████████████████████████"[6]

An "MTF/CCP" is a multilateral trading facility that connects to a CCP so it can operate like an anonymous exchange.  It is, in other words, precisely the type of trading platform the Prime Broker Defendants feared would "████████████" them.  Their agreement to this "████████" that no "████" (that is, no individual bank) would "████████████" with any multilateral trading platform linked to central clearing is *per se* unlawful.  *See Klor's, Inc. v. Broadway-Hale Stores, Inc*., 359 U.S. 207, 212 (1959) ("Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category.").

The Prime Broker Defendants' pledge to confess to each other ████████████ ████████████████ is also classic cartel behavior.  Indeed, Defendant ████████████ ████████████ admitted at his deposition that, at this June 2009 meeting, ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████[7]  Competitors are supposed to make *independent* decisions about what new entrants to support or not to support.  They are not permitted to coordinate these decisions with each other.  This was a group boycott, plain and simple.

Quadriserv was one of the new entrants that Defendants agreed to boycott.  In early 2009, Quadriserv had launched AQS, a centralized platform for stock loan transactions connected to a CCP.  When the Prime Broker Defendants agreed not to become involved with any MTF/CCP, they had AQS in mind.  The Prime Broker Defendants repeatedly discussed AQS, and agreed not

---

[6]  Ex. 5 (2009.6.22 ████████████████████) at '776; *see also* Ex. 6 (2009.6.22 ████████ ████████████) at '329-30.
[7]  Ex. 7 (████ Tr.) at 111:15-116:14 (emphasis added).

to support it.  They also conspired to make sure no one else would either.  Thus, when AQS

announced in early 2010 

████████ This is just one example of the strong-arm tactics employed by the Prime Broker

Defendants—tactics that are further hallmarks of cartel behavior.

The Prime Broker Defendants engaged in similar tactics to head off the threats posed by

other potential new entrants as well.  They boycotted SL-x, which launched a trading platform

that would have improved efficiency and price transparency across the market, and Data

Explorers, which the Prime Broker Defendants feared might launch a data offering that would

allow borrowers to see the mark-ups prime brokers charging.

While the Prime Brokers were busy shutting down threats to their market dominance,

regulators continued to push for market reforms.  By 2014, those reforms (especially one known

as Basel III) made it highly likely that central clearing would finally take root in the stock loan

market.  But the Prime Broker Defendants used their cartel to make sure that central clearing

would happen only in a way that would preserve the bilateral market structure.  At a March 2015

meeting of the ████████████████████████████████████████████

████████████████████████████████████████████

The first of these ████████████ was crystal clear:  "████████████████████"[8]  As

one board member admitted at his deposition, the Prime Broker Defendants agreed to this

---

[8]  Ex. 8 (2015.3.18 ████████████████████████) at '885.

principle to "██████████████████████████████████████████████

██████████████████████████████" He further admitted that "█████████████████████

████████" this agreement was meant to combat, and "████████████████"⁹

As a result of Defendants' conspiracy, now revealed in black and white, the Prime Broker Defendants have maintained the bilateral model for borrowing and lending stock in the United States. No multilateral trading platform has been able to enter and survive. AQS, SL-x, and other trading platforms failed, and Data Explorers did not release the data offering the Prime Broker Defendants opposed. Stock borrowers and lenders remain trapped in an inefficient and opaque market, and the Prime Broker Defendants are cemented as permanent intermediaries who take a highly profitable cut on every trade in which they engage. Class certification should be granted because all of this evidence of Defendants' conspiracy—the central issue in the case—is common to all class members.

Class certification is also warranted because Plaintiffs are capable of proving that Defendants' conspiracy imposed class-wide impact. Simply put, it is well known that the transition of a financial market from an OTC market to one with multilateral trading has market-wide benefits, and so basic economics provides that Defendants' conspiracy to block this from happening imposed market-wide harms.

To prove impact at trial, Plaintiffs will offer the testimony of Haoxiang Zhu, a Professor of Management and Finance at the MIT Sloan School, and a leading expert on financial market structure. For the reasons explained in his report, Professor Zhu concludes that all or nearly all

---

⁹ Ex. 7 (██████ Tr.) at 407:3-414:12 ("████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████").

class members were harmed because the alleged conspiracy blocked multilateral trading platforms that would have benefited the class by no later than January 1, 2012.  Professor Zhu explains that Defendants' conspiracy imposed higher search costs on class members, and demonstrates through the application of an economic model from his independent research that the conspiracy caused class members to pay higher costs as borrowers and receive lower revenues as lenders.  Professor Zhu's conclusion of class-wide impact is also supported by his analysis of empirical evidence from other markets that moved from an opaque OTC market to transparent multilateral trading, and by contemporaneous analyses of the stock loan market conducted by the Prime Broker Defendants themselves.

Plaintiffs are also capable of proving class-wide damages.  Here, Plaintiffs offer the work of two other leading market structure experts, Paul Asquith, a Professor of Finance at the MIT Sloan School of Management, and Parag Pathak, a Professor of Economics at MIT and the 2018 recipient of the John Bates Clark Medal as the best American economist under age 40.  In their joint report, these economists explain that they have developed an economic model that uses generally applicable, formulaic approaches to estimate the damages suffered by the class.

Accordingly, Plaintiffs seek class certification under Rule 23(b)(3) of those harmed by Defendants' conspiracy to block competition in the U.S. stock loan market, defined as follows:

> All persons and entities who, directly or through an agent, entered into at least 100 U.S. Stock Loan Transactions as a borrower from the prime brokerage businesses of the U.S.-based entities of the Prime Broker Defendants, or at least 100 U.S. Stock Loan

Transactions[10] as a lender of Hard-to-Borrow stock[11] to the U.S.-based entities of the Prime Broker Defendants, from January 1, 2012, until February 22, 2021 (the "Class Period").

This class has two management subclasses under Federal Rule of Civil Procedure 23(d):

**The "End-User Subclass"**:  All persons and entities within the class who, directly or through an agent, entered into at least 100 U.S. Stock Loan Transactions as a borrower from the prime brokerage businesses of the U.S.-based entities of the Prime Broker Defendants during the Class Period.

**The "Beneficial Owner Subclass"**:  All persons and entities within the class who, directly or through an agent, entered into at least 100 U.S. Stock Loan Transactions as a lender of Hard-to-Borrow  stock to the U.S.-based entities of the Prime Broker Defendants during the Class Period.

Excluded from the Class are Defendants,[12] as well as Citadel LLC, Two Sigma Investments, PDT Partners, Renaissance Technologies LLC, TGS Management, Voloridge Investment Management, and the D.E. Shaw Group and their corporate parents, subsidiaries, and wholly owned affiliates, as well as any federal governmental entity, any judicial officer presiding over this action, and any juror assigned to this action.

---

[10]  A "U.S. Stock Loan Transaction" is a daily position involving the lending or borrowing of a stock listed on the NYSE, NYSE American, NASDAQ, NYSE Arca, or Bats exchanges, according to the CRSP U.S. Stock Database, at a Loan Cost that is positive on the date when the loan or borrow is initiated, except for any transaction made under an exclusive contract (*i.e.*, contracts where the lender offers inventory to a broker-dealer for a flat fee).  "Loan Cost" is the price of borrowing, reflected as an annualized rate, equivalent to either (1) for cash-collateralized transactions, the Federal Funds Open Rate, Overnight Bank Funding Rate, or other benchmark minus the rebate rate paid by the lender to the borrower; or (2) for non-cash collateralized transactions, the fee rate paid by the borrower to the lender.

[11]  "Hard-to-Borrow" stock is one whose Loan Cost is more than 10 basis points above (1) for positions held prior to September 16, 2016, the Federal Funds Open Rate or (2) for positions held on or after September 16, 2016, the Overnight Bank Funding Rate.

[12]  "Defendant" means any entity in which a Defendant or its parent, subsidiary, or wholly owned affiliate is a majority owner or holds a majority beneficial interest.  Not included is any investment company or pooled investment fund (including mutual fund families, exchange-traded funds, fund of funds and hedge funds) in which any Defendant has or may have a direct or indirect interest, or as to which its affiliates may act as investment advisors, unless the Defendant or any of its affiliates is a majority owner or holds a majority beneficial interest in the fund.  The term "Defendant" does not encompass a Defendant acting as an agent or on behalf of an unrelated entity.

Plaintiffs respectfully request that the Court grant class certification.

**BACKGROUND ON U.S. STOCK LOAN MARKET**

In the U.S. stock loan market, the Prime Broker Defendants operate as intermediaries between a "wholesale" or "supply" side and a "retail" or "demand" side. A diagram from a ███████████ internal presentation shows this market structure:[13]



On the "wholesale" or "supply" side, beneficial owners of stock lend out their shares to earn additional return on their investments. This is the "Beneficial Owners Subclass." Many beneficial owners place their assets in the custody of a bank, which manages their portfolio and acts as their "Agent Lender." Agent Lenders loan shares not directly to short sellers, but to broker-dealers, the largest of which are the Prime Broker Defendants. On the "retail" or "demand" side of the market, the Prime Broker Defendants and other broker-dealers lend shares to their prime brokerage clients who engage in short selling (the "End-User Subclass"). Short

---

[13]   *See* Ex. 9 (Zhu Rpt.) ¶ 22; Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 46-61; Ex. 151 (ISLA Presentation) at Slide 6.

selling is a component of a number of investment strategies.  Typically, a short seller borrows a stock, sells it, then buys an equivalent share at a later time to return to the lender.[14]

Stock loans are collateralized with either cash or non-cash instruments (*e.g.*, Treasury bonds).  If the collateral is non-cash, the borrower pays a "fee"—an annualized rate applied to the value of the borrowed security.  When collateral is cash, the lender reinvests the cash, retains a portion of the earnings as its "fee," and returns the rest of the reinvestment earnings to the borrower in the form of a "rebate" calculated as an annualized percentage rate applied to the value of the collateral that is lower than the rate at which the cash is reinvested.  For scarce "Hard-to-Borrow" stocks (as opposed to more generally available stock which are referred to as "General Collateral"), rebate rates may be negative, meaning that in addition to providing collateral, the borrower pays a daily accrued rate to the lender over the loan's life.[15]

The prevailing market structure does not permit End Users to borrow stock directly from Beneficial Owners or Agent Lenders for their short selling activity.  Rather, they must place a short sale order with their prime broker.  The prime broker will locate the stock on the "supply" side, borrow it, sell it on the equities market on its client account, and then hold the proceeds of the sale as collateral.[16]  In these transactions, ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████."[17]

---

[14]  Ex. 9 (Zhu Rpt.) ¶ 31; Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 46-61.

