## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, *et al.*,<br><br>        Plaintiffs,<br><br>                - against -<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>        Defendants. | No. 17 Civ. 6221 (KPF) |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

**Page**

TABLE OF ACRONYMS ............................................................................... viii

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND ...............................................................................................4

    A.    Stock Loans ...........................................................................................4

    B.    The Alleged Conspiracy .......................................................................7

        1.    AQS.................................................................................................7

        2.    SL-x and Data Explorers.................................................................9

        3.    EquiLend .......................................................................................10

ARGUMENT ...................................................................................................11

I.    Individualized Inquiries Will Predominate at Trial. .................................11

    A.    Plaintiffs lack common proof of classwide injury. ...............................13

        1.    Plaintiffs fail to account for fundamental differences between OTC and platform stock loans. ...............................................................13

        2.    Plaintiffs' own quantitative model disproves their claims of classwide injury. ..........................................................................17

            a)    ████████████████████ is irreconcilable with Plaintiffs' assertions of classwide injury. ...............................................................................18

            b)    Plaintiffs' quantitative model ███████████ ████████████. ...................................................19

        3.    Class members that would not have used a trading platform disprove Plaintiffs' assertions of classwide injury....................................23

        4.    Individual inquiries into injury will predominate at trial.........................26

        5.    Plaintiffs' contrary arguments lack merit. .................................27

B.    Plaintiffs' proposed qualitative proof of classwide injury does not eliminate the need for individual inquiries at trial. ...............................29

1.    Plaintiffs' qualitative evidence suffers from inherent flaws. ....................30

2.    Each form of qualitative evidence Plaintiffs offer is flawed for additional reasons. ......................................................................32

C.    Individual issues arising under the FTAIA defeat predominance. .......................35

D.    Individual damages issues defeat predominance. ....................................37

II.    Plaintiffs and Proposed Class Counsel Are Inadequate Class Representatives. ................37

A.    The proposed lender and borrower subclasses have fundamentally conflicting interests. .................................................................38

1.    Borrowers and lenders have directly conflicting interests. .......................38

2.    Plaintiffs cannot cure these fatal conflicts. ....................................44

B.    Plaintiffs and their counsel are inadequate and atypical for three additional reasons. .............................................................................45

III.    Individual Actions Would Be Superior to Class Treatment. ..............................47

IV.    Plaintiffs' Attempt to Extend the Class Period Beyond 2017 Is Improper. ....................49

CONCLUSION .....................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akagi v. Turin Hous. Dev. Fund Co.*,
  2017 WL 1076345 (S.D.N.Y. 2017)....................................................................44

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ................................................................... passim

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997).......................................................................................37

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ...................................................................... passim

*In re Auction Houses Antitrust Litigation*,
  193 F.R.D. 162 (S.D.N.Y. 2000) ...................................................................43

*Bell Atl. Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ........................................................................12

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ........................................................................12

*Brecher v. Republic of Arg.*,
  2010 WL 3584001 (S.D.N.Y. 2010)............................................................48

*Brecher v. Republic of Arg.*,
  806 F.3d 22 (2d Cir. 2015).............................................................................29

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) ...................................................................41, 42

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010)...........................................................................22

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
  Care, L.L.C.*,
  504 F.3d 229 (2d Cir. 2007)......................................................................42, 44

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...........................................................................36

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)........................................................................................37

*Decastro v. City of New York*,
    2019 WL 4509027 (S.D.N.Y. 2019)..................................................................50

*Dewey v. Volkswagen Aktiengesellschaft*,
    681 F.3d 170 (3d Cir. 2012).........................................................................43

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004) .............................................................17, 29

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004)....................................................................................35

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019)................................................... passim

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)..........................................................................48

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008).................................................................30

*Gui Hua Ding v. Baumgart Rest., Inc.*,
    2020 WL 7768387 (D.N.J. 2020) ...............................................................29

*In re High-Tech Employee Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013).......................................................30

*Hnot v. Willis Grp. Holdings Ltd.*,
    2006 WL 2381869 (S.D.N.Y. 2006)......................................................49, 50

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)...................................................................11, 12

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    2014 WL 6601941 (D. Del. 2014) ........................................................15, 29

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019)..........................................................................28

*In re Joint E. & S. Dist. Asbestos Litig.*,
    982 F.2d 721 (2d Cir. 1992)........................................................................38

*Kayes v. Pacific Lumber Co.*,
    51 F.3d 1449 (9th Cir. 1995) ......................................................................42

*Kottaras v. Whole Foods Mkt., Inc.*,
    281 F.R.D. 16 (D.D.C. 2012)......................................................................28

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    791 F.2d 1356 (9th Cir. 1986) ................................................................28

*In re Lamictal Direct Purchasers Antitrust Litig.*,
    957 F.3d 184 (3d Cir. 2020) ..............................................12, 18, 22, 23

*Lavoho, LLC v. Apple, Inc.*,
    232 F. Supp. 3d 513 (S.D.N.Y. 2016) ...................................................28

*Lavoho, LLC v. Apple Inc.*,
    71 F. Supp. 3d 395 (S.D.N.Y. 2014) .....................................................35

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...................................................40

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) ........................................................ passim

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...............................................................................28

*In re Microsoft Corp. Antitrust Litig.*,
    218 F.R.D. 449 (D. Md. 2003) ..............................................................42

*Minn-Chem, Inc. v. Agrium, Inc.*,
    683 F.3d 845 (7th Cir. 2012) ................................................................35

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
    676 F. Supp. 486 (S.D.N.Y. 1987) ........................................................28

*Molina v. Mallah Org., Inc.*,
    804 F. Supp. 504 (S.D.N.Y. 1992) ........................................................45

*Montgomery v. New Piper Aircraft, Inc.*,
    209 F.R.D. 221 (S.D. Fla. 2002) ..........................................................42

*Moore v. Margiotta*,
    581 F. Supp. 649 (E.D.N.Y. 1984) ........................................................43

*Moreno v. Autozone, Inc.*,
    2007 WL 4287517 (N.D. Cal. 2007) .....................................................44

*Morris v. Wachovia Sec., Inc.*,
    223 F.R.D. 284 (E.D. Va. 2004) ...........................................................45

*In re NASDAQ Market-Makers Antitrust Litigation*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ..........................................................43

*In re Niaspan Antitrust Litig.*,
    464 F. Supp. 3d 678 (E.D. Pa. 2020) ...................................................................24

*In re NYSE Specialists Securities Litigation*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ...........................................................................43

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
    993 F.3d 774 (9th Cir. 2021) ...............................................................................12

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)........................................................................41, 43, 44

*In re Painewebber Securities Litig.*,
    151 F.R.D. 248 (S.D.N.Y. 1993) .........................................................................42

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    827 F.3d 223 (2d Cir. 2016).......................................................38, 42, 46

*In re Petrobras Securities*,
    862 F.3d 250 (2d Cir. 2017)................................................................................36

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 242 (D.C. Cir. 2015) .....................................................12, 30, 31

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) .................................................................. passim

*Randleman v. Fid. Nat. Title Ins. Co.*,
    646 F.3d 347 (6th Cir. 2011) ...............................................................................29

*Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*,
    2018 WL 1831850 (S.D.N.Y. 2018)......................................................37, 38, 47

*Scott v. New York City Dist. Council of Carpenters Pension Plan*,
    224 F.R.D. 353 (S.D.N.Y. 2004) .........................................................................47

*Sharp Farms v. Speaks*,
    917 F.3d 276 (4th Cir. 2019) ...............................................................................42

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)..................................................................................12

*TI Inv. Servs. LLC v. Microsoft Corp.*,
    23 F. Supp. 3d 451 (D.N.J. 2014) .......................................................................35

*United States v. Jefferson Cty., Alabama*,
    2008 WL 11394184 (N.D. Ala. 2008) .................................................................45

*Ward v. Apple Inc.*,
  2018 WL 934544 (N.D. Cal. 2018) ................................................................30

*Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc.*,
  439 F.3d 165 (2d Cir. 2006)..........................................................................45

**Statutes & Rules**

15 U.S.C. § 6a ....................................................................................................36

Foreign Trade Antitrust Improvements Act.........................................................35

N.Y. Rule of Prof. Conduct § 1.0 ¶ 7.................................................................45

Rules Enabling Act ............................................................................................27

Rule 23 ..................................................................................................... passim

Rule 23(a)...........................................................................................................41

Rule 23(a)(4) .............................................................................................3, 37, 41

Rule 23(b)(3).................................................................................................2, 11

Rule 23(c)(2) .....................................................................................................45

**TABLE OF ACRONYMS**

| Acronym | Meaning |
| --- | --- |
| A&P | Dr. Paul Asquith and Dr. Parag Pathak (Plaintiffs' quantitative experts) |
| AQS | Automated Equity Finance Markets, Inc. (a trading platform for stock loans) |
| BPS | Basis points (equal to one hundredth of one percent) |
| CCP | Central counterparty |
| FTAIA | Foreign Trade Antitrust Improvements Act |
| GC | General collateral stock |
| HTB | Hard-to-borrow stock |
| IPERS | Plaintiff Iowa Public Employees' Retirement System |
| LACERA | Plaintiff Los Angeles County Employees Retirement Association |
| OCC | Options Clearing Corporation |
| OCERS | Plaintiff Orange County Employees Retirement System |
| OTC | Over-the-counter |
| SCERA | Plaintiff Sonoma County Employees' Retirement Association |

## PRELIMINARY STATEMENT

Plaintiffs' simplistic depiction of the stock lending market glosses over inherent individualized inquiries and class conflicts that compel denial of their class certification motion. According to Plaintiffs, prime brokers are mere middlemen:  they simply borrow stock from beneficial owners at artificially low prices and then loan the exact same stock to short sellers at artificially high prices, pocketing the difference between these prices while contributing no value.  Plaintiffs further assert that the only reason this market structure persists is that Defendants conspired to suppress anonymous exchange-style platforms that could play the same intermediary role as prime brokers at a lower cost. If anonymous trading platforms had been successful, Plaintiffs argue, all beneficial owners and all short sellers would have received better prices on all of their transactions regardless of whether they chose to trade on or off a platform.

As the record in this case makes clear, an accurate understanding of how stock lending actually works is fatal to Plaintiffs' motion.  In contrast to a stock *sale*, a stock *loan* creates an ongoing relationship between counterparties:  the lender has the right to recall the stock at any time, and the borrower has the right to return it at any time.  The parties also have the right to change their pricing by "rerating" the loan at any time.  Experience has shown that anonymous trading platforms that simply match buyers and sellers cannot efficiently administer this type of ongoing relationship.  Nor can anonymous platforms provide the critical services that prime brokers offer, such as highly *stable* stock loans backed by recall protection.  Unsurprisingly,

███████████████████████████████████████████████████████████

███████████████████████████████  Furthermore, executing a stock loan over an anonymous platform actually involves *more* intermediaries and *more* intermediation costs than executing the same transaction over-the-counter ("OTC") with a prime broker.  When those market realities are taken into account, Plaintiffs' depiction of a "but-for world" in which anonymous platform trading

would be superior to OTC trading for *all* short sellers and *all* beneficial owners is exposed as a fiction.

As a result of these market features and the other considerations discussed below, Plaintiffs fail to satisfy each of the following Rule 23 requirements, requiring denial of their motion.

1. <u>Predominance</u>.  To satisfy the Rule 23(b)(3) predominance requirement, Plaintiffs must show that they can "prove, through common evidence, that all class members were . . . injured by the alleged conspiracy." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 45 (S.D.N.Y. 2020).  Plaintiffs argue that they meet this requirement because abstract economic theory and theoretical models alone are sufficient to prove injury to all class members.  (Pls. Mem. 35-40.) But Plaintiffs' purported proof of classwide injury suffers from a fatal threshold flaw:  it wholly fails to account for important differences between stock loans executed on anonymous platforms and stock loans executed OTC with prime brokers.  Even setting that threshold defect aside, Plaintiffs' highly theoretical claims of classwide injury are contradicted by real-world transaction data and their own quantitative model.  That quantitative model estimates that ██████████ of class members were unharmed by the alleged conspiracy even in its original and uncorrected form, and with modest corrections to its mistaken assumptions, the model estimates that █████ ████ of class members were unharmed.  Individual inquiries into the circumstances of each class member therefore are necessary to determine which class members, if any, were harmed by the alleged conspiracy.

Plaintiffs preemptively attempt to distance themselves from the predictions of their quantitative model by claiming that they use it solely to show the *quantum* of injury to each class member as opposed to its existence, but they cannot simply disavow their own quantitative model where it produces results that defeat their motion.  Moreover, the non-quantitative evidence that

Plaintiffs proffer to try to prove classwide injury—economic theory, a pair of theoretical models, and inapposite comparisons to other markets—cannot carry Plaintiffs' burden.  That evidence is irreconcilable with real-world pricing data, assumes away most of the costs and disadvantages of using anonymous platforms, and ignores the considerable value prime brokers provide to both lenders and borrowers of stock.

