UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, *et al.*,<br><br>    Plaintiffs,<br><br>        v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>    Defendants. | No. 17-cv-6221 (KPF-SLC) |

**SUR-SUR-REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION <u>AND APPOINTMENT OF CLASS COUNSEL</u>**

## TABLE OF AUTHORITIES

**Page**

### Cases

*Barry's Cut Rate Stores v. Visa,*
  2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019) ............................................................. 5

*Dietrich v. Bauer,*
  192 F.R.D. 119 (S.D.N.Y. 2000) .............................................................................. 1

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.,*
  417 F.3d 1267 (D.C. Cir. 2005) ............................................................................... 5

*George v. Shamrock Saloon II, LLC,*
  2019 WL 8106153 (S.D.N.Y. Aug. 7, 2019) ............................................................ 3

*In re Foreign Exch. Benchmark Rates Litig.,*
  407 F. Supp. 3d 422 (S.D.N.Y. 2019) ...................................................................... 1

*In re NYSE Specialists Sec. Litig.,*
  260 F.R.D. 55 (S.D.N.Y. 2009) ............................................................................... 1

### Other Authorities

SEC, "Proposed rule: Reporting of Securities Loans" (November 18, 2021) .................. 2

Defendants' arguments against class certification in their sur-reply ("SR") are meritless and, in many cases, premised on blatant errors or misstatements of the record.

***No Fundamental Conflicts***: Defendants wrongly assert (SR 1) that "there is a zero-sum conflict of interests between short sellers and beneficial owners." They say this is so because, under Plaintiffs' damages model, "any estimates that underestimate harm to one will overestimate harm to the other." (SR 6.) But caselaw establishes that supposed conflicts about *damages apportionment* do not prevent certification or require separate representation. *E.g.*, *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 73 (S.D.N.Y. 2009). Defendants confirm this principle by relying on inapposite cases with fundamental "conflicts [that] extend well beyond the apportionment of damages." *In re Foreign Exch. Benchmark Rates Litig.*, 407 F. Supp. 3d 422, 439 (S.D.N.Y. 2019). Moreover, Defendants' premise is flawed. *See* Asquith/Pathak Sur-Reply Rpt., Ex. 179 ("A/P SRR") ¶¶ 202-05. Neither subclass can rig the model to inflate its damages at the expense of the other; that would undermine the model's reliability to the detriment of all. *Cf. Dietrich v. Bauer*, 192 F.R.D. 119, 127 (S.D.N.Y. 2000) (questioning the genuineness of defendants' inter-class-conflict concerns). Borrowers and lenders here are best served by pursuing their overwhelmingly common interests *together*.

***Impact Does Not Require Individualized Inquiries***: Defendants argue Plaintiffs made an "abrupt reversal," by first claiming platforms would take over the entire market, but then later claiming some OTC trading would remain. SR 3. But this mischaracterizes the record. Starting with his *opening* report, Dr. Zhu has repeatedly explained that platform entry benefits all class members, "including not only those traders that begin using the platform *but also those traders that continue to trade with prime brokers on a bilateral basis.*" Zhu Rpt. ¶ 11. His model specifically shows all class members benefit when only *22%* of stock loan transactions move to a

1

platform. *Id.* ¶ 275.[1]  This is consistent with many other financial markets, where modest platform entry led to large benefits for all investors.  A/P SRR ¶¶ 82-107.

Defendants' own expert, Dr. Hendershott, published papers showing that in one of those markets (corporate bonds) very modest platform entry saved investors *more than $2 billion annually.*  A/P SRR ¶¶ 103-07.  Defendants must now try to distinguish their own expert's work, arguing that the corporate bonds experience is irrelevant here.  Plaintiffs' experts disagree.  So does the U.S. Securities and Exchange Commission ("SEC"), which recently cited the corporate bonds' experience in proposing a reporting rule to bring transparency to the stock loan market.[2]  The SEC explains that, because the stock loan market is "opaque," it is "difficult *for borrowers and lenders alike* to ascertain market conditions and to know whether the terms that they receive are consistent with market conditions."  *Id.* at 7, 9.  This leads to *"less favorable prices for beneficial owners and end borrowers."*  *Id.* at 115.  Relying on what happened in corporate bonds and other comparable markets, the SEC explains that more transparency will benefit stock loan borrowers and lenders in many ways, including better prices.  The SEC's independent analysis fully vindicates Plaintiffs' impact showing.  *See* A/P SRR ¶¶ 108-19.

