M331IOWC

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | ------------------------------x |
| 3 | IOWA PUBLIC EMPLOYEES' |
| | RETIREMENT SYSTEM, *et al.*, |
| 4 | |
| | Plaintiffs, |
| 5 | |
| | v.                                    17 Civ. 6221 (KPF) |
| 6 | |
| | BANK OF AMERICA CORPORATION, |
| 7 | *et al.*, |
| 8 | |
| | Defendants.              Remote Conference |
| | ------------------------------x |
| 9 | March 3, 2022 |
| | 2:10 p.m. |
| 10 | |
| | Before: |
| 11 | |
| | HON. KATHERINE POLK FAILLA, |
| 12 | |
| | District Judge |
| 13 | |
| | APPEARANCES |
| 14 | |
| | COHEN MILSTEIN SELLERS & TOLL PLLC |
| 15 |      Attorneys for Plaintiffs |
| | BY:  MICHAEL B. EISENKRAFT, ESQ. |
| 16 |      ROBERT W. COBBS, ESQ. |
| 17 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| |      Attorneys for Plaintiffs |
| 18 | BY:  SASCHA N. RAND, ESQ. |
| 19 | SHEARMAN & STERLING LLP |
| |      Attorneys for Bank of America Defendants |
| 20 | BY:  RICHARD F. SCHWED, ESQ. |
| 21 | COVINGTON & BURLING LLP |
| |      Attorneys for J.P. Morgan Defendants |
| 22 | BY:  ROBERT D. WICK, ESQ. |
| |      HENRY LIU, ESQ. |
| 23 |      JOHN S. PLAYFORTH, ESQ. |
| 24 | CRAVATH, SWAINE & MOORE LLP |
| |      Attorneys for Morgan Stanley Defendants |
| 25 | BY:  MICHAEL A. PASKIN, ESQ. |

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record, beginning with plaintiffs.

4          MR. EISENKRAFT:  Michael Eisenkraft, Cohen Milstein

5     Sellers & Toll, and with me is my colleague Rob Cobbs and my

6     colleague from Quinn Emanuel, Sascha Rand, but I expect I'll be

7     speaking today.

8          THE COURT:  Okay.  Mr. Eisenkraft, this is Judge

9     Failla.  I thank you very much.  And I just heard my deputy and

10    the phone system tell me that there were many, many people on

11    this call.  Since not everyone is speaking, I think I'll just

12    focus on those who are, and I know that and welcome all of you.

13         And representing the defendants today, is it Mr. Wick?

14         MR. WICK:  Correct, your Honor.

15         THE COURT:  Thank you very much.

16         All right.  I appreciate your willingness to

17    participate in this conference on what seems like short notice.

18    I really wanted to get back to you after receiving the initial

19    submission from plaintiffs on February 23rd and the defendants'

20    response on February 28th.  I was on trial last week, and I'm

21    just sort of recovering from that.

22         Mr. Eisenkraft, I'm going to begin by speaking with

23    you, sir, and I'm going to also just note that I'd appreciate

24    it if you would get a transcript of this conference, and if you

25    order it in the ordinary course and receive a copy, I'll

1    receive a copy automatically.  So would you be able to do that,

2    sir?

3         MR. EISENKRAFT:  Of course, your Honor.

4         THE COURT:  I thank you.

5         All right.  Mr. Eisenkraft, I guess what I'm trying to

6    figure out in the first instance is a really basic thing, and

7    you'll excuse me if you've said it very clearly in your

8    submission and I overlooked it.  That's the fog that comes from

9    having trials.  Sir, I'm trying to understand whether your

10   concern is that JPMorgan has violated the discovery protocols

11   or agreements that it entered into with you in this litigation

12   or whether what you're saying is, as a result of what you've

13   learned from the CFTC and SEC materials, you would have

14   negotiated the discovery protocols in a different way.

