# Rebuttal

Plaintiffs' Deck

# Imagine a world in which the _only options_ for travel are luxury, high end travel agents

# Torus is an adequate class representative





Opening Mot. Ex. 151 (Goldman Sachs ISLA Presentation) at 6

**Torus borrowed from two Prime Broker Defendants—Goldman Sachs and Bank of America**

**It is irrelevant that Torus is a proprietary trading fund—a Goldman Sachs documents (*left*) shows that proprietary traders are typical end users**

**Torus would have been able to trade on a platform in the but-for world**

**All class members would have obtained better OTC prices in the but-for world through market-wide price disciplining.**

**Simeone was <u>not</u> a trader for Torus!**

# Absent the conspiracy, Torus would have been able to trade on a platform or obtain better OTC prices

**Platform trading fees would not be prohibitive for Torus in the but-for world.**

 

**As Dr. Zhu opines, all class members would have obtained better OTC prices in the but-for world through market-wide price disciplining.**

**Multiple Torus witnesses testified about their desire to use a viable platform.**

# SCERA is an adequate class representative





Defendants argue that SCERA is an inadequate representative because it borrowed and lent stock.

Obviously they don't think there is a conflict.

This fails for the reasons discussed earlier: ***Any conflict between borrowers and sellers relates only to the allocation of damages, which can be dealt with after trial***.

Defendants cite *Payment Card* and *Literary Works* – settlement only classes.

Defendants' argument would largely frustrate any financial market case like this one.

# Unlike in *FOREX*, there is no conflict here because Class members have no adverse incentives in establishing *<u>liability</u>*

| FOREX | Stock Loan |
|---|---|
| "[C]lass members … trade directly with each other," taking "oppositional trading positions." | Class members trade with Prime Broker Defendants as intermediaries |
| "The Named Plaintiffs and their class member counterparties would have directly conflicting incentives to establish whether spread manipulation occurred on certain dates and the extent to which it affected their transactions." | All Class members want to show they paid supracompetitive spreads, which are charged to both sides of the market, *on all transactions* |
| Distinguishes *NASDAQ* by noting that "the conflicts within the Exchange Class extend well beyond the apportionment of damages." | As in *NASDAQ*, any conflict relates only to the apportionment of damages |

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 407 F. Supp. 3d 422, 439 (S.D.N.Y. 2019)

# Similarly, unlike in *LIBOR*, there is no conflict here because Class members have no adverse incentives in establishing *liability*





BID/OFFER SPREAD

| *LIBOR* | Stock Loan |
|---------|------------|
| Episodic up and down manipulation of a benchmark | Group boycott of platform trading to maintain intermediary position and supracompetitive spreads |
| "Directional differences ... create directly conflicting incentives" because "a named plaintiff ... has active <u>dis</u>incentive to establish trader-based manipulation when the direction of that manipulation benefited its trading positions ...." | No class member benefited from the conspiracy to boycott platform trading |

*In re LIBOR-Based Financial Instruments Antitrust Litigation,* 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018)

# Defendants' arguments only go to whether non-Defendant broker-dealers are injured, and they are

Non-Defendant broker-dealers benefit from platform, which reduces spreads they pay

Non-Defendant broker-dealers benefit from increased access to supply on the platform

Non-Defendant broker-dealers benefit because platforms increase their competitiveness

# All class members—including non-Defendant broker-dealers—benefit when some class members gain access to multilateral trading

| Data (all in bps) | | | | Model input (all in bps) | | | | Model implications (all in bps) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (L1+L2)/2 | Multi-prime | Calibrated | Not critical | | | | | Bid-ask spread | | |
| | L1 price | L2 price | Spread | c | mu | s | v | price range | E(p, slow) | E(p, fast) | E(p, all) | For all | For slow | For fast |
| Cold | 8.6 | 30.2 | 21.6 | Actual world | 19.4 | 0.28 | 2.51 bps | >34.4 | [23.05, 34.39] | 31.88 | 25.85 | 30.19 | 21.58 | 24.96 | 12.9 |
| | | | | But-for world | 19.4 | 0.5 | 2.51 bps | >34.4 | [20.51, 29.39] | 26.88 | 21.91 | 24.4 | 10 | 14.96 | 5.02 |
| | | | | | | | | Spread compression -> | | | | 53.66% | 40.06% | 61.09% |
| Warm | 16.5 | 40.7 | 24.2 | Actual world | 28.6 | 0.28 | 2.81 bps | >45.38 | [32.68, 45.38] | 42.57 | 35.83 | 40.68 | 24.16 | 27.94 | 14.46 |
| | | | | But-for world | 28.6 | 0.5 | 2.81 bps | >45.38 | [29.84, 39.79] | 36.98 | 31.41 | 34.19 | 11.18 | 16.76 | 5.62 |
| | | | | | | | | Spread compression -> | | | | 53.73% | 40.01% | 61.13% |
| Hot | 331.7 | 440.8 | 109.1 | Actual world | 386.25 | 0.28 | 12.7 bps | >462.11 | [404.70, 462.11] | 449.41 | 418.91 | 440.87 | 109.24 | 126.32 | 65.32 |
| | | | | But-for world | 386.25 | 0.5 | 12.7 bps | >462.11 | [391.87, 436.81] | 424.11 | 398.95 | 411.53 | 50.56 | 75.72 | 25.4 |
| | | | | | | | | Spread compression -> | | | | 53.72% | 40.06% | 61.11% |

280. This table shows better pricing for *all* class members, regardless of the stock loan temperature (cold/warm/hot) or the customer's status as a "fast" or "slow" customer. I qualitatively explain these results below.

