# EXHIBIT A

*Iowa Pub. Emps.' Ret. Sys. et al. v. Bank of Am. Corp. et al.*,
No. 17-cv-6221-KPF-SLC

Defendants' Class Certification Presentation

April 28, 2022

# Table of Contents

Page

I.    Adequacy .................................................................1

II.   Predominance ...........................................................15

      A.    Injury............................................................16

            1.    Differences between prime broker OTC loans
                  and anonymous platform loans ..............................16

            2.    Plaintiffs' common evidence................................34

            3.    Defendants' individualized evidence .......................45

      B.    The FTAIA .......................................................78

      C.    Individual transactions and damages .............................82

III.  Superiority ............................................................85

IV.   Post-2017 Period .......................................................89

# I. Adequacy

1. Plaintiffs propose "unitary representation" of lenders and borrowers.

2. Lenders and borrowers have fundamental conflicts of interest that bar unitary representation.

- Plaintiffs' "w" factors allocate the alleged injury and recovery between lenders and borrowers.
  - "w" = 25% for "warm" stock and 35% for "hot" stock

ECF 432-2, McCrary ¶¶ 265-267.



- Plaintiffs' experts' choice of 25% and 35% allocation factors is subjective and debatable.

  **ECF 432-2, McCrary ¶¶ 269, 271.**

- Reasonable arguments could be made for higher, lower, or varying percentages, but Plaintiffs didn't make them.

  *Id. ¶¶ 257-58, 265-82.*

# Example 2: Conflict Over Who Bears Platform Fees

- Lenders and borrowers have a zero-sum conflict of interest over whether platform fees should be:

  ➢ split 50/50 between lenders and borrowers; or

  ➢ paid by borrowers.

- Reasonable minds could disagree—and Plaintiffs' experts did disagree–about that question for the class period.

  **ECF 431, Defs. Opp. 40 & n. 26.**

- Resolution of this conflict eliminates any potential recovery <u>at all</u> for many lenders or many borrowers.

  **Id.; ECF 432-2, McCrary ¶¶ 260-264.**

- Plaintiffs' experts say:

  1. Search costs cause market participants to accept worse prices.

  2. Platform trading lowers search costs.

  **ECF 414-9, Zhu ¶¶ 32-47, 258.**

- But <u>prime brokers</u> are the ones who bear search costs when dealing with lenders.

  Plaintiffs' experts:

  > "The OTC search costs associated with locating HTB shares largely arise because the <u>broker-dealer</u> may sometimes have to contact many potential suppliers of shares …."

  **Drs. Asquith and Pathak
  (ECF 414-10, A&P ¶ 128); see also
  ECF 432-2, McCrary ¶¶ 250-52**

# Example 3: Conflict Over Search Costs

- Plaintiffs' own sources agree that search costs benefit lenders.

**ECF 432-2, McCrary ¶¶ 250-52.**

"[L]enders benefit—sometimes significantly—from search costs…."

"Thus, the results . . . provide new evidence that <u>search costs give equity lenders the ability to charge higher prices</u>."

**Kolasinski, Reed, and Ringgenberg, *A Multiple Lender Approach to Understanding Supply and Search in the Equity Lending Market,* pp. 578, 593-94 (cited in ECF 414-10, A&P ¶ 116 & n. 101)**

"Obtaining a securities loan often involves an extensive search for counterparties <u>by broker-dealers</u>."

Beneficial owners "<u>could . . . experience reduced revenues from their lending activities</u>."

**Securities Exchange Commission,
*Reporting of Securities Loans* ("SEC Proposed Rule"),
86 Fed. Reg. 69802, 69805, 69837 (Dec. 8, 2021)**

# Unitary Representation Is Inadequate Where A Recovery Must Be Allocated Among Subclasses

*In re Literary Works*, 654 F.3d 242, 254 (2d Cir. 2011):

> "Although all class members share an interest in maximizing the collective recovery, their interests diverge as to the distribution of that recovery . . . . Named plaintiffs who hold other combinations of claims had no incentive to maximize the recovery for Category C-only plaintiffs . . . . The interests of Category C-only plaintiffs could be protected only by the formation of a subclass and the advocacy of independent counsel."

*In re Payment Card*, 827 F.3d 223, 234 (2d Cir. 2016):

> "Unitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other . . . ."

*Central States v. Merck-Medco*, 504 F.3d 229, 246 (2d Cir. 2007):

> "Because the antagonistic interests apparent in the class should be adequately and independently represented, we remand to the District Court for certification of a subclass . . . ."

# Unitary Representation Is Inadequate Where Subclasses Have Directly Conflicting Incentives

*In re Forex Antitrust Litig*., 407 F. Supp. 3d 422, 439 (S.D.N.Y. 2019):

"In exchange trading, putative class members would trade directly with each other. The oppositional trading positions taken by the Named Plaintiffs and class members would create fundamental conflicts that preclude class certification . . . ."

*In re LIBOR*, 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018):

"[T]he named plaintiffs with opposite net trading positions will have directly conflicting incentives to establish not only the existence but also the magnitude of any manipulation that occurred on those dates. . . .

Directional differences are particularly corrosive of adequacy in that they create directly conflicting incentives  . . . ."

- Plaintiffs and their counsel can't give their undivided loyalty to either lenders or borrowers:  they are already committed to a <u>mixed</u> group of named plaintiffs.

- Plaintiffs and their counsel have already committed themselves to positions harming both subclasses:

  ‣ Already selected allocation factors.

  ‣ Already adopted but-for prices.

  ‣ Already taken positions on platform fees and search costs.

- SCERA cannot represent a borrower class because it was a large <u>lender</u> as well as a borrower.

*In re Payment Card,* 827 F.3d at 235:

> "[N]amed plaintiffs with claims in multiple subgroups cannot adequately represent the interests of any one subgroup."

*In re Literary Works,* 654 F.3d at 251:

> "Owning Category C claims in addition to other claims does not make named plaintiffs adequate representatives for those who hold only Category C claims."

# Torus Is An Extreme And Atypical Outlier

- Torus is a tiny proprietary trading firm.     **ECF 432-4, Savoldelli ¶¶ 182-83.**

- It was too small to be a viable platform participant.
  **ECF 431, Defs. Opp. 46-47;**
  **ECF 432-2, McCrary ¶ 203;**
  **ECF 432-9, Asquith Tr. 284-88, 335-36, 339.**

- It didn't have a <u>prime brokerage</u> account.
  **ECF 432-4, Savoldelli ¶¶ 186-193.**

- It had no understanding at all of the hedge funds that make up the vast majority of the proposed borrower class:

> "I don't know what a hedge fund does. . . . I never dealt with a hedge fund. I don't know what they have or what they do, to be honest with you. I never came across one."

**ECF 432-68, Simeone (Torus) Tr. 25, 49-50.**

# Torus And SCERA Threatened To Litigate Against Their Own Proposed Class Members Over Access To Sensitive Data



"[Plaintiffs'] request also demonstrates the clear divergence between the interests of Plaintiffs' Counsel and the interests of many purported class members."

Intervenor letter to Judge Failla, ECF 199 at 3.

13

- Plaintiffs argue that "spreads" were too wide.

- But many class members <u>benefitted</u> from wide spreads.
    - Citibank
    - Deutsche Bank
    - BNP Paribas
    - State Street customers

- Class members that benefitted from wide spreads bar class certification.

*In re Forex*, 407 F. Supp.3d at 439;
ECF 432-2, McCrary ¶¶ 283-285;
ECF 431, Defs. Opp. 45-46.

