**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, *et al.*,<br><br>        Plaintiffs,<br><br>                    v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>        Defendants. | No.  17 Civ. 6221 (KPF) (SLC) |

**PLAINTIFFS' LIMITED OBJECTION TO PART IV.D OF MAGISTRATE JUDGE CAVE'S REPORT AND RECOMMENDATION GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND <u>APPOINTMENT OF CLASS COUNSEL</u>**

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... ii

ARGUMENT ........................................................................................................... 2

I.    The Court Should Modify The R&R To Clarify That The End Of The Class Period Limits Class *Membership*, But Not The Recoverability Of Post-2017 Class *Damages By That Class* ...................................................................................................... 3

    A.    Injuries Incurred By Class Members After The Class Period's Cut-Off Date Are Recoverable Antitrust Class Damages ........................................................ 4

    B.    It Is Premature To Rule At The Class-Certification Stage Whether The Class Will Prevail In Proving Its Claim To Recover Post-2017 Damages ...................... 9

II.   The Court Should Modify The R&R To Make Clear That Plaintiffs May Seek Additional Productions Relevant To Damages From Post-2017 Transactions ................. 11

III.  The Court Should Modify The R&R To Extend The Class Period To Run Until No Earlier Than December 31, 2017, Not August 16, 2017 .................................................. 16

CONCLUSION ...................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### Cases

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982) ................................................................................................ 6

*Barry's Cut Rate Stores Inc. v. Visa, Inc.*,
   2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019) ........................................................ 7

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) .................................................................................... 6

*Borger v. Yamaha Int'l Corp.*
   625 F.2d 390, 398 (2d Cir. 1980) ........................................................................... 5

*Christou v. Beatport*
   2013 WL 2422916 (D. Colo. June 4, 2013) ............................................................ 5

*Dash v. Seagate Tech. (US) Holdings, Inc.*,
   2015 WL 4257329 (E.D.N.Y. July 14, 2015) ....................................................... 13

*DDMB, Inc. v. Visa, Inc.*,
   2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ........................................................ 8

*Everlight Elecs. Co. v. Nichia Corp.*,
   2015 WL 412184 (E.D. Mich. Jan. 30, 2015) ...................................................... 13

*Gorzynski v. JetBlue Airways Corp.*,
   2012 WL 712067 (W.D.N.Y. Mar. 5, 2012) ......................................................... 12

*Hickory Secs. Ltd. v. Republic of Argentina*,
   493 F. App'x 156 (2d Cir. 2012) ..................................................................... 10, 11

*Hnot v. Willis Group. Holdings Ltd.*,
   2006 WL 2381869 (S.D.N.Y. Aug. 17, 2006) ................................................. 15, 16

*In re Blood Reagents Antitrust Litig.*,
   266 F. Supp. 3d 750 (E.D. Pa. 2017) ...................................................................... 4

*In re: Domestic Drywall Antitrust Litig.*,
   2016 WL 3453147 (E.D. Pa. June 22, 2016) .......................................................... 4

*In re: Domestic Drywall Antitrust Litig.*,
   322 F.R.D. 188 (E.D. Pa. 2017) .............................................................................. 6

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ................................................... 6

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  2020 WL 5016922 (D.D.C. Aug. 25, 2020) ...................................................... 7

*In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*,
  335 F.R.D. 1 (E.D.N.Y. 2020) ........................................................................ 10

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ...................................................................... 11

*Lawlor v. Loewe*,
  235 U.S. 522 (1915) ......................................................................................... 6

*Levy v. BASF Metals Ltd.*
  2017 WL 2533501 (S.D.N.Y. June 9, 2017), *aff'd*, 917 F.3d 106 (2d Cir. 2019) ............................. 3

*Lujan v. Cabana Mgmt., Inc.*,
  284 F.R.D. 50 (E.D.N.Y. 2012) ...................................................................... 13

*Magadia v. Wal-Mart Assocs., Inc.*,
  384 F. Supp. 3d 1058 (N.D. Cal. 2019) ........................................................... 4

*Martinek v. AmTrust Fin. Servs., Inc.*,
  2022 WL 326320 (S.D.N.Y. Feb. 3, 2022) ....................................................... 3

*N. Am. Soccer League v. Nat'l Football League*,
  1984 WL 726 (S.D.N.Y. Aug. 8, 1984) ..................................................... 5, 6, 8

*Reinsdorf v. Skechers U.S.A., Inc.*,
  2013 WL 12116416 (C.D. Cal. Sept. 9, 2013) ............................................... 13

*Robbins & Myers, Inc. v. J .M. Huber Corp.*,
  274 F.R.D. 63 (W.D.N.Y. 2011) ............................................................... 12, 13

*Shim-Larkin v. City of New York*,
  2020 WL 5534928 (S.D.N.Y. Sept. 14, 2020) ............................................... 13

