**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IOWA PUBLIC EMPLOYEES' RETIREMENT
SYSTEM, *et al.*,

       Plaintiffs,

               - against -

BANK OF AMERICA CORPORATION, *et al.*,

       Defendants.

No. 17 Civ. 6221 (KPF) (SLC)

## DEFENDANTS' OBJECTIONS TO JUDGE CAVE'S REPORT & RECOMMENDATION REGARDING CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND .....................................................................................................6

STANDARD OF REVIEW......................................................................................8

ARGUMENT ..........................................................................................................8

I.     The R&R Erred in Finding That Plaintiffs Are Adequate Class Representatives. ............8

     A.     The two subclasses are divided by fundamental conflicts of interest. ...................9

     B.     The R&R erred by failing to require separate representation of each subclass..................................................................................................12

          1.     Second Circuit law requires independent representation of the lender and borrower subclasses. ...............................................13

          2.     The R&R erred in finding no fundamental conflict. ..........................15

     C.     The R&R erred in finding Torus and SCERA adequate and typical representatives of the borrower subclass. ...........................................17

II.     The R&R Erred in Finding Predominance.....................................................18

     A.     The R&R erred by disregarding the evidence Defendants will present at trial to contest the existence of injury to individual class members. ...................19

          1.     Individual inquiries are necessary to identify class members that valued recall protection and other unique features of the OTC market. .................................................................................20

          2.     Individual inquiries are necessary to identify class members that would not have used or benefitted from platform trading. .......................25

          3.     Plaintiffs' "absolute certainty" argument is unavailing............................31

     B.     Plaintiffs' own model of but-for prices demonstrates that many individual inquiries will be necessary at trial.......................................................33

     C.     The R&R erred in determining that Plaintiffs' proffered common evidence is capable of showing injury to all class members..............................................38

          1.     Dr. Zhu's search cost model cannot prove injury to the entire class........39

          2.     The R&R erred in crediting Dr. Zhu's yardstick analysis. .......................44

     D.     The R&R erred in finding that individual transaction and damages inquiries do not defeat predominance. ...............................................45

     E.     The R&R erred in finding that individual issues arising from the FTAIA do not defeat predominance.................................................................46

III.     The R&R Erred in Finding Superiority. .......................................................49

CONCLUSION.......................................................................................................50

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akagi v. Turin Hous. Dev. Fund Co.*,
    2017 WL 1076345 (S.D.N.Y. 2017) (Failla, J.) ...................................................15

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
    463 F. Supp. 3d 409 (S.D.N.Y. 2020) .................................................................48

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................... 14, 49

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...........................................................................................43

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ............................................................................14

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care,*
    *L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) ..............................................................................13

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ..............................................................................48

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .....................................................................................39, 45

*Cuevas v. Citizens Fin. Grp.*,
    526 F. App'x 19 (2d Cir. 2013) ...........................................................................2

*Dewey v. Volkswagen Aktiengesellschaft*,
    681 F.3d 170 (3d Cir. 2012) ..............................................................................16

*Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*,
    417 F.3d 1267 (D.C. Cir. 2005) .........................................................................49

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004) .........................................................................38

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ...........................................................................................46

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ...........................................................................................43

*In re Aluminum Warehousing Antitrust Litig.*,
   336 F.R.D. 5 (S.D.N.Y. 2020) ...................................................................... passim

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) .......................................................................... passim

*In re Auction Houses Antitrust Litig.*,
   193 F.R.D. 162 (S.D.N.Y. 2000) ......................................................................... 16

*In re Bank of Am. Home Affordable Modification Program Litig.*,
   2013 WL 4759649 (D. Mass. 2013) ..................................................................... 18

*In re Electronic Books Antitrust Litig.*,
   2014 WL 1282293 (S.D.N.Y. 2014) ..................................................................... 28

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   2016 WL 5108131 (S.D.N.Y. 2016) ........................................................ 47, 48, 49

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   407 F. Supp. 3d 422 (S.D.N.Y. 2019) ............................................................ passim

*In re Gaming Lottery Sec. Litig.*,
   58 F. Supp. 2d 62 (S.D.N.Y. 1999) ..................................................................... 17

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ............................................................... 5, 35, 39, 45

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   2014 WL 6601941 (D. Del. 2014) ................................................................ 20, 38

*In re Intuniv Antitrust Litig.*,
   2019 WL 3947262 (D. Mass. 2019) .............................................................. 33, 34

*In re Joint E. & S. Dist. Asbestos Litig.*,
   982 F.2d 721 (2d Cir. 1992) ............................................................................. 13

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   957 F.3d 184 (3d Cir. 2020) ....................................................................... 19, 28

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ........................................................... 14, 39

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) .......................................................................... passim

*In re Microsoft Corp. Antitrust Litig.*,
   218 F.R.D. 449 (D. Md. 2003) ........................................................................... 14

*In re Monosodium Glutamate Antitrust Litig.*,
477 F.3d 535 (8th Cir. 2007) .............................................................49

*In re Namenda Indirect Purchaser Antitrust Litig.*,
338 F.R.D. 527 (S.D.N.Y. 2021) .........................................................39

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ................................................. 15, 16

*In re Niaspan Antitrust Litig.*,
464 F. Supp. 3d 678 (E.D. Pa. 2020)...................................................27

*In re NYSE Specialists Securities Litig.*,
260 F.R.D. 55 (S.D.N.Y. 2009) .................................................. 15, 16

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014).........................................................41

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) ..................................................... 13, 17, 18

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013)..................................................18, 19, 41

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019)................................................... passim

*In re Sumitomo Copper Litig.*
182 F.R.D. 85 (S.D.N.Y. 1998) ...........................................................17

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
924 F.3d 57 (2d Cir. 2019) ..................................................................37

*Kayes v. Pac. Lumber Co.*,
51 F.3d 1449 (9th Cir. 1995) ...............................................................15

*Kottaras v. Whole Foods Mkt., Inc.*,
281 F.R.D. 16 (D.D.C. 2012).............................................................38

*Kottler v. Deutsche Bank AG*,
2010 WL 1221809 (S.D.N.Y. 2010) ....................................................50

*Lavoho, LLC v. Apple Inc.*,
71 F. Supp. 3d 395 (S.D.N.Y. 2014)....................................................46

*Lou v. Ma Labs., Inc.*,
2014 WL 68605 (N.D. Cal. 2014)........................................................15

*Mazzei v. Money Store,*
　829 F.3d 260 (2d Cir. 2016) ........................................................................46

*Myers v. Hertz Corp.,*
　624 F.3d 537 (2d Cir. 2010) ...................................................................1, 31

*Nypl v. JP Morgan Chase & Co.,*
　2022 WL 819771 (S.D.N.Y. 2022) ...............................................................46

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
　31 F.4th 651 (9th Cir. 2022) (en banc) .........................................................43

*Ortiz v. Fibreboard Corp.,*
　527 U.S. 815 (1999) ...............................................................................12, 16

*Pall Corp. v. Entegris, Inc.,*
　249 F.R.D. 48 (E.D.N.Y. 2008) ......................................................................8

*Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.,*
　2018 WL 1831850 (S.D.N.Y. 2018) (Failla, J.) .............................46, 49, 50

*Ruzhinskaya v. Healthport Techs. LLC,*
　311 F.R.D. 87 (S.D.N.Y. 2015) ....................................................................31

*Sjunde AP-Fonden v. Gen. Elec. Co.,*
　2022 WL 1078460 (S.D.N.Y. 2022) .............................................................17

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.,*
　546 F.3d 196 (2d Cir. 2008) ...................................................................18, 35

*TI Inv. Servs. LLC v. Microsoft Corp.,*
　23 F. Supp. 3d 451 (D.N.J. 2014) .................................................................46

*Tyson Foods, Inc. v. Bouaphakeo,*
　577 U.S. 442 (2016) ......................................................................................43

*Wal-Mart Stores, Inc. v. Dukes,*
　564 U.S. 338 (2011) .........................................................................25, 39, 45

**Statutes & Rules**

28 U.S.C. § 636(b)(1)(C) .......................................................................................8

Fed. R. Civ. P. 23 ......................................................................................... passim

Fed. R. Civ. P. 72 ...................................................................................................8

**Other Authorities**

1 McLaughlin on Class Actions § 4:30 ...................................................................................... 13

Kolasinski, Reed, and Ringgenberg, *A Multiple Lender Approach To Understanding Supply and Search in the Equity Lending Market* J. of Fin. 559, 578, 593-94 (2013) ........... 12

SEC, Reporting of Securities Loans, 86 Fed. Reg. 69802 (Dec. 8, 2021) ....................... 12, 33, 36

## TABLE OF RECORD CITATION ABBREVIATIONS

| Abbreviation | Full Description |
|---|---|
| A&P | Expert Report of Paul Asquith and Parag Pathak in Support of Plaintiffs' Motion for Class Certification (ECF No. 414-10) |
| A&P Reply | Reply Expert Report of Paul Asquith and Parag Pathak in Further Support of Plaintiffs' Motion for Class Certification (ECF No. 470-2) |
| A&P Sur-Reply | Sur-Reply Expert Report of Paul Asquith and Parag Pathak in Further Support of Plaintiffs' Motion for Class Certification (ECF No. 514-1) |
| Asquith Dep. | Transcription of the deposition of Paul Asquith, taken on May 14-15, 2021 (ECF No. 432-9) |
| ▮▮▮ | Declaration of ▮▮▮▮ (▮▮▮), dated June 5, 2021 (ECF No. 432-14) |
| ▮▮▮ | Declaration of ▮▮▮▮ (▮▮▮▮), dated June 17, 2021 (ECF No. 432-57) |
| Defs. Br. | Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 431) |
| Defs. Pres. | Defendants' Class Certification Presentation for oral argument held before Magistrate Judge Sarah L. Cave on April 28, 2022 (ECF No. 557-1) |
| Defs. Sur-Reply | Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 495) |
| ▮▮▮ Dep. | Transcription of the deposition of ▮▮▮▮ (▮ taken on September 15-16, 2020 (ECF No. 414-39) |
| ▮▮▮ Dep. | Transcription of the deposition of ▮▮▮▮ (▮ taken on August 27, 2020 (ECF No. 496-5) |
| Hendershott | Expert Report of Terrence Hendershott in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF No. 432-1) |
| Hendershott Reply | Reply Expert Report of Terrence Hendershott in Support of Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 496-1) |
| ▮▮▮ | Declaration of ▮▮▮▮ (▮▮▮ dated May 27, 2021 (ECF No. 432-43) |

| Abbreviation | Full Description |
|---|---|
| McCrary | Expert Report of Justin McCrary in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF No. 432-2) |
| McCrary Reply | Reply Expert Report of Justin McCrary in Support of Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 496-2) |
| ▮▮▮ | Declaration of ▮▮▮▮ (▮▮▮▮), dated June 4, 2021 (ECF No. 432-56) |
| ▮▮▮r | Declaration of ▮▮▮▮ (▮▮▮), dated September 25, 2020 (ECF No. 432-6) |
| Pathak Dep. | Transcription of the deposition of Parag Pathak, taken on May 5, 2021 (ECF No. 432-42) |
| Pls. Br. | Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (ECF No. 415) |
| Pls. Reply | Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Class Certification (ECF No. 469) |
| Pls. Sur-Sur-Reply | Sur-Sur-Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Class Certification (ECF No. 513) |
| Pridmore | Expert Report of William F. Pridmore in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF No. 432-3) |
| Pridmore Reply | Reply Expert Report of William F. Pridmore in Support of Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 496-3) |
| R&R | Report and Recommendation of Magistrate Judge Sarah L. Cave regarding Class Certification (ECF No. 563) |
| Savoldelli | Expert Report of Fabio Savoldelli in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF No. 432-4) |
| Savoldelli Reply | Reply Expert Report of Fabio Savoldelli in Support of Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification (ECF No. 496-4) |
| ▮▮▮ Dep. | Transcription of the deposition of ▮▮▮▮ (▮▮▮), taken on October 13, 2020 (ECF No. 432-7) |
| ▮▮▮ | Declaration of ▮▮▮▮ (▮▮▮ dated June 10, 2021 (ECF No. 432-44) |

| Abbreviation | Full Description |
|---|---|
| ██████ Dep. | Transcription of the deposition of ██████ (██████ taken on October 15, 2020 (ECF No. 432-39) |
| Tr. | Transcription of oral argument held before Magistrate Judge Sarah L. Cave on April 28, 2022 (ECF No. 559-1) |
| Zhu | Expert Report of Haoxiang Zhu in Support of Plaintiffs' Motion for Class Certification (ECF No. 414-9) |
| Zhu Dep. | Transcription of the deposition of Haoxiang Zhu, taken on May 11, 2021 (ECF No. 432-59) |
| Zhu Reply | Reply Expert Report of Haoxiang Zhu in Support of Plaintiffs' Reply to Plaintiffs' Motion for Class Certification (ECF No. 470-1) |

## PRELIMINARY STATEMENT

Plaintiffs' motion for class certification ultimately rests on the twin contentions that (i) an anonymous trading platform for stock loans would have improved prices for *all* of the thousands of members of the proposed class even if the platform captured only a small fraction of trading volume, and (ii) each and every member of the borrower or lender subclasses would have so clearly and obviously benefitted from platform trading that nothing useful could be learned by examining the circumstances of individual class members at trial.  The Report and Recommendation ("R&R") erroneously accepted both of those contentions in recommending that this Court certify the proposed class.  In so doing, the R&R advanced legal positions that cannot be reconciled with controlling precedent and, in ignoring or dismissing much of the record evidence, abrogated the court's responsibility to rigorously analyze the evidence in considering class certification.  Two errors in particular distorted the R&R's analysis of Rule 23's requirements.

