**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, *et al.*, | Case No. 17-cv-6221 (KPF) (SLC) |
| Plaintiffs, | |
| v. | Hon. Katherine Polk Failla |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES,
LITIGATION EXPENSES, AND SERVICE AWARDS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

ARGUMENT .........................................................................................................................7

I.      CO-LEAD COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE .....................7

      A.      The Fee Request is Reasonable Under the *Goldberger* Factors .............................9

            1.      Co-Lead Counsel invested substantial time and resources .........................9

            2.      The case is incredibly complex .................................................................10

            3.      The case involved—and still involves—substantial risk .........................11

            4.      Co-Lead Counsel provided high-quality representation ...........................13

            5.      The effective percentage being requested is below applicable norms........................................................................................................14

            6.      Public policy supports approval of the fee request ...................................16

      B.      The Fee Request is Reasonable Under the Lodestar Cross-Check .......................17

      C.      The Reaction of the Classes .................................................................................19

II.     CO-LEAD COUNSEL'S REQUEST FOR AN AWARD OF LITIGATION EXPENSES IS REASONABLE.........................................................................................20

III.   THE REQUESTED SERVICE AWARDS FOR CLASS REPRESENTATIVES ARE FAIR AND EQUITABLE .............................................................................................22

CONCLUSION.....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                          **Page(s)**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006), *aff'd*, 272 Fed. Appx. 9 (2d Cir.
2008) ................................................................................................................14

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2011 WL 2909162 (E.D.N.Y. July 15, 2011) .....................................................8

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015)......................................................22

*In re Akazoo S.A. Secs. Litig.*,
2021 WL 4316717 (E.D.N.Y. Sept. 9, 2021) ..................................................7, 8

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018).................................15, 16, 20, 22

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) .............................................................15

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*,
481 F.2d 1045 (2d Cir. 1973)..............................................................................2

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001)...............................................................17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 183285 (N.D. Cal. Jan. 14, 2016) .....................................................15

*In re Checking Acct. Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011), *mot. granted*, 2012 WL 456691 (S.D.
Fla. Feb. 14, 2012) ............................................................................................15

*Chen v. XpresSpa at Terminal 4 JFK LLC*,
2021 WL 4487835 (E.D.N.Y. Oct. 1, 2021)......................................................25

*In re Citigroup Inc. Bond Litig.*,
988 F. Supp. 2d 371 (S.D.N.Y. 2013)................................................................10

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger*, 209
F.3d 43 ..............................................................................................................17

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) .....................................................18

*In re Colgate-Palmolive Co. ERISA Litig.*,
    36 F. Supp. 3d 344 (S.D.N.Y. 2014)................................................................17, 18

*In re Credit Default Swaps Antitrust Litig.*,
    2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)..............................................7, 17, 21

*Dial Corp. v. News Corp.*,
    317 F.R.D. 426 (S.D.N.Y. 2016) ................................................................23, 24

*Fleisher v. Phoenix Life Ins. Co.*,
    2015 WL 10847814 (S.D.N.Y. Sep. 9, 2015)........................................................19

*Garfield v. Boxed, Inc.*,
    2022 WL 17959766 (Del. Ch. Dec. 27, 2022).......................................................16

*In re Glob. Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................................20

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)..........................................................8, 9, 11, 18

*In re Holocaust Victim Assets Litig.*,
    2007 WL 805768 (E.D.N.Y. Mar. 15, 2007).......................................................11

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009), *modification denied*, 2009 WL
    3698020 (S.D.N.Y. Nov. 4, 2009) ......................................................................15

*Jermyn v. Best Buy Stores, L.P.*,
    2012 WL 2505644 (S.D.N.Y. June 27, 2012) .....................................................12

*Jones v. Treubig*,
    2022 WL 1223215 (S.D.N.Y. Apr. 26, 2022).......................................................18

*Kurtz v. Kimberly-Clark Corp.*,
    2024 WL 184375 (E.D.N.Y. Jan. 17, 2024) .............................................20, 24, 25

*LeBlanc-Sternberg v. Fletcher*,
    143 F.3d 748 (2d Cir. 1998)...............................................................................18

*In re Linerboard Antitrust Litig.*,
    2004 WL 1221350 (E.D. Pa. June 2, 2004), *order amended*, 2004 WL
    1240775 (E.D. Pa. June 4, 2004) ......................................................................25

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) .......................................................................14

*Martinek v. Amtrust Fin. Servs., Inc.*,
2022 WL 16960903 (S.D.N.Y. Nov. 16, 2022) (Failla, J.)......................................8

*Melito v. Am. Eagle Outfitters*,
2017 WL 3995619 (S.D.N.Y. Sept. 8, 2017)..........................................................8

*Meredith Corp. v. SESAC, LLC*,
87 F. Supp. 3d 650 (S.D.N.Y. 2015).............................................................10, 21

*Moses v. New York Times Co*.,
79 F.4th 235 (2d Cir. 2023) ....................................................................3, 22, 23

*In re Namenda Direct Purchaser Antitrust Litig*.,
2020 WL 3170586 (S.D.N.Y. June 15, 2020) ...........................................................22

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................10, 11, 12

*Oleniak v. Time Warner Cable Inc.*,
2013 WL 12447094 (S.D.N.Y. Dec. 17, 2013) (Failla, J.) .................................8, 25

*Parker v. Jekyll & Hyde Ent. Holdings, L.L.C.*,
2010 WL 532960 (S.D.N.Y. Feb. 9, 2010).............................................................25

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2024 WL 640266 (E.D.N.Y. Feb. 15, 2024)...........................................................22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
991 F. Supp. 2d 437 (E.D.N.Y. 2014) ...............................................12, 13, 15

*In re Polyurethane Foam Antitrust Litig.*,
2015 WL 1639269 (N.D. Ohio Feb. 26, 2015).......................................................15

*Reyes v. Altamarea Grp., LLC*,
2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) .......................................................25

*Roberts v. Texaco, Inc.*,
979 F. Supp. 185 (S.D.N.Y. 1997)..............................................................23, 24, 25

*Sanz v. Johny Utah 51 LLC*,
2015 WL 1808935 (S.D.N.Y. Apr. 20, 2015).......................................................15

*Sykes v. Harris*,
2016 WL 3030156 (S.D.N.Y. May 24, 2016) .......................................................16

*Tatum v. City of New York*,
2010 WL 334975 (S.D.N.Y. Jan. 28, 2010) .......................................................18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ..........................................................15

