UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM; LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION; ORANGE COUNTY EMPLOYEES RETIREMENT SYSTEM; SONOMA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION; and TORUS CAPITAL, LLC, *on behalf of themselves and all others similarly situated,*<br><br>                    Plaintiffs,<br><br>                    -v.-<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; MERRILL LYNCH L.P. HOLDINGS, INC.; and MERRILL LYNCH PROFESSIONAL CLEARING CORP.,<br><br>                    Defendants. | 17 Civ. 6221 (KPF) (SLC)<br><br>**OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION** |

KATHERINE POLK FAILLA, District Judge:

On June 30, 2022, Magistrate Judge Sarah L. Cave issued a 71-page Report and Recommendation (the "Report"), in which she recommended that the motion for class certification (the "Motion") brought by Plaintiffs in this antitrust class action be granted in part and denied in part. Plaintiffs filed a modest objection to one portion of the Report, while the remaining defendants in the case (collectively, "Defendants") pursued broader challenges to her decision. For the reasons that follow, the Court adopts the Report nearly in its entirety, with a limited exception concerning the end date of the relevant class period (the "Class Period").

# BACKGROUND[1]

## A.    Factual Background

Both this Court and Judge Cave have previously recounted the facts underlying this action, in which Plaintiffs allege that a handful of banks conspired to prevent the U.S. stock loan market from transitioning to a transparent, direct electronic exchange.  *See Iowa Pub. Employees' Ret. Sys.* v.

---

[1]    This Opinion draws its facts from Plaintiffs' Amended Complaint ("AC" (Dkt. #73)), the parties' submissions in connection with Plaintiffs' Motion (Dkt. #411, 412, 413, 414, 415, 468, 469, 470, 513), and the Report (Dkt. #563).

The parties' submissions include the following documents and the exhibits attached thereto: (i) Declaration of Michael B. Eisenkraft in Support of Plaintiffs' Motion for Class Certification and Appointment of Cohen Milstein Sellers & Toll PLLC as Co-Lead Class Counsel, dated February 22, 2021 (Dkt. #413); (ii) Declaration of Daniel L. Brockett in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, dated February 22, 2021 (Dkt. #414), including the expert report of Dr. Haoxiang Zhu ("Zhu Report" (Dkt. #414-9)) and the expert report of Dr. Paul Asquith and Dr. Parag Pathak ("A&P Report" (Dkt. #414-10)); (iii) Declaration of Michael A. Paskin in Support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, dated June 29, 2021 (Dkt. #432), including the expert report of Dr. Terrence Hendershott ("Hendershott Report" (Dkt. #432-1)), the expert report of Dr. Justin McCrary ("McCrary Report" (Dkt. #432-2)), and the expert report of Fabio Savoldelli ("Savoldelli Report" (Dkt. #432-4)); (iv) Reply Declaration of Daniel L. Brockett in Support of Plaintiffs' Motion for Class Certification, dated October 5, 2021 (Dkt. #470), including the reply expert report of Dr. Zhu ("Zhu Reply" (Dkt. #470-1)) and reply expert report of Dr. Asquith and Dr. Pathak ("A&P Reply" (Dkt. #470-2)); (v) Declaration of John S. Playforth in Support of Defendants' Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification, dated November 22, 2021 (Dkt. #496), including the reply expert report of Dr. McCrary ("McCrary Reply" (Dkt. #496-2)); and (vi) Sur-Sur-Reply Declaration of Daniel L. Brockett in Further Support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel, dated January 18, 2022 (Dkt. #514).

For ease of reference, the Court refers to Plaintiffs' memorandum of law in support of the Motion as "Pl. Br." (Dkt. #415), and notes that docket entry 415 is the corrected version of the original memorandum of law that was filed on February 22, 2022 (Dkt. #412).  The Court refers to Defendants' memorandum of law in opposition to Plaintiffs' Motion as "Def. Br." (Dkt. #431); and to Plaintiffs' reply memorandum of law as "Pl. Reply" (Dkt. #469).

Further, the Court refers to Plaintiffs' objection to the Report as "Pl. Obj." (Dkt. #573); to Defendants' opposition to Plaintiffs' objection as "Def. Opp." (Dkt. #595); and to Plaintiffs' reply to Defendants' opposition as "Pl. Reply" (Dkt. #615).  Similarly, the Court refers to Defendants' objections to the Report as "Def. Obj." (Dkt. #576); to Plaintiffs' opposition to Defendants' objections as "Pl. Opp." (Dkt. #597); and to Defendants' reply to Plaintiffs' opposition as "Def. Reply" (Dkt. #617).

*Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 297-310 (S.D.N.Y. 2018) ("*IPERS I*") (denying Defendants' motion to dismiss); *Iowa Pub. Employees' Ret. Sys.* v. *Bank of Am. Corp.*, No. 17 Civ. 6221 (SLC), 2022 WL 2829880, at *1-13 (S.D.N.Y. June 30, 2022) (Report).  The Court assumes familiarity with these prior opinions, and adopts and employs the defined terms from *IPERS I*.  The Court provides here only a brief discussion of those facts that are relevant to resolving the instant objections to the Report.

### 1.    The U.S. Stock Loan Market

A stock loan transaction occurs when stock is temporarily transferred from one investor to another.  (AC ¶ 2).  The owner of the shares, referred to as a "stock lender" or "beneficial owner," lends its stock to the borrower.  (*Id.* ¶¶ 2, 97).[2]  Beneficial owners are typically entities such as pension funds, mutual funds, or insurance companies that own U.S. equities.  (Zhu Report ¶ 23).  Borrowers typically include entities like hedge funds.  (*See* AC ¶¶ 19, 136, 164; Zhu Report ¶¶ 190, 191).  In exchange for lending stock to a borrower, the beneficial owner receives cash or noncash collateral and is paid a "borrowing fee."  (AC ¶¶ 2, 97).  The borrower holds the stock for a period of time, and later returns the stock to the beneficial owner when the borrowing period has ended.  (*Id.* ¶ 2).  The period of time during which the borrower holds the stock is not always preset; the loan can be for a fixed term, or it can be an "open" loan that

---

[2]    The stock lender transfers legal title to the stock to the borrower, but retains the economic benefits of the stock, such as dividends.  (Zhu Report ¶ 20).

can be terminated at any time by either the beneficial owner or the borrower. (Zhu Report ¶ 21).

Notably, beneficial owners generally do not transact directly with borrowers. (Zhu Report ¶ 28). Rather, in the above-described transaction, it is typical that an "agent lender," usually a custodian bank, would act as an intermediary agent on behalf of the beneficial owner. (AC ¶ 97). The agent lender would interact with a broker-dealer, such as the Prime Broker Defendants in this case. (*Id.*).[3] The broker-dealer would also serve as an intermediary, borrowing the stocks from the beneficial owner, through the agent lender, and lending the stocks to the borrower. (Zhu Report ¶ 28; *see* Report 5 (outlining the typical steps of a stock loan transaction facilitated by a broker-dealer)). In exchange for doing so, the broker-dealer would collect a fee from the borrower for the transaction, a portion of which the broker-dealer would then keep before passing the remainder of the fee to the lender. (AC ¶ 97). Because the broker-dealer typically would not inform the lender (acting through the agent lender) or the borrower of the amount of the fee that the borrower paid, or the amount of that fee that the lender received, neither the borrower nor the lender would ever become aware of the broker-dealer's portion of the transaction fee. (*Id.*). "The differences in the price between the[se] two

---

[3]    As defined in *IPERS I*, the Prime Broker Defendants are large banks that "engaged in securities lending and stock lending transactions with class members, either directly or through Defendants' affiliates." *Iowa Pub. Employees' Ret. Sys.* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 298 (S.D.N.Y. 2018). The Prime Broker Defendants act as "prime brokers," which are broker-dealers "who offer an array of services that include stock lending." *Id.* at 300 (citing AC ¶ 102).

4

sides of the market" is called the "spread," and it "is a measure of the transaction cost for end users and a measure of prime broker revenues." (Zhu Report ¶ 28).

As Defendants' experts explain, broker-dealers justify the spread by explaining that broker-dealers provide other services to facilitate these transactions, the cost of which is "bundled" with the cost of matching the lender and borrower. (*See* McCrary Report ¶ 22; Savoldelli Report ¶¶ 25-26). Those services include establishing relationships with agent lenders and promoting stability of transactions by managing the risks of "recalls" of stocks and "rerate[s]" of stock transactions. (Report 9-10). A "recall" occurs when a stock lender ends the loan. (Zhu Report ¶ 21). A "rerate" occurs when one party to the loan demands a different rate or threatens to terminate the loan if the counterparty does not accept the new rate. (*Id.*).

Plaintiffs posit that the practice of stock lending is advantageous because it promotes liquidity in financial markets by (i) allowing institutional investors to earn returns while holding stable interests in a given company and (ii) facilitating "short-selling," a trading strategy. (AC ¶ 3). But despite the importance of the stock loan market in the United States, it remains an "over-the-counter" ("OTC") market, in that there is no "central marketplace" where trades can take place. (*Id.* ¶ 98). As a result, market participants have little opportunity to "price shop" among competing broker-dealers and remain unaware of the pricing terms on which other market participants are transacting, all of which makes it difficult to negotiate with broker-dealers. (*Id.*

¶¶ 99, 103).  For a variety of reasons, Plaintiffs argue that "th[is] OTC market structure benefits intermediaries at the cost of customers."  (Zhu Report ¶ 32). Further, "[t]he broker-dealer market is highly concentrated, and the six Prime Broker Defendants control the majority of stock lending volume."  (A&P Report ¶ 115).