[15]  Ex. 9 (Zhu Rpt.) ¶¶ 15-21; Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 46-77.

[16]  Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 52, 59, 383.

[17]  Ex. 2 (████████████████████████) at '962.

The Prime Broker Defendants profit from the "spread" between their costs of borrowing (*i.e.*, the fees or rebate rates on wholesale transactions with the Beneficial Owners Subclass) and their revenue from lending (the fees or rebates in retail transactions with the End-User Subclass). There is little to no price transparency as to the spread broker-dealers charge. There also is no central marketplace or platform on which Beneficial Owners or End Users can see the prices charged on comparable transactions or by other broker-dealers in real time. This lack of transparency and multilateral trading inflates the Prime Broker Defendants' spread and preserves an inefficient market structure to their benefit, and to the detriment of the proposed class.[18]

## ARGUMENT

Plaintiffs allege a market-wide conspiracy to block new offerings that would have benefited class members generally. A class action is, therefore, clearly "the metho[d] best suited to adjudication of the controversy fairly and efficiently." *Amgen*, 568 U.S. at 460. "The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020). Plaintiffs must satisfy Rule 23's standard by a preponderance of the evidence, *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015), but need not prove success on the merits. *Amgen*, 568 U.S. at 459.[19]

## I.    PLAINTIFFS SATISFY RULE 23(A)'S REQUIREMENTS

A proposed class must show "numerosity," "commonality," "typicality," and "adequacy." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Each is easily shown here.

---

[18]   Ex. 9 (Zhu Rpt.) ¶¶ 22, 28-29, 32-76; Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 19, 131-133.

[19]   This memorandum focuses on class certification with respect to Plaintiffs' antitrust claim. Plaintiffs' Second Cause of Action (Unjust Enrichment), *see* Am. Compl. ¶¶ 395-97, rises or falls with the antitrust claim, Dkt. 123 at 88, and the proposed class should be certified with respect to Plaintiffs' unjust enrichment claim as well, for the same reasons.

### A.      Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  "Numerosity is presumed for classes larger than forty members."  *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014).  Here, there are thousands of members of the proposed class.[20]  That is more than sufficiently numerous to make joinder impracticable, satisfying Rule 23(a)(1).  In addition, class membership is ascertainable, because the class is defined using "objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017).

### B.      Commonality

Commonality exists where "plaintiffs' grievances share a common question of law or of fact."  *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).  "[E]ven a single common question will suffice."  *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 286 (S.D.N.Y. 2012) (citing *Wal-Mart*, 564 U.S. at (2011)).  "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 609 (1997).  As set forth in Part II.A, common issues predominate in this case.

### C.      Typicality

Rule 23(a)(3) mandates that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Typicality is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).  "[T]ypicality in the antitrust context will be established by plaintiffs and all class

---

[20]   Ex. 10 (Asquith/Pathak Rpt.) ¶ 25.

members alleging the same antitrust violations by the defendants." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 87 (S.D.N.Y. 2017) (collecting cases). Here, each named Plaintiff entered into stock lending transactions with the Prime Broker Defendants during the Class Period, and each brings the same claims alleging it was harmed in those dealings by Defendants' conspiracy. The claims of the class representatives are thus typical of the claims of each proposed subclass.

**End-User Subclass**: Plaintiffs Sonoma County Employees' Retirement Association ("Sonoma Retirement") is a pension fund and Torus Capital, LLC is a proprietary trading fund.[21] Both engaged in short sales during the Class Period through prime brokerage accounts they held with Defendants ████████████████████████████.[22] They were allegedly injured by the same antitrust conspiracy asserted on behalf of the class. The claims of these Plaintiffs are thus typical of the End-User Subclass.

**Beneficial Owner Subclass**: Plaintiffs Iowa Public Employees' Retirement System, Orange County Employees Retirement System, Sonoma Retirement, and Los Angeles County Employees Retirement Association are pension funds that hold large stock portfolios and have major stock lending programs. They lend out their shares using major Agent Lenders such as State Street, Deutsche Bank, and BNYM, who transact vast volumes with Defendants.[23] Each representative of the Beneficial Owner Subclass lent Hard-to-Borrow stock to the Prime Broker Defendants and was allegedly injured by the conspiracy.[24] The claims of these Plaintiffs are thus

---

[21]  Ex. 13 (████████) at 285:15-286:15; Ex. 15 (Nishimura Tr.) at 22:12-20.

[22]  Ex. 13 (████) at 31:24-32:11, 33:6-16, 51:6-52:10; Ex. 16 (Simeone Tr.) at 156:22-25, 192:21-193:7.

[23]  Ex. 11 (████) at 51:8-14, 51:24-52:7; Ex. 12 (██████) at 44:13-23; Ex. 13 (████) at 31:18-23, 79:14-17; Ex. 14 (██████) at 46:7-15.

[24]  The Beneficial Owner Subclass does not include beneficial owners who lent only General Collateral to Prime Broker Defendants based on Professor Asquith and Pathak's analysis that the real-world price is at market equilibrium for wholesale General Collateral. *See* Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 28, 341-47.

typical of the Beneficial Owner Subclass.

### D.   Adequacy

Adequacy is satisfied unless the named plaintiffs' "interests are antagonistic to the interest of other members of the class." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 (2d Cir. 2015).  Moreover, "not every conflict among subgroups of a class will prevent class certification—the conflict must be "fundamental" to violate Rule 23(a)(4)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).  Adequacy exists here.

*First*, Plaintiffs and the class are similarly situated.  Sonoma Retirement and Torus Capital engaged in borrowing transactions like those of the End-User Subclass.   All Plaintiffs but Torus Capital engaged in lending transactions like those of the Beneficial Owner Subclass. The proposed class representatives assert the same causes of action, raise the same liability issues, and seek the same relief as all class members.  They share "an interest in proving the existence of Defendants' conspiracy" and "in maximizing the aggregate amount of classwide damages." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 513 (S.D.N.Y. 1996).

*Second*, there are no disabling conflicts within the Class or between the two subclasses. Rule 23(d)(1)(A) gives courts broad discretion to "prescribe measures to prevent … complication in presenting evidence or argument."  Among the measures the Court may take is to create administrative subclasses "to expedite resolution of the case by segregating a distinct legal issue that is common to some members of the existing class," without requiring separate counsel for each subclass. *Casale v. Kelly*, 257 F.R.D. 396, 408-09 (S.D.N.Y. 2009).  The proposed subclasses here account for different damages evidence between End-Users (as borrowers) and Beneficial Owners (as lenders), while preserving their common claims.[25]  This approach requires

---

[25]   Even if there were some conflict between subclasses (there is not), that would not be a basis

only that the subclasses do not have a fundamental conflict, which they do not.

Courts have approved administrative subclasses in analogous antitrust cases.  In *NASDAQ Market-Makers*, this Court certified two such subclasses of buyers and sellers of stock on the NASDAQ exchange.  169 F.R.D. at 513-15.  Here, as in *NASDAQ Market Makers*, there is an abundance of common issues applying to all class members.  Any tension between borrowers and lenders "relates only to the apportionment of the damages as between purchasers and sellers," and "[s]uch hypothetical conflicts regarding proof of damages are not sufficient to defeat class certification at this stage of the litigation."  *Id.*

Since *NASDAQ Market Makers*, this Court has reiterated that "the mere presence of purchasers and sellers in a given class does not provide a basis for denying class certification." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 73 (S.D.N.Y. 2009); *see also In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000) ("Both buyers and sellers who have used defendants' services allegedly have been impacted by the artificial inflation of both buyers' and sellers' commissions pursuant to the conspiracy.  Any distinctions between the two groups are of no moment at this stage of the litigation and pose no bar to class certification.").

*Third*, Plaintiffs' counsel is "qualified, experienced and generally able to conduct the litigation."  *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 365 (S.D.N.Y. 2014).  Quinn Emanuel and Cohen Milstein are fully able to advance the interests of the class, as they have

---

to deny certification, but would support "formal certification of subclasses pursuant to Rule 23(c)(5)," which is the "proper solution if a court discerns a conflict among members of a proposed class…."  *Casale*, 257 F.R.D. at 409.  Similarly, the Court has the power to modify the class or subclass definitions, including certifying some part thereof, should the Court deem it appropriate in light of future developments.  *See Sumitomo Copper Litig. v. Credit Lyonnais Rouse*, Ltd., 262 F.3d 134, 139 (2d Cir. 2001).

done and will continue to do.  *See* Part III, *infra.*[26]

## II.     THE PROPOSED CLASS SATISFIES RULE 23(B)(3)

Class certification is warranted under Rule 23(b)(3) where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy…."  Both requirements are satisfied here.