2. Adequacy.  Plaintiffs and proposed class counsel are inadequate class representatives under Rule 23(a)(4).  Plaintiffs and their counsel seek to represent a class composed of both beneficial owners that *lend* stock to prime brokers and short sellers that *borrow* stock from prime brokers.  But lenders and borrowers have fundamentally conflicting interests:  lenders would be best served by proving that the prices on anonymous platforms would have been high, while borrowers would be best served by proving that the prices on those platforms would have been low.  This zero-sum conflict of interest forces Plaintiffs to make choices time and again that favor one subclass at the expense of the other.  Although Plaintiffs pay lip service to this issue by proposing to divide the class into distinct lender and borrower subclasses (Pls. Mem. 13-15), that proposal does not cure the conflict because there are no non-conflicted counsel or class representatives who can give their undivided loyalty to either subclass.  Plaintiffs and their counsel are thus inadequate class representatives as a matter of law.  *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011).

Plaintiffs are also inadequate because (i) the proposed class includes class members that would have *benefitted* from the alleged conspiracy, (ii) 22 proposed class members that "collectively have assets under management of over $7 trillion" have already informed this Court that Plaintiffs have acted contrary to the interests of the proposed class (ECF No. 199), and (iii) no named plaintiff is an adequate or typical representative of the proposed borrower subclass.

3. <u>Superiority</u>.   The proposed class is comprised primarily of large hedge funds and institutional investors that are plainly ready, willing, and able to protect their own interests without the need for a class action.   Indeed, that dynamic already played out before this Court when 22 hedge funds retained their own counsel and objected to the data discovery sought by Plaintiffs, with seven taking the extraordinary step of preemptively opting out of the proposed class.   A class action thus is not a superior way to protect the rights of these sophisticated firms.

4. <u>Class Period</u>.   Plaintiffs' belated attempt to extend the proposed class period beyond 2017 is untimely and unjustified.   Plaintiffs bear the burden of proving that they satisfy the elements of Rule 23.   They have no such proof for the post-2017 period because the parties never sought or obtained any discovery for that period.   Nor did Plaintiffs seek leave to amend their complaint to extend the class period beyond 2017, and it is much too late to do so now.

For all these reasons, Plaintiffs' motion for class certification should be denied.

## BACKGROUND

### A.    Stock Loans

A stock *sale* is a one-off transaction that initiates and concludes the relationship between buyer and seller.   A stock *loan*, by contrast, "███████████████████████████" that lasts until the borrower "██████" or the lender "██████" the borrowed stock.   (Ex. 5, ██████████████ at -5432.)[1]   The prices charged for stock loans depend on factors including the identity of the parties to the loan, the demand for the stock at issue, and the type of collateral provided for the loan.   (Hendershott ¶¶ 48-58.)   Lenders with reputations for ████████████ ██████████████████████████████████████████.   (Hendershott ¶ 139;

---

[1]   All references to "Ex." are to the exhibits accompanying the Declaration of Michael A. Paskin dated June 29, 2021.  Citations to the Hendershott Report, McCrary Report, Pridmore Report, and Savoldelli Report are to Exs. 1, 2, 3, and 4, respectively.  Unless otherwise noted, all emphasis is added, and citations and internal quotations are omitted.

Pridmore ¶ 62.)  Prime brokers and other market participants compete fiercely to lend and borrow stock, leaving little room for non-competitive prices.  (McCrary ¶¶ 104-119.)[2]

Stock lending involves two distinct markets:  the "lending" market and the "borrowing" or "shorting services" market.  (A&P ¶ 22; Hendershott ¶¶ 41-42.)  In the lending market, beneficial owners of stock typically lack the ability or inclination to manage their own lending programs.  Accordingly, they often lend stock through agent lenders that pool and lend the stock of multiple beneficial owners.  (Pridmore ¶ 22.)  Beneficial owners and their agent lenders require *flexibility* to recall lent stock at any time in order to sell their stock or participate in corporate actions such as shareholder votes, tender offers, or rights offerings.  (Pridmore ¶¶ 26, 69-70; Hendershott ¶ 34.)

In the shorting services market, hedge funds and other investors borrow stock to cover short sales.  (Hendershott ¶¶ 30, 32.)  In a short sale, an investor sells shares of stock it does not own, hoping for the stock price to decline, at which time the investor covers the short position by purchasing shares at the (hopefully) lower price and pocketing the price difference.  Because short sellers cannot predict precisely when price declines will occur, they generally require *stability*, *i.e.*, the ability to retain borrowed stock until they are ready to close their short positions.  A recall of borrowed stock can force a short seller to liquidate its short position prematurely, potentially resulting in large losses.  (Hendershott ¶¶ 62, 128; Savoldelli ¶¶ 41-45.)

Prime brokers accommodate these conflicting needs by providing flexibility to beneficial owners and stability to short sellers.  (Hendershott ¶ 125.)  Prime brokers provide flexibility to beneficial owners by, for example, ████████████████████████████████ ████████████████████████████████████████████████████.

---

[2]  In fact, even Plaintiffs and their experts concede that real-world lending prices for general collateral ("GC") stock were competitive.  (Pls. Mem. 13 n.24.)

(Hendershott ¶ 125; Pridmore ¶¶ 69-70.)  Prime brokers provide stability to short sellers by, among

other things, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████. (Hendershott ¶ 134; Savoldelli ¶¶ 44, 48-49.)  Prime brokers also provide a suite of related

services to short sellers that are critical to effectuating short sales, including satisfying regulatory

"locate" requirements, delivering shares to cover short sales, managing corporate actions, and

executing, clearing, and settling trades.  (Hendershott ¶¶ 60-64; Savoldelli ¶ 25 & Ex. 2.)  Finally,

prime brokers establish relationships with agent lenders that benefit both short sellers and

beneficial owners by helping short sellers obtain more stable loans and helping beneficial owners

lend a larger percentage of their lendable stock.  (Pridmore ¶¶ 50-68.)

Plaintiffs and their experts ignore these valuable prime broker services and incorrectly treat

stock loans executed on anonymous platforms as identical to OTC stock loans executed with prime

brokers.  But Plaintiffs offer no evidence to support the notion that anonymous platform loans are

equivalent to OTC loans, and the record is replete with ██████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████.[3]

Stock loans also lack the key characteristics necessary for a financial instrument to trade

successfully on an anonymous trading platform.  First, stock loans are not standardized:  their

---

[3]  *See, e.g.*, Ex. 6, ██████████████ Decl. ¶ 13 ("█████████████████████████
███████████████"); Ex. 7, ████████████ Dep. 60:17-61:11 (████ "█
███████████████████████████████████████████████████████████
████████"); Ex. 8, ████████████ Dep. 85:24-86:16 ("█████████████████
███████████████████████████████████████████████████████████
█████████████████").

duration and stability are uncertain, and consequently their price and quality depend in large part on the identity of the parties to the loan.  (Hendershott ¶¶ 150-151.)  Second, transactions in the stock lending markets tend to be infrequent:  ██████████████████████████████████ ████████████████.  (*Id.* ¶¶ 160-165, 191 & Ex. 14.)  Third, borrowing stock on a trading platform (even anonymously) would result in real-time disclosure of a short seller's trading flows to all other platform participants, ██████████████████████████.  (Savoldelli ¶¶ 62-68, 177-178; Hendershott ¶¶ 166-172.)  Plaintiffs and their experts fail to identify ████████████ ██████████████████████████ successfully on an anonymous trading platform. (*See, e.g.*, Ex. 9, Asquith Dep. 55:11-56:8; Hendershott ¶¶ 173-209.)

### B.    The Alleged Conspiracy

Plaintiffs allege a broad-ranging conspiracy to boycott and obstruct the AQS and SL-x trading platforms and the Data Explorers data aggregation service.  Those allegations, however, are thoroughly discredited by the discovery record.

### 1.    AQS

Plaintiffs assert that AQS failed because of a boycott conspiracy, but the discovery record shows that AQS actually failed because its anonymous trading model increased the cost and complexity of stock loan transactions and failed to offer the stability and other essential services provided by prime brokers.

While Plaintiffs suggest that AQS *reduced* the number of intermediaries in stock loan transactions, AQS in fact required *more* intermediaries than OTC transactions.  ████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████  (Pridmore ¶ 106; Hendershott ¶ 91.)  In addition, ████████████████ ██████████████████████████████████████████████████████



████████████████████████████████████████████. (Hendershott ¶¶ 216-217.)

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ (*Id.*)  A typical OTC transaction, by contrast, involved only two intermediaries—a prime broker and an agent lender.  (*Id.*)  Numerous market participants contemporaneously predicted that the ████████████████████████████████████████████████ ████████████████████████████████████████.[4]  In fact, ████████████████████████████ ████████████████████████████████████████ "████████████████████████████ ███████████████████" ████████████████████████████████████████████ "██████████ ████████████████████████████████" (Ex. 12, ████████████ Dep. 33:21-35:19.)

AQS also failed to replicate the stability that prime brokers provide in OTC transactions. Quite the opposite: ████████████████ recognized that an "████████████████████████████ ████████████████████" ████████████████████████████████████.  (Ex. 13, ████████████ at -6113.) ██████ (McCrary ¶ 78 & Ex. 3.)  For hedge funds for whom ████████████████████████████ ████████████████████████████████████████████.[5]  Indeed, by 2015, AQS itself

---

[4]  *See, e.g.*, Ex. 10, ████████████████████ ("████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████" ); Ex. 5, ████████████████ at -5432 ("██████████████████
████████████████████████████████████████████████████████████████████████████████" );
Ex. 11, ████████████████████████ at -1623 ("████████████████████████████████████████████
████████████████████████████████████████████" ).

[5]  *See, e.g.*, Ex. 6, ████████████████ Decl. ¶ 11; Ex. 14, ████████████████ Decl. ¶¶ 18-20;
Ex. 15, ████████████████ ("████████████████████████████████████████████████████████████
████████████████████" ).

acknowledged it had been "█████████████████████████" (Ex. 16, █████████.)

## 2.   SL-x and Data Explorers

Plaintiffs' boycott theories regarding SL-x and Data Explorers are even more far-fetched. Although Plaintiffs imply that Defendants boycotted a functioning SL-x trading platform (Pls. Mem. 26), discovery showed that SL-x "█████████████████████████████████" and ██████████████████████████████. (Ex. 17, ██████████ Dep. 75:21-76:2; *see also* Ex. 18, ██████████ Dep. 163:25-164:9, 174:9-16, 252:6-9.)  Moreover, ████████ ██████████—a paid consultant to Plaintiffs' counsel—testified that he does not believe that ███████████████████████████████████ (Ex. 18, ████████ Dep. 267:3-268:21.)   ████████████ likewise testified that ██████████████████. (Ex. 19, ██████████ Dep. 172:4-174:3.)

Nor was there any apparent reason for Defendants to boycott SL-x.  Consistent with its founders' view ██████████████████████████████ (Ex. 20, ██████████), the proposed SL-x platform ████████████████████████ ████████████████████████████████████████[6]  Plaintiffs nevertheless complain that Defendants were "████████████" about SL-x (Pls. Mem. 26), but that assertion quotes out of context ████████████████████████████ ███████████████████████████████████████████████ ██████████████[7]

---

[6]   *See* Ex. 21, ██████████ at -0644 ("████████████████████████ ████████"); Ex. 18, ██████████ Dep. 40:2-12 ("████████████████████████ ██████████████████████████████████████████").

[7]   *See* Ex. 22, ██████████ at -0003; *see also* Ex. 23, ██████████ Dep. 48:23-49:10 (████████████████████████████████████████████ ██████████████████████████████████).

Plaintiffs also allege that Defendants conspired to "████" the Data Explorers data aggregation service (Pls. Mem. 28), but that allegation borders on frivolous.  As of 2012—several years into the alleged boycott—Data Explorers was ████████████████ (Ex. 24, ████



████████████ Dep. 184:4-186:19), ████████████████████████████

████████████████████████████████████████████████" (Ex. 25,

████████ at -1280.)

████████████████████████████████ (Ex. 24,  ████████████

Dep. 126:13-127:21.)

Lacking any evidence that Defendants boycotted Data Explorers, Plaintiffs allege that EquiLend's creation of a competing data provider—DataLend—starved Data Explorers of customers and "[c]rippled" it before its sale to Markit.  (Am. Compl. ¶¶ 265-267.)  But DataLend did not launch until January 2013, nearly ten months *after* Markit acquired Data Explorers. (Hendershott ¶¶ 117, 119.)  And Data Explorers ████████████████████████████

████████████████████████████. (Ex. 26, ████████████████ Dep. 67:14-69:4;

Ex. 27, ████████████████ Decl. ¶ 72.)  At most, DataLend's entry ████████████

████████████ (*see* Ex. 28, ████████████ at -5220),

████████ (Ex. 29, ████████████ Decl. ¶ 18; Ex. 27, ████████████ Decl.

¶ 73).

### 3.    EquiLend

EquiLend is an efficiency-enhancing joint venture that was launched in 2001 by several leading agent lenders and prime brokers.[8]  Plaintiffs misleadingly assert that EquiLend was "████

---

[8]    *See, e.g.*, Ex. 30, ████████ Dep. 264:20-266:16; Ex. 31, ████████ Dep. 46:2-47:24, 106:9-107:5, 379:7-380:8; Ex. 8, ████████████ Dep. 249:11-250:6; Ex. 32, ████████ Dep. 216:6-14, 224:2-13; Ex. 33, ████████████ Dep. 229:25-232:3; Ex. 34,

█████████" (Pls. Mem. 17), but in fact it was born eight years before the alleged conspiracy began.[9]  Plaintiffs also cast aspersions on EquiLend's formation of "███████████████" in 2009 and 2015 (Pls. Mem. 3-5, 20-21), but those ██████████████████████

████████████████████████████████ and "████████████████████

█████████████" (Ex. 38, ████████████ at -9911.)  While Plaintiffs complain that the 2015

███████████████████████████████████████████████████

████████████████████████ (Pls. Mem. 31), it is wholly unremarkable that the ██████

███████████████████████████████████████████████████

████████████████████████████.