Defendants retreat to arguing (SR 3-4) that only those class members who actually trade on platforms would benefit from platform entry, but that defies basic economics.  As a general rule, competition and transparency improve conditions market-wide.  The only conceivable way a class member might not benefit from platform entry is if *each* prime broker would know, with

---

[1]  Defendants have no valid critique of Dr. Zhu's search model.  They are wrong to say it "assumes away widespread dispersion in real-world prices" and "ignores all differences among class members."  SR 10-11.  The opposite is true—the model accounts for price dispersion while showing all class members benefit *after* observable factors are controlled.  Zhu Reply ¶¶ 278-86.

[2]  SEC, "Proposed rule: Reporting of Securities Loans" (November 18, 2021), at 7, available at https://www.sec.gov/rules/proposed/2021/34-93613.pdf.

2

*absolute certainty*, that the class member would *never* be able to trade on a platform. Such certainty is impossible. Defendants claim that the current prime broker for lead plaintiff Torus would know it was uneconomic for Torus to trade on a platform, based on past practice. But that prime broker could never know what Torus might do in the future or what terms a platform might offer to induce Torus to join; other prime brokers would know even less. A/P SRR ¶¶ 50-61; Zhu Reply ¶¶ 19-21, 256-64. Beyond these common-sense points, if Defendants were right about their perfect knowledge of Torus's options, one would expect Torus to pay worse-than-average prices in the real world. But the data shows Torus often paid ███████████. A/P SRR ¶¶ 58-59. That result contradicts Defendants' premise that they have perfect knowledge about Torus and its options. And Torus and other class members would have done far better in a more competitive market, with greater options, absent Defendants' conspiracy.[3]

Defendants also argue that the *addition* of a platform option would *subtract* desirable trading options that exist today, but that too defies basic economics. Defendants again wheel out their "preferential access" arguments, but they are based on flawed analyses and flawed locate data, and even if some class members did enjoy relatively ███████████████, those benefits would still be available in the but-for world. A/P SRR ¶¶ 39-42. Nor would platforms remove existing liquidity. They would *increase* liquidity by complementing the OTC structure, a point made in the very textbook upon which Defendants' expert relies. *Id.* ¶¶ 62-67. Plaintiffs' experts do not "concede" (SR 4) anything to the contrary.

As for Defendants' claims that the Prime Brokers provide such valuable "recall" or

---

[3] Defendants are unable to cite *any* specific "individualized evidence" or "defenses" to show *any* class member was unharmed (much less that *many* were). Their speculation that they might do so later "is too speculative to defeat a finding of predominance." *George v. Shamrock Saloon II, LLC*, 2019 WL 8106153, at *10 (S.D.N.Y. Aug. 7, 2019).

3

"rerate" protections that platforms could never thrive, their experts still cannot cite any economic support for that proposition and rely instead on easily debunked anecdotes. A/P SRR ¶¶ 25-38. In the end, their arguments only *confirm* the opacity of the existing market—as reflected, for example, in Dr. Hendershott's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 17.