15        MR. EISENKRAFT:  The second, your Honor.  And

16   basically what we're trying to figure out here is just

17   basically figuring out what happened.  You know, we have a

18   situation where there is admitted widespread illicit use of

19   personal communications by JPMorgan employees and the

20   destruction of those communications, and, I mean, this is an

21   antitrust case, so those kind of illicit communications would

22   be potentially really important to our case, and we're trying

23   to figure out, were any of the custodians in our case

24   implicated in this, and if so, when did JPMorgan find out, when

25   did counsel find out, and those are the very basic questions

1    we're trying to find answers to.  That's what we're here for

2    today.

3              THE COURT:  Okay.  Pause.  Thank you.  And just pause

4    right there, please, sir.

5              Do I understand that you personally are involved in

6    the *Interest Rate Swaps* litigation as well?

7              MR. EISENKRAFT:  Yes, your Honor.

8              THE COURT:  When I've looked -- and please understand

9    that I know basically what the parties have told me about that

10   litigation.  I'm not going to dive deeply into it.  I have my

11   own docket.  But as I understood it, the discovery protocols

12   into which you entered in this case admitted the possibility

13   and indeed the fact that certain business was conducted by

14   JPMorgan employees on their personal devices, and I thought

15   that's why there was the inclusion of what I'll call the BYOD

16   protocol.  Is there something different?  Because I would have

17   thought that that would have covered the documents that you

18   believe have been lost in this litigation.

19             MR. EISENKRAFT:  There are some distinctions there,

20   your Honor.  So our protocol, which we negotiated thinking that

21   perhaps, you know, here and there maybe a communication had

22   been sent, we, you know, we assumed that in general, you know,

23   as attorneys state and the policies state, they comply with

24   regulations.  But we were only allowed to negotiate with

25   respect to BYOD devices, you know, devices that were paid for

1    or owned by JPMorgan.  Personal devices were considered, you

2    know -- JPMorgan would not produce anything from that, we would

3    not ask about them, totally out of bounds, and said that

4    there's nothing, you know -- we cannot go there, basically.  So

5    it's those kinds of devices, especially, that we're interested

6    in now.

7              THE COURT:  And what you're saying to me, sir, is the

8    upshot of the CFTC and SEC orders is that when they're

9    referring to employees conducting business on personal devices

10   with the knowledge of JPMorgan management, these aren't the

11   BYOD devices; these are purely personal devices as to which

12   JPMorgan had no involvement in the billing or payment or

13   retention of information from.

14             MR. EISENKRAFT:  I mean, we have the same information

15   you do from the orders, but I assume --

16             THE COURT:  Yes, sir.

17             MR. EISENKRAFT:  -- it's both personal, purely

18   personal and BYOD, but I don't know.  And that's what we're

19   trying to figure out.

20             THE COURT:  And was that part of -- please understand,

21   I don't want to get into any privileged communications, and I

22   also don't really want to get into the gory details of any

23   meet-and-confers that you've had.  But is it the case that your

24   discussions with defense counsel lead you to believe that the

25   BYOD protocol in your agreements does not extend to cover the

1    materials that were discussed or at issue in the SEC and CFTC

2    orders?

3              MR. EISENKRAFT:  Correct.  I believe the BYOD may be a

4    subset of those, but the larger thing leaves personal devices

5    untouched.  So, you know, it's, you know, if you have your

6    cellphone, some people have two cellphones, some people have

7    one cellphone, some people have, you know -- so it would be a

8    subset.

9              THE COURT:  Okay.  Now other than the fact -- and this

10   is a big "other than," but let me say this nonetheless.  You

11   have reason to believe that, wittingly or unwittingly, your

12   adversaries have not retained or have not produced information

13   contained on purely personal, not BYOD devices by JPMorgan

14   employees; is that correct?

15             MR. EISENKRAFT:  Large number of their employees.  I

16   don't know whether our custodians were in that large number, so

17   potentially.  That's what I'm trying to figure out, but yes.

18             THE COURT:  Of course, sir.  Of course.  That's why I

19   said, so other than that, you don't have reason to believe that

20   JPMorgan otherwise violated the discovery protocols in this

21   case, correct?

22             MR. EISENKRAFT:  Correct.

23             THE COURT:  Okay.  And so your concern is, you'll be

24   sad if it turns out that these custodians, the custodians

25   listed, are part of the groups who did things on personal

1  devices they did not have, correct, that JPMorgan's lawyers did

2  not have access to, correct?