## Dr. Zhu's model applies regardless of customer type

ECF No. 414-9 (Zhu Rpt.) ¶¶ 279-280

# Platforms also enhance non-Defendant broker-dealer's ability to compete with the Prime Broker Defendants



206. Common evidence also indicates support of AQS from ███████ found that AQS generated "a positive P&L impact to [them] with the ability to more efficiently distribute stock borrow supply participants that we are not currently reaching with our Prime Brokerage offering, or with whom we may not currently have relationships and/or credit lines."[263] As stated by senior ███ executives, "the reason[] that ███ invested in AQS" "was essentially for ███ to potentially gain more market share in prime brokerage."[264] ███ recognized that this competitive edge was borne out of the fact that "[a] lot of market participants have an interest in understanding, as best they can, the pricing mechanism on a stock borrow."[265]

ECF No. 414-9 (Zhu Rpt.) ¶ 206

# In *Asacol*, under the plaintiffs' theory, only those class members who would have *switched from brand to generic* would suffer any harm

907 F.3d 42

United States Court of Appeals, First Circuit.

IN RE: ASACOL ANTITRUST LITIGATION.

United Food & Commercial Workers Unions

3

Plaintiffs make no explicit claim that the price of Delzicol and Asacol HD would have been lower had generic versions of Asacol been available.

But they had no method for identifying who would switch, and they knew thousands would not switch.

Plaintiffs' impact theory thus *required* individualized inquiries.

In re Asacol Antitrust Litig., 907 F.3d 42, 47 (1st Cir. 2018)

# *Asacol*'s "individualized defenses" ruling does not apply here

The "individualized defenses" issue arises only when class plaintiffs do *not* have a common methodology for proving *Class-wide impact*.

In *Asacol*, the plaintiffs *conceded* that injury depended on switching from brand to generic and that *thousands* (~10%) would not switch and were not injured.

The plaintiffs also had no viable "winnowing" methodology for separating out those who would switch from those who wouldn't.

The plaintiffs proposed a claims administrator could do the winnowing (based on affidavits)—it was that proposal the Court found would violate the defendants' rights.

# This case is very different

Here, Plaintiffs have a viable methodology for proving *Class-wide* impact.

Specifically, Plaintiffs will prove that *the option* to trade on a platform benefits *all Class members* by increasing competition and improving dealer prices.

Thus, Plaintiffs are *capable* of proving Class-wide impact without the need for *any* individual inquiries (much less thousands).

Defendants will have a fair opportunity to attack Plaintiffs' proof of Class-wide impact at trial.

# *First*, Defendants can attack Plaintiffs' ability to prove antitrust impact on a Class-wide basis

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

OLEAN WHOLESALE GROCERY COOPERATIVE, INC., BEVERLY YOUNGBLOOD, PACIFIC GROSERVICE, INC., DBA Pitco Foods, CAPITOL HILL SUPERMARKET, LOUISE ANN DAVIS MATTHEWS, JAMES WALNUM, COLIN MOORE, JENNIFER A. NELSON, ELIZABETH DAVIS-BERG, LAURA

No. 19-56514

D.C. No.
3:15-md-02670-DMS-MDD

OPINION

Argued and Submitted En Banc September 22, 2021
Pasadena, California

Filed April 8, 2022

Neither Dr. Mangum's pooled regression model nor Dr. Johnson's critique required individualized inquiries into the class members' injuries.  If the jury found that Dr. Mangum's model was reliable, then the DPPs would have succeeded in showing antitrust impact on a class-wide basis, an element of their antitrust claim.  On the other hand, if the jury were persuaded by Dr. Johnson's critique, the jury could conclude that the DPPs had failed to prove antitrust impact on a class-wide basis.[30]  In neither case would the litigation raise individualized questions regarding which members of the DPP class had suffered an injury.   Although such issues

**This attack raises a *common* dispute.**

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 2022 WL 1053459, at *19  (9th Cir. Apr. 8, 2022)

# *Second,* Defendants could try to "*pick off*" Class members through "*individualized rebuttal*"

**SUPREME COURT OF THE UNITED STATES**

Syllabus

HALLIBURTON CO. ET AL. *v.* ERICA P. JOHN FUND, INC., FKA ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, INC.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 13–317.   Argued March 5, 2014—Decided June 23, 2014

*Basic* does afford defendants an opportunity to rebut the presumption of reliance with respect to an individual plaintiff by showing that he did not rely on the integrity of the market price in trading stock.   While this has the effect of "leav[ing] individualized questions of reliance in the case," *post*, at 12, there is no reason to think that these questions will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).   That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)

# Defendants' ability to contest Class-wide impact as to some plaintiffs *does not defeat predominance*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

OLEAN WHOLESALE GROCERY
COOPERATIVE, INC., BEVERLY
YOUNGBLOOD, PACIFIC
GROSERVICE, INC., DBA Pitco
Foods, CAPITOL HILL
SUPERMARKET, LOUISE ANN DAVIS
MATTHEWS, JAMES WALNUM, COLIN
MOORE, JENNIFER A. NELSON,
ELIZABETH DAVIS-BERG, LAURA

No. 19-56514

D.C. No.
3:15-md-02670-
DMS-MDD

OPINION

Argued and Submitted En Banc September 22, 2021
Pasadena, California

Filed April 8, 2022

Nor can a district court decline to certify a class that will require determination of some individualized questions at trial, so long as such questions do not predominate over the common questions. *See* Fed. R. Civ. P. 23(b)(3). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453 (internal quotation marks omitted). Thus, *Halliburton* concluded that so long as plaintiffs could show that their evidence is capable of proving the prerequisites for invoking the presumption of reliance (a key element in a securities class action) on a class-wide basis, the fact that the defendants would have the opportunity at trial to rebut that presumption as to some of the plaintiffs did not raise individualized questions sufficient to defeat predominance. 573 U.S. at 276. "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Id.*