# II. Predominance

# II. Predominance

A. Injury

   1. Differences between prime broker OTC loans and anonymous platform loans

   2. Plaintiffs' common evidence

   3. Defendants' individualized evidence

B. The FTAIA

C. Individual transactions and damages

# OTC Loans and Platform Loans Are Fundamentally Different Products

|  | OTC Loans | Platform Loans |
|---|:---:|:---:|
| Loan stability - recall protection | ✓ | ✖ |
| Loan stability - rerate management | ✓ | ✖ |
| Linkage between GC/HTB lending | ✓ | ✖ |
| Preferential access to HTB stock | ✓ | ✖ |
| Integrated bundle of services | ✓ | ✖ |
| Confidentiality of short position | ✓ | ✖ |

- Plaintiffs claim "recall protection is usually unnecessary" and of limited "economic value."

  **ECF 469, Pls. Reply at 7**

- Overwhelming record evidence demonstrates the opposite.

# Many Short-Sellers Highly Value Loan Stability

- Short-selling industry expert, Fabio Savoldelli:

> "Recalls disrupt a short seller's investment strategy because they require the short seller to return borrowed stock at potentially unexpected times. Likewise, rerates can make an investment strategy less profitable and can result in the borrower being forced to return the stock and unwind its short position. **Many short sellers thus place a high value on stability of borrow**. The current OTC market structure ensures a level of stability in a way that an anonymous multilateral trading platform such as AQS could not have replicated."

**ECF 432-4, Savoldelli ¶ 41**

- No one with any experience in the industry denies the value of loan stability.

# Many Short-Sellers Highly Value Loan Stability

- AQS executives recognized the value of loan stability:

> "The primary reasons that the OTC model has sustained itself this long is that there is still **huge value** in the way the structure protects [short-sellers against recalls and rerates], and if we're going to seriously compete with a different model, the idea that we can be successful while not delivering at least equal service for **the two most highly valued elements of the product** will lead to a lot of frustration."
>
> **Greg DePetris, AQS Co-Founder and Chief Strategy Officer, ECF 432-40 at -331**

> "Unlike a buy or sell, **a borrow and loan transaction creates a 'marriage' of lender and borrower** until the item is ultimately returned. . . . **Under the cloak of anonymity one would be vulnerable to rate changes, recalls, and corporate action issues** that would leave no room for negotiation as the 'partner' in this marriage is not revealed."
>
> "These items can stay open for a day, a week, a month or longer. So it's important to know who your counterpart is because they have a history of how they behave in certain situations."
>
> **Pat Cestaro, AQS CEO (previously at JPMorgan), ECF 432-5 at -432; ECF 432-31, Tr. at 21**

> "The bets that [hedge funds] place are significant. . . . They could be recalled on hundreds of thousands of shares of one stock. So, you know, **we could be talking tens of millions of dollars that they are being recalled on**."
>
> **John Surgent, AQS COO and Head of Integration, ECF 432-39, Tr. at 202**

# Many Short-Sellers Highly Value Loan Stability

- Hedge funds recognize the value of stability:

> "The stability of the borrow . . . and the stability of the price over the life of the short . . . are critically important to certain trading strategies."

**ECF 432-6 ¶ 15, Declaration of Former Head of Portfolio Finance and Head of Business Management at Major Hedge Fund**

> "Loan stability was very important to us" because "had we been compelled to prematurely exit our short positions due to a recall, in the best cases we would have been unable to reap the full benefit of our investments. In the worst cases, we would have suffered substantial losses."

**ECF 432-14 ¶ 19, Declaration of Co-Founder of Major Hedge Fund**

> "Generally, prime brokers understand the importance of advertising borrow, and if their clients short stock that they want to effectively keep them in the name or keep them in that position so they understand that it's an incredibly important part of the service that they provide."

**ECF 432-7, Executive at Major Hedge Fund, Tr. at 22**

# Many Short-Sellers Highly Value Loan Stability

- **Non-defendant prime brokers agree:**

> "[S]ecurities lending is interesting in that one price is not necessarily reflective of what the true value of that borrow is. And what I mean by that is, there is a benefit to having stability in a stock borrow. The more stable a stock borrow is, the more desirable it is from the point of view of a short seller."

**ECF 432-3 ¶ 62 n.129 (Deposition of Non-Defendant Prime Broker, Tr. at 22)**

- **Prime broker defendant witnesses also agree.**

**ECF 432-57 ¶ 10 (Decl. of M. Collins, Morgan Stanley)**
**ECF 432-4 ¶ 47 n.46 (Decl. of M. Slomienski, Goldman Sachs)**
**ECF 432-1 ¶ 131 (Cusick (UBS) Tr. at 87)**

# Many Short-Sellers Highly Value Loan Stability

- Dr. Zhu acknowledged value of loan stability "depends on the hedge fund strategy."

  ECF 432-59, Zhu Tr. at 358

- Major Hedge Fund Executive:

  > "Whereas hedge funds employing high-frequency trading or other short-term strategies may maintain short positions for mere minutes (or even seconds), making loan stability less of an issue, [Hedge Fund] had a global long/short strategy focused on identifying overvalued stock and shorting it until the price dropped to reflect fundamental value (or taking long positions in stocks considered to be undervalued)."
  >
  > ECF 432-14 ¶ 19, Declaration of Co-Founder of Major Hedge Fund

- Non-Defendant Prime Broker:

  > "If you look at a risk arb transaction, you know, or any -- a deal, a merger arb, the stability of that borrow and the manner in which the asset owner makes an election on that corporate action, is extremely important to that transaction. So that could most definitely impact a difference in price, you know, to the hedge funds."
  >
  > ECF 432-3 ¶ 62 n.129 (Deposition of Non-Defendant Prime Broker, Tr. at 23)

# Anonymous Platforms Are Not Comparable

- ## Sergei Poliakoff, AQS Head of Technology:

> A "multilateral anonymous system like AQS *attracts* unstable supply", leading to "excessive re-rates" and "excessive recalls".

ECF 432-13 at -6113

> - "[T]he recalling lender will always be more willing to recall from AQS than from any other source".
> - Anonymous platforms should "expect runaway re-rating of all contracts on a daily basis."

ECF 470-8 at -718, 732

- ## John Surgent, AQS COO and Head of Integration:

> "[Recall] was one of those operational overhead issues, aspects, processes that [certain borrowers] never had to deal with because typically if -- if stock was recalled they were -- their prime broker did the running around to -- to find it [...] I actually remember this -- the first day [certain non-clearing members] got recalled they didn't know what it was. They didn't understand that they had to deliver stock back and they went crazy."

ECF 432-39, Tr. at 91-92

# Anonymous Platforms Are Not Comparable

- Hedge funds did not trust AQS to provide loan stability:

"[I] borrow [stock and] a day later all stock goes on recall[.] HOW IS THAT FAIR TO ME[?] WHY WOULD I WANT TO TRADE ON THAT PLATFORM[?]."

**ECF 432-4, Savoldelli ¶ 51 (AQS email reporting client complaint)**

"I believe we would have been significantly disadvantaged borrowing stock on an anonymous trading platform, as getting forced out of a short position was a risk we could not take—and one we did not have to when we borrowed through our prime brokers."

**ECF 432-14 ¶ 20, Declaration of Co-Founder of Major Hedge Fund**

"With respect to borrow stability, I did not consider AQS's anonymous platform to be a viable alternative to our PB relationships."

**ECF 432-6 ¶ 17, Declaration of Former Head of Portfolio Finance and Head of Business Management at Major Hedge Fund**

# Anonymous Platforms Are Not Comparable

- Martin Hakker, AQS Co-Founder, called its algorithm for assigning recalls and rerates the "wheel of misfortune".