*United States v. Diaz*,
  176 F.3d 52, 98 (2d Cir. 1999) ........................................................................ 7

*U.S. Football League v. Nat'l Football League*,
  842 F.2d 1335 (2d Cir. 1988) ....................................................................... 5, 6

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*,
  668 F.2d 1014, 1057 (9th Cir. 1981) ............................................................... 5

*Zelman v. JDS Uniphase Corp.*,
   376 F. Supp. 2d 956 (N.D. Cal. 2005) ........................................................... 3

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   401 U.S. 321 (1971) ........................................................................... 3, 4, 6

## Statutes

28 U.S.C. § 636 ........................................................................................ 2

## Rules and Regulations

Fed R. Civ. P. 26 .......................................................................... 12, 13, 15

Fed. R. Civ. P. 72 ......................................................................................... 3

## Other Authorities

SEC, "Proposed rule: Reporting of Securities Loans" (November 18, 2021) ..................................... 7

In her June 30, 2022 Report and Recommendation (ECF No. 563, "R&R"), Magistrate Judge Cave recommended that the Court grant Plaintiffs' motion to certify a class of "[a]ll persons and entities who, directly or through an agent, entered into at least 100 U.S. Stock Loan Transactions" within a Class Period beginning on January 1, 2012.  R&R at 69-70.  Plaintiffs requested that the Class Period conclude on February 22, 2021, the date of their certification motion.  But the R&R instead recommended that the Class Period end as of the date of Plaintiffs' initial Complaint, August 16, 2017.  *Id.*

Plaintiffs urge the Court to adopt Magistrate Judge Cave's well-reasoned recommendation to certify the proposed Class.  But Plaintiffs respectfully object to and request modification and clarification of the R&R on three discrete points, all related to the end of the Class Period and the recoverability of damages arising after 2017.

*First*, to the extent the R&R may be interpreted to bar the ability of Class members to recover damages for transactions occurring after the Class Period, Plaintiffs object to that limitation as contrary to law and premature at the certification stage.  This case involves an alleged conspiracy that was in existence when the Complaint was filed and is still causing damages today.  As the Court is aware, Plaintiffs allege that Defendants conspired to block and boycott new entrants into the U.S. Stock Loan market in order to preserve an over-the-counter ("OTC") market structure, and Plaintiffs have identified abundant common evidence showing that Defendants' conspiracy succeeded.

If Plaintiffs prove at trial that Defendants' conspiracy was successful, and if Defendants cannot show they ended the conspiracy or withdrew from it, then the antitrust laws would require the Court to permit the Class to recover the full scope of the damages they can prove.  The public policy underlying those laws—deterring anticompetitive conduct by ensuring that wrongdoers

are held accountable for their unlawful conduct—would otherwise be undermined, as damages did not cease in 2017 and were ongoing at the time Plaintiffs filed their initial and amended complaints.  The alternative would be to allow antitrust conspirators to reap illegal profits.  The Court should therefore modify the R&R to clarify that Class members can seek to recover damages arising after the Class Period, including ongoing damages up to the time of trial.

*Second*, the R&R's apparent determination that Plaintiffs are not entitled to discovery regarding supplemental transactional data related to post-2017 Class damages is incorrect and premature at this stage.  As shown below, the R&R appears to have relied on Defendants' representations that the parties had agreed to limit the temporal scope of the data Defendants would produce.  But Defendants' representations were false and misleading.  The sole agreement between the parties explicitly concerned the scope of only ***initial*** data productions.  Plaintiffs have been crystal clear at each stage of the litigation that they would seek supplemental data productions as part of their pursuit of the Class's ongoing damages.  The appropriate time for that supplementation is in the next phase of this litigation, after the Court has issued a final ruling on class certification.  Plaintiffs should be permitted to seek those supplemental data productions at that time, so they can incorporate any additional data received into their merits expert reports.

*Third*, even accepting the R&R's recommendation of a Class Period ending earlier than Plaintiffs' requested date of February 22, 2021, the R&R's own logic, and Defendants' own concessions, warrant an end date of no earlier than December 31, 2017—the date through which Defendants have already produced transactional data—not August 16, 2017.

## ARGUMENT

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C); *accord* Fed. R. Civ. P. 72(b)(3).  Here, Plaintiffs urge the Court to adopt the R&R's certification recommendation,

subject to the following three clarifications or modifications.