*First*, the R&R erred when it largely ignored the evidence *Defendants* will present at trial, focusing almost exclusively on the evidence Plaintiffs will offer.  Defendants' case at trial will include thousands of individualized showings that specific class members were unharmed by the alleged conspiracy because they would not have used or benefitted from anonymous platform trading.  Defendants' case also will include individualized evidence showing that (i) numerous class members were unable to trade on an anonymous platform or unwilling to forgo the valuable benefits they received by trading over-the-counter ("OTC") with prime brokers, (ii) numerous class members benefitted from OTC trading in ways not reflected in the transaction data, which make OTC loans more valuable than platform loans, and (iii) large numbers of transactions are beyond the scope of U.S. antitrust law under the FTAIA.  The breadth of individualized evidence that Defendants will present at trial will raise individualized questions that predominate over common ones.  *See, e.g.*, *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010) ("[C]ourts must

consider potential defenses in assessing the predominance requirement.").  The R&R mistakenly disregarded or discounted Defendants' evidence based on a series of legal and factual errors described below.

*Second*, the R&R failed to perform a rigorous analysis of Plaintiffs' purported proof of antitrust impact and damages.  In assessing class certification, the Court must carefully analyze the soundness of Plaintiffs' evidence and resolve all factual and expert disputes bearing on Rule 23 issues.  *See, e.g.*, *Cuevas v. Citizens Fin. Grp.*, 526 F. App'x 19, 22 (2d Cir. 2013).  Yet, the R&R largely punted to the jury to determine whether Plaintiffs' expert analysis and economic models are capable of proving injury to the entire class.  To suggest, as the R&R did, that any flaws in Plaintiffs' models are "common issues" that are "appropriately deferred to the merits stage" (R&R 56, 58) is a fundamental misreading of Rule 23.  *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46-47 (S.D.N.Y. 2020).

These and other errors led to the R&R's mistaken conclusion that Plaintiffs satisfied the adequacy of representation, predominance, and superiority requirements of Rule 23.

1. Adequacy.  Second Circuit law requires that each subclass be represented by independent counsel and class representatives with undivided loyalty solely to that particular subclass.  *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249-56 (2d Cir. 2011).  Yet, here, the R&R concluded that the same set of counsel and named Plaintiffs can simultaneously represent two distinct subclasses:  a subclass that *borrowed* stock from Defendants and a subclass that *lent* stock to Defendants.  Those two subclasses, however, have fundamental conflicts of interest on critical questions such as whether the borrower or lender subclass suffered most or all of the alleged injury since any harm to one subclass benefits the other.  Given those conflicts, Plaintiffs and their counsel cannot satisfy Rule 23's adequacy requirement.  Indeed, they

already have divided their loyalties between lenders and borrowers by staking out positions that compromise the interests of both subclasses.  In nonetheless concluding that Plaintiffs and their counsel are adequate representatives of both subclasses, the R&R broke with Second Circuit law and applied an outdated legal standard for evaluating conflicts of interest.

2. <u>Predominance</u>.  Rather than resolving all factual and expert disputes relevant to the predominance requirement under a preponderance-of-the-evidence standard, the R&R largely glossed over those disputes or deferred them to the jury to determine at trial.  This improper approach to Rule 23(b)(3) manifested in at least the following five errors of fact and law.

*First*, the R&R improperly disregarded the individualized evidence Defendants will offer at trial to contest the existence of injury to particular class members.  This evidence will include class-member-by-class-member showings that numerous class members could not trade on a platform due to their particular trading strategies, needs, and circumstances.  It also will include evidence that (i) OTC loans provide valuable benefits to class members—such as recall protection and rerate management—that cannot be replicated on trading platforms, (ii) these benefits are highly valuable to many class members, and (iii) many class members would have been unwilling to forgo these valuable features of OTC loans by trading on anonymous platforms.

The R&R failed to address overwhelming record evidence establishing the need for such individualized inquiry.  For instance, the R&R dismissed Defendants' evidence that OTC loans are more valuable than platform loans to a great many class members, asserting that Defendants failed to substantiate the value of OTC loans with anything other than "self-serving statements." (R&R 53.)  But Defendants provided voluminous evidence from class members, industry experts, and representatives of the AQS platform attesting to the differences between OTC loans and platform loans and the vital importance of those differences.  The R&R also disregarded

3

Defendants' evidence that many class members would not have used or benefitted from platform trading on the theory that "[a]ny argument" about whether class members "would or would not have elected to join a platform in the but-for world" is "speculative." (R&R 55.) But antitrust cases routinely involve predictions about what class members would have done or experienced in the but-for world, and courts are required to make such predictions in deciding class certification. The R&R thus erred in disregarding Defendants' individualized evidence in its analysis.

*Second*, the R&R determined that common questions predominate because the damages model proffered by Plaintiffs' experts Professors Asquith and Pathak (the "A&P model") supposedly showed that only 0.5% of class members were uninjured and Defendants' criticisms of that model rested on purported data errors. Neither conclusion is correct. Defendants established that ██████████████████████████████████████████████████ ████████, and Plaintiffs' calculations rely on a series of unrealistic and erroneous assumptions. For instance, the A&P model posits—despite undisputed evidence to the contrary—that class members wishing to trade on a platform would incur *zero* costs for fixed platform fees, *zero* costs for the significant technological infrastructure required to access trading platforms, and much lower clearing costs than those estimated by AQS itself. Additionally, the A&P model is unable to assess injury at the level of actual class members (or even at the level of individual transactions), and fails to offset gains against losses. Once one or more of these errors are corrected, the number of uninjured class members ranges from ██% to ██%. This alone defeats predominance, yet the R&R improperly failed to weigh *any* of this relevant evidence or attempt to resolve these disputes.

*Third*, the R&R failed to resolve the parties' disputes about whether the work of Plaintiffs' expert Dr. Zhu is capable of proving injury to each individual class member. To start, Dr. Zhu never even *built* a search cost model for the lender subclass; instead, he simply speculated about

the results such a model might produce if he were to build one.  This leaves Plaintiffs with *no* common proof of impact for half of the proposed class.  For the borrower subclass, Dr. Zhu's search cost model purports to show that borrowers would have benefitted if platform trading had lowered their costs of searching for stocks available to be borrowed.  But Dr. Zhu's model predicts that all borrowers would benefit from lower search costs only because it deliberately assumes away all real-world reasons why many borrowers would not benefit from platform trading.  Dr. Zhu also offered a so-called "yardstick analysis" to try to shore up his opinion that all class members would have benefitted from platform trading, but that analysis consists of little more than conclusory generalizations about the average effects platforms have had on markets that lack the central characteristic of stock lending—an ongoing relationship between borrowers and lenders.  In other markets where such an ongoing relationship exists, all or almost all transactions take place OTC.

The R&R should have resolved the parties' disputes about whether the flaws in Dr. Zhu's search cost model and yardstick analysis render that work incapable of proving injury to each individual class member.  *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) ("*In re IPO*").  Rather than engage in rigorous analysis of the parties' evidence, however, the R&R punted those questions to the jury to determine at trial.  (R&R 59.)  Because Plaintiffs' attempt to demonstrate predominance depends on Dr. Zhu's analysis, the R&R's failure to scrutinize it was error.  This Court should subject Dr. Zhu's work to the rigorous analysis required by Rule 23 and find that it is incapable of proving injury to the entire class.

*Fourth*, the R&R ignored the vast number of individual inquiries into particular transactions and transaction records that would be necessary to determine injury and damages at trial.  For this reason as well, individual inquiries will predominate at any trial in this action.

*Fifth*, the R&R committed a clear error of law in concluding that the FTAIA's

extraterritoriality requirements "do[] not preclude a finding of predominance." (*Id.* at 61.) The R&R wrongly assumed that the relevant question under the FTAIA is whether the parties to stock-loan transactions were *domiciled* in the United States, when in fact, the relevant question is whether the parties were *operating* in the United States at the time of their transactions. Determining where the parties to stock-loan transactions were operating will require enormous numbers of transaction-by-transaction inquiries at trial, which defeats predominance under *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 407 F. Supp. 3d 422 (S.D.N.Y. 2019) ("*FOREX II*").

3. <u>Superiority</u>. The R&R also erred in finding that Plaintiffs had demonstrated that class treatment would be superior to individual trials. The size and sophistication of class members in this case, as well as the active role played by a group of hedge funds during the discovery process, make clear that class members are willing to represent their own interests in individual trials, and that a class trial in which many would be actively involved would quickly prove unmanageable. The R&R erred in dismissing this evidence.

## BACKGROUND

The following abbreviated factual recitation assumes the Court's familiarity with the extensive factual record in this case discussed in the parties' briefs on class certification. Defendants focus here on certain salient attributes of the stock-lending market that are particularly relevant to the arguments that follow.

Unlike most other financial markets in which the instrument at issue is bought or sold and title changes hands, stock loans create an ongoing "███████" between the lender and borrower that lasts until the borrower returns, or the lender recalls, the borrowed stock. (Defs. Br. 1, 4-5.) For lenders (the beneficial owners of the stock), flexibility is critical: they need to be able to recall their shares on demand to manage their portfolios or participate in a corporate action such as a shareholder vote, dividend, or rights offering. (*Id.* at 5.) For borrowers (short sellers, mostly hedge

funds), loan stability is the key:  because their shorting strategies involve selling borrowed stock and hoping for the price to decline before covering the short position by buying back the stock, it is critical that they not be forced to return borrowed stock before their investment strategy plays out.  Borrowers thus have a keen interest in knowing the identity of their counterparty so that they can assess the risk of an early recall, which varies from lender to lender.  (*Id.* at 4, 6-7.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

By contrast, anonymous trading platforms like AQS perform a far more limited role and involve ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



## STANDARD OF REVIEW

This Court reviews *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). "Under the *de novo* standard," the Court "make[s] an independent determination of the relevant issue, giving no deference to any previous resolution of such issue." *Pall Corp. v. Entegris, Inc.*, 249 F.R.D. 48, 52 (E.D.N.Y. 2008) (citing Fed. R. Civ. P. 72(b)).

## ARGUMENT

## I.     The R&R Erred in Finding That Plaintiffs Are Adequate Class Representatives.

Plaintiffs propose that the same pair of law firms (Quinn Emanuel and Cohen Milstein) and the same group of five named Plaintiffs will simultaneously represent a borrower and a lender subclass. Those two subclasses, however, are divided by fundamental conflicts of interest. Despite those conflicts, the R&R found that Plaintiffs and their counsel are adequate representatives of both the lender and the borrower subclass because Defendants allegedly "harmed both Subclasses, who have a mutual incentive to maximize their recovery from Defendants." (R&R 44.) That was error. Second Circuit precedent squarely rejects the notion that conflicts of interest are excusable merely because "all class members share an interest in maximizing the collective recovery." *Literary Works*, 654 F.3d at 254. Under Second Circuit law,

Plaintiffs and their counsel cannot adequately represent either a borrower or a lender subclass because they cannot give their undivided loyalty to either subclass.

A.      **The two subclasses are divided by fundamental conflicts of interest.**

Lenders and borrowers stand on opposite sides of the stock-lending market:  lenders *receive* fees for lending stock, while borrowers *pay* fees for borrowing stock.  These opposing market positions create inherent conflicts of interest over whether lenders or borrowers sustained most or all of the alleged injury here, *i.e.*, whether lenders or borrowers would have captured most or all of the "savings" that platform trading allegedly would have generated in the but-for world.  (McCrary ¶¶265-273.)  Plaintiffs and their counsel, however, have not made the best available arguments for maximizing the alleged injury to either the lender or the borrower subclass.  Instead, they have staked out "compromise" positions that harm the interests of both subclasses.  Simultaneous representation of both subclasses by the same counsel and representatives thus fails to provide the necessary "structural assurance" that each subclass will be adequately represented.  *Literary Works*, 654 F.3d at 250.  Three examples—each of which the R&R failed to address— illustrate the point.