*Thornhill v. CVS Pharmacy, Inc.*,
  2014 WL 1100135 (S.D.N.Y. Mar. 20, 2014) ...................................................14, 15

*In re Urethane Antitrust Litig.*,
  2016 WL 4060156 (D. Kan. July 29, 2016) .........................................................15

*Velez v. Novartis Pharms. Corp.*,
  2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) .......................................................16

*In re Visa Check/Mastermoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom.*, *Wal-Mart*, 396 F.3d 96 ...................21

*In re Vitamin C Antitrust Litig.*,
  2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) .......................................................20

*In re Vitamins Antitrust Litig.*,
  2001 WL 34312839 (D.D.C. July 16, 2001) .........................................................15

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................8, 17

## Other Authorities

Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92
  N.Y.U. L. Rev. 937, 951 (2017) ....................................................................14

5 Newberg & Rubenstein on Class Actions §§ 17:1, 17:3 (6th ed. 2023) ....................................23

## PRELIMINARY STATEMENT

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Class Representatives and Co-Lead Counsel respectfully move for an award of attorneys' fees, payment of litigation expenses, and payment of service awards to the Class Representatives from the common fund.

Co-Lead Counsel respectfully seek $102,200,000 in fees, plus proportionate interest accrued in the Settlement Fund accounts. This is very low compared to fee requests in similar-sized settlements. This amounts to just 17.6% of the *cash* portion of the settlements, well below what is frequently awarded to class counsel, even in "mega-fund" cases. Co-Lead Counsel here *also* secured forward-looking measures; when those are considered, Co-Lead Counsel's fee request reduces to the equivalent of just 11.4% of the total value created for the Settlement Classes. This is even further below the norm.

The history of this case confirms the reasonableness of our request. This case has its roots in Co-Lead Counsel's investigative efforts into alleged collusion in the stock lending market, a crucial but obscure corner of the nation's financial markets. The heart of the case is a group boycott—a conspiracy to maintain the status quo—that is inherently harder to prove than a case where the defendants have conspired to *change* the status quo, *e.g.*, by jointly raising prices. Unlike many antitrust class actions, no government agency paved the way for this suit, and no other firms sought to lead the case on behalf of the proposed class.

Co-Lead Counsel alone thus devoted more than 180,000 hours of attorney time over the course of more than six years without pay, and advanced nearly $19 million for expert and other litigation costs, to pursue these claims. Co-Lead Counsel successfully navigated the suit past motions to dismiss and through years of protracted discovery. Discovery involved, among other things: more than half a billion pages of produced documents; approximately 100 depositions,

many taken at the outset of the pandemic lockdown; and nearly 13 *terabytes* of transactional data—a unit of measurement usually reserved for entire computer systems or libraries of multimedia files rather than rows of simple text data.  Class certification took almost a year just to *brief* for Magistrate Judge Cave, with additional months of briefing required for the parties' objections.  Though Plaintiffs prevailed in substantial part before Magistrate Judge Cave, the Court still has not ruled on the parties' objections.  At every step of the way, Co-Lead Counsel were opposed by attorneys from prominent defense firms.

In spite of these challenges and risks, acting as "private attorneys general," the Class Plaintiffs and Co-Lead Counsel reached more than $580 million in cash settlements with six of the seven Defendants along with industry reforms valued at $319 million—a result that would not have been possible without Co-Lead Counsel's diligent prosecution of the case.  As the Second Circuit has explained:

> [O]ne whose labors produce a favorable result deserves adequate recompense.  Such a notion is particularly applicable in the area of antitrust class action, which depends heavily on the notion of the private attorney general as the vindicator of the public policy.  In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation.

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973) (citation omitted).

The fairness of the request is also confirmed by the so-called lodestar "cross-check."  While courts use "multipliers" to compensate attorneys for the risk of taking on contingency cases, here, at our historic rates, $102,200,000 equates to a "multiplier" of just 1.05—that is, Co-Lead Counsel are barely being compensated for our risk at all.  And by the current-rates measure courts often use instead, Co-Lead Counsel is incurring a loss on the case, with a "negative"

multiplier of 0.70.[1]  This is a testament to the extremely conservative nature of Co-Lead Counsel's current request.

We also respectfully request that the Court grant reimbursement of $18,845,997.91 in litigation expenses, plus proportionate accrued interest.  Almost all of these expenses arise out of the work of experts.  Working with such a high volume of data requires blue-chip experts, and this case required particularly intensive expert work to compile and analyze data that would benefit class members at the class certification stage and on the merits.  Courts routinely recognize that class counsel should be reimbursed for such investments.  Without them Plaintiffs could not have secured such substantial recoveries.

Finally, the contributions of the named Plaintiffs—the "Class Representatives"—warrant reasonable service awards.  The Class Representatives, all institutional investors, were diligent in overseeing Co-Lead Counsel and acting on behalf of the class.  They actively participated in every aspect of discovery and strategic settlement decisions.  Without the Class Representatives' involvement, this litigation would not have occurred, and important public policies would not have been vindicated.  Recently, in *Moses v. New York Times Co.*, the Second Circuit has made clear that Rule 23(e)(2)(D)'s instruction to consider equitable treatment of class members includes recognizing the efforts of class representatives in bringing suit, supervising the litigation, and cooperating in discovery.  79 F.4th 235 (2d Cir. 2023).  The Class Representatives here request service awards of $100,000 each—in line with awards to institutional plaintiffs in similarly sized class cases—for a total of $500,000, plus accrued interest.

---

[1] These figures conservatively use only Co-Lead Counsel's lodestar; however, other firms contributed important work for the benefit of the class, including for instance Safirstein Law LLC, who represented named Plaintiff Torus Capital LLC in this Action.

## STATEMENT OF FACTS

***The six-year history of this case.*** Co-Lead Counsel's work, as well as the riskiness and other relevant features of this case, are summarized in the accompanying May 8, 2024, Joint Declaration of Daniel L. Brockett and Michael B. Eisenkraft ("Joint Decl."). A very brief summary of this six-year case is below.

Prior to suit, Co-Lead Counsel conducted an extensive, proprietary investigation into the stock lending industry. This investigation eventually led to a 87-page complaint, which was filed on behalf of three of the five Class Representatives in August 2017. Co-Lead Counsel continued to investigate the claims after filing, and later filed a 144-page amended complaint with even more material, including allegations of direct evidence of the conspiracy. Defendants filed two motions to dismiss the amended complaint, but the Court's 93-page opinion denied both in full after extensive briefing by the parties. *See* Joint Decl. ¶¶ 9-16.