### 2.    Defendants' Anticompetitive Conduct

The Report discusses the evidence that Plaintiffs proffer as proof that the Prime Broker Defendants conspired to prevent new market entrants, including AQS and SL-x Markets ("SL-x"), from bringing innovations to the stock loan market that would have disrupted their market position, as well as the evidence Defendants proffer to refute those claims.  (Report 11-19).  For example, the evidence shows that in 2001, Defendants Bank of America,[4] Goldman Sachs, Morgan Stanley, JP Morgan, and UBS formed an entity called "EquiLend" explicitly to address the "[t]hreat of disintermediation," *i.e.*, the threat that intermediaries would become less ubiquitous in the domestic stock lending market.  (*See* Dkt. #414-4 at 44 (Presentation for a 2015 EquiLend Board of Directors meeting)).

---

[4]    As stated in *IPERS I*,

> due to Bank of America Corporation's 2009 acquisition of Merrill Lynch & Co., and to Bank of America Securities LLC's 2010 merger with Defendant Merrill Lynch, Pierce, Fenner & Smith Inc., the Amended Complaint uses the term "Bank of America" to refer to Defendants Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Professional Clearing Corp., Merrill Lynch L.P. Holdings, Inc., and their parents, subsidiaries, and affiliates.

*IPERS I*, 340 F. Supp. 3d at 298 n.2.

By 2009, members of EquiLend had formed a "CCP Working Group,"
precisely because they feared that "CCP"[5] would be "forced on [them] by
regulators in some form[.]"  (Dkt. #414-27 at 2).  From the perspective of
EquiLend's members, it was preferable to find a solution through EquiLend
that would be satisfactory to regulators while avoiding potential
disintermediation.  (*Id.*).  In consequence, the working group resolved to "stay
close to CCP market evolvement and understand CCP models but *not* formally
engage or develop links to any CCP[.]"  (*Id.* (emphasis added)).  What is more,
the Board members of EquiLend were instructed to report to EquiLend "if their
view or perception of CCPs change[d]" or if they "decide[d] to participate in CCP
bi-laterally."  (*Id.*; *see also* Dkt. #414-35 at 2 (managing director of EquiLend
explaining that EquiLend recommended that "owner firms inform [them] …
if/when they start doing any business through a CCP" because EquiLend did
not "want to be blindsided if [in] six months … half of the firms [had started]
using one of these CCPs in some capacity)).

At the end of January 2009, a company called AQS launched an
electronic trading platform that would allow trades to "be executed and
centrally cleared at transparent prices."  (*See* AC ¶ 9).  The first Bank of
America trades were successfully executed on the AQS platform on January 31,

---

[5]    CCP, or central counterparty clearing, refers to the use of "clearinghouses" as
intermediaries between parties to a loan, protecting them from counterparty risk, *i.e.*,
the risk that the counterparty will default.  (AC ¶¶ 9 n.3, 147).  Clearinghouses do so by
becoming the "borrower to every lender and the lender to every borrower."  (*Id.* ¶ 9 n.3).
If "one party fails to meet its obligations, the clearinghouse steps in and assumes the
obligation."  (*Id.*).

2009 (Dkt. #414-40 at 4), and Bank of America initially worked to promote AQS to hedge funds (Dkt. #414-39 at 755). But Plaintiffs have put forth evidence that Bank of America later shifted resources away from that effort (Dkt. #414-39 at 755-756), and claim that this shift occurred because Bank of America needed to "f[a]ll in line with" the other Prime Broker Defendants (Pl. Br. 29). The Prime Broker Defendants "[r]eally want[ed] to squash th[o]se muppets," namely AQS, and worked to do so by threatening supporters of AQS. (Dkt. #414-48 at 2; *see* Report 13 (compiling evidence that the Prime Broker Defendants pushed firms not to work with AQS)). By 2016, AQS had failed and EquiLend purchased its assets. (Dkt. #414-39 at 12-14; *see also* Dkt. #414-62 at 3 (Credit Suisse employees discussing the topic of central clearing and stating that "AQS learned the hard way that [neither Credit Suisse] nor any of the major [prime brokers] will support a [h]edge fund model"). As the Report acknowledges, Defendants argue that AQS failed, not because of any interference by Defendants, but because the platform did not offer key services that broker-dealers offer in stock loan transactions. (Report 14).

In 2011, another electronic stock lending platform emerged: SL-x. In marketing itself, SL-x recognized that prime brokers were aware of "the advantages of a central counterparty model for stock lending, but [were] concerned about its impact on their market position and relationships." (Dkt. #414-63 at 3). SL-x therefore offered a model that was "[d]ealer focused," in that it "d[id] not try to change the existing buy-side/sell-side ecosystem," "d[id] not disintermediate dealers," and "[m]aintain[ed] relationships as [a] key barrier

to entry." (*Id.* at 27).  The fact that SL-x would allow prime brokers to maintain their market position distinguished it from other "electronic stock lending platforms … [that had] failed because of lack of support from prime brokers and agent lenders." (*Id.* at 3).  As detailed in the Report, Plaintiffs advance evidence suggesting that the Prime Broker Defendants still ultimately, and as a group, decided not to use SL-x.  (Report 15; *see also* Dkt. #414-77 at 2 (contemporaneous email exchange stating that the EquiLend Board was "unanimous in not seeing much benefit in the SL[-]x proposal")).  To refute Plaintiffs' suggestions of collusive and/or anticompetitive activity, Defendants point to the testimony of SL-x's Chairman, in which he stated that SL-x never received regulatory approval in the United States and therefore did not have an operational platform in the United States.  (Dkt. #432-17 at 75-77).

Finally, the Report addressed evidence regarding the Prime Broker Defendants' response to Data Explorers, which was the leading provider of securities lending data and which provided "transparency and benchmarking to one of the last obscure frontiers in financial markets."  (Report 16 (quoting Dkt. #414-81 at 5 (Markit company presentation))).  Plaintiffs' evidence suggests that the Prime Broker Defendants not only discouraged funds from participating in Data Explorers, but also decided to develop their own data product, Markit.  (*Id.* at 17).  Ultimately, in 2012, Data Explorers was acquired by Markit — a firm that was majority-owned by banks including the Prime Broker Defendants.  (*Id.*).   As the Report noted, Defendants argue that they acquired Data Explorers, not to stop the service, but because it was a market

leader in that sector, and that they did not stop providing data to Data Explorers before the acquisition. (*Id.*). In point of fact, however, Markit has never issued a data product that provides market-wide transparency. (*Id.*).

## B.    Procedural Background

### 1.    Plaintiffs' Claims and Class Certification Briefing

Plaintiffs filed an initial complaint on August 16, 2017 (Dkt. #1), and the Amended Complaint on November 17, 2017 (Dkt. #73), bringing claims of (i) conspiracy to restrain trade in violation of Section 1 of the Sherman Act; and (ii) unjust enrichment in violation of New York law. Those defendants then in the case jointly moved to dismiss; the motion was denied in *IPERS I*; and the case proceeded to discovery.

On February 22, 2021, Plaintiffs filed the instant Motion, seeking class certification and appointment of lead counsel. (Dkt. #411). At the parties' request, this Court permitted briefing on class certification to be filed over a period of seven months and directed Plaintiffs to refile the notice of motion for class certification at the time they filed their reply brief. (*See* Dkt. #417). After an additional extension, Defendants filed their memorandum of law in opposition to the Motion on June 29, 2021. (Dkt. #431). On October 5, 2021, Plaintiffs filed the renewed notice of motion and reply memorandum of law in further support of the Motion. (Dkt. #468-469). Defendants then filed a sur-reply on November 22, 2021 (Dkt. #495), followed by Plaintiffs' sur-sur reply on January 18, 2022 (Dkt. #513).

This Court referred the Motion to Judge Cave for a report and recommendation. (Dkt. #471). On April 28, 2022, Judge Cave heard a full day of oral argument from the parties on the Motion. (*See* April 28, 2022 Minute Entry; *see also* Dkt. #535, 555-1, 556-1, 556-2, 557-1, 559-1 (parties' presentations and oral argument transcript)).

### 2.    The Report and the Objections to the Report

On June 30, 2022, Judge Cave issued the Report, recommending that the Court grant Plaintiffs' Motion in part and deny the Motion in part. After a comprehensive, well-reasoned analysis of the parties' arguments and evidence, Judge Cave recommended that the following class be certified (the "Class"):

> All persons and entities who, directly or through an agent, entered into at least 100 U.S. Stock Loan Transactions as a borrower from the prime brokerage businesses of the U.S.-based entities of the Prime Broker Defendants, or at least 100 U.S. Stock Loan Transactions as a lender of Hard-to-Borrow stock to the U.S.-based entities of the Prime Broker Defendants, from January 1, 2012 until August 16, 2017.

> Excluded from the Class are: Defendants, as well as Citadel LLC, Two Sigma Investments, PDT Partners, Renaissance Technologies LLC, TGS Management, Voloridge Investment Management, and the D.E. Shaw Group and their corporate parents, subsidiaries, and wholly owned affiliates, as well as any federal governmental entity, any judicial officer presiding over this action, and any juror assigned to this action.

(Report 69-70). Judge Cave further recommended that the following management subclasses be utilized (collectively, the "Subclasses"):

> The "End-User Subclass": All persons and entities within the class who, directly or through an agent, entered into at least 100 U.S. Stock Loan Transactions as a borrower from the prime brokerage businesses of

11

the U.S.-based entities of the Prime Broker Defendants during the Class Period; and

The "Beneficial Owner Subclass": All persons and entities within the class who, directly or through an agent, entered into at least 100 U.S. Stock Loan Transactions as a lender of Hard-to-Borrow stock to the U.S-based entities of the Prime Broker Defendants during the Class Period.

(*Id.* at 70).  Judge Cave also recommended that Plaintiffs IPERS, LACERA, OCERS, SCERA, and Torus be appointed as co-Lead Plaintiffs and that Cohen Milstein and Quinn Emanuel be appointed as Class Counsel.  (*Id.* at 65-66, 70).