### A.     Common Questions Of Law And Fact Predominate

Predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). "Predominance is a test readily met in certain cases alleging ... violations of the antitrust laws," *Amchem*, 521 U.S. at 625; *see also In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012), and "courts will generally certify for class treatment those group boycott claims that trigger a *per se* test."  6 NEWBERG ON CLASS ACTIONS § 20:25 (5th ed. 2019).

The "elements of an antitrust claim are (1) a violation of antitrust law; (2) injury and causation; and (3) damages."  *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010).  Here, common questions predominate as to each element.

### 1.     Common Evidence Of Defendants' Liability Will Predominate

Whether Defendants conspired is the most substantial issue in this case, and resolution of this issue will occur through the presentation of generalized proof and evidence that is common to all class members.  *See Meredith Corp. v. SESAC LLC*, 87 F. Supp. 3d 650, 661 (S.D.N.Y.

---

[26]   Some courts address adequacy of class counsel solely under Rule 23(g), *see, e.g.*, *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 339 (S.D.N.Y. 2004), which Plaintiffs address in Part III.

2015) ("The central issue ... is whether [defendants] engaged in anti-competitive conduct proscribed by § 1 or § 2 of the Sherman Act.  Resolution of this issue 'will not vary among class members.'").  *See also In re Amla Litig.*, 282 F. Supp. 3d 751, 767 (S.D.N.Y. 2017) ("[P]redominance requires a qualitative assessment too; it is not bean counting."); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1185 (N.D. Cal. 2013) (same).

That this central issue of liability will be resolved by common evidence weighs heavily in favor of certification.  Evidence that defendants conspired to restrain trade is "indisputably 'common' because it focuses on the allegedly unlawful actions of the defendants, not the actions of individual plaintiffs."  *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *38 (E.D.N.Y. Oct. 15, 2014).  To illustrate, Plaintiffs summarize just some of the common evidence of Defendants' conspiracy below.

### (a)  Common Evidence Of The Conspiracy's Origins

That evidence shows the Prime Broker Defendants laid the ground for their conspiracy when Defendants Goldman Sachs, Morgan Stanley, JPMorgan, Merrill Lynch, and UBS joined forces to form EquiLend in 2001.  EquiLend was "████████████"[27] ████████████

████████████[28]  Specifically,

---

[27]  Ex. 3 (2008.1.28 ████████████) at '454 (Sheet 3).  The Prime Broker Defendants ████████████ ████  *See* Ex. 17 (████████████) at '887-889.  As a result of the Bank of America acquisition of Merrill Lynch in 2008, JPMorgan acquisition of Bear Stearns in 2008, and the collapse of Lehman Brothers in 2008, the Prime Broker Defendants ████████████ ████████████  *See* Ex. 18 (2017.1.24 ████████████).  ████████████  *See* Ex. 17 (████████████) at '835.

[28]  Ex. 7 (████ Tr.) at 380:7-381:9; Ex. 19 (████ Tr.) at 22:18-23:14, 48:13-50:2, 60:10-62:9; Ex. 20 (2013.12.13 ████ Email) at '650.

EquiLend was a tool for its owners to jointly combat the "███████████████"[29]

███ —who "█████████████" to form EquiLend—stated "███████████████"

█████████████████████████████████████████████████████████

██████████████████████████████"[30]

    The Prime Broker Defendants needed this "████████"[31] because they "████

████████████████████████████████████████████████

████████████"[32] ████████████████—"██████████████

████████"[33]—Defendants agreed that "█████████████████

███████"[34]  That is, *only* from within EquiLend.  And if a central counterparty were ever

coming to the U.S., they agreed "█████████████████"[35]

    Secfinex was a stock loan exchange platform owned by the New York Stock Exchange

that posed an early "████████████" threat.  By ████ Secfinex offered "████████████

████████████████" with "████████"[36]  But, after being identified "███

████" by ████████████[37] Secfinex was boycotted.  Defendant, ████ noted, for example,

that "█████████" (*i.e.*, the Prime Broker Defendants) should "█████████████

<hr />

[29] Ex. 4 (2015.12.2 ███████████) at '681.

[30] Ex. 21 (█████████████████) at '574.

[31] *Id.*

[32] *Id.* at '575.

[33] Ex. 22 (2012.2.15 ██████ Message) (sic).

[34] Ex. 23 (2013.8.7 ████████ Meeting Notes) at '351.

[35] Ex. 24 (2010.9.13 ██████ Email).

[36] Ex. 25 (SecFinex Presentation) at '867.

[37] Ex. 26 (2010.2.4 ████████ Email) at '358.

███████████████████████████████████████████████████████████

████████████████ [38]  Secfinex thus failed to gain traction.

By 2008, the financial crisis led regulators to seek ways to make markets more secure and transparent, including by mandating the clearing of stock lending transactions through CCPs.[39] Defendants expressed concern that CCP-backed multilateral trading platforms could lower their profits by facilitating competition. ███████████ recognized by April 2008 the "████" of "█████████████" applied by "████████████████████████████████████████████"[40] It also recognized "██████████" as a ████████████████████ that could cause "█████████████" and "█████████████████"[41]  *Id.*  In January 2009, ████████████ stressed the ███ that an "███████████████████████████████████████"[42]  A February 2009 ████████████ presentation noted "███████████████████████████ ███████████" and "████████████████████████████████████████ ████████████████████"[43]

████████████ noted in March 2009 that "████████████████████████████████████████████ █████████████████████████" and that "██████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████"[44]  ████████████ also observed that "████████████████████████████████████"

---

[38]  Ex. 27 (2009.6.17 ███████ Email) at '786.

[39]  Ex. 28 (2009.12.21 ███████████ Email) ("████████████████████████████████ ████████").

[40]  Ex. 29 (April 2008 ███████ Presentation) at '656 (Slide 1).

[41]  *Id.* at '656 (Slide 17).

[42]  Ex. 30 (2009.1.16 ████████ Email) at '463.

[43]  Ex. 31 (2009.2.25 ████████ Presentation) at '795 (Slide 2).

[44]  Ex. 32 (2009.3.20 █████ Email) at '602.



█████████████████████████████████████ " and "████████████
████████████████████████████████████"[45]

### (b) Common Evidence Of Defendants' Conspiracy To Block And Boycott Disintermediation Threats

Common evidence also shows that the Prime Broker Defendants organized to combat the

"███████████" threats arising from AQS, SL-x, and others.  In early 2009, they formed a

"███████████" through EquiLend to "████████████████████████████

█████████████████████████████████████████"[46]  The

Prime Broker Defendants █████████████████████████████

█████████████████████████████████████████████

██████  The name of this group was misleading—███████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████ June 17, 2009, when, at a meeting ███████████

███████████████████████████████████

According to a summary, "████████████████████████████████

██████████"[47]  The ███████████ agreed to present the following to the full EquiLend

Board: "████████████████████████████████

████████████████████████" and "████████████████████████

██████████████████████████████████████"[48]

---

[45]  Ex. 33 (2009.3.20 ████████████████████) at '613.

[46]  Ex. 34 (2008.12.17 ███████████████ Call Notes) at '447.

[47]  Ex. 27 (2009.6.17 ████████ Email) at '786.

[48]  *Id.*; *accord* Ex. 7 (████████ Tr.) at 115:13-117:23; *see also* Ex. 35 (2009.6.17 █████ Email)
(██████ of █████ summarized the ███████████ findings in an email to ████████

These competitors had no legitimate reason to ███████████████████████████

███████████████████████████ This commitment was a way of policing the conspiracy. And

the evidence shows that this agreement changed the state of play—as noted above, shortly before

the ███████████████████████████████████████████

But the ███████████████████████████████████████

███████████████████████████████████ and "████████████████████

██████████████████████████"[49]

On June 22, 2009, the Prime Broker Defendants, as members of the EquiLend Board,

████████████████████████████████████████████████████

███████████████████████████████[50] They expressly agreed that "████████████████

████████████████████████████████████████████████████

███████"[51] They thus agreed that individual firms would not become involved with

multilateral trading facilities aligned with CCPs. As one ████████████████████████

██████████ testified, they then used future meetings to "████████████████████

████████████████████████████"[52] Such agreements among competitors are *per*

_____

and ███████ of ███████████ "███████████████████████████

██████████████ " In addition, "████████████████████████████

███████████████████████████████████").
[49] Ex. 36 (2009.6.18 ███████████ Presentation) at '496 (Slides 2, 3).
[50] Ex. 6 (2009.6.22 ███████████) at '329-30; *see also* Ex. 37 (2009.6.23 ███████
Email).
[51] Ex. 5 (2009.6.22 ███████████████) at '776 (emphasis added); Ex. 6 (2009.6.22
████████████████ ) at '329-30 (██████████████████████████).
[52] Ex. 7 (███████ Tr.) at 111:15-116:14 ("████████████████████████████
██████████████████████████████
████████████████████") (emphasis added). By September 2009, Defendants
jointly decided through EquiLend to ███████████████ Ex. 38 (2009.9.14 ███ Email).

*se* unlawful. *See Klor's, Inc.* 359 U.S. at 212; *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 326-27 (S.D.N.Y. 2018).

### (i)    AQS

AQS was one of the new entrants that the Prime Broker Defendants agreed to boycott. Created by Quadriserv, AQS was a central, electronic marketplace for stock loan transactions.[53] It was live and operational by early 2009, with growing support and trading volume.[54]

The Prime Broker Defendants quickly identified AQS as a threat. 

---

[53]  Ex. 39 (          Tr.) at 141:25-143:18.

[54]  Ex. 40 (2009.1.30          Email) at '625; Ex. 41 (2010.6.15          Email) at '162.

[55]  Ex. 42 (2011.2.9      Message).