## ARGUMENT

## I. Individualized Inquiries Will Predominate at Trial.

Rule 23(b)(3)'s predominance requirement cannot be satisfied in an antitrust class action merely by showing that "proof of the alleged conspiracy is a common issue."  *Aluminum*, 336 F.R.D. at 44-45.  Instead, "[t]he most fundamental prerequisite to certification of an antitrust class is the identification of a common methodology capable of allowing the trier of fact to determine that each member of the proposed class suffered *antitrust injury and damages* as a result of the challenged conduct."  1 McLaughlin on Class Actions § 5:36 (17th ed. updated 2020).  Proof of antitrust injury is an essential element of liability.  *See, e.g.*, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).  Accordingly, overwhelming authority holds that class certification should be denied unless common evidence alone will be sufficient to decide the issue

---

████████████████ Dep. 51:4-52:11; Ex. 35, ████████████ Dep. 128:11-129:24; Ex. 36, ████████████ Dep. 322:24-324:3; Ex. 37, ████████████.

[9]  Plaintiffs pluck the "████" phrase out of context from a document that uses "████" █████████████████. It states: ████████████████████████████████████████████████████████████████████████" (Pls. Ex. 3.)

of antitrust injury for the entire class.[10]  Otherwise, "the need to present evidence that varies from member to member to establish antitrust injury will almost inevitably make individual questions more prevalent or important than common ones."  *Aluminum*, 336 F.R.D. at 45.

Here, there is no common evidence capable of proving antitrust injury for all (or even virtually all) class members.  To the contrary, Plaintiffs fail to account for fundamental differences between stock loans executed on anonymous trading platforms and stock loans executed through prime brokers; their own quantitative model estimates ████████████████████████████████ ████████████████████████; and ████████████████████████████████████████ ████████████████████████████████████████████.  Plaintiffs also lack any common evidence capable of distinguishing domestic stock loan transactions from foreign transactions that are beyond the scope of U.S. antitrust law.  Individual inquiries into injury,

---

[10]  *See, e.g.*, *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 784-85, 791-93 (9th Cir. 2021) (plaintiffs must establish by a "preponderance of evidence" that "all (or nearly all) members of the class suffered damage as a result of Defendants' alleged anticompetitive conduct"); *In re Lamictal Direct Purchasers Antitrust Litig.*, 957 F.3d 184, 192 (3d Cir. 2020) (plaintiffs must "prove by a preponderance of the evidence that they could establish, through *common* proof at trial" that "all class members" suffered antitrust injury); *In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*Rail Freight III*"), 934 F.3d 619, 624-25 (D.C. Cir. 2019) (certification should be denied where plaintiffs' damages model fails to show that "all" or "virtually all" class members were injured); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018) (certification should be denied where the individual inquiry needed to identify "uninjured" class members will "overwhelm common issues"); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) ("'[P]laintiffs must . . .  show that they can prove, through common evidence that all class members were . . . injured by the alleged conspiracy.'" (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig. ("Rail Freight I")*, 725 F.3d 242, 252 (D.C. Cir. 2015)); *Hydrogen Peroxide*, 552 F.3d at 311 (requiring proof of antitrust impact on "every class member"); *Blades v. Monsanto Co.*, 400 F.3d 562, 571-72 (8th Cir. 2005) (denying certification where "not every member of the proposed classes can prove with common evidence that they suffered impact from the alleged conspiracy"); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (requiring proof of impact "for every class member through proof common to the class").

causation, and the foreign or domestic character of individual transactions therefore will predominate at trial.

### A.      Plaintiffs lack common proof of classwide injury.

Plaintiffs' proposed common proof of classwide antitrust injury is highly unorthodox. Rather than employing the usual method of comparing the prices class members received in the actual world with the prices they allegedly would have received in the but-for world, Plaintiffs rely mainly on abstract economic theory, comparisons to other markets, and a theoretical "search cost" model to try to show injury to all class members.  (Pls. Mem. 35-40.)  At the same time, however, two of Plaintiffs' experts, Drs. Asquith and Pathak ("A&P"), created a quantitative model that compares each class member's actual prices to their estimated but-for prices.  Plaintiffs carefully refrained from using this model to try to prove classwide injury, and instead confined it solely to the task of estimating total damages to the class as a whole.  (*Id.* at 39 n.147.)

The A&P quantitative model singlehandedly defeats Plaintiffs' motion:  it predicts ███

████████████████████████████████████████████████████████████████████████

██████████████████.  Moreover, even apart from these quantitative results, Plaintiffs' proposed proof of classwide injury is fatally flawed by its failure to account for critical differences between stock loans available on anonymous platforms and stock loans available through prime brokers.  Plaintiffs thus lack any common proof of classwide injury and causation, and "[w]ithout common proof of injury and causation, [antitrust] plaintiffs cannot establish predominance."  *Rail Freight III*, 934 F.3d at 623.

### 1.      Plaintiffs fail to account for fundamental differences between OTC and platform stock loans.

Plaintiffs proceed on the flawed premise that stock loans executed OTC with prime brokers are directly comparable to stock loans executed on anonymous trading platforms.  There are

fundamental differences, however, between OTC loans and platform loans:  OTC loans include a host of enhanced protections, benefits, and services that platform loans do not.  (Hendershott ¶¶ 60-68; McCrary ¶¶ 56-72; Savoldelli ¶¶ 37-92; Pridmore ¶¶ 50-70.)  Plaintiffs never account for the value of these benefits in either their quantitative model or their purported theoretical proof of classwide injury, and instead treat stock loans as fungible commodities, which they are not. (McCrary ¶¶ 91-95.)  As a result, Plaintiffs systematically understate the value of OTC loans and overstate the value of platform loans.  (*Id.*)  The following examples illustrate the point.

**Recall and rerate protection**.  Prime brokers provide their clients with "recall protection,"



(Savoldelli ¶¶ 41-49; Hendershott ¶¶ 62-64; McCrary ¶¶ 59, 62-70.)   This protection is of paramount importance to many short sellers:  a recall of borrowed stock can force the premature termination of a short position, potentially resulting in large trading losses.  (Savoldelli ¶¶ 41-47; Hendershott ¶¶ 129-130; McCrary ¶ 62.)[11]  Prime brokers also help shield customers from frequent rerates of their loans.  (Hendershott ¶¶ 62-63, 86-88.)  Anonymous platforms, by contrast, are incapable of providing comparable protections and inherently attract unstable loans.  (Hendershott ¶¶ 152-155; Pridmore ¶¶ 92-99.)  Even ▮▮▮▮▮▮▮▮▮▮▮▮ recognized that "▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[11]  *See also* Ex. 6, ▮▮▮▮▮▮▮▮▮ Decl. ¶¶ 11, 15-16 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 14, ▮▮▮▮ ▮▮▮▮▮▮ Decl. ¶¶ 17-20 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 7, ▮▮▮▮▮▮▮▮▮▮▮▮ Dep. 22:3-17 (testifying that ▮▮▮▮▮▮▮▮ "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 39, ▮▮▮▮▮▮ Dep. 90:21-93:11, 201:17-203:12 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").



████████" (Ex. 40, ███████████; *see also* Ex. 41, ███████████ (acknowledging that "███████████████████████████████████████████

███████████████").)

OTC loans enhanced with recall and rerate protection are fundamentally different than anonymous platform loans that lack these protections, and any valid comparison of the two must account for this difference in quality.  (McCrary ¶¶ 91-95.)  Yet Plaintiffs and their experts entirely disregard those differences and make no attempt to account for them in any of their purported proof of classwide injury.  (*Id.*)  Moreover, Plaintiffs cannot use "common evidence" to account for these differences because the importance of recall and rerate protection varies widely from short seller to short seller.  (Savoldelli ¶ 47; Hendershott ¶¶ 129-130.)  For example, recall and rerate protection might not be as vital to a high frequency trading firm that maintains short positions for mere seconds or minutes, but it is indispensable to hedge funds with investment strategies requiring long holding periods.  (Savoldelli ¶ 45.)  Plaintiffs' failure to account for this variation and the critical differences between platform loans and OTC loans deprives them of any viable proof of classwide injury.  *See, e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig.*, 2014 WL 6601941, at *13 (D. Del. 2014) (denying class certification where plaintiffs lacked common proof "that any benefits received by certain purchasers as a result of [the challenged conduct] are exceeded by the overcharges").

**Enhanced opportunities to lend and borrow**.  OTC trading also provides many short sellers and beneficial owners with better opportunities to lend and borrow stock than they would

have had in a but-for world dominated by anonymous platform trading.  For example, according to A&P, lenders that lent general collateral ("GC") stocks in the actual world would have been ████████████████████████████ ████████████████████████████ ████████████████████████████  (Hendershott ¶¶ 217, 220-221, 337-341; Ex. 9, Asquith Dep. 297:18-298:15; Ex. 42, Pathak Dep. 321:17-323:24.)  For many of these lenders, losing the revenue they earn from GC lending could ████████████████████████████████ ████████████████████████████████—as in fact ████████████████████ ████████  (Hendershott ¶¶ 337-341; McCrary ¶¶ 183-185, 209-210; Pridmore ¶¶ 128-131.)  Similarly, short sellers that currently receive enhanced access to scarce HTB stock through their relationships with prime brokers would ████████████████████████████ ████████████████████████  (Ex. 42, Pathak Dep. 385:10-389:22; Savoldelli ¶¶ 73, 157; Hendershott ¶¶ 342-344.)  Losing that access could cost a short seller trading opportunities far more valuable than any alleged price improvements that would have been available on a trading platform in the but-for world.  (Savoldelli ¶¶ 157-158; Hendershott ¶¶ 342-344.)

The value of these enhanced opportunities to lend and borrow varies considerably from class member to class member.  For example, a lender that specializes in lending HTB stock will be less concerned about losing the option to lend GC stock than a lender that (like most) lends significant volumes of GC stock.  (Pridmore ¶¶ 58-59, 89-91.)  Yet Plaintiffs once again ignore these differences throughout their purported proof of classwide injury.

**Bundled services and costs**.  Prime brokers provide their clients with an extensive bundle of services related to short selling, including satisfying regulatory "locate" requirements, providing custody and settlement, and managing complex corporate actions that often affect borrowed stocks.  (Savoldelli ¶¶ 25, 37, 69-72, 84-92, 119 & Ex. 2; Hendershott ¶¶ 60, 67; McCrary ¶¶ 58-

60.)  Prime brokers typically provide these services to short sellers ███████████ and offer

████████████████████████████████████████.  (Savoldelli ¶¶ 26, 81-83,

119; Hendershott ¶¶ 65-70; McCrary ¶ 60.)  If short sellers were to shift their stock borrowing

activity to a trading platform, ███████████████████████████

████████████████████.  (Savoldelli ¶¶ 118-125; Hendershott ¶¶ 345-353;

Ex. 43, ██████████████ Decl. ¶¶ 38-39.)  The resulting costs would be substantial:  ███

██████████████████████████████████████████████

██████████████████████████████████████

████████████.  (Savoldelli ¶ 106.)  Moreover, the value and cost of replacing ██████████

████ inherently varies from class member to class member, depending on the degree to which

each class member depends on these services.  (*Id.* ¶¶ 123-125, 130.)

        Plaintiffs and their experts make no effort to account for the value and costs of *any* of the

services and opportunities described above.  (Hendershott ¶¶ 345-353; McCrary ¶¶ 73, 94, 130,

134.)  Their proposed common proof of classwide impact is therefore fatally incomplete.  *See, e.g.*,

*Rail Freight III*, 934 F.3d at 626-27 (certification denied where plaintiffs lacked common proof of

impact on "overall prices" that accounted for all relevant costs); *Exhaust Unlimited, Inc. v. Cintas

Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) (certification denied where plaintiffs could not

demonstrate that "the alleged conspiracy inflated [each class member's] net payments . . . above

the [but-for] price").

                    2.    **Plaintiffs' own quantitative model disproves their claims of classwide
                          injury.**

        Even if OTC loans and platform loans were directly comparable products (and they are

not), Plaintiffs would still have no common evidence capable of proving classwide antitrust injury.