   ***Plaintiffs' Damages Model Does Not Disprove Impact***: Defendants' argument that Plaintiffs must prove *impact* via their separate *damages* model defies logic because impact and damages are separate prongs of an antitrust violation. Thus, no effort by Defendants to manipulate Plaintiffs' damages model can undermine Dr. Zhu's independent opinion that the conspiracy negatively impacted all class members. Moreover, Plaintiffs' damages model makes conservative assumptions about the but-for world, so it is not meaningful for impact that a small number of trades or accounts are "undamaged." To argue otherwise, Defendants resort to overtly flawed data manipulations. Previously, Dr. McCrary generated skewed results by improperly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Conceding this error, Defendants pivot (SR 6) to claiming that "even if the data at issue are discarded, Plaintiffs' model *still* predicts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." But this claim too relies on errors by Dr. McCrary, such as his mistaken conflation of *individual accounts* with *class members* (in reality, a single class member will often have multiple accounts). This leads him to overstate by many multiples the platform fees a class member would pay by erroneously assuming that each *account* must pay those fees separately. A/P SRR ¶¶ 144-55.

   Defendants' final effort to show "undamaged" class members is to pump up the estimate of platform costs. A/P SRR ¶¶ 162-77. Our experts show why these costs are grossly inflated, but in the end, the exact costs are irrelevant: even assuming the inflated fixed costs Defendants

say should apply, ███████████████████████████████████████

███████████████ which is more than enough for market-wide impact. A/P SRR ¶¶ 9, 160.

***The FTAIA Does Not Bar Certification***: In arguing (SR 11) that Plaintiffs stretch FTAIA's "domestic effects" exception "past the breaking point," Defendants hypothesize a transaction between traders in Hong Kong and China. But the Class's definition is limited by its terms to those who transacted with Defendants' *U.S.-based* entities. Where a conspiracy "effected the exclusion of the American rival of one defendant, resulting in higher consumer prices," the "domestic effects" exception applies. *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 417 F.3d 1267, 1269 (D.C. Cir. 2005). Here, it squarely applies because Defendants boycotted platforms like *U.S.-based AQS*, and class members paid higher prices in *U.S.-listed stock* (another Class definition filter) traded with Defendants' *U.S.-based* entities as a result.

***The Class Is Entitled To Post-2017 Damages***: Finally, Defendants maintain that they should be able to keep years of ill-gotten profits, even if the jury finds them *guilty of conspiring*, simply because of the date governing initial productions of transactional data. That claim is preposterous and could hugely reward unlawful conduct. If Plaintiffs prove that Defendants unlawfully conspired to block platform entry, Defendants are on the hook for all resulting damages, unless any Defendant can prove it withdrew from the conspiracy (and there is no evidence of that). *See Barry's Cut Rate Stores v. Visa*, 2019 WL 7584728, at *23 (E.D.N.Y. Nov. 20, 2019). Defendants' claim (SR 12) that "market conditions in the pre-2017 period differed from those in the post-2017 period" is unsupported. Defendants drove the boycotted platforms out of existence, and thus borrowers and lenders alike remain trapped in an inefficient market without platform options. If Defendants lose at trial, they must be held accountable for the damages they caused.

DATED: January 18, 2022

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: /s/ Michael B. Eisenkraft
Michael B. Eisenkraft
Christopher J. Bateman
David Fisher
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com
cbateman@cohenmilstein.com
dfisher@cohenmilstein.com

Julie G. Reiser (*pro hac vice*)
Richard A. Koffman (*pro hac vice*)
Kit A. Pierson (*pro hac vice*)
Emmy L. Levens (*pro hac vice*)
Daniel McCuaig (*pro hac vice*)
Robert W. Cobbs (*pro hac vice*)
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
jreiser@cohenmilstein.com
rkoffman@cohenmilstein.com
kpierson@cohenmilstein.com
elevens@cohenmilstein.com
dmccuaig@cohenmilstein.com
rcobbs@cohenmilstein.com

**SAFIRSTEIN METCALF LLP**

Peter Safirstein
1345 Avenue of the Americas, 2nd Floor
New York, New York 10105
Telephone: (212) 201-2845
psafirstein@safirsteinmetcalf.com

*Counsel for Torus Capital, LLC*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: /s/ Daniel L. Brockett
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Deborah K. Brown
Daniel P. Mach
David LeRay
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
deborahbrown@quinnemanuel.com
danielmach@quinnemanuel.com
davidleray@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
jeremyandersen@quinnemanuel.com