3          MR. EISENKRAFT:  Sad is an apt description, yes.

4          THE COURT:  Okay.  Thank you.  One moment, please.

5          In your discussions, sir, in your meet-and-confers,

6  did you receive any assurance or communications from defense

7  counsel suggesting that the custodians at issue in your case

8  were not involved or did not use totally personal devices?

9          MR. EISENKRAFT:  I'm sorry.  In our --

10          THE COURT:  I'll ask a better question, sir.  My

11  understanding -- and I think you'd agree with me -- is that you

12  had some conversations with JPMorgan's counsel before filing

13  your letter of February 23rd, correct?

14          MR. EISENKRAFT:  Yes, many conversations.

15          THE COURT:  Okay.  Fair enough, sir.  And in those

16  conversations, I assume you've explained to them the very thing

17  that you're explaining to me, which is that you are concerned

18  that their custodians may have used personal devices to conduct

19  business or to communicate about matters at issue in this case

20  and therefore you don't know whether the materials that you

21  received were in fact the entire universe of materials,

22  correct, sir?

23          MR. EISENKRAFT:  I hope I was that clear, but that's

24  certainly what I intended to convey, yes, so hopefully I did.

25          THE COURT:  Okay.  When you raised those issues with

1    defense counsel, did they say anything to the effect that these

2    custodians were not involved in those other matters, though

3    these custodians only used either company phones or company

4    devices or the BYOD program and that you had nothing to fear?

5            MR. EISENKRAFT:  No.

6            THE COURT:  Okay.  Was it instead just couched in

7    terms of burden, sir?

8            MR. EISENKRAFT:  It was basically that we forfeited

9    our rights and would we be interested in asking about a subset

10   of the custodians and, you know, we, you know -- time has

11   expired and, you know, we don't have any documents, those kinds

12   of -- but it was not -- and what I found a little frustrating,

13   to be honest, is like, I looked at the SEC order, and they're

14   required to hire a compliance consultant who will, like -- who

15   will describe -- who will review the survey of how JPMorgan

16   determined which employees failed to comply with JPMorgan

17   policies and procedures, so I think they have a list, and I

18   just want to know if our people are on that list.

19           THE COURT:  Okay.  Again, so that I'm clear,

20   Mr. Eisenkraft, is it the case that it's not as though you

21   would have asked for different or other custodians, you care

22   about the custodians you named earlier?

23           MR. EISENKRAFT:  Yes.

24           THE COURT:  Thank you.  Okay.

25           All right.  Mr. Wick, let me begin with you, sir.  Do

M331IOWC

you want to just respond or add your thoughts to the discussion

that I've had with Mr. Eisenkraft, or is it your preference

instead, sir, that I ask you questions?

        MR. WICK:  I'd like to respond, if I may.

        THE COURT:  Please.

        MR. WICK:  So I would say a couple of things, your

Honor.

        First, the questions that Mr. Eisenkraft is now asking

we think were asked and answered, to the extent they have any

arguable relevance, in May 2019 when the plaintiffs initiated

this question.  So the parties agreed, pursuant to an elaborate

agreement relating to phone communications and phone discovery,

on a specific set of covered custodians for whom there would be

certain phone discovery.  The plaintiffs asked us in May 2019,

have you taken appropriate steps to preserve the communications

of those individuals; we responded telling them the three

things we had done to preserve those communications and that we

were doing to produce those communications.  And what we said

was, number one, we promptly sent, after the initiation of the

litigation, a document hold notice that explicitly called on

the covered custodians to preserve personal device

communications; secondly, we told them that in light of their

communications, we were going to go back to the covered

custodians who were still employed at the bank and specifically

remind them of their obligation to preserve those

1    communications; and third, we told them that to the extent that

2    those individuals had any intercustodian communications that

3    the plaintiff had expressed an interest in having produced, we

4    would ask them to give those communications to us. And we

5    tried to confirm, and I believe have confirmed to the

6    plaintiff, that those things were done.