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 2022 WL 1053459, at *9 (9th Cir. Apr. 8, 2022)

**Defendants cite *no case* in which the plaintiffs *had a viable method for proving class-wide impact*, but class certification was denied because the defendants threatened to present "individualized defenses" at trial.**

# In any event, *Asacol* has been seriously questioned by courts in the Second Circuit

Case 1:18-md-02819-NG-LB   Document 501   Filed 05/05/20   Page 1 of 69 PageID #: 21506

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| IN RE RESTASIS (CYCLOSPORINE OPHTHALMIC EMULSION) ANTITRUST LITIGATION | 18-MD-2819 (NG) (LB) |
|---|---|
| THIS DOCUMENT APPLIES TO: ALL END-PAYOR PLAINTIFF CLASS CASES | OPINION AND ORDER ON END-PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |

GERSHON, United States District Judge:

Defendant's argument, buoyed by *Asacol*, that the Seventh Amendment, Due Process Clause, and Rules Enabling Act require that it be permitted to challenge each class member's ability to show injury at the liability stage of trial is also inconsistent with *Tyson Foods*. *Tyson*

\* \* \*

As described above, uninjured class members here will "not contribute to the size of any damage award," and, by identifying and removing such class members during the claims administration process, plaintiffs' proposal satisfies Chief Justice Roberts's concerns. It also is in line with *Hickory*, in which the Second Circuit expressed no concern that uninjured class members had not been identified during the liability phase. *See* 493 F. App'x at 160. I therefore disagree with the First Circuit's conclusion in *Asacol* that defendant has a constitutional right to remove these individuals at the liability stage of trial. Notably, in a comprehensive opinion, the court in

> *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 25-26 (E.D.N.Y. 2020)

# *In re Aluminum Warehousing Antitrust Litig*, 336 F.R.D. 5 (S.D.N.Y. 2020) is also very different

Case 1:13-md-02481-PAE   Document 1274   Filed 07/23/20   Page 1 of 119

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE ALUMINUM WAREHOUSING
ANTITRUST LITIGATION

This Document Relates To:

*In re Aluminum Warehousing Antitrust
Litigation* (Direct Purchaser Plaintiffs),
No. 14-cv-3116-PAE (S.D.N.Y.)

13-md-2481 (PAE)
14-cv-3116 (PAE)

OPINION & ORDER

"This case is decidedly idiosyncratic."  *Id*. at 45.

Plaintiffs had no viable way to prove class-wide impact, including because their expert failed to isolate the effects of the conspiracy, and instead isolated "the effect of doubling the LME load-out rule," a rule change the expert overlooked.  *Id*. at 52.

No broad rule in favor of offsets or netting; rather, because the alleged conspiracy was to lengthen queues to raise all-in price, expert should have considered the effect of longer queues on all aspects of the all-in price.  *Id*. at 57-62.

The relevant issue is whether *queues* cause the MWP and LME price to move in opposite directions so as potentially to cause less than a classwide impact from queue-driven increases in the MWP, and, if so, whether Dr. Gilbert adequately accounted for that effect in his analysis.

*In re Aluminum Warehousing Antitrust Litig*, 336 F.R.D. 5, 61 (S.D.N.Y. 2020)

# Defendants have not demonstrated their ability to *"pick off"* <u>any</u> Class members, much less thousands.

Defendants have not demonstrated how they would "pick off" Class members with reliable evidence.

Defendants cannot prove any Class member *benefited from* the conspiracy.

Defendants' efforts to "pick off" Torus fail, and ultimately show that Torus is a good Class representative.

# Prof. Hendershot could not identify *any Class member* who would have been worse off in the but-for world



Remote Videotaped Deposition of TERRENCE HENDERSHOTT, Ph.D., an Expert Witness in the above-entitled action, taken via Zoom before Dawn Matera, a Shorthand Reporter and Notary Public.

Q. Okay. My question wasn't as precise as it should be.

Do you present any mathematical or empirical work in your report demonstrating that any specific class member would have been harmed in the but-for world?

A. A particular client that is harmed. Right, so there is the example of Torres, which is unharmed. But think you're asking about that is specifically harmed. And I would think about -- there are a lot of in the paper that provide evidence everything you need to know to be that. But I am trying to think of does -- there is a lot of evidence why people may have been harmed.

Now, do I identify someone specifically who was harmed? No, there are lots of reasons to think that you would need to do a lot of inquiry to understand that. Off the top of my head, I can't think of a specific example.

> Now, do I identify someone specifically who was harmed? No, there are lots of reasons to think that you would need to do a lot of inquiry to understand that. Off the top of my head, I can't think of a specific example.

ECF No. 470-4 (Hendershott Tr.), 208:21-209:20

# Defendants will not be able to call thousands of Class members to offer speculation



**Prof. Parag Pathak**

23.     Record evidence concerning the subjective and untested beliefs of certain market participants does not trump rigorous empirical analysis.[32][33]   As the SEC itself recognizes,[34] short sellers have long lacked critical information about stock loans, from price to the quality of the "bundle" of services they purportedly receive.   Given the opaqueness of this market, that certain market participants may have subjectively come to believe that their prime brokers provided them with additional economic value is not surprising.   It is, after all, in the prime brokers' interest to convince short sellers that the inflated rates they were paying for their stock loans included economically valuable "bundled" services.   As we establish empirically, however, that subjective belief does not actually mean that short sellers received any economically valuable protections.

ECF No. 514-1 (Asquith & Pathak Sur-Reply Report) ¶ 23

# Courts reject *"speculative"* contentions that *"individualized inquiries are necessary"*

2019 WL 8106153
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Meghan GEORGE, on behalf of herself
and all others similarly situated, Plaintiff,

v.