    **ECF 414-109, Hakker Tr. at 103**

- John Sardina of AQS:

    > "The robot is getting a little aggressive with rate changes," and the rerates on AQS would "drive [these clients] back to borrow OTC for stability."

    **ECF 432-4, Savoldelli ¶ 51 (AQS email)**

- "Wheel of misfortune" was no substitute for prime broker protection.

    > "While I understand that AQS did have some methodology for identifying relative lender and borrower 'quality,' to me that was not a meaningful substitute for a PB relationship as a protection against recall risk."

    **ECF 432-6 ¶ 17, Declaration of Former Head of Portfolio Finance and Head of Business Management at Major Hedge Fund**

# Anonymous Platforms Are Not Comparable

- Prime brokers provide real, valuable loan stability to clients:

Despite "73 recalls for UBS in [one] week [...] with a value of USD 101.3m, **NONE [were] passed to hedge funds**."

**ECF 432-2, McCrary ¶ 66**

JPMorgan could "confidently state we don't recall clients in the U.S., at all."

**ECF 432-2, McCrary ¶ 66**

"I believe our PBs often helped us mitigate those effects, whether through their ability to negotiate with agent lenders or beneficial owners to avoid re-rates, or on occasion even to absorb the cost of re-rates without passing them on."

**ECF 432-6 ¶ 19, Declaration of Former Head of Portfolio Finance
and Head of Business Management at Major Hedge Fund**

"Our prime brokers helped insulate us from re-rate risks, whether by negotiating solutions with agent lenders and/or beneficial owners to avoid re-rates or by absorbing re-rates they could not avoid so the re-rates were not passed on to us."

**ECF 432-14 ¶ 21, Declaration of Former Co-Founder of Major Hedge Fund**

# Anonymous Platforms Are Not Comparable

- AQS recalled a significant portion of HTB loans.

  **ECF 432-1, Hendershott ¶ 293**

- Drs. Asquith & Pathak's OTC analysis focuses solely on **lender** recalls—not whether they were passed on to short-sellers.

  **ECF 496-2, McCrary Reply ¶ 22**

- Although Plaintiffs claim short-sellers could replace recalled stock on the platform:

  **ECF 470-2, Asquith & Pathak Reply ¶ 93**

  - Makes no sense for HTB stock where supply is limited.

    **ECF 432-4, Savoldelli ¶ 60**

  "The general feedback on the market here is [AQS] has predominantly become an exchange for GC," and "specials trading there has been muted."

  **ECF 432-4, Savoldelli ¶ 75 (Non-Defendant Prime Broker email)**

  - Short-sellers would have to pay people to monitor and replace recalled stock.

    **ECF 432-4, Savoldelli ¶¶ 93, 101-02, 106**

# Loan Stability = Better Pricing for Lenders

- Lending industry expert, William Pridmore:

> "Some lending agents have strong reputations for stability due to their size or their broader investment strategies. **Lending agents who can reduce recall risk and who reasonably engage in re-rate negotiations may command better prices, or attract more borrowing**, than other lending agents due to these factors."

**ECF 432-3, Pridmore ¶¶ 51, 62 n.127**

- Pat Cestaro, AQS CEO:

> "I may choose to take a lesser price from an index fund lender than I take from a more speculative portfolio where there is lots of buys and sells and [...] I have a higher likelihood of being recalled on it."

**ECF 432-31, Tr. at 280**

- Greg DePetris, AQS Co-Founder, acknowledged some lending agents receive a "stability premium."

**ECF 432-3, Pridmore ¶ 62 (AQS email)**

# Lenders: Increased GC Utilization/Linkage

- Lenders leverage relationships to achieve greater GC utilization in the OTC market.

**ECF 432-3, Pridmore ¶ 40**

- Pat Cestaro, AQS CEO:

> "When an agent lender, any agent lender lends hard to borrow stock they lend it to people that run big general collateral balances. So they leverage their specials to get more flow in the not so special securities, and that's true for a certain amount of their business."

**ECF 432-31, Tr. at 88-89**

- Judith Polzer, Head of Fiduciary Risk at JP Morgan:

> "You need to be able to link your general collateral together with your specials and increase utilization."

**ECF 432-32, Tr. at 427**

# Short-Sellers: Preferential HTB Access and Pricing

- Dr. McCrary: data analysis confirmed that some class members received preferential access to HTB stock.

  **ECF 432-2, McCrary ¶ 81**

- Consistent with prime broker evidence:

  **ECF 432-4, Savoldelli ¶¶ 73, 122**

> "We allocate scarce supply based on factors including our overall relationship with the client".

**ECF 432-43 ¶ 37, Declaration of Michael Kelleher, Head of Americas Equity Finance at JPMorgan**

> "Larger hedge funds typically got more aggressive prices because . . . of their overall relationship with the bank."

**ECF 432-4, Savoldelli ¶ 122 n.238 (Lingard (UBS) Tr. at 387)**

> "Biggest and best clients have first access to preferential pricing."

**ECF 432-4, Savoldelli ¶ 122 (Non-Defendant Prime Broker document)**

# Additional Prime Broker Services

- Services include satisfying "locate" requirements, providing custody and settlement and managing corporate actions.

  **ECF 432-4, Savoldelli ¶¶ 119, 123-24**

  > Rates "charged reflect the overall value of the bundled services [short-sellers] receive."

  **ECF 432-4 ¶ 47 n.46 (Declaration of M. Slomienski (Goldman Sachs) ¶ 9)**

- Plaintiffs agree these services exist, but fail to account for their value in the but-for world.

  **ECF 469, Pls. Reply at 12**

- Dr. Zhu claims class members would "pay less for the trading component", but ascribes **<u>zero</u>** value to the rest.

  **ECF 470-1, Zhu Reply ¶ 15**
  **ECF 496-1, Hendershott Reply ¶ 44**

# Many Short-Sellers Value Confidentiality

- Increased transparency will harm some short-sellers.

  - The SEC:

  > "Increasing short selling transparency may make it more costly for short sellers to implement their positions as other market participants would more quickly learn about and react to short sellers' activities. These dynamics **decrease the profitability of short selling** and may mitigate some of the benefits discussed in the preceding paragraphs."

  **SEC Proposed Rule, 86 Fed. Reg. at 69839**

  - Hedge Fund:

  > "In my view, it did not make business sense for [major hedge fund] to provide Data Explorers with data regarding our stock borrowing activity, **as it could have revealed sensitive information regarding our trading strategies**."

  **ECF 432-14 ¶ 15, Declaration of Former Co-Founder of Major Hedge Fund**

  - Data Explorers:

  > "Hedge funds were also extremely concerned about the confidentiality of their data. **They were especially concerned about what that data might reveal about their trading strategies, and about their illiquid short positions being squeezed**."

**ECF 432-27 ¶ 52, Declaration of David Carruthers, Former Head of Quantitative Services**

# II. Predominance

### A. Injury

    1. Differences between prime broker OTC loans and anonymous platform loans

    2. Plaintiffs' common evidence

    3. Defendants' individualized evidence

### B. The FTAIA

### C. Individual transactions and damages

# Dr. Zhu's "Search Cost" Model Is of No Value

- Unlike Drs. Asquith & Pathak, Dr. Zhu does not even **attempt** to assess whether individual class members are injured.

| | Zhu Model | A&P Model |
|---|:---:|:---:|
| Attempts to use real-world price data | ✖ | ✓ |
| Attempts to model but-for world prices | ✖ | ✓ |
| Attempts to compare actual real-world prices to but-for prices | ✖ | ✓ |
| Attempts to account for platform costs | ✖ | ✓ |
| Attempts to account for differences between OTC and platform loans | ✖ | ✖ |

# Dr. Zhu Does Not Use Actual Real-World Prices

- Dr. Zhu assumes away real-world price dispersion.