**I.**     **The Court Should Modify The R&R To Clarify That The End Of The Class Period Limits Class *Membership*, But Not The Recoverability Of Post-2017 Class *Damages By That Class***

The R&R's recommendation to end the Class Period on August 16, 2017, does not and should not be applied to cut off the ability of Class members to recover damages on stock loan transactions occurring after that date.  In class actions, the class definition (including the temporal scope of the class period) sets "definite boundaries" on which entities qualify for class membership.  *Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *3 (S.D.N.Y. Feb. 3, 2022) (Failla, J.) (citation omitted).  "The purpose of defining a plaintiff class, through dates or otherwise, is to limit the class of plaintiffs to those ascertainable individuals who have standing to bring the action."  *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966 (N.D. Cal. 2005). The purpose of those membership criteria is ***not***, however, to define the scope of class damages or "limit[] the universe of actionable conduct."  *Id.*

Distinguishing class membership, on the one hand, from the scope of damages, on the other, is especially important in cases like this one, where an ongoing antitrust conspiracy imposes ongoing harm.  In such cases, plaintiffs have the right to recover the ***full scope*** of the damages they suffer—not just damages already suffered, but also "all provable damages" they "***will suffer in the future***."  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971) (emphasis added) ("[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date."); *see also Levy v. BASF Metals Ltd.*, 2017 WL 2533501, at *6 (S.D.N.Y. June 9, 2017), *aff'd*, 917 F.3d 106 (2d Cir. 2019).

Defendants may argue that the R&R's ruling on the Class Period end date imposes a

limitation on the scope of the *damages* the Class may recover in addition to Class *membership*. Specifically, Defendants can be expected to argue that the R&R, if adopted, would prevent Class members from even attempting to prove damages arising from Defendants' conspiracy accruing after 2017. To avoid uncertainty, Plaintiffs request that the Court modify the R&R to make clear that it does not categorically bar the Class from seeking to prove post-2017 damages.

### A. Injuries Incurred By Class Members After The Class Period's Cut-Off Date Are Recoverable Antitrust Class Damages

Victims of antitrust conspiracies are entitled to recover damages for the full extent of the harm stemming from the conspiracy, including "all provable damages that will flow in the future from the acts of the conspirators." *Zenith Radio Corp.*, 401 U.S. at 339. Consistent with this fundamental premise, courts have recognized that the end date of a class period (which must be set at a certain date to limit class membership) does not preclude those class members from seeking to prove damages arising after that period. *See, e.g.*, *Magadia v. Wal-Mart Assocs., Inc.*, 384 F. Supp. 3d 1058, 1105 (N.D. Cal. 2019) ("[D]amages in a class action do not have to terminate at the date of class certification."). Parties and courts "should not confuse [the conspiracy period] window with the possibly different time period for the calculation of damages," because "[i]t is possible that [plaintiffs] may be able to prove damages for a broader time period than the scope of discovery and liability." *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 783-84 (E.D. Pa. 2017) (quoting *In re Domestic Drywall Antitrust Litig.*, 2016 WL 3453147, at *4 n.5 (E.D. Pa. June 22, 2016)).

Plaintiffs here made clear from the outset that Defendants' conspiracy had imposed, and is continuing to impose, long-lasting harm on the market.[1] Such ongoing harm is almost inherent

---

[1] ECF No. 73 (Pls.' Am. Compl.) ¶ 303 ("***To this day***, no lender or borrower can trade and centrally clear stock loans without the significant involvement and tacit approval of the Prime Broker

in a group boycott case like this one, where Defendants drove the boycotted platforms out of existence and no subsequent multilateral trading platform has been able to enter the market and survive, so Class members continue to transact at anticompetitive prices to Defendants' illegal benefit.  While some antitrust cases are filed only after the alleged conspiracy is over and done, this case was filed while the alleged conspiracy was ongoing and still directly imposing harm.  In such cases, it is well recognized that class members will often suffer damages *after* the conclusion of fact discovery and *after* the date selected as the end point of the class's temporal definition.  Indeed, in many cases, the victims of the antitrust conspiracy will continue to suffer damages up to and possibly beyond the trial itself, potentially years after fact discovery ends.

Accordingly, in such antitrust cases, plaintiffs are entitled to pursue the **full** extent of their "damages up to the time of trial."  *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 398 (2d Cir. 1980) ("[I]n an appropriate case the trial court may permit supplementation of the complaint to allow for recovery of damages up to the time of trial.")[2]; *see also U.S. Football League v. Nat'l*

---

Defendants.") (emphasis added), ¶ 323 ("***As a result of their conspiracy, the Prime Broker Defendants continue to dominate the stock loan market***, collectively controlling over 70% of the stock loan brokerage market and taking for themselves more than 65% of the multi-billion-dollars per year in gross revenue generated by stock lending activity.") (emphasis added), ¶ 324 ("Stock lending persists in an inefficient, antiquated OTC structure that depends on the central position of the Prime Broker Defendants."), ¶ 328 ("The current stock loan market involves high search costs and inefficient pricing."), ¶ 344 ("The inefficient OTC structure of the stock loan market prevents borrowers and lenders from using the forces of competition to drive pricing.").