**i.  <u>Conflict over platform prices</u>**.  Lenders and borrowers face a zero-sum conflict of interest over the prices at which they allegedly would have transacted with each other on anonymous trading platforms in the but-for world.  Borrowers are best served by showing that platform prices would have been *low* because low prices maximize the alleged injuries to borrowers—and minimize those to lenders.  (McCrary ¶¶265-273.)  Lenders, by contrast, are best served by showing that platform prices would have been *high* because high prices maximize the alleged injuries to lenders—and minimize those to borrowers.  (*Id.*)  Plaintiffs and their counsel— forced by their dual representation arrangement to compromise between these opposing interests— failed to advance the best available arguments in favor of either lenders or borrowers.  Instead,

Plaintiffs adopted a damages model—the A&P model—that arbitrarily allocates "injury" between lenders and borrowers to the detriment of both subclasses.  (*Id.*; A&P ¶464.)

The allocation percentages used in the A&P model exemplify the conflict of interest.  For all "warm" stocks (*i.e.*, moderately hard-to-borrow stocks), the model allocates ██% of the alleged price savings in the but-for world to lenders and ██% to borrowers.  (McCrary ¶¶265-267; A&P ¶464.)  For all "hot" stocks (*i.e.*, stocks that are harder to borrow than warm stocks), the model allocates ██% of alleged price savings to lenders and ██% to borrowers.  (*Id.*)  Those percentages determine not just how much any given class member might recover at trial, but also whether a class member has a chance to recover anything at all, because any price savings that a class member allegedly could have achieved through platform trading must be offset against the costs the class member would have incurred for using a platform.  (McCrary ¶¶172-177, 186-192, 270-278.)

Despite the critical role these percentages play in allocating the alleged injury between lenders and borrowers, Drs. Asquith and Pathak arbitrarily picked their ██% and ██% allocation factors using their own subjective judgment.  (*Id.* ¶¶268-269; A&P ¶464.)  These arbitrary choices exacerbate the conflicts of interest between lenders and borrowers because reasonable arguments could have been made for choosing higher or lower percentages.  For example, a reasonable argument could have been made that the allocation percentage for extremely hot stocks should have been ██% to lenders rather than ██%, which would have allocated much more of the alleged injury to lenders.  (McCrary ¶275 & Ex. 24.)  Similarly, reasonable arguments could have been made for using *customized* percentages that vary by stock and by day, which would have dramatically altered the allocation of the alleged injury.  (*Id.* ¶¶258, 279-282.)  But instead of advancing the best available arguments for either lenders or borrowers, Plaintiffs arbitrarily

adopted fixed allocation factors of ██% and ██% for all transactions, to the detriment of large numbers of lenders and borrowers.

**ii. Conflict over platform fees**.  A similar zero-sum conflict exists regarding allocation of the transaction fees a platform would charge borrowers and lenders.  Even though resolution of that conflict will singlehandedly extinguish any chance of recovery for either numerous lenders or numerous borrowers, the R&R never even mentioned this fundamental conflict.

Drs. Asquith and Pathak acknowledge that their damages model must account for the transaction fees that trading platforms would have charged borrowers and lenders in the but-for world.  (A&P ¶264.)  They further acknowledge that reasonable arguments can be made for allocating those platform fees in two alternative ways:  (i) the fees could be allocated ██████ between borrowers and lenders, as occurred on AQS in the actual world, or (ii) ████████████ ██████████████████████████████████████████████████████████ ██████████████.  (*Id.* ¶¶468, 476-478; McCrary ¶261.)  Although the A&P model allocated these fees on a ██████ basis, Dr. Pathak testified that the fees more likely would have been shifted ██████████████████ (Pathak Dep. 338:15-341:8), while Dr. Asquith testified that the ██████ allocation was more likely (Asquith Dep. 224:10-225:13).

The choice between these alternative allocations is critical.  Even under the ultra-low assumptions about the costs of platform trading used in the A&P model, the model predicts that allocating platform fees on a ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████.  (McCrary ¶263 & Ex. 22; McCrary Reply App'x Ex. D.5.)  These figures climb even higher if Plaintiffs' unrealistic assumptions about the all-in costs of platform trading are replaced with realistic assumptions.  (McCrary ¶¶172-174.)  Accordingly, class representatives

loyal to borrowers alone would have argued vigorously for the ▆▆▆ allocation, while representatives loyal to lenders alone would have argued vigorously for ▆▆▆▆▆▆▆ ▆▆▆▆. Plaintiffs and their counsel did neither of those things, thus betraying both subclasses.

**iii. <u>Conflict over search costs</u>.** The R&R is also silent on the fundamental conflict of interest between lenders and borrowers over "search costs," *i.e.*, the costs borrowers incur when searching for stock available to be borrowed. Plaintiffs argue that search costs in the OTC market enable lenders to charge high fees and that platform trading would reduce these search costs, thereby reducing the fees for borrowing stock. (Zhu ¶¶32-47, 258; A&P ¶116.) But if that is true, then the lender subclass would be *harmed* by platform trading because reducing search costs would reduce their ability to charge high fees. (McCrary ¶¶228, 250-252.) Indeed, the very academic literature cited by Plaintiffs' experts concludes that "lenders benefit—sometimes significantly— from search costs" and that "search costs give equity lenders the ability to charge higher prices."[1] Plaintiffs' search costs argument thus pits one subclass directly against the other.

**B.    The R&R erred by failing to require separate representation of each subclass.**

Without addressing any of the specific conflicts discussed above, the R&R found that there is no need for separate representation of lenders and borrowers because there are no "fundamental" conflicts of interest between them. (R&R 43-45.) But appellate precedent establishes that where, as here, two subclasses have directly conflicting interests with respect to proving an alleged injury or allocating a recovery, Rule 23(a)(4) requires the "structural protection" of independent representation of each subclass. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999). No

---

[1] Kolasinski, Reed, and Ringgenberg, *A Multiple Lender Approach To Understanding Supply and Search in the Equity Lending Market*, 68 J. of Fin. 559, 578, 593-94 (2013) (cited in A&P ¶116 & n. 101); *see also* SEC, Reporting of Securities Loans, 86 Fed. Reg. 69802, 69805, 69837 (Dec. 8, 2021) ("Obtaining a securities loan often involves an extensive search for counterparties by broker dealers" and lenders "could . . . experience reduced revenues" if price transparency is increased).

such independent representation exists here.  The R&R thus erred in concluding that Plaintiffs and their counsel are adequate class representatives.

### 1. Second Circuit law requires independent representation of the lender and borrower subclasses.

Under Second Circuit law, distinct subclasses with competing interests must be represented by "independent counsel pressing [the] most compelling case" on behalf of each subclass, *Literary Works*, 654 F.3d at 253-54, and by counsel and named plaintiffs "who have undivided loyalties only to members of their respective subclasses," *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 742-43 (2d Cir. 1992).  Certifying a class that lacks these protections creates a "structural flaw" that violates Rule 23(a)(4), *Literary Works*, 654 F.3d at 253, and "could prove disastrous" because it would invite any dissatisfied class member to "collaterally attack the judgment on inadequate representation grounds," 1 McLaughlin on Class Actions § 4:30.

Plaintiffs and their counsel cannot satisfy these requirements:  as a mixed coalition of both lenders and borrowers, they cannot give their undivided loyalty to either subclass.  Indeed, they have already committed themselves to "compromise" positions that harm both subclasses on the critical questions discussed above.  Plaintiffs and their counsel are thus inadequate under Rule 23(a)(4).  *See*, *e.g.*, *Literary Works*, 654 F.3d at 255-57 (reversing certification and requiring independent representation of subclasses with "discrete categories of claims" who "must compete with one another over the allocation" of a recovery); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233-34 (2d Cir. 2016) (reversing certification and requiring independent representation of separate classes where the "fault lines were glaring as to matters of fundamental importance" such as "essential allocation decisions"); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245-46 (2d Cir. 2007) (reversing certification where subclasses had conflicting interests as to which one

13

was "more damaged by [defendant's] conduct"); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998) (reversing certification where "it is clear that the remedial interests of those within the single class are not aligned" (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 626 (1997))); *In re Microsoft Corp. Antitrust Litig.*, 218 F.R.D. 449, 452 (D. Md. 2003) (denying certification where same counsel sought to represent both suppliers and customers because "[t]his dual scenario places plaintiff's counsel in a position of irreconcilable conflict").

Two recent decisions in this District apply these principles in factual settings much like this one. In *FOREX II*, the court declined to certify a class of traders that transacted on a futures exchange because numerous class members had "trade[d] directly with each other" and thus had "oppositional trading positions" that created direct conflicts of interest. 407 F. Supp. 3d at 439. Similarly, in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, the court declined to certify a class of exchange traders suing over LIBOR manipulation because "differing exposures . . . on different trading days create[] differences between class members . . . that undermine the class representatives' incentive to fully pursue the class's claims." 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018). The court explained that "opposite net trading positions" create "directly conflicting incentives to establish not only the existence but also the magnitude of any manipulation" and that these types of "[d]irectional differences are particularly corrosive of adequacy in that they create directly conflicting incentives." *Id.* The same analysis applies here: class certification should be denied because lenders and borrowers have "oppositional trading positions," *FOREX II*, 407 F. Supp. 3d at 439, and "directly conflicting incentives," *LIBOR*, 299 F. Supp. 3d at 539, that extend not only to the size of the potential recovery of each subclass, but also to whether numerous class members will have a chance to recover anything at all.

Plaintiffs and their counsel could have avoided these conflicts by dividing themselves into separate lender and borrower groups at the outset of the litigation, but it is much too late for that now.  First, Plaintiffs cannot retract the compromise positions they have already taken that harm both subclasses, such as the A&P model's arbitrary allocation of any recovery here.  Second, to represent either a lender or a borrower subclass, Plaintiffs' counsel would have to free themselves of competing tugs on their loyalties by dropping their representation of all named Plaintiffs that stand on the opposite side of the market from that subclass.  *See, e.g., Literary Works*, 654 F.3d at 253-55 (each subclass was entitled to conflict-free counsel with no reason to refrain from "advanc[ing] the strongest arguments" for that subclass); *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (class counsel could not represent both proposed class and individual plaintiffs with potentially conflicting interests); *Lou v. Ma Labs., Inc.*, 2014 WL 68605, at *2 (N.D. Cal. 2014) (denying certification because "[a] class in this case deserves to be championed by its counsel unencumbered by their duties to other clients").  Plaintiffs' counsel have not tried to drop those individual clients, nor could they ethically do so now.  *See, e.g., Akagi v. Turin Hous. Dev. Fund Co.*, 2017 WL 1076345, at *12 (S.D.N.Y. 2017) (Failla, J.) (dropping a client to avoid a conflict of interest would violate counsel's duty to the "disfavored client").

### 2.    The R&R erred in finding no fundamental conflict.

The R&R ignored the above authority requiring independent representation of subclasses with conflicting interests and failed to cite a *single* Second Circuit or appellate decision on that question.  Instead, the R&R relied solely on a handful of district court decisions in concluding that the conflicts here are not "fundamental."  (R&R 44-45.)  Those cases are factually inapposite and relied on outdated legal standards.

*First*, the two cases at the heart of the R&R's analysis—*In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493 (S.D.N.Y. 1996), and *In re NYSE Specialists Securities*

*Litigation*, 260 F.R.D. 55 (S.D.N.Y. 2009)—rely on a legal standard that has since been rejected. In *NASDAQ*, Judge Sweet concluded that a "fundamental" conflict of interest is a conflict "so palpable as to outweigh the substantial interest of every class member" in "maximizing the aggregate amount of classwide damages," 169 F.R.D. at 513-15, a standard he later reapplied in *NYSE Specialists*, 260 F.R.D. at 73-74.  But subsequent appellate authority rejects that standard, focusing instead on whether "fault lines" within a class create direct conflicts of interest between subclasses.  *See Literary Works*, 654 F.3d at 250, 254 (reversing class certification despite plaintiffs' argument that "all class members share an interest in maximizing the collective recovery"); *see also Ortiz*, 527 U.S. at 857-58 (rejecting plaintiffs' argument that subclasses' conflicting interests should be weighed against their "common interest in securing contested insurance funds"); *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012) ("[*Ortiz*] explicitly rejected the argument that the class members all had the same incentive simply because all members of the class wished for a maximum recovery.").  The R&R thus erred in setting aside the fundamental conflicts of interest between lenders and borrowers based on their purported "mutual incentive to maximize their recovery from Defendants."  (R&R 44.)

*Second*, most of the cases cited in the R&R involved hypothetical or speculative conflicts rather than conflicts that had already manifested.  For example, the *NASDAQ* court decided class certification solely on the pleadings—which is no longer permissible—and disregarded a potential conflict of interest that was only "hypothetical" at the pleadings stage.  169 F.R.D. at 513; *see also NYSE Specialists*, 260 F.R.D. at 73-74 (finding no conflict "at this early stage in the litigation," but reserving decision "[i]f, in the future, it becomes clear that intra-class conflicts" exist); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000) (deciding adequacy on the pleadings and finding no conflict "at this stage of the litigation" where adequacy was undisputed);

*In re Sumitomo Copper Litig.* 182 F.R.D. 85, 88, 92 & n.9 (S.D.N.Y. 1998) (accepting allegations in complaint as true and reserving decision on adequacy "[i]f potential conflicts are later shown"); *In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 64 (S.D.N.Y. 1999) (deciding class certification when "discovery has not yet been complete"). Here, by contrast, the case is well beyond the pleadings stage, and the factual record reveals fundamental conflicts of interest that are neither hypothetical nor speculative.