Co-Lead Counsel undertook a massive discovery effort over the course of more than two years, beginning in late 2018. Among the highlights, Co-Lead Counsel obtained more than 500 million pages of produced documents; negotiated over the course of months productions from more than 100 sets of Defendants' transactional data; took and defended nearly 100 depositions; pioneered remote deposition strategies with the onset of COVID-19; and responded to contention interrogatories with, among other responses, a 77-page narrative history of the alleged conspiracy. *See id.* ¶¶ 17-58.

To support the motion for class certification, Co-Lead Counsel worked intensively with leading market-structure economists, backed by a team of consulting experts. They created the most comprehensive set of stock-lending-market transaction observations ever seen in the field. *See id.* ¶¶ 59-68.

To prove classwide impact, Plaintiffs offered the expert report of Dr. Haoxiang Zhu, a market structure economist and then-Professor at the MIT Sloan School of Business (and now Director of the SEC's Division of Trading and Markets). Dr. Zhu used a "search model" to show how the higher search costs imposed by Defendants' boycott harmed not only class members who would have traded on the platforms at issue, but also class members who would *not* have joined those platforms. Drawing on the work of 2010 Nobel Laureate Peter Diamond and his own groundbreaking research, Dr. Zhu showed that dealer uncertainty over their counterparties' "outside options" necessarily lead to market-wide improvements in pricing for class members. Dr. Zhu also confirmed his model with a "yardstick' analysis of comparable real-world financial markets that have adopted multilateral electronic trading, showing benefits for virtually all traders in each market. *See* Expert Rept. of Haoxing Zhu, ECF No. 414-9.

Co-Lead Counsel also worked with Professors Paul Asquith and Parag Pathak, both world-renowned Professors at MIT. Professors Asquith and Pathak used terabytes of stock lending transactional data to model the damages to class members flowing from the conspiracy. Professors Asquith's and Pathak's quantitative analysis of class damages was supported by experts from Berkeley Research Group who worked with data sets that required hundreds of hours of specialized work on data validation, computer coding, and analyzing millions of data observations. *See* Expert Rept. of Paul Asquith & Parag Pathak, ECF No. 414-10.

In the motion for class certification, Co-Lead Counsel also synthesized the results of the prior two years' discovery into a meticulously documented history of the Defendants' alleged conspiracy, complete with citations to hundreds of exhibits demonstrating that common evidence would be overwhelmingly available to prove the core antitrust violation issue at the center of Plaintiffs' and the class's claims. *See* Joint Decl. ¶ 59.

After deposing Plaintiffs' testifying experts, Defendants submitted four separate opposing expert reports. Co-Lead Counsel continued to work with Plaintiffs' experts to prepare extensive reply reports that responded to Defendants' criticisms, refined Professors Asquith's and Pathak's damages models, and addressed a number of arguments set forth by Defendants' experts. Unusually, briefing on Plaintiffs' motion extended into a sur-reply from Defendants and even a brief sur-sur-reply from Plaintiffs, ultimately extending the briefing timeline to some eleven months. *See id.* ¶¶ 60-66.

Ultimately, Co-Lead Counsel prevailed before Magistrate Judge Cave on Plaintiffs' motion. In a careful, 71-page Report and Recommendation, Magistrate Judge Cave rejected Defendants' factual and legal attacks on certification, finding for Plaintiffs on virtually every disputed point. Defendants won only with respect to the issue of post-filing damages. Extensive briefing on Defendants' objections to Magistrate Judge Cave's Report and Recommendation are still pending before the Court, as is briefing on Plaintiffs' narrow objections to Magistrate Judge Cave's class period recommendation. *See id.* ¶¶ 674-68.

***The Settlements.*** Negotiations with Defendants were intense. They included a two-day mediation with the Newly Settling Defendants before retired U.S. District Judge Layn Phillips, and months of negotiations thereafter with and without Judge Phillips's assistance.

Plaintiffs and Co-Lead Counsel settled with Credit Suisse in late January 2022 for $81 million in cash; Plaintiffs and Co-Lead Counsel settled with the Newly Settling Defendants in June 2023 for $499,008,750. *See generally* Joint Decl. § II; Stip. & Agreement of Settlement with Credit Suisse Group, ECF No. 521-1; Stip. & Agreement of Settlement with Goldman Sachs, Morgan Stanley, JPMorgan, UBS, and Equilend, ECF No. 652-1 ("New Settlement").

The New Settlement also includes market reforms designed to deter collusion. Dr. Rosa M. Abrantes-Metz, a Ph.D. economist specializing in industrial organization, finance, and econometrics, with a focus on conspiracies, estimates the value of these reforms at $319 million. *See generally* Joint Decl. Ex. A (Abrantes-Metz Rept.) at ¶¶ 1-14 (qualifications); *id*. at ¶¶ 36-40 (general methodology).

***The Class Representatives.*** The Class Representatives' contributions to the case are detailed in Exhibits B-F of the Joint Declaration. Throughout the last six years of this litigation, the Class Representatives have contributed extensive institutional time and resources to evaluating, supervising, and settling the case, and even more time and resources cooperating with discovery requests, sitting for depositions, and otherwise serving as typical representatives of the class members. The Class Representatives, all institutional investors, also took a considerable risk in publicly filing this lawsuit against the dominant forces in finance. Many investors would have, and did, refuse to take such actions. The Class Representatives took time out of official board meetings, offered key investment managers and internal staff up for deposition, devoted hours of their general counsels' time, and otherwise diverted key personnel away from their ordinary duties to pursue this litigation.

## **ARGUMENT**

## I.   **CO-LEAD COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE**

"Attorneys whose work created a common fund for the benefit of a group of plaintiffs' may receive reasonable attorneys' fees from the fund." *See In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *16 (S.D.N.Y. Apr. 26, 2016) ("*CDS*") (internal quotation marks and citation omitted). Fees can be awarded based on a settlement that only partially resolves the action. *See, e.g.*, *In re Akazoo S.A. Secs. Litig.*, 2021 WL 4316717, at *1 (E.D.N.Y. Sept. 9,

2021). Awarding reasonable attorneys' fees from the common fund recognizes and compensates

Counsel's efforts in bringing and prosecuting this case and advances the purpose of the antitrust

laws, which rely on private actions like this one to further important public-policy goals.