On the particular issue of Plaintiffs' request to extend the Class Period end date from August 16, 2017, to February 22, 2021, or later, Judge Cave expressed concern that adopting such a proposed end date would require the reopening of fact discovery, which had closed in October 2020.  (*See* Report 68; *see also* Dkt. #298 (Fourth Amended Case Management Plan)).  In Part IV.D. of the Report, Judge Cave found that Plaintiffs had "failed to show the 'good cause' required ... for further extending fact discovery to encompass more than four years of transactional data."  (Report 68).  Accordingly, Judge Cave recommended that this Court reject Plaintiffs' proposed Class Period, and instead set a Class Period of January 1, 2012, to August 16, 2017.  (*Id.* at 69).

On August 15, 2022, Plaintiffs filed an objection to Part IV.D. of the Report.  (Dkt. #573).  On the same date, Defendants filed their objections to the Report.  (Dkt. #576).  Both Plaintiffs and Defendants filed oppositions to the

other side's objections and later filed replies to those oppositions.  (Dkt. #595, 597, 615, 617).[6]

## DISCUSSION

### A.    Applicable Law

#### 1.    Review of a Magistrate Judge's Report and Recommendation

When deciding whether to adopt a report and recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3).  The Court conducts a *de novo* review of those portions of a report and recommendation to which a party submits a timely objection.  *See United States* v. *Romano*, 794 F.3d 317, 340 (2d Cir. 2015).

"To accept those portions of the report to which no timely objection has been made, 'a district court need only satisfy itself that there is no clear error on the face of the record.'"  *King* v. *Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (quoting *Wilds* v. *United Parcel Serv., Inc.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)), *aff'd*, 453 F. App'x 88 (2d Cir.

---

[6]    On September 11, 2024, the Court granted final approval to two settlement agreements and dismissed the following Defendants from the case:  Credit Suisse Group AG; Credit Suisse AG; Credit Suisse Securities (USA) LLC; Credit Suisse First Boston Next Fund, Inc.; Credit Suisse Prime Securities Services (USA) LLC; Goldman, Sachs & Co. LLC; and Goldman Sachs Execution & Clearing, L.P. (merged into Goldman, Sachs & Co. LLC as of June 12, 2017); J.P. Morgan Securities LLC; J.P. Morgan Prime, Inc.; J.P. Morgan Strategic Securities Lending Corp.; JPMorgan Chase Bank, N.A.; Morgan Stanley; Morgan Stanley Capital Management, LLC; Morgan Stanley & Co. LLC; Morgan Stanley Distribution, Inc.; Prime Dealer Services Corp.; Strategic Investments I, Inc.; UBS AG; UBS Americas Inc.; UBS Securities LLC; UBS Financial Services Inc.; EquiLend LLC; EquiLend Europe Limited; and EquiLend Holdings LLC.  (Dkt. #683, 684).  Accordingly, at present, Plaintiffs' claims remain pending against only Merrill Lynch, Pierce, Fenner & Smith Inc.; Merrill Lynch L.P. Holdings, Inc.; and Merrill Lynch Professional Clearing Corp.  The Clerk of Court is directed to modify the caption on the docket accordingly.

2011) (summary order); *accord Galeana* v. *Lemongrass on Broadway Corp.*, 120 F. Supp. 3d 306, 310 (S.D.N.Y. 2014). Indeed, a party's failure to object timely to a report and recommendation, after receiving clear notice of the consequences of such a failure, operates as a waiver both of the party's right to object to the report and recommendation and of the right to challenge the report and recommendation on appeal. *See Frank* v. *Johnson*, 968 F.2d 298, 300 (2d Cir. 1992) ("We have adopted the rule that failure to object timely to a report waives any further judicial review of the report."); *accord Park* v. *State Farm Mut. Auto. Ins. Co.*, No. 23-7230, 2024 WL 4834935, at *1 (2d Cir. Nov. 20, 2024) (summary order) (collecting cases).

### 2. Class Certification

"[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met[.]" *In re Initial Pub. Offerings ("IPO") Sec. Litig.*, 471 F.3d 24, 27 (2d Cir. 2006). The party seeking certification must establish that the proposed class meets all the requirements of Rule 23, by a "preponderance of the evidence." *See Myers* v. *Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Under Rule 23(a), the moving party must show that:

> [i] the class is so numerous that joinder of all members is impracticable; [ii] there are questions of law or fact common to the class; [iii] the claims or defenses of the representative parties are typical of the claims or defenses of the class; and [iv] the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to the four express Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy, an implicit

14

"ascertainability" requirement must be met. *See In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017). Ascertainably is a "threshold requirement" that necessitates that a class be "defined using objective criteria that establish a membership with definite boundaries." *Id.*

If the requirements of Rule 23(a) are met, "a plaintiff must also establish that the proposed class falls into one of the three categories set forth in Rule 23(b)." *Azor-El* v. *City of New York*, No. 20 Civ. 3650 (KPF), 2024 WL 4326921, at *7 (S.D.N.Y. Sept. 27, 2024). Here, Plaintiffs seek to certify a class under Rule 23(b)(3). (Pl. Br. 16-50). Rule 23(b)(3) provides that a class action "may be maintained if … the court finds [i] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and [ii] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Ultimately, the district court has broad discretion in deciding how and whether to certify a class, arising from its 'inherent power to manage and control pending litigation.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 37 (S.D.N.Y. 2020) (quoting *Myers*, 624 F.3d at 547). This includes the power to "alter or modify the class, create subclasses, and decertify the class whenever warranted." *Sumitomo Copper Litig.* v. *Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001).

## B. Analysis

As discussed, both Plaintiffs and Defendants timely filed objections to the Report. Plaintiffs' objection is limited to Part IV.D. of the Report, and thus each

of Plaintiffs' arguments relates to the Class Period for the class action.  In contrast, Defendants' objections encompass broader arguments regarding the Report's ultimate recommendation to certify the Class in the first instance. Specifically, Defendants argue that Judge Cave erroneously concluded that Plaintiffs satisfied the adequacy of representation requirement of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b).[7]  The Court begins by analyzing Defendants' arguments, because Plaintiffs' failure to satisfy any of the Rule 23 criteria would be fatal to class certification.  The Court then proceeds to consider Plaintiffs' Class Period arguments.

Ultimately, after *de novo* review of the challenged portions of the Report, the Court finds that Plaintiffs have demonstrated that the Class recommended by Judge Cave satisfies the adequacy, predominance, and superiority requirements of Rule 23.  Furthermore, the Court finds that the appropriate end date for the Class Period is November 17, 2017.  Accordingly, the Court certifies the Class in the form recommended by Judge Cave, except that the Class Period shall encompass January 1, 2012, through November 17, 2017.

### 1.    The Requirements of Rule 23

#### a.    Adequacy

Rule 23(a)(4) requires that "the representative parties [in a class action] will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  In conducting the adequacy inquiry, courts must consider whether (i) "plaintiff[s'] interests are antagonistic to the interest of other members of the

---

[7]    Neither side challenges the numerosity requirement.

class" and (ii) "plaintiff[s'] attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).

The adequacy analysis is intended "to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc.* v. *Windsor*, 521 U.S. 591, 625 (1997). That said, "[n]ot every conflict among subgroups of a class will prevent class certification — the conflict must be 'fundamental' to violate Rule 23(a)(4)." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). Even where a conflict is fundamental, because it goes to the "very heart of the litigation" and is not speculative or hypothetical, *see id.* at 259 (Straub, J., concurring in part, dissenting in part (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund* v. *Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007))), "it can be cured by dividing the class into separate 'homogeneous subclasses ... with separate representation to eliminate conflicting interests of counsel,'" *id.* at 249-50 (quoting *Ortiz* v. *Fibreboard Corp.*, 527 U.S. 815, 856 (1999)). Where no fundamental conflict exists, the same class representatives and counsel may represent multiple classes or subclasses in the same class action. *See Loc. 2507, Uniformed EMTs, Paramedics & Fire Inspectors* v. *City of New York on behalf of Fire Dep't of City of New York*, No. 22 Civ. 10336 (AT), 2024 WL 4276495, at *7-8 (S.D.N.Y. Sept. 24, 2024) (finding that the lead plaintiffs had no conflicts with the class or subclasses and that plaintiffs and lead counsel were adequate representatives of the class and subclasses); *see also Azor-El*,

17

2024 WL 4326921, at *10-11 (finding that the representative parties were adequate to represent the three proposed classes).[8]

As discussed above, Plaintiffs propose a class comprised of borrowers and lenders who transacted with the U.S.-based entities of the Prime Broker Defendants. (Pl. Br. 7-8). Plaintiffs also propose two management subclasses: the "End-User Subclass," consisting of borrowers, to be represented by named Plaintiffs SCERA and Torus, and the "Beneficial Owner Subclass," consisting of lenders, to be represented by named Plaintiffs IPERS, OCERS, SCERA, and LACERA. (*Id.* at 8, 13). Plaintiffs contend that the named Plaintiffs are adequate class representatives, inasmuch as they "assert the same causes of action, raise the same liability issues, and seek the same relief as all class members." (*Id.* at 14). Finally, Plaintiffs seek appointment of the Quinn Emanuel and Cohen Milstein firms as co-lead class counsel. The Motion does not contemplate separate representation of the subclasses. (*Id.* at 50).

In their objections, Defendants argue that the Report erred in finding that Plaintiffs and their counsel are adequate class representatives. (Def. Obj. 8-18). These arguments are threefold: (i) the Report failed to recognize that the End-User Subclass and the Beneficial Owner Subclass are divided by fundamental conflicts of interest; (ii) the Report failed to require separate representation of the two Subclasses; and (iii) the Report erred in finding that

---

[8]     Rule 23(c)(5) explicitly grants courts the authority to divide a class into subclasses, where it is appropriate. Fed. R. Civ. P. 23(c)(3)(5); *see also Sumitomo Copper Litig.* v. *Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) (stating that district courts are best positioned to "assess the propriety of the class" and can "create subclasses ... whenever warranted").

18

Torus and SCERA are adequate representatives of the End-User Subclass. (*Id.*).  This Court considers each argument in turn.