[56]  Ex. 43 (October 2010          Presentation) at '224.

[57]  Ex. 44 (2008.10.9          Email) at '374.

[58]  Ex. 45 (2009.1.14          Email) at '249.          also identified a "
                                        " Ex. 46 (                    ) at
'651 (Slide 5).

[59]  Ex. 47 (2009.6.25          Presentation) at '670.

After agreeing to their group boycott, Defendants went to work to " ███████████

██████ "[60] They largely refused to do business with AQS or trade on the platform—and they

pressured Bank of America, the only Prime Broker Defendant to invest in or use AQS, to drop its

support. Bank of America had initially invested in AQS, ████████████████████████

████████████████████████████████████[61] It believed that ██████████████

████████████████████ the bank "████████████████████████████████

████████ "[62] But Bank of America ultimately fell in line with the conspiracy, withdrawing its

support and joining the ranks of the other Prime Broker Defendants in boycotting the platform.[63]

The Prime Broker Defendants also threatened to retaliate against supporters of AQS.

████████████████ told clients that if it "████████████████████████████████████ "[64]

They also pressured Agent Lenders not to use AQS. As noted, when ██████████ of ██████

██████ heard that ████████████████████████████ he "████████████ " referring to ██████

___



[60]  Ex. 48 (2010.3.17 ████████ Email) at '096.
[61]  Ex. 49 (2008.5.30 ████████ Email) (████████████); Ex. 50 (2009.2.2 ████
████████) at '439 (Slide 1) (████████████); Ex. 51 (2011.10.2 ████
████████) at '145 (Slide 1) (████████████); Ex. 50 at '439 (Slide 3)
("████████████████████████████████████████████████████████
████████████████████"); Ex. 52 (████████ Tr.) at 72:20-74:4 (████████ recognized that
the AQS platform allowed them to "████████████████████
████████" because "████████████████████████████████
████████████████████").
[62]  Ex. 53 (████████ Tr.) at 67:25-68:21; 84:22-85:2; 99:15-100:21; 117:22-119:5.
[63]  Ex. 39 (████████ Tr.) at 682:12-25 ("████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████"), 683:16-684:21 (████████████████████████
████████).
[64]  Ex. 54 (2011.2.15 ████████ Email) at '375.

████████████████████████████████████████████████

████████████████████████████████████████████████

████ [65] ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ [66]  State Street also expressed

interest in ████████████████████████.[67]  But after meeting with ████

████████████████████,[68] it also ██████████████.  It later expressed

concern that the AQS platform ████████████████████████████

████████████████████████████ [69]

Because of Defendants' coordinated efforts, AQS was unable to gain traction.  This

deprived class members of the price transparency and competition that would have resulted from

the platform.  As ████████████████ put it, "████████████████████

████████████████████████████████"[70]  Ultimately, AQS failed and its assets

were sold to EquiLend—not because EquiLend wanted to bring AQS to market, but as a

"████████" for Defendants to neutralize the "████████" forever.

---

[65]  Ex. 55 (2010.2.3 ████ Email) at '580; Ex. 56 (2010.3.4 ████ Email) at '997; Ex. 57
(████) at 65:25-70:9.
[66]  Ex. 58 (2010.12.15 ████ Email) at '704.
[67]  Ex. 59 (████) at 64:17-25 (testifying that State Street ████████████████████
████████████.
[68]  Ex. 60 (2010.12.3 ████████████████████) ████████████████████
████████████████████████████████████.
[69]  Ex. 61 (2014.4.23 ████████████) at '197.
[70]  Ex. 62 (2011.4.29 ████ Email) at '416.

### (ii)    SL-x

SL-x was another new entrant that was targeted by Defendants' group boycott. SL-x was created to address the "opaque bilateral OTC market ... dominated by a tight, relationship-based network of large banks, operating as agents for the lenders and borrowers."[71]

Several SL-x founders had worked on SecFinex. Having seen SecFinex fail (due to a boycott of which they were unaware), SL-x's founders tried a more conservative approach. They did not design SL-x to start as an all-to-all trading platform like AQS. Rather, they designed the platform to be accessible, at least in the beginning, to dealers alone.[72] But the platform would increase the efficiency and transparency in the market and could adopt an exchange model once it gained a foothold. As one founder explained: "█████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████"[73]

Some Defendants initially expressed interest in SL-x. ███████ for example, thought SL-x "███████████████████████████"[74] ███████████ thought SL-x appeared to be "████████████████"[75] ████████████████████ described the SL-x

---

[71]  Ex. 63 (2011.3.7 SL-x Preliminary Investment Review) at '415 (Slides 12-13).

[72]  Ex. 26 (2010.2.4 ████████ Email) at '358 (reporting that SecFinex was "███████████
██████████████████████████████████████████
████████████"); Ex. 64 (████████) at 17:23-21:5; *see also*
Ex. 63 (2011.3.7 SL-x Preliminary Investment Review) at '415 (Slides '002, '022, '025-26, '028, '031-32).

[73]  Ex. 64 (████████) at 324:11-23.

[74]  Ex. 65 (2012.8.20 ████ Email) at '930.

[75]  Ex. 66 (2014.4.30 ████████ Email) at '807.

front end as "█████████████████████████"[76] ████████ executive ████████ later wrote, "████████████████████████████████████████████"[77]

But the Prime Broker Defendants boycotted SL-x because they feared it could transform to an anonymous all-to-all platform.[78]  They agreed none of them would use or deal with SL-x. ████████████ of ██████████ admitted that, as part of the Prime Broker Defendants' practice of sharing with each other "████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████"[79]  Similarly, after a series of meetings with his competitors, ████████ executive ████████ reported that "██████████████████" are ████████████

██████████████████████[80]  This is blatantly conspiratorial conduct.

To make sure there were no defections from their boycott, and to sabotage SL-x's progress, the Prime Broker Defendants insisted that SL-x negotiate with them *as a group* rather than individual banks.  ████████████ told SL-x it should "████████████████████

████████████████████████████████████"[81] ████████████

████████████ told the CEO of SL-x that "████████████████████████████████

████████████████"[82] ████████ wanted a "██████████████████████████

████████████████████████████████████████████████" and

---



[76]  Ex. 67 (2011.11.18 ████████ Email) at '864.
[77]  Ex. 68 (2012.11.9 ████████ Email) at '084.
[78]  Ex. 69 (2012.11.13 ████████████ Email) at '548 ("████████████████████████

████████████████████").
[79]  Ex. 7 (████████ Tr.) at 111:15-116:14, 283:15-23.
[80]  Ex. 70 (2011.8.5 ████████ Email) at '660.
[81]  Ex. 71 (2011.7.19 ████████ Email).
[82]  Ex. 72 (2011.9.13 ████████ Email) at '106.

thought " 

████████████████████████████████████ "[83] ██████████ a strategy

executive at ███████ emailed her counterparts at ████████[84] and ███████████[85] to

████████████████ and ███████████████████ that "███████

████████████████████[86] ██████████ ultimately confirmed that ███████████

"███████████████" or fellow cartel members, were "███████████████████

███"[87]

But after Defendants forced SL-x to approach them as a group, they refused to engage.

The Prime Broker Defendants, as members of the EquiLend board, were "███████████

███████████████" in SL-x's proposal because EquiLend "███████████████████

████████████████████████████████"[88] Defendants

stuck to their agreement that "████████████████████████████████████"[89]

SL-x was forced to shutter its doors by September 2014.[90]

### (iii)    Data Explorers

Defendants also identified Data Explorers as a threat because it had the potential to

disseminate data to End Users that could lead to more competitive pricing.[91] ███████████

---

[83]  Ex. 73 (2011.7.5 ███ Email) at '912.
[84]  Ex. 74 (2011.7.13 ███ Email).
[85]  Ex. 75 (2011.7.19 ███ Email) (emailing ███████ to "███████████").
[86]  Ex. 76 (2011.7.19 ███ Email) at '049.
[87]  Ex. 73 (2011.12.1 ████ Email) at '912.
[88]  Ex. 77 (2011.9.15 ████ Email) at '393-94.
[89]  Ex. 23 (2013.8.7 SL-x and ████ Meeting Notes) at '351.
[90]  Ex. 78 (2014.9.19 ████ Email) at '490-91.
[91]  Ex. 79 (2008.3.4 ████ Email) at '475 (████████ writes, "████████████████████
████████████"); Ex. 80 (████ Securities Lending Deck) at '924
(listing ████████████████████████████████████████████).



█████████████████████████████████████████████.[92] ████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████.[93] ████████████████████

refused to "█████████████████████████████████" in an attempt to "███████" because

"█████████████████████████████████████████████████████████████"[94]

When Data Explorers planned to offer a premium product to end-users, ████████████

executives determined it was ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████[95] ██████████████████████ later confirmed that this competitor

coordination occurred, explaining "████████████████████████████████████████████████

████████████████████████████████████"[96]

Defendants decided to kill Data Explorers off by creating an alternative they could jointly

adopt and control. ████████████████████████████████████████████████

██████████████████████████ to "████████████" for Data Explorers' "████████

[92]  Ex. 81 (████████████████████████████) at '280.
[93]  Ex. 82 (█████████) at 101:15-102:19.
[94]  Ex. 83 (2008.8.1 █████ Email) at '372. *See also* Ex. 82 (███████) at 37:9-25 (███████
████████████████████████████████; Ex. 84 (2008.7.29 ████████ Email) at
'976 ("████████████████████████████████"); Ex. 85 (████████ Tr.) at
129:10-14 (noting that he ████████████████████████████████████████████████
██████████████████████████).
[95]  Ex. 86 (2011.7.27 ████████ Email) at '471. *See also* Ex. 87 (████████ Tr.) at 215:6-12 (███
████████████████████████████████████████████████).
[96]  Ex. 86 (2011.7.27 █████ Email) at '470.