To the contrary, ████████████████████████████████████████████

████████████████████████. Even in its original and uncorrected form, the model estimates

█████████████████████████████████████████████████████████, and with

conservative corrections to the model's mistaken assumptions, ███████████████████████

████████████████. (McCrary ¶¶ 149-150, 168, 181, 190, 194-196.)  These results alone require

that class certification be denied.  *See, e.g.*, *Rail Freight III*, 934 F.3d at 623-24 (affirming denial

of certification where plaintiffs' model indicated unharmed class members); *Lamictal*, 957 F.3d

at 194 (vacating certification where it was unclear whether plaintiffs' model was "mask[ing]"

unharmed class members); *Asacol*, 907 F.3d at 47, 51-53 (reversing certification where plaintiffs'

expert's analysis revealed uninjured class members).

      a)      **████████████████████████████ is irreconcilable
with Plaintiffs' assertions of classwide injury.**

As Plaintiffs' experts acknowledge—████████████████████████—███████████████

███████████████████████████████████ (A&P ¶ 116; McCrary ¶¶ 120-128;

Hendershott ¶¶ 50-56, 69-72.)  The data also show ██████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████. (McCrary ¶ 122; Hendershott ¶¶ 57, 73-76.)  These

█████████████, however, would disappear in Plaintiffs' but-for world, in which ████████████

████████████████████████████████████████████████████ determined on

anonymous trading platforms.[12]  Individualized inquiry is therefore necessary to determine which

class members were better off in the actual world than they would have been in Plaintiffs' but-for

---

[12]  *See, e.g.*, Hendershott ¶ 334; McCrary ¶ 136; A&P ¶ 116 ("there is ████████████████████" in
real-world prices, but in the but-for world, prices "should be similar at a given point in time"); *id.*
¶ 256 ("Prices in an electronic market converge to a competitive equilibrium price"); *id.* ¶¶ 291-
292 (concluding that prime brokers would not offer prices more favorable than platform prices in
the but-for world); Ex. 42, Pathak Dep. 112:17-113:5 ████████████████████████████████████
████████████████████████████.

world as a result of the ███████████████████████████ (McCrary ¶¶ 135-136;

Hendershott ¶¶ 328-335.)

        **b)**      **Plaintiffs' quantitative model identifies** ███████████

███████████████████████

Notwithstanding its tendency to overestimate the value of platform loans and underestimate

the value of OTC loans, the A&P quantitative model *still* ████████████████████

████████████████████████████ thus disproving Plaintiffs' assertions of

classwide injury.

The A&P model begins by using a "data-driven methodology" to predict the platform

prices and platform fees that allegedly would have existed in the but-for world.  (A&P ¶¶ 25-26,

261-267; Ex. 9, Asquith Dep. 64:6-66:11.)  The model then estimates the impact of the alleged

conspiracy by comparing a class member's actual-world prices to the class member's estimated

but-for prices and but-for platform fees.  (A&P ¶¶ 328, 336.)  Although all three of Plaintiffs'

experts agree that the A&P model provides the best available estimates of the alleged conspiracy's

impact on class members (Ex. 42, Pathak Dep. 97:2-99:12; Ex. 9, Asquith Dep. 64:6-66:11; Zhu

¶ 260), they nonetheless ignored those estimates in assessing whether each class member was

injured.  Defense expert Dr. Justin McCrary took the obvious step that Plaintiffs' experts failed to

take and used the A&P model to assess the question of classwide injury.  The results showed that,

with or without corrections to its mistaken assumptions, the model predicts that ███████████

██████████████████ the alleged conspiracy.

*First*, even in its original and uncorrected form, the A&P model estimates that, ███████

██████ ████████████████████████████████████████

received █████████ in the actual world than those they allegedly would have received in the but-

for world.  (McCrary ¶ 168 & Ex. 11.)  These results alone defeat predominance, even if the class

members at issue account for only a small percentage of total transaction volume.  *See, e.g.*, *Rail Freight III*, 934 F.3d at 625-26 (denying certification where 12.7% of class members may have been uninjured despite plaintiffs' argument that they accounted for less than 1% of overall volume); *In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), 407 F. Supp. 3d 422, 434 (S.D.N.Y. 2019) (rejecting argument that unharmed trades were "only a *de minimis* number" because harm must be proven for "*each* and *every* trade upon which liability is premised").

*Second*, the model's estimates of uninjured class members ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ if allowance is made for ▮▮▮▮▮▮▮▮▮▮ that A&P admittedly ignored.  As A&P recognize,



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the actual world ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[13] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but A&P nevertheless "ignore[d]" these fees in their model.  (A&P ¶ 480; McCrary ¶ 187.)  When the A&P model is adjusted to allow for ▮▮▮▮▮▮▮▮ even at the ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮  (McCrary ¶ 190 & Ex. 14.)

*Third*, estimates of uninjured class members ▮▮▮▮▮▮▮▮▮ if A&P's unreasonably low estimates of CCP margin costs and clearing sponsor fees are replaced with reasonable estimates.  (McCrary ¶¶ 175-182 & Ex. 13, 190 & Ex. 14.)  Central clearing through a CCP is indispensable to platform trading (*e.g.*, Zhu ¶ 118), and CCPs require deposits of collateral known as "margin"

---

[13]  *See, e.g.*, A&P ¶ 270 (noting AQS's fixed subscription fees); Ex. 42, Pathak Dep. 301:12-23 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also* Ex. 44, ▮▮▮▮▮▮▮ Decl. ¶¶ 11-12 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮); Hendershott ¶¶ 258-262 (fixed fees would exist in but-for world).

to protect themselves against default risk.  (Hendershott ¶ 230.)  The costs of providing CCP margin can ████████████████████ of transaction volume, but A&P completely ignored these costs in their model.[14]   A&P compounded that error by assuming that the clearing sponsor fees that platform users would incur in the but-for world would █████████████. (A&P ¶¶ 484, 487, 494-495.)  That assumption—which A&P adopted based on a single draft ████ presentation addressing an entirely different subject[15]—bears no resemblance to reality.  Even before the proposed class period, ████████████████████████████ ██████████████████████████████████████████[16]  And, by the time of the proposed class period, the Basel III reforms had raised the costs of providing clearing



[14]   *See* Hendershott ¶¶ 230-235 & Ex. 16.  Dr. Asquith asserted at his deposition that ████████ ██████████████████████ (Ex. 9,  Asquith Dep. 231:3-20), but ████████████████████████████████ ████████████████████████ (Hendershott ¶ 250.) Dr. Pathak ████████████████████████████████████ ████████████████████████████ (*Id.* ¶¶ 244-249.)

[15]   A&P took ████ ████████████ from a 2009 draft ████ presentation ████████████████ ██████████████████████████████—a presentation directed solely at ██████████████ ████████████████████████. *See, e.g.*, Hendershott ¶¶ 368-372; Ex. 45, ████████████ Dep. 136:25-137:4, 173:15-20; Ex. 46, ████████████ at -3171.

████   A&P were ██████████████████████████████████████████████ ████████████████████████████████████████████  *See* Ex. 9, Asquith Dep. 340:7-347:25, 368:6-20; Ex. 42, Pathak Dep. 164:12-168:17, 176:21-178:20.

[16]   *See, e.g.*, Hendershott ¶¶ 251-253 & Ex. 17; Ex. 47, ████████████ (█ ████████████████████); Ex. 48, ████████████ (████████████████████ ████████████████████████████████); Ex. 49, ████ (███████████████████████████████████████████████); Ex. 50, ████████████████████ at -7244 (█ ████████████████); Ex. 51, ████████████ at slide 5 (█ ████████████); Ex. 52, ████████████ at slides 3, 6 (████████ ████████████); Ex. 53, ████████████ (█ ████████████); Ex. 54, ████████████ at slides 7, 8 (same).

21

sponsorship to a minimum of ████████████, many multiples higher than A&P's ████ ████ ████████.[17]

Taken together, clearing sponsorship fees and CCP margin costs likely would have ranged from roughly ██████████ for most class members, depending on a class member's specific circumstances.  (Hendershott ¶ 228 & Ex. 16; McCrary ¶ 177 & n.227.)  At those levels, the A&P model estimates that ██████ ██████████████████████████ were uninjured.  (McCrary ¶¶ 181 & Ex. 13, 189-190 & Ex. 14.)  Furthermore, the relevant figures for class certification are ██████████████████ ████████████—because Plaintiffs are attempting to proceed *without* any individual inquiry into the level of costs that any particular class member would incur.  Plaintiffs must therefore choose a "common denominator" cost assumption that will not be exceeded by any class member.  To the extent that there are fact or expert disputes about what this cost assumption should be, this Court must resolve those disputes under a preponderance of the evidence standard because they bear directly on whether Plaintiffs can show classwide injury through common proof.  *See, e.g.*, *Lamictal*, 957 F.3d at 194 (vacating class certification where district court declined to resolve expert disputes bearing on whether all class members were injured); *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (courts "must resolve material factual disputes relevant to each Rule 23 requirement" under a preponderance of the evidence standard).

*Finally*, the A&P model likely would find even more uninjured beneficial owners if A&P could identify these lenders in the data.  ████████████████████████

████████████████████████████████████████████████████

---

17 *See* Hendershott ¶¶ 237-243 & Ex. 16; Ex. 43, ██████████ Decl. ¶¶ 41-43; Ex. 55, ██████████████ Decl. ¶¶ 6-7.



███████████ (McCrary ¶¶ 166(b), 169-170.)  Certain ████████ data, however, allowed Dr. McCrary to distinguish ████████████████████████.  (*Id*. ¶ 169.) Dr. McCrary's analysis of these data indicates ████████████████████████████ ██████████████████████████.  (*Id*. & Ex. 12.)  That is a further failure of Plaintiffs' proof and an independent basis for denying class certification.  *See, e.g.*, *Lamictal*, 957 F.3d at 194 (vacating certification where district court's reliance on averaging left unresolved whether plaintiffs' proof of classwide injury "mask[ed]" uninjured members); *Aluminum*, 336 F.R.D. at 57 (denying certification where reliance on "averaging mechanism" left plaintiffs "devoid of common proof that conspiratorial conduct caused pricing injury to all purchasers").

### 3. Class members that would not have used a trading platform disprove Plaintiffs' assertions of classwide injury.

Plaintiffs' experts acknowledge that not all class members would have used a trading platform in the but-for world and that there is no common evidence that identifies which class members would have done so.  (*See* A&P ¶¶ 332, 338; Ex. 42, Pathak Dep. 128:7-129:3; Ex. 59, Zhu Dep. 150:9-151:11.)  They nevertheless assert that the mere existence of an anonymous trading platform would enable *all* class members—including those that would never join or use such a platform—to execute *all* OTC transactions at *all* times throughout the class period at prices ████████████████████.  (A&P ¶¶ 288-296; Zhu ¶¶ 342-343.)  They argue that so long as a platform would be a "viable option" for a class member, any class member could leverage the threat of joining the platform into better OTC prices.  (A&P ¶ 289; Zhu ¶¶ 342-343; Ex. 42, Pathak Dep. 55:19-58:18.)  Plaintiffs are incorrect for three main reasons.

*First*, for many class members, a platform would not be a viable option.  For example:

- For many class members, ███████████████████████████████ █████████████████████████████ (McCrary ¶¶ 186-192);

- Many class members rely on ███████████████████████████ from prime brokers that would not be available on a trading platform (Savoldelli ¶¶ 41-61; Hendershott ¶¶ 125-138; McCrary ¶¶ 75-78, 99);

- Many class members, particularly hedge funds with proprietary trading strategies, are unwilling to expose their transaction flow to other platform participants (Savoldelli ¶¶ 62-68, 177-178; Hendershott ¶¶ 166-172, 380-386);

- Many beneficial owners face legal or financial impediments to using CCPs or trading platforms (Pridmore ¶¶ 105-113; Hendershott ¶¶ 214-287);

- Many beneficial owners that are able to achieve higher prices or lending volumes as a result of their reputations as stable lenders could not do so on anonymous platforms (Pridmore ¶¶ 56-70, 92-99; Hendershott ¶¶ 139-143, 333-344); and

- A platform often would have no legal or practical ability to offer the transactions that particular class members wish to execute, such as non-cash collateral transactions, transactions in securities subject to voluntary corporate actions, or transactions in securities for which the platform has no liquidity (Savoldelli ¶¶ 77, 103, 154; Pridmore ¶¶ 77-78, 98-99; McCrary ¶¶ 100-101; Hendershott ¶¶ 95, 160-165, 296).

None of these class members could use the existence of a trading platform to bargain for better prices because none could credibly threaten to move their business to a platform. (Hendershott ¶¶ 359-362; McCrary ¶ 102.)   Individualized fact-finding therefore would be necessary to identify those class members that would not have benefitted from the mere existence of a platform.  *See, e.g.*, *Asacol*, 907 F.3d at 53 (no predominance where class certification would provide "no meaningful opportunity to contest whether an individual would have" purchased an alternative product in the but-for world); *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 716 (E.D. Pa. 2020) (no predominance where individual inquiry was needed "to assess whether a purchaser would have purchased [an alternative product] had that option been available").

*Second*, Plaintiffs' assumption that OTC prices in the but-for world never would have deviated from platform prices by ████████  ██████████ is wishful thinking.  The sole basis for the ████████████ is the same discredited draft ████ presentation described above.  *See supra* at 21 & n.15.  According to A&P, the ██████████████████  ████████████████

24

██████████████████████████████████████, and A&P somehow leap from that estimate to the conclusion that OTC prices in the but-for world would never deviate from platform prices by ██████ █████████.  (A&P ¶¶ 494-495.)  Even if this reasoning made any sense (and it does not), it is indisputable that by the start of the class period, the costs to prime brokers of executing OTC transactions were far higher than ████████████.  (Hendershott ¶¶ 368-372.)  The Basel III capital costs of executing OTC transactions alone were (and are) roughly ███ ████████████, and the all-in costs of executing OTC transactions were (and are) substantially higher.  (*Id.* ¶¶ 237-243 & Appendix C; Ex. 43, ██████████████ Decl. ¶¶ 40-47.)