7            And so as to the covered custodians, we had

8    communications with them about whether they used personal

9    devices, whether there was anything to preserve, whether there

10   was anything to produce, and in all instances but one, the

11   result of those communications was there was nothing to

12   preserve and nothing to produce. The one exception was that

13   for one custodian, one JPMorgan custodian, there had been a

14   string of text messages exchanged with a custodian at another

15   bank, Goldman Sachs, and we timely produced that string of

16   about 50 text messages in discovery. I will emphasize that

17   string of 50-odd text messages has nothing at all to do with

18   this litigation. It had nothing to do with stock lending or

19   stock lending platforms. It had to do with daughters' weddings

20   and college educations and college applications, but because it

21   happened between two different custodians and the plaintiffs

22   had said they wanted to receive those things, even if not

23   relating to stock lending, we produced them.

24           So as far as we are aware, your Honor, there is

25   nothing more to preserve and nothing more to produce. The SEC

1   order and the CFTC order relate to -- I don't have any inside

2   information about what investigation led to those orders, and

3   JPMorgan doesn't think it's appropriate to comment on the

4   specific ins and outs of the negotiation of a consent order

5   with the regulator, but I have gone to JPMorgan and I have

6   asked them, as a result of anything that happened in the SEC or

7   CFTC investigation, is the answer different now than it was at

8   the time.  At the time, based on the communications we had with

9   covered custodians employed with the bank, we concluded there

10  was nothing more to preserve or produce other than the one set

11  of text messages we produced.  I have asked, as to the

12  custodians in this litigation, have you now come into

13  possession of anything new that you didn't have then, and the

14  answer is no, not to the best of our knowledge based on a

15  reasonable inquiry, no.

16          THE COURT:  All right.  Sir, just pause right there,

17  please.

18          When you've spoken with your client about whether

19  you've come into possession of anything new, I appreciate that

20  the answer is no, but I guess that for me begs the question,

21  because if perchance these materials were discarded because

22  they were on a personal device and the device either was, you

23  know, traded up or changed or lost or something, that there

24  might be nothing new and yet there might still be documents

25  potentially responsive that were lost.  Without disclosing

1  privileged communications, have you and your client accounted

2  for the possibility that the custodians in this case, the

3  covered custodians in this case, might have used personal

4  devices on which the communications are now lost?

5        MR. WICK:  We accounted for that in May 2019, your

6  Honor.  In May 2019, when the plaintiffs asked us what we were

7  doing to preserve and produce these communications, we told

8  them the three things we were doing.  If they thought some

9  fourth or fifth step was necessary, they should have said so

10  then.  They didn't say so.  So based on the communications we

11  had at the time, we concluded that as to the covered custodians

12  discussed in our May 2019 email, there was nothing more to

13  produce -- to preserve, there was nothing more to produce.  If

14  the question, your Honor, is, is there something about the SEC

15  or CFTC order that leads me to believe that what we learned in

16  May 2019 was wrong, the answer was no.  The SEC order talks

17  about a large number of JPMorgan employees.  It says dozen.

18  But the exemplars it gives of what was at issue there, it

19  doesn't touch stock lending and it doesn't touch our time

20  period.  The time period in the SEC order is January 2018 to

21  November of 2020.  We are dealing with an earlier time period

22  of 2008 through mid-2016, when AQS's assets were sold to

23  EquiLend.  So we think the best evidence of whether there was

24  anything more to preserve or produce are the communications we

25  had in May 2019.  I have not -- I'm not privy to any sort of

1  inside information about what went on in the SEC and CFTC

2  investigations, but it seems to us, your Honor, that the May

3  2019 communications we had with the plaintiffs and the

4  communications that we had with the covered custodians at the

5  time are the best evidence here.

6          THE COURT:  Sir, if you'll pause please.

7          I wanted to make sure that I'm understanding what each

8  side is saying.  And so you'll recall that earlier in this

9  discussion, when I was speaking with Mr. Eisenkraft, I was

10 asking questions about whether the BYOD documents were

11 something different from personal devices, and he gave his

12 belief that the BYOD devices were a subset of the personal

13 devices that were used by JPMorgan employees.  I believe I

14 understand you to be saying—but I want to make sure that I

15 understand you to be saying—that when you negotiated the

16 discovery protocols in May of 2019 as to the covered

17 custodians, you obtained from them the responsive documents

18 from, or responsive communications from, and you told them to

19 hold, or put a litigation hold on communications that were on

20 both their company-subsidized devices and their personal

21 devices; am I correct?