SHAMROCK SALOON II, LLC, d/b/a,
"Calico Jack's Cantina," et al., Defendants.

17 Civ. 6663 (RA) (HBP)
|
Signed 08/07/2019

**\*10** Furthermore, defendants' contention that individualized inquiries are necessary on the issue of consent is too speculative to defeat a finding of predominance. As discussed above, prior express written consent is an affirmative defense; "[t]he calling party bears the burden of demonstrating [that it had] prior express written consent." Duran v. La Boom Disco, Inc., supra, 369 F. Supp. 3d at 482; accord Gerrard v. Acara Solutions Inc., supra, 2019 WL 2647758. Plaintiff represents through her expert's written report that Calico Jack's and Call Fire's records do not contain any form of written consent for the 67,630 proposed class members, and defendants have not produced any written agreements for these phone numbers to indicate that they had prior written consent. Because defendants have not produced in discovery any documentary evidence of consent with respect to the members of the proposed class, it is unlikely that they would be permitted to offer such evidence at trial or in connection with a summary judgment motion. Fed.R.Civ.P. 37(c)(i); Design Strategy, Inc. v. Davis, 469 F.3d 284, 269-97 (2d Cir. 2006). Thus, defendants' argument concerning the need for individualized proof is speculative, and courts generally are not persuaded by such speculative arguments to deny conditional certification. See Braver v. Northstar

# *Olean* also rejects Defendants' attempt to use *individual damages estimates* to disprove *impact*

As in *Olean*, Defendants' experts here do *not* actually adopt the results of Plaintiffs' damages model.

Instead, Defendants re-run the damages model (in flawed ways) to  try to "*undermine confidence*" in Plaintiffs' proof of impact.

As *Olean* explains, that argument at most goes to the *persuasiveness* of Plaintiffs' impact methodologies—a jury question.

# In *Olean,* the lack of positive overcharges for some purchasers *did not mean* they were not impacted

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

OLEAN WHOLESALE GROCERY COOPERATIVE, INC., BEVERLY YOUNGBLOOD, PACIFIC GROSERVICE, INC., DBA Pitco Foods, CAPITOL HILL SUPERMARKET, LOUISE ANN DAVIS MATTHEWS, JAMES WALNUM, COLIN MOORE, JENNIFER A. NELSON, ELIZABETH DAVIS-BERG, LAURA

No. 19-56514

D.C. No. 3:15-md-02670-DMS-MDD

OPINION

Argued and Submitted En Banc September 22, 2021 Pasadena, California

Filed April 8, 2022

regression model to yield meaningful results. For example, Dr. Mangum acknowledged that the model, as changed by Dr. Johnson to consider purchasers on an individual basis, could not estimate a positive and statistically significant overcharge for 169 direct purchasers. But according to Dr. Mangum, *no* regression model could yield a statistically significant estimate for many of those 169 direct purchasers on such an individual purchaser-by-purchaser basis, because 61 of those purchasers did not make any purchases during the benchmark periods, and many of the other purchasers had not undertaken a sufficient number of transactions during either the benchmark periods or collusion period to yield statistically significant results. And logically, Dr. Mangum asserted, given the evidence that the defendants were able to inflate prices generally through the conspiracy, that the tuna market was susceptible to collusion, and that the model showed a robust, statistically significant impact of the price-fixing scheme on the tuna market, even the DPP class members for whom Dr. Johnson's test did not yield a positive, statistically significant overcharge should be able to rely on the pooled regression model as evidence of impact.

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* **2022 WL 1053459, at \*13  (9th Cir. Apr. 8, 2022)**

# Dr. Zhu's model is *"substantially probative"* of impact and consistent with many other Court-approved impact models

Dr. Tollison's "market structure" analysis in *Air Cargo*

Dr. Beyer's "market structure" and "pricing pattern" analyses in *Blood Reagents*

Dr. Mackie-Mason's "price variation" model in *Dial Corp*

Dr. Leamer's "market equilibrium" model in *High-Tech Employees*

Dr. Frank's "yardstick analysis" in *Restasis*

# Defendants' arguments that Dr. Zhu's model does not adequately consider certain factors go only to *persuasiveness*

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

OLEAN WHOLESALE GROCERY COOPERATIVE, INC., BEVERLY YOUNGBLOOD, PACIFIC GROSERVICE, INC., DBA Pitco Foods, CAPITOL HILL SUPERMARKET, LOUISE ANN DAVIS MATTHEWS, JAMES WALNUM, COLIN MOORE, JENNIFER A. NELSON, ELIZABETH DAVIS-BERG, LAURA

No. 19-56514

D.C. No. 3:15-md-02670-DMS-MDD

OPINION

Argued and Submitted En Banc September 22, 2021 Pasadena, California

Filed April 8, 2022

[16] The dissent argues that Dr. Mangum's opinion is not persuasive because large retailers have bargaining power and can extract price discounts, promotional credits, and rebates. Dissent at 72–73. As the dissent concedes, Dissent at 73 & n. 5, Dr. Mangum took these issues into account (to the extent that the Tuna Suppliers provided relevant data). After doing so, Dr. Mangum ran the regression model using both gross and net prices and determined that his regression model continued to produce a statistically significant overcharge. Dr. Mangum therefore reasoned that discounts and promotions did not affect his pooled model or his conclusion of class-wide impact. Although the dissent argues that (in the dissent's view) Dr. Mangum did not consider price discounts, promotional credits, and rebates "adequately," Dissent at 73 & n. 5, the persuasiveness of Dr. Mangum's analysis is not at issue at this phase of the proceeding.