**ECF 432-2,
McCrary Ex. 21**

# Dr. Zhu Does Not Use Actual Real-World Prices

- Real-world prices varied widely.

  - Dr. Zhu:

    "One fact about OTC market is . . . price dispersion."

    **ECF 432-59, Zhu Tr. at 269**

  - The SEC:

    Stock loan price dispersion is "approximately five times the median fee charged for securities lending transactions."

    **SEC Proposed Rule, 86 Fed. Reg. at 69833**

  - Dr. McCrary:

    Price dispersion was "several times larger" than the average prime broker fee, and some clients systematically get better prices than others.

    **ECF 432-2, McCrary ¶¶ 121-22, 240-41**

- Dr. Zhu's assumption: prices are random because prime brokers do not know which clients are multi-primed.

  **ECF 414-9, Zhu ¶¶ 265, 282**

> "In practice, dealers do not in general know whether an incoming customer has other competing quotes, which means that in the model, dealers do not know if a customer is fast or slow."

**ECF 414-9, Zhu ¶ 265**

- Dr. Zhu's model predicts an anonymous platform provides no benefit to borrower class members known to be multi-primed.

  **ECF 432-2, McCrary ¶ 242**

# Dr. Zhu Does Not Use Actual Real-World Prices

- Overwhelming evidence shows the opposite:

> Salespeople "are in close communication with our clients and are well aware, for example, of which clients are multi-primed."

**ECF 432-43 ¶ 16, Declaration of Michael Kelleher, Head of Americas Equity Finance at JPMorgan**

> "It is common for Morgan Stanley to be aware of which of its clients have multiple prime brokers as clients are typically open about this."

**ECF 432-57 ¶ 15, Declaration of Matthew R. Collins, Co-Head of Securities Lending at Morgan Stanley**

> "[Major Hedge Fund] did not hide the fact that it was multi-primed."

**ECF 432-14 ¶ 14, Declaration of Co-Founder of Major Hedge Fund**

> "Where a PB's rates were out of line with competing PBs, I could leverage this discrepancy to obtain lower rates or some other benefit."

**ECF 432-6 ¶ 10, Declaration of Former Head of Portfolio Finance and Head of Business Management at Major Hedge Fund**

> "Your prime broker knows your business because your prime broker is [...] helping you maintain your records" and "if your hedge fund [. . .] normally [trades] with Goldman and you trade with JPM[organ], Goldman finds out about it because they have to do the transaction."

**ECF 432-9, Asquith Tr. at 50-51**

# Dr. Zhu Does Not Model But-For Pricing

- Dr. Zhu admits he **does not model** but-for world prices.

"My model examines what happens at an **interim step** . . . . [The] specific prices that are generated by this model **should not be interpreted as the prices specific class members would pay** . . . Professors Asquith and Pathak compute those prices in the context of their model."
**ECF 414-9, Zhu ¶ 260**

- Drs. Asquith & Pathak do attempt to model but-for world prices.

Q. And are the but-for world prices you estimate with your methodology the best estimates you're able to make with the information available to you?

A. That's, I mean, why I put it forth in the report. I think it's a pretty reliable methodology.
**ECF 432-42, Pathak Tr. 97:16-25**

Q. Are the but-for world prices that you estimate with your model, are those the best estimates you're able to come up with with the information available to you?

A. Yes, they are.
**ECF 432-9, Asquith Tr. 65:21-66:4**

# Dr. Zhu Has No Model of the Lender Class

- Dr. Zhu **does not have** a search cost model for lenders.

- Any search cost model for lenders would show many lenders harmed.

  ECF 432-2, McCrary ¶¶ 248-52

  > "The OTC search costs associated with locating HTB shares largely arise because **the broker-dealer** may sometimes have to contact many potential suppliers of shares . . . ."

  ECF 414-10, Asquith & Pathak ¶ 128

  > "Beneficial owners could benefit from better terms but could also experience reduced revenues from their lending activities."

  SEC Proposed Rule, 86 Fed. Reg. at 69837

- Prime brokers know large beneficial owners and agent lenders lend stock to multiple prime brokers.

  ECF 432-2, McCrary ¶ 249

# The SEC Recognizes Increased Transparency Would Harm Some Class Members

- The SEC does **<u>not</u>** "fully vindicate Plaintiffs' impact showing."

ECF 513, Pls. Sur-Sur-Reply at 2

"[The proposed rule] reduces information asymmetries, which would be **<u>beneficial to some and costly to others</u>**."

SEC Proposed Rule, 86 Fed. Reg. at 69837

"**<u>[S]ome investors may see returns decrease</u>** due to more competitive fee pricing which may lower securities lending revenue for some lenders. On the other hand, other investors may see returns increase if the cost of borrowing securities decreases as it will facilitate investment, hedging, and potentially market making strategies. Many investors may experience both effects."

SEC Proposed Rule, 86 Fed. Reg. at 69837

"Lending fees are influenced by factors including: The current demand for the given security, the potential difficulty a particular broker dealer may face finding an alternative source of loans, the length of the loan, the collateral used, the credit worthiness of the counterparty, and the relative bargaining power of the parties involved, among others. **<u>Consequently, there is usually a significant range of fees charged for loans of the same security on the same day to different entities</u>**."

SEC Proposed Rule, 86 Fed. Reg. at 69831

# The SEC Recognizes Increased Transparency Would Harm Some Class Members

"**<u>Lending programs may also experience reduced revenues</u>** through the change in terms offered by broker-dealers to their customers."

SEC Proposed Rule, 86 Fed. Reg. at 69837

"Increasing short selling transparency may make it more costly for short sellers to implement their positions as other market participants would more quickly learn about and react to short sellers' activities. These dynamics **<u>decrease the profitability of short selling</u>** and may mitigate some of the benefits discussed in the preceding paragraphs."

SEC Proposed Rule, 86 Fed. Reg. at 69839

"Given the fixed costs associated with establishing and maintaining systems to report data . . . the Commission preliminarily believes that the proposed Rule may **<u>cause some smaller lending programs and broker-dealers to exit the market</u>** . . . . This may pose indirect costs on these broker-dealers' and lending programs' customers. Such costs would include . . . the **<u>loss of potentially more suitable options</u>** . . . and **<u>potentially higher prices</u>** associated with reduced competitive pressures."

SEC Proposed Rule, 86 Fed. Reg. at 69843

- **Winners and losers = individualized inquiry.**

# Dr. Zhu's Yardstick Analysis Is Flawed

- Dr. Zhu's yardstick markets are not comparable.

| | Stock Lending Market | U.S. Stock Market | Corporate Bond Market | Government Bonds and Oil Futures |
|---|---|---|---|---|
| One-and-done transaction | ✖ | ✓ | ✓ | ✓ |
| Fungible instrument | ✖ | ✓ | ✓ | ✓ |
| Frequent trading | ✖ | ✓ | ✓ | ✓ |

- Dr. Zhu's support does not examine whether — or conclude that — all traders in his yardsticks benefitted, as opposed to generalized, market-wide benefits.

# II. Predominance

### A. Injury

1. Differences between prime broker OTC loans and anonymous platform loans
2. Plaintiffs' common evidence
3. Defendants' individualized evidence

### B. The FTAIA

### C. Individual transactions and damages

# Legal Principles

- Defendants' evidence alone can defeat predominance.