[2]   Citing *Borger*, the court in *Christou v. Beatport*, 2013 WL 2422916 (D. Colo. June 4, 2013) granted leave for plaintiffs to file an amended or supplemental complaint to seek "the recovery of damages resulting from wrongful acts committed subsequent to the filing of the action."  *Id.* at *3 (quoting *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*, 668 F.2d 1014, 1057 (9th Cir. 1981)).  The court saw "no reason why" in an antitrust case "where the alleged misconduct has continued to the present time, there is something magic about the date the complaint was filed" and therefore rejected the defendants' argument that the date of the complaint should be "a cutoff" for plaintiffs' damages.  *Id.*  Such supplementation is not required for Plaintiffs to seek recovery for post-2017 damages that accrued after the Amended Complaint but were caused by Defendants' wrongful conduct alleged in the Amended Complaint.  *N. Am.*

*Football League*, 842 F.2d 1335, 1378 n.27 (2d Cir. 1988) (affirming jury instructions that antitrust plaintiffs may "recover damages they claim they will suffer in the future as a result of the anticompetitive conduct of defendants that has already taken place and which may take place in the future" if the jury "can make a fair and reasonable estimate of plaintiffs' future damages," which "need not be calculated with mathematical precision"); *In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 215 (E.D. Pa. 2017) (approving plaintiffs' use of a regression analysis to show conspiracy had the effect of increasing prices including for a year's period after the end of the "class period").

Allowing plaintiffs to recover ongoing damages in antitrust cases is important to deterring anticompetitive practices. *See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572 (1982) ("A principal purpose of the antitrust private cause of action is, of course, to deter anticompetitive practices." (internal citation omitted)). As the R&R itself recognized, "[a]n unlawful monopolist must be deprived of the fruits of its wrongful conduct, and one of the forbidden fruits is an excessive price … So long as a monopolist enjoys the flower of evil at the expense of its customers, those victims must have a remedy." R&R at 55 (alteration in original) (citing *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *20 (S.D.N.Y. Mar. 28, 2014) (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979))). In ongoing conspiracy cases, plaintiffs' ability to obtain a full recovery and deter misconduct is "a bulwark of antitrust enforcement." *Zenith Radio Corp.*, 401 U.S. at 340. Otherwise, unlawful conspiracies might yet generate profits for the cartel members.

---

*Soccer League v. Nat'l Football League*, 1984 WL 726, at *3 (S.D.N.Y. Aug. 8, 1984) ("Damages accruing since the action began were allowed, but only such as were the consequences of acts done before and constituting part of the cause of action declared on." (quoting *Lawlor v. Loewe*, 235 U.S. 522, 536 (1915))).

Defendants here have presented no evidence that they ended their conspiracy after this case was filed or that its harmful effects have ceased.[3]  Even if Defendants could somehow prove that they ended their conspiracy upon reading the Complaint, the law holds that plaintiffs can still recover damages for any "lingering effects of a completed conspiracy after a class period." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2020 WL 5016922, at *24 (D.D.C. Aug. 25, 2020) (collecting cases).  And the SEC just last year found that the market remains "opaque"— an inefficiency that benefits Defendants and that their conspiracy aimed to preserve—making it "difficult for borrowers and lenders alike to ascertain market conditions and to know whether the terms that they receive are consistent with market conditions." SEC, "Proposed rule: Reporting of Securities Loans" (November 18, 2021) at 7, 9, available at https://www.sec.gov/rules/proposed/2021/34-93613.pdf (cited at ECF 513 (Pls.' Sur-Sur-Reply Br.) at 2).  This opacity, the SEC found, leads to "less favorable prices for beneficial owners and end borrowers," *id*. at 115, confirming that Class members continue to be damaged by the conspiracy.

If Plaintiffs win at trial, and a jury finds that Defendants unlawfully conspired to block competition in the U.S. Stock Loan market, the Class must be permitted to recover all provable damages (including up to the time of trial) both to be made whole and to effectively deter future antitrust violations in financial and other markets.  If the Court instead cuts off the ability of Class members to seek damages after 2017 (six years or more before trial), that ruling would allow Defendants to keep ***well over $2.5 billion dollars*** of wrongful profits from their unlawful conspiracy.  *See* ECF No. 470-2 (Asquith/Pathak Reply Rpt.) ¶ 16 (estimating Class-wide

---

[3]  "Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators."  *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *23 (E.D.N.Y. Nov. 20, 2019) (quoting *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1999)).

damages as about $5 billion between 2012-2017 and $7.5 billion between 2012 and February 22, 2021); ECF No. 556-1 (Pls.' Class Cert. Hr'g Ex.) at Slide 62 (same).

With such a windfall, Defendants might profit even if they lose at trial. But even if that extreme result did not occur, Defendants would nevertheless be able to keep **billions** of dollars in profits from an antitrust conspiracy deemed unlawful by a jury.[4] The Court should avoid these results, all of which undermine the purposes of the antitrust laws. Specifically, the Court should refrain from adopting any specific date as a cut-off to damages and make clear that Plaintiffs are entitled to prove **all** damages suffered by Class members arising from Defendants' conspiracy.