*Third*, the cases cited in the R&R that addressed adequacy on a developed factual record are easily distinguished. In those cases, large classes of securities or commodities buyers alleged that the defendants had inflated prices. *See, e.g.*, *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2022 WL 1078460, at *3 (S.D.N.Y. 2022); *Sumitomo*, 182 F.R.D. at 88; *Gaming Lottery*, 58 F. Supp. 2d at 65-67. Although a potential conflict of interest existed for relatively few "in-and-out" traders on a small number of days over the course of a lengthy class period, the courts held that those diffuse and isolated conflicts "relating to the times at which particular class members purchased their securities . . . do not warrant denial of class certification." *Sjunde*, 2022 WL 1078460, at *2; *see also Sumitomo*, 182 F.R.D. at 95-96; *Gaming Lottery*, 58 F. Supp. 2d at 69-71. Here, by contrast, the conflicts at issue are not diffuse, isolated, or confined to a handful of trading days or a small number of proposed class members. Instead, the class is split right down the middle between lenders and borrowers that *always* stand on opposite sides of the market. This obvious "fault line" requires independent representation of each subclass. *Payment Card*, 827 F.3d at 233-34.

### C.    The R&R erred in finding Torus and SCERA adequate and typical representatives of the borrower subclass.

The R&R also erred in finding that the two named Plaintiffs that borrowed stock—Torus and SCERA—are adequate representatives of the borrower subclass. SCERA is inadequate because it was a large lender as well as a borrower, and "named plaintiffs with claims in multiple

subgroups cannot adequately represent the interests of any one subgroup." *Id.* at 235.  The R&R's contrary conclusion ignored this Second Circuit precedent.  (R&R 47.)

Torus, in turn, is not even a *member* of the borrower subclass—a point the R&R ignored.  The borrower subclass is defined as "[a]ll persons and entities . . . who, directly or through an agent, entered into at least 100 U.S. Stock Loan Transactions as a borrower *from the prime brokerage businesses*" of Defendants.  (*Id.* at 20 (emphasis added).)  Plaintiffs' counsel thus emphasized at oral argument that the borrower subclass "is specifically limited to transactions with the *prime brokerage business* of the defendants" and "does not include trades with the [other] desk[s] of these banks." (Tr. 56-57.)  Torus, however, was never a client of a Defendant's prime brokerage business.  (Savoldelli ¶¶187-189.)  Instead, it borrowed stocks from separate clearing services businesses at ███████████ and ████████████—not the prime brokerage businesses.  (*Id.*)  Torus cannot represent a class to which it does not belong.  *See, e.g.*, *In re Bank of Am. Home Affordable Modification Program Litig.*, 2013 WL 4759649, at *7 (D. Mass. 2013).  Torus also is inadequate and atypical because it is a tiny proprietary trading firm that bears no resemblance to the large hedge funds that make up the vast majority of the borrower subclass, and its trading volume was far too small to justify the substantial costs it would have incurred for joining a trading platform.  (McCrary ¶203; Hendershott ¶261; Savoldelli ¶¶182-189.)

## II.   The R&R Erred in Finding Predominance.

To satisfy Rule 23(b)(3), a plaintiff must prove that common questions will predominate over individual ones at trial.  *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  In antitrust class actions, this "requirement demands more than common evidence the defendants colluded to raise [prices].  The plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C.

Cir. 2013) ("*Rail I*"). If common evidence alone cannot establish injury on a classwide basis—*i.e.*, if the jury would have to consider both individualized and common evidence to decide whether individual class members were injured—certification of an antitrust class should be denied. *See, e.g., id.*; *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 195 (3d Cir. 2020) (vacating certification because "every plaintiff must be able to show antitrust injury through evidence that is common to the class"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 627 (D.C. Cir. 2019) ("*Rail II*") (affirming denial of certification because "individual determinations of injury and causation" were required); *Aluminum*, 336 F.R.D. at 45 ("The need to present evidence that varies from member to member to establish antitrust injury will almost inevitably make individual questions more prevalent or important than common ones.").

Here, the jury would have to consider extensive individualized evidence to determine whether individual class members were injured and to assess whether particular transactions and class members satisfy the FTAIA's requirements. The R&R reached a contrary conclusion based on the legal and factual errors described below.

**A.    The R&R erred by disregarding the evidence Defendants will present at trial to contest the existence of injury to individual class members.**

The R&R erred at the outset of its predominance analysis by disregarding the evidence *Defendants* will present at trial. Defendants' case at trial will include individualized showings that numerous class members—due to their particular needs, characteristics, and circumstances—would not have used or benefitted from platform trading and thus were unharmed by the alleged conspiracy. The R&R dismissed those individualized inquiries as irrelevant to the predominance analysis on the theory that Defendants—as the alleged wrongdoers—are legally barred from disputing whether class members "would or would not have elected to join a platform in the but-for world." (R&R 55.) That was error. Where, as here, Defendants can make plausible showings

19

that individual class members were unharmed, Defendants have a constitutional right to make those showings at trial. *See Rail II*, 934 F.3d at 624-25; *In re Asacol Antitrust Litig.*, 907 F.3d 42, 55 (1st Cir. 2018).

> **1.**   **Individual inquiries are necessary to identify class members that valued recall protection and other unique features of the OTC market.**

Defendants' evidence at trial will start with the fundamental differences between stock loans executed OTC with prime brokers and stock loans executed on anonymous platforms.  As Defendants showed in prior briefing, many borrowers rely on prime brokers to provide highly *stable* stock loans protected from recalls and rerates.  (Defs. Br. 13-17.)  Similarly, many lenders rely on the OTC market ██████████████████████████████████████ ████████████████.  (*Id.* at 15-16.)  Because class members vary widely in their need for these features of the OTC market (Hendershott Reply ¶¶33-44), individual inquiries are necessary to assess whether class members would have been (i) willing to forgo the benefits of OTC trading to trade on anonymous platforms, and (ii) better or worse off in the but-for world after accounting for the added value of OTC loans as compared to platform loans.  *See, e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig.*, 2014 WL 6601941, at *13 (D. Del. 2014) (denying certification where individual inquiries were necessary to determine whether "any benefits received by certain purchasers as a result of [the challenged conduct] are exceeded by the overcharges").

The R&R dismissed these individual issues from its predominance analysis in two ways.  First, the R&R asserted that "[o]ther than their own self-serving statements, . . . Defendants have failed to substantiate these supposed fundamental differences" between OTC loans and platform loans.  (R&R 53.)  Second, the R&R hypothesized that to the extent the protections provided by prime brokers are valuable, "the better way to offer [them] . . . would be through standardized contractual terms on a multilateral platform."  (*Id.* at 54.)  The R&R erred in both instances.

**i. Differences between OTC loans and platform loans.**   Contrary to the R&R's characterization of Defendants' evidence as consisting only of "self-serving statements," Defendants introduced a mountain of real-world evidence and expert analysis to substantiate the fundamental differences between OTC loans and platform loans and to demonstrate the value to class members of prime-broker services such as recall protection and rerate management. (Defs. Br. 13-17.) The R&R wholly ignored this voluminous evidence.

Executives of ███ ---one of the allegedly boycotted platforms—explicitly recognized the importance of the recall and rerate protections provided by prime brokers. ████████

████████████████ (████ Dep. 121:10-13)—acknowledged in 2010 that there was "████████" in the recall and rerate protections provided by prime brokers:



(ECF No. 432-40 at -331 (emphasis added).)  Other ███ executives agreed. ████████ stated that ████████████████," which is what the platform was, "████████

████████████████ (ECF 432-5 at -432; *see also* ████ Dep. 90:21-92:13, 201:17-203:12; Savoldelli ¶46 n.45 (███ 300482332 at -334), ¶51 nn.65-67 (███ 300500692 at -692-93, ███ 300237274 at -275-76, ███ 300352088 at -098), ¶51 n.70 (███ 300189439 at -440).)  These admissions from the allegedly boycotted platform are not self-serving statements by Defendants.

Beyond ███ class members, including some of the world's largest hedge funds, also attested to the value of the recall protection and rerate management they received from their prime brokers. ████████████████ testified

that "███████████████████████," sometimes "███████████████

███████████████████████." (█████ ¶21.) Similarly, ███████████

█████████████████████████████████████████████

██████, testified that loan stability is "██████████████████████" and

that ██████ "████████████████████████████████████

███████████." (█████ ¶¶15-16; see also █████ Dep. 22:3-17.)  Non-defendant prime

brokers likewise confirmed the importance of recall protection and rerate management (Pridmore

¶62 n.129 (citing █████████ (██ Dep. 22)), as did Defendants' witnesses and contemporaneous

business documents.[2]



██████████████████████████████████████████

██████████████████████████████ (McCrary ¶66 (citing

██ SL00131155 at -193 (despite "████████████████████████████

████████████████████")); id. (citing █████-SL-00180436 at -436

(██████ could "███████████████████████████")); █████ ¶19 ("

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████"); ███ ¶21 ("████████████████████████

█████████████████████████████████████████████

██████████████████████████████████").)

Defendants reinforced this real-world evidence with uncontroverted testimony from two

industry experts with more than sixty years of combined practical experience in the stock-lending

---

[2] See, e.g., █████ ¶¶5-6, 9-10; █████ ¶23; Savoldelli ¶44 n.38 (citing █████████ (██ Decl.
¶5.ii.b), ¶49 n.48 (citing ██████_SL 129417 at -436); McCrary ¶67 n.63 (citing
████ SL00024072 at p. 5), ¶77 n.82 (citing █████ (██ Dep. 87).

market: Fabio Savoldelli and William Pridmore. Both of those experts detailed the benefits of loan stability to class members and described the reasons why many class members would have been unwilling to forgo those benefits by engaging in platform trading. (Savoldelli §III; Pridmore §IV.) As these experts further explained, because the importance of these benefits varies substantially from class member to class member, only individualized analysis can identify class members that would not have engaged in platform trading due to their dependence on the value-added features of OTC trading.[3] (Savoldelli ¶47; Pridmore ¶120.)

By contrast, Plaintiffs never offered any credible evidence—no testimony from a single fact witness or industry expert, no business document, and no empirical study or academic literature—suggesting that recall protection, rerate management, or the other value-added features of OTC trading were unimportant. Nor have they explained why AQS was so intent on trying to replicate these protections if they had no value. The R&R thus had it backwards in suggesting that Defendants—rather than Plaintiffs—relied only on "self-serving statements" to support their position on these issues. Moreover, Defendants' uncontroverted, real-world factual evidence cannot be ignored, particularly when it is Plaintiffs' burden to demonstrate predominance and Plaintiffs failed to cite any evidence to substantiate *their* contention that those protections are unimportant. In any event, contrary to Plaintiffs' contention, Defendants provided empirical evidence supporting the existence of recall protection and rerate management. For example, the data analysis by Defendants' expert Dr. McCrary ███████████████████████ ████████████████████████████████████████████. (McCrary ¶¶66,

---

[3]      ███ ¶19 ("
████████████████████████████████████████████████████████████
███████████████████████████").

78, Ex. 3.)  Nor can evidence of the importance of recall protection be discarded by observing, as the R&R did, that "none of the Prime Broker Defendants' agreements with their customers contained any written recall provision."  (R&R 54.)   The record evidence establishes that Defendants' clients expected and valued recall protection, that Defendants' marketing pitches included representations about recall protection, and that Defendants rarely, if ever, recalled stock from their customers.[4]

ii. **Inability of platforms to replicate OTC benefits**.  The R&R also erred to the extent it suggested that recall protection, rerate management, and other OTC benefits can be replicated on anonymous trading platforms. (*Id.* at 54.)

Recognizing the critical importance of these attributes of the OTC market, the only anonymous platform that operated during the class period-- ███ --tried to mimic the loan stability provided by prime brokers.  It could not.  ████████████ of ███ emphasized that, by its very nature, a " ██████████████████████████████████ ████████████████████████████████."  (ECF No. 432-13 at -113; *see also* ECF No. 470-8 at -718, 732.)  ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████. ( ████ Dep. 102:14-104:8.)  Loan instability thus became a major concern for ████ with one ████ witness stating in contemporaneous emails that " █████████████████████████ " and

---

[4] *See* ████ ¶10 (" ████████ ███████ ); Hendershott ¶64 n.109 (citing ████ -SL-00183865 at -869 (marketing presentation stating ████ had ████████████████ Savoldelli ¶49 n.48 (citing ████ SL 129417 at -436 ( ████████ response to ████ RFP ████ noting ████ █ ████████████████████████████████ )).



predicting that rerates would "█████████████████████████." (Savoldelli ¶51 n.65

(█ 300500692 at -694), ¶51 n.66 (███████████████████████: "█

████████████████████████████████████████████████████████████

███████████████████████████████]" (███ 300237274 at -275-

276)); *see also* Hendershott Reply ¶37; █████ Dep. 91:9-92:13.)