Without "adequate attorneys' fee awards, many antitrust actions would not be commenced, since

the claims of individual litigants, when taken separately, often hardly justify the expense of

litigation." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2011 WL 2909162, at *6 (E.D.N.Y.

July 15, 2011) (citation omitted).

Ultimately, "market rates" are the "ideal proxy" for an attorney's compensation.

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 52 (2d Cir. 2000). Consistent with these

observations, courts have recognized that "[a]lthough courts award attorneys' fees under either

the lodestar method or the percentage-of-the-fund method, the 'trend in this Circuit is toward the

percentage method.'" *Melito v. Am. Eagle Outfitters*, 2017 WL 3995619, at *17 (S.D.N.Y. Sept.

8, 2017) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)),

*aff'd in part sub nom.*, *Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85 (2d Cir. 2019). The

percentage method provides "appropriate financial incentives" necessary "to attract well-

qualified plaintiffs' counsel who are able to take a case to trial," while also "directly align[ing]

the interests of the class and its counsel" by providing "a powerful incentive for the efficient

prosecution and early resolution of litigation." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d

319, 355, 359 (S.D.N.Y. 2005) (citation omitted); *see Martinek v. Amtrust Fin. Servs., Inc.*, 2022

WL 16960903, at *2 (S.D.N.Y. Nov. 16, 2022) (Failla, J.) (applying percentage method with

lodestar cross-check); *Oleniak v. Time Warner Cable Inc.*, 2013 WL 12447094, at *8-*9

(S.D.N.Y. Dec. 17, 2013) (Failla, J.) (same).

## A.    The Fee Request is Reasonable Under the *Goldberger* Factors

Courts evaluating whether a fee is reasonable consider "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50 (quoting *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989)).

### 1.    *Co-Lead Counsel invested substantial time and resources*

As discussed in Section II below, Co-Lead Counsel have invested more than 180,000 hours of time from attorneys and professional support staff and almost $19 million in expenses in connection with this case—the vast majority of which went to experts and data analysts. These enormous investments were required because of the complexity of the case, its length, and the amount of expert work and resources necessary to prosecute it. Our investigation began over six years ago, and at the time of the Settlements we were still awaiting a final decision on the certification issue.

As detailed in the Statement of Facts above and in the Joint Declaration, the case required nearly 100 depositions, the compilation and analysis of terabytes of pricing data from the stock lending market that had never been put together before, and hundreds of pages of briefing and expert reports at class certification. Much of this work required close consultation between attorneys and experts. This work built value for the class, developing from scratch an antitrust claims suit that settled for more than half a billion dollars in cash and meaningful industry reforms. This work also ensured that Co-Lead Counsel could reasonably assess the risks and rewards of settlement.

Accordingly, this factor strongly supports awarding the requested fee.

2.      *The case is incredibly complex*

"[C]lass actions have a well deserved reputation as being most complex," *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (internal quotation marks and citation omitted), with antitrust cases being among the most "complex, protracted, and bitterly fought," *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 669 (S.D.N.Y. 2015) (citation omitted).  In cases that require more expertise, a larger percentage of the fund should be awarded to the lawyers who can competently prosecute the case.  *See In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379 (S.D.N.Y. 2013) ("The upshot is that the magnitude and complexity of the litigation also weigh in favor of a significant award.").  Because Co-Lead Counsel have had to develop the factual and legal theories of the case, this was a substantially more complex task than a typical antitrust class action, which often follows on the heels of government action.  *See id.*

The facts of this case also made it exceptionally complex.  This is a group boycott case about entrenched industry players resisting technological change in an obscure but important area of the financial markets.  Drawing on considerable pre-existing expertise in financial markets, Co-Lead Counsel nonetheless had to develop, with expert help, specialized understanding of both sides of the stock lending markets, financial market regulation, technological change, and economic theory relating to all the above.  They had to depose witnesses and glean facts from multiple Defendants in multiple countries as well as numerous third parties.  These factual complexities also raised legal issues that were just as complex.  And as more fully detailed in the Joint Declaration, every issue, large and small, was fought by top-flight defense counsel.

The amount of out-of-pocket expenses incurred to gather, process, understand, and analyze the massive amounts of data in this case also speaks to the case's complexity—with Co-Lead Counsel expending more than $16 million on testifying and non-testifying outside experts on behalf of the class, most of which represents the costs of analyzing transactional data. *See* Brockett Decl. Ex. B; Eisenkraft Decl. Ex. B.

For all these reasons, a fee award that accounts for the prosecution of litigation that was "extraordinary in both complexity and scope" is appropriate. *In re Holocaust Victim Assets Litig.*, 2007 WL 805768, at *46 (E.D.N.Y. Mar. 15, 2007), *report & recommendation adopted*, 528 F. Supp. 2d 109 (Dec. 14, 2007); *see also NASDAQ*, 187 F.R.D. at 477 ("There can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result.").

3.    *The case involved—and still involves—substantial risk*

The Second Circuit has "historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." *Goldberger*, 209 F.3d at 54 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987)). When considering attorneys' fees in a contingency action, the Court should consider the risks of the litigation at the time the suit was brought. *See id.* at 55. The most vivid illustration of the risk undertaken at the inception of the litigation is that nobody else—neither the government nor another private law firm—put themselves forward to undertake this litigation, either before or after this case was filed. *See* Hr'g Tr. at 30:16-24, *New Jersey Carpenters Health Fund v. Rali Series 2006-QO1*, No. 1:08-cv-8781 (S.D.N.Y. Aug. 14, 2015), ECF No. 355 ("I think it is the most striking factor here, that in 2008 no one else seemed to want to take this particular tack with litigation . . . .  Plaintiffs' counsel took on an enormous amount of risk and stuck with it for

nearly seven years . . . that very much influences my decision to award the fees sought."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 441 (E.D.N.Y. 2014) (fact that plaintiffs "did not piggyback on previous government action" supported fee award).

More generally, Defendants made clear from the start their intent to challenge whether any conspiracy existed at all. They also challenged whether the alleged conspiracy damaged class members and whether the case could be maintained as a class action. Defendants argued that the platforms themselves would not have succeeded even if there were no group boycott by Defendants. Many of these defense arguments, deployed already, will be raised again at the merits stage. At class certification, Defendants assembled a small army of experts who attacked Plaintiffs' motion on numerous grounds, including whether Plaintiffs had sufficiently demonstrated impact. Plaintiffs believe these arguments are meritless, and Magistrate Judge Cave has largely agreed, but not for want of strong opposition, the results of which are still uncertain.