### i.    Fundamental Conflicts of Interest

To begin, Defendants argue that there are fundamental conflicts of interest between the End-User Subclass and Beneficial Owner Subclass, because "[l]enders and borrowers stand on opposite sides of the stock-lending market" and "[t]hese opposing market positions create inherent conflicts of interest over whether lenders or borrowers sustained most or all of the alleged injury here[.]"  (Def. Obj. 9).  As a preliminary matter, the presence of entities that are on opposite sides of a market in a class does not create a *per se* fundamental conflict.  *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 513-15 (S.D.N.Y. 1996) (finding no fundamental conflict where the class included both buyers and sellers, because both buyers and sellers had an interest in proving the existence of the alleged conspiracy and in maximizing the total amount of class-wide damages); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000) (finding the adequacy requirement met where the class consisted of both buyers and sellers); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998) (stating that "it is settled in this Circuit that … the presence of both purchasers and sellers … will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class").

Defendants claim in their objection (Def. Obj. 9-12), as they did before Judge Cave (Def. Br. 39-43), that analyses of three issues — "but-for world"[9] platform prices, platform fees, and search costs — illustrate a fundamental conflict between the subclasses.  Defendants first argue that the subclasses are fundamentally at odds regarding but-for world pricing because borrowers have an interest in demonstrating that anonymous trading platforms would have yielded lower prices, while lenders have a converse interest in demonstrating that such platforms would have yielded an ability to lend stock at higher prices.  (Def. Obj. 9-11).  Relatedly, Defendants claim that borrowers and lenders are at odds regarding the fees that would be charged on anonymous trading platforms in the but-for world:  Borrowers are alleged to have an interest in showing that the fees charged by anonymous trading platforms would be allocated equally between borrowers and lenders, while lenders have an interest in showing that fees would be allocated entirely to borrowers.  (*Id.* at 11).

Both examples relate to damages allocation and therefore, as other courts in this Circuit have found, do not preclude certification.  In *NASDAQ Market-Makers*, for example, the court found that potential conflicts between parties on opposite sides of relevant transactions (there, buyers and sellers) regarding damages did not necessitate denial of class certification.  169 F.R.D.

---

[9]     *See* AC ¶ 332 (referring to the "'but for' world where the role of the Prime Broker Defendants is significantly reduced and their cut in large part flows instead to the borrowers and lenders, minus the small fees charged by an efficient platform and the clearing broker who provides the borrower and lender access to the central clearinghouse").

at 514-15.  Similarly, in *Sjunde AP-Fonden* v. *General Electric Company*, the court rejected an argument that the proposed class representatives were not adequate to represent a class of members who purchased securities at different times, because the court found that issues related to damages did not warrant denial of class certification.  341 F.R.D. 542, 548-49 (S.D.N.Y. 2022).

Intra-class conflicts defeat adequacy only where the conflicts "extend … beyond the apportionment of damages."  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 439 (S.D.N.Y. 2019) ("*Forex III*").  The court in *Forex III* found such a conflict.  407 F. Supp. 3d at 439.  There, the class included members who transacted directly with each other, and the class definition did not specify the days on which the alleged spread manipulation occurred or the direction of the manipulation.  *Id.*  As a result, the class members had "directly conflicting incentives to establish whether spread manipulation occurred on certain dates and the extent to which it affected their transactions."  *Id.*  The court explicitly distinguished the circumstances of its case from the circumstances in *NASDAQ Market-Makers*, wherein there was "no conflict given [the] allegation that spread manipulation inflated prices for purchasers and depressed prices for sellers, giving *both* an incentive to establish spread manipulation."  *Id.*

Here, the same logic holds as in *NASDAQ Market-Makers*.  Members of both Subclasses allege that Defendants' conspiracy resulted in inflated spreads and costs that were borne by both borrowers and lenders.  (AC ¶¶ 341-345, 376-377, 394).  The evidence put forth by Plaintiffs supports the same.

21

Members of both Subclasses were harmed by Defendants because the conspiracy resulted in an opaque market that deprived them all of "reduc[ed] bid/offer spreads[,]" as well as "lower operational costs, improved liquidity, and decreased risk[,]" that would have resulted from anonymous multilateral trading. (Zhu Report ¶ 11; *see also* A&P Report ¶ 255 (providing that centralized platforms would result in "more favorable prices for the End-User and Beneficial Owner Subclasses")). Both Subclasses were harmed by the same conspiracy and have a shared interest in maximizing recovery for the class. At the class certification phase, potential conflicts over the allocation of damages do not defeat adequacy.

Attempting to provide a third example of a fundamental conflict between the Subclasses, Defendants argue that only borrowers would benefit from reduced search costs in the but-for world of anonymous trading platforms. (Def. Obj. 12). They argue further that lenders would actually be harmed by reduced search costs because it would lessen their ability to charge high lending prices. (*Id.*). Again, the evidence does not support that argument. To the contrary, Plaintiffs proffer evidence that anonymous platform trading would decrease search costs for both the End-User and Beneficial Owner Subclasses. (*See* A&P Report ¶ 87 (providing that the OTC market structure leads to "higher search costs, because, in order to transact, *both* the borrower and lender must contact and work through broker-dealers" (emphasis added)); *see also* Zhu Report ¶ 11 (concluding that search costs would have been decreased for all class members by anonymous multilateral trading)).

### ii.     Separate Representation of Subclasses

Defendants next argue that because a fundamental conflict of interest divides the Subclasses, the Report erred in failing to require that different counsel represent each subclass.  (Def. Obj. 12-15).  They point to two class actions in which there were fundamental conflicts as support for this contention.  (*Id.* (citing *Literary Works*, 654 F.3d at 253-57; *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 742-43 (2d Cir. 1992)).  Because this Court has found that no fundamental conflict of interest exists at this phase of the litigation (*see supra* D.1.a.i.), Defendants' second argument necessarily fails.

### iii.     Adequacy and Typicality of Torus and SCERA

In their third and final adequacy challenge, Defendants argue that the Report erred in finding that Torus and SCERA are adequate representatives of the End-User Subclass.  (Def. Obj. 17-18).  According to Defendants, SCERA is inadequate to represent the End-User Subclass of borrowers because, in addition to being a borrower, it was a lender.  (*Id.* at 17).  But, as the Report found, the fact that SCERA was both a borrower and lender actually *supports* the lack of fundamental conflict between the Subclasses and makes SCERA an appropriate representative of both.  (*See* Report 47).  *See also E. Texas Motor Freight Sys. Inc.* v. *Rodriguez*, 431 U.S. 395, 403 (1977) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks omitted)).

Defendants next argue that Torus is an inadequate representative because it is not a member of the End-User Subclass. Defendants ground this argument in their claim that Torus was not a "client of a Defendant's prime brokerage business," because it borrowed stock from Goldman Sachs Execution & Clearing, L.P. and Merrill Lynch Professional Clearing Corp. (Def. Obj. 18). As it happens, however, both Goldman Sachs Execution & Clearing, L.P. and Merrill Lynch Professional Clearing Corp were named as Defendants in this case and provided prime brokerage services to Torus. (*See* AC ¶¶ 48, 50; *see also* Dkt. #560, Tr. 208:1-6).

Finally, Defendants renew their argument that Torus is an atypical representative because it is a "tiny proprietary trading firm that bears no resemblance to the large hedge funds that make up the vast majority of the borrower subclass, and its trading volume was far too small to justify the substantial costs it would have incurred for joining a trading platform." (Def. Obj. 18). Despite its comparatively smaller size, Torus met the threshold number of transactions required for membership in the End-User Subclass, and provided testimony that it would have joined a trading platform. (Dkt. #470-10, Tr. 77:2-11). The Court therefore rejects Defendants' arguments and finds that Torus is a member of the End-User Subclass and an adequate representative of that class.

### b. Predominance

In addition to the Rule 23(a) requirements, the proposed class must also satisfy the Rule 23(b)(3) predominance and superiority requirements. The

predominance inquiry is intended to "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 594. "[T]he requirement is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Mazzei* v. *Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (quoting *Myers*, 624 F.3d at 547).

When assessing predominance, a court must examine "[i] the elements of the claims and defenses to be litigated, [ii] whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief, and [iii] whether the common issues can profitably be tried on a class[-]wide basis, or whether they will be overwhelmed by individual issues." *Scott* v. *Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020) (quoting *Johnson* v. *Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (internal quotation marks omitted)). "The three required elements of an antitrust claim are [i] a violation of antitrust law; [ii] injury and causation; and [iii] damages." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 114 (S.D.N.Y. 2010) (quoting *Cordes & Co. Fin. Servs.* v. *A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) (internal quotation marks omitted)).

In their Motion, Plaintiffs argued that they satisfied the predominance requirement because they can prove each of the elements of their antitrust

claim by common evidence, can prove class-wide injury at trial, and have put forth a damages model that sufficiently demonstrates that damages can be measured by a common methodology. (Pl. Br. 16-49). When evaluating those arguments and issuing the Report, Judge Cave agreed with Plaintiffs and determined that the predominance requirement was satisfied. (Report 49-63).

Defendants counter that the Report erred in making that determination because, rather than being able to rely on common evidence to establish class-wide injury at trial, "the jury would have to consider extensive individualized evidence to determine whether individual class members were injured and to assess whether particular transactions and class members satisfy the [Foreign Trade Antitrust Improvements Act ("FTAIA")]'s requirements." (Def. Obj. 19). In other words, Defendants' predominance arguments focus on whether Plaintiffs have established that both injury and damages can be proven by common evidence. The Court discusses these arguments in greater detail in the remainder of this section.

### i.    Antitrust Injury

In their Motion, Plaintiffs summarized the evidence that they argued could prove class-wide impact, including the economic search model and yardstick analyses conducted by their expert Dr. Zhu and the separate impact analysis conducted by expert witnesses Dr. Asquith and Dr. Pathak. (Pl. Br. 34-41). In cases where plaintiffs put forth an expert's model as the basis for their claim of class-wide impact, "a court is obliged to rigorously examine the soundness of that model at the class certification stage[,]" and "may certify

a class under these circumstances only where the Court finds the model methodologically sound." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 46.  That being said, "the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact *could* prove such impact, not whether plaintiffs in fact can prove class-wide impact." *In re Magnetic Audiotape Antitrust Litig.*, No. 99 Civ. 1580 (LMM), 2001 WL 619305, at *4 (S.D.N.Y. June 6, 2001) (emphasis added).