███████████[97] The goal was to preserve Defendants' exclusive control of pricing information and avoid the pressure on spreads that increased information would cause.

At a December 8, 2010 meeting, ████████████████████████████████

████████████████████████████████████████████████████████

███████████[98] By January 2011, Defendants had formed a "██████████████████████" to

"████████████████████████████████████████████

███████████████[99] Relying on EquiLend's product would allow its owner firms to "█████

███████████████████████[100] The product would, by agreement, provide less transparency to customers than Data Explorers did (and much less than it would have absent the conspiracy). In November 2011, ████████ of ████████████ reported internally, "███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████[101]

---

[97] Ex. 88 (████████████ Strategy) at '503. *See also* Ex. 86 (2011.7.26 ████ Email) at '472 (████████ email chain that notes "████████████████████" "████████████████████████████████" because of "█████ ████"); *id.* (2011.7.27 ████ Email) at '470 (Same ████████ executive responded to chain that "████████████████████████████████" and it is observed elsewhere in the chain that "████████████████████████████████ ████████████████").

[98] Ex. 89 (2020.12.20 ████ Email) at '461; *see also* Ex. 90 (2010.12.8 ████████████ ████) at '292-93.

[99] Ex. 91 (2011.1.6 ████ Email) at '512.

[100] Ex. 92 (████ Tr.) at 221:14-21.

[101] Ex. 93 (2011.11.3 ████ Email) at '686; *see also* Ex. 94 (2013.12.10 ████ Email) ████ ████████████████████████████).

Defendants' need to kill off Data Explorers completely, however, was eliminated when

Markit, ████████████████████████████████████████████████████████

████████████████████████████████████████████████.[102]  The Markit ████████

████████████████████████████████████████████████████████

████"[103] and to "preserve market integrity."[104]  The ████████████████████

████████████████████████████████.[105]  Data Explorers does not provide a data

product showing transparency across the market, even today.

### (c)  Common Evidence Of Defendants' Continuing Efforts To Preserve A Bilateral Trading Model

Common evidence will also prove that Defendants continued to conspire until they

completely killed off the threats from AQS and SL-x, and from central clearing more broadly, in

2016.  Specifically, they conspired to preserve the "bilateral" trading model that ensures they get

an inflated cut of nearly every stock loan transaction with members of the proposed class.

In December 2011, the U.S. Federal Reserve announced it would substantially implement

a regulatory framework known as Basel III.[106]  Basel III incentivized a shift from OTC to a

centrally cleared market by allowing financial institutions to characterize cleared stock lending

transactions as less risky than OTC stock lending transactions.[107]  As a consequence, broker-

---

[102]  Ex. 95 (████████) at 28:13-24.

[103]  Ex. 95 (████████) at 15:10-20, 127:24-135:8; Ex. 96 (2012.4.3 ████ Email) at '317.

[104]  Ex. 97 (2012.9.12 ████ Email) (noting to ████████████████████ Markit's efforts to "preserve market integrity").

[105]  Ex. 95 (████████) at 150:19-151:10 (████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████.

[106]  Ex. 98 (Fed Proposes New Capital Rules for Banks, New York Times (Dec. 20, 2011)).

[107]  *See* Ex. 99 (December 2010 Basel III Guidelines) at 4 ("A bank's collateral and mark-to-

dealers would not have to allocate as much capital on their balance sheet to a cleared stock loan trade as compared to a bilateral uncleared trade.  This gave new life to AQS, which was working with the OCC (the world's largest equity derivatives clearing organization) to deliver a clearing/CCP model to the market, even as AQS struggled under the weight of Defendants' boycott.

Seeing the writing on the wall, the Prime Broker Defendants agreed that if "████████

██████████████████████████████████████████████████████

███████"[108] "████████████████████████████████" as to what an EquiLend-based

CCP product would and would not be, noting that they ███████████████████████

██████████████████████████████████████████████ and

stating it must ███████████████████" and instead must "███████████████."[109]

Specifically, the Prime Broker Defendants ████████████████████████████

████ on March 18, 2015 █████████████████████████████████

█████████████████████████████[110]  The first "█████████████" was:

"████████████████████████"[111]  As noted, ██████████ EquiLend board

representative admitted at his deposition ███████████████████████████████



market exposures to CCPs meeting these enhanced principles will be subject to a low risk weight, proposed at 2%[.]").

[108]  Ex. 7 (█████ Tr.) at 373:21-378:16.

[109]  Ex. 100 (2014.8.26 █████ Email) at '165; *accord* Ex. 57 (█████) at 212:16-213:3.

[110]  Ex. 8 (2015.3.20 █████ Email) at '883. ███████████████████ included representatives from each of the Prime Broker Defendants. *Id*. at '885, '893; *see also* Ex. 101 (2015.3.25 ██████████) at '300.

[111]  Ex. 8 (2015.3.20 ██████ Email) at '885 (emphasis added). ████████████████████████
██████████████████████████████████████████████████ *See*
Ex. 102 (2015.3.18 ████████████████) at '482 ("█████████████████████████
█████").

██████████████████████████████████████████████████████████████

████████████████████████████████████[112]

Defendants' boycott drove Quadriserv into dire financial straits, forcing it to look for a buyer for the AQS platform. One logical buyer was the OCC, through whom AQS had been clearing trades since its inception. Throughout 2015, Quadriserv and OCC negotiated a transaction.[113] In October 2015, Quadriserv ████████████████████████████████

██████████████████████████████████████████████████████████████

████.[114]

But, ████████████ from the OCC that it was "████████,"[115] the OCC never ████████████████.[116] The evidence shows the OCC ████████████████████

████ because the Prime Broker Defendants, ████████████████████,[117] ████████

████████████████████████████████████████. In fact, the Prime Broker Defendants were ████████████████████████████████████████████████████

████████████████████████.[118] Eventually, EquiLend acquired certain AQS assets and

---

[112]  Ex. 7 (███████ Tr.) at 407:3-414:12 ("██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████").

[113]  Ex. 103 (2015.1.27 ████████ Email) at '267; *id.* (2014.12.9 ████████ Email) at '268.

[114]  Ex. 104 (████████) at 61:10-14; Ex. 105 (████████████████) at '122 ████████████████ of $██████); Ex. 106 (2015.11.23 ████████ Email) at '602 (explaining that ██████████████); Ex. 104 (████████) at 108:22-109:21.

[115]  Ex. 104 (████████) at 40:22-41:6.

[116]  *Id.* at 64:23-65:12.

[117]  Ex. 107 (2010.12.15 ████ Email) ("██████████████████████████"); Ex. 59 (████████) at 68:13-22.

[118]  Ex. 108 (2015.4.15 ████████ Email) at '885; Ex. 104 (████████) at 60:15-60:20, 80:11-81:22; Ex. 105 (2015.10.23 ████████ Email) at '120.

licensed the AQS middle office technology to the OCC for a price of $███████████████ ██████████████████████████████████████████████████████████ from AQS.[119]
This evidence strongly suggests that the OCC was used as a tool of the Prime Broker Defendants to prevent AQS's technology from falling outside of their control.

As the OCC/AQS transaction began to hemorrhage in the Fall of 2015, ████████████ ██████████████████████████████████████████ on the watered down version of AQS focused on the inter-dealer market, known as AQS Direct.[120]  With the OCC ██████ ████████, and ████████████████████████ ██████████████████████ ████ ████ Quadriserv had little choice but to sell AQS assets to EquiLend,[121]

Senior executives of ██████████ and ████████████████ and ████████████████ ████████████ so the Prime Broker Defendants could all "████████████████"[122]  On February 6, 2016, █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████[123]  On March 23, 2016, ████████████ one of ████████████████ informed him that the ████████ █████ and ████████████████████████████████████ about how "██████ ████████████" and how the ████████████████████████████████████████████████

[119]  Ex. 104 (████████) at 121:6-122:22; *see also* Ex. 109 (█████ Tr.) at 328:19-24.
[120]  Ex. 110 (████ Tr.) at 230:17-232:9.
[121]  Ex. 111 (████████) at 206:17-207:3; Ex. 112 (██████████████) at '737-41.
[122]  Ex. 113 (2016.2.5 ████ Email) at '703.
[123]  *Id.*

the risk posed by AQS.[124] ███████ of ███████████ and ███████ of ███████████

███████ for ████████████████████████████[125]

In an attempt to prevent any future entrants from following AQS's path, Defendants also

agreed to a plan for a ████████████████████████ would ensure that

EquiLend ████████████████████████████████████████████

████████████████[126] And the ████████████████████████

████████████████████████████████████████████████

████████[127] The Prime Broker Defendants agreed that the "██████" would be "████

████████████████████████████"[128] No independent companies offering multilateral

trading platforms have entered the market since the Gateway was implemented.

### 2. Plaintiffs Are Capable Of Proving Class-Wide Impact At Trial

Class certification is also warranted because Plaintiffs are capable of showing that

Defendants' conspiracy imposed class-wide impact across the market. Antitrust impact "is the

'fact of damage' that results from a violation of the antitrust laws." *In re DRAM Antitrust Litig.*,

---



[124]  Ex. 114 (2016.3.23 ████ Email).
[125]  Ex. 115 (████ Tr.) at 71:2-72:4; Ex. 116 (████ Tr.) 85:9-12 (██████████
████████████), *id.* 87:9-88:15 (████████████████████████████);
Ex. 117 (████████ Calendar) at '684 (calendar entry showing a March 28, 2016,
████ and ████); Ex. 118 (2016.30.3 Msg. from ████) at '729 (████████
████).
[126]  Ex. 119 (2016.2.5 ████ Email) at '360; Ex. 120 (2016.3.21 ████ Email) at '226
(████ asking the OCC "██████████████████████████████████
██████████████████████████████████████"); Ex. 121
(2016.3.23 ████) at '909 (the Gateway "████████████████████████
████").
[127]  Ex. 122 (████████████████████) at '992.
[128]  Ex. 123 (██████████████████████) at '163 (emphasis added).