*Third*, if Plaintiffs are correct that trading platforms would capture a majority of stock loan transactions in the but-for world (A&P ¶ 296; Zhu ¶ 341), then the substantial minority of class members that would have continued to rely on OTC trading in the but-for world would have experienced higher prices and lower liquidity in a shrunken OTC market (Hendershott ¶¶ 363, 366-367).  A large body of academic literature confirms that this type of "liquidity externality" raises prices and reduces liquidity when financial markets are divided into distinct trading arenas. (*Id.* ¶¶ 364-365.)  OTC prices also would have risen in the but-for world because prime brokers would have been forced to spread their multi-billion dollar overhead costs over a smaller volume of OTC transactions.  (Ex. 43, ██████████████ Decl. ¶¶ 36-39; Hendershott ¶¶ 353, 364.) Individual inquiry would be necessary to determine, for any given class member, whether the harmful effects of higher prices and reduced liquidity in OTC trading would have outweighed any alleged benefits arising from the existence of platform trading.  (Hendershott ¶¶ 363-372.)

Any assertion that these harmful effects on OTC trading would have been overcome by the "pricing transparency" generated by platform trading would be incorrect.  Platform trading would have had no effect on pricing transparency for many class members, including those for whom

platform trading was not a viable option, those who would not have paid for access to platform pricing data, and those who were already well-informed about market prices.[18]   Moreover, increased pricing transparency would have *harmed* many class members if Plaintiffs' experts are correct that improvements in transparency would have reduced the price dispersion from which many class members benefitted.  (Hendershott ¶¶ 332-334, 376-379; McCrary ¶¶ 135-136; A&P ¶¶ 116, 446; Ex. 42, Pathak Dep. 385:10-387:4.)  For all these reasons, individual inquiries would be necessary to determine whether class members that continued to trade OTC were harmed by the alleged conspiracy.  (Hendershott ¶¶ 354-358.)

### 4.    Individual inquiries into injury will predominate at trial.

As the foregoing discussion makes clear, individual inquiries into injury and causation would be necessary for each of the thousands of potential class members, including analysis of:

- whether each class member would have elected to join and use a trading platform in the but-for world;

- whether each class member received favorable prices in the actual world that would not be available in the but-for world;

- whether the CCP margin costs, sponsorship costs, and other costs each class member would be forced to incur to trade on a platform would have exceeded any alleged price improvements available to the class member on the platform;

- whether each class member received higher quality loans or valuable services through OTC trading that it could not have obtained through platform trading;

- whether each class member would have been harmed by higher OTC prices or reduced OTC liquidity in a shrunken OTC market in the but-for world; and

- whether each class member would have lost the opportunity to lend GC stock or lost preferred access to HTB stock in the but-for world.

---

[18] Hendershott ¶¶ 374-375, 396-428; McCrary ¶¶ 106-113; Savoldelli ¶¶ 162-180; Pridmore ¶¶ 100-104, 147-153; Ex. 43, ███████████ Decl. ¶¶ 13-14; Ex. 56, ███████████ Decl. ¶¶ 19-24; Ex. 57, ███████████ Decl. ¶ 14; Ex. 6, ███████████ Decl. ¶ 10; Ex. 14, ███████████ Decl. ¶¶ 11-15; Ex. 58, ███████████ ("███████████").

(Hendershott ¶¶ 439-445; McCrary ¶¶ 74, 88, 201-215; Savoldelli ¶¶ 100, 112, 117, 125, 131, 156, 158, 174, 180; Pridmore ¶¶ 56-76, 80-88, 91, 99, 120-134.)

Defendants have a constitutional right to present individualized witness testimony, documents, and expert analysis on these questions for each of the thousands of class members at trial. *See, e.g.*, *Asacol*, 907 F.3d at 53 ("The fact that plaintiffs seek class certification provides no occasion for jettisoning the rules of evidence and procedure, the Seventh Amendment, or the dictate of the Rules Enabling Act."); *Rail Freight III*, 934 F.3d at 625 (class action defendants have "Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense"). As a result, thousands of individual inquiries into injury and causation will overwhelm any common inquiries at trial. No federal appeals court has ever found that common issues predominated where, as here, individualized testimony and analysis regarding the circumstances of hundreds or thousands of class members would be relevant and admissible at trial. *See, e.g.*, *Asacol*, 907 F.3d at 57-58; *Rail Freight III*, 934 F.3d at 627.

### 5.    Plaintiffs' contrary arguments lack merit.

Plaintiffs apparently will contend that, even if large numbers of class members would have been worse off in the but-for world, these class members still count as "injured" if the A&P model estimates they would have received a better price on at least *one* transaction on at least *one* day in the but-for world. (*See* Pls. Mem. 35.) Plaintiffs are mistaken for several reasons.

First, the A&P model ███████████████████████████████████████



████████████████████ (McCrary ¶ 147.) Second, for those class members that would not join a trading platform, any estimates of the price improvement allegedly available through platform trading are hypothetical and fail to establish any injury. (*Id.* ¶¶ 100-102.) Third, once realistic cost estimates are considered, the A&P model predicts that ██████████████████████████

████████████████████████████████████████████████, even under Plaintiffs'

definition of a "transaction." (*Id.* ¶¶ 193-196.) Fourth, Plaintiffs artificially inflate the ███████ ███████████████████████ by defining each day a stock loan is outstanding as a brand new "transaction." (*Id.* ¶¶ 162-165.) For example, if a class member entered into a single stock loan that lasted 100 days, Plaintiffs' experts would (i) divide that single loan into 100 separate one-day "transactions" and (ii) record an injured "transaction" if ████████████████████████ ███████████████████████ on *one* out of 100 days, even if ████████████████████ on the other 99 days. (*Id.*) In the real world, however, there would be no "injury" to a stock loan unless the loan price *as a whole* would have been better in the but-for world. (*Id.* ¶¶ 163, 165.) Plaintiffs thus manufacture injured "transactions" where none exist.

Finally, and most fundamentally, a party that on balance benefitted from an alleged antitrust violation lacks antitrust standing to sue.[19] Accordingly, Plaintiffs must provide common proof that each class member would have been better off *on balance* in the but-for world, not merely that each class member would have been better off on at least one loan on at least one day. *See, e.g.*, *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) ("Since benefits must be offset against losses, it is clear that widespread injury to the class simply cannot be proven

---

[19] *See, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986) ("Respondents cannot recover antitrust damages" when they "stand to gain" from the alleged conspiracy); *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 63 (2d Cir. 2019) (noting cases in which "courts have denied antitrust standing to a competitor that benefitted from a market distorted by anticompetitive conduct"); *id.* at 64 ("[T]he question of actual injury becomes whether [plaintiff] is worse off than it would be if the market were free of anticompetitive forces."); *Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 525 (S.D.N.Y. 2016) ("[A] plaintiff cannot establish antitrust injury where it 'actually tended to benefit' from the alleged conduct."); *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986) ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted . . . ."); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 488 (S.D.N.Y. 1987) ("A plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall.").

through common evidence."); *Intel Corp. Microprocessor*, 2014 WL 6601941, at *13 (similar);

*Exhaust Unlimited*, 223 F.R.D. at 513-14 (similar).

Any attempt to redefine the proposed class to consist solely of "injured" class members

would be equally unavailing.  Beyond being untimely, *see, e.g.*, *Gui Hua Ding v. Baumgart Rest.,*

*Inc.*, 2020 WL 7768387, at *2 n.5 (D.N.J. 2020), redefining the class to include only "injured"

members would create an "improper fail-safe class" in which "[e]ither the class members win" by

proving they are injured, "or, by virtue of losing, they are not in the class and, therefore, not bound

by the judgment."  *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011).

Moreover, Plaintiffs cannot rely on the A&P model to identify "injured" class members because,

as noted above, ███████████████████.  Lastly, any redefined class would be fatally

indefinite because there would be no clear way to (i) send a class notice that tells recipients whether

they were "injured" and therefore meet the class definition or (ii) determine which class members

would be bound by a judgment.  *See Brecher v. Republic of Arg.*, 806 F.3d 22, 24-25 (2d Cir.

2015); *Asacol*, 907 F.3d at 54 (reversing certification where plaintiff failed to identify a

"mechanism that can manageably remove uninjured persons from the class in a manner that

protects the parties' rights").

**B.**     **Plaintiffs' proposed qualitative proof of classwide injury does not eliminate the need for individual inquiries at trial.**

Earlier in this action, Plaintiffs informed the Court that quantitative analysis of Defendants'

transaction data would be "critical for [their] motion for class certification" (ECF No. 189 at 1),

and that a trade-by-trade analysis of all transaction data would be necessary "to show class wide

liability" (ECF No. 196 at 2).  Yet, now that their own quantitative model estimates ████████

████████████████████████████ Plaintiffs disavow any reliance on the data and the

model for purposes of proving classwide injury.  (*See* Pls. Mem. 39 n.147, 42; Ex. 9, Asquith

Dep. 66:5-14.)  Instead, Plaintiffs rely on several forms of *non*-quantitative evidence to try to carry their burden.  But none of this qualitative evidence—consisting of Dr. Zhu's theoretical model of "search costs," his comparisons to other markets, A&P's theoretical framework, and a handful of vague statements plucked from Defendants' documents (Pls. Mem. 35-41)—remotely demonstrates that *all* of the thousands of class members were harmed by the alleged conspiracy.

### 1.    Plaintiffs' qualitative evidence suffers from inherent flaws.

Courts consistently hold that qualitative evidence based on economic theory, expert testimony, or generalizations made in discovery documents is far too imprecise to prove injury to *all* participants throughout an entire market.  *See, e.g.*, *Aluminum*, 336 F.R.D. at 50 (rejecting "broad generalizations" drawn from "qualitative evidence" as "far too imprecise"); *Rail Freight III*, 934 F.3d at 626-27 (rejecting "documentary evidence" and economic theory as insufficient to prove that all class members "must have been harmed"); *Asacol*, 907 F.3d at 54 (rejecting plaintiffs' argument "that, at trial, they will prove classwide impact with the testimony of their expert . . . and with defendants' own documents and admissions"); *Rail Freight I*, 725 F.3d at 252-53 ("No damages model, no predominance, no class certification."); *Ward v. Apple Inc.*, 2018 WL 934544, at *3 (N.D. Cal. 2018) ("Absent a data-driven model" that proves classwide antitrust injury, "plaintiffs have failed to meet their burden under Rule 23."); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 496 (N.D. Cal. 2008) (rejecting experts' contention that "economic theory dictates" finding of classwide injury).[20]

---

[20]  Plaintiffs cite *In re High-Tech Employee Antitrust Litigation*, 985 F. Supp. 2d 1167, 1192 (N.D. Cal. 2013), for the proposition that qualitative proof may show classwide injury, but the court there relied on "expert reports using statistical modeling, economic theory, and data."  Moreover, the qualitative proof in *High-Tech* established that all class members had the "same salary structure" and necessarily would have suffered the same injury.  *Id.*  As a result, "*High-Tech Employee*'s dicta regarding the theoretical possibility that documentary evidence alone could establish classwide impact is not instructive."  *Aluminum*, 336 F.R.D. at 51 n.43.

These principles apply with particular force here.  Plaintiffs assert that economic theory and theoretical models alone are sufficient to prove that all class members would have received better prices in the but-for world, but ███████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████ to be dismissed as mere error in the data.  (McCrary ¶ 138.)  Plaintiffs' proposed qualitative proof of classwide injury therefore generates "false positives" and fails as a matter of law to satisfy Rule 23.  *See, e.g.*, *Rail Freight I*, 725 F.3d at 252-55 (vacating class certification where proposed proof of classwide injury generated "false positives").

Equally important, Plaintiffs' proposed qualitative proof of classwide injury would not eliminate individual issues at trial because it would not prevent *Defendants* from introducing individualized testimony, documents, and expert analysis to refute Plaintiffs' qualitative evidence. Defendants have a constitutional right to present this individualized evidence because Plaintiffs' qualitative evidence would not entitle them to *summary judgment* that each and every class member sustained an injury.  *See, e.g.*, *Rail Freight III*, 934 F.3d at 625 (unless common evidence would "support summary judgment," defendants have "Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense" using individualized evidence); *Asacol*, 907 F.3d at 52-53, 58 (observing that defendants are entitled to present individualized evidence regarding injury at trial unless plaintiffs' common evidence is sufficient to "secure a favorable summary judgment ruling disposing of the issue"); *Aluminum*, 336 F.R.D. at 50 (denying class certification because "defendants would have a right to present individualized evidence" contradicting proposed qualitative proof of classwide injury).