22         MR. WICK:  Correct, your Honor.  And not wanting to

23 waive any privileges, there is a sort of a -- there are two

24 different communications or agreements at issue here.  There's

25 a July 2019 what I would call comprehensive and integrated

1   phone discovery agreement.  And in that July 2019 agreement,

2   there is implicitly a sort of a three-part taxonomy.  There are

3   employer-issued mobile devices, there are employer-subsidized

4   or BYOD devices, and then there's a third category, which would

5   be a purely personal device which is not employer subsidized

6   and not employer issued, and that July 2019 phone agreement

7   required the defendants to make certain productions as to the

8   first two categories, employer-issued or employer-sponsored

9   phones.  It also imposed obligations as to work landline phone

10  numbers.  It did not impose any obligations to produce or

11  preserve purely personal phone communications because the

12  defendants objected that purely personal devices were beyond

13  their custody and control, and the plaintiffs, while not

14  necessarily agreeing with that, acquiesced in that in order to

15  get what they wanted to get regarding BYOD and employer-issued

16  devices.  Notwithstanding that limitation, your Honor,

17  notwithstanding that we had no obligation to do so, under the

18  integrated and exhaustive and exclusive agreement relating to

19  production of mobile phone discovery, we, pursuant to the May

20  2019 email exchange with the plaintiffs, did more than we were

21  required to do.  When we went to the covered custodians

22  identified in the May 2019 email and asked them about their

23  personal device communications, we asked them not just about

24  employer-issued or BYOD communications but about also about

25  communications on personal devices:  Did you have any

1   communications on a personal device relating to stock lending

2   or the litigation?  Did you have any communications on a

3   personal device with another custodian at another bank?  And as

4   I said, your Honor, the answer to that, the take-away from all

5   those communications, without waiving any privileges, is, there

6   was nothing, with one exception.  The one exception was that

7   string of about 50 text messages.  That was from a purely

8   personal phone.  That was not from a work-issued phone.  That

9   was not from a BYOD phone.

10          THE COURT:  Okay.  Thank you.

11          And again, sir, you'll excuse me if you have said this

12  to me.  I just want to make sure I'm understanding this.  I

13  appreciate what you're saying, which is that you went beyond

14  the commitments you had originally made, but when you speak

15  about going to these covered custodians and asking them about

16  communications on their personal devices, had you previously

17  advised them or had the company advised them of the need for a

18  litigation hold as to their personal devices?  I'm

19  distinguishing that from whatever you agreed to actually look

20  at and produce with plaintiff's counsel, but you're saying,

21  from the outset of this litigation, you had advised the covered

22  custodians to retain all communications on whatever type of

23  device they might rest?

24          MR. WICK:  Correct, your Honor.  And again, without

25  wanting to waive any privilege, when the litigation was filed,

1    a hold notice went out promptly to all individuals who were

2    identified as having potentially responsive ESI.  That hold

3    notice explicitly said, hold this stuff, no matter where it

4    resides, even if it's on a personal computer or on a personal

5    device.  It explicitly addressed personal devices.  That was

6    the hold notice at the outset.  Plaintiffs then raised, in May

7    2019, in a global email to all defendants, would you please

8    reassure us that appropriate steps are being taken to preserve

9    personal devices, and a week later we answered yes.  As to

10   personal devices, we did send a correct hold notice, but per

11   your email, we will go back to them and specifically remind the

12   covered custodians identified in the May 2019 agreement that

13   they need to preserve purely personal device communications,

14   not just work-issued device communications.  And then we had

15   the communications with custodians that I've described, and the

16   upshot of that is, we ultimately came up with one text string

17   from a personal device that we produced.