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 2022 WL 1053459, at n.36 (9th Cir. Apr. 8, 2022)

# The Court must only resolve whether Dr. Zhu's methodology has "*a rational basis*" and "*could be persuasive to a jury at trial*"

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

OLEAN WHOLESALE GROCERY COOPERATIVE, INC., BEVERLY YOUNGBLOOD, PACIFIC GROSERVICE, INC., DBA Pitco Foods, CAPITOL HILL SUPERMARKET, LOUISE ANN DAVIS MATTHEWS, JAMES WALNUM, COLIN MOORE, JENNIFER A. NELSON, ELIZABETH DAVIS-BERG, LAURA

No. 19-56514

D.C. No. 3:15-md-02670-DMS-MDD

OPINION

Argued and Submitted En Banc September 22, 2021
Pasadena, California

Filed April 8, 2022

The district court also considered Dr. Johnson's argument that the Chow test showed that Dr. Mangum's model cannot be applied to all defendants. The court acknowledged that failure of a statistical test used to determine whether a regression is appropriate should be taken seriously, and could lead a court to reject the model at the class certification stage as not capable of providing class-wide proof. But it also noted that most regressions models will fail one or more tests if enough are run, even if the model itself is statistically sound. Because there was a rational basis for Dr. Mangum's use of the pooled regression model to demonstrate class-wide impact, the court concluded the failure of the Chow test did not require the court to reject the model.

* * *

After resolving each dispute between the experts, the district court acknowledged that the defendants' critique of Dr. Mangum's model could be persuasive to a jury at trial. But the district court recognized that at this stage of the proceedings, its task was to determine whether Dr. Mangum's evidence was capable of showing class-wide impact, not to reach a conclusion on the merits of the DPPs' claims. After weighing the evidence put forth by the DPPs, including the regression model, the correlation tests, the record evidence and the guilty pleas and admissions entered in this case, the district court concluded there was sufficient evidence to show common questions predominated as to common impact. Therefore, it ruled that this prerequisite to Rule 23(b)(3) was met.

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 2022 WL 1053459, at *14 (9th Cir. Apr. 8, 2022)

# Dr. Zhu's search model strips out observable factors to isolate the cause-and-effect relationship at issue – *i.e.*, lower search costs



278. But the difference between the model price distributions and the real-world data reflects a feature rather than a bug. As mentioned above, conditioning analysis on observable factors ensures that you isolate the cause-and-effect relationship you want to study. Analyzing the **raw** transactional data like Prof. McCrary proposes would, to the contrary, inevitably **add error to the analysis.** While Prof. McCrary is certainly correct that the real-world pricing data is more disperse than my model, that additional real-world dispersion is caused by **observable** factors like, as Prof. McCrary describes, "their revenue, asset size, number of prime brokers with whom they work, type of stock borrowed, and their investment strategies."[304]

## Dr. Zhu *does* use actual world data!

**ECF No. 470-1 (Zhu Reply Report) ¶ 278; ECF No. 432-59 (Zhu Tr.) at 251:23-253:8**

# Dr. Zhu's economic search model applies *to both borrowers and lenders* – because *both incur search costs* in the OTC market

### The Journal of FINANCE
The Journal of THE AMERICAN FINANCE ASSOCIATION

THE JOURNAL OF FINANCE • VOL. LXXII, NO. 5 • OCTOBER 2017

## Benchmarks in Search Markets

DARRELL DUFFIE, PIOTR DWORCZAK, and HAOXIANG ZHU*

Our model works roughly as follows. In an OTC market with a finite number of dealers and a continuum of investors that we call "traders," the cost to a dealer of providing the asset to a trader is the sum of a dealer-specific (idiosyncratic) component and a component that is common to all dealers. (In practice the clients of financial intermediaries may be buying or selling the asset. We consider the case in which traders wish to buy. The opposite case is effectively the same, up to sign changes.) The existence of a benchmark is taken to mean



May 11, 2021 4:18:01 pm

ECF No. 432-59 (Zhu Tr.) at 308:11-310:22

# Like Dr. Zhu, the SEC recognizes the search difficulties *faced by end borrowers <u>and</u> beneficial owners*



manner. For example, the Commission preliminarily believes that the data collected and made available by the proposed Rule would improve price discovery in the securities lending market and lead to a reduction of the information asymmetry <u>faced by end borrowers and beneficial owners</u> in the securities lending market. The Commission preliminarily believes the proposed

dealers provide to their customers with fail to deliver positions. Enhancing the transparency of data on securities lending transactions should provide more information to help illuminate investor behavior in the securities lending market and the broader securities market more generally. It will also provide <u>beneficial owners and borrowers</u> with better tools to ascertain current market conditions for securities loans and allow them to determine whether the terms that they receive for their loans are consistent with market conditions.

Reporting of Securities Loans, 86 Fed. Reg. at 69804

# In the current OTC market, beneficial owners face *"market failures"* that lead to *"less favorable prices"*



2. **Market Failures**

The securities lending market is characterized by asymmetric information between market participants and a general lack of information on current market conditions,[188] which can lead to inefficient prices for securities loans (including equity lending and fixed income lending).[189] These information frictions stem from the fact that access to timely lending market data is very limited for some market participants. The current "give-to-get" model of



beneficial owners and end borrowers. This asymmetric information between those in the center of the lending market and those on the periphery may lead to inferior terms for those on the periphery, in the form of lower performance and less favorable prices for beneficial owners and end borrowers.[206]

Reporting of Securities Loans, 86 Fed. Reg. at 69830, 69832

# Like Dr. Zhu, the SEC expects that beneficial owners will reap *many benefits* from additional transparency and competition



Additional benefits from increased transparency could include increased savings and profits for investors, improved terms for beneficial owners participating in lending programs, and improved competitiveness in the lending agent and broker-dealer businesses. The proposal might also reduce the cost of short selling and lead to an increase in fundamental research, which contributes to more efficient prices.[20] Finally, access to additional data can contribute to more informed portfolio management and lending decisions.[21]

**Reporting of Securities Loans, 86 Fed. Reg. at 69804**

# The SEC believes that reductions in transaction costs ultimately benefit *beneficial owners*

As discussed below, the Commission preliminarily believes that the data provided by the proposal may decrease the cost of lending. Consequently, some investors may see returns decrease due to more competitive fee pricing which may lower securities lending revenue for some lenders. On the other hand, other investors may see returns increase if the cost of borrowing securities decreases as it will facilitate investment, hedging, and potentially market making strategies. Many investors may experience both effects. In general, the Commission believes that reductions in transaction costs ultimately benefit investors.