> Defendants' intention to raise "plausible" individualized challenges to claims of classwide antitrust injury barred class certification. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 52-55, 58 (1st Cir. 2018).

> "[C]ourts must consider potential defenses in assessing the predominance requirement." *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010).

> "At trial, defendants would have a right to present individualized evidence that these statements [of classwide impact] are untrue for large numbers of individual purchases and purchasers." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 50 (S.D.N.Y. 2020).

> "[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

# Legal Principles

- <u>All</u> unharmed class members must be identified and excluded at or before trial.

> "Uninjured class members cannot prevail on the merits, so their claims must be winnowed away as part of the liability determination. . . .
>
> [A]ny winnowing mechanism must be truncated enough to ensure that the common issues predominate, yet robust enough to preserve the defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense." *Rail Freight III*, 934 F.3d at 624-25.

> "Plaintiffs argue that [unharmed trades] constitute only a *de minimis* number of trades in the database. . . . But this is not a case in which a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial. . . . Even if it is unlikely that any given class member executed [an unharmed trade], absent an individualized examination of class members, Defendants could be held liable for losses they did not cause." *In re Forex*, 407 F. Supp. 3d at 434.

# Defendants' Individualized Evidence

Defendants will present class-member-by-class-member evidence regarding:

    i.   Non-users of platforms

    ii.   Class members who receive worse prices in the but-for world

    iii.   Class members who lose valuable options in the but-for world

# Non-Users Of Platforms

- Many class members wouldn't use trading platforms.

  **ECF 432-4, Savoldelli ¶¶ 128-131; ECF 432-3, Pridmore ¶¶ 71-99.**

- Dr. Zhu agreed most trading would occur off platform:

  > "[M]y view is that, absent a conspiracy, platforms would capture a significant **but not majority** share of the stock lending market, at least initially."

  **ECF 470-1, Zhu Reply ¶ 35; *see also id*. ¶ 12.**

- AQS concurred:

  > "[W]e see ourselves capturing **10% to 15% of the market**."

  **ECF 432-1, Hendershott ¶ 306 (quoting AQS's Ed Connelly).**

# Non-Users Of Platforms

- Many class members aren't <u>credible</u> platform users and therefore wouldn't benefit, such as those with:

  - ❑ Insufficient size to justify platform costs

  - ❑ Investment strategies incompatible with platforms

  - ❑ Relationship benefits or specific trading needs

  - ❑ High costs for using a platform

  - ❑ Stock loans that <u>can't</u> take place on platforms

ECF 432-1, Hendershott ¶¶ 296, 360-362; ECF 432-2, McCrary ¶¶ 100-101;
ECF 432-43, Kelleher ¶¶ 24-32; ECF 496-2, McCrary Reply ¶¶ 32-36;
ECF 496-1, Hendershott Reply ¶¶ 12-16, 67; ECF 432-4, Savoldelli ¶¶ 45, 47, 153;
ECF 432-3, Pridmore ¶¶ 56-70, 92 99, 111; ECF 496-3, Pridmore Reply ¶ 7 & nn.12, 14;
ECF 496-4, Savoldelli Reply ¶¶ 4-10.

# Non-Users:  Torus Illustration

- Individualized evidence shows Torus wasn't a credible platform user.

  - ❑ Torus' trading volume was far too small for platform trading.

    - ➢ Fixed platform fees alone far exceeded any potential price savings.

      **ECF 432-2, McCrary ¶¶ 202-205; ECF 432-1, Hendershott ¶¶ 259-262;
      ECF 496-1, Hendershott Reply ¶ 14; ECF 514-1, A&P Sur-Reply ¶ 148 backup table cell E5
      (Plaintiffs' experts estimate $1,328/yr in potential price savings for Torus).**

    - ➢ Fixed platform fees stopped Torus from joining a Treasuries platform.

      **ECF 432-1, Hendershott ¶ 262.**

  - ❑ Torus needed a "single point of execution."

    **ECF 432-4, Savoldelli ¶ 184;
    ECF 432-1, Hendershott ¶ 130.**

# Non-Users: Torus Illustration

- Individualized evidence shows Torus had no leverage.

  - Torus was dropped as a customer.

    > "Goldman Sachs raised the equity to—to $50 million, so which forced us to move.  So they basically kicked us out."

    **ECF 432-68, Simeone (Torus) Tr. 80:24-81:4; ECF 496-1, Hendershott Reply ¶ 18.**

  - Torus didn't even know what it was paying for stock loans.

  - Torus didn't receive favorable prices.
    - high financing rates
    - non-prime-brokerage account with limited access to HTB stock

      **ECF 496-1, Hendershott Reply ¶ 57;**
      **ECF 432-1, Hendershott ¶¶ 233-234;**
      **ECF 432-4, Savoldelli ¶¶ 186-193;**
      **ECF 432-67, Nishimura Tr. 92:25-93:10.**

# Non-Users: "Perfect" Knowledge Is Not Required

- Prime brokers often have <u>sufficient</u> knowledge to know that platform trading isn't viable for many class members.

  ➤ Easily observable characteristics make platform trading non-viable.

  ➤ Prime brokers know their customers well.

  ➤ Prime brokers sometimes are willing to risk losing the customer rather than improve their prices.

**ECF 496-1, Hendershott Reply ¶ 13-19;**
**ECF 432-2, McCrary ¶¶ 237-239;**
**ECF 496-2, McCrary Reply ¶¶ 34-35;**
**ECF 432-43, Kelleher Decl. ¶ 16;**
**ECF 496-4, Savoldelli Reply ¶ 9;**
**ECF 432-1, Hendershott ¶¶ 74, 349.**

# Defendants' Individualized Evidence

Defendants will present class-member-by-class-member evidence regarding:

    i.   Non-users of platforms

    ii.   Class members who receive worse prices in the but-for world

    iii.  Class members who lose valuable options in the but-for world

# Favorable Actual-World Prices

- Plaintiffs' model of but-for prices finds that actual-world prices often were <u>better</u> than but-for prices.

| Subclass | Unharmed transactions with Plaintiffs' cost assumptions | Unharmed transactions with intermediate cost assumptions | Unharmed transactions with high cost assumptions |
|---|---|---|---|
| Lenders | 31% | 67% | 82% |
| Short Sellers | 32% | 69% | 90% |

Source:  ECF 496-2, McCrary Reply App. D Ex. D.2

# Favorable Actual-World Prices Are Lost In The But-For World

- The many actual-world prices that were better than Plaintiffs' but-for-world prices disappear in the but-for world.

**ECF 496-2, McCrary Reply ¶ 46 ;**
**ECF 496-1, Hendershott Reply ¶ 30.**

## Dr. Asquith:

> Prime brokers in the but-for world are "<u>not going to charge a short seller less than the [platform] price</u>, because if they can get a higher price on the platform, they'll trade on the platform...."

**ECF 432-9, Asquith Tr. 84:24-85:4.**

## Drs. Asquith and Pathak:

> "<u>If a Prime Broker Defendant pays a beneficial owner who does not need to be sponsored more than the [platform price], then the Prime Broker Defendant loses money</u> because they could have borrowed the shares on the platform at a lower loan price. Hence, it must be the case that" but-for-world OTC prices are equal to or worse than platform prices.