The large multidistrict litigation pending in the Eastern District of New York against Visa and Mastercard illustrates that class members can continue to suffer recoverable damages after class certification in antitrust cases. *In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig.*, Case No. 05-md-1720-MKB. There, the plaintiffs (both class and non-class) allege that defendants Visa and Mastercard agreed to fix certain fees charged to merchants and to impose and abide by rules to stifle competition. Those plaintiffs seek ongoing damages. *See, e.g.*, *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *1 (E.D.N.Y. Sept. 27, 2021) (certifying injunctive relief class based on allegations of defendants' ongoing violations).

---

[4]  To prevent this intolerable result, Plaintiffs may need to file an additional lawsuit to recover damages for the post-2017 wrongful profits. But it would be much more efficient for Plaintiffs to be able to pursue such damages in the existing case. Even if the process of gathering and analyzing supplemental transactional data takes months, as the R&R anticipated, the time for that production would be outweighed by the burdens of having to litigate a trailing case. It also would not delay the establishment of a trial date, would conserve judicial and party resources, and would prevent victims from potentially being denied compensation. These factors strongly favor permitting the class to pursue post-2017 damages rather than forcing a follow-on lawsuit. *See N. Am. Soccer League*, 1984 WL 726, at *3 ("If I did not permit the NASL to bring up to date its after-accruing damages before rendering judgment in this action, the plaintiffs would be obliged to seek them in a separate and subsequent action. That would be wasteful of both parties' and the court's resources ….").

In 2019, the court certified a Rule 23(b)(3) settlement class with a class period of January 1, 2004, to January 24, 2019 (the date of settlement approval).  *See Payment Card*, ECF No. 7257-2 at 17-18; ECF No. 7361.  Recognizing that alleged damages continue to accrue, the class settlement provides for a release of damages claims that extends five years *after* the final settlement approval date.  *See Payment Card*, ECF No. 7257-2 at 29-30; ECF No. 7796-1 ¶ 16(q).  In other words, a class whose membership ended in January 2019 is nevertheless being compensated (and releasing claims) for damages accruing more than five years after that date.

As in *Payment Card*, a decision at the certification stage as to the proper Class Period in this case defines only who qualifies as a Class member.  It does not bar Class members from seeking damages for transactions occurring thereafter.  Plaintiffs have gathered significant evidence to prove that Class members suffered damages from transactions that occurred after 2017, even if the Class Period ends that year.  If Class members can prove they suffered post-2017 damages at summary judgment or trial, they must be allowed to seek recovery for such damages.

### B.   It Is Premature To Rule At The Class-Certification Stage Whether The Class Will Prevail In Proving Its Claim To Recover Post-2017 Damages

Apart from the fact that this a continuing-harm conspiracy, a ruling now on the scope of damages, a quintessential merits (not certification) issue, would be procedurally premature. Plaintiffs have not yet even submitted their merits expert reports for the certified Class.  Those reports will come in the next, yet-to-be-scheduled phase of the litigation, and they will address the full damages suffered by Class members, applying methodologies described in Plaintiffs' class-certification submissions.  Defendants' effort to frontload arguments that Plaintiffs will not have enough evidence to prove post-2017 damages is not ripe at class certification, with further discovery still remaining in the case (even without any reopening of discovery or change in the

schedule).

At the class-certification stage, Plaintiffs need only have a viable plan and methodology for how the Class's damages can be proved after all discovery is taken.  To be clear, Plaintiffs' burden to demonstrate a viable damages methodology for class certification is modest. Plaintiffs' methodology included two components of relevance here.  The first is Plaintiffs' damages model that compared real world and but-for world prices, using the available transactional data to conduct a comparison of real-world borrowing and lending costs Class members have incurred in dealings with Defendants against the predicted prices at which those transactions would have occurred in the but-for world.  Plaintiffs' experts carried out that analysis on a preliminary basis in their reports supporting class certification, using certain of the transactional data records produced by Defendants from January 1, 2012, until December 31, 2017.  ECF No. 470-2 (Asquith/Pathak Reply Rpt.) ¶ 377.

Second, Plaintiffs' experts also described a common method to estimate Class members' damages for transactions that occurred after 2017—specifically, a statistically reliable extrapolation analysis from the calculations run on pre-2018 data.  *See* ECF No. 414-10 (Asquith/Pathak Rpt.) ¶¶ 533-36; ECF No. 470-2 (Asquith/Pathak Reply Rpt.) ¶ 377 & Ex. IV.3.[5]  The R&R found no fault in either damages methodology, both of which meet the Second Circuit's certification standard "accept[ing] the use of aggregate classwide damages so long as they 'roughly reflect' the harm caused to plaintiffs."  *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 31 (E.D.N.Y. 2020) (quoting *Hickory Secs.*

---

[5]  To further ensure a reliable estimate for the post-2017 period, Drs. Asquith and Pathak drew on publicly available IHS Markit data showing that global securities lending revenues from equity securities were consistent with the levels reported from 2012 through 2017, making an extrapolation from the pre-2018 calculations highly reliable.  *See* ECF No. 414-10 (Asquith/Pathak Rpt.) ¶¶ 533-36.