Class members cited concerns about recalls and rerates as reasons why they were

uninterested in platform trading.  For example, ████████ testified that ████████ would have

been "███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████."  (████ ¶20; *see also* ████████ ¶17 (despite

"████████████████████████████████████████████████" it "█

████████████").)  Other hedge funds that tried ████ ultimately concluded that the risks associated

with the platform made it unattractive and unfeasible.  (███████ ¶¶16-17.)

The R&R's failure to credit the factual record in favor of unsupported speculation about

hypothetical "standardized contractual terms on a multilateral platform" (R&R 53-54) or a

different algorithm that a platform might someday develop is not the "rigorous analysis" required

by Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

### 2.    Individual inquiries are necessary to identify class members that would not have used or benefitted from platform trading.

Defendants' case at trial will include thousands of class-member-by-class-member

showings that individual class members would not have used or benefitted from the introduction

of platform trading.  The R&R dismissed this evidence as irrelevant (R&R 55-56), but this

evidence alone defeats predominance.  *See, e.g.*, *Rail II*, 934 F.3d at 627 ("Given the need in this

case for at least 2,037 individual determinations of injury and causation, the district court did not abuse its discretion in denying class certification on the ground that common issues do not predominate."); *Asacol*, 907 F.3d at 57-58 (noting that no federal appeals court has ever affirmed class certification when the testimony of "thousands of class members" would be relevant at trial); *Aluminum*, 336 F.R.D. at 63 ("[W]ith injury provable only via individualized inquiries keyed to each particular purchaser, individual determinations of injury will predominate over the common issues in this litigation.").

Plaintiffs' experts concede that a "majority" of trading would remain OTC even after the successful introduction of platform trading. (Zhu Reply ¶35; *see also id.* ¶144 (rejecting "false premise" that "platforms would dominate the market in the but-for world").)  AQS likewise projected that only a small percentage of stock loans would occur on its platform, with the remainder staying OTC.  (Hendershott ¶306 & nn.648, 649.)  Those concessions are not surprising because, for many class members, platform trading is not a viable option due to their particular needs, circumstances, or trading strategies.  (*Id.* ¶361; Hendershott Reply ¶12; McCrary ¶¶98-101; McCrary Reply ¶¶29-32.)  There is thus no escaping the conclusion that many class members would not have used anonymous trading platforms even if such platforms had proved successful. (Hendershott ¶¶122-319; Pridmore ¶¶71-120; Savoldelli ¶¶34-149.)

For related reasons, many class members would not have benefitted from the existence of platform trading.  In theory, certain non-platform users might have benefitted indirectly from platform trading if they had bargained for better prices from their prime brokers by threatening to move their business to a platform (Hendershott ¶362), but many others would not have benefitted because they could not have *credibly* threatened to shift to platform trading (*id.* ¶¶354-355, 362; McCrary ¶102; Hendershott Reply ¶¶12, 19; McCrary Reply ¶¶30, 35).  Only individualized

evidence is capable of identifying the many class members that would not have benefitted from platform trading for these reasons; there is no "common" evidence that can do so.  (Hendershott ¶¶441-445; McCrary ¶103; Hendershott Reply ¶¶12, 19, 98-100; McCrary Reply ¶36.)

The R&R did not disagree that these disputes would predominate at trial if Defendants were permitted to raise them, but concluded that Defendants are not entitled to raise them because "[a]ny argument" about "which Class Members would or would not have elected to join a platform in the but-for world" is "too speculative."  (R&R 55.)  If that were the law, defendants would invariably lose the predominance question in any antitrust case because there will always be uncertainty about the but-for world, and defendants thus could never present individualized evidence of how class members would have acted in that world.  Contrary to the R&R's assertion, however, Defendants have a constitutional right to make these individualized showings at trial if they are "colorable" and "plausible."  *See, e.g.*, *Rail II*, 934 F.3d at 625; *Asacol*, 907 F.3d at 55.

*Asacol* is instructive.  There, the plaintiffs sought to certify an antitrust class on the theory that the defendants had suppressed a generic drug that would have lowered drug prices for class members.  907 F.3d at 44-46.  Defendants opposed certification on the ground that they would make individualized showings at trial that certain class members would not have used the generic. *Id.* at 46-47, 52-53.  The court recognized that, so long as those individualized showings were "plausible," the defendants had a constitutional right to present them, and the resulting individual inquiries into whether any given class member would have used the generic defeated certification. *Id.* at 53, 55-58.  Likewise here, class certification should be denied because Defendants have a right to make individualized showings that class members would not have used or benefitted from platform trading.  *See id.*; *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 716 (E.D. Pa. 2020)

(denying certification where individual inquiry was needed "to assess whether a purchaser would have purchased [an alternative product] had that option been available").

The R&R cites *In re Electronic Books Antitrust Litigation*, 2014 WL 1282293 (S.D.N.Y. 2014), but that decision does not support a contrary conclusion. There, a proposed class of purchasers of electronic books sued Apple and others for fixing electronic-book prices. *Id.* at *1. Apple opposed certification, arguing that any overcharges class members paid on electronic books would have to be "offset" against the benefits class members received if Apple's launch of an electronic bookstore led them to buy more electronic books than they otherwise would have. *Id.* at *15. The court rejected that novel "offset" defense on the twin grounds that (i) the plaintiffs were challenging the fixing of electronic-book prices, not Apple's launch of an electronic bookstore, and (ii) Apple failed to support its speculation that individuals who actually had purchased electronic books would not have done so in the but-for world. *Id.* at *19-20. Here, by contrast, Defendants are not raising a speculative "offset" argument to try to counterbalance an overcharge. Instead, Defendants' evidence shows that no overcharge would have arisen in the first place for the many class members for which platform trading is not viable.

Any suggestion that Defendants' evidence is impermissibly "speculative" or fails to qualify as "plausible" or "colorable" would be meritless. To be sure, Defendants rely on predictions about what individual class members would have done in the but-for world, but antitrust cases *always* involve predictions about the but-for world, and courts routinely make them. *See, e.g.*, *Lamictal*, 957 F.3d at 193 (vacating certification where district court failed to analyze what market participants "would or would not have possibly done in the but-for world"). Moreover, the factual record makes clear that genuine disputes of fact exist as to whether platform trading was viable for large numbers of class members. Three examples illustrate the point.

**i. Low trading volume**.  A trial would require numerous individual inquiries into whether any given class member conducted enough trading to make platform trading viable.  (Hendershott ¶¶360, 444; McCrary ¶100; Pridmore ¶80; Savoldelli ¶¶93-95, 108; Hendershott Reply ¶¶58, 98-100.)  Class members that engaged in platform trading would incur costs for internal systems, technology, and personnel ranging from ██████████ of dollars to over $█████ per year.  (Savoldelli ¶106; *see also* Hendershott ¶¶281-287; Pridmore ¶¶85-87; Savoldelli ¶¶93-105.)  They would also incur fixed platform fees of approximately $█████ to $█████ per year.  (McCrary Reply ¶53; *see also* ██████ ¶¶9-10.)  ████████████████████████████ ████████████████████████████████ (McCrary Reply ¶¶53-57.)  Indeed, the A&P model estimates that ████████████████████████████ ████████████████████████████████ (*Id.* ¶57 & Ex. 1.)

Named plaintiff Torus is a case in point.  According to the A&P model, Torus could have saved about $█████ per year had it used a trading platform (Paskin Decl. ¶2), but fixed platform fees alone would have far exceeded those savings (McCrary Reply ¶53).  Accordingly, Torus—and many other class members like it—could not have used or credibly threatened to use a trading platform.  (Hendershott ¶¶261, 360; McCrary ¶¶100, 202-203; Hendershott Reply ¶¶14, 17, 57.)  This is not an abstract proposition.  Torus declined to join a U.S. Treasuries trading platform after being presented with the platform's fixed monthly fees.  (Hendershott Reply ¶53.)

**ii. High transactional costs**.  Platform trading also involves high *transactional* costs arising from (i) the costs of providing collateral to the central counterparty that guarantees completion of platform transactions and (ii) the high capital costs incurred by the clearing sponsors that sponsor transactions into the central counterparty.  (Hendershott ¶¶211-257; Hendershott

Reply ¶¶ 46, 59-97.)    Plaintiffs assert that *all* class members would zero out these high transactional costs by giving "surplus collateral" to central counterparties and massively over-collateralizing their clearing sponsors. (Hendershott Reply ¶¶64-65, 69.) But many class members have no surplus collateral available (Savoldelli Reply ¶¶3-11; Hendershott Reply ¶¶69-71), and many more are unwilling or legally unable to give collateral to central counterparties or clearing sponsors (Pridmore ¶111 & n.264; Pridmore Reply ¶7; Hendershott Reply ¶¶66-67, 89-90). Defendants' case at trial would include inquiries into which individual class members were unable to use "surplus collateral" to zero out these costs, and thus not viable candidates for platform trading. (Hendershott Reply ¶¶64, 68, 71; Pridmore Reply ¶10; Savoldelli Reply ¶¶2, 11.)

      **iii. <u>Trading strategies incompatible with platforms</u>.**    Many more individual inquiries would be necessary to identify class members for which platform trading was not viable due to their specific trading strategies. (Hendershott ¶¶361, 441-442; Pridmore ¶120; Savoldelli ¶¶130-131; *see also* Pridmore ¶¶88-99.) For example:

- Many hedge funds use trading strategies that are highly vulnerable to recall risk and would not use platforms because of heightened recall risk. *See supra* at §II(A)(1).

- Many hedge funds are hypersensitive about the confidentiality of their strategy and are not credible platform users because their platform trades—unlike OTC trades—are immediately observable. (Savoldelli ¶¶62-68; Hendershott ¶¶166-172; ▮▮▮ ¶29.)

- Many lenders rely on strategies that cannot occur on platforms, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (Pridmore ¶¶51-52, 62-63; Hendershott ¶¶54, 98, 139) ▮▮▮▮▮▮▮ (Pridmore ¶¶52-59, 88-91; Hendershott ¶¶38, 46, 140, 339).

- Many hedge funds focus their stock borrowing on "voluntary corporate actions" such as tender offers and rights offerings, but such strategies cannot be deployed on trading platforms because no central counterparty could process them. (▮▮▮ ¶28; Hendershott ¶296; Pridmore ¶¶70, 98; Savoldelli ¶¶103, 154; Hendershott Reply ¶14.)

- Many class members use non-cash collateral, and those transactions cannot be executed on platforms. (Pridmore ¶78b; McCrary ¶101 & App'x D ¶9; McCrary Reply ¶32.)

For all these reasons, individual inquiries into whether any given class member would have used or benefitted from platform trading would predominate at trial *regardless* of whether Plaintiffs limit their case to common evidence. *See, e.g.*, *Asacol*, 907 F.3d at 58; *Myers*, 624 F.3d at 551 ("[C]ourts must consider potential defenses in assessing the predominance requirement"); *Aluminum*, 336 F.R.D. at 50 (denying certification where "defendants would have a right to present individualized evidence that these statements [of classwide injury] are untrue for large numbers of individual purchases and purchasers"); *Ruzhinskaya v. Healthport Techs. LLC*, 311 F.R.D. 87, 105 (S.D.N.Y. 2015) (predominance assessment "requires attention not merely to how the plaintiff would attempt to establish liability, but also how the defendant would attempt to refute it").

### 3. Plaintiffs' "absolute certainty" argument is unavailing.

Plaintiffs argued in the prior round of briefing that *all* class members could credibly threaten to move their business to a trading platform because prime brokers would never have "absolute certainty" about what a class member might do. (Pls. Sur-Sur-Reply 2-3.) The R&R did not adopt this argument, and the argument is incorrect for two main reasons.

*First*, contrary to Plaintiffs' assertion, prime brokers often would know that platform trading is not a viable option for a class member. For example, there are readily observable reasons relating to a class member's size, needs, and trading strategies that determine whether platform trading is viable. *See supra* at § II(A)(2)(i)-(iii). ███████████████████ ████████████████████████████████████ (Savoldelli Reply ¶9; Hendershott Reply ¶¶13-19; McCrary ¶¶237-239; ████████ ¶16.) Furthermore, most class members would access platforms *through their prime broker* acting as their clearing sponsor, which also means that prime brokers often would know whether class members were willing or able to use a platform. (Hendershott Reply ¶15; Savoldelli ¶115.) As Plaintiffs' expert Dr. Asquith recognized: "████████████████████

█████████████" and "█████████" which clients used a platform.  (Asquith Dep. 50:23-51:19; *see also* Hendershott Reply ¶¶13-19.)