It is often said that antitrust cases boil down to a "battle of the experts" on proof of damages. *In re NASDAQ*, 187 F.R.D. at 476. Here, this is certainly true. In class certification briefing, both Plaintiffs and Defendants put forward widely disparate views on damages from their respective experts. Plaintiffs do not expect this to change at the merits stage.

Co-Lead Counsel took this case on a fully contingent basis. *See* Joint Decl. ¶ 82. "Counsel should be rewarded for undertaking [those risks] and for achieving substantial value for the class." *Payment Card*, 991 F. Supp. 2d at 441; *see also Jermyn v. Best Buy Stores, L.P.*, 2012 WL 2505644, at *10 (S.D.N.Y. June 27, 2012) ("[T]he risk of non-payment in cases prosecuted on a contingency basis where claims are not successful . . . can justify higher fees.").

Accordingly, the risk of the case strongly supports the requested fee award.

### 4. *Co-Lead Counsel provided high-quality representation*

As a general matter, Co-Lead Counsel are among the most experienced and skilled antitrust and class action firms in the country. Each firm has led several prior mega-fund class action cases, received numerous accolades, and tried class action cases to verdict—and the attorneys who worked on the case are highly qualified litigators. *See generally* Decl. of Daniel L. Brockett in Supp. of Mot. for Attorneys'. Litig. Expenses, & Serv. Awards ("Brockett Decl.") Ex. C & Decl. of Michael B. Eisenkraft in Supp. of Mot. for Attorneys'. Litig. Expenses, & Serv. Awards. ("Eisenkraft Decl.") Ex. C ("Firm resumes" and selected attorney biographies).

Co-Lead Counsel's skill and tenacity are confirmed by the excellent result in this matter. *See Payment Card*, 991 F. Supp. 2d at 441 ("[T]he quality of representation . . . may be measured in large part by the results that counsel achieved for the classes."). Here, Co-Lead Counsel obtained both $580 million in cash and industry reforms for the benefit of the Settlement Classes. And of course, the Settlement Funds are *not* a full-case recovery—Bank of America is still an active Defendant.

Moreover, Plaintiffs' opponents were some of the most experienced and prominent defense firms in the world—including Cahill Gordon & Reindel LLP, Cleary Gottlieb Steen & Hamilton LLP, Covington & Burling, LLP, Cravath, Swaine & Moore LLP, Katten Muchin Rosenman LLP, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Shearman & Sterling LLP, and Sullivan & Cromwell LLP. Co-Lead Counsel's ability to secure the Settlements while facing aggressive, well-funded, and well-represented Defendants is not just a testament to the merits of the Settlements, but also the skill with which Co-Lead Counsel have prosecuted this case. *See* Fairness Hr'g Tr. at 43:13-20, *In re Wells Fargo & Company Sec. Litig.* No. 20-cv-4494

(S.D.N.Y. Sept. 15, 2023), ECF No. 211 ("Defendants were represented in this case by experienced, prominent defense firms, including Sullivan & Cromwell LLP. . . . Cravath, Swaine & Moore LLP, and Shearman & Sterling LLP. . . . The ability of plaintiffs' counsel to obtain a favorable settlement for the class in the face of such formidable legal opposition confirms the quality of their representation of the class.") (internal quotation marks and citation omitted)); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement."); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work." (citation omitted)), *aff'd*, 272 Fed. Appx. 9 (2d Cir. 2008).

For all these reasons, the quality of the representation in this case strongly supports the fee application.

     5.    <u>*The effective percentage being requested is below applicable norms*</u>

Every possible marker confirms that a $102,200,000 request is not just reasonable, but well below the norms in this Circuit.

The request is the equivalent of only about 17.6% of just the $580 million cash portion of the Settlements. This is itself below what courts in this Circuit routinely award. For instance, a 2017 study found that the mean and median awards in the Second Circuit are 28 percent and 30 percent, respectively.[2] Surveys by courts themselves have reached similar results. *See Thornhill*

---

[2] Theodore Eisenberg et al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 951 (2017).

*v. CVS Pharmacy, Inc.*, 2014 WL 1100135, at *3 (S.D.N.Y. Mar. 20, 2014) (collecting cases, noting: "In this Circuit, courts typically approve attorneys' fees that range between 30 and 33[%].");￼ *Sanz v. Johny Utah 51 LLC*, 2015 WL 1808935, at *1 (S.D.N.Y. Apr. 20, 2015) (same).

Our request is also significantly below the approximately $120 million (20.7%) that would be provided under the sliding-scale approach developed by Judge Gleeson and sometimes cited by other courts in this District (even before accounting for ten years of inflation since Judge Gleeson set his scale).  *See Payment Card*, 991 F. Supp. 2d at 445-46.  Moreover, courts recognize that large, complex antitrust cases present considerable risk and require extensive work.  As a result, courts often award fees well above what is being requested here, even for mega-fund cases.[3]

---

[3]    *See, e.g.*, *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) (approving fees of 26% of $504.5 million antitrust settlement); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *8 (D. Kan. July 29, 2016) (awarding 33.33% of $835 million settlement); Slip Op., *Klein v. Bain Cap. Partners, LLC*, No.1:07-cv-12388 (D. Mass. Feb. 2, 2015), ECF No. 1095 (awarding 33% of $590.5 million antitrust settlement); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *20 (N.D. Cal. Apr. 3, 2013) (awarding 28.6% of $1.08 billion settlement); *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011) (awarding 30% of $410 million settlement), *mot. granted*, 2012 WL 456691 (S.D. Fla. Feb. 14, 2012); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding 33.33% of $510 million settlement), *modification denied*, 2009 WL 3698020 (S.D.N.Y. Nov. 4, 2009); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1241 (S.D. Fla. 2006) (awarding 31.33% of $1.06 billion settlement); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (awarding 34.06% of settlement valued at $359 million); *see also* Order at 5, *Standard Iron Works v. Arcelormittal*, No. 1:08-cv-05214 (N.D. Ill. Oct. 22, 2014), ECF No. 539 (awarding 33% of $164 million settlement); *In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015) (awarding 30% of $147.8 million settlement); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 183285, at *2-*3 (N.D. Cal. Jan. 14, 2016) (awarding 30% of $127.5 million settlement); Order at 1, *In re Municipal Derivatives Antitrust Litig.*, No. 1:08-cv-02516 (S.D.N.Y. July 8, 2016), ECF No. 2029 (awarding 33.33%).