Defendants argue that the Report erred in determining that the proffered common evidence is capable of demonstrating class-wide injury.  (Def. Obj. 38-45).  As detailed below, this Court has examined the proposed models and other evidence challenged by Defendants and determines that they constitute common evidence capable of demonstrating class-wide injury.

### (a)    Economic Search Model

Plaintiffs' expert, Dr. Zhu, first used an economic search model, adopted from his peer-reviewed independent research, to analyze the question of class-wide impact.  (Zhu Report ¶ 11).  As explained by Dr. Zhu, in a "canonical OTC market structure," investors must search for prices by individually contacting dealers.  (*Id.* ¶ 32).  Dealers then offer a price that investors cannot simultaneously compare against other quoted prices.  (*Id.*).  Such a structure necessarily "benefits intermediaries at the cost of customers," because there is no "easy access to market-wide price information or competing offers[.]"  (*Id.*).

Dr. Zhu's search model employs the concepts of "slow" and "fast" customers to illustrate the impact that the adoption of trading platforms would

have on an OTC market structure. (Zhu Report ¶¶ 264-265). "Slow" customers in the model are those that "must visit dealers one by one, and each visit, including the first, incurs a search cost." (*Id.* ¶ 264). Dr. Zhu explains that search costs, in practice, include "the costs of making the operational, technological, and legal arrangements with a dealer so that trades can take place." (*Id.*). "Fast" customers, in contrast, are those that "can observe all dealers' quotes simultaneously, at zero cost, and pick the best one." (*Id.* ¶ 265).

Dr. Zhu posits that the results of the search model show that the introduction of a trading platform benefits all customers. Certain customers that change from "slow" to "fast" benefit because they gain the ability to receive "[m]ore quotes from more dealers without the need to search[.]" (Zhu Report ¶ 281). The outputs of the model also demonstrate that spreads are reduced for those customers. (*Id.*). Dr. Zhu's results further demonstrate that even customers who do not change from "slow" to "fast" experience benefits. (*Id.* ¶ 282). When trading platforms are introduced, dealers have imperfect information about which customers are "fast" and which are "slow." (*Id.*). Because they do not know with certainty which customers have access to pricing information, dealers price lower on average. (*Id.*). Therefore, Dr. Zhu concluded, "[t]he model shows that the introduction of a multilateral trading platform would benefit *all or virtually all* class members on both sides of the market, including not only those traders that begin using the platform but also

those traders that continue to trade with prime brokers on a bilateral basis."
(*Id.* ¶ 11).

In their objections, Defendants argue that Dr. Zhu's search cost model is incapable of proving injury to all borrowers and lenders. (Def. Obj. 39). *First*, Defendants claim that the search cost model cannot show that all *borrowers* would have benefitted from the introduction of a multilateral trading platform because the model "assumes away all of the real-world reasons why many class members would not have benefitted [from such trading platforms]." (*Id.* at 40). For example, the model assumes that borrowers pay similar prices, despite evidence that there is wide price dispersion in the stock lending market, because borrowers have different revenue, asset sizes, and investment strategies, among other variables. (*Id.* (citing McCrary Report ¶¶ 226-243; McCrary Reply ¶¶ 63-65)). But Dr. Zhu cogently responded to this critique in his reply, defending his model as using the "standard economic technique" of "condition[ing price distribution] on all observables." (Zhu Reply ¶¶ 274-275, 278). Dr. Zhu acknowledged that dispersion in real-world pricing is caused in part by observable factors like a fund's revenue or asset size. (*Id.* ¶ 278). As a result, his model intentionally uses a "conditional distribution" (*id.* ¶ 283), which allows it to isolate the "cause-and-effect relationship" between platform usage and pricing, rather than introducing other factors (*id.* ¶ 278).

Defendants also argue more broadly that the model "assumes what it purports to prove" — that all borrowers would benefit from lower search costs. (Def. Obj. 41). Again, Dr. Zhu thoughtfully addressed that argument. Dr. Zhu

did not assume that all borrowers would benefit.  Instead, he explained why even customers who continue to operate in the OTC market, rather than on multilateral platforms, would benefit from the entry of those platforms:  a platform-using segment of the stock loan market would both attract additional market participants, generating more liquidity that would then move OTC segment prices closer to platform segment prices, while also putting pressure on the OTC segment of the market to retain their market share by reducing their own profit margin.  (Zhu Reply ¶¶ 238-252).  Finally, as they did before Judge Cave, Defendants argue that Dr. Zhu's model is flawed because he failed to "compare the actual world to the but-for-world[.]"  (Def. Obj. 41; *see* McCrary Report ¶¶ 244-247).  But again, Dr. Zhu defended his model by explaining that a perfect "before/after" analysis cannot be conducted because the conspiracy is alleged to have occurred from the early 2000s through to the present.  (Zhu Report ¶ 253).

*Second*, Defendants argue that the economic search model cannot prove an adverse impact on *lenders* because Dr. Zhu did not build a search cost model for lenders and instead "speculated" that the results for such a model would be the same as for borrowers.  (Def. Obj. 42-44).  But Dr. Zhu did not speculate; rather, he opined that "the model is qualitatively the same for the other side of the market (where beneficial owners enter into 'lend' transactions with dealers)."  (Zhu Report ¶ 262).  That comports with Dr. Zhu's prior academic work on OTC markets.  In presenting another version of his economic search model in his joint paper with Professors Darrell Duffie and Piotr

Dworczak, Dr. Zhu reported the results of the model for buyers, but acknowledged that the clients of financial intermediaries could be "buying or selling" assets and, significantly, that "[t]he [seller] case is effectively the same[.]" (*See* Dkt. #556-2 at Slide 30 (Plaintiffs' Presentation Slides); *see also* Zhu Report ¶ 45)). Further, in discussing the results of his academic research, Dr. Zhu provided additional support for his finding that as search costs are reduced, the prices charged to end users, which include borrowers and lenders, are reduced. (Zhu Report ¶ 45).

Dr. Zhu concluded that the economic search model shows benefits for "*all or virtually all* class members on both sides of the market." (Zhu Report ¶ 11). After examining the model, the Court finds that it is methodologically sound and capable of proving class-wide impact. That is all that is required at this stage. *Dial Corp.* v. *News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015), *as amended*, No. 13 Civ. 6802 (WHP), 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016) (determining that proposed methodology was sufficient and did not defeat predominance).

### (b) Yardstick Analysis

Dr. Zhu also employed a yardstick analysis to examine the class-wide effects of Defendants' alleged conspiracy. (Zhu Report ¶¶ 290-315). In conducting that analysis, Dr. Zhu selected several comparators, including the stock market, the corporate bond market, the government bond market, and the oil market. Each is a market in which Defendants were not alleged to have conspired to prevent a transition from OTC trading to anonymous multilateral

trading.  (*See, e.g.*, *id.* ¶ 292 (explaining the similarities between the stock market and the stock lending market); Zhu Reply ¶ 333 (same)).  He examined the transitions in those markets and observed empirical data that demonstrated that each of the comparators experienced market-wide benefits because of the introduction and adoption of anonymous multilateral trading. For example, Dr. Zhu observed that "[m]ost transactions" in the stock market today occur on multilateral exchanges and that the "bid/offer spreads [have] nearly collapsed" in the electronic trading environment, benefitting all stock traders.  (Zhu Report ¶¶ 293, 299).  He therefore concluded, based on all examined comparable markets, that "multilateral trading mechanisms in the U.S. stock loan[] market would similarly bring widespread benefits for all or virtually all Class members."  (*See id.* ¶ 315).

Defendants' objections to the yardstick analysis begin with their argument that Dr. Zhu should have selected different comparators, such as various overseas stock lending markets, rather than other U.S.-based markets in different sectors.  (Def. Obj. 44-45).  But Dr. Zhu provided a compelling defense of his model in his reply report, explaining that overseas stock lending markets do not make perfect comparators, in part because the markets in other countries are significantly smaller than the stock lending market in the United States.  (Zhu Reply ¶¶ 293-294).  Moreover, Dr. Zhu found that "central clearing and multilateral trading of stock loans have been implemented successfully in many other countries with significantly smaller capital markets"

and that this "serve[s] as a lower bound of what is possible for the U.S." *because* it is a larger market. (*Id.* ¶ 294).

Courts in this Circuit have repeatedly stated that a "yardstick" methodology is an accepted method to measure antitrust impact and damages. *See, e.g.*, *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2014 WL 1282293, at *25 (S.D.N.Y. Mar. 28, 2014) (collecting cases that state common methods of quantifying antitrust damages, including the yardstick method); *see also In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 21 (E.D.N.Y. 2020) (finding that the decision to use a yardstick approach to demonstrate class impact was "sound and workable")*; SourceOne Dental, Inc.* v. *Patterson Companies, Inc.*, No. 15 Civ. 5440 (BMC), 2018 WL 2172667, at *4 (E.D.N.Y. May 10, 2018) (stating that the yardstick methodology is a "generally accepted method for measuring antitrust damages"). The Court has examined the yardstick analysis conducted by Dr. Zhu, as well as his thorough reply in further support of that analysis, and concludes that the analysis is methodologically sound.

The Report found that Dr. Zhu's evidence is capable of showing class-wide impact, leaving for the jury the decision of whether that evidence in fact shows class-wide impact. (Report 59). In doing so, Judge Cave did not "punt[] to the jury." (Def. Obj. 39). She applied the correct legal analysis — analyzing whether the proposed methodology was sound and concluding in the affirmative. After conducting its own analysis of the proposed methodology, the Court agrees and finds that common evidence is capable of proving injury.