2006 WL 1530166 at *7 (N.D. Cal. June 5, 2006).  Impact exists if class members suffered *some*

injury from the antitrust violation—"inquiry beyond this minimum point goes only to the amount

and not the fact of damage."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114

n.9 (1969).  When class-wide impact is "capable of proof at trial," the predominance requirement

is met.  *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114-15 (S.D.N.Y. 2015).  "[O]n a motion for

class certification, the Court only evaluates whether the method by which plaintiffs propose to

prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-

wide impact."  *In re Magnetic Audiotape Antitrust Litig.*, 2001 WL 619305, at *4 (S.D.N.Y. June

6, 2001) ).[129]

Plaintiffs' primary impact expert, Professor Haoxiang Zhu, has published numerous peer-

reviewed academic papers on financial market evolution and how the transition from opaque

OTC market structures yields price benefits to end users of financial markets.  He explains that

class members here were harmed because the conspiracy blocked anonymous multilateral trading

platforms, like AQS, that would have benefited the entire class by the start of the Class Period.

As a result of the conspiracy, class members faced higher search costs and worse prices.[130]

Professor Zhu's impact conclusions are based on accepted economic principles, including

groundbreaking work by the 2010 Nobel Prize Laureate Peter Diamond.  That work shows that

"even a minute search cost moves the equilibrium price very far from the competitive price."  A

---

[129]   Proof of antitrust impact "poses two distinct questions": (1) the "legal question whether the alleged injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful'" and (2) the "factual question whether class members have indeed suffered harm, or 'injury-in-fact,' as a result of the defendants' violation." *Air Cargo*, 2014 WL 7882100, at *40.  At the motion to dismiss phase, Defendants did not challenge that the alleged injury was "of the type the antitrust laws were intended to prevent[.]" *Iowa Pub. Emps.*' *Ret. Sys*, 340 F. Supp. 3d at 331.

[130]   Ex. 9 (Zhu Rpt.) ¶¶ 1-13, 80-345 and App'x A.

large body of economic work shows that the introduction of search frictions into financial markets allows dealers like the Prime Broker Defendants to charge supra-competitive prices.[131]

Professor Zhu deploys these economic principles by applying an economic model from his independent research to the facts and circumstances of this case. Published in a leading economic journal in 2017, Professor Zhu's model provides a framework to analyze how rational end-user traders and broker-dealers would react to the introduction of an anonymous multilateral trading platform.[132] Professor Zhu shows that all or virtually all end-user traders would benefit from anonymous multilateral trading platforms due to lower search costs and better pricing.[133]

Professor Zhu's model demonstrates class-wide injury even though some class members are more commercially sophisticated than others. In the model, dealers are aware that both "fast" customers with access to a full slate of dealer quotes and "slow" customers that must engage in costly searches for price comparisons exist, but do not know exactly which customers are in each category. But because the dealer knows it is costly for at least some customers to find multiple quotes, dealers are able to set prices above competitive levels, knowing that many customers will accept the supra-competitive price rather than engage in a costly search.[134]

When a trading platform comes to market, however, a higher percentage of customers gain access to competitive pricing. The dealers must lower their prices in response, because they cannot determine exactly which customers have access to competitive price information. Broker-dealers, therefore, rationally offer superior prices to *all* traders. Fundamentally, therefore, lowering search costs for *some* in the market who use the platform yields benefits for

---

[131]   *Id.* ¶¶ 37-47.

[132]   *Id.* ¶¶ 11, 252-89.

[133]   *Id.*

[134]   *Id.* ¶¶ 262-71.

*all*.  Professor Zhu thus demonstrates why a conspiracy to block multilateral trading from entering the market creates *market-wide impact*, harming all or virtually all class members.[135]

Professor Zhu explains that common evidence from the record supports applying the conclusions of this model to the U.S. stock loan market.  Central clearinghouses were viable in the stock loan market by roughly 2009.  The OCC served as a clearinghouse in the stock loan market as early as 1993.[136]  The OCC ███████████████████████████████, the "█████████████████,"[137] which was functional in 2009.  By June 2010, "through the OCC combined Stock Loan Program and AQS Securities Lending Market Program some 1200 transactions [were] processed daily, with 6900 contracts outstanding valued at $12 billion."[138]

Professor Zhu concludes that, absent a conspiracy, multilateral electronic trading platforms would have sufficient market penetration such that they would improve prices market-wide by the start of the Class Period.  For example, he explains that "there was market demand for the AQS platform" and that AQS solved for technical and feasibility problems by the start of the Class Period, despite the obstacles imposed by the conspiracy."[139]

Professor Zhu also confirms his conclusions of class-wide impact through a "yardstick" analysis, examining comparable financial markets that moved from OTC to multilateral trading.  That analysis shows "that multilateral trading mechanisms in the U.S. stock loans market would

---

[135]  *Id.* ¶¶ 272-89.

[136]  *Id.* ¶¶ 119, 121-25.

[137]  Ex. 124 (2009.1.22 ███ Email) at '223.

[138]  Ex. 125 (CCP White Paper) at '011.  The same paper concludes "Options Clearing Corporation (US), LCH Clearnet and SIS x-clear in Europe all are operating live CCPs" during the same time period.  *Id.* at '014.

[139]  Ex. 9 (Zhu Rpt.) ¶¶ 183-236.

similarly bring widespread benefits for all or virtually all Class members."[140]  As he explains, "every comparable market that I studied had marketwide benefits for all or virtually all traders in the market."[141]

He identifies the stock market as the most comparable to the U.S. stock loans market, because "the stock market and the stock loan market transfer similar risks: the risk that stock prices go up and down" and because the two markets are "tightly linked in the sense that short selling, which is conducted in the stock market, is preceded by borrowing shares in the stock loan market."[142]  The impact of electronic trading in the stock market is thus informative about the benefits electronic trading would have brought to the stock loan market—and the benefits of transparent, electronic trading for the stock market were enormous.  In Congressional testimony, for example, Citadel CEO Ken Griffin observed:

> The unleashing of competition and surge in innovation has markedly improved conditions for all investors, who benefit from dramatically lower trading costs, improved market transparency and liquidity, and increased competition by liquidity providers.  As a result, bid-ask spreads are substantially narrower, currently averaging less than 0.03 percent for S&P 500 stocks, while displayed market depth for the average stock, measured as the value of the shares displayed on the bid and offer, is nearly triple what it was a decade ago.[143]

Professor Zhu explains that "[e]conomic studies of the equities market confirm Mr. Griffin's observation that market conditions have 'markedly improved' for 'all

---

[140]  *Id.* ¶¶ 290-315.

[141]  *Id.* ¶ 255.  In cases like this one, where the relevant market has consistently been infected by the challenged anticompetitive conduct, economists can use a "yardstick" approach that analyzes what transpired in related, comparable markets where a conspiracy was not deployed.  *See, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 15 (E.D.N.Y. 2020) (the yardstick approach "examines the actual prices and quantities that occurred in a similar market that was not affected by defendant's behavior").

[142]  Ex. 9 (Zhu Rpt.) ¶ 292.

[143]  *Id.* ¶ 295.

investors.'"[144]  He cites an empirical study of the stock market conducted by Barclay *et. al* showing that the "inside spreads" between bids and asks in the stock market decreased for all of the "dollar volume" categories evaluated in the study.  And he explains that Defendants' own analyses confirm market-wide impact in the stock market from the introduction of electronic trading platforms.  ██████████ for example, noted a "████████" in ██████████
██████████████████████████████████[145]

Professor Zhu examines other markets as part of his yardstick analysis as well, including corporate and government bonds and oil.  In each, he concludes that the empirical evidence reveals that a move to electronic trading brought widespread benefits to virtually all buyers and sellers across the market.[146]

Professors Asquith and Pathak independently show class-wide impact.[147]  They describe how "[i]ntermediation of stock loans primarily involves locating shares and certifying counterparty credit quality," but in this market there is "relatively little inventory risk" and "the costs of certifying credit worthiness are small."[148]  In an efficient market, therefore, there is no economic basis for a significant "spread" between borrow and lend prices in the marketplace.[149]  Thus, broker-dealer revenues from the conspiracy would, in the competitive market equilibrium be "retained by beneficial owners and short sellers."[150]  Professors Asquith and Pathak further

---

[144]  *Id*. ¶ 296.

[145]  *Id*. ¶¶ 297-99 (citing Ex. 29 (April 2008 ██████████  Presentation) at '656 (Slide 8)).

[146]  *Id*. ¶¶ 300-15.

[147]  Professors Asquith and Pathak analyze impact in Sections IV-VIII of their report. They provide a damages model for the class in Sections IX-XI of their report.

[148]  Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 96-97, 108.

[149]  *Id*. ¶¶ 82-88.