2.      **Each form of qualitative evidence Plaintiffs offer is flawed for additional reasons.**

a. <u>**Dr. Zhu's theoretical model**</u>.  Plaintiffs argue that Dr. Zhu's theoretical "search cost" model proves that the alleged conspiracy had "market-wide impact."  (Pls. Mem. 36-37.)  But Dr. Zhu's model is essentially meaningless because it fails to compare actual-world prices to estimates of but-for prices.  The model instead begins with illustrative prices that assume away almost all of the price dispersion that existed in the actual world (McCrary ¶¶ 227, 244-245), and then compares these hypothetical prices to an alternative set of prices that are *not* estimates of but-for prices (*id.* ¶ 246).  The model purports to show that most class members would have benefitted if "search costs" went down in the but-for world and nothing else changed, but *many* things would have changed, including that the widespread price dispersion that benefitted many class members would have disappeared.  (*Id.*)  The model thus proves nothing about whether individual class members would have been better off in the but-for world.  (*Id.* ¶ 247.)  Indeed, even Dr. Zhu concedes his model is inferior to the A&P quantitative model for estimating individual injury. (McCrary ¶ 246; Zhu ¶ 260.)

Dr. Zhu's model suffers from additional fatal flaws.  Its fundamental premise is that prime brokers do not know which of their clients have multiple prime brokers, but that is demonstrably false.[21]  The model's predictions of market-wide benefits collapse in the absence of that premise. (McCrary ¶¶ 226, 242; Ex. 59, Zhu Dep. 262:16-264:8.)  The model also fails to account for the fact that *prime brokers* often incur search costs, and these prime broker search costs sometimes result in better prices for class members.  (McCrary ¶¶ 250-252; Hendershott ¶ 339.)  Finally,

---

[21]  *See, e.g.*, McCrary ¶¶ 236-239; Savoldelli ¶ 152; Ex. 43, ██████████ Decl. ¶ 16 ("██ ██████████████████"); Ex. 56, ██████████ Decl. ¶ 20 (similar); Ex. 57, ██████████ Decl. ¶ 15 (similar).

because short sellers generally borrow GC stock at prices fixed in advance by contract, the model is irrelevant to GC transactions.  (McCrary ¶ 243.)

b. **Dr. Zhu's yardstick analysis**.  Plaintiffs argue that Dr. Zhu's "yardstick analysis" of "comparable financial markets" proves that all class members would have benefitted had stock lending shifted to anonymous platform trading.  (Pls. Mem. 37-39.)  But Dr. Zhu's four selected markets—U.S. equities, corporate bonds, government bonds, and crude oil futures—are anything but comparable.  None of these markets involves the key feature that renders stock loans ill-suited to anonymous platform trading—an ongoing relationship with no fixed duration.  (Hendershott ¶ 188.)  Dr. Zhu's four comparison markets are also inapposite for several additional reasons:

- U.S. equities are fully fungible instruments that trade at high frequency among vastly more market participants in instantaneous transactions that involve no ongoing relationship between counterparties.  (Hendershott ¶¶ 189, 196, 265-266.)

- Government bonds are one of the most liquid and actively traded financial products in the world.  (Hendershott ¶ 189.)  Yet Dr. Zhu ignores that even in such a liquid market, when government bonds go "off-the-run" and their liquidity decreases, they experience a shift to *non-anonymous* OTC trading.  (Hendershott ¶¶ 143, 189, 194; Ex. 59, Zhu Dep. 344:21-345:15.)

- Corporate bonds trade primarily on *non-anonymous* platforms according to the study cited by Dr. Zhu.  (Zhu ¶ 304.)  And despite characterizing the corporate bond market as a "conservative yardstick" because it is "significantly less liquid than the stock lending market" (*id.* ¶ 301), Dr. Zhu ███████████████ ███████████████ (Ex. 59, Zhu Dep. 102:20-104:6).  In fact, corporate bonds trade much more frequently than stock loans.  (Hendershott ¶¶ 191, 193, 278.)

- Crude oil futures are far more standardized, trade much more frequently, and trade in much smaller sizes than stock loans.  (*Id.* ¶¶ 188-189, 195.)

Dr. Zhu could have selected more comparable markets as his "yardsticks," such as overseas stock lending markets or the U.S. equity repo market.  Those yardsticks would have confirmed that stock loans are not well-suited to anonymous trading.  (Hendershott ¶¶ 173-184, 197-200.)  Finally, even Dr. Zhu's selected markets do not demonstrate that *all* market participants benefit

when a market transitions to platform trading.  (*Id.* ¶¶ 186, 192-196.)  At most they illustrate the potential effects on average market participants or the market as a whole (*id.* ¶¶ 193, 196, 199, 363-367, 382-395), which is irrelevant to the predominance analysis.

      **c. The A&P theoretical model**.  Plaintiffs also rely on an abstract theoretical framework offered by A&P purporting to show that all class members would have been better off in a but-for world that lowered the intermediation costs for stock loans.  (Pls. Mem. 39-40.)  But this theoretical framework is fundamentally flawed because it assumes that OTC loans and platform loans are identical products, when in fact OTC loans are higher-value products infused with distinct features and benefits.  (McCrary ¶ 134.)  In addition, the A&P framework essentially assumes its own conclusion by (i) assuming away the widespread dispersion in actual-world prices and (ii) assuming that intermediation costs of using a platform are *always* lower than intermediation costs of using a prime broker.  (McCrary ¶¶ 135, 141; Hendershott ¶¶ 214-215, 244, 334-335.)

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

(Hendershott ¶¶ 244-262, 334-335; McCrary ¶¶ 135, 141-145, 175-192.)[22]

      **d. Defendants' documents**.  Plaintiffs suggest that a handful of documents cherry-picked from among the millions produced in discovery might alone suffice as proof of classwide injury (Pls. Mem. 40-41), but none of these documents purports to predict that platform trading would

---

[22]  Plaintiffs assert in passing that A&P's analysis of AQS prices also proves that all class members would have been better off in the but-for world (Pls. Mem. 40), but that analysis is meaningless because it completely ignores AQS platform fees, clearing sponsor fees, and CCP margin costs. (Hendershott ¶¶ 434-435.)  Furthermore, even ignoring those AQS transaction costs, ████████████████████████████████████.  (*Id.* ¶¶ 437-438.)  Finally, A&P argue that but-for world prices would have differed from actual-world AQS prices, which means that AQS prices are inferior to the A&P estimates of but-for prices for purposes of assessing classwide injury.  (*Id.* ¶ 436.)

have led to better pricing for *all* class members on *all* of their stock loans at *all* times throughout the class period.  In addition, many other documents produced by Defendants and third parties predicted that ███████████████████████████████████████████████████████████ ████████████████████████████.[23]  The "broad generalizations" that Plaintiffs infer from hand-picked documents are therefore "far too imprecise, indiscriminate, and disconnected from reliable factual moorings to reliably establish" classwide injury.  *See Aluminum*, 336 F.R.D. at 42.

### C.    Individual issues arising under the FTAIA defeat predominance.

The Foreign Trade Antitrust Improvements Act ("FTAIA") excludes two relevant categories of stock loans from the ambit of U.S. antitrust law:  (i) transactions between a prime broker and a counterparty where both are operating abroad, *see F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004), and (ii) transactions between a defendant operating domestically and a counterparty operating abroad, so long as they do not harm a U.S. exporter, *see, e.g., id.*; *Lavoho, LLC v. Apple Inc.*, 71 F. Supp. 3d 395, 397-98 (S.D.N.Y. 2014); *TI Inv. Servs. LLC v. Microsoft Corp.*, 23 F. Supp. 3d 451, 467-69 (D.N.J. 2014).[24]

---

[23] *See, e.g., supra* at 8 & n.4; Hendershott ¶¶ 429-433; Ex. 5, ███████████████ at -5432 ("█████ ████████████████████████████████████████████████████████████████████████████████"; "███████████████████████████████████████████████████████████████████████████████████ ████████████████████"); Ex. 60, ████████████ (internal ████████████ correspondence describing ████ as "█████████" and needing "████████████████████" as "████████████████████████ ███████████████████████████████████████████"); Ex. 61, ███████████████ at -4691 (████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████).

[24] Plaintiffs appear to concede that loans exported by a Defendant operating domestically to a short seller operating abroad are export transactions rather than import transactions (Pls. Mem. 48), and rightly so.  *See Lavoho*, 71 F. Supp. 3d at 398 ("'Export commerce' is . . . commerce between a United States seller and foreign buyer in which the goods flow from the United States to a foreign country.").  Plaintiffs assert that "qualifying transactions" between a Defendant operating domestically and a beneficial owner operating abroad are "import commerce" (Pls. Mem. 48), but the import commerce exclusion was intended to protect U.S. importers overcharged on their imports, not foreign exporters allegedly underpaid on their exports.  *See Minn-Chem, Inc. v.*

Huge numbers of individual inquiries would be necessary to identify and exclude stock loans that fall into those two categories. Plaintiffs assert that the U.S.-domiciled prime broker defendants ███████████████████████████████████ (Pls. Mem. 47), but that is incorrect. ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████[25] Plaintiffs lack any data or common proof

███████████████████████████████████████████████████████████████████████████

███████████. (McCrary ¶¶ 216-217.) Individual inquiries into thousands of transactions would be necessary to answer that question, which alone is enough to defeat class certification. *See, e.g.*, *In re Petrobras Securities*, 862 F.3d 250, 272 (2d Cir. 2017) (vacating certification where "investigation of domesticity appears to be an 'individual question' requiring putative class members to 'present evidence that varies from member to member'"); *FOREX*, 407 F. Supp. 3d at 431-33 (denying certification where plaintiffs lacked "generalized proof" of "class members' trading locations" at "the time of their trades" and noting that "available domicile data would not obviate the need for [this] fact-intensive individualized inquiry").

It makes no difference that Plaintiffs propose to limit the class to stocks listed on a U.S. exchange. The stock loans at issue were executed OTC, not on an exchange, and thus the relevant inquiry is whether Defendants and class members were operating domestically or abroad when they entered into a particular OTC transaction. *See, e.g.*, 15 U.S.C. § 6a; *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 180-81 (2d Cir. 2014)

_____

*Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (import commerce exclusion reflects that "[f]oreigners who want to earn money from the sale of goods or services in American markets should expect to have to comply with U.S. law").

[25] *See, e.g.*, McCrary ¶ 216; Ex. 43, ████████████ Decl. ¶ 7; Ex. 56, ████████████ Decl. ¶ 3; Ex. 62, ████████████ correspondence; Ex. 63, ████████████ correspondence; Ex. 64, ████████ correspondence; Ex. 65, ████████████ correspondence; *see also* Savoldelli ¶ 27 (noting that large numbers of hedge funds are legally domiciled abroad).

(*listing* on a domestic exchange does not establish domesticity if the relevant transaction did not *occur* on a domestic exchange); *FOREX*, 407 F. Supp. 3d at 431-33 (operating location of transacting parties is dispositive for OTC transactions).

### D.   Individual damages issues defeat predominance.

Painstaking individualized analysis would be necessary to estimate damages for each class member, including inquiries into (i) the reliability and proper interpretation of complex transaction data for each class member, (ii) identifying and excluding all funding and exclusive-portfolio transactions from each class member's data, (iii) disputes over whether tens of thousands of transaction data entries should or should not be discarded as erroneous, and (iv) disputes over how to net all alleged gains and losses that particular class members would have experienced in the but-for world.  (McCrary ¶¶ 218-225.)  This thicket of individual damages inquiries further confirms that individual issues will predominate at trial.  *See, e.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (reversing certification of a class where "individual damage calculations will inevitably overwhelm questions common to the class"); *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 1831850, at *8 (S.D.N.Y. 2018) (Failla, J.) ("[I]ndividualized inquiries necessary to distribute damages among investors, along with the individualized questions discussed above, would dwarf the only common question identified in this case.").

## II.   Plaintiffs and Proposed Class Counsel Are Inadequate Class Representatives.

To satisfy Rule 23(a)(4), Plaintiffs must prove that there are no "fundamental" conflicts of interest among proposed class members, *Literary Works*, 654 F.3d at 249, and that the class representatives "will fairly and adequately protect the interests of the class," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Plaintiffs cannot satisfy either requirement.

### A.     The proposed lender and borrower subclasses have fundamentally conflicting interests.

Plaintiffs seek certification of two distinct subclasses that occupy opposing positions in the stock lending markets:  a subclass of beneficial owners that *lent* stock to Defendants, and a subclass of short sellers that *borrowed* stock from Defendants.  (Pls. Mem. 8.)  Plaintiffs propose that one of the five named plaintiffs (Torus) will represent the borrower subclass, three (IPERS, OCERS, and LACERA) will represent the lender subclass, and one (SCERA) will represent both subclasses. (*Id.* at 13-14.)  Plaintiffs also propose that Quinn Emanuel and Cohen Milstein will simultaneously represent both subclasses.  (*Id*. at 15-16.)

Quinn Emanuel, Cohen Milstein, and the five named plaintiffs cannot adequately represent either subclass, let alone both of them.  The two proposed subclasses must be represented by class counsel and named plaintiffs "who have undivided loyalties only to members of their respective subclasses."  *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 742-43 (2d Cir. 1992). Borrowers and lenders, however, have directly opposing economic interests that make it impossible for Plaintiffs and their counsel to give undivided loyalty to both subclasses simultaneously.  As a result, the "[u]nitary representation" proposed by Plaintiffs would "create unacceptable incentives for counsel to trade benefits to one class for benefits to the other."  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 234 (2d Cir. 2016).  Moreover, it is too late to try to cure these conflicts of interest because Plaintiffs have already committed themselves to various positions that harm the interests of both lenders and borrowers on core questions of injury and damages.