18         THE COURT:  Okay.  Now when you and I first began

19   speaking, sir, you were giving me your response to some of the

20   statements made by plaintiff's counsel in my discussions with

21   plaintiff's counsel, and one of the things that you said was

22   that you went back to your client, to JPMorgan, and asked them,

23   as a result of the SEC and CFTC orders, is the answer

24   different?  If the answer that was given -- or I may have

25   shorthanded that, but basically is there anything else for you

1  to do, is there anything that needs to be modified in light of

2  the CFTC and SEC orders, and what you've told me today is that

3  their response to you is no.  Do I understand you to be saying,

4  sir, that you haven't gone back and checked whether these

5  particular custodians were involved in these particular

6  matters, what you're saying is that way back when at the

7  beginning of this litigation, your litigation hold covered

8  their personal devices, you checked with them, and you've

9  gotten all the responsive communications from personal devices,

10 work devices, things of that nature.  So do I have the

11 recitation of facts correct so far, sir?

12           MR. WICK:  No, your Honor.

13           THE COURT:  Okay.  Excuse me.  So let me get it

14 correctly, please.

15           MR. WICK:  Yeah.  We did what we did.  When the

16 plaintiffs raised this in May 2019, we did what we did, and our

17 view is that if they thought something more was required by way

18 of preservation, the time to say so was then, and nothing was

19 said.  Then after --

20           THE COURT:  Okay.  Yes.

21           MR. WICK:  Then after, you know, two and a half years

22 passes, the plaintiffs write us a letter December 23rd and then

23 we have meet-and-confer communications with them, and at first

24 those communications were focused heavily on what appeared to

25 us to be searching for evidence of spoliation and to see if

1    they had some angle to bring a spoliation sanctions motion.

2    When we eventually did have one videoconference with them,

3    which was rather brief, Mr. Eisenkraft said something like,

4    look, it looks like you went back and you might have got some

5    more things off personal devices that you didn't have before

6    and you now have something now that you didn't have then, and

7    that seemed to me to be, you know, a reasonable question.  I

8    don't think the spoliation thing is reasonable at all, but he's

9    saying, look, if you come into possession of something, some

10   new evidence now that you didn't have then, I thought I should

11   go ask my client whether there was anything like that.  And so

12   we've asked for the specific set of custodians, covered

13   custodians at issue here:  Do you now have any more personal

14   device ESI or communications now than you had then?  And the

15   answer was no.  In the *Interest Rate Swaps* case, the answer was

16   yes, as to one individual, and we've told the plaintiff, as to

17   one individual, we did after the close of discovery get

18   something new in the *Interest Rate Swaps* case, and we've

19   offered to meet and confer with them about whether they're

20   entitled to get that.  But the answer as to this case, as to

21   these custodians, was no.

22            THE COURT:  Okay.  Thank you.

23            Sir, are there other things that you wish to comment

24   on regarding my discussions with Mr. Eisenkraft or other things

25   that you think would be useful to me in resolving this issue?

1    MR. WICK:  I think beyond what we've discussed, your

2  Honor, I would just rely on our papers on the fact that these

3  issues were vetted and discussed in May 2019.  If they think

4  something more by way of preservation should have been done,

5  they should have said so then, not long after the fact.

6    And finally, I would say that the idea that they would

7  have negotiated a different phone discovery agreement I don't

8  think is credible, your Honor.  That phone agreement that they

9  negotiated in July 2019 was not a one-off agreement with

10  JPMorgan alone based on, you know, their impressions of what

11  happened at JPMorgan.  It was a global agreement between all

12  plaintiffs and all defendants in which each side balanced their

13  effective interest and we came out with a compromise, and the

14  compromise was that they were entitled to get certain

15  discovery, they were not entitled to get certain other

16  discovery.  That's clear from paragraph 18 of the discovery.

17  And as I think I've heard Mr. Eisenkraft say, he's not saying

18  anybody violated that agreement.  Well, that was an integrated

19  and exhaustive agreement, and they got everything they were

20  entitled to get under it.