**Defendants cut off the last sentence on their slide 42!**

Reporting of Securities Loans, 86 Fed. Reg. at 69837

# Defendants' argument that they could *selectively deny* some Class members the benefits of competition fails

Without conspiring, Defendants could not control the forces of competition to determine who benefits and who does not

Dr. Zhu's economic search model disproves this premise

Dr. Zhu's yardstick analysis also disproves this premise

In any event, the dispute is fundamentally a class-wide dispute

# Defendants' own arguments show *they cannot possibly know a trader's outside options with certainty*

> (Reply 16.) Not so. In most cases, prime brokers would know whether platform trading was viable for their clients because they know their <u>clients' size</u>, <u>trading strategies</u>, <u>financing needs</u>, <u>access to collateral</u>, and <u>other characteristics</u>. (Savoldelli Reply ¶ 9; Hendershott Reply ¶¶ 13-19; McCrary

**Prime Brokers could <u>never</u> know <u>all</u> of this information about class members that were not clients**

**Prime Brokers could <u>never</u> know whether these features might change in the future**

ECF No. 495 (Defs.' Sur-Reply Br.) at 4

# When dealing with potential *new clients,* Prime Brokers would assume *the presence of a platform*



**Dr. Haoxiang Zhu**

> 264.    Prof. McCrary's best argument is that the prime broker servicing the client currently has a good sense of the client's trading patterns and financial wherewithal.  But that prime broker is in a *unique* position relative to all prime brokers.  All of the other prime brokers—absent collusion—would not have information about the client's trading records, and therefore cannot make informed judgments about the client's ability to use a trading platform. Thus it is not the case that a platform "clearly would not have been chosen" for smaller Class members—to most prime brokers, the client is just a prospective source of business that they would offer terms to assuming the presence of a platform.  And with this competitive introductory rate, the borrower can then negotiate down its existing broker.

ECF No. 470-1 (Zhu Reply Report) ¶ 264

# Prof. Hendershott acknowledges Prime Brokers would have limited information about potential *new clients*



Remote Videotaped Deposition of TERRENCE HENDERSHOTT, Ph.D., an Expert Witness in the above-entitled action, taken via Zoom before Dawn Matera, a Shorthand Reporter and Notary Public.

Q. Are you aware of any economic literature that finds that dealers in OTC markets could have perfect knowledge of the outside options available to investors?

A. So I guess it's a matter of what you mean by perfect. So I mean -- and this was dealers in financial markets?

Q. Yes.

A. And these are dealers who are also providing -- so when we think about dealers and what people might know and what they might know about outside options, you would have to understand sort of all the interactions that those dealers have with that customer to understand exactly how much they know. And, you know, so if a customer -- if it's the first time you ever go to a dealer, it might be different, it might be very different than a dealer you trade with all the time. And, you know, for like a prime broker who also may act as a

ECF No. 470-4 (Hendershott Tr.), 208:21-209:20

# OTC and Platform loans do not have to be *identical* for platforms to be beneficial



**Dr. Haoxiang Zhu**



261. Finally, Prof. Hendershott's item (e) in his list of paragraph 361 argues that certain stocks may not be available on the platform. Note that the proper level of discussion is at the end-user level, not the stock level nor the trade level. To use an analogy, the subway and commuter rail system does not cover every corner of a metropolitan area, but I have yet to meet a single person in New York or London who has never used the train system in his/her life. In this sense, the trains do not entirely replace driving, biking, or walking, but it is beneficial to all residents of the city. Likewise, a stock loan platform does not need to cover all stocks or all trades, but as long as it provides an outside option for some stocks and some trades, all end users will still find it useful.

ECF No. 470-1 (Zhu Reply Report) ¶ 261

# Even Class members with *idiosyncratic preferences* (such as dealer "relationships") would benefit from the platform option



**Dr. Haoxiang Zhu**

259. Prof. Hendershott argues that certain end users may have preferences that are so dogmatic and lexicographical that they would never use the platform—regardless of the price. That argument is illogical. If standard economics teaches us anything, it is that there is a price to clear demand and supply. For example, take an end user that is supposed to value the "relationship" with a prime broker. There is a price for this relationship, as Prof. Hendershott himself recognizes when mentioning that an end user can purchase the service "à la carte" elsewhere in his report.[275] For the sake of illustration, suppose the consumer believes the fair price of the relationship is 5 bps of loan balance per year. Would the end user stay OTC if the platform price is 10 bps better than OTC price? Obviously, 10 > 5, so the rational end user would forgo the "relationship" and switch to a platform. Every single item of Prof. Hendershott's list in paragraph 361 (except (d) and (e), which I address separately below) is subject to the same logical flaw. To use an analogy, Prof. Hendershott is arguing that consumers who like blue would pay any price to get a blue car, even if otherwise identical cars are available in different colors at much, much lower prices. Even if such a consumer existed, it would be utterly unwise if he/she disclosed such preference to the car dealers who can exploit this information.[276]

**ECF No. 470-1 (Zhu Reply Report) ¶ 259**

# A CCP makes the fact that stock loans are *"going concerns"* largely irrelevant



**Dr. Haoxiang Zhu**

49.    Securities financing transactions, including stock lending, are going concerns. The obligations to exchange cash (plus interest) and securities in the future imply that the two parties need to continue to monitor and manage the transaction until the trade is unwound. As long as the exposures remain bilateral and not centrally cleared, both counterparties need to know the identities of each other in order to monitor default risk, which makes anonymous trading difficult.