**ECF 414-10, A&P ¶¶ 292-293.**

# Platform Costs

## AQS diagram of platform trading



ECF 432-1, Hendershott Ex. 15

# Platform Costs:  Plaintiffs' Unrealistic Assumptions

| Cost | Plaintiffs' experts | Dr. Hendershott |
|---|:---:|:---:|
| Class member internal costs | 0 | varies |
| Fixed platform fees | 0 | varies |
| Clearing sponsor fees and costs | | |
| Default fund contributions | 3 bps | 3 bps |
| Operational/overhead costs | 0 | varies |
| Profit | 0 | varies |
| Capital costs | 0 | 15 to 28 bps |
| Beneficial owner collateral margin | 0 | 3 to 38 bps |
| Short-seller collateral margin | 5 bps | 3 to 38 bps |
| Total clearing sponsor fees | | |
| Beneficial owners | 3 bps | 26 to 69 bps |
| Short-sellers | 8 bps | 21 to 62 bps |

**Source:  ECF 432-1, Hendershott Exs. 16-17; ECF 496-1, Hendershott Reply ¶ 46.**

- Plaintiffs assume <u>zero</u> internal costs to class members from platform trading.

- Internal costs for systems, technology, personnel, etc., vary and would be significant.

  **ECF 432-4, Savoldelli ¶¶ 93-98, 106-108;**
  **ECF 432-1, Hendershott ¶¶ 281-287.**

- The SEC recently estimated that a far easier lift—simple post-trade reporting of stock loan prices—would require:

  - over a million startup hours.

  - over 400,000 hours annually.

  **SEC Proposed Rule, 86 Fed. Reg. at 69827.**

# Costs Example 2: Fixed Platform Fees

- Plaintiffs assume <u>zero</u> fixed platform fees.

- AQS charged annual fixed fees of $37,500 for API access or $10,500+ for web access:

| | |
|---|---|
| **API Access** | $30,000/yr |
| **Web access** | $3,000/yr per user |
| **Annual subscription fee** | $7,500/yr |
| **One-time application fee** | $7,500 |

**ECF 432-44, Surgent Decl. ¶ 8-10;**
**ECF 414-10, A&P ¶ 270;**
**ECF 496-1, Hendershott Reply ¶¶ 50, 52.**

# Costs Example 2: Fixed Platform Fees

- According to Plaintiffs' model of but-for prices, many short-sellers were unharmed once fixed fees are considered.

| Fixed Platform Fees | Short Seller Accounts Unharmed On A Single Transaction |
|---|---|
| $1,000 Per Year | 27% |
| $2,000 Per Year | 34% |
| $10,500 Per Year | 56% |
| $37,500 Per Year | 72% |

Source: ECF 496-2, McCrary Reply ¶ 57 Ex. 1.

## Plaintiffs' expert Dr. Pathak:

> Q. [D]o you think that those fixed fees would have gone away in the but-for world? Is that what you're saying?
>
> **A. No. No. They wouldn't have gone away** . . . .
>
> Q. [A]re you assuming that the [fixed] fees . . . on that March 2012 AQS fee schedule would have gone away or would have remained in place in the but-for world?
>
> A. For the purposes of my report . . . . **we can assume that they would stay as they were**. . . .

**ECF 432-42, Pathak Tr. 301:12-302:19.**

## Dr. Pathak continued:

> "[T]here's something specifically I can cite that actually happened, which is what AQS charged as of 2012. So I have no discretion, right, there. . . . You know, my hands are tied by what the AQS document had."

**ECF 432-42, Pathak Tr. 347:13-348:10.**

- AQS projected that per-user fixed platform fees would rise—not fall—as the platform grew.

  **ECF 496-1, Hendershott Reply ¶ 51;**
  **ECF 432-44, Surgent Decl. ¶ 9.**

- Fixed fees were necessary to cover out-of-pocket technology costs of $1,250/month per participant.

  **ECF 432-44, Surgent Decl. ¶¶ 11-13 & Exs. 1-2.**

- Record evidence and experience on other platforms indicate that fixed platform fees would not have fallen.

  **ECF 496-1, Hendershott Reply ¶¶ 49-55.**

- Plaintiffs' argument that short-sellers sometimes had multiple accounts in the data is unavailing.

    1. Even assuming several accounts per short-seller, fixed platform fees <u>still</u> eliminate all alleged harm for many short-sellers.

        **ECF 432-2, McCrary ¶ 189.**

    2. Many short-sellers have only one account in the data.

        - Torus had only one account after 2012.

        - SCERA had only one.

        - Many short-sellers can't have more than one account in the data given 8,487 accounts unevenly distributed among "thousands" of short-sellers.

            **ECF 432-4, Savoldelli ¶¶ 187-188;**
            **ECF 514-1, A&P Sur-Reply ¶ 59 Ex. II.5; ECF 432-2, McCrary ¶ 206;**
            **ECF 414-10, A&P ¶ 25; ECF 496-2, McCrary Reply App. C ¶ 16.**

    3. Plaintiffs cannot identify class members with multiple accounts in the data at trial; the data don't identify them.

        **ECF 432-2, McCrary ¶¶ 166-167.**

- Plaintiffs have no basis for speculating that clearing sponsors would cover fixed platform fees for short-sellers.

  ➤ No contemporaneous evidence supports this sheer speculation.

  ➤ Short-sellers paid their own fixed platform fees in the actual world.

  ➤ Short-sellers access platforms <u>themselves</u> and place their own trades.

  ➤ Torus didn't join a Treasuries platform because of its fixed platform fees; it didn't expect a clearing sponsor to cover those fees.

**ECF 496-1, Hendershott Reply ¶ 55;**
**ECF 432-44, Surgent Decl. ¶¶ 4-13;**
**ECF 432-1, Hendershott ¶ 262.**

- Plaintiffs' assumption that clearing sponsor fees would be 3 bps for lenders and 8 bps for short sellers is far-fetched.

  - Implies <u>zero</u> profit, <u>zero</u> recovery of overhead, and <u>zero</u> recovery of balance sheet costs for clearing sponsors.

  - Far below real-world sponsors' fees.

  - Far below AQS's expectations for sponsorship fees.

**ECF 432-1, Hendershott ¶¶ 251-253.**
**ECF 496-1, Hendershott Reply ¶¶ 59-63.**

# Costs Example 3: Clearing Sponsor Fees

- Plaintiffs' assumptions about clearing sponsor fees bear no resemblance to actual-world sponsorship fees.

**ECF 496-2; Hendershott Reply ¶¶ 60-62.**

| | Sponsorship Fees (in bps) | |
|---|---|---|
| I. Short Sellers | GC | HTB |
| Jefferies fee for Short Seller A | 50 | 50 |
| Citigroup fee for Short Seller B | 25 | 65 |
| BAML fee for Short Seller C | 25-35 | 25-35 |
| BAML fee for Short Seller D | 15 | 35 |
| BAML fee for Short Seller E | 35 | 35 |
| | | |
| II. Beneficial Owners/Agent Lenders | | |
| AQS client segment analysis for agent lenders | 19.75 | 48 |
| AQS model for State Street | 16 | 34 |
| BAML internal presentation on agent lender sponsorship | 6.75 | 35 |

**ECF 432-1, Hendershott Ex. 17.**

AQS recognized clearing sponsors would need high fees to cover high balance sheet costs:

"But soon after joining [AQS] . . . it became very quick for me to realize that it was going to be difficult for broker-dealers to sponsor people from an economic perspective. . . .  [T]hey did not have excess balance sheet which would be required to sponsor hedge funds and agent lenders.  And the price that they would probably be required to do it at would not be economical. . . .  Meaning that if they were to charge what they really needed to charge it would just make the transaction uneconomical. . . .

". . . . And people's balance sheets were pared down tremendously from where they were in 2007.  That was just federal regulation being installed. . . .  And the balance sheet then that remained had to, you know, it was precious.  So, you know, you had to charge dearly for it."