*Ltd. v. Republic of Argentina*, 493 F. App'x 156, 158 (2d Cir. 2012)); *see also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1251 (10th Cir. 2014) (affirming post-trial the admissibility of expert testimony and class certification where plaintiffs' expert used "sample data from roughly 50% of class sales" and "extrapolated damages for the entire class"). If necessary, Plaintiffs could proceed to trial seeking damages after the Class Period without any further productions of transactional data by applying the methodologies described at the class-certification stage. But it would be premature now to cut off the ability of Plaintiffs' experts to present their analyses for any time period.[6]

## II.   The Court Should Modify The R&R To Make Clear That Plaintiffs May Seek Additional Productions Relevant To Damages From Post-2017 Transactions

Because the antitrust laws give Class members the ability to pursue post-2017 damages (whether the Class Period extends after 2017 or not), the Court should not categorically prevent Plaintiffs from seeking supplemental transactional data from Defendants to make post-2017 damages calculations more robust and precise. In discussing the potential need for additional data, the R&R appears to have been misled by Defendants' contentions that Plaintiffs' request for updated data productions from Defendants would be untimely. However, the operative case schedule already provides for continuing productions and expert disclosures ***after*** certification. Specifically, the Fourth Amended Case Management Order and Schedule contemplates further expert discovery after a ruling on Plaintiffs' motion for class certification:

> ***All expert discovery, including reports, production of underlying documents, and depositions, shall be conducted in accordance with a schedule to be issued following a ruling on Plaintiffs' motion for class certification***. The parties shall promptly meet and confer regarding a schedule for expert discovery upon the Court's ruling on Plaintiffs' class

---

[6]   These are all issues relating only to damages, not antitrust impact, because the Class membership would remain the same and, as the R&R recognized, Plaintiffs have already demonstrated they can prove impact on a Class-wide basis. R&R at 57-59.

certification motion, and file a joint proposed schedule for expert discovery
no later than 7 days after the Court's decision.

ECF No. 298 ¶ 7(f) (emphasis added).  In assessing whether "good cause" exists to *reopen* fact discovery under this same scheduling order, the R&R overlooks that this future round of expert discovery already leaves time for supplemental data productions.

The R&R expressed concern that updated data productions may disrupt the case's progress towards trial.  But any updated data productions will not take as long for Defendants to make as the initial round of data discovery negotiations in 2019 and 2020.  Those negotiations involved identification of the appropriate databases for production and extensive correspondence designed to ensure that Defendants extracted and produced data that included the fields of information that Plaintiffs sought to use as inputs for their damages model.  Now that those data specification issues have been decided, supplementing productions of data can proceed on an expedited schedule.  And while Plaintiffs share the desire to proceed to trial as swiftly as reasonably possible, the ability of Class members to recover their full damages should not be sacrificed in the process.

While the R&R appears to conclude that additional data productions would require reopening fact discovery for "good cause," many courts have required instead that defendants produce this type of supplemental discovery without reopening of fact discovery, as a matter of course under Rule 26(e)(1) of the Federal Rules of Civil Procedure.  That rule provides that defendants must supplement discovery responses and productions—even after discovery's close—"in a timely manner …. if there is an objectively reasonable likelihood that the additional or corrective information could substantially affect or alter the opposing party's discovery plan or trial preparation."  *Gorzynski v. JetBlue Airways Corp.*, 2012 WL 712067, at *1, 4 (W.D.N.Y. Mar. 5, 2012); *see also Robbins & Myers, Inc. v. J .M. Huber Corp.*, 274 F.R.D. 63, 73-81

(W.D.N.Y. 2011).  This duty to supplement applies to new as well as corrective information.  *See Robbins & Meyers, Inc.*, 274 F.R.D. at 76; *Dash v. Seagate Tech. (US) Holdings, Inc.*, 2015 WL 4257329, at *12 (E.D.N.Y. July 14, 2015).  And the obligation persists even after the close of discovery.  *See, e.g.*, *Shim-Larkin v. City of New York*, 2020 WL 5534928, at *12 (S.D.N.Y. Sept. 14, 2020); *Reinsdorf v. Skechers U.S.A., Inc.*, 2013 WL 12116416, at *8 (C.D. Cal. Sept. 9, 2013); *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 68 (E.D.N.Y. 2012).