   *Second*, it is irrelevant whether prime brokers would have had absolute certainty about the intentions of each and every class member.  The relevant question instead is whether at least *some* class members could not make a *credible* threat to move their business to a platform.  Threats that are not "realistic" or "credible" have no effect on bargaining positions and would not improve the prices offered to class members.  (Hendershott ¶¶359-362; McCrary ¶102; Hendershott Reply ¶¶12-16 & n.37; McCrary Reply ¶70.)  Prime brokers already compete in a highly competitive market in which class members often move their business among prime brokers.  (McCrary ¶¶106-111.)  Adding a non-credible threat to move business to a trading platform would make no difference to those dynamics.  (*Id.* ¶¶102, 236-240; Hendershott ¶362.)

   Torus again illustrates the point.  Torus could not credibly threaten to use a trading platform due to its small size, minimal trading volume, and use of a trading strategy ill-suited to platform trading.  (Hendershott ¶¶130, 211, 233, 261-262, 360; McCrary ¶¶201-205; Hendershott Reply ¶¶14, 17-18, 53, 57.)  Torus witnesses gave relevant testimony on these questions at their depositions and would have to testify again on those issues at trial.  (Hendershott ¶¶130, 261-262, 353; McCrary ¶¶201-203, 205; Hendershott Reply ¶¶14, 17-18, 53, 57 (citing testimony of industry participants including Torus witnesses █████████████ and █████████).)  Thus, for Torus and many other class members that would not have traded on a platform, there are plausible factual disputes about whether they would have derived any indirect benefit from platform trading, and numerous witnesses would testify on those questions at trial.

**B.      Plaintiffs' own model of but-for prices demonstrates that many individual inquiries will be necessary at trial.**

Plaintiffs' own model of but-for prices—the A&P model— ███████████████

████████████████████████████████████████ The R&R's contrary conclusion rested

on clear errors of law and fact relating to the model's predictions and the costs of platform trading.

The A&P model thus provides an independent basis for denying class certification. *See, e.g.*, *Rail*

*II*, 934 F.3d at 625-26 (denying certification where damages model indicated 12.7% of class

members were potentially uninjured); *Asacol*, 907 F.3d at 45, 47 (reversing certification where

"around 10%" of class members were uninjured); *In re Intuniv Antitrust Litig.*, 2019 WL 3947262,

at *8 (D. Mass. 2019) (denying certification where "at least 8%" of putative class was uninjured).

Without any modifications at all by Defendants' experts, the A&P model predicts that over

██% of all stock-loan transactions occurred at better prices in the actual world than those that

allegedly would have existed in the but-for world.  (McCrary Reply ¶¶18, 56, 59.)  That is no

surprise:  actual-world prices varied widely, and many class members consistently received better

prices than others.  (McCrary ¶¶120-128; McCrary Reply ¶¶41-44; *see also* Reporting of Securities

Loans, 86 Fed. Reg. at 69833 (stock loan price dispersion is "approximately five time[s] the

median fee" for stock loans).)  In Plaintiffs' but-for world, however, the "price dispersion" that

benefitted many class members in the actual world is replaced by "price convergence."  (A&P

Reply ¶¶189-193; McCrary Reply ¶45; McCrary ¶135.)  The A&P model confirms, as logic

dictates, that class members that received favorable actual-world prices often are worse off in the

but-for world.  (McCrary Reply ¶46; McCrary ¶136.)

The A&P model identifies even more unharmed class members and transactions when

reasonable assumptions are made about the costs of platform trading.  Class members that engaged

in platform trading would incur substantial costs in the form of fixed annual platform fees, clearing

sponsor fees, and internal systems and technology costs.  (Hendershott ¶¶230, 258-262, 281-287; Savoldelli ¶¶93-112.)  Those costs vary widely from class member to class member (Hendershott ¶¶232-234; Hendershott Reply ¶¶52-58, 71, 98-100; McCrary ¶¶173, 175, 186-189), but Plaintiffs' experts ignore this variation and instead assume that those costs would be near *zero* for all class members (Hendershott Reply ¶¶45-47; McCrary Reply ¶51)  When that far-fetched assumption is replaced with reasonable estimates of the costs of platform trading, the A&P model estimates that ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████).  (McCrary Reply App. D. Ex. D.2.; *see also id.* ¶57 & Ex. 1.)  This level of potentially unharmed class members ██████████████████████████████████.  *See, e.g.*, *Rail II*, 934 F.3d at 627; *Asacol*, 907 F.3d at 47, 57-58; *In re Intuniv*, 2019 WL 3947262, at *8.  Moreover, large numbers of individual inquiries would be necessary to determine which class members were unharmed according to the A&P model because only individual inquiry can identify the true costs of platform trading to individual class members.  (McCrary ¶¶173, 175, 186-192; Hendershott Reply ¶¶98-100.)

The R&R's contrary conclusion rested on three clear errors.

**1. Purported data errors**.  Defendants' expert Dr. McCrary demonstrated that the A&P model ███████████████████████████████████████████ (McCrary Reply ¶¶18, 56, 59.)  The R&R asserted that those results "arose from Prof. McCrary's data errors, and when those errors are corrected, [the model] show[s] that the potential number of uninjured Class Members in either Subclass is less than 0.5%."  (R&R 54.)  That is incorrect.  Even when Dr. McCrary used the A&P dataset that corrected all purported data errors, the A&P model *still* predicts that over ██% of transactions were unharmed.  (McCrary Reply ¶18.)  Moreover, when

Dr. McCrary used that "corrected" data in conjunction with reasonable assumptions about the costs of platform trading, the model predicted that up to █% of borrower accounts were unharmed on a single transaction and that up to █% of borrowers were unharmed on a net basis.[5]  (McCrary Reply ¶¶52-57 & Ex. 1.)  The R&R thus committed a clear factual error in dismissing the numerous unharmed class members identified by the A&P model as a product of "data errors."  (R&R 54.)

　　**2.  <u>Costs of platform trading</u>**.  In concluding that the A&P model identified only 0.5% of class members as unharmed, the R&R implicitly and erroneously credited Plaintiffs' ultra-low assumptions about the costs of platform trading.  Incredibly, Plaintiffs assume for *all* class members that (i) the internal costs of platform trading would be *zero*, (ii) fixed platform fees would be *zero*, (iii) clearing sponsors would charge *below-cost* prices, (iv) beneficial owners would incur *zero* costs for collateralizing central counterparties, and (v) short-seller collateralization costs would be a *de minimis* 5 basis points.  (McCrary Reply ¶51; Hendershott Reply ¶46.)  Defendants showed at length that those assumptions are wildly unrealistic (Hendershott Reply ¶¶48-97), but the R&R ignored these issues.  The R&R should have resolved those disputes under a preponderance of the evidence standard because they bear directly on predominance.  *See, e.g.*, *Bombardier*, 546 F.3d at 202; *In re IPO*, 471 F.3d at 41.

　　Three examples—each of which the R&R failed to address—illustrate the far-fetched nature of Plaintiffs' cost assumptions and show that numerous disputes about the costs of platform trading to individual class members will arise at trial.  (McCrary Reply ¶¶52-60 & Exs. 1-2.)

　　*Class member internal costs*.  Plaintiffs' experts make the extreme assumption that the internal costs of platform trading would be *zero* for everyone, but uncontroverted testimony from

---

[5] No similar figures for the number of lender class members unharmed on a single transaction are available because the beneficial owner data generally identify only an agent lender account that aggregates multiple beneficial owner accounts.  *See infra* at II(B)(3).

Defendants' industry expert Fabio Savoldelli establishes that platform trading involves systems, technology, and personnel costs that would range from ███████████ to over $█████ per year. (Savoldelli ¶¶93-98, 105-106.) And the SEC recently corroborated that expert opinion when it estimated that a far easier technological lift—simple post-trade reporting of stock-loan prices—would cost lenders hundreds of millions of dollars and require over 400,000 hours of annual personnel time. *See* Reporting of Securities Loans, 86 Fed. Reg. at 69827, 69841-842. Even assuming that internal costs are only $████ per year—unrealistically low—the A&P model estimates that ███████████████████████████████████ (McCrary Reply ¶57.)

  *Fixed platform fees.* ████ charged fixed annual fees of $██████ for automated access to its platform or $██████ for manual web access. (A&P ¶270; Hendershott ¶259; McCrary ¶187; McCrary Reply ¶53.) Plaintiffs' experts admitted that those fees "wouldn't have gone away" in the but-for world and that "we can assume that [fixed annual fees] would stay as they were" on ████ (Pathak Dep. 301:12-302:19), but they nevertheless assumed *zero* fixed platform fees in their modeling.[6] When those platform fees alone are included, the A&P model predicts that ██% to ██% of borrower accounts were unharmed on a single transaction. (McCrary Reply ¶57 & Ex. 1.)

  *Clearing sponsor fees.* Plaintiffs' experts assume that clearing sponsors would have operated at a loss: they purportedly would have charged *zero* to cover their overhead or capital costs or to earn a profit. (Hendershott Reply ¶¶46-47, 59-63.) Not a shred of real-world evidence supports that assumption. Even at its most optimistic, ████ recognized clearing sponsor fees would be far higher, and the clearing sponsors that worked with ████ from 2010 through 2012

---

[6] *See also* Pathak Dep. 347:12-348-10 ("You know, my hands are tied" by "what ████ charged as of 2012"); Asquith Dep. 111:24-112:3 (████████ 2012 fees provide "the best estimate" of platform fees in the but-for world). ███████████████████████████████████ █████████████████████████████████ █████ ██ ██████ ¶¶4-13.) To the contrary, ██████████ (Hendershott Reply ¶51 & n.121.)

charged fees ███████ what Plaintiffs assumed.  (Hendershott ¶252 & Ex. 17.)  The all-in costs of clearing sponsorship would have been at least that high during the class period and likely higher due to the increased costs that Basel III imposed.  (*Id.* ¶¶230-234, 251 & Ex. 16; Hendershott Reply ¶¶64-97; Pridmore Reply ¶¶3-10; Savoldelli Reply ¶¶3-11.)

 **3.  <u>The "One-Harmed-Loan-Day" Standard</u>**.  In finding that less than 0.5% of class members were unharmed, the R&R implicitly and erroneously adopted Plaintiffs' argument that class members that suffered no net harm on a single stock loan were nevertheless "harmed" if the A&P model estimates that the but-for price was better than the actual-world price on a single *day* of a multi-day loan.  The 0.5% figure depends on this counterintuitive standard (A&P Reply ¶344; McCrary Reply ¶50), which suffers from fatal flaws the R&R failed to address.

 *First*, Plaintiffs' one-harmed-loan-day standard artificially multiplies "harm" by treating each individual day of a multi-day stock loan as a separate transaction.  For example, if a class member borrowed a stock for 100 days, Plaintiffs would treat the class member as "harmed" even if the A&P model predicted that the actual-world price was better than the but-for-world price on 99 out of 100 loan-days, so long as the but-for price was better on one day.  (McCrary Reply ¶50.) That makes no sense:  a multi-day loan is a single economic transaction, and there is no harm to that indivisible loan if the actual-world price as a whole was better than the but-for price.  (*Id.*)

 *Second*, even setting aside Plaintiffs' incorrect definition of a "transaction," Plaintiffs' proposed standard of harm overlooks the fact that class members lack antitrust standing if they suffered no net economic injury on the *totality* of their transactions.  An antitrust plaintiff suffers "actual injury" only if the plaintiff "is worse off than it would be if the market were free of anticompetitive forces."  *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 64 (2d Cir. 2019).  Here, class members are "worse off" only if they suffered a net economic injury after

netting out all gains and losses between the but-for world and the actual world on *all* of their transactions.  Plaintiffs have never denied—and cannot deny—that the A&P model predicts that

████████████████████████████████████████████████████████████████████

████████████████████   (McCrary Reply ¶¶56, 59.)  Moreover, "[s]ince benefits must be offset against losses, it is clear that widespread injury to the class simply cannot be proven through common evidence." *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012); *see also Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) ("A class member could not have actually been injured unless the alleged conspiracy inflated its *net* payments for textile rental services above the competitive (or 'but-for') price" (emphasis added)); *Intel*, 2014 WL 6601941, at *13 (similar); Defs. Br. at 28-29 & n.19 (citing additional cases).

*Third*, even under a one-harmed-loan-day standard, there are genuine disputes of fact about whether many or most class members suffered any alleged harm at all.  For example, class members that could not use (or credibly threaten to use) a platform would not have been harmed on a single loan-day.  In addition, using realistic assumptions about platform costs, the A&P model predicts that as many as ██% of borrower accounts were unharmed on a single loan-day.  (McCrary Reply ¶¶53-57 & Ex. 1.)  For the lender class, Plaintiffs cannot even *apply* the one-harmed-loan-day standard because they can only observe *agent lender* accounts that aggregate large numbers of underlying lender class members.  (*Id.* ¶60.)  As a result, the A&P model's estimate that between ██ and ██ agent lender accounts were unharmed on a single loan day ████████████████████ ████████████████████████████████.  (*Id.* ¶¶60-62.)