All of this is true even if one considers only the value of the cash component of the Settlements. But here the Settlements *also* provide for meaningful equitable relief in the form of industry reforms. In such a situation, it is appropriate to look at the *total* value provided to the class. *See, e.g.*, *Sykes v. Harris*, 2016 WL 3030156, at *17 (S.D.N.Y. May 24, 2016) (calculating fee in relation to calculable value of injunctive relief); *Velez v. Novartis Pharms. Corp.*, 2010 WL 4877852, at *8 (S.D.N.Y. Nov. 30, 2010) (same); *Garfield v. Boxed, Inc.*, 2022 WL 17959766, at *11 (Del. Ch. Dec. 27, 2022) (observing that "preventive action is as beneficial as corrective action, if not more: diffusing a ticking time bomb can be more valuable than cleaning up shrapnel" and provides a "material benefits" eligible for attorney fees). In fact, courts regularly grant requests for substantial attorney fees where, unlike here, there is *only* non-monetary relief provided to the class.[4]

If the value of the equitable relief is considered—which it should be—the above comparisons demonstrate that the fee request here is even more of a *low outlier*. Using Dr. Rosa M. Abrantes-Metz's estimate of value for the equitable relief, our fee request of $102,200,000 is equivalent to a mere *11.4%* of the $899 million in total value created by the Settlements.

### 6. *Public policy supports approval of the fee request*

"[P]ublic policy favors rewarding the successful prosecution of antitrust claims." *See Alaska Elec.*, 2018 WL 6250657, at *1. This is particularly here, as this private antitrust lawsuit was brought without the assistance of any governmental investigation or prosecution and where no other law firms even attempted to file competing claims.

---

[4] *See, e.g.*, Op. & Order, *Rudi v. Wexner*, No. 2:20-cv-03068 (S.D. Ohio May 16, 2022), ECF No. 46 (attorney fees of $21 million for governance reforms concerning sexual harassment and discrimination); Order, *In re Abbot-Depakote S'Holder Derivative Litig.*, No. 1:11-cv-08114, (N.D. Ill. May 22, 2014), ECF No. 332 ($9.9 million in attorney fees for governance reforms related to oversight and compliance with respect to unlawful marketing practices).

With respect to the first point, had private counsel with our skill and resources not taken this lawsuit, the Settlement Classes may well have recovered nothing and important public interests would not have been vindicated.  *See CDS*, 2016 WL 2731524, at *18 ("It is important to encourage top-tier litigators to pursue challenging antitrust cases . . . . Our antitrust laws address issues that go to the heart of our economy.").

With respect to the second point, that no other law firms sought lead in this matter indicates that "[t]his was a novel case on behalf of a class that no one else seemed to want to pursue, and therefore public policy favors granting the request for fees."  Hr'g Tr. at 31:10-12, *New Jersey Carpenters Health Fund v. Rali Series 2006-QO1*, No. 1:08-cv-8781 (S.D.N.Y. Aug. 14, 2015), ECF No. 355.  *Cf. WorldCom*, 388 F. Supp. 2d at 359 ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

Accordingly, the public policy factor also supports the requested fee.

### B.  <u>The Fee Request is Reasonable Under the Lodestar Cross-Check</u>

Courts recognize providing fee awards beyond standard hourly rates is necessary to incentivize attorneys to take cases despite the risks inherent in contingency-fee arrangements. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success."), *abrogated on other grounds by Goldberger*, 209 F.3d 43.  *See also In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (taking contingent fee risk "into account in determining the appropriate fee to award").  Thus, while it is normal to award fees above counsel's investment in the case, the lodestar method is used "as a sanity check

to ensure that an otherwise reasonable percentage fee would not lead to a windfall." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014). "[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

The cross-check in this case makes clear there is no windfall. To the contrary, these calculations only confirm how extremely conservative our fee request is and confirm the presence of the complexity and risk factors discussed above.

As demonstrated in the supporting declarations, Co-Lead Counsel's attorneys and professional support staff collectively spent over 180,000 hours on this matter. *See* Brockett Decl. Ex. A; Eisenkraft Decl. Ex. A. Using historic rate schedules, this translates to a lodestar investment in this case by Co-Lead Counsel of $97,501,520.80 in attorney and staff hours. *See* Brockett Decl. Ex. A; Eisenkraft Decl. Ex. A. Given our fee request is just for $102,200,000, we are barely getting a "multiplier" at all (1.05). Considering the lodestar investment at *current* rates—as courts in this Circuit typically do[5]—the "multiplier" is *below 1* (0.70)—that is, we are asking for *less* than our current-rate lodestar. This is known as a "negative" multiplier and is a "strong indication of the reasonableness of the requested fee." *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *13 (S.D.N.Y. May 9, 2014) (internal quotation marks omitted).

---

[5] *See, e.g.*, *Jones v. Treubig*, 2022 WL 1223215, at *2 (S.D.N.Y. Apr. 26, 2022) ("Courts look to current rates, rather than historical rates, . . . to compensate for the delay in payment . . . ." (internal quotation marks and citation omitted)); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment."); *Tatum v. City of New York*, 2010 WL 334975, at *5 (S.D.N.Y. Jan. 28, 2010); *LV v. New York City Dep't of Educ.*, 700 F. Supp. 2d 510, 514 (S.D.N.Y. 2010).

Unsurprisingly given the incentive structure that fee awards are supposed to create—to incentivize the bringing and prosecution of tough and complex cases—the "multipliers" associated with our fee request here fall far below the norm. As Judge Rochon recently recognized when approving an 18% fee award for a settlement of $1 billion and a lodestar multiplier of 3.8, "[i]n complex litigation, Lodestar multipliers between 2 and 5 are commonly awarded, and fee awards resulting in multipliers as high as 6 have also been approved." Fairness Hr'g Tr. at 49:16-19, *In re Wells Fargo & Company Sec. Litig*. No. 20-cv-4494 (S.D.N.Y. Sept. 15, 2023), ECF No. 211 (citation omitted). *See also Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *18 (S.D.N.Y. Sep. 9, 2015) ("Courts regularly award lodestar multipliers from 2 to 6 times lodestar in this circuit . . . ." (internal quotation and citation omitted)) (collecting cases).