33

(c)    <strong>Individual Inquiries</strong>

Finally, Defendants argue that even if Plaintiffs attempt to use common proof to prove class-wide injury, common proof will not predominate at trial because Defendants will need to conduct individual inquiries to contest the existence of class-wide injury.  (Def. Obj. 19-33).  Defendants presented the same arguments to Judge Cave (Def. Br. 23-29), and Judge Cave found that they did not preclude predominance (Report 49-59).  This Court sees no reason to conclude differently.

Defendants first argue that individual inquiries would be necessary to determine which class members valued certain aspects of OTC trading to the extent that they would not have used multilateral trading platforms.  (Def. Obj. 20-32).  Defendants identify two "unique features" of OTC trading that they claim are valued by members of the class: "recall protection" and "rerate management."  (*See id.* at 21).  In particular, Defendants contend that prime brokers provide recall protection to members of the Class when a security is recalled prematurely by locating new shares of recalled stock for those clients, thereby allowing the clients to maintain their positions and avoid losses.  (*See* Def. Br. 6, 14; Def. Obj. 21).  They contend that prime brokers also provide rerate management for members of the class by paying a portion of the difference between the original rate and an increased rate, in instances when an agreed-upon rate changes over time.  (*See* Def. Br. 6; Def. Obj. 22).

Dr. Zhu examined the support for these arguments as put forth by Defendants' experts and reiterated his conclusion that "all Class members are

34

better off in the but-for world." (*See* Zhu Reply ¶¶ 37, 59-60).  More to the

point, Dr. Zhu explicitly rejected the premise that there are fundamental

differences between platform and OTC loans, opining instead that "[t]he

differences raised by Defendants — primarily the theoretical possibility of

implied 'recall' or 'rerate' protection that prime brokers build into the price of

OTC stock loans — are overstated, and … can be provided in the but-for world

by broker-dealers sponsoring clients on platforms." (*Id.* ¶¶ 60, 73).  Further,

he opined that (i) "there is scarce evidence in the record that shows the

presence and value of these purported protections" and (ii) "these purported

services are not offered for free, but sold in an opaque manner as a bundle in

the OTC segment without any transparency of the cost of each item." (*Id.* ¶

73).

 The Court acknowledges, as it must, that Defendants have offered limited

evidence to support the notion that certain end users value recall and rerate

protections.  For instance, James O'Connor, the former Head of Portfolio

Finance and Head of Business Management at Och Ziff Capital Management,

maintained that prime brokers helped to protect the asset-manager from "risk

of recall or rerate." (Dkt. #432-6 ¶ 16).  O'Connor further stated that he did

not find "AQS's anonymous platform to be a viable alternative to [their prime

broker] relationships." (*Id.* ¶ 17).

 But as Plaintiffs highlighted at oral argument before Judge Cave,

Defendants failed to provide any academic research to support their claim that

prime brokers provide these protections, and, if so, to what extent. (*See* Dkt.

559-1, Tr. 42:2-16; Dkt. #470-6, Tr. 326:2-9).  As but one example, Defendants' experts analyzed a strikingly small amount of data in attempting to prove the extent of these benefits.  (*See, e.g.*, Hendershott Report ¶ 88 (summarizing the exhibit that attempts to illustrate "how brokers may provide re-rate protection to their short seller clients" based on one bank's borrowing and lending prices for one company's stock)).  Further, despite Defendants' claims that these protections are extremely valuable, none of the prime brokerage agreements between broker-dealers and end users included a provision requiring (or even laying out the terms of) those services.  (*See* Dkt. #559-1, Tr. 43:1-6).  Plaintiffs argue that this "highlights how opaque and inefficient the market is for class members" (*id.* at Tr. 43:9-11), and the Court agrees.  The evidence shows that these benefits, to the extent they are valued by Class members at all, can be contracted for when trading on multilateral platforms.  (Zhu Reply ¶¶ 95-100).

Moreover, Dr. Zhu fully expects that the OTC segment would remain in the but-for world, and therefore that the benefits allegedly provided by prime brokers would continue to be offered.  (Zhu Reply ¶¶ 37, 62-67, 73).  As Dr. Zhu explained, "[t]he key question from an impact perspective" is not whether some Class members benefit from conducting OTC trades, but whether all Class members "in the but-for world would be better off than they were in the real world."  (*Id.* ¶ 64).

In the Second Circuit, the existence of individual defenses "does not compel a finding that individual issues predominate over common ones."

*Nextel Commc'ns Inc.*, 780 F.3d at 138 (internal quotation marks omitted).
Rather, courts, in determining whether to certify a Rule 23(b)(3) class, must
decide whether the issues "that qualify each class member's case as a genuine
controversy … are more substantial than the issues subject only to
individualized proof." *Id.* at 139 (internal quotation marks omitted).  Having
weighed those issues, the Court finds that the issues raised by Defendants
regarding antitrust injury do not defeat predominance.

As a final point on this issue, the Court agrees with Plaintiffs that
Defendants' purported plan to call "thousands" of class members, who have
neither been deposed nor subpoenaed, is unlikely to be carried out (or, for that
matter, be permitted by this Court).  (*See* Pl. Opp. 36-39).  Defendants may be
able to "pick off" some class members "through individualized rebuttal," but
even those modest successes would not defeat predominance.  *Halliburton Co.*
v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014).

### ii.    Antitrust Damages

In this Circuit, "[a]ll that is required at class certification is that the
plaintiffs must be able to show that their damages stemmed from the
defendant's actions that created the legal liability."  *Sykes* v. *Mel S. Harris &
Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (internal quotation marks omitted);
*see also Nextel Commc'ns Inc.*, 780 F.3d at 138 ("Common issues — such as
liability — may be certified, consistent with Rule 23, even where other issues —
such as damages — do not lend themselves to classwide proof.").  Additionally,
under Supreme Court precedent, "certification pursuant to Rule 23(b)(3) [does

not] require[] a finding that damages are capable of measurement on a classwide basis." *Roach* v. *T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015) (applying *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013)). The Supreme Court has also expressed "willingness to accept a degree of uncertainty" in instances where "[t]he vagaries of the marketplace ... deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation[.]" *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) (comparing damages resulting from an antitrust violation to those resulting from personal injury or condemnation of land, which are more concrete).

The instant case is unlike *Comcast Corp.* v. *Behrend*, an antitrust class action in which the Supreme Court clarified that "damages questions should be considered at the certification stage when weighing predominance issues" and ultimately held that certification was not appropriate. *See Roach*, 778 F.3d at 408 (explaining the scope of *Comcast*). In *Comcast*, the model "d[id] not even attempt" to "measure only those damages attributable to" the impact theory. 569 U.S. 27, 35 (2013). Here, by contrast, Plaintiffs' "theory of liability and antitrust impact" is that "Defendants conspired to maintain an inflated spread between the price at which they borrow from the Beneficial Owner Subclass and the price at which they lend to the End-User Subclass." (Pl. Br. 42). Consistent with that theory, Plaintiffs' damages model allows for the comparison of real-world prices to estimated prices that would exist in a world in which Defendants' alleged conspiracy had not taken place, generating an

estimate of the amounts that borrowers were overcharged and that lenders were underpaid by Defendants because of the anticompetitive conduct. (A&P Report ¶¶ 25, 29; *see generally id.*, Sections IX-XI). To demonstrate that the damages methodology is a "common, formulaic approach [that] can reliably be applied to measure the damages suffered on each stock loan transaction without the need of individualized enquiry[,]" Drs. Asquith and Pathak have already "compute[d] the damages incurred by each named Plaintiff on exemplar stock loans transacted with the Prime Broker Defendants during the Class Period." (*Id.* ¶¶ 541-567).

In their objections, Defendants argue that Plaintiffs' "model of but-for prices" undercuts Plaintiffs' impact showing, because Defendants' expert, Dr. McCrary, applied the model and found that it "predicts that over 30% of all stock-loan transactions occurred at better prices in the actual world than those that allegedly would have existed in the but-for world." (Def. Obj. 33 (citing McCrary Reply ¶¶ 18, 56, 59)). Judge Cave explicitly addressed this argument in her Report, finding that Plaintiffs' evidence had demonstrated that the 30% calculation in fact "arose from … data errors." (Report 54). Her finding was not factual error.

Plaintiffs' experts explain that Dr. McCrary's calculations were "driven by his inaccurate processing of data from Defendant UBS and grossly overstate[d] the percentage of undamaged class members." (A&P Reply ¶ 348). Drs. Asquith and Pathak found that only 0.4% of all Beneficial Owner Subclass accounts and 0.2% of all End User Subclass accounts lacked positive damages

on a transaction.  (*Id.* ¶ 344; *see also id.* ¶ 348 (discussing that only 2% of short-seller accounts, rather than 21% of short-seller accounts, are undamaged when correcting Dr. McCrary's data processing errors); Dkt. #556-1 at 73-74 (showing the effects of the data processing errors on model output)).

Defendants argue further that the Report erroneously failed to resolve disputes about the costs of platform trading, and that unrealistic cost assumptions are baked into Plaintiffs' damages model.  (Def. Obj. 35-37).  But Plaintiffs' experts rebuffed the critiques of Defendants' experts regarding the estimated costs of platform trading in the but-for world.  (*See* A&P Reply ¶¶ 12-13; *see also* Zhu Report ¶¶ 335-340).  Drs. Asquith and Pathak found that the costs proposed by Defendants' expert, Dr. Hendershott, lacked support and would render "all current stock lending … entirely uneconomical."  (A&P Reply ¶ 13).  Further, even when Drs. Asquith and Pathak made adjustments to their calculations to address Dr. Hendershott's concerns, they "*continue[d]* to find positive damages for virtually all class members[.]"  (*Id.* ¶ 12 (emphasis added)).