[150]  *Id*. ¶ 88.

explain how their economic analysis indicates the stock lending market was well-positioned for the entry of electronic platforms, and that real-world examples of AQS, SL-x and other platforms provide compelling evidence that platforms would enter in the but-for world.  Finally, they explain why all class members would benefit when the market reaches competitive equilibrium.[151]

As part of their analysis of the AQS platform, Professors Asquith and Pathak empirically analyze AQS trading data and conclude that, even as AQS was subjected to Defendants' boycott,

█████████████████████████████████████████████████████████████

█████[152]  All three economists conclude that the fact that even a boycotted platform was ███

█████████████████████████████████████████████  provides further evidence that a

*non-boycotted* platform would have benefitted all or virtually all class members in the but-for world.[153]  That is, "superior pricing provides an important indication of how an electronic platform, like AQS, could have improved pricing in the market."[154]  Analysis of AQS data (albeit contaminated by the conspiracy) is thus further evidence of class-wide impact.[155]

Finally, contemporaneous analyses conducted by the Prime Broker Defendants themselves further confirm that the conspiracy would have market-wide impact.  ████████████ concluded, for example, that "██████████" that "██████████████████

---

[151]  *Id*. ¶¶ 117-33.

[152]  Specifically, when Professors Asquith and Pathak run their model on historical AQS transactions and compare the results to historical OTC pricing, it shows that ████ ████████████
████████████████████████████████████████████  *Id*. ¶¶ 200-229, Tables VII.6 and VII.8.

[153]  Ex. 9  (Zhu Rpt.) ¶¶ 316-17; Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 200-29.

[154]  Ex. 10 (Asquith/Pathak Rpt.) ¶ 228.

[155]  *Id*. ¶¶ 200-29.



[REDACTED]

[REDACTED] [156] [REDACTED] concluded that "[REDACTED]

[REDACTED]" and that

"[REDACTED]"[157]

And in a presentation entitled "[REDACTED]" [REDACTED] found that [REDACTED]

[REDACTED]

[REDACTED][158]

[REDACTED] even conducted a formal "[REDACTED]" analysis of what would happen if

[REDACTED][159] It concluded AQS would "[REDACTED]

[REDACTED]"[160] The bank proceeded to

quantitatively estimate the impact [REDACTED]

[REDACTED] It determined that [REDACTED]

[REDACTED] estimated it would [REDACTED]

[REDACTED] that would be a gain for class members.[161]

These contemporaneous studies by Defendants can also be used for "the purpose of
ultimately proving impact." *High-Tech*, 985 F. Supp. 2d at 1193.  In fact, a party's own pre-
litigation analyses are often "among the most persuasive to a jury as it illustrates and confirms
many of the actual dynamics at play." *Id.* at 1215.[162]

---

[156] Ex. 29 (April 2008 [REDACTED] Presentation) at '656 (Slide 17).
[157] Ex. 50 (2009.2.2 [REDACTED]) at '439 (Slide 12)
[158] Ex. 127 ([REDACTED]) at '584.
[159] Ex 150 (2010.2.19 [REDACTED] Email) at '048.
[160] Ex. 126 ([REDACTED]) at '694.
[161] *See* Ex. 126 ([REDACTED]) at '699 (Sheet 1), Column 7.
[162] "The use of Defendants' own forecasts to model a but-for world has been held to be a sound

### 3.   Common Evidence Provides A Reliable Model Of Damages

Class certification also is warranted because Plaintiffs have a damages model that is "sufficient to show that damages are measurable through use of a common methodology." *Dial Corp*, 314 F.R.D. at 119.  This methodology is set forth in the accompanying Expert Report of Professors Asquith and Pathak (Exhibit 10).

### (a)   The Model Provides A Robust Estimate Of Class Damages

Professors Asquith and Pathak's model calculates a well-recognized measure of antitrust damages:  "the difference between the prices actually paid and the prices that would have been paid absent the conspiracy," *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988).  This flows from Plaintiffs' theory of liability and antitrust impact:  Defendants conspired to maintain an inflated spread between the price at which they borrow from the Beneficial Owner Subclass and the price at which they lend to the End-User Subclass.  Using Defendants' data records, Professors Pathak and Asquith ██████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████ due to their antitrust violation.

Professors Pathak and Asquith model the competitive prices that would have prevailed for every stock, for every day during the Class Period "but for" the conspiracy.  As discussed above, they demonstrate in the context of their opinions on impact that there is no economic justification for a significant spread between the "borrow" and "lend" prices for stock lending

---

economic methodology." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 182 (S.D.N.Y. 2018).

transactions.[163]  Professors Pathak and Asquith explain that, for that reason, they take as a starting point for calculating the but-for world price the market-clearing equilibrium price.[164]

    To estimate that price, Professors Asquith and Pathak apply separate approaches for General Collateral and Hard-to-Borrow stocks.  For General Collateral, they explain that because there is excess supply in the market, the market-clearing equilibrium price is the same as the average real-world price earned by lenders for a particular stock on a given day in the wholesale market plus the platform fee a lender would need to pay for use of the platform.[165]  For Hard-to-Borrow stocks, Professors Asquith and Pathak use pricing data from trades that occurred on the AQS platform and Defendants' transactional data to estimate where the market-clearing equilibrium would be.[166]  After calculating the market-clearing equilibrium price for every stock and every day during the class period, they make conservative adjustments to ensure their posited but-for world is conservative.  First, they include fees that a multilateral trading platform would need to charge to cover its costs, using the real-world fees charged by AQS as a proxy.[167]  Second, acknowledging that some trades would potentially trade OTC even though a platform is available, they model a price difference between the but-for platform price and the but-for OTC price, which they denote $F_{OTC}$.[168]  They then conservatively assume that all class members would transact at inferior, "worst case" but-for OTC prices, *even though* they believe the vast majority of trades would occur on multilateral platforms in the but-for world.[169]

---

[163]  Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 95-114.

[164]  Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 327-40.

[165]  *See* Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 438-39.

[166]  *Id*. ¶¶ 440-64.

[167]  *Id*. ¶¶ 465-82.

[168]  *Id*. ¶¶ 483-96.

[169]  *Id*. ¶ 483.

With but-for world pricing modelled, Professors Asquith and Pathak explain that damages can be computed on a per-stock, per-day basis for every transaction in Defendants' databases by comparing the real-world transaction price with the but-for world price. While it is time and resource intensive to run calculations on Defendants' massive data sets, this process is formulaic once the parameters for determining but-for world pricing estimates described above are set. Further details of the conceptual parameters and assumptions of Professors Asquith and Pathak's methodology, and the mechanics of their computations, are provided in their report.[170]

At trial, Plaintiffs will be able to use this methodology to prove aggregate class damages from the start of the Class Period through judgment (or any other end-point the Court orders). This supports certification, as "[t]he Second Circuit has accepted the use of aggregate class-wide damages so long as they 'roughly reflect' the harm caused to plaintiffs." *Restasis*, 335 F.R.D. at 31 (quoting *Hickory Sec. Ltd. v. Repub. of Arg.*, 493 F. App'x 156, 159 (2d Cir. 2012)).

To demonstrate their ability to estimate class-wide damages, Plaintiffs' experts have applied their model to millions of class member transactions. To date, they have calculated aggregate class damages ▮▮▮▮▮ Prime Broker Defendants data sets (▮▮▮▮▮ ▮▮▮▮▮ and ▮▮▮▮▮) for the period from January 1, 2012 to December 31, 2017. These calculations show, for ▮▮▮▮▮ Defendants, Beneficial Subclass damages in the amount of ▮▮▮▮▮ and End-User Subclass damages in the amount of ▮▮▮▮▮[171]

These experts also examined the relevant databases for Defendants ▮▮▮▮▮ ▮▮▮▮▮ and ▮▮▮ and determined that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ They thus conclude that there is no barrier to computing damages for those

---

[170] *Id.* ¶¶ 341-540.
[171] *Id.* ¶¶ 502-20, Tables XI.24 and XI.25.

Defendants.  To provide an estimate of overall class damages before that calculation is done, the experts have designed an extrapolation method.  Because the calculations run on ███████ ███ show that each Defendant's damages are approximately proportionate to their respective market shares, the calculations already done can be compared to ████████████████ respective market share to estimate damages.  This yields an estimate of aggregate damages across all six Prime Broker Defendants of ██████████ for the Lender Subclass and ███████████ for the End-User Subclass from the start of the Class Period until the end of 2017.[172]  And while Defendants' data productions were confined to the discovery period running from January 1, 2009 until December 31, 2017, the same methodology can be expanded to determine class-wide damages, which are ongoing, from January 1, 2018 through trial.  This can be done either by running the model on updated data productions or through a temporal extrapolation, as Professors Asquith and Pathak describe in their report, yielding an estimated aggregate class-wide damages amount of ██████████ through the Class Period.[173]

Professors Asquith and Pathak's methodology applies more rigor than the law requires.  Courts recognize that "but-for" world pricing by definition cannot be observed or calculated with absolute certainty.  *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981) ("Damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) ("Where the but-for price is uncertain, the plaintiff's burden of proving damages is, to an extent, lightened, for the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (citations omitted)).  Their model is also

---

[172]   *Id*. ¶¶ 529-32, Tables XI.27 and XI.28.

[173]   *Id*. ¶ 540 and Table XI.30.

versatile, and so if any of its assumptions are deemed problematic, or should the Court require that certain categories of transactions be excluded, the model can be adjusted accordingly.[174]

### (b)   The Model Excludes Trades That Are Not In The Class

Professors Asquith and Pathak designed the model to exclude certain categories of transactions to ensure that it estimates all damages attributable to class members, but not for transactions of non-class members or for which Plaintiffs do not claim damages.

*First*, Defendants' databases include ███████████████████████████████ ███████████████████████████████████████████████████████████████ As Professors Asquith and Pathak explain, "[i]n a typical stock loan collateralized by cash, the borrower of the security provides cash collateral to the lender in exchange for the securities borrowed" and the "entity lending shares typically earns a positive return."[175]  However, in a funding trade, the "lender" of stock essentially pays the "borrower" in order to obtain cash collateral for liquidity purposes.  Because these transactions reflect different economic purposes from traditional stock loans, entities that engage solely in funding trades are excluded from the class, and Professors Asquith and Pathak exclude funding trades from the calculation of class damages.[176]

*Second*, "[i]n any large dataset for financial transactions, it is possible that recording errors or other anomalies can cause the data for important variables to be substantially outside the ranges of values typically observed for these variables."[177]  These are excluded by identifying data values that are clear statistical outliers.  Similarly, the class definition is limited to entities

---

[174]  *Id*. ¶¶ 29-30.