### 1.     Borrowers and lenders have directly conflicting interests.

Plaintiffs argue that in the but-for world, lenders would have lent their stock directly to borrowers on anonymous trading platforms.  (Pls. Mem. 10-11.)  That claim generates an inherent

conflict of interest between lenders and borrowers:  lenders are best served by proving that they would have lent their stock to borrowers at *high* prices in the but-for world, and borrowers are best served by proving that they would have borrowed from lenders at *low* prices.  (McCrary ¶¶ 253-254.)  Borrowers and lenders thus face a zero-sum conflict of interest with respect to the determination of but-for prices:  higher prices maximize the alleged injuries to lenders, and lower prices maximize the alleged injuries to borrowers.  (*Id.*)  Three examples illustrate the point.

      **i. <u>Allocation percentages</u>.**  The allocation percentages used in the A&P model crystallize the conflict between the lender and borrower subclasses.  The model uses two fixed percentages—██████████████████████████████—to determine how high or low it will set its predictions of but-for prices.  (McCrary ¶¶ 265-267.)  Lenders and borrowers have diametrically opposed interests with respect to the selection of these percentages:  higher percentages result in higher but-for prices (which maximize the alleged injuries to lenders and minimize those to borrowers), and lower percentages have the opposite effect.  (*Id.* ¶¶ 265-273.)

      Despite the pivotal role these percentages play in allocating injury among lenders and borrowers, A&P ████████████   █████████   █████ as a matter of their own subjective judgment.  (McCrary ¶¶ 268-269; A&P ¶ 464.)  There are reasonable grounds, however, for choosing different percentages than those chosen by A&P, which would allocate either more or less of the alleged injury to lenders versus borrowers.  (McCrary ¶¶ 270-278.)  The two subclasses thus have an irreconcilable conflict of interest with respect to these percentages.

      The A&P percentages also create a conflict of interest *within* each of the two subclasses over whether to use A&P's two *fixed* percentages or *customized* percentages that vary by stock and by day, consistent with market realities.  (McCrary ¶¶ 258, 279-282.)  Some class members would see their estimated injuries ████████████████████████████████████████████

██████████████████████████████████████████.  (*Id.* ¶ 282.)   This fundamental intra-class conflict independently bars class certification.  *See, e.g.*, *FOREX*, 407 F. Supp. 3d at 439 (denying certification where class members "have directly conflicting incentives"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018) (denying certification in part because "[d]irectional differences" in class members' incentives "are particularly corrosive of adequacy").

**ii. <u>Shifting of platform fees</u>.**  A&P's treatment of platform transaction fees presents an additional zero-sum conflict between the subclasses.  A&P argue that trading platforms have a "strong incentive to shift platform fees" from lenders to borrowers and are likely to do so "in the long run" (A&P ¶¶ 478, 482), but they leave open the question of whether these fees would have shifted *by the time of the proposed class period*.  There are reasonable grounds for disagreement on that timing question, and even Drs. Asquith and Pathak answered it differently at their depositions.[26]   Moreover, the outcome of that question may determine whether over ████████ ████████ had any alleged injury at all:  the A&P model predicts that if platform fees are shifted to short sellers during the class period, then ████ ██████████████████ would no longer have any injury, and if those fees are *not* shifted, it predicts that ████ ██████████████ would no longer have any injury.  (McCrary ¶¶ 263-264.)

**iii. <u>New supply and search costs</u>.**  Plaintiffs and their experts assert that in the but-for world, more beneficial owners would have made their stock available for loan, thus ████████ ████

---

[26]  *See* McCrary ¶¶ 256, 261-262; Ex. 42, Pathak Dep. 338:15-341:8 (████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████); Ex. 9, Asquith Dep. 224:10-225:13 (████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████).

█████████████████████████████████ (Ex. 66, Pls. Interrogatory Resp. at 147; *see also* A&P ¶¶ 309, 321.)  They also argue that trading platforms would lower the costs of searching for loans and thereby lower the borrowing prices paid by short sellers (Zhu § V.C.1; A&P ¶ 116), but if that is so, then lower search costs would *harm* lenders by lowering their lending prices (McCrary ¶¶ 228, 250-252).  Indeed, the academic studies Plaintiffs rely upon reach precisely that conclusion.  (McCrary ¶ 251; *see also* Hendershott ¶ 339.)  If Plaintiffs maintain these anti-lender positions, they will harm the lender subclass, and if they refrain from taking these positions, they will harm the borrower subclass.

Each of these conflicts illustrates why neither Plaintiffs nor their counsel can adequately represent either one of the proposed subclasses.  Rule 23(a)(4) requires that each subclass be represented by "independent counsel pressing its most compelling case" on behalf of that subclass, *Literary Works*, 654 F.3d at 253-54, and by "named plaintiffs [that] possess undivided loyalties to absent class members."  *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998).  The lender subclass is thus entitled to representatives who will do their best to prove that but-for prices would have been high, and the borrower subclass is entitled to representatives who will do their best to prove that those prices would have been low.  Plaintiffs and their counsel, by contrast, are a coalition of both borrowers and lenders and therefore cannot give their undivided loyalty to either subclass, thus creating a "structural flaw" that renders them inadequate class representatives.  *See Literary Works*, 654 F.3d at 253.  Certifying a class despite this structural flaw "could prove disastrous if, after the [class action] is resolved . . . absent class members collaterally attack the judgment on inadequate representation grounds."  1 McLaughlin on Class Actions § 4:30; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999) (Rule 23(a) requires the "structural protection of independent representation as for subclasses with conflicting

interests"); *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) ("The 'appearance' of divided loyalties" is "not limited to instances manifesting such conflict.").

    *Literary Works* is instructive.  There, the district court permitted the same counsel to represent a settlement class that held three distinct types of copyright infringement claims, even though "the interests of class members who h[eld] only Category C claims fundamentally conflict[ed] with those . . . who h[eld] Category A and B claims" because "their interests diverge[d] as to the distribution of [] recovery."  654 F.3d at 254.  The Second Circuit reversed, reasoning that each category of claimants was entitled to representation by separate counsel with no reason to refrain from "advanc[ing] the strongest arguments" for that particular category of claimant.  *Id.* at 253-55.  Likewise here, class certification should be denied because Plaintiffs and their counsel cannot give their undivided loyalty to either a lender or borrower subclass.  *See, e.g.*, *id.*; *Payment Card*, 827 F.3d at 233-34 (denying certification where class counsel sought to represent members with "divergent interests" as to "essential allocation decisions"); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245-46 (2d Cir. 2007) (denying certification where class members had conflicting interests as to which "were more damaged by [defendant's] conduct"); *Broussard*, 155 F.3d at 338 (denying certification where "it is clear that the remedial interests of those within the single class are not aligned"); *In re Microsoft Corp. Antitrust Litig.*, 218 F.R.D. 449, 452 (D. Md. 2003) (denying certification where the same counsel sought to represent both suppliers and customers because "[t]his dual scenario places plaintiff's counsel in a position of irreconcilable conflict").[27]

---

[27]  *See also Sharp Farms v. Speaks*, 917 F.3d 276, 297 (4th Cir. 2019) (denying certification when class members had conflicting interests in allocation of recovery); *In re Painewebber Securities Litig.*, 151 F.R.D. 248, 249 (S.D.N.Y. 1993) ("One who represents others in a class action should be free of extraneous tugs on one's loyalties."); *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 226-27 (S.D. Fla. 2002) ("[T]he claims of sellers and buyers are inherently

Plaintiffs' citation to *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493 (S.D.N.Y. 1996), is unavailing.  There, the court decided class certification based solely on the pleadings—which is no longer permissible—and disregarded a "hypothetical" conflict of interest. *Id*. at 513.  Here, by contrast, the factual record establishes genuine, materialized, and unavoidable conflicts of interest on class certification, injury, and damages issues.  *See FOREX*, 407 F. Supp. 3d at 439 (distinguishing *NASDAQ* and denying certification where class members had "directly conflicting incentives").  Furthermore, *NASDAQ* applied a conflicts standard that subsequent appellate authority has rejected.  *Compare NASDAQ*, 169 F.R.D. at 513-15 (holding that a conflict must be "so palpable as to outweigh the substantial interest of every class member" in "maximizing the aggregate amount of classwide damages"), *with Ortiz*, 527 U.S. at 857-58 (giving "no weight" to the argument that adequacy should be weighed against "the certified class members' common interest in securing contested insurance funds"), *Literary Works*, 654 F.3d at 254 ("[A]dequacy of representation cannot be determined solely by finding that the settlement meets the aggregate interests of the class."), *and Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012) ("[*Ortiz*] explicitly rejected the argument that the class members all had the same incentive simply because all members of the class wished for a maximum recovery.").[28]

---

antagonistic" when buyers "have to prove that they paid full price" and sellers must claim "they received a depressed price."); *Moore v. Margiotta*, 581 F. Supp. 649, 653 (E.D.N.Y. 1984) ("[T]he mere fact of adjusting or compromising legal tactics or arguments to accommodate both classes of plaintiffs obviously impairs counsel's use of independent professional judgment as to each class.").

[28] *In re Auction Houses Antitrust Litigation*, 193 F.R.D. 162 (S.D.N.Y. 2000), is inapposite because it was decided on the pleadings and adequacy of representation was undisputed.  *Id.* at 163-64.  *In re NYSE Specialists Securities Litigation*, 260 F.R.D. 55 (S.D.N.Y. 2009), is even further afield:  the buyers and sellers there had no conflicting interests and instead alleged "identical harm, regardless of whether the violative trades involved purchases or sales of stock." *Id.* at 73.  Moreover, like *NASDAQ*, the court in *NYSE Specialists* relied on a conflicts standard that appellate authority has rejected.  *Id.* at 73-74 (invoking the rejected *NASDAQ* standard).

### 2.      Plaintiffs cannot cure these fatal conflicts.

Proposed class counsel have represented all five Plaintiffs jointly—both lenders and borrowers—since filing the operative complaint in November 2017.  (ECF No. 73.)  Plaintiffs and their counsel are thus obliged to pursue the *joint* interests of both lenders and borrowers rather than giving undivided loyalty to lenders or borrowers alone.  It is too late for Plaintiffs' counsel to try to cure this conflict by withdrawing from representing all borrowers or all lenders because they already have committed themselves to litigation positions and expert submissions that harm the interests of both subclasses on various issues.  *See supra* at 38-41.  Moreover, dropping an existing client "like a hot potato" would violate counsels' duty of loyalty to the "disfavored client."  *See, e.g.*, *Akagi v. Turin Hous. Dev. Fund Co.*, 2017 WL 1076345, at *12 (S.D.N.Y. 2017) (Failla, J.); *Moreno v. Autozone, Inc.*, 2007 WL 4287517, at *6 (N.D. Cal. 2007) ("[U]nder the 'hot potato rule', dual representation conflicts cannot be cured by the expedient of severing the relationship with one of the clients.").

Nor can these conflicts be cured by relying on expert witnesses to estimate injury and damages.  Under settled law, conflicted class representatives cannot "rely[] on advice from experts of their own choosing," *Cent. States*, 504 F.3d at 237, 245-48, to substitute for the "structural protection of independent representation . . . for subclasses with conflicting interests."  *Ortiz*, 527 U.S. at 855.  After all, class members with conflicting incentives have the right to select *different* experts than those chosen by conflicted representatives.  *Id.* at 863 (expert-based estimate of class recovery "is inadequate as an independent benchmark" without "[c]onflict-free counsel").  It makes no difference that Dr. Pathak alone calculated damages to borrowers and Dr. Asquith alone calculated damages to lenders:  both experts were selected and instructed by conflicted representatives, and both applied exactly the same methodology, economic model, and percentage factors to allocate the alleged injury between the two subclasses.  (A&P ¶¶ 438-464, 497-504.)

Finally, neither opt-out rights nor named plaintiff conflict waivers can cure these conflicts. *See, e.g.*, *Morris v. Wachovia Sec., Inc.*, 223 F.R.D. 284, 297 (E.D. Va. 2004) ("[T]he opt out provisions of Rule 23(c)(2) may not be used to achieve compliance with the prerequisites of 23(a)."); *Wolfert ex rel. Est. of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 172 n.10 (2d Cir. 2006) (noting *Amchem* "abrogated the suggestion" that "the lack of needed sub-classes could be remedied by an opt-out opportunity"); *United States v. Jefferson Cty., Alabama*, 2008 WL 11394184, at *31 (N.D. Ala. 2008) (a named plaintiff may not "consent to a conflict of interest on behalf of the entire class"); *Molina v. Mallah Org., Inc.*, 804 F. Supp. 504, 513 n.16 (S.D.N.Y. 1992) (similar); Comment to N.Y. Rule of Prof. Conduct § 1.0 ¶ 7 ("silence" is not consent).