21    THE COURT:  I thought I understood him to be saying in

22  part that if only he had known about the degree to which

23  individuals at JPMorgan used personal devices, he would have

24  done something else.  And so for you to say the time for them

25  to do that was in 2019, I think that's his response.  His

1   response is, I didn't know the degree to which business was

2   conducted on personal devices.  I'm understanding you,

3   Mr. Wick, to be saying that the response to that is that it

4   actually doesn't matter in this case because the parties agreed

5   on a set of covered custodians; as to those covered custodians,

6   the litigation hold pertained to personal devices.  When it

7   came time to get information from the covered custodians, you

8   went and asked about materials on the personal devices,

9   additional to the work and the BYOD materials, and so

10  therefore, you think that the disclosures in the CFTC and SEC

11  orders don't impact the quantum of discovery that would have

12  been realized in this case; am I correct?

13          MR. WICK:  Well, you cut out for about 10 seconds

14  there, but I think I --

15          THE COURT:  Oh, that's unfortunate.  It was pretty

16  brilliant stuff, too, sir, so I'm sorry that it did.  But go

17  ahead, yes.  I can try it again, or I'll just listen to you.

18          MR. WICK:  I think I have it.  You're saying, as I

19  understood it:  Mr. Wick, isn't your primary argument that the

20  SEC order or whatever it says about things in general doesn't

21  tell us much of anything about these specific custodians; for

22  these specific custodians, you addressed the problem, and

23  there's no reason to think you didn't address it

24  satisfactorily?  You're right.  That is our primary argument.

25          I also have a secondary argument, which is the

1    suggestion that the negotiation -- the agreement would have

2    been negotiated differently I don't believe is credible because

3    it wasn't a one-off agreement with JPMorgan alone; it was a

4    collective agreement among all plaintiffs and all defendants.

5    It was a global agreement.  And so the perception that one

6    defendant may have used a little more or a little less personal

7    device communication I don't think would have changed the

8    contours of a global agreement struck between all plaintiffs

9    and all defendants.

10            THE COURT:  Mr. Wick, let me ask a very different

11   question, and that is:  According to plaintiffs, the

12   interrogatories are just designed to give them comfort, to make

13   sure they understand and can have confidence in the

14   completeness of what is being produced.  I suspect I know the

15   answer to this, but I want you to tell me:  What would be so

16   bad or so onerous about responding to any of the

17   interrogatories?  Perhaps you'll tell me all of it is just too

18   much.  But are you talking about each one of them would be too

19   onerous a thing to do?  And you may just say, look, Failla, I'm

20   standing on principle, they should have done this years ago.

21   But I'm asking a different question, which is:  How tough would

22   it be for you to respond to the three interrogatories I've been

23   shown?

24            MR. WICK:  Okay.  I would sort of say the following,

25   your Honor.  I mean, shall I go interrogatory by interrogatory

1    or would you rather I sort of take it more generally?

2          THE COURT:  Whatever's easier for you, sir.  I'll take

3    either.

4          MR. WICK:  Okay.  I'm just flipping to the

5    interrogatories.

6          So in the first place, your Honor, we don't view these

7    interrogatories as primarily designed to just learning whether

8    there's any new information that they might be able to come

9    into possession of.  We view them as basically a fishing

10   expedition to see if there's some sort of spoliation sanction

11   motion that they can apply against JPMorgan, and we think that

12   would be obviously unreasonable.  So I would say three things.

13         First, discovery is closed.  We spent millions of

14   dollars, thousands of hours responding to discovery in this

15   case.  They need to show good cause.  They shouldn't say, like,

16   what's the harm in responding to the interrogatories.  The

17   burden is the other way.  The burden is on them to show good

18   cause to reopen discovery, and I don't think they have on this

19   record.

20         Secondly, we think this is a fishing expedition to

21   mount a spoliation sanctions motion.  When they were

22   specifically told what was being done to preserve this material

23   and didn't suggest at the time that anything more was required,

24   it seems to us already clear that a spoliation sanctions motion

25   can't have merit, and therefore there's no reason to go down

1    that road and start putting burdens on us.

2           Third, the interrogatories are clearly and obviously

3    overbroad, your Honor.  They don't even limit themselves to the

4    covered phone custodians that the parties agreed upon.  They

5    don't divide between employees who still work at the bank when

6    the litigation was filed and an employee who in one case left

7    the bank seven years before the litigation was filed.  They

8    don't draw any of those distinctions.  They actually ask, or

9    they demand a response as to anyone, whether or not they were

10   even a document custodian, if they were identified on the

11   initial disclosure to any party, any plaintiff or any defendant

12   in the litigation.  So, you know, as a matter of burden,

13   proportionality, scope, they seem to us overbroad.