50.    In practice, the most widely adopted method for managing an ongoing contract exposure is a clearinghouse, also known as a central counterparty (CCP). Once a trade is centrally cleared, the CCP becomes the official counterparty to both economic counterparties (in the stock lending market, this would be the borrower and the lender). The CCP reduces

* * *

agreements (repos, which are similar to securities financing). Therefore, once stock loans become centrally cleared, anonymous multilateral trading mechanisms such as limit order books and double auctions can be adopted immediately.

> **ECF No. 414-9 (Zhu Report) ¶¶ 49-50**

# Dr. Zhu's BFW for impact *is complementary to* what Profs. Asquith & Pathak assume for damages modeling



**Dr. Haoxiang Zhu**

287.    As I explained in my opening report, the market structure embedded in the search model—dealers remain liquidity providers and customers obtain quotes from a wider set of dealers via the platform—is likely an intermediate state of market evolution.  From that point on, the market may well evolve into a shape and form that resemble today's U.S. equity markets, in which non-dealers and customers can also provide liquidity to each other.  The latter market structure is closer to the model envisioned by Profs. Asquith and Pathak when they calculate damages.  There is nothing inconsistent between my model and theirs because one evolves from the other.  Prof. McCrary has mischaracterized the two models as conflicting, rather than complementary.

ECF No. 470-1 (Zhu Reply Report) ¶ 287

# A platform is a *more efficient way* to find replacement shares for recalled stock



**Prof. Parag Pathak**



**Prof. Paul Asquith**

92. If "recall protection" means that Prime Broker Defendants provide the channel through which short sellers obtain replacement shares, then the need for protection arises because borrowers have no other means to obtain replacement shares in the actual world. The reason for there being no other alternatives is that Prime Broker Defendants' OTC desks control the venues for stock lending and borrowing, an outcome that resulted from the conspiracy.

93. By contrast, in the but-for world with one or more stock loan platforms, a supply of replacement shares would be centrally located and available on these platforms. This includes supply from multiple prime brokers. Therefore, if a lender recalled shares, a short seller could simply access the platform and switch to the next available source of supply. Recall protection by a particular Prime Broker would be unnecessary because the short seller would have immediate access to multiple suppliers of shares, and not be constrained to those of a particular Prime Broker. In our opinion, such substitution will be more readily facilitated when all market participants are able to view available stock loan supply at available prices on an exchange. In the supply-and-demand framework of our Opening Report, we emphasized that the equilibrium quantity of shares lent is greater in the but-for world when the prime broker does not stand between the lender and borrower.

ECF No. 470-2 (Asquith/Pathak Reply Report) ¶ 92-93

# <u>Costs:</u> Rebuttal

# __NONE__ of Defendants' criticisms regarding the costs of platform trading render certification inappropriate

"__Defendants have not pointed to some specific, major factor__ that [Plaintiffs' Expert] excluded that shows his __model is wholly without merit.__"

. . .

"To the contrary, [Plaintiffs' expert] __went to great lengths to include in his independent variables all sorts of factors . . . .__"

. . .

"[The] methodology therefore appears to be __firmly rooted__ in sound economic and econometric principles, and the __large majority of Defendants' experts' criticisms go to the merits . . . .__"

. . .

"This is a __merits question__ that the Court __does not need to resolve in order to decide whether to certify the class.__"

*Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 605 (N.D. Ill. 2015), *aff'd sub nom. Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016).

# Professors Asquith and Pathak reasonably conclude that fixed fees would not exist in the but for world

**John Surgent**
**EquiLend VP Operations (EQS)**

"fee waived for 1st year on platform" and "4 ids until opportunities pick up"

"no user id fees until order flow picks up"

Cited in ECF No. 470-2, ¶ 328 n. 372
(EQUIL201264195).

Q. Yes. So for all of those
5  beneficial owners who use an agent
6  lender they wouldn't have incurred
7  start-up operational costs, correct?
8    A. No. Their lending agent
9  would.

ECF No. 470-12 (Pridmore Tr.) at 296:4-9.



■ **Changes in the exchange landscape**

- Technology advancements have lowered barriers to entry, allowing for more competition
- Post "de-mutualization", relationships between exchanges and brokers have changed in nature, "the world is flattening".
- A highly competitive environment has resulted in a large reduction in exchange fees, savings that have been passed on to the end customers

Cited in ECF No. 470-2, ¶ 328 n. 373 (GS-SL-00571662 at '664).

# Should the Court or Jury decide that fixed fees should be considered, the Asquith/Pathak model can accommodate that

A. By recognizing them -- by

...sting them, by laying them out

there, by putting them in the report

and saying this is $250 a month for

5   a user, it's a small fee, we have

6   accounted for them I believe. I

7   mean if -- if the court wanted to

8   say these fees matter and these are

9   not de minimus, we could easily put

10  them back in the model and reduce

11  the damages by $250 a month or

12  $3,000 a year on $260 billion worth

13  of business. We could do that

14  easily if these fees -- if the court

15  decided these fees were not small

16  and de minimus so.

ECF No. 432-9 (Asquith Tr.) at 254:8-17.

"With respect to the amount of aggregate damages, [Defendants'] criticisms can be accommodated by [the damages] model depending on how facts are further developed, what questions are resolved on summary judgment, and the findings of the trier of fact . . . ."

*In re Lidoderm Antitrust Litig.*, No. 14-md-2521, 2017 WL 679367, at *12 (N.D. Cal. Feb. 21, 2017).