ECF 432-12, AQS's Timothy Keenan, at 33:9-34:18, 37:19-38:9.

68

# Costs Example 3: Clearing Sponsor Fees

Plaintiffs' responses are meritless:

- <u>Real-world AQS clearing sponsor fees</u> were not inflated; they were set at low levels to try to help AQS and attract customers.

  **ECF 432-1, Hendershott ¶ 253;**
  **ECF 496-1, Hendershott Reply ¶ 63**

- <u>Basel III</u> would have driven clearing sponsor fees even higher.

  **ECF 496-1, Hendershott Reply ¶¶ 62, 64-86**

- <u>Balance sheet netting</u> for stock loans has never been allowed.

  **ECF 432-31, Cestaro Tr. 166-169**

- <u>Overcollateralization</u> wouldn't have worked for beneficial owners or for many short-sellers.

  **ECF 496-4, Savoldelli Reply ¶¶ 2-10;**
  **ECF 496-3, Pridmore Reply ¶¶ 2-10;**
  **ECF 496-1, Hendershott Reply ¶¶ 66-71**

# Platform Costs: Many Short-Sellers Were Unharmed

| Total Sponsorship and Fixed Platform Costs | Not "Harmed" on a Single Loan-Day | Economically Unharmed |
|---|:---:|:---:|
| **8 bps (Plaintiffs)** | | |
| Fixed Cost of $1,000 Per Year | 27% | 31% |
| Fixed Cost of $10,500 Per Year | 56% | 59% |
| Fixed Cost of $37,500 Per Year | 72% | 75% |
| **21 bps (Intermediate)** | | |
| Fixed Cost of $1,000 Per Year | 33% | 53% |
| Fixed Cost of $10,500 Per Year | 63% | 76% |
| Fixed Cost of $37,500 Per Year | 78% | 88% |
| **62 bps (High)** | | |
| Fixed Cost of $1,000 Per Year | 48% | 89% |
| Fixed Cost of $10,500 Per Year | 75% | 96% |
| Fixed Cost of $37,500 Per Year | 87% | 98% |

**ECF 496-2, McCrary Reply ¶ 57 Ex. 1.**

# Platform Costs: Many Beneficial Owners Were Unharmed

| Total sponsorship costs | Number Unharmed | Percentage Unharmed |
|---|---|---|
| **Loan-Days** | | |
| 3 bps (Plaintiffs) | 57,338,683 | 31% |
| 26 bps (Intermediate) | 123,261,034 | 67% |
| 69 bps (High) | 149,654,139 | 82% |
| **Accounts (mainly agent lender accounts)** | | |
| 3 bps (Plaintiffs) | 1,208 | 30% |
| 26 bps (Intermediate) | 2,381 | 59% |
| 69 bps (High) | 3,235 | 80% |

**ECF 496-2, McCrary Reply App. D. Ex. D.2.**

# Plaintiffs Don't Win Even Under Their "One Harmed Transaction" Standard

1. Plaintiffs overcount class members that allegedly had at least one harmed "transaction" by:

   ❑ Wrongly treating each separate <u>loan-day</u> as a separate <u>transaction</u>.

   ❑ Assuming away most platform trading costs.

   ❑ Ignoring the added value embedded in OTC loans.

2. Many class members weren't "harmed" on a single loan-day:

   ❑ Those that were not credible platform users.

   ❑ Those for whom fixed platform fees or internal costs exceed any alleged savings.

   ❑ The data don't identify individual beneficial owners or how many of them were "harmed" on at least one loan-day.

**ECF 496-2, McCrary Reply ¶¶ 50-62.**

# "One Harmed Transaction" Is The Wrong Standard

- Courts in cases involving trading gains and losses hold that plaintiffs cannot recover unless they were harmed <u>on balance</u>.

> "That plaintiffs in an antitrust action may recover only for their net injury is a common-sense and well-established principle." *Nypl v. JP Morgan Chase & Co.*, 2022 WL 819771, at *4 (S.D.N.Y. 2022).

> "[P]laintiffs may ultimately recover only to the extent of their net injury, given that plaintiffs may well have benefited from [alleged conduct] in the same transaction or in a different transaction." *Sonterra Capital Master Fund v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 563 n.20 (S.D.N.Y. 2017).

# Defendants' Individualized Evidence

Defendants will present class-member-by-class-member evidence regarding:

i. Non-users of platforms

ii. Class members who receive worse prices in the but-for world

iii. Class members who lose valuable options in the but-for world

# Favorable Actual-World Prices Are Lost In The But-For World

- Platform trading takes away favorable pricing options that class members had in the actual world.

### Dr. Pathak:

Q: "[I]sn't it correct that some options—some price options that existed in the actual world would go away in the but-for world for class members?"

A: ". . . I think that's—that's right."

Q: "What do you expect would happen to that widespread price dispersion in the but-for world?"

A: ". . . I would expect that that dispersion would go down substantially."

ECF 432-42, Pathak Tr. 112:18-23; *id.* at 74:10-25.

- If a significant amount of trading moved to platforms, many of those left behind in a shrunken OTC market would be harmed by:

  ➢ Higher trading costs

  ➢ Reduced opportunities to borrow

  ➢ Reduced opportunities to lend

**ECF 432-1, Hendershott ¶¶ 338-339, 342-344, 363-367;**
**ECF 432-2, McCrary ¶¶ 80-88; ECF 496-1, Hendershott Reply ¶ 20.**

- Beneficial owners would be shut out of general collateral lending on platforms except for the few that became OCC clearing members.

**ECF 432-1, Hendershott ¶¶ 338-339.**

Plaintiffs' expert Dr. Pathak:

> Q. Now, in the actual world, not all of the lending of general collateral is done by clearing members; correct?
>
> A. In the actual world, by OCC clearing members? Yeah. That's correct. Yes.
>
> Q. And in the but-for world, would you expect to see some replacement of lending— some—to some extent clearing members replacing non-clearing members as lenders of general collateral?
>
> A. Yes. . . .
>
> **ECF 432-42, Pathak Dep. 325:14-25.**

- Only individual inquiry can identify class members that would be harmed by a shrunken OTC market.

**ECF 432-1, Hendershott ¶¶ 363-367;**
**ECF 496-1, Hendershott Reply ¶¶ 24-27.**

# II. Predominance

A. Injury

    1. Differences between prime broker OTC loans and anonymous platform loans

    2. Plaintiffs' common evidence

    3. Defendants' individualized evidence

B. The FTAIA

C. Individual transactions and damages

# FTAIA Inquiries Defeat Predominance

- The FTAIA bars application of U.S. antitrust law where either:
    1. Both parties to a trade operated abroad ("foreign" transactions), or
    2. The defendants operated domestically and their counterparties operated abroad ("export" transactions).

- *In re Forex* denied class certification where:
    - The parties entered into trades both domestically and abroad, and
    - The data didn't identify whether they were operating domestically or abroad at the time of their trades.

- The same is true here:
    - Defendants and class members entered into stock loans both domestically and abroad.
    - The data don't identify where they were operating at the time of any transaction.

ECF 432-2, McCrary ¶¶ 216-217;
ECF 431, Defs. Opp. 35-36 & n. 25;
ECF 432-4, Savoldelli ¶ 27;
ECF 432-43, Kelleher Decl. ¶ 7.

# The "Domestic Effects" Exception Doesn't Apply

- Plaintiffs say the FTAIA's domestic effects exception applies because "arbitrage" would generate a single worldwide price:

  ➤ Arbitrageurs allegedly would "arbitrage" the difference between U.S. platform prices and foreign OTC prices until prices "are equalized."