The supplemental discovery ordered in *Everlight Electronics Co. v. Nichia Corp.*, 2015 WL 412184 (E.D. Mich. Jan. 30, 2015) is on point.  In that case, the court compelled production of updated sales data after the close of discovery under Rule 26(e) to accurately measure damages at trial.  *Id.* at *1.  Plaintiffs sought updated sales information for the purposes of updating a damages model, *id.* at *1-2, much as the Class here would seek post-2017 transactional data as support for updating its experts' damages model.  The Court deemed that information "an important factor for the jury's consideration in fashioning a damages award" and therefore compelled supplementation under Rule 26(e).  *Id.* at *2.

The R&R relied upon Defendants' assertion that "the parties limited discovery to the period ending in 2017," R&R at 67, to find that Plaintiffs had failed "to raise at any time before the Motion the possibility that they would seek transactional data discovery post-2017."  *Id.* at 68.  In fact, Plaintiffs have been crystal clear to Defendants from the start of the case that they would seek additional data productions to update damages calculations.  In ***December 2018***, for example, Plaintiffs' requests for production of transactional data specifically demanded data covering the period "from January 1, 2005 ***to the present***."  Eisenkraft Decl. Ex. 1 (Pls.' 2d Set of RFPs) at 8 (emphasis added).  And Plaintiffs made clear that their request for data through "the present" did not even end in December 2018, but instead that the requests:

shall be deemed ***continuing requests*** so as to require supplemental responses if You obtain or discover additional documents between the time of initial production and the time of trial.… ***Plaintiffs specifically reserve the right to seek supplementary responses and the additional supplementary production of documents before trial***.

*Id.* (emphasis added).

When the parties negotiated the temporal scope of those initial data productions, transactional data for much of the post-2017 period running up to today did not yet exist.  The parties therefore agreed to date ranges for ***initial*** data productions, resulting in an agreement that "Defendants are willing to agree to a ***default*** data discovery date range for all parties from January 7, 2009 through December 31, 2017."  Eisenkraft Decl. Ex. 2 (June 6, 2019 Email from L. Rosenberg) at 1 (emphasis added).

But even here, Plaintiffs again made clear their intent to seek supplemental data for damages arising after 2017.  Specifically, Plaintiffs explained that later data "is relevant to the data analysis as this is an ongoing conspiracy," and that therefore Plaintiffs were "***reserving rights to seek supplemental data as appropriate to the needs of the case at a later stage***."  *Id.* (June 4, 2019 Email from D. Mach) at 2.  In response, Defendants "reserve[d] all rights to object to any further requests" for data.  *Id.* (June 6, 2019 Email from L. Rosenberg) at 1.  Defendants' reservation of rights demonstrates that they knew full well that Plaintiffs intended to seek supplemental data in the future.

At various stages of the lengthy negotiation of data productions in 2019 and 2020, Plaintiffs repeatedly told both Defendants and this Court of their intent to seek supplementation for post-2017 damages.  In Plaintiffs' experts' opening report, for example, Drs. Asquith and Pathak explained that "[i]f provided with additional post-2017 data, this same Class-wide damages methodology [used to calculate damages for the 2012-2017 period] can be applied to

the remainder" of time post-2017.  ECF No. 414-10 (Asquith/Pathak Rpt.) ¶ 29.

Respectfully, it was erroneous for the R&R to view Plaintiffs' intent to seek supplemental data as "too late" under the case schedule without "good cause."  Indeed, had Plaintiffs sought supplementation earlier, such as during the class-certification phase, Defendants would have argued that the request was ***too early*** because the Court might deny class certification altogether.  As noted, the most appropriate time to update data productions is ***after*** class certification is resolved, as part of the next phase of discovery contemplated in the case schedule.

The R&R also errs by relying on *Hnot v. Willis Group Holdings Ltd.*, 2006 WL 2381869 (S.D.N.Y. Aug. 17, 2006), as support for finding a lack of good cause for supplemental data discovery.  *Hnot* was an employment-discrimination class action where plaintiffs sought database discovery extending beyond 2001.  *Id.* at *3.  But the plaintiffs in *Hnot* had "failed to take even minimally adequate steps to protect their alleged right to the discovery."  *Id*. at *4.  As shown above, to the contrary, Plaintiffs here have continually reserved their rights and affirmed their intention to seek supplemental transactional data.  Eisenkraft Decl. Ex. 2 (June 4, 2019 Email from D. Mach ) at 2; Ex. 1 (Pls.' 2d Set of RFPs) at 8.

The *Hnot* court also rejected the plaintiffs' argument that the defendants were required to supplement their productions on database discovery pursuant to Rule 26(e) because "[t]he parties agree that the only request for production of database information to which defendants ever had a duty to respond was a request to produce information through December 31, 2001."  2006 WL 2381869, at *5.  But here, as discussed, Plaintiffs expressly stated in their discovery requests that supplementation could be required before trial and agreed to productions of data ending December 31, 2017, only on the express reservation of rights to seek supplemental data for the

post-2017 period at a later stage of the case.[7]  Of greatest importance, though, *Hnot* is not an

antitrust case involving an ongoing conspiracy, so it did not implicate the congressional purpose

animating private enforcement of the antitrust laws.