### C.   The R&R erred in determining that Plaintiffs' proffered common evidence is capable of showing injury to all class members.

The R&R's finding that Dr. Zhu's search cost model and his so-called "yardstick analysis" might be capable of proving injury to the entire class (R&R 57-59) fails to establish predominance

for two main reasons.  First, Dr. Zhu's work would not prevent *Defendants* from introducing individualized evidence at trial to show that particular class members were unharmed.  *Supra* at § II(A).  Second, the R&R failed to subject Dr. Zhu's work to the "rigorous analysis" required by Rule 23.  *Wal-Mart*, 564 U.S. at 350-51; *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Although the R&R acknowledged that Defendants raised serious questions about whether Dr. Zhu's work is capable of proving classwide injury, it simply recited the parties' disputes on those questions and then punted to the jury to determine whether "Defendants' critiques of Prof. Zhu [are] persuasive."  (R&R 57-59.)  That was legal error.  The Court—not the jury—must resolve those disputes because they bear directly on whether Dr. Zhu's work is capable of proving injury to each individual class member.  *See, e.g.*, *In re IPO*, 471 F.3d at 41 (courts must "resolve[] factual disputes relevant to each Rule 23 requirement"); *LIBOR*, 299 F. Supp. 3d at 471 ("[D]isputes between experts must be resolved if necessary to the Rule 23 analysis.").  As shown below, Dr. Zhu's evidence does not withstand the scrutiny that Rule 23 requires and is incapable of proving injury to all class members.

### 1.  Dr. Zhu's search cost model cannot prove injury to the entire class.

When Dr. Zhu's search cost model is subjected to the "rigorous analysis" required by Rule 23, the only reasonable conclusion is that it is incapable of proving injury to all borrowers and lenders.  *See, e.g.*, *Aluminum*, 336 F.R.D at 47 ("Following *Comcast*, circuit courts in antitrust cases have consistently, and correctly, read that decision to require that district courts carefully examine, at the class certification stages, the soundness of an expert's model relied upon to establish classwide impact."); *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 554 (S.D.N.Y. 2021) ("Simply accepting [a party's expert's] models as true, without engaging in searching analysis, risks certifying a class of uninjured plaintiffs, or a class of plaintiffs who were not injured in the same way such that common issues of law or fact predominate.").

**Borrowers**.  Dr. Zhu's search cost model cannot possibly show that *all* borrowers would have benefitted from platform trading because it deliberately assumes away all of the real-world reasons why many class members would not have benefitted.

Dr. Zhu's model makes no attempt to compare the actual world to the but-for world, or even to compare OTC trading to platform trading.  (McCrary ¶¶229-243; McCrary Reply ¶¶63-65.)  Instead, it compares two grossly simplified versions of OTC trading.  (McCrary ¶¶229-235; McCrary Reply ¶63.)  The model's version of OTC trading assumes that (i) some borrowers have only one prime broker, others have multiple prime brokers, and prime brokers never know whether any given borrower is "single-primed" or "multi-primed"; and (ii) there is very little price dispersion, *i.e.*, all borrowers pay roughly the same prices, despite the real-world evidence to the contrary.  (McCrary ¶¶226-243; McCrary Reply ¶¶63-65.)  The model then asks what happens if more borrowers become multi-primed, but all else stays the same.  (McCrary ¶¶229-235.)  It concludes that borrowers would almost always receive better prices in that scenario because prime brokers now face a higher probability that any given borrower is multi-primed and therefore has low search costs.  (*Id.*; McCrary Reply ¶¶63, 65.)

The Zhu model's theoretical comparison fails to show that all class members would benefit from *platform* trading because it assumes away all real-world factors that would lead to the opposite conclusion.  (McCrary Reply ¶¶63, 65.)  For example, contrary to Dr. Zhu's assumption, ███████████████████████████████████████████, and the Zhu model predicts *zero* benefit to such borrowers.  (McCrary ¶¶231, 235-243; McCrary Reply ¶¶66-69.)  Similarly, the Zhu model ignores all real-world reasons why many class members would not benefit from platform trading, *e.g.*, platform trading reduces price dispersion that benefitted certain class members that received superior OTC prices, reduces trading opportunities for class members that

do not access platforms, and is not a viable option for many class members.  (McCrary Reply ¶¶63-64; McCrary ¶229; *see also* McCrary Reply ¶¶45-46; Hendershott Reply ¶¶20-27; *supra* at § II(A)(2)(i)-(iii).)  The Zhu model thus assumes what it purports to prove:  it estimates that all borrowers would benefit from lower search costs only because, by design, it "does not admit the possibility of unharmed class members."  (McCrary Reply ¶65.)  That is fatal.  *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321 (N.D. Cal. 2014) (rejecting analysis that "makes no attempt to establish, but instead simply assumes, class-wide impact").

The A&P model dispels any doubt about these conclusions.  Unlike the Zhu model, the A&P model attempts to compare the actual world to the but-for-world and at least *tries* to account for the real-world factors that Dr. Zhu ignores.  (McCrary Reply ¶64.)  That is why the A&P model—in contrast to the Zhu model— ███████████████████████████████ (*Id.*; *see also id.* ¶¶56, 59.)  Even Dr. Zhu admits that the A&P model is superior to his model for estimating prices in the but-for world.  (Zhu ¶260.)  Thus, by Dr. Zhu's own admission, his model is inferior to the A&P model for purposes of determining whether all class members were harmed.  (McCrary Reply ¶64.)  That defeats any reliance on Dr. Zhu's model.  *See Rail I*, 725 F.3d at 252-55 (vacating certification where proposed proof of classwide injury generated "false positives"); *Aluminum*, 336 F.R.D. at 49 (denying certification where proposed proof "yields false positives [and] masks uninjured class members by using an 'averaging mechanism' to allocate injury across the class").

The R&R ignored this central defect in Dr. Zhu's model and briefly addressed only a few of the other defects.  First, as the R&R acknowledged (R&R 57), the Zhu model assumes away 97% of the price dispersion that existed during the class period (McCrary ¶¶245-247 & Ex. 21).  In response, the R&R recited—but did not analyze—Dr. Zhu's assertion that this fatal weakness is somehow a strength because the model is "condition[ed] on observable factors," *i.e.*, the model

purportedly controls for observable factors such as "revenue, asset size, number of prime brokers . . . , and . . . investment strategies." (R&R 57.) That assertion is simply untrue: Dr. Zhu did *not* build a model conditioned on or controlling for any of those factors. (McCrary Reply ¶¶71-72.) Rather, he simply speculated that *if* he had built such a model, it would support his conclusion of classwide injury. (*Id.*) This "audacious" attempt to rely on what Dr. Zhu imagines he could show in a model he never prepared "effectively asks the Court at once to grant [Dr. Zhu] a mulligan and to assume that his future tee shot will hit the green." *Aluminum*, 336 F.R.D. at 55.

The R&R also briefly addressed Dr. Zhu's erroneous assumptions that (i) prime brokers *never* know whether borrowers are served by more than one prime broker, (ii) prime brokers incur no search costs, and (iii) his model applies to GC stock loans. (R&R 57-58.) In each of those instances, the R&R merely recited Dr. Zhu's responses on these issues without endorsing them and then punted the disputes to the jury. (*Id.* at 57-59.) But uncontroverted evidence shows that ██████████████████████████████████████████████████████████████, which means that the model predicts no harm to many class members.[7] Similarly, the record shows that prime brokers incur search costs and that the Zhu model is inapplicable to GC stock loans because prices for GC stock loans often are fixed by contract. (McCrary ¶¶243, 251-252; McCrary Reply ¶¶72, 74.) The R&R thus failed to conduct the "rigorous analysis" required by Rule 23.

**Lenders**.  The R&R ignored the fact that Dr. Zhu never even *built* a search cost model for lenders.  Instead, he speculated that *if* he had built such a model, its results would be "qualitatively

---

[7] *See* McCrary ¶¶236-243; McCrary Reply ¶¶66-69; Zhu Reply ¶276 (admitting that a borrower's "█████████████████" is "█████████" ¶14 ("█████████████████████████████████"); Asquith Dep. 50:23-51:8 (███████████████████████████████████████████████████ and ████████████████████████████████████.").

the same" as those for borrowers.  (Zhu ¶262.)  Dr. Zhu's speculation about a model he never built

fails to satisfy Rule 23.  *Aluminum*, 336 F.R.D. at 55.  Moreover, the very SEC authority cited by

Plaintiffs concludes that reducing search costs would *harm* many lenders because search costs

enable lenders to lend their stock at higher prices.  *See supra* at § I(A) & n.1.  Thus, if Dr. Zhu *had*

built a search cost model for the lender subclass, it would show that many lenders are worse off in

Plaintiffs' but-for world.  (McCrary ¶¶250-252; McCrary Reply ¶74; Hendershott ¶339.)

The R&R declined to address these errors in the Zhu model on the theory that the only

"question before the Court is whether Prof. Zhu's evidence is *capable* of showing class-wide

impact." (R&R 59.)  That is an incomplete statement of the law.  To be sure, the argument that a

proposed form of common proof fails to prove injury for *any* proposed class members might not

defeat predominance because it does not necessarily create a risk "that a failure of proof on the

common question . . . will result in individual questions predominating."  *Amgen Inc. v. Conn. Ret.*

*Plans & Tr. Funds*, 568 U.S. 455, 467-68 (2013); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577

U.S. 442, 457 (2016); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th

651, 666-68 (9th Cir. 2022) (en banc).  But where, as here, a proposed form of common proof is

flawed because it fails to demonstrate injury for *all* proposed class members, certification is

inappropriate because a trial would require analysis of injury at the class-member level "and

thereby cause individual questions . . . to predominate."  *Halliburton Co. v. Erica P. John Fund,*

*Inc.*, 573 U.S. 258, 282 (2014); *see also Olean*, 31 F.4th at 666 n.9 ("[n]ot all expert evidence is

capable of resolving a class-wide issue in one stroke," including where such evidence

"demonstrated nonsensical results such as false positives"); *Aluminum*, 336 F.R.D. at 49 (expert analysis that "masks uninjured class members" does not establish predominance).[8]

## 2.   The R&R erred in crediting Dr. Zhu's yardstick analysis.

Dr. Zhu's "yardstick analysis" is equally defective.  None of Dr. Zhu's yardstick markets— U.S. equities, corporate bonds, government bonds, and crude oil futures—involves the key feature that renders stock loans ill-suited to anonymous platform trading:  an ongoing relationship between borrower and lender with no fixed duration.  (Hendershott ¶188; Defs. Br. 33-34.)  Dr. Zhu could have selected far more comparable yardsticks, such as overseas stock-lending markets or the equity repo market, and analysis of those markets confirms that stock loans are ill-suited to platform trading.  (Hendershott ¶¶173-184, 197-200; Hendershott Reply ¶¶101-115.)  Further, Dr. Zhu's yardstick analysis is inherently incapable of showing that *all* class members would benefit from the introduction of platform trading.  (Hendershott ¶¶186, 192-196.)  At most, that analysis might be relevant to the *general* or *average* effects of platform trading, not to whether each individual class member would benefit.  (*Id.* ¶¶193-194, 196; *see also id.* ¶¶339, 363-367, 382-395.)

The R&R again punted these disputes to the jury to resolve at trial on the theory that "a selection of perfectly comparable benchmark markets [is] essentially impossible."  (R&R 58.)  But

---

[8] The R&R also mentioned the A&P theoretical supply-and-demand framework—a separate analysis by Drs. Asquith and Pathak distinct from their damages model—as part of Plaintiffs' proffered classwide proof of injury (R&R 7-8), but it declined to rely on that framework in discussing predominance.   Regardless, the A&P supply-and-demand framework fails to demonstrate classwide injury for many of the same reasons as the Zhu model:  it is belied by the transaction data and generates false positives (McCrary ¶¶135, 141-145; McCrary Reply ¶¶17-18); implies all transactions are harmed when the A&P model clearly shows the opposite (McCrary ¶¶135, 141-145; McCrary Reply ¶¶17-18); ignores the costs of platform trading (McCrary ¶¶155-157, *see also supra* § II(B)(2)); assumes away price dispersion beneficial to some class members (McCrary ¶¶135-136, 138; McCrary Reply ¶¶17-18); and ignores the fundamental differences between OTC loans and platform loans (McCrary ¶¶134, 137; McCrary Reply ¶18; *supra* at § II(A)(1)(i)-(ii).).

"the reliability of . . . [plaintiffs' expert models] may not be deferred or deflected to a trial on the merits," *Aluminum*, 336 F.R.D. at 49, and a plaintiff cannot satisfy Rule 23 merely by making "some showing" or a showing that "is not fatally flawed," *In re IPO*, 471 F.3d at 40. Accordingly, this Court should subject Dr. Zhu's yardstick analysis to a "rigorous analysis," *Wal-Mart*, 564 U.S. at 350-51; *Comcast*, 569 U.S. at 33, and find that it is incapable of proving injury to each individual class member.

### D. The R&R erred in finding that individual transaction and damages inquiries do not defeat predominance.

The R&R also failed to account for the millions of individual inquiries into distinct transactions and transaction records that would be required at trial. Those inquiries would be necessary to resolve disputed questions including:

- The correct customized "w" allocation percentage for each transaction and class member because those percentages determine the recovery (if any) that any given class member would be due. (McCrary ¶¶274-282, McCrary Reply ¶¶77-79.)

- How to account for the millions of transaction records that Plaintiffs concede do not reflect the "full economics" of the transaction, such as transactions that conferred added benefits like recall protection on class members that are not reflected in the transaction price. (McCrary ¶¶222-225; McCrary Reply ¶¶39-40, 52.)

- Netting of all gains and losses for each class member on its entire set of transactions, which cannot be done without individualized analysis of materials that are not in the record and might not exist for the class period. (McCrary ¶¶218-221.)

The R&R conceded that applying A&P's model "may . . . involve some individual issues," but concluded that this "does not bar certification . . . , particularly where Defendants have not succeeded in precluding Plaintiffs' experts on *Daubert* grounds." (R&R 56.) But that is a *non sequitur*: a *Daubert* motion goes to the *admissibility* of Plaintiffs' economic models; it has no bearing on whether the A&P model satisfies Plaintiffs' evidentiary burden under Rule 23(b)(3)'s predominance requirement. The R&R also suggested that these individualized issues are irrelevant because Plaintiffs proposed "a reliable, formulaic damages model" (R&R 56), but all of the

individualized inquiries itemized above are required *before* Plaintiffs' damages model can be applied. The need for these individual inquiries thus provides an independent basis for denying class certification. *See, e.g.*, *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (denying certification where "the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim"); *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, 2018 WL 1831850, at *8 (S.D.N.Y. 2018) (Failla, J.) ("[I]ndividualized inquiries necessary to distribute damages among investors, along with the individualized questions discussed above, would dwarf the only common question identified in this case."); *FOREX II*, 407 F. Supp. 3d at 435 (denying certification where trade-by-trade analysis was necessary for "tens or hundreds of thousands" of trades); *Nypl v. JP Morgan Chase & Co.*, 2022 WL 819771, at *4, 7-9 (S.D.N.Y. 2022) (holding that "netting" of gains and losses is required and denying certification where "individualized proof of each trade and each trading day will be required to show if and to what extent each retail purchaser was actually injured by the alleged conspiracy").

E.     **The R&R erred in finding that individual issues arising from the FTAIA do not defeat predominance.**

The R&R also disregarded enormous numbers of individual inquiries necessary under the FTAIA based on an erroneous construction of the FTAIA that *FOREX II* rejected.

The FTAIA generally bars application of U.S. antitrust law to (i) "export" transactions between a Defendant operating domestically and a class member operating abroad, *Lavoho, LLC v. Apple Inc.*, 71 F. Supp. 3d 395, 397-98 (S.D.N.Y. 2014); *TI Inv. Servs. LLC v. Microsoft Corp.*, 23 F. Supp. 3d 451, 467-69 (D.N.J. 2014), and (ii) "foreign" transactions between a Defendant and a class member both operating abroad, *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004). Determining which transactions fall into those two categories requires innumerable individual inquiries, barring a finding of predominance under *FOREX II*.

In the *FOREX* litigation, a proposed class of antitrust plaintiffs alleged that they paid inflated "spreads" on currency exchange transactions.  407 F. Supp. 3d at 426-27.  Although the plaintiffs argued that all transactions involving class members "domiciled" in the United States satisfied the FTAIA, the court disagreed, holding that the FTAIA barred application of U.S. antitrust law to class members that were *operating* abroad at the time of their transactions, even if they were U.S.-domiciled.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *11, *13-15 (S.D.N.Y. 2016) ("*FOREX I*").  Furthermore, the transaction data produced in discovery did not identify whether any given class member "was operating abroad at the time of [a] transaction," which meant that enormous numbers of transaction-by-transaction inquiries would have been necessary to determine which transactions satisfied the FTAIA. *FOREX II*, 407 F. Supp. 3d at 433.  The court held that those individual inquiries weighed heavily against a finding of predominance and denied certification.  *Id.* at 431.

The same analysis applies here.  Plaintiffs have attempted to satisfy the FTAIA by limiting the class definition to transactions entered into with Defendant legal entities that were *domiciled* in the United States.  (R&R 60-61.)  But what matters under the FTAIA is where Defendants— and class members—were *operating* at the time of any given transaction.  *See FOREX I*, 2016 WL 5108131, at *11-13.



(*See, e.g.*, McCrary ¶216;                ¶7;                ¶3; ECF 432-62,                          correspondence; ECF 432-63,                          correspondence.) Similarly, the proposed class includes both foreign and domestic legal entities that entered into stock loans both domestically and abroad.  (*See, e.g.*,                          oldelli ¶27; ECF 432-64,                          correspondence.)   Finally, as in *FOREX*, the voluminous transaction data produced in this action do not identify where either Defendants or class members were operating

at the time of any given transaction. (McCrary ¶217 & App. Ex. D.15.) Voluminous transaction-by-transaction inquiries therefore will be necessary to identify which trades satisfy the FTAIA, and these individual inquiries defeat predominance. *See FOREX II*, 407 F. Supp. 3d at 431-33.

The R&R erroneously concluded that Plaintiffs avoided all FTAIA issues and successfully excluded all transactions "with a Defendant's foreign desk" by limiting the class to transactions entered into with Defendants' U.S.-domiciled legal entities. (R&R 62.) That is factually wrong:

████████████████████████████████████████████████████

███████████████. *See supra* at 47. The R&R is equally incorrect as a legal matter to the extent that it considered domicile—not operating location—to be determinative. *See FOREX II*, 407 F. Supp. 3d at 432-33 & n.9; *FOREX I*, 2016 WL 5108131, at *13-14.

The R&R similarly erred in concluding that all transactions with *lender* class members are rescued by the FTAIA's "import commerce" exclusion. (R&R 62.) That exclusion applies, if at all, only to foreign lenders' transactions with Defendants operating domestically, *see Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 425 (S.D.N.Y. 2020), and the data do not distinguish those transactions from transactions in which Defendants were operating abroad.[9]

The R&R erred again in suggesting that even transactions that occurred between class members and Defendants that were *both* operating abroad satisfy the FTAIA's "domestic effects" exception. (R&R 61-62.) The R&R reasoned that any overcharges paid on these foreign transactions can be traced to a "domestic effect" because pricing in foreign markets allegedly

---

[9] Plaintiffs' attempt to limit the class to transactions in stocks listed on U.S. exchanges is likewise unavailing because all class transactions at issue were executed OTC, not on an exchange. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 180-81 (2d Cir. 2014) (listing on a domestic exchange does not establish domesticity if the relevant transaction did not occur on a domestic exchange); *FOREX II*, 407 F. Supp. 3d at 431-33 (operating location of transacting parties is dispositive for OTC transactions).

would have improved if U.S. stock-lending platforms had flourished.  (*Id.*)  The R&R thus accepted Plaintiffs' argument that "arbitrage" and "price discipline" would have brought foreign prices into line with U.S. prices in the but-for world.  (Pls.' Reply 28; Zhu Reply ¶¶240, 242, 246.)

That mistaken argument threatens to gut the FTAIA:  under Plaintiffs' argument, U.S. antitrust law would apply to a stock loan between a class member operating in Russia and a prime broker operating in China.  The case law rejects that extreme result by limiting the domestic-effects exception to situations where a domestic effect is the "proximate"—not merely "but-for"—cause of injuries in foreign markets.  *See, e.g.*, *FOREX I*, 2016 WL 5108131, at *14 ("Plaintiffs' contentions that . . . prices in the United States directly impact foreign prices show at best but-for causation, but not proximate causation.")  Plaintiffs' but-for causation arguments about arbitrage and price discipline therefore fail to satisfy the FTAIA.  *See, e.g.*, *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 417 F.3d 1267, 1270-71 (D.C. Cir. 2005) (rejecting argument that "arbitrageurs" would have brought foreign prices into line with U.S. prices "but-for" the alleged conspiracy); *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 539-40 (8th Cir. 2007) (same).

## III.   The R&R Erred in Finding Superiority.

The R&R also erred in concluding that Plaintiffs satisfied Rule 23(b)(3)'s superiority requirement.  When analyzing superiority, courts consider a "nonexhaustive" list of relevant factors, each of which is aimed at "encourag[ing] courts to 'consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit.'" *Royal Park*, 2018 WL 1831850, at *9 (quoting *Amchem*, 521 U.S. at 616).  Here, "class members' interests in individually controlling the prosecution or defense of separate actions" and "the likely difficulties in managing a class action" compel denial of Plaintiffs' motion, just as they did in *Royal Park*.  *Id.*

The R&R disregarded evidence showing that class members are both able and willing to represent their own interests in this litigation.  Although the R&R acknowledged that the proposed class includes highly sophisticated "hedge funds and financial institutions [] who are more than capable of prosecuting any claims they believe they might have against Defendants," it brushed aside that fact because it does not "independently [] bar" class certification.  (R&R 64.)  But it is Plaintiffs' burden to show that a class action is superior to individual actions, and courts routinely find that a putative class consisting of "highly sophisticated, knowledgeable financial institutions" by itself "weighs against certification."  *Royal Park*, 2018 WL 1831850, at *9; *see Kottler v. Deutsche Bank AG*, 2010 WL 1221809, at *5 (S.D.N.Y. 2010) (same).  Similarly, the R&R failed to consider the active involvement in this litigation of a group of hedge funds that hired counsel to ensure their interests were protected and played a significant role in discovery.  Many of these hedge funds undoubtedly would be actively involved at trial.  Those hedge funds' prior involvement in discovery exemplified "the interests of the individual members of the class in controlling" this litigation.  *Royal Park*, 2018 WL 1831850 at *9.  The R&R also erred in summarily concluding that the "individual issues" it acknowledged "will not make a class action unmanageable or inappropriate."  (R&R 65.)

## CONCLUSION

Plaintiffs' motion for class certification should be denied in its entirety.

DATED:  August 15, 2022                    Respectfully submitted,

_/s/ Robert D. Wick_

Robert D. Wick
Henry B. Liu
John S. Playforth
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
rwick@cov.com
hliu@cov.com
jplayforth@cov.com

**_Attorneys for Defendants JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, J.P. Morgan Prime, Inc., and J.P. Morgan Strategic Securities Lending Corp._**

_/s/ Michael A. Paskin_

Daniel Slifkin
Michael A. Paskin
Damaris Hernández
Lauren M. Rosenberg
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
dslifkin@cravath.com
mpaskin@cravath.com
dhernandez@cravath.com
lrosenberg@cravath.com

**_Attorneys for Defendants Morgan Stanley & Co. LLC, Prime Dealer Services Corp., and Strategic Investments I, Inc._**

_/s/ Richard F. Schwed_

Adam S. Hakki
Richard F. Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
ahakki@shearman.com
rschwed@shearman.com

Michael P. Mitchell
401 9th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 508-8100
michael.mitchell@shearman.com

**_Attorneys for Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, Merrill Lynch L.P. Holdings, Inc., and Merrill Lynch Professional Clearing Corp._**

_/s/ Alexis Collins_

David I. Gelfand (_pro hac vice_)
Alexis Collins (_pro hac vice_)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave., NW
Washington, DC 20037
Telephone: (202) 974-1690
dgelfand@cgsh.com
alcollins@cgsh.com

Carmine D. Boccuzzi, Jr.
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2508
cboccuzzi@cgsh.com

**_Attorneys for Defendants EquiLend LLC, EquiLend Europe Limited, and EquiLend Holdings LLC_**

/s/ Staci Yablon

Robert Y. Sperling
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-7941
rsperling@winston.com

George E. Mastoris
Staci Yablon
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
gmastoris@winston.com
syablon@winston.com

Richard C. Pepperman, II
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
peppermanr@sullcrom.com

**Attorneys for Defendant Goldman Sachs &
Co. LLC**

/s/ Peter G. Wilson

Alan J. Brudner
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
alan.brudner@katten.com

Peter G. Wilson
Sarah K. Weber
Elliott M. Bacon
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
sarah.weber@katten.com
elliott.bacon@katten.com (*pro hac vice*)

**Attorneys for Defendants UBS AG, UBS
Americas Inc., UBS Securities LLC, and
UBS Financial Services Inc.**