As with the percentage method, no matter how calculated, the lodestar method strongly supports the requested fee award. This is, clearly, not a windfall situation, but rather an incredibly conservative and class-friendly request.

### C. The Reaction of the Classes

The Notice stated that Co-Lead Counsel may seek a fee of up to $105,000,000. The actual fee requested is *less*, for only $102,200,000. Co-Lead Counsel will update the Court on the reaction of the class in our reply papers, but at this point, no objections to the fee request have been received.[6]

---

[6] As today's papers were being finalized, the settlement administrator received one request for exclusion from an individual who indicated he did not know whether he is a member of the class. If appropriate, further details will be included in reply briefs.

## II.  CO-LEAD COUNSEL'S REQUEST FOR AN AWARD OF LITIGATION EXPENSES IS REASONABLE

"Counsel are entitled to be reimbursed for the reasonable expenses advanced in class litigation." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 469 (S.D.N.Y. 2004); *see also In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *11 (E.D.N.Y. Oct. 23, 2012) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." (citation omitted)).  Members of the Settlement Classes were informed that Co-Lead Counsel would move for an award of litigation costs of up to $23 million.  We respectfully request an expense award of $18,845,997.91, plus interest thereon, which is *less* than the maximum amount described in the notice.[7]  *See* Brockett Decl. Ex. B; Eisenkraft Decl. Ex. B; May 8, 2024 Decl. of Peter Safirstein Ex. A. (detailing expenses).

"When the 'lion's share' of expenses reflects the typical costs of complex litigation such as 'experts and consultants, trial consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses,' courts should not depart from 'the common practice in this Circuit of granting expense requests.'" *Kurtz v. Kimberly-Clark Corp.*, 2024 WL 184375, at *4 (E.D.N.Y. Jan. 17, 2024) (citation omitted); *Alaska Elec.*, 2018 WL 6250657, at *4.  As described in the supporting declarations, that is exactly the situation here.  Our expenses were associated with the typical costs of complex litigation.

---

[7] Co-Lead Counsel believe these expense figures to be current as of filing.  Because we continue to incur ongoing expenses for the benefit of the class such as document hosting fees, and because vendors sometimes belatedly identify additional amounts due in spite of our efforts to obtain up-to-date accounting, Co-Lead Counsel may present, at the time of our reply papers or at the fairness hearing, updated expense figures for final consideration.  Plaintiffs do not expect updated figures to approach the $23 million included in initial notice papers.

While the expenses in this case may seem large when viewed in a vacuum to an outsider, in large financial market antitrust cases like this one—involving extraordinarily complex computation and data management fees—these expenses, are, unfortunately, typical. For example, in the ISDAFIX antitrust class action, Judge Furman approved the reimbursement of expenses in the amount of $18,429,687.63. *Id.* at *3. In the foreign-exchange antitrust settlement, which involved the market for foreign exchange, Judge Schofield approved expense reimbursements of $22,490,654.29. Order Awarding Reimbursement of Litigation Expenses, *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-07789 (S.D.N.Y. Aug. 16, 2018), ECF No. 1115. *See also CDS*, 2016 WL 2731524, at *18 (reimbursing over $10 million in expenses incurred even pre-certification of the class and noting that "[m]ost of these expenses were incurred in connection with retention of experts" and that this "expert work was essential to the litigation and invaluable to the Class").

The non-expert-related expenses in this case are relatively small (13% of the total, more than half of which are document hosting fees) and Co-Lead Counsel reviewed them closely and believe them to be reasonable. Both firms maintain industry-standard expense policies to ensure these expenses remained reasonable.

For the reasons discussed above, "substantial expenses were necessary in this complex antitrust case." *Meredith*, 87 F. Supp. 3d at 671. There is thus "no reason to depart from the common practice in this circuit of granting expense requests." *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) (granting $18.7 million expense request where bulk of expenses were "experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses"), *aff'd sub nom.*, *Wal-Mart*, 396 F.3d 96.

## III. THE REQUESTED SERVICE AWARDS FOR CLASS REPRESENTATIVES ARE FAIR AND EQUITABLE

The requested awards of $100,000 each to five Class Representative are in line with service awards—also sometimes known as "incentive awards"—granted by other courts in this Circuit in cases with large recoveries. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 640266, at *4 (E.D.N.Y. Feb. 15, 2024) (granting awards of up to $200,000 per Class Representative); *In re Namenda Direct Purchaser Antitrust Litig.*, 2020 WL 3170586, at *2 (S.D.N.Y. June 15, 2020) (awarding $75,000 to each class representative even though they "made only a minimal contribution to the prosecution of the case"); *Alaska Elec.*, 2018 WL 6250657, at *4 (granting awards totaling $500,000, including $100,000 for certain named plaintiffs); Order at 2, *Laydon v. Mizuho Bank, Ltd.*, No. 1:12-cv-3419 (S.D.N.Y. Nov. 10, 2016), ECF No. 724 (awards totaling $580,000); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 WL 5918273, at *5-*6 (E.D.N.Y. Oct. 9, 2015) (awards totaling $540,000).

"Incentive awards encourage class representatives to participate in class action lawsuits, which are 'designed to provide a mechanism by which persons, whose injuries are not large enough to make pursuing their individual claims in the court system cost efficient, are able to bind together with persons suffering the same harm and seek redress for their injuries.'" *Moses*, 79 F.4th at 253 (citing 1 Joseph McLaughlin, McLaughlin on Class Actions § 1:1 (19th ed. 2022)). "Such incentive awards often level the playing field and treat differently situated class representatives equitably relative to the class members who simply sit back until they are alerted to a settlement." *Id.*[8]

---

[8] The "equitable-treatment requirement [of Rule 23(e)(2)(D)] protects the interests of class representatives who play an active role in the litigation—often providing the background information that forms the basis of the lawsuit, engaging in fact discovery, and devoting

The proposed awards here—$100,000 for each Class Representative, for a total of $500,000, plus accrued interest—fairly balance these two competing concerns by providing compensation to the Class Representatives for the valuable work they undertook on behalf of the class. "[T]he decision to grant the award, and the amount thereof, rests solely within the discretion of the [c]ourt." *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 439 (S.D.N.Y. 2016). Discretionary awards to named plaintiffs are routinely made in class actions, including antitrust matters. *See* 5 Newberg & Rubenstein on Class Actions §§ 17:1, 17:3 (6th ed. 2023) ("Empirical evidence shows that incentive awards are now paid in most class suits . . . .").

Courts in this Circuit use a number of factors to determine if "incentive awards [to plaintiffs] are reasonable and promote equity between class representatives and absent class members." *Moses*, 79 F.4th at 245. "The guiding standard in determining an incentive award is broadly stated as being the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (*e.g.,* factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery." *Roberts*

---

considerable time and effort into the settlement process—from having absent class members free ride on their efforts." *Moses*, 79 F.4th at 245 (internal quotation marks and citation omitted). As described in the leading class treatise and by the Second Circuit, "if the class representatives face particular risks in serving the class and/or undertake valuable work on behalf of the class but cannot recover any of the costs of those efforts through an incentive fee award, they have a fair argument that the settlement is not treating them equitably relative to the absent class members." *Id*. (quoting 5 Newberg & Rubenstein on Class Actions §§ 17:3-4 (6th ed.)). The Second Circuit concurrently recognized, however, that "the rule requires that courts reject incentive awards that are excessive compared to the service provided by the class representative or that are unfair to the absent class members." *Id.*

*v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997). All of these factors support the award to Plaintiffs. *See generally* Joint Decl. Exs. B-F (detailing Class Representative contributions).

*First*, the personal risk incurred by the plaintiff-applicant in becoming and continuing as a litigant was extraordinary here. The Class Representatives here—all institutional investors—publicly took on the largest investment banks in the world. These institutional investors are dependent on these same investment banks to provide essential services. By stepping up and bringing this antitrust suit, these institutions took risks on behalf of the class to which absent class members did not subject themselves. *See, e.g.*, *Dial Corp.*, 317 F.R.D. at 439 ("[T]he named Plaintiffs in this case assumed a substantial risk in antagonizing a longstanding, powerful business partner and suffering sweeping consequences in the marketplace as a result of filing this action").

*Second*, the time and effort expended by the Class Representatives support the award. The Class Representatives here are institutional investors, not individual investors, which significantly increases the effort and time required to be a Class Representative. *C.f.*, *id.* (noting relatively high incentive awards when "courts have recognized the efforts of corporate representatives in granting incentive awards"). The Class Representatives preserved, gathered, and produced documents from multiple repositories. They responded to follow up document and information requests. They produced key personnel for depositions. And they reviewed every significant filing and decision in the case. From investigation to now, this litigation has spanned over seven years and their duties to act on behalf of the class have been unfaltering. *See Kurtz v. Kimberly-Clark Corp.*, 2024 WL 184375, at *9 (E.D.N.Y. Jan. 17, 2024) (noting, when approving service awards for litigation that extended through eight years, that "length and

intensity of this lawsuit logically necessitated more extensive services and work by the named Plaintiffs").

*Third*, courts look at the requested award in comparison to the ultimate recovery for the class. Here, the total of the proposed awards ($500,000) is less than 0.1% of the cash recovery of $580 million, which does not even take into account the substantial value of the equitable relief the Settlements provide to the Settlement Classes. This is a far lower percentage than courts in this District often award as incentives.[9] That this was an antitrust case brought without the assistance of a government action also counsels in favor of an incentive award. *See In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *18 (E.D. Pa. June 2, 2004) (noting that incentive payments are "particularly appropriate" in cases where "there was no preceding governmental action alleging a conspiracy"), *order amended*, 2004 WL 1240775 (E.D. Pa. June 4, 2004).

## CONCLUSION

For the foregoing reasons, Co-Lead Counsel respectfully request that the Court approve Co-Lead Counsel's application for the payment of attorneys' fees and expenses in the amounts set forth above, plus interest thereon. Plaintiffs also request the Court approve the request for service awards, plus interest thereon. Co-Lead Counsel will submit proposed orders in connection with our reply papers.

---

[9] *See, e.g.*, *Chen v. XpresSpa at Terminal 4 JFK LLC*, 2021 WL 4487835, at *7-*8 (E.D.N.Y. Oct. 1, 2021) (awarding 3.7 % of total award); *Oleniak v. Time Warner Cable Inc.*, 2013 WL 12447094, at *10 (S.D.N.Y. Dec. 17, 2013) (approving $70,000 of incentive awards where Maximum Settlement Amount was $3.75 million); *Reyes v. Altamarea Grp., LLC*, 2011 WL 4599822, at *1, *9 (S.D.N.Y. Aug. 16, 2011) (approving service awards totaling $50,000, representing approximately 16.6% of the $300,000 settlement); *Parker v. Jekyll & Hyde Ent. Holdings, L.L.C.*, 2010 WL 532960, at *2 (S.D.N.Y. Feb. 9, 2010) (approving service awards totaling 11% of the total recovery); *Roberts*, 979 F. Supp. at 202 (0.18% of a $115 million Fund).

- 25 -

DATED: May 8, 2024

Respectfully submitted,

**COHEN MILSTEIN SELLER & TOLL PLLC**

By: */s/ Michael B. Eisenkraft*
Michael B. Eisenkraft
Christopher J. Bateman
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com
cbateman@cohenmilstein.com

Julie G. Reiser (*pro hac vice*)
Richard A. Koffman (*pro hac vice*)
Emmy L. Levens (*pro hac vice*)
Daniel McCuaig (*pro hac vice*)
Robert W. Cobbs (*pro hac vice*)
1100 New York Ave NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
jreiser@cohenmilstein.com
rkoffman@cohenmilstein.com
elevens@cohenmilstein.com
dmccuaig@cohenmilstein.com
rcobbs@cohenmilstein.com

*Co-Lead Counsel for the Class*

**SAFIRSTEIN LAW LLC**

Peter Safirstein
45 N. Broad Street
Suite 100
Ridgewood, NJ 07450
Telephone: (917) 952-9458
psafirstein@safirsteinlaw.com

*Counsel for Plaintiff Torus*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Daniel L. Brockett*
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Deborah K. Brown
David LeRay
Maxwell Deabler-Meadows
Avi Grunfeld
Nicolas Siebert
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
sascharand@quinnemnuel.com
steigolson@quinnemanuel.com
deborahbrown@quinnemanuel.com
davidleray@quinnemanuel.com
maxmeadows@quinnemanuel.com
avigrunfeld@quinnemanuel.com
nicolassiebert@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
jeremyandersen@quinnemanuel.com

*Co-Lead Counsel for the Class*