Defendants next argue that, in making the finding that less than 0.5% of the class was harmed, the Report "implicitly and erroneously adopted Plaintiffs' argument that class members that suffered no net harm on a single stock loan were nevertheless 'harmed' if the A&P model estimates that the but-for price was better than the actual-world price on a single *day* of a multi-day loan." (Def. Obj. 37-38).  They claim that this is error because this means that each day of a multi-day stock loan is treated as a separate transaction, when in fact,

a multi-day stock loan is a single economic transaction.  (*Id.* at 37).  Instead, Defendants argue, the damages for each day of a multi-day loan should be netted against each other.  But, as explained by Plaintiffs' experts, "[m]ost stock loans in the U.S. are 'on-demand' (or open) loans" which means that they can be terminated at any time, for any reason, and therefore, "the loan is effectively 're-rated' every day; that is, the loan fee is reset daily."  (A&P Report ¶ 58).  Further, the Court has already addressed Defendants' argument that some "class members suffered no net injury because actual-world prices often were better than but-for prices."  (Def. Obj. 38).  As discussed, Dr. Zhu demonstrated that prices would have improved for all members of the class, even those that currently receive preferable pricing.  *See supra* D.1.b.i.a.

Finally, Defendants argue that the Report erred in finding that individual damages inquiries do not defeat predominance.  (Def. Obj. 45-46).  The Court notes that "[t]he Supreme Court [has not] foreclose[d] the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations."  *Roach*, 778 F.3d at 408.  Further, here, the inquiries raised by Defendants, namely whether Plaintiffs' experts correctly applied filters to the data and whether damages should be netted (Def. Obj. 45-46), are common legal questions.

In sum, Plaintiffs have proposed a common methodology that purports to measure only those damages attributable to the impact theory.  The Report thus correctly found that the issue of antitrust damages does not defeat predominance.  (Report 56).

41

### iii.    The Impact of the FTAIA

Defendants' final predominance argument is that the Report erred in finding that the FTAIA does not bar certification, because "innumerable individual inquiries" will be required to determine which transactions must be excluded from Sherman Act liability under the FTAIA.  (Def. Obj. 46-49).  The FTAIA states, in relevant part, that the Sherman Act does "not apply to conduct involving trade or commerce … with foreign nations."  15 U.S.C. § 6a.  By its express terms, it thus "excludes from the Sherman Act's reach much anticompetitive conduct that causes *only* foreign injury."  *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 158 (2004) (emphasis added); *see also Lotes Co.* v. *Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413-14 (2d Cir. 2014) ("[T]he FTAIA generally excludes wholly foreign conduct from the reach of the Sherman Act[.]").

Of potential note, however, the FTAIA contains two exceptions:  "[i] the import exclusion, which applies to 'conduct involving … import trade or import commerce,' and [ii] the domestic effects exception, which applies to other foreign conduct that has a direct, substantial, and reasonably foreseeable effect on import or domestic commerce and that gives rise to a Sherman Act claim[.]"  *Biocad JSC* v. *F. Hoffmann-La Roche*, 942 F.3d 88, 94 (2d Cir. 2019) (internal citations omitted).  When either exception applies, the Sherman Act applies.

In the instant matter, Plaintiffs allege a domestic conspiracy involving the U.S. stock loan market.  To be included in the class, a person or entity must have entered into the requisite number of "U.S. Stock Loan Transactions,"

those that involve the "lending or borrowing of a stock listed on [a U.S. exchange,]" with "the U.S.-based entities of the Prime Broker Defendants[.]" (Pl. Br. 7, 8 n.10). The present case is therefore distinguishable from the two main cases on which Defendants rely, which are two decisions from the *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at \*11 (S.D.N.Y. Sept. 20, 2016) ("*Forex II*"), and 407 F. Supp. 3d 422 (S.D.N.Y. 2019) ("*Forex III*"). (Def. Obj. 46-48).[10]

In *Forex II*, a sister court in this District concluded that the FTAIA barred "[p]laintiffs' claims arising from OTC transactions where the plaintiff was operating abroad and transacted with a foreign desk of a defendant, and bar[red] claims arising from transactions conducted on a foreign exchange." 2016 WL 5108131, at \*15. Because of the class definition in the instant case, however, none of Plaintiffs' claims arises from OTC transactions where the plaintiffs transacted with a foreign desk of a Defendant or from OTC transactions arising from transactions conducted on a foreign exchange.

Further, even if some of the transactions involved foreign conduct, the domestic effects exception would apply to them. As discussed, the conduct ascribed to Defendants — conspiring to prevent the U.S. stock loan market from transitioning into a transparent, direct, all-to-all electronic exchange — clearly had "a direct, substantial, and reasonably foreseeable effect" on

---

[10]    Defendants do not in their objections reference the first opinion and order issued in the *Forex* litigation, *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015) ("*Forex I*"), but the Court discusses *Forex I* below in distinguishing the *Forex* litigation from the instant matter.

domestic commerce.  15 U.S.C. § 6a(1)(A).  That effect was the continued opacity of the U.S. stock lending market, and the concomitant lack of alternative options for transactions in that market, all of which sustained high spreads on U.S. transactions to the benefit of the Prime Broker Defendants and to the detriment of Plaintiffs.  *Forex II* does not require this Court to reach a different conclusion.  There, the plaintiffs argued that the "domestic effect of [d]efendants' conduct" had caused their *foreign* injuries, because there was a "single [foreign exchange] market" that meant that antitrust conduct in the U.S. affected *foreign* prices.  *Forex II*, 2016 WL 5108131, at *14-15.  While the court held that the domestic effects exception did not apply, *id.*, the facts of that case are clearly distinguishable from the instant action.

Finally, the import exception applies to transactions involving even foreign beneficial owners.  In *Allianz Global Investors GmbH* v. *Bank of America Corp.*, the district court explicitly held that claims arising from instances where "foreign-domiciled or operating Plaintiffs transacted with domestically-operating Defendants … fall within the FTAIA imports exception."  463 F. Supp. 3d 409, 423 (S.D.N.Y. 2020).  Here, any foreign-domiciled beneficial owners necessarily would have been transacting with domestic desks of the Prime Broker Defendants, because of the way the Class is defined.  On this point as well, the *Forex* litigation cited by Defendants is inapposite.  In *Forex I*, the plaintiffs alleged that manipulation had occurred that "impacted currencies worldwide," and did not plead that the manipulation "was directed at the U.S. import market."  74 F. Supp. 3d at 599; *see also Forex III*, 407 F. Supp. 3d at

44

431-32 (finding that "the location of [p]laintiffs' trading activities [wa]s highly material to [their] class claims," where the plaintiffs alleged an antitrust conspiracy in a foreign exchange market and where class members traded with foreign desks of the defendants). As discussed, the Class definition here ensures that *only* transactions involving U.S.-operating Defendants are included, and the evidence shows that the conspiracy was directed at the U.S. stock loan market. (Pl. Br. 7, 8 n.10).

The Report correctly concluded that the FTAIA does not bar certification. Having considered Defendants' objections to the Report regarding predominance, the Court finds that Plaintiffs have satisfied the predominance requirement of Rule 23(b)(3) and proceeds to consider the superiority requirement.

### c. Superiority

Rule 23(b)(3) requires the moving party to establish that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides non-exhaustive factors that bear on the superiority determination, including: (i) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (ii) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (iv) "the likely difficulties in managing a class action." *Id.*; *Amchem*, 521 U.S. at 615-16. By utilizing those factors, courts "consider the

interests of individual members of the class in controlling their own litigations and carrying them on as they see fit." *Amchem*, 521 U.S. at 616 (internal quotation marks omitted).

The Report found that Plaintiffs have demonstrated superiority, and that each of the Rule 23(b)(3) factors weighs in favor of that finding. (Report 63-65). Objecting to that finding, Defendants argue that two of the factors, "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the likely difficulties in managing a class action," warrant a different conclusion. (Def. Obj. 49-50). As explained herein, those factors do not weigh against certification, and the Court therefore adopts the Report's recommendation regarding superiority.

*First*, on the issue of the class members' interests in individual prosecution, Defendants' objection primarily rests on their contention that the Report "disregarded evidence showing that class members are both able and willing to represent their own interests in this litigation[,]" despite its acknowledgement that the putative class includes sophisticated hedge funds and financial institutions. (Def. Obj. 50). Defendants are correct that the class representatives in this case are sophisticated hedge funds and financial institutions that are better positioned to carry out an individual lawsuit than less sophisticated parties. But "authority in the Second Circuit holds that the presence of sophisticated institutional [entities] capable of pursuing their claims independently 'is no bar to a class when the advantages of unitary adjudication exist.'" *N.J. Carpenters Health Fund* v. *Royal Bank of Scotland*

*Grp., PLC*, No. 08 Civ. 5310 (DAB), 2016 WL 7409840, at *11 (S.D.N.Y. Nov. 4, 2016) (quoting *Bd. of Trs. of the AFTRA Ret. Fund* v. *JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 355 (S.D.N.Y. 2010)); *see also Cromer Fin. Ltd.* v. *Berger*, 205 F.R.D. 113, 134 (S.D.N.Y. 2001) (finding that superiority was established where "[r]elatively few of the investors" indicated a desire to litigate their claims outside of the class action, even where they were "all concededly 'sophisticated' investors"). That is because while the superiority requirement exists in part to ensure that the interests of individual members of the class have been considered by a reviewing court, it is also "designed to avoid repetitious litigation and possibility of inconsistent adjudications." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 57 (E.D.N.Y. 2019) (internal quotation marks omitted); *see also In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (recognizing that substituting a single class action for numerous trials achieves economies of time, effort, and expense, and promotes uniformity of decision).

Such advantages exist here, where there is a class that includes thousands of members. (*See* A&P Report ¶ 25). Individual actions would prove costly and inefficient in comparison to this class action. *See Pub. Employees' Ret. Sys. of Miss.* v. *Merrill Lynch & Co.*, 277 F.R.D. 97, 120 (S.D.N.Y. 2011).[11]

---

[11]    In *Public Employees' Retirement System of Mississippi* v. *Merrill Lynch & Co.*, the court found that plaintiffs, several pension funds including Plaintiff Los Angeles County Employees Retirement Association, had established superiority, in part because "there [wa]s no overwhelming interest by class members to proceed individually." 277 F.R.D. 97, 120 (S.D.N.Y. 2011). The court noted that a class action would be more efficient and cost-effective than individual actions, where there were over 1,600 geographically-dispersed class members. *Id.*

Additionally, "[m]ultiple actions by multiple plaintiffs could also significantly reduce the prospects for recovery as it would decrease [P]laintiffs' bargaining power" (*id*.), which is an important consideration where, as here, Plaintiffs have alleged that the Prime Broker Defendants "dominate[]" the stock loan market and conspired to crush any efforts by individual actors to increase competition in the stock loan market (*see* AC ¶ 1).  And while the class representatives are sophisticated entities alleging large individual damages, smaller institutional investors may not be willing or able to maintain individual lawsuits against the Prime Broker Defendants.  *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 172 F.R.D. 119, 130 (S.D.N.Y. 1997) ("[S]maller institutional investors may not be willing and able to hire counsel to battle against the collective resources of the nation's largest financial industry firms.").

Second, on the issue of manageability, Defendants argue that the Report erred because it "summarily conclud[ed]" that the "individual issues" discussed would not make a class action unmanageable.  (Def. Obj. 50).  But the Report is correct that predominance and manageability can be related findings.  *See Royal Park Invs. SA/NV* v. *Wells Fargo Bank, N.A.*, No. 14 Civ. 9764 (KPF) (SN), 2018 WL 1831850, at *9 (S.D.N.Y. Apr. 17, 2018) (finding that because predominance was not satisfied due to necessary individual inquiries, the Court and litigants would have great difficulty managing the litigation).  Here, the Court has found that individual issues will not predominate.  Further, "there are no apparent difficulties that are likely to be encountered in the management of this action as a class action apart from those inherent in any

hard fought battle where substantial sums are at issue and all active parties are represented by able counsel." *Pub. Employees' Ret. Sys. of Miss.*, 277 F.R.D. at 120 (quoting *Cromer Fin. Ltd.*, 205 F.R.D. at 134).

Accordingly, the Court finds that Plaintiffs have shown that litigation of this case as a class action is superior to other methods of adjudication. Moreover, having carefully considered Defendants' adequacy, predominance, and superiority arguments, the Court finds that Plaintiffs have satisfied Rule 23 in the Class as defined. In its remaining analysis, the Court considers Plaintiffs' objections to the Report, which relate to (i) the end date of the Class Period and (ii) the recoverability of damages arising after 2017.

### 2. The Class Period

In both the Complaint, filed on August 16, 2017, and the Amended Complaint, filed on November 17, 2017, Plaintiffs proposed a class period that spanned from January 7, 2009, "through the present." (*See* Dkt. #1 at 1; AC 1). At the stage of certification briefing, Plaintiffs proposed a class period of January 1, 2012, through February 22, 2021,[12] the date of the filing of the original motion for class certification. (Pl. Br. 8; *see also* Pl. Reply 34-35).

In their opposition to certification, Defendants argued that the Class Period should not extend beyond 2017 and that the phrase "through the present" should be understood to mean November 17, 2017, the date of the

---

[12] The Court notes that the original motion for class certification proposed the date February 22, 2021, and that the reply memorandum proposed the date February 21, 2021. (Pl. Br. 8; Pl. Reply 35). The Court uses the date February 22, 2021, as that is the date on which the certification motion was filed.

filing of the Amended Complaint. (*See* Def. Br. 49). Defendants maintained that (i) there was no evidentiary basis for certifying a class that extends beyond 2017 because there has been no discovery covering the additional four-year period encompassed in Plaintiffs' proposed class period; and (ii) certifying a class beyond 2017 would waste resources, because it would require additional data productions, fact discovery, expert reports, and supplemental briefing. (*Id.* at 49-50).

In their certification reply, Plaintiffs continued to argue for an end date of February 22, 2021, offering that they had used the phrase "through the present" in the Amended Complaint to indicate that the "conspiracy was still causing *ongoing* harm" at the time of that filing. (Pl. Reply 34). Therefore, they argued, the use of the phrase "through the present" in the Amended Complaint was consistent with the proposed end date in the Motion (*i.e.*, the harm was ongoing at the time the Amended Complaint was filed and continued through the date of the filing of the Motion). (*Id.*).

As a threshold matter, "[i]t is well-established that a certifying court 'is not bound by the class definition proposed in the complaint.'" *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 210 (S.D.N.Y. 2018). While this concept is typically cited in support of narrowing, rather than expanding, a proposed class definition, courts in this District have demonstrated that it is not "categorically improper" to expand a class definition "beyond that which was proposed in the complaint[.]" *Id.* at 210-11 (collecting cases). For example, in *Menking*, the plaintiff first proposed a citywide class in

50

her complaint and later proposed a statewide class in her motion for class certification. *Menking ex rel. Menking* v. *Daines*, 287 F.R.D. 174, 181 (S.D.N.Y. 2012). The court ultimately concluded that the larger, statewide class definition was proper, after ensuring that such a definition met the requirements of the Rule 23(a). *Id.*

Further, there is no specific point in a case's life cycle that courts in this District use consistently as the end date for a class period. *See, e.g.*, *Decastro* v. *City of New York*, No. 16 Civ. 3850 (RA), 2019 WL 4509027, at *7 (S.D.N.Y. Sept. 19, 2019) (selecting the date the complaint was filed as the end date for the class period); *Balverde* v. *Lunella Ristorante, Inc.*, No. 15 Civ. 5518 (ER), 2017 WL 1954934, at *5, 12 (S.D.N.Y. May 10, 2017) (certifying a class "through the present," the date of the decision on class certification); *Hart* v. *Rick's NY Cabaret Int'l, Inc.*, No. 09 Civ. 3043 (PAE), 2013 WL 11272536, at *5-6 (S.D.N.Y. Nov. 18, 2013) (modifying the class period end date from the date of "the entry of judgment in this case" to the date on which fact discovery closed); *Ansoumana* v. *Gristede's Operating Corp.*, 201 F.R.D. 81, 85 n.2 (S.D.N.Y. 2001) (considering the end date proposed in the complaint, namely the date of entry of judgment, and the end date proposed in the certification motion, namely the date of the filing of the complaint, and fixing the end date as the date of the decision of the class certification motion). But though they may differ in the date selected, courts do recognize that a definite end date is advantageous, as it allows for ascertainability of class members, *see Decastro*, 2019 WL 4509027, at *7, and affords putative class members a better

understanding of whether their interests will be represented in the pending lawsuit, *see Rick's NY Cabaret Int'l, Inc.*, 2013 WL 11272536, at *5-6.

As discussed above, Judge Cave ultimately recommended that Plaintiffs' proposed class period be rejected in part, and that this Court set a class period of January 1, 2012, to August 16, 2017, the date of the initial complaint. (Report 69). Plaintiffs, understandably, object to the proposed end date and argue that the Court should modify the Report to extend the class period to run until *at least* November 17, 2017, the date that the Amended Complaint was filed, or December 31, 2017, the date up to which Defendants have already produced transactional data. (Pl. Obj. 16-17).

"[C]onsistent with the certifying court's broad discretion over class definition[,]" *Namenda*, 331 F. Supp. 3d at 212, the Court sets a Class Period of January 1, 2012, to November 17, 2017, the date of the Amended Complaint. The Court selects November 17, 2017, because the Amended Complaint is the operative complaint in this matter, and because the evidence presented by Plaintiffs extends throughout that period.

The remainder of Plaintiffs' arguments pertain to whether Plaintiffs may seek (i) damages arising after the end of the Class Period and (ii) additional productions relevant to post 2017-damages. (Pl. Obj. 3-16). The Court notes that in antitrust cases, provable damages can include *future* damages. *See Zenith Radio Corp.* v. *Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971) ("If a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages

52

incurred by that date *and all provable damages that will flow in the future from the acts of the conspirators on that date*[,]" unless the fact of their accrual of "is speculative or their amount and nature unprovable." (emphasis added)).  In other words, the certified Class members, who took part in the requisite number of stock loan transactions between January 1, 2012, and November 17, 2017, could seek to prove damages that flow from acts conducted by the conspirators during the Class Period.

But, as the Report stated, fact discovery has closed in this case.  (Report 68 (citing Dkt. #298 (Fourth Amended Case Management Plan) (stating that "all fact discovery" was to be completed by October 16, 2020))).  The Report also correctly pointed out that "good cause" would be required to amend the Fourth Amended Case Management Plan, which governs discovery in this case.  (*Id.*).  *See also* Fed. R. Civ. P. 16(b) (providing that scheduling orders, like the Fourth Amended Case Management Plan, shall not be modified except upon a showing of "good cause" and by leave of the district judge)); *cf. Sacerdote* v. *New York Univ.*, 9 F.4th 95, 116 (2d Cir. 2021) ("District courts wishing to evaluate motions for leave to amend under Rule 16 after a particular date need only write their scheduling orders consistent with that intent, and state that no amendment will be permitted after that date in order to trigger the Rule 16 standard.").  The Court declines, in ruling on a class certification motion, to reach the question of whether supplemental production of transactional data is permissible in this case to prove damages.  To the extent that Plaintiffs wish to

seek such supplemental productions to update damages calculations, Plaintiffs will be required to do so through a separate motion to the Court.

## CONCLUSION

For the foregoing reasons, Defendants' objections to the Report are OVERRULED and Plaintiffs' Motion is GRANTED IN PART and DENIED IN PART. Plaintiffs' objection to the Report regarding the Class Period is OVERRULED IN PART. The Court certifies the Class, in the form recommended by Judge Cave, except that the Class Period shall be January 1, 2012, through November 17, 2017. The Clerk of Court is directed to terminate the motion pending at docket entry 468. The Clerk of Court is further directed to modify the caption as discussed *supra*, at note 6.

The Court extends its appreciation to Judge Cave for her meticulous Report. The parties remaining in this litigation are directed to submit a joint letter to this Court on or before **January 6, 2025**, advising the Court as to how they wish to proceed.

SO ORDERED.

Dated:      December 6, 2024
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge

54