[175]  *Id*. App'x C.  *See also* Ex. 128 (2020.12.18 ██████████ Ltr.) at 6-7; Ex. 129 (2021.1.7 ████████ Ltr.) at 2; Ex. 130 (2021.1.21 ████████ Email).

[176]  Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 366-67.

[177]  *Id*. ¶ 378.

who engaged in at least 100 transactions for the same reason, because this limitation further eliminates outlier and idiosyncratic records of entities with very few trades.

*Third*, transactions that are not part of the class, including wholesale-market General Collateral transactions and transactions under exclusive contracts, are excluded.[178]

*Fourth*, the proposed class is limited to *United States* Stock Loan Transactions, defined as transactions in U.S. Stock conducted with U.S.-based entities of the Prime Broker Defendants. Professors Asquith and Pathak apply two filters to limit their model to transactions that have a nexus with U.S. commerce.  First, they exclude transactions where the Prime Broker Defendant's ████████████████████████████████████████████████ Second, using ████ ███████████████████████████████████ they limit the damages calculation to transactions involving stock that is listed on the New York Stock Exchange, NYSE MKT, NASDAQ, Arca, or BATS, according to the CRSP database.  These limitations precisely align with the definition of U.S. stock loan Transactions in the proposed class definition.

These limitations preclude any argument by Defendants that the class runs afoul of the territorial limitations of the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a (barring antitrust claims involving certain "trade or commerce with … foreign nations"). Because the ██████████████████████████████████████████████████████████ ███████████[179] the first filter ensures that class damages are generally transactions between Defendants' U.S.-based entities, with domestic counterparties.  Such domestic-to-domestic-counterparty transactions involve wholly domestic commerce that does not implicate the FTAIA.

---

[178]  *Id.* ¶ 370.

[179]  *See* Ex. 131 (2020.9.24 ██████ Ltr.) at 1-2; Ex. 132 (2020.7.10 ██████ Ltr.) at 1-3; Ex. 133 (2021.1.28 ███ Email); Ex. 134 (2020.07.03 ██████ Ltr.).

As for any exceptions where the U.S. Defendant entity transacts with a foreign counterparty, removing transactions other than U.S.-listed stock means that even trades with foreign entities flow through domestic commerce. *See Chan Ah Wah v. HSBC N. Am. Holdings Inc.*, 2017 WL 2417854, at *2 (S.D.N.Y. June 5, 2017) (finding pleading would satisfy FTAIA's domesticity requirement where alleged antitrust violation was based on transactions that "were executed on a U.S. exchange or with a U.S. trading desk"); *In re Vitamin C Antitrust Litig.*, 904 F. Supp. 2d 310, 321 (E.D.N.Y. 2012) (collecting cases holding that "payment for a product in the United States is sufficient to create a domestic effect for FTAIA and antitrust standing purposes"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5477313, at *5 (N.D. Cal. Dec. 31, 2010). Finally, qualifying transactions with a foreign Beneficial Owner / Agent Lender are excluded from the FTAIA's territorial limits by the statute's import exclusion. *See Allianz Glob. Inv'rs GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 425 (S.D.N.Y. 2020) ("[T]ransactions between Plaintiffs operating abroad and Defendants operating domestically fall within the FTAIA imports exclusion, and such transactions are not barred.").

### (c) Plaintiffs Are Capable Of Calculating Individual Class Members' Damages

Once class-wide damages are established at trial using the data produced by Defendants, computation of individual damages in the claims process will be "simple and mechanical." *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 472 (S.D.N.Y. 2014) ("individual damage calculations" that are "simple and mechanical" support predominance). Professors Asquith and Pathak explain it is straightforward to take a class member's transaction records as input and

generate a damages estimate for that class member.[180]  They demonstrate this process by using trading records from the five named Plaintiffs as examples.[181]

### B.  Resolving The Dispute As A Class Action Is Superior To Any Alternative

Class certification is also far superior to any alternative method for adjudicating this case. *See* Fed. R. Civ. 23(b)(3).  *First*, as the Supreme Court has recognized, a "core" purpose of class actions is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action."  *Amchem Prods.*, 521 U.S. at 617.  That purpose is clearly served for a case of this scale and complexity, where prosecuting these claims requires many millions of dollars.  *Second*, while superiority might be lessened based on "the extent of any independent litigation already begun by class members," *In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 200 (E.D. Pa. 2017), no class members have brought independent litigation here.  *Third*, as compared to the hypothetical alternative of individual actions by class members, "class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency."  *Dial Corp.*, 314 F.R.D. at 121.  *Fourth*, no inherent difficulties undermine the maintenance of this case as a class action.

This Court has recognized that "[a]ntitrust violations go to the heart of our economy.  Our economic health and stability as a nation depend on the rule of law and trust in the fairness and transparency of our marketplace."  Final Approval Hr'g Tr., *In re: Credit Default Swaps Antitrust Litig.*, 13-MD-2476 (April 15, 2016), Dkt. No. 563.  Class actions play a vital role in private enforcement of these laws.  *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); 6 Newberg on Class Actions § 20:1 (5th ed. 2019).  Without this action, it is possible that there

---

[180]   Ex. 10 (Asquith/Pathak Rpt.) ¶¶ 541-67.

[181]   *Id.*

would be *no* private challenge to Defendants' antitrust violations, meaning that Defendants would effectively escape civil liability for a massive conspiracy to preserve an inefficient market structure.  The need for the private enforcement of the antitrust strongly favors class certification.

## III.   THE COURT SHOULD APPOINT QUINN EMANUEL AND COHEN MILSTEIN AS CO-LEAD COUNSEL

Finally, Plaintiffs request the appointment of Quinn Emanuel Urquhart & Sullivan, LLP, and Cohen Milstein Sellers & Toll PLLC as co-lead class counsel.  Rules 23(g)(1)(A) identifies four factors used to determine lead counsel, namely "the work counsel has done ... [,] counsel's experience ... [,] knowledge of the applicable law[, and] resources that counsel will commit."  *In re Air Cargo*, 2014 WL 7882100, at *66 (quoting Rule 23(g)).  *See also* Rule 23(g)(1)(B).

Each of these factors favor appointment of these firms a co-lead counsel for the class.  These top-tier firms bring extensive experience and expertise in antitrust class actions, have worked extensively investigating and prosecuting this case, and have already committed substantial resources to the case.  Plaintiffs' counsel have committed tens of thousands of hours and many millions of dollars investigating, developing, and litigating this matter.  As discussed in the attached firm resumes, both firms have ably served as lead class counsel in many major antitrust actions in this District and nationwide, recovered billions of dollars in antitrust cases, and received awards recognizing the quality of our work.  They are apt counsel for the class.[182]

## CONCLUSION

Plaintiffs respectfully request that the Court grant the motion for class certification.

---

[182]   *See* Exhibits 135-149 and Eisenkraft Dec. Exhibits 152-162.  Additional information about the firms can be found at www.quinnemanuel.com and www.cohenmilstein.com.

DATED:        February 22, 2020                          Respectfully submitted,

**COHEN MILSTEIN SELLERS &**                             **QUINN EMANUEL URQUHART &**
**   TOLL PLLC**                                         **   SULLIVAN, LLP**

By:   */s/ Michael B. Eisenkraft*                        By:   */s/ Daniel L. Brockett*
Michael B. Eisenkraft                                    Daniel L. Brockett
Christopher J. Bateman                                   Sascha N. Rand
David Fisher (*pro hac vice*)                            Steig D. Olson
88 Pine Street, 14th Floor                               Deborah K. Brown
New York, New York 10005                                 Daniel P. Mach
Telephone: (212) 838-7797                                David LeRay
meisenkraft@cohenmilstein.com                            51 Madison Avenue, 22nd Floor
cbateman@cohenmilstein.com                               New York, New York 10010
dfisher@cohenmilstein.com                                Telephone: (212) 849-7000
                                                         danbrockett@quinnemanuel.com
Julie G. Reiser (*pro hac vice*)                         sascharand@quinnemnuel.com
Richard A. Koffman (*pro hac vice*)                      steigolson@quinnemanuel.com
Kit A. Pierson (*pro hac vice*)                          deborahbrown@quinnemanuel.com
Emmy K. Levens (*pro hac vice*)                          danielmach@quinnemanuel.com
Daniel McCuaig (*pro hac vice*)                          davidleray@quinnemanuel.com
Robert W. Cobbs (pro *hac vice*)
1100 New York Ave NW, Suite 500                          Jeremy D. Andersen (*pro hac vice*)
Washington, DC 20005                                     865 South Figueroa Street, 10th Floor
Telephone: (202) 408-4600                                Los Angeles, California 90017
jreiser@cohenmilstein.com                                Telephone: (213) 443-3000
rkoffman@cohenmilstein.com                               jeremyandersen@quinnemanuel.com
kpierson@cohenmilstein.com
elevens@cohenmilstein.com
dmmcuaig@cohenmilstein.com
rcobbs@cohenmilstein.com

**SAFIRSTEIN METCALF LLP**

Peter Safirstein
1345 Avenue of the Americas, 2nd Floor
New York, New York 10105
Telephone: (212) 201-2845
psafirstein@safirsteinmetcalf.com

*Counsel for Torus Capital, LLC*