## B.  Plaintiffs and their counsel are inadequate and atypical for three additional reasons.

*First*, the proposed class includes class members that would have *profited* from the alleged conspiracy. Plaintiffs assert that the alleged conspiracy inflated the so-called "spread" between borrowing prices and lending prices (Pls. Mem. 11), but many class members often received that "spread" rather than paid it, such as non-defendant prime brokers and broker-dealers, as well as class members that sometimes transacted directly with other class members. (McCrary ¶¶ 283-284.) These entities often would have profited from any alleged "spread inflation," and therefore are not proper class members. *See, e.g.*, *FOREX*, 407 F. Supp. 3d at 427, 439 (denying certification where plaintiffs alleged that defendants "conspired to widen spreads" and some class members had at times *received* the spreads); *see also* 1 McLaughlin on Class Actions § 4:30 ("A class cannot be certified if class members benefit from the same acts alleged by the representative to be harmful to other members of the class."). Plaintiffs cannot cure this conflict by excluding these entities from the class because there is no common proof identifying precisely which class members often received the spreads rather than paying them (McCrary ¶ 285;

A&P ¶¶ 351-352, 374), and "the Court would need to individually determine" which class members did so, *see FOREX*, 407 F. Supp. 3d at 434-35 (denying certification on this basis).

*Second*, Plaintiffs and their counsel made a conflicted decision to seek sensitive trading data over the strenuous opposition of some of their own proposed class members.  In 2019, Plaintiffs demanded daily trading data for all proposed borrower class members.  (ECF No. 199 at 2-3.)  Twenty-two of these borrowers were so "alarm[ed]" that they notified this Court of the "*clear divergence between the interests of Plaintiffs' Counsel and the interests of many purported class members*."  (*Id*.)  Those borrowers urged Plaintiffs to seek only an anonymized sample of their data and warned that, even in anonymized form, comprehensive production of their data would expose them to unacceptable risks.  (*Id*. at 3.)  Plaintiffs nevertheless "dismissed the sincerity" of these concerns and threatened to litigate the issue against their own proposed class members.  (*Id*.)  Seven borrowers then preemptively withdrew from the proposed class to avoid production of their data, and the remainder reluctantly agreed to production of pre-2018 data in anonymous form.  (ECF No. 264 at 2 & n.2.)  Despite all this, Plaintiffs now threaten to renew and intensify the conflict by seeking to extend the class period through the present (Pls. Mem. 45), thus requiring production of "commercially sensitive" *recent* data that none of the borrowers agreed to provide (ECF No. 196 at 2).

*Third*, the representatives of the proposed borrower subclass—SCERA and Torus—are inadequate and atypical.  SCERA cannot give its undivided loyalty to a borrower subclass because ███████████████████████████████████.  (Savoldelli ¶ 199; McCrary ¶ 206.)  *See, e.g.*, *Payment Card*, 827 F.3d at 235 ("[N]amed plaintiffs with claims in multiple subgroups cannot adequately represent the interests of any one subgroup."); *Literary Works*, 654 F.3d at 251-52 (similar).  Torus, in turn, is a tiny proprietary trading fund that never had an account with any

46

Defendant's prime brokerage businesses.  (Savoldelli ¶¶ 182-189.)  Instead, Torus had only a clearing brokerage account that did not include the services and protections accorded to prime brokerage customers.  (*Id.* ¶¶ 187-193.)  Moreover, Torus cannot credibly claim it would have used a trading platform because the fixed fees for joining such a platform ███████████████ ███████████████████████.  (McCrary ¶ 203; Hendershott ¶ 261.)  Plaintiffs' expert Dr. Asquith testified that ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████  (Ex. 9,  Asquith  Dep. 284:20-288:13,  335:24-336:12,  339:9-16; McCrary ¶ 203.)  Finally, Torus is inadequate and atypical because it is "not aware [it owes] any duties . . . to other members of the class" and has no understanding of the interests of the hedge funds that make up the vast majority of the borrower subclass.[29]  *See, e.g.*, *Scott v. New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) (representatives with "little or nonexistent knowledge of their role" were inadequate).

## III.   Individual Actions Would Be Superior to Class Treatment.

The proposed class here is not comprised of individual consumers who lack sufficient resources or stakes to litigate individually.  To the contrary, hedge funds and financial institutions that manage over a billion dollars in assets account for the vast majority of stock loans.  (*See, e.g.*, Savoldelli ¶¶ 147-148.)  These sophisticated financial firms are more than capable of prosecuting any claims they believe they might have against Defendants.  Individual litigation therefore is superior to class action litigation.  *See, e.g.*, *Royal Park Invs.*, 2018 WL 1831850, at *9 (individual

---

[29]  *See* Ex. 67, Nishimura (Torus) Dep. 166:11-15 (no understanding of class representative duties); Ex. 68, Simeone (Torus) Dep. 25:9-16 ("I don't know what a hedge fund does"); *id.* 49:14-50:3 ("I never dealt with a hedge fund.  I don't know what they have or what they do, to be honest with you.  I never came across one.").

actions superior where plaintiffs were "highly sophisticated, knowledgeable financial institutions or wealthy private investors" with a "strong interest in individually controlling the prosecution of their own actions").

The history of this litigation proves the point. As the Court is aware, a group of 22 hedge funds with over $7 trillion under management has already made clear that they need no assistance from counsel they did not choose to protect their interests. That group of hedge funds retained separate counsel and objected when they believed Plaintiffs were harming their interests by seeking their sensitive trading data. (ECF No. 199.) Certifying a class would only intensify the concerns that led to those objections. If Plaintiffs were to obtain a recovery here, class members claiming a portion of that recovery would be required to provide detailed evidence of their stock lending transactions to a host of entities not of their choosing, including a claims administrator, Plaintiffs' counsel, and various other consultants and vendors. It would be unfair to force class members to choose between receiving their share of any recovery and protecting their sensitive data.[30] That is particularly so where the size and sophistication of the putative class members makes them among the most capable entities imaginable at protecting their own interests. Finally, that these sophisticated entities have declined to bring their own antitrust suits is a strong indication that "the facts were other than as alleged by plaintiff[s]." *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 79 (2d Cir. 2013).

---

[30] To the extent Plaintiffs suggest this problem can be cured by opt-out rights, they are wrong. If the Court were to certify a class and direct publication of notice, including the right to opt out, that must happen before trial. *Brecher v. Republic of Arg.*, 2010 WL 3584001, at *2 (S.D.N.Y. 2010) (discussing how numerous other courts have "emphasized the importance of class notice before the merits of the case are adjudicated"). At that stage, there is no recovery yet to be claimed, let alone a plan for how such recovery would be calculated or what documents and data would be required to support a class member's claim. By the time those additional facts are known— necessarily following trial and judgment—any deadline to opt out will have long since passed.

## IV.    Plaintiffs' Attempt to Extend the Class Period Beyond 2017 Is Improper.

Plaintiffs' complaint alleges a class period ending in 2017.[31]  As a result, when discovery began following the Court's motion to dismiss decision in September 2018, the parties limited discovery to the period ending in 2017, and then spent two years deposing 99 fact witnesses and producing millions of documents and massive volumes of transaction data—all limited to the period ending in 2017.  All along, Plaintiffs never so much as suggested to Defendants or the Court that they would ultimately seek class certification covering a period four or more years *beyond* 2017.  Now, however, Plaintiffs invite this Court—for the first time and with no explanation or evidence proffered in support—to certify a class for a period ending *either* February 22, 2021 *or* "through trial," which could be years down the road.  (Pls. Mem. 8, 45.)  Plaintiffs' belated attempt to certify a class beyond 2017 is improper and should be rejected.

*First*, there is no evidentiary basis for certifying a class that extends beyond 2017.  Plaintiffs took no discovery covering that period, and no transaction data covering that period were ever produced or analyzed.  Moreover, the minimal evidence that does exist concerning the post-2017 period strongly suggests that market conditions and prices during that period differed from those in the earlier period.  (McCrary ¶¶ 197-200.)  Thus, as to the post-2017 period, Plaintiffs lack any evidentiary basis whatsoever for satisfying their burden of proof under Rule 23.  Indeed, Plaintiffs advance no substantive argument in support of an extended class period, instead simply asking the Court to assume that if the requirements for class certification are met for the period through 2017 (and they are not), then that must also be the case for the years that followed.

---

[31]  Plaintiffs' Complaint sought a class period "through the present" (Am. Compl. ¶ 363), with "present" being commonly understood as the date of the filing, *i.e.*, November 17, 2017.  *See, e.g.*, *Hnot v. Willis Grp. Holdings Ltd.*, 2006 WL 2381869, at *2 n.4 (S.D.N.Y. 2006).

*Second*, certifying a class extending beyond 2017 would result in precisely the type of "wasting of resources" that this Court sought to avoid when the Court asked Plaintiffs in January 2018 whether they intended to amend their complaint.  (ECF No. 102 at 69.)  At a minimum, an extended class period would require (i) production of post-2017 transaction data that would take many months to retrieve and analyze, and (ii) another lengthy round of fact discovery, expert reports, and supplemental briefing concerning the post-2017 period.  Making matters worse, a supplemental production of current transaction data as opposed to the years-old data previously produced would invite another rebellion by the hedge fund class members whom Plaintiffs purport to represent.  *Supra* at 46.

If Plaintiffs believed an extension of the class period was warranted, the proper procedure would have been to move for leave to amend their complaint, not to seek a back-door amendment in their class certification motion years later.  *See Hnot*, 2006 WL 2381869, at *2 n.4 (denying a motion to extend class period beyond the filing of the complaint); *Decastro v. City of New York*, 2019 WL 4509027, at *7 (S.D.N.Y. 2019) (closing class period on the date the complaint was filed because plaintiffs did not specify a later date).  Plaintiffs never sought such relief from the Court, and it is far too late to seek it now.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied.

DATED:  June 29, 2021                    Respectfully submitted,

*/s/ Robert D. Wick*                     */s/ Michael A. Paskin*
Robert D. Wick                           Daniel Slifkin
Henry B. Liu                             Michael A. Paskin
John S. Playforth                        Damaris Hernández
COVINGTON & BURLING LLP                  Lauren M. Rosenberg
One CityCenter                           CRAVATH, SWAINE & MOORE LLP
850 Tenth Street, NW                     Worldwide Plaza
Washington, DC 20001                     825 Eighth Avenue
Telephone: (202) 662-6000                New York, NY 10019
rwick@cov.com                            Telephone: (212) 474-1000
hliu@cov.com                             dslifkin@cravath.com
jplayforth@cov.com                       mpaskin@cravath.com
                                         dhernandez@cravath.com
**Attorneys for Defendants JPMorgan Chase**   lrosenberg@cravath.com
**Bank, N.A., J.P. Morgan Securities LLC,**
**J.P. Morgan Prime, Inc., and J.P. Morgan**  **Attorneys for Defendants Morgan Stanley &**
**Strategic Securities Lending Corp.**        **Co. LLC, Prime Dealer Services Corp., and**
                                         **Strategic Investments I, Inc.**

*/s/ Richard F. Schwed*                  */s/ David G. Januszewski*
Adam S. Hakki                            David G. Januszewski
Richard F. Schwed                        Herbert S. Washer
SHEARMAN & STERLING LLP                  Elai Katz
599 Lexington Avenue                     Jason M. Hall
New York, NY 10022                       Sheila C. Ramesh
Telephone: (212) 848-4000                Margaret A. Barone
ahakki@shearman.com                      CAHILL GORDON & REINDEL LLP
rschwed@shearman.com                     32 Old Slip
                                         New York, NY 10005
Michael P. Mitchell                      Telephone: (212) 701-3000
401 9th Street, N.W.                     djanuszewski@cahill.com
Washington, D.C. 20004                   hwasher@cahill.com
Telephone: (202) 508-8100                ekatz@cahill.com
michael.mitchell@shearman.com            jhall@cahill.com
                                         sramesh@cahill.com
**Attorneys for Defendants Merrill Lynch,**   mbarone@cahill.com
**Pierce, Fenner & Smith Incorporated,**
**Merrill Lynch L.P. Holdings, Inc., and**    **Attorneys for Defendants Credit Suisse AG,**
**Merrill Lynch Professional Clearing Corp.** **Credit Suisse Securities (USA) LLC, Credit**
                                         **Suisse First Boston Next Fund, Inc., and**
                                         **Credit Suisse Prime Securities Services**
                                         **(USA) LLC**

*/s/ Alexis Collins*

David I. Gelfand (*pro hac vice*)
Alexis Collins (*pro hac vice*)
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Ave., NW
Washington, DC 20037
Telephone: (202) 974-1500
dgelfand@cgsh.com
alcollins@cgsh.com

Carmine D. Boccuzzi, Jr.
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2508
cboccuzzi@cgsh.com

**Attorneys for Defendants EquiLend LLC,
EquiLend Europe Limited, and EquiLend
Holdings LLC**

*/s/ Peter G. Wilson*

Alan J. Brudner
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
alan.brudner@katten.com

David C. Bohan
Peter G. Wilson
Sarah K. Weber
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
david.bohan@katten.com
peter.wilson@katten.com
sarah.weber@katten.com

**Attorneys for Defendants UBS AG, UBS
Americas Inc., UBS Securities LLC, and
UBS Financial Services Inc.**

*/s/ Staci Yablon*

Robert Y. Sperling
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-7941
rsperling@winston.com

George E. Mastoris
Staci Yablon
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
gmastoris@winston.com
syablon@winston.com

Richard C. Pepperman, II
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
peppermanr@sullcrom.com

**Attorneys for Defendant Goldman Sachs &
Co. LLC**