14          The first interrogatory:  What was the basis for the

15   representations you made?  I mean, we're kind of dumbfounded by

16   that one, your Honor.  I mean, the representation that we made

17   was that producing landline phone logs, not personal device

18   phone logs, we made a representation that -- or an objection,

19   really, not a representation, an objection that producing

20   landline phone logs would be burdensome.  Do they really

21   seriously need to ask, in Interrogatory 1, What was the basis

22   for your burden objection?  That seems to us like harassment,

23   not like good-faith discovery.

24          Interrogatory 2:  What were the circumstances of your

25   failure to preserve?  Well, that's a legal conclusion.  We

1 don't think there was any failure to preserve.  So how do we

2 answer "What was your failure to preserve" when, for the

3 reasons I've articulated, we don't think there was any failure

4 to preserve?

5    No. 3:  "Identify all efforts JPMorgan undertook to

6 investigate whether relevant employees" etc., etc., etc., I

7 mean, that calls for privileged and work product information.

8 When I had a meet-and-confer with Mr. Eisenkraft and asked him

9 whether he was willing to narrow the interrogatories at all in

10 any respect whatsoever, he said no.  And that's the last

11 exhibit, or that's among the exhibits in the two motions, to

12 the two letters.

13    THE COURT:  Okay.  All right.  Thank you, sir.

14    Mr. Eisenkraft, I'll hear from you in reply.

15    MR. EISENKRAFT:  First of all, there are some

16 corrections that I need to make.  They're with Mr. Wick,

17 actually.

18    THE COURT:  Okay.

19    MR. EISENKRAFT:  So he said that the SEC order just

20 covered from 2018 or '19.  What he did not say was that the

21 CFTC order, in that order, JPMorgan consents to the fact that

22 the issues were widespread since at least July 2015.

23    THE COURT:  Yes.  I did read that, sir.

24    MR. EISENKRAFT:  Also, the discovery in this case is

25 not 2009-2016; it's 2008 to the end of 2017.  I triple-checked.

1    I don't know where -- he must have made -- just an error, but I
2    just wanted to correct that.

3        And this is also a continuing conspiracy where the
4    allegations go on, so they have a continuing obligation to
5    preserve their documents. So the idea that this is somehow all
6    in the past is just -- I disagree with that.

7        The idea that this is a global deal with all the
8    defendants, if I had known, if I had the CFTC and SEC orders in
9    front of me when I was negotiating these phone agreements, yes,
10   the deal with JPMorgan would have been very different than the
11   deal with everyone else.

12       And we're not fishing here for spoliation. We're
13   trying to figure out if our documents were destroyed. So if
14   they were destroyed, then we may have a spoliation motion, but
15   if they were not, we're trying to figure out the harm that did
16   or did not happen to us so we can decide what to do. We're not
17   fishing. We have a $200 million, you know, consent decree from
18   two regulators talking about this. This is not some sort of
19   meritless thing.

20       And also, Mr. Wick was very careful, when he said who
21   they had checked with, he said the custodians at issue here.
22   They have defined that to exclude all former employees, which
23   are a lot of them now. So I'm talking about all the custodians
24   that we agreed to in this case and whose documents were
25   produced. I think there are 18 of them. So, you know, I

1    didn't hear anything about checking with them, and this is the

2    first I've heard of him checking with them, and what I want to

3    know is just simply:  JPMorgan did a huge investigation to

4    figure out who was doing this kind of stuff.  Were any of our

5    18 people doing this?  That's what I would like to know.

6              THE COURT:  Okay.  One moment, please, sir.

7              All right.  Mr. Eisenkraft, anything else?

8              MR. EISENKRAFT:  No, your Honor.

9              THE COURT:  Okay.  I thank you both.  Very, very well

10   argued.  I will think about this, and I'll issue an endorsement

11   as quickly as I can.  Thank you, all.  Be well, everyone.  We

12   are adjourned.

13                            o0o

14

15

16

17

18

19

20

21

22

23

24

25