# Plaintiffs' experts show that fixed fees are not a deterrent to platform use for 99% of notional volume in the market



**Platform VIABLE**

EXHIBIT III.4

CUSIP-DAYS AND NOTIONAL VALUE FOR WHICH SHORT SELLING ACCOUNTS WOULD TRADE EXCLUSIVELY NON-PLATFORM OR NOT FOR DIFFERENT LEVELS OF FIXED COSTS

| Annual Fixed Fee | Count of CUSIP-Days | | | Notional Value ($ billions) | | |
|---|---|---|---|---|---|---|
| | Non-Platform | Platform | % Platform | Non-Platform | Platform | % Platform |
| $1,000 | 4,102 | 8,192,044 | 99.9% | 322 | 472,749 | 99.9% |
| $3,000 | 5,467 | 8,190,679 | 99.9% | 1,257 | 471,815 | 99.7% |
| $10,500 | 14,485 | 8,181,661 | 99.8% | 4,540 | 468,532 | 99.0% |

ECF No. 514-1 (Asquith/Pathak Sur-Reply Rpt.) Exhibit III.4.

# Basel III sought to incentivize the use of CCPs

12 C.F.R. § 217.35

§ 217.35 Cleared transactions.

(iii) Notwithstanding paragraphs (c)(3)(i) and (ii) of this section, a clearing member Board-regulated institution may apply a risk weight of zero percent to the trade exposure amount for a cleared transaction with a CCP where the clearing member Board-regulated institution is acting as a financial intermediary on behalf of a clearing member client, the transaction offsets another transaction that satisfies the requirements set forth in § 217.3(a), and the clearing member Board-regulated institution is not obligated to reimburse the clearing member client in the event of the CCP default.

# Professor Hendershott fails to incorporate strategies for mitigating risk (and capital requirements) *actually used* in the SL market





Cited in ECF No. 470-1, ¶ 181 n. 184 (GS-SL-00103930 at '936).

# Plaintiffs are <u>capable</u> of proving platform viability and a rough approximation of the Class's damages using common evidence

"[D]efendants' arguments against the accuracy of [the experts'] figures . . . go purely to the merits, and present no overlap with the predominance requirement."

*In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1175, 2014 WL 7882100, at *63 (E.D.N.Y. Oct. 15, 2014), *adopting R. & R.,* 2015 WL 5093503 (E.D.N.Y. Jul. 10, 2015).

"[T]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification . . . ."

*McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 231 (2d Cir. 2008).

# "cart before the horse"

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 460 (2013).

# FTAIA: Rebuttal

# Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 417 F.3d 1267 (D.C. Cir. 2005).

EMPAGRAN S.A. et al., Appellants

v.

F. HOFFMANN–LAROCHE, LTD. et al., Appellees.

No. 01–7115.

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 2005.

Decided June 28, 2005.

commerce with foreign nations." 15 U.S.C. § 6a(1)(A). In addition, the legislative history makes clear that the FTAIA's "domestic effects" requirement "does not exclude all persons injured abroad from recovering under the antitrust laws of the United States." H.R.Rep. No. 97–686, at 17a. The appellants need only demonstrate therefore that the U.S. effects of the appellees' allegedly anti-competitive conduct "g [a]ve rise to" their claims.

*Empagran S.A. v. F. Hoffman-LaRoche*, Ltd., 417 F.3d 1267, 1269 (D.C. Cir. 2005).

# Defendants' domestic effects authority does not apply to this case

## Defendants' Cases

- **CONDUCT:** Global Conspiracy

- **MARKET:** Plaintiffs operating abroad, paid supracompetitive global prices

- **CAUSATION:** global conspiracy→ affected US prices and global prices; Plaintiffs paid <u>global price</u>



**Link not sufficiently proximate; domestic effects exception does not apply**

## This Case

- **CONDUCT:** domestic conspiracy to boycott a US company

- **MARKET:** US Stocks borrowed/loaned to/from US Domestic Counterparties

- **CAUSATION:** domestic conspiracy→ affected US prices of US securities



**Conduct and effects solidly domestic; domestic effects exception applies**

# In re Vitamin C Antitrust Litig., 904 F. Supp. 2d 310 (E.D.N.Y. 2012)

**In re VITAMIN C ANTITRUST LITIGATION.**

This document relates to: Animal Science Products, Inc., et al., Plaintiffs,

v.

Hebei Welcome Pharmaceutical Co. Ltd., et al., Defendants.

Nos. 06–MD–1738 (BMC)(JO), 05–CV–0453.

United States District Court, E.D. New York.

Nov. 16, 2012.

"Defendants' interpretation of the import exception is too narrow." *Id.* at 317.

"[P]ayment for a product in the United States is sufficient to create a domestic effect for FTAIA and antitrust standing purposes." *Id.* at 321 (collecting cases).

*See* 542 U.S. at 159–60, 124 S.Ct. at 2364. *Empagran* leaves open the possibility that the domestic effects exception may be satisfied where either the purchase or the delivery of goods takes place within the United States. Indeed, defendants have cited no case where delivery of the goods into the United States was found to be insufficient for FTAIA purposes and the Court is unaware of any.

In re Vitamin C Antitrust Litig., 904 F. Supp. 2d 310, 321 (E.D.N.Y. 2012).

# Defendants' own hypothetical demonstrates why the FTAIA is not a bar to this case

"Plaintiffs' reading of the domestic effects exception stretches the exception past the breaking point: it would apply U.S. antitrust law even to transactions between a Defendant operating in Hong Kong and a class member operating in China." ECF No. 495 (Defs.' Sur-Reply) at 11.

## Class is limited to trades with DOMESTIC Prime Brokers