    **ECF 470-1, Zhu Reply ¶¶ 240, 242, 246.**

  ➤ This "price disciplining influence" allegedly brings foreign OTC prices into line with U.S. platform prices in the but-for world.

    **ECF 469, Pltfs. Reply 28.**

- This argument proves too much:  U.S. law would apply even where both parties were operating in Tokyo or Shanghai.

# The "Domestic Effects" Exception Doesn't Apply

- Case-law rejects Plaintiffs' argument that "price discipline" and "arbitrage" generate a single worldwide price.

*Empagran S.A. v. F. Hoffman-LaRoche*:  Rejected argument that "arbitrageurs" would have brought foreign prices into line with U.S. prices. 417 F.3d 1267, 1270-71 (D.C. Cir. 2005).

*In re Monosodium Glutamate Antitrust Litig.*:  Rejected argument that "arbitrageurs" meant that "super-competitive pricing in the United States gave rise to the foreign super-competitive prices paid by the appellants." 477 F.3d 535, 539 (8th Cir. 2007).

*In re Forex*:  "Plaintiffs' contentions that there is a 'single' FX market and that prices in the United States directly impact foreign prices show at best but-for causation, but not proximate causation."  2016 WL 5108131, *14-15.

# II. Predominance

### A. Injury

1. Differences between prime broker OTC loans and anonymous platform loans

2. Plaintiffs' common evidence

3. Defendants' individualized evidence

### B. The FTAIA

### C. Individual transactions and damages

# Individual Transactions And Damages Inquiries

- Courts deny class certification where thousands of individual inquiries into records and data are required.

*Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016): denying certification where "the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim."

*In re Forex*, 407 F. Supp. 3d at 435: denying certification where trade-by-trade analysis was necessary for "tens or hundreds of thousands" of trades.

*Nypl v. JP Morgan Chase & Co.*, 2022 WL 819771, at *7 (S.D.N.Y. 2022):  denying certification where "individualized proof of each trade and each trading day will be required to show if and to what extent each retail purchaser was actually injured by the alleged conspiracy."

- Here, trial would involve thousands if not millions of individual inquiries into:

  i. Millions of transaction records that don't reflect the "full economics" of the transaction

  ii. The proper "w" percentage for each individual class member

  iii. Millions of transaction records that Plaintiffs say are anomalous

  iv. Each individual class member's platform costs and net gains and losses across all accounts

ECF 432-2, McCrary ¶¶ 218-225, 274-282;
ECF 496-2, McCrary Reply ¶¶ 37-40, ¶¶ 77-79.

# III. Superiority

Where a proposed class is comprised of "**highly sophisticated, knowledgeable financial institutions** or wealthy private investors" with a "**strong interest in individually controlling the prosecution of their own actions,**" individual actions are superior. *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 1831850, at *9 (S.D.N.Y. 2018) (Failla, J.)

- Plaintiffs' proposed class includes some of the world's "most sophisticated" financial entities, including:

  - Blackrock

  - Los Angeles County Employees Retirement Association

  - Point 72

  - Vanguard Group

  - Jane Street Group

**ECF 199, Sept. 17, 2019 Ltr. from L. Portnoy,
Counsel for the Objecting Firms, to Judge Failla
ECF 432-2, McCrary ¶ 211**

- After learning that Defendants would be producing stock loan transaction trading data from January 1, 2009 to December 31, 2017, **22 "highly sophisticated, knowledgeable financial institutions" consequently retained counsel, engaged with the parties and informed this Court that they were "prepared" to litigate in order to protect their data privacy interests.**



The 22 Firms represent some of the largest and most sophisticated fund managers, investment advisors, and broker-dealers in the world and their affiliates.[1] They collectively have assets under management of over $7 trillion, for which they develop and execute highly proprietary investment strategies, including algorithmic and other quantitative trading strategies.

**ECF 199, Sept. 17, 2019 Ltr. from L. Portnoy, Counsel for the Objecting Firms, to Judge Failla**

# IV. Post-2017 Period

# Plaintiffs' Extended Class Definition

- Plaintiffs' Class Certification Motion Seeks to Certify a Class:

**"From "January 1, 2012" to *either* "February 22, 2021" *or* "through trial."**     **ECF 419, Pls' Mt for Class Cert.**

- Plaintiffs' Complaint Seeks to Certify a Class:

**"January 7, 2009, <u>through the present</u>."**

**ECF 1, Compl. (August 16, 2017);**
**ECF 73, Am. Compl. (Nov. 17, 2017)**

"[A] a statement referring to 'the present' generally does not refer to any moment in time beyond when the statement was made." *Hnot v. Willis Grp. Holdings Ltd.*, No. 01-cv-06558 2006 WL 2381869, at *2 n.4 (S.D.N.Y. Aug. 17, 2006)

# Plaintiffs' Request to Extend the Class Period Should be Denied

Plaintiffs have not taken *any* post-2017 fact discovery, yet seek to extend the class period for at least 3.5 years beyond the agreed-upon discovery period.



**Plaintiffs therefore cannot met their burden to satisfy Rule 23 for the post-2017 time period.**

- The lending and borrowing markets shifted dramatically over the 2009 – 2017 period

  ◦ "Q. **The average difference [between borrowing and lending loan costs in 2016 to 2017] shrunk, it got smaller, right?**
  ◦ A. Yes, it did.
  ◦ Q. Did those differences continue to shrink in 2018, 2019 and 2020?
  ◦ A. **I do not know because we only got data through 2017."**

**ECF 432-9, Asquith Tr. 378**

- "From January 2016 to June 2017, almost 30% of hedge funds ended one or more of their prime broker relationships, and over 35% of hedge funds added one or more prime broker relationships."

  **ECF 432-4, Savoldelli ¶ 146**

- Since March 2017, class representative "Torus has [] not used any brokerage services provided by any Defendant."

  **ECF 432-4, Savoldelli ¶ 189**

# The Proposed Reopening of Data Discovery

- Plaintiffs' request for historical stock loan trading data was fiercely contested by class members.



"The 22 Firms concluded, based on the above, that the requested discovery left them dangerously, uniquely, and unreasonably exposed to the negative consequences of their data being disclosed, including the potential for reverse-engineering of their investment strategies, and a high likelihood that their data could be misused to their and their clients' substantial detriment."

"Such disclosure would create the immediate risk of substantial economic harm to the members of the putative class, including the 22 Firms."

**ECF 199, Sept. 17, 2019 Ltr from L. Portnoy, Counsel for the Objecting Firms, to Judge Failla**

# The Proposed Reopening of Data Discovery

- Some of the "largest and most sophisticated fund managers, investment advisors, and broker-dealers in the world," leveraged their influence to demand an enhanced protective order for decade-old data; others opted out of the class entirely.



These "lengthy, protracted negotiations" ultimately lasted "six month[s]," required substantial "consultation with experts," and clients, and were followed by the "time-intensive work" required to extract, "anonymize, [] process, standardize and analyze" the data."

**ECF 267, Jan. 24, 2020 Ltr. From D. Brockett and M. Eisenkraft to Judge Failla**

# No Notice of Newly-Proposed Class Period



"January 1, 2008 through December 31, 2017 (the agreed-upon [document] review period)."

ECF 173, April 25, 2019 Ltr. From D. Slifkin to Judge Failla

# No Notice of Newly-Proposed Class Period



The fact discovery deadline "may not be modified or the dates [] extended, **except by further Order of this Court for good cause shown**."

**ECF 298, Fourth Amended Civil Case Management Plan and Scheduling Order**