### III.  The Court Should Modify The R&R To Extend The Class Period To Run Until No Earlier Than December 31, 2017, Not August 16, 2017

Finally, the R&R recommended that the Class Period end on August 16, 2017, reasoning

that Plaintiffs could not establish "good cause" to reopen fact discovery for Defendants to

produce additional transactional data.  This was the sole ground in the R&R for recommending

the August 16, 2017 end-date; the R&R did not find any issues from the perspective of

ascertainability or any Rule 23 certification requirement with Plaintiffs' proposed February 22,

2021 end-date.[8]  As noted, however, Defendants have already produced transactional data

through ***December 31, 2017***.  This data was used in preparing Plaintiffs' experts' reports at class

certification and incorporated into the models presented to the Court.  This is presumably why, at

oral argument, Defendants conceded that "if the court were to recommend that a class or subclass

be certified, ***the end date must be set at December 31, 2017***."  ECF No. 559-1 (Apr. 28, 2022

Class Cert. Hr'g Tr.) at 196:10-12 (emphasis added).  Accordingly, the Class Period should be

---

[7]  Because post-certification discovery in this matter has not been scheduled yet, Plaintiffs did not request an order compelling data supplementation as part of their class-certification motion, though they referred to the issue at oral argument as an outstanding discovery need.  *See* ECF No. 559-1 (Apr. 28, 2022 Class Cert. Hr'g Tr.) at 52:2-53:2; *see also* ECF No. 556-1 (Pls.' Class Cert. Ex.) at Slide 65.  This is in contrast to *Hnot*, where the court inquired whether there were outstanding discovery issues, the plaintiffs identified none, and the plaintiffs failed to seek modification of the relevant schedule.  *Hnot*, 2006 WL 2381869, at *4-5.

[8]  While this brief focuses on the ***damages period*** and the reasons why the R&R's own logic compels defining a class period running until at least December 31, 2017, Plaintiffs also object to any shortening of the proposed Class Period, and incorporate their prior certification briefing's discussion of why the end date of February 22, 2021, is proper under Rule 23.  *See, e.g.*, ECF No. 469 (Pls.' Reply Br.) at 34-35, ECF No. 513 (Pls.' Sur-Sur-Reply Br.) at 5.

modified to end no earlier than December 31, 2017.[9]

## CONCLUSION

Plaintiffs respectfully object to Section IV.D of the R&R and request that the Court certify the class with a Class Period ranging from January 1, 2012, to no earlier than December 31, 2017, and modify the R&R to clarify that Class members can recover damages for harm suffered after the Class Period.  Plaintiffs request that the R&R be adopted in all other respects.

---

[9]   Should the Court agree with the R&R that an end-point earlier than February 22, 2021, is appropriate for any reason, Plaintiffs explain above why, even under the reasoning of the R&R, December 31, not August 16, is the better end-point in 2017.  In the alternative, at minimum, the end-date should be November 17, 2017—the date of Plaintiffs' Amended Complaint—as opposed to the August 16, 2017 date of Plaintiffs' initial Complaint used in the R&R.

DATED:          August 15, 2022

Respectfully submitted,

**COHEN MILSTEIN SELLERS &**
   **TOLL PLLC**

By:   _/s/ Michael B. Eisenkraft_
Michael B. Eisenkraft
Christopher J. Bateman
David Fisher (*pro hac vice*)
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com
cbateman@cohenmilstein.com
dfisher@cohenmilstein.com

Julie G. Reiser (*pro hac vice*)
Richard A. Koffman (*pro hac vice*)
Kit A. Pierson (*pro hac vice*)
Emmy K. Levens (*pro hac vice*)
Daniel McCuaig (*pro hac vice*)
Robert W. Cobbs (*pro hac vice*)
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
jreiser@cohenmilstein.com
rkoffman@cohenmilstein.com
kpierson@cohenmilstein.com
elevens@cohenmilstein.com
dmccuaig@cohenmilstein.com
rcobbs@cohenmilstein.com

**QUINN EMANUEL URQUHART &**
   **SULLIVAN, LLP**

By:   _/s/ Daniel L. Brockett_
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Deborah K. Brown
Daniel P. Mach
David LeRay
Maxwell Deabler-Meadows
Avi Grunfeld
Nicolas Siebert
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
deborahbrown@quinnemanuel.com
danielmach@quinnemanuel.com
davidleray@quinnemanuel.com
maxmeadows@quinnemanuel.com
avigrunfeld@quinnemanuel.com
nicolassiebert@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
jeremyandersen@quinnemanuel.com

**SAFIRSTEIN METCALF LLP**

Peter Safirstein
1345 Avenue of the Americas, 2nd Floor
New York, New York 10105
Telephone: (212) 201-2845
psafirstein@safirsteinmetcalf.com

*Counsel for Torus